**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Matthew M. Loker, Esq. (279939)
ml@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone:   (800) 400-6808
Facsimile:    (800) 520-5523

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Todd M. Friedman, Esq. (216752)
tfriedman@toddflaw.com
Adrian R. Bacon, Esq. (280332)
abacon@toddflaw.com
21550 Oxnard Street, Suite 780
Woodland Hills, CA 90212
Telephone:   (877) 206-4741
Facsimile:    (866) 633-0228

[ADDITIONAL PLAINTIFFS' COUNSEL ON SIGNATORY LINE]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN MCCURLEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br>v.<br><br>ROYAL SEAS CRUISES, INC.,<br><br>Defendant. | **Case No.:** 17-cv-986 BAS (AGS)<br>*consolidated with*<br>17-cv-1988 AJB (AGS)<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**HON. CYNTHIA A BASHANT** |
| DAN DEFOREST, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br>v.<br><br>ROYAL SEAS CRUISES, INC.,<br><br>Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................1

II. PROCEDURAL BACKGROUND ...........................................4

III. FACTUAL BASIS FOR CLASS CERTIFICATION.................4

   A. Royal Seas Cruises.........................................................4

   B. Prospects DM Manufactured Consent ...........................6

   C. Plaintiffs Dan Deforest and John McCurley ..................9

   D. Scope Of The Class And Class Definition ...................10

IV. THE TELEPHONE CONSUMER PROTECTION ACT .........11

V. RULE 23 STANDARDS AND CLASS CERTIFICATION ANALYSIS ....13

   A. The Proposed Class Is Adequately Defined And Ascertainable ...............14

   B. Numerosity .................................................................15

   C. Commonality ..............................................................16

   D. Typicality ...................................................................18

   E. Adequacy ....................................................................20

   F. Hybrid Class Certification Under Rules 23(b)(2) and (b)(3) Should Be Granted.........................................................21

     1. Rule 23(b)(2) .........................................................21

     2. Rule 23(b)(3) .........................................................22

       a. A Class Action Is Superior To Numerous Individual Actions .............24

VI. CONCLUSION .................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) .............22

*Abels v. JBC Legal Group, P.C.*, 227 F.R.D. 541 (N.D. Cal. 2005) ........................27

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................27

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. Cal. 2001)..............................................23

*Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543 (7th Cir. 2009).15

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D.Ill.2014)..........5

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) .............................18

*Bruce v. Christian*, 113 F.R.D. 554 (S.D.N.Y. 1986)................................................19

*Caldera v. American Medical Collection Agency*, 320 F.R.D. 513 (C.D. Cal. 2017) ........................................................................................................................22

*Califano v. Yamaki*, 442 U.S. 682 (1979) ................................................................17

*Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016) .............................................17

*CE Design Ltd. V. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009)..27

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)..................................................17

*Elliott v ITT Corp.*, 150 F.R.D. 569 (N.D. Ill. 1992) ................................................18

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ............... 20, 27

*Ellison v. Steven Madden*, LTD, 11-CV-5935-PSG (AGRx) (C.D. Cal. Sept. 25, 2012) .......................................................................................................................21

*Franklin v. City of Chicago*, 102 F.R.D. 944 (N.D. Ill. 1984) ................................21

*G.M. Sign, Inc. v. Group C Communs., Inc.*, 2010 U.S. Dist. LEXIS 17843 (N.D. Ill. Feb. 25, 2010) ...................................................................................................29

*Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3rd Cir. 2011)....................................25

*General Telephone Co. of Southwest v. Falcon*, 457 U.S 147 (1982) .....................17

*General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ..............................20

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)............................................................8

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988) .................. 20, 24, 27, 29

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)...................... 17, 22, 24

*Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596 (N.D. Ill. Feb. 7, 2008) ....................................................................................................................23

*Holtzman v. Turza*, 2009 U.S. Dist. LEXIS 95620, (N.D. Ill. Oct. 14, 2009).........23

*In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150 (N.D. Cal. 1991) ........................18

*Kevin Amini, et al. v. Heart Savers, LLC*, 2016 WL 10621698 (C.D. Cal. Oct. 17, 2016) ....................................................................................................................22

*Lee v. Stonebridge Life Ins. Co.,* 289 F.R.D. 292 (N.D. Cal. 2013)........................18

*Lemieux v. Schwan's Home Serv.*, 2013 U.S. Dist. LEXIS 127032 (S.D. Cal. Sept. 5, 2013) ........................................................................................................... 18, 21

*Los Angeles Lakers, Inc. v. Federal Insurance Company*, 869 F.3d 795 (9th Cir. 2017) ......................................................................................................................25

*Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228 (C.D. Cal. 2018) ...........................22

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012)..............27

*Meyer v. Portfolio Recovery Associates, LLC*, 2012 WL 4840814 (9th Cir. Oct. 12, 2012) ......................................................................................................... 18, 22, 23

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012) ............................................7

*Montgomery v. Rumsfield*, 572 F.2d 250 (9th Cir. 1978).........................................17

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. N.Y. 2002)...........................27

*Moreno v. Autozone, Inc.*, 251 F.R.D. 417 (N.D. Cal. 2008)...................................18

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006)..........................29

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................8

*Ritchie v. Van Ru Credit Corp.*, 2014 U.S. Dist. LEXIS 31934 (D. Ariz. Mar. 12, 2014) ......................................................................................................................21

*Santillan v. Ashcroft*, 2004 U.S. Dist. LEXIS 20824 (N.D. Cal. Oct. 12, 2004)........18

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)......................16

*Schwartz v. Upper Deck Co.*, 183 F.R.D. 672 (S.D. Cal. 1999) ................................18

*St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 2007 U.S. Dist. LEXIS 11650
(W.D. Wash. Feb. 16, 2007) ...............................................................................7

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ......................................... 19, 24

*Stemple v. QC Holdings, Inc.*, 2014 WL 4409817 (S.D. Cal. Sept. 5, 2014).. 5, 20,
22

*Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*,
247 F.R.D. 98 (C.D. Cal. 2007) .........................................................................17

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ..................... 27, 28

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017) ...........5

*Wagner v. Nutrasweet Co.*, 95 F.3d 527 (7th Cir. Ill. 1996) ...................................23

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)....................... 17, 20, 21, 26

*Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223 (C.D. Cal. 2003).......29

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) .............27

*Yoshioka v. Charles Schwab Corp.*, 2011 U.S. Dist. LEXIS 147483 (N.D. Cal. Dec.
22, 2011) ...................................................................................... 25, 26

**Statutes**

Telephone Consumer Protection Act, 47 U.S.C. § 227 et. seq. .................... passim

**Rules**

Fed. R. Civ. P. 23........................................................................... passim

**Treatises**

5 Jeremy C. Moore, Moore's Fed. Prac. (3rd Ed. 2001) ...........................................18

C. Wright, A. Miller & M. Kane, *Federal Prac. & Proc. Civil 2d* (1986) ...... 17, 18

H. Newberg, *Newberg on Class Actions* (1st Ed. 1977)...........................................23

**Regulations**

47 C.F.R. §§ 64.1200 ................................................................................16

In the Matter of The Joint Petition Filed by Dish Network, LLC, et al., CG Docket

No. 11-50 (FCC 13-54), 28 FCC Rcd 6574 (2013) ..............................................16

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3

4

5

> "[D]eclining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct."

6

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D.Ill.2014).

7

8

> "Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof."

9

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

10

11

12

13

14

15

16

> "In [*Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, (9th Cir.2012)], the Ninth Circuit rejected the defendant's arguments that individualized issues of consent should preclude a finding of typicality or commonality because some debtors might have agreed to be contacted at any telephone number, since the defendant failed to point to a single case where consent was given. *Id*. at 1042. Similarly, '[d]efendants' speculation that customers may have given their express consent to receive text message advertising is not sufficient to defeat class certification.' *Agne v. Papa John's Intern.*, Inc., 286 F.R.D. 559, 566 (W.D.Wash.2012).

17

*Stemple v. QC Holdings, Inc.*, 2014 WL 4409817 *7 (S.D. Cal. Sept. 5, 2014).

18

19

20

21

22

23

24

25

26

27

This case epitomizes why class actions are so necessary to protecting consumers' rights, while simultaneously reinforcing the importance of why prior express consent in Telephone Consumer Protection Act cases must be treated strictly as an affirmative defense.  Defendant Royal Seas Cruises, Inc. ("Royal Seas") and its third party lead generator Prospects, DM, Inc. ("Prospects DM") have jointly called consumers over 630 million times in the past two years using a prerecorded voice to solicit Royal Seas' services.  Miraculously, Royal Seas takes the position that it had prior express *written* consent to call the entire United States twice over to sell its services to these individuals, but it bases this precarious position on the sole fact that Prospects DM signed a contract with Royal Seas

28

promising that they would only call people for Royal Seas who gave such consent.

Royal Seas implemented no verification procedures to perform any TCPA compliance diligence whatsoever on whether the sources used by their agent to generate consent were actually legitimately being used to do so, and it admitted in sworn testimony of its Rule 30(b)(6) representative that no such measures were in place and that the company has no idea whether the methods used were sound or manufactured. They most assuredly were not sound, as is demonstrable by Plaintiffs' experts, data produced by Prospects DM and Royal Seas, as well as by use of common sense observation. One need only ask themselves how a website with no Alexa ranking,[1] no backlinks, no search engine visibility, and no other web presence, and which was simply comprised of a series of blank data boxes asking for contact information could somehow drive hundreds of thousands of consumers to willingly give up their private information so that they could be provided with nothing in return except the privilege of being intrusively robodialed by a telemarketer. Defendant's position makes absolutely no sense,[2] for three reasons: 1) 99.5% of the calls placed have no verifiable source from which the phone number were gathered, 2) of the remaining .5% of the calls, the websites used to supposedly gather these phone numbers are not visible on the internet and could not under any circumstances have generated anywhere close to the number of leads represented in the data, and 3) the "consent data" contains numerous indications that scripts were used to manufacture "consent" by taking data from another

---

[1] Alexa is an internet website ranking service based on popularity. Having no ranking means there are tens of millions of other websites that generate more visits. To put this into context, an average single location California strip mall taco shop's website (for example http://calitacos.com/ ) has an Alexa ranking of about 3 million, as can be verified here - https://www.alexa.com/siteinfo/calitacos.com.

[2] The only explanation for this, according to Plaintiff's expert Wesley Weeks, is that somebody was using scripts to automatically enter data from another existing database into these websites to make it appear that all of these people consented to be robodialed - a shocking case of fraudulently-manufactured consent.

database source and plugging it into these websites.[3]

Royal Seas channeled the spirit of Pontius Pilot throughout this charade, fielding millions of calls from Prospects DM, while turning a blind eye and completely washing its hands of their patently obvious misdeeds and the bogus "consent" generation websites they operated. No doubt Royal Seas will point to some data produced by Prospects DM and claim that there are individualized issues of consent, but this is a farce. There is no consent. The data is unreliable, and these websites are merely fronts by their operators used to profit by providing a false artifice of legal compliance, so that Royal Seas could attempt to insulate itself from liability, telemarket to the entire country at will, and try to get away with it. Royal Seas cannot meet its burden of proving that any of this "consent" was authentic, because what little consent data exists is so pervasively tainted by manipulation. This Honorable Court should not be enticed by Defendant's smoke and mirrors and should send a strong message to Defendant and telemarketers everywhere that manufacturing consumer consent will not be rewarded.

The TCPA is "aimed at protecting recipients from the intrusion of receiving unwanted communications." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 2007 WL 564075, *4 (W.D. Wash. Feb. 16, 2007). Indeed, the U.S. Supreme Court has noted that consumers are outraged over the proliferation of automated telephone calls that are intrusive, nuisance calls, found to be an invasion of privacy by Congress. *See Mims v. Arrow Fin. Servs. LLC,* 132 S. Ct. 740 (2012). Cold calling consumers with a prerecorded voice to solicit their business is exactly the type of conduct that the TCPA was designed to prohibit. Trying to cover it up by manufacturing prior express consent makes this conduct even more deplorable.

This putative class action centers on a few simple allegations which, if found to

---

[3] Data produced in discovery reveals that thousands of consumers across the country somehow used the same IP address to provide consent to these sites, a clear indication that the data has been fraudulently manipulated and entered into the websites from the same location to make it appear these individuals gave consent.

be true, constitute numerous violations of the TCPA.   John McCurley and Dan Deforest ("Plaintiffs") allege that Royal Seas hired Prospects DM to robocall millions of consumers using a prerecorded voice to sell its products, and that Prospects DM did so without consumers' prior express consent in violation of the TCPA.  Claims under the TCPA, such as the ones in this case, make ideal class actions because the putative class members suffer the same injury in the same manner. Plaintiffs move to certify a nationwide TCPA class action against Defendant and submit that the requirements of Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) are satisfied.

## II.    PROCEDURAL BACKGROUND

Plaintiff John McCurley filed his case on May 12, 2018.  Shortly thereafter, Plaintiff Dan Deforest filed a separate action on June 7, 2017.  Plaintiffs thereafter agreed to consolidate the matters on December 4, 2017.  Dkt. No. 28.  Plaintiffs filed a consolidated complaint on December 20, 2017.  Dkt. No. 31.  Defendant Answered on January 8, 2018.  Dkt. No. 32.  Plaintiffs served written discovery on Royal Seas as well as third party Prospects DM, to which both companies responded.  Plaintiffs took the deposition of Defendant's Rule 30(b)(6) representative, and Defendant took the depositions of both Plaintiffs.  The Court granted an extension to July 30, 2018 for Plaintiffs to file their motion for class certification.  Dkt. No. 46.

## III.   FACTUAL BASIS FOR CLASS CERTIFICATION

### A.    Royal Seas Cruises

Defendant is a Florida corporation which operates a cruise line, owning multiple cruise ships and offering vacation packages in the Bahamas.  In order to market these services, Defendant hired Prospects DM in October 2016, to provide telemarketing services, primarily lead generation through automated robocalls placed using prerecorded voice technology.  Declaration of Todd M. Friedman ("Friedman Decl.") Ex B.  Defendant and Prospects DM entered into a contract by which Prospects DM would provide these services as part of Royal Seas' inbound transfer call program for a fee, which was calculated based on the number of calls

placed which resulted in a live transfer.  Friedman Decl. Ex A, Deposition of Jennifer Poole ("Poole Depo.") at 12:9-16, 13:5-25, and Ex. B.

Pursuant to the contract, Prospects DM places the calls on behalf of Royal Seas.  Poole Depo. at 18:2-19:3.  The calls are placed using an automated dialer with a prerecorded voice, the language and script for which is approved by Royal Seas. *Id*. at 22:17-25:17, and Ex. B.  Once a call is placed by Prospects DM, a consumer is greeted with a prerecorded voice using a "press one" IVR, which allows them to be transferred to a Prospects DM agent.  The Prospects DM agent will then ask a series of scripted questions to the consumer over the course of at least 60 seconds, to gauge their interest and "qualify" the lead before transferring to a live representative of Royal Seas.  *Id*. at 44:4-48:10 and Ex B.  Prospects DM is paid per "Qualified Exit Read Transfer" which is someone who is qualified by Prospects DM, is transferred to Royal Seas and who lasts on the line with Royal Seas for at least 60 seconds. *Id*. at 48:10-50:4, Ex B ¶ 4.  When an incoming call is transferred from Prospects DM to Royal Seas, Royal Seas electronically logs the call in its database, including the phone number called, and any consumer contact information available such as name and address of the consumer.  *Id*. at 12:9-16, 19:24-21:5 and 35:2-41:21.  Royal Seas produced this data in Excel format to Plaintiffs.

Prospects DM agreed, as a condition of its contract with Royal Seas, to only call consumers in compliance with the Telephone Consumer Protection Act, however there is no contractual provision envisioning any form of compliance oversight by Royal Seas.  *Id*. at Ex B.  Indeed, as testified by Royal Seas' Rule 30b(6) witness, the only compliance oversight that Royal Seas ever conducted was to generally approve of standardized boilerplate language that Prospects DM said it would put on opt in websites that it claimed it would set up in order to gather consent from consumers.  *Id*. Ex A at 22:17-23:9.  Royal Seas washed its hands of all compliance by placing sole responsibility of staying up to date on the law and ensuring compliance on Prospects DM.  *Id*. at 22:17-23:9 and 50:21-53:8.  It's only

form of cross checking whether consumers provided consent to be called is to look at the data of the phone number that was dialed by DM Prospects and match that with the phone number of consumers who end up becoming customers and making a purchase from Royal Seas to see if there is a match, which in fact verifies nothing at all and is meaningless information. *Id*. and Ex B.

## B. Prospects DM Manufactured Consent

Royal Seas has no evidence whatsoever that even a single consumer consented to be robocalled by its agent, and it blindly relied on Prospects DM's representation that it would acquire such consent before placing calls. Friedman Decl. Ex A at 34:20-25, 42:4-44:1. Prospects DM produced records of over 630 million phone calls it placed on behalf of Royal Seas Cruises, comprised of over 53 million unique phone numbers (class members). Declaration of Wesley Weeks 1 ¶ 16.[4] The database contains information pertaining to the consumer name, phone number, and in some cases, address and email address. A small fraction of the data (.5%) shows a website affiliated with the consumer's phone number. The rest contain no meaningful information regarding the source that the phone number came from. Weeks 1 ¶ 2. On July 25, 2018,[5] Royal Seas Cruises produced a second dataset, in the form of four Excel Spreadsheets, which contained over 2 million entries, which included the name of the consumer, phone number, address, in some instances a website, and an IP address. Weeks 1 ¶ 32-44.

Plaintiff's expert Wesley Weeks thoroughly analyzed several of the websites, including the websites that Prospects DM's data associated with Plaintiffs' phone numbers, as well as both the data produced by Prospects DM, and data produced by Royal Seas. His findings were absolutely shocking and definitively prove that consent data for the leads being called by Prospects DM was manufactured. The

---

[4] Mr. weeks submits two reports contemporaneously herewith, the first of which, entitled "Report of Wesley Weeks" is referred to herein as "Weeks 1" and the second of which entitled "RE Lead Generation Sites" is referred to herein as "Weeks 2."

[5] An obvious act of gamesmanship to produce this 5 days before this brief was due.

evidence of such can be broken down into three categories:

### 1. *99.5% of the calls placed have no verifiable source from which the phone numbers were allegedly gathered.*

- 99.5% of the data has no website associated with the source of "consent," including entries for Plaintiffs, making it impossible to know whether any consent was legitimate. Weeks 1 ¶ 2.
- If Prospects DM were legitimately generating leads, inconsistencies would not exist, because the data would be complete. Weeks 1 and 2 generally

### 2. *Of the remaining .5% of the calls, the websites identified could not under any circumstances have generated the leads represented in the data*

- Of those websites which were identified in .5% of the call data, the majority had extremely high or even no Alexa ranking,[6] meaning that the volume of web traffic was incredibly low or non-existent. Weeks 1 ¶¶ 3-4, 20-27, 46-53, 66; Weeks 2 ¶¶ 7, 30, 32, 39, 50, 55, 58, 64, 67, 75, 80.
- The websites are of low quality and complexity, and contain very little actual information or benefit for their related topics, as if each were created in less than a day. Weeks 2 ¶ 16, 44.
- Websites generally have four ways that a consumer can reach them: by direct link (i.e. typing in the URL), by backlink (hyperlink from another website), social media, or search engine (the most prevalent). Weeks 2 ¶ 9-12.
- None of the websites have been search engine optimized and do not place high enough in search results to generate organic visits. Weeks 2 ¶¶ 10, 78, 83.
- The sites do not have significant backlinks to provide traffic. Weeks 1 ¶ 49, ; Weeks 2 ¶¶ 31, 36, 40, 56, 65, 76, 78, 83, Ex B.
- The sites are not generating traffic from paid advertising. Weeks 1 ¶ 50; Weeks 2 ¶¶ 9, 25-26, 78.
- Most of the traffic is through direct links, which require prior knowledge by a consumer of the exact domain URL, which is highly unlikely unless the URL was being advertised through TV, radio or print media. Given the costs associated with these forms of advertisement, the customer acquisition costs would not have been profitable under the Royal Seas contract to pay to drive consumers to the sites using those methods. Absent these measures, such a phenomenon is "statistically impossible." Weeks 2 ¶ 9, 22-81.

---

[6] Alexa global traffic rank is a measure of how a website is doing relative to all other sites on the web, calculated by combining a site's estimated average of daily unique visitors and its estimated number of page views.

- The industry-median online personal information conversion rate is 2.35%, meaning if there are 10,000 visitors to a website, on average, 235 of them will provide personal information.  The websites at issue would likely have lower expected conversion rates due to their low quality content.  Weeks 2 ¶13-14.
- The data reflects multiple-times more people supposedly providing their personal information, than had ever even visited these websites.  For instance, the data includes a website 123freetravel.com, which is associated with 15,397 leads, yet that website has no online visibility, and no Alexa ranking, meaning it received less than 10 visitors a day.  Even assuming 10 visits a day, this would mean that the website had a 1,710% conversion rate, i.e. that 17.1 times as many people entered in their "consent" information than actually visited the website, which is of course impossible.  Industry conversion rate average is 2.35%, which means 727 times more people's personal information was present in the data than even the most generous set of assumptions would feasibly support actually organically and legitimately provided any consent.  DiabetesHealth.info shows a 32,000% conversion rate.  This is the rule, not the exception throughout the data.  Weeks 1 ¶ 20-27, 52-56.
- None of the websites reviewed by Plaintiff's expert demonstrated typical usage patterns.  For instance, there are gaps where no leads are generated in certain months, on certain days, and/or times of the day.  Weeks 1 ¶¶ 52-63; Weeks 2 ¶¶ 79-83
- Web traffic shows short-lived direct access spikes, which are consistent with fraudulent data entries being made, and inconsistent with expected organic consumer search patterns.  Weeks 2 ¶ 27, 37, 63 78-83.
- Traffic spikes between the various sites with common ownership seem to have significant overlap in traffic pattern spikes for both sites, indicating fraudulent use of scripts to manufacture consent.  Weeks 2 ¶ 81.

### 3.  *<u>The websites and data reflect that the "consent" was manufactured</u>*

- The websites contain false information, such as PinPointSchool.com boasting that it helped nearly 200,000 students find a school, employs 200 people and generates 30,000 leads per month, which would be impossible since the website traffic is limited based on online web tool analysis, and the owner of the website was only a legal business entity for two months.  Weeks 1 ¶ 41.
- Steps have been taken by the operators of the websites to hide or mask the identity of the operators, with a great deal of effort.  They are owned by companies in Clearwater Florida, the same geographical area as Royal Seas.  These are red flags that leads are of dubious authenticity.  Weeks 2 ¶ 43, 82.
- IP address data relating to the same websites is often the same for hundreds

or even thousands of consumers.  For instance, getmysolarpower.com has no Alexa ranking, which means the number of people who visit the site is so negligible that it does not even register on Alexa.  However, "consent" data provided by Royal Seas shows that approximately 1,300 different consumers who were geographically dispersed throughout the country somehow all provided their "consent" through this website using the same IP address.  This is physically impossible due to the way IP addresses function, meaning the consent had to have been manufactured.  Weeks 1 ¶ 64  and Ex C.

- Lead information produced in discovery for the phone numbers associated with Plaintiffs provide completely different stories.  One document, shows Deforest's number came from myhealthcarauthority.com, while the call records database shows that Mr. Deforest's number was gathered from yourautohealthlifeinsurance.com, and even more mysteriously the "consent" data production produced on July 25, 2018, shows no website affiliated with the gathering of Mr. Deforest's information.  These sources correspond to an address in Powder Springs Georgia where Mr. Deforest never lived.  There are other inconsistencies in the data between different calls made to the named plaintiffs.  Weeks 1 ¶ 10-14, 28-44; Ex A, D and E.

## C.    Plaintiffs Dan Deforest and John McCurley

With regard to Plaintiffs, their facts are typical of other consumers.  Plaintiffs each received automated prerecorded voice calls to their cell phones marketing Royal Seas' products and services.  Deforest Decl. ¶¶ 3-4, 9; McCurley Decl. ¶¶ 3-7.  Plaintiffs never gave their prior express consent to receive such calls, and never visited the websites that Defendant contends they visited and provided consent.  Deforest Decl. ¶¶ 5-10; McCurley Decl. ¶¶ 8-30.[7]  On July 25, 2018, Defendant produced several Excel spreadsheets of additional "consent" data.  The data contains a different entry for Plaintiff Deforest, on a different date, with no associated website.  There is no entry in either data production reflecting the information

---

[7] Defendant produced a document purporting to show the source of where Prospects DM allegedly acquired Plaintiffs' phone numbers.  Plaintiff McCurley's phone number allegedly was pulled from a website diabeteshealth.info, and was associated with an individual named Jose Fernandez.  Mr. McCurley does not know anyone by that name.  Plaintiff Dan Deforest's phone number allegedly was pulled from a website myhealthcareauthority.com, and was associated with an address in Powder Springs, Georgia, where Mr. Deforest never lived.

produced by Defendant in Friedman Decl. Ex C.  Moreover, according to Mr. Weeks, neither of the websites reflected in Friedman Ex. C were capable of generating any significant amount of traffic to the sites, and yet the data shows hundreds of thousands of phone calls placed to tens of thousands of consumers who supposedly visited these sites and provided their information.  Weeks 1 ¶ 45-63.

### D.   Scope Of The Class And Class Definition

Plaintiffs can show that his situation here is not unique, and that many persons similarly situated received ATDS calls which used a prerecorded voice sent to their cell phones without prior express consent according to objective records in possession of known third party dialer companies.  Plaintiffs are in possession of over 630 million call records during the time frame of November 2016 to June 2018.  These calls were made to over 53 million unique numbers, with an estimated 38 million of those numbers being cellular phones.  Peters-Stasiewicz Decl. ¶¶ 16, 23, 35; Weeks 1 ¶ 16. In addition, Royal Seas produced evidence that 3,451,413 calls placed to 2,129,642 unique numbers were connected with a Royal Seas agent.  Friedman Decl. ¶ 8.  No proof of prior express consent has been provided for any of these phone calls. Therefore, a 47 U.S.C. § 227(b)(1)(A) (iii) Class is justified, consisting of:

Class:
All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018.

Transfer Subclass:
All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018, and whose call resulted in a Transfer to Royal Seas Cruises, Inc.

Excluded  from  the  Class  are  persons  called  for  emergency  purposes  and

Defendant's employees and agents. Based upon the allegations in the Complaint, evidence obtained thus far, and evidence that will likely be obtained through further discovery, class certification of Plaintiffs' TCPA claims is appropriate.

## IV.  THE TELEPHONE CONSUMER PROTECTION ACT

Congress enacted the TCPA in 1991 amidst an unprecedented increase in the volume of telemarketing calls to consumers in America, as the TCPA combats the threat to privacy being caused by the automated practices, stating it is unlawful: "(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system **or** an artificial or prerecorded voice...(iii) to any telephone number assigned to a ... cellular telephone service ..." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). It is also unlawful to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B). As the Seventh Circuit put it, there is a "right to be left alone under the TCPA." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 551 (7th Cir. 2009).

To demonstrate a TCPA violation, Plaintiffs need only show that Defendant (1) placed a call using an automatic telephone dialing system or an artificial or prerecorded voice; (2) to any telephone number (in the case of prerecorded voice) or any telephone number assigned to a cellular telephone service (in the case of an ATDS without a prerecorded voice); (3) without the prior express consent of the called parties. 47 U.S.C. § 227(b)(1)(A)(iii) and § 227(b)(1)(B). The TCPA sets statutory damages of $500 per negligent violation and $1,500 per willful or knowing violation, and provides for injunctive relief. 47 U.S.C. § 227(b)(3) (A-B).[8] The question of whether a dialing system qualifies as an ATDS focusses primarily on the capacity of the system. However, because the statute is written in the disjunctive

---

[8] A single call using an ATDS without prior express consent violates the TCPA. *Satterfield v. Simon & Schuster, Inc*. 569 F.3d at 946, 956 (9th Cir. 2009).

1  (key word: "or"), when a call is placed with a prerecorded voice, it is not required
2  to be placed with an ATDS.  47 U.S.C. § 227(b)(1)(A)(iii) and § 227(b)(1)(B).

3      The Ninth Circuit has defined "express consent" to mean "clearly and
4  unmistakably stated," *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 955 (9th
5  Cir. 2009).  Prior express consent is an affirmative defense for which the TCPA
6  defendant bears the burden of proof.  *Van Patten v. Vertical Fitness Group, LLC*,
7  847 F.3d 1037, 1044 (9th Cir. 2017).[9]  As a result, Defendant needs to show that
8  Plaintiff provided *written* clear and unmistakable intent to receive telemarketing
9  calls via an ATDS or artificial or prerecorded voice message.  Notably, Defendant
10 cannot demonstrate prior express consent for any of the class members under the
11 definition herein, because it lacks any knowledge about whether or not the phone
12 numbers called by Prospects DM were called with prior express consent, and
13 because the websites that Prospects DM's data suggests it was using were
14 demonstrably not being organically visited by any measurable number of
15 consumers, which means that that consent data was unquestionably being
16 manufactured, and that Defendant cannot meet its burden.

16      The only remaining question is whether Royal Seas is vicariously liable for
17 calls placed by Prospects DM, a merits issue.  The FCC held that an entity "may be
18 held vicariously liable under federal common law agency principles for a TCPA
19 violation by a third-party telemarketer."  In the Matter of The Joint Petition Filed
20 by Dish Network, LLC, et al., CG Docket No. 11-50 (FCC 13-54), 28 FCC Rcd
21 6574, 6582 ¶ 24 (2013) ("2013 FCC Ruling"). These include agency principles of

22 _____
[9] If a call "includes or introduces an advertisement" or "constitutes telemarketing,"
23 prior express consent must be *written.  See* 47 C.F.R. §§ 64.1200(a)(1)(2). The
24 regulation also defines "advertising" and "telemarketing." *See* 47 C.F.R. §§
64.1200(f)(1)(12).  An "advertisement" is "any material advertising the commercial
25 availability or quality of any property, goods, or services." Id.§ (f)(1).
26 "Telemarketing" is "the initiation of a telephone call or message for the purpose of
encouraging the purchase or rental of, or investment in, property, goods, or services,
27 which is transmitted to any person." *Id*. § (f)(12).

28

1   direct agency, apparent authority and ratification.   *Id*; *Campbell-Ewald Co. v.*
2   *Gomez*, 136 S.Ct. 663, 673 (2016).

## V.   RULE 23 STANDARDS AND CLASS CERTIFICATION ANALYSIS

4          Rule 23 governs the certification of class actions and has as main objectives
5   the efficient resolution of the claims or liabilities of many individuals in a single
6   action as well as the elimination of repetitious litigation and possibly inconsistent
7   adjudication. *Califano v. Yamaki*, 442 U.S. 682, 700-01 (1979); C. Wright, A. Miller
8   & M. Kane, *Federal Prac. & Proc. Civil 2d* at § 1754 (1986).  Courts are afforded
9   broad discretion in determining whether an action should be certified. *Montgomery*
10  *v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir. 1978).  Rule 23 outlines a two-step process
11  for determining whether class certification is appropriate.  First, Rule 23(a) sets forth
12  four conjunctive prerequisites that must be met for any class: (1) the class is so
13  numerous that joinder of all members is impracticable, (2) there are questions of law
14  or fact common to the class, (3) the claims or defenses of the representative parties
15  are typical of the claims or defenses of the class, and (4) the representative parties
16  will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a);[10]
17  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).   These
18  requirements are referred to as numerosity, commonality, typicality, and adequacy.
19  *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*, 247
20  F.R.D. 98, 105 (C.D. Cal. 2007).[11] Once subdivision (a) is satisfied, the party seeking

---

[10] A plaintiff must show compliance with the prerequisites of Rule 23 (a) under a rigorous analysis. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011). However, "[i]n determining the propriety of a class action, the question is not whether the plaintiff … ha[s] stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (emphasis added).  "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim…" *General Telephone Co. of Southwest v. Falcon*, 457 U.S 147, 160 (1982).

[11] Class actions are essential to enforce laws protecting consumers. Indeed, the Ninth Circuit recently affirmed preliminary approval of a TCPA injunctive relief class in

certification must demonstrate the action falls into one of three categories under Rule 23(b).  *See In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 153 (N.D. Cal. 1991).

### A. The Proposed Class Is Adequately Defined And Ascertainable

"Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed.'" *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999) (quoting *Elliott v ITT Corp.*, 150 F.R.D. 569, 573-74 (N.D. Ill. 1992)).[12]  The Ninth Circuit has recently held that in the context of a consumer class action, that plaintiffs not only do not have to identify class members as a prerequisite to meeting their burden under Rule 23, but also do not even have to present a feasible methodology for doing so, as manageability issues are best reserved post-certification. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 and 1132-33 (9th Cir. 2017) Class membership may be readily determined by objective criteria, namely, whether (i) Prospects DM used an ATDS with a prerecorded voice to (ii) place a call (iii) to the cellular telephone of (iv) an individual to whom they were trying to market Royal Seas Cruises services, (v)

---

*Meyer v. Portfolio Recovery Associates, LLC*, 2012 WL 4840814 (9th Cir. Oct. 12, 2012).  Other courts have recently certified similar TCPA class actions. *See Lemieux v. Schwan's Home Serv.*, 2013 U.S. Dist. LEXIS 127032 (S.D. Cal. Sept. 5, 2013); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013); *Stern v. DoCircle, Inc.*, 2014 WL 486262 (C.D. Cal. 2014).

[12] "A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." *Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal. 2008).  "[T]he identity of class members must be ascertainable by reference to objective criteria." 5 Jeremy C. Moore, Moore's Fed. Prac., § 23.21[1], p. 23-57 (3rd Ed. 2001).  A class may be certified even though the court cannot identify every potential member at the moment of certification. *See Santillan v. Ashcroft*, 2004 U.S. Dist. LEXIS 20824 (N.D. Cal. Oct. 12, 2004).  If "general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." 7A Wright, Miller & Kane, Federal Practice & Procedure, Civil 3d § 1760 at 118 (3 ed. 2005).

without prior express consent, and (vi) between November 14, 2016 to Present. Such objective information can be readily determined using records already in possession of Plaintiffs' experts.[13]   Plaintiffs are already in possession of the full outbound dial list data from Prospects DM, which includes name address and phone number of every member of the broad class, as well as data regarding the website or "consent" source associated with each data entry.   This data would allow Plaintiffs and/or The Honorable Court to certify a class of any group of individuals for which it was determined that consent data was unreliable.[14]

Thus, Plaintiffs have identified the general outlines of class membership, and it is administratively feasible for the parties to review documentation maintained by known third parties in electronic searchable format, (i.e., the outbound dial list data), which is a limited, basic inquiry made relatively simply through the use of technology.   Therefore, the class definition is adequately defined and the class members are clearly ascertainable according to objective criteria.

## B. Numerosity

Under Rule 23 (a), the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a) (1); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003).   There is no magic number that satisfies the test of impracticability of joinder and thus each case stands on its own particular facts. *Bruce v. Christian*, 113 F.R.D. 554, 556 (S.D.N.Y. 1986). "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer." *Stemple v. QC Holdings, Inc.*, 2014 WL 4409817 *4 (S.D. Cal. Sept. 5, 2014) (citing Celano v. Marriott Int'l, Inc., 242 F.R.D. 544, 549 (N.D.Cal.2007)).

Plaintiffs are in possession of records showing that Prospects DM placed over

---

[13] The amount of data in possession of Plaintiffs would allow a narrower class definition to be identified if The Honorable Court determined such act appropriate.
[14] Plaintiffs propose a class definition which scrubs the data for cell phones, and has retained Christina Peters-Stasiewicz as an expert to perform this function.

630 million calls to 53 million unique phone numbers, approximately 73% of which are cell phones, and can further demonstrate that the data produced by Prospects DM is entirely unreliable and manufactured with respect to any assertion that it evidences prior express consent.  See Generally - Weeks Declarations.  Moreover, the existence of a database of over 630 million phone calls, with numerous columns of data that can be filtered with relative ease, gives The Honorable Court and Plaintiffs flexibility to certify a narrower class if doing so is deemed appropriate. The number of class members far exceeds forty individuals and is so numerous that this action should be maintained as a class action because many separate, yet nearly identical, TCPA actions would be economically and judicially impracticable.

## C. Commonality

Rule 23(a)(2) requires there be at least one common question of law or fact to certify a class. A class has sufficient commonality "if there are questions of fact and law which are common to the class" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988) (quoting Fed. R. Civ. P. 23(a) (2)). Commonality focuses on whether certification will offer a more economical approach to resolving the underlying disputes than would individual litigation. *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982).  "Plaintiffs need not demonstrate that all questions are common to the class; [as there need only be]…'a common core of salient facts coupled with disparate legal remedies within the class' are present." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506 (N.D. Cal. 2012) (citing *Hanlon*, *supra*, *at* 1019-20).  Defendant engaged in a common course of conduct[15]

---

[15] Commonality requires a "common contention of such a nature that it is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes* , 131 S. Ct. at 2551.  Where questions of law involve "standardized conduct of the defendants towards members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement...is usually met."  *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984).  Class

towards Plaintiffs and the class members by hiring a lead generation company Prospects DM to robodial consumers with a prerecorded voice to market Royal Seas' cruise services. *Ritchie v. Van Ru Credit Corp.*, 2014 U.S. Dist. LEXIS 31934, *7 (D. Ariz. Mar. 12, 2014) ("There is complete identity of common factual and legal issues: the central question is whether Defendants violated the TCPA by calling putative class members.")

- There is one dialing company whose calls will be at issue in the damages phase: Prospects DM, a common issue;

- Class Members were called by a prerecorded voice, a common issue;

- The calls were all made to market Royal Seas' services;

- Whether Royal Seas is vicariously liable for these calls will be a single legal question that can be answered for all class members; and

- Royal Seas has no evidence that any of the calls were made with prior express written consent of any of the class members, since there is no reliable documented prior express consent, and since the websites used to supposedly gather consent were demonstrably used to manufacture consent for Plaintiffs and other class members.

The common questions of law and fact in this TCPA case include, but are not necessarily limited to: (1) whether Prospects DM placed ATDS (prerecorded voice) calls; (2) to the (cellular) telephones numbers; (3) of consumers; (4) without prior express consent[16] and whether (5) Royal Seas is vicariously liable for the calls.

---

certification is appropriate where the "classwide proceeding [will] generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2551.

[16] *See Lemieux*, 2013 U.S. Dist. LEXIS at *17-18 ("The Court finds there are question of law and fact common to the class, including: (1) whether Defendants used an ATDS or artificial/prerecorded voice, (2) to call (3) NutriSystem customers' cell phones, (3) for non-emergency purposes, and (4) without the customers' prior express consent."); *Ellison v. Steven Madden*, LTD, 11-CV-5935-PSG (AGRx) (C.D. Cal. Sept. 25, 2012) ("the material issue in the case, whether Defendant sent unsolicited, automated text message advertisements to class members, is a question that is

Very similar classes with virtually identical common issues were recently certified by Judge Selna in *Kevin Amini, et al. v. Heart Savers, LLC*, 2016 WL 10621698 ( C.D. Cal. Oct. 17, 2016), by Judge Marshall in *Caldera v. American Medical Collection Agency*, 320 F.R.D. 513 (C.D. Cal. 2017), by Judge Pregerson in *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228 (C.D. Cal. 2018), by Judge Guilford in *Stern v. DoCircle, Inc.*, 2014 WL 486262 (C.D. Cal. Jan. 29, 2014), by Judge Houston in *Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303, 308-309 (S.D. Cal. 2015), by This Honorable Court in *Stemple v. QC Holdings, Inc.*, Case No. 12–cv–01997–BAS(WVG) 2014 WL 4409817 (S.D. Cal. Sept. 5, 2014), and by the Ninth Circuit in *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. Cal. 2012).[17]  Since Plaintiffs' claim arises from Defendant's solicitation calling practices, as described above, nearly all of the issues of law and fact are common to the Class, and certifying this case as a class action will produce common answers sought by the parties, including Defendant.  Further discovery will permit Plaintiffs to determine exactly how many actionable calls were placed to unique cellular telephone numbers.  Commonality is easily satisfied.

### D. <u>Typicality</u>

Rule 23 (a)(3) requires that the claims of the representative parties be typical of the claims of the class.  The typicality requirement serves to "assure that the interest of the named representative aligns with the interests of the class."  *Hanon,* 976 F.2d at 508.   Typicality refers to the *nature* of the claim or defense of the class representative and not on facts surrounding the claim or defense.  *Id.* (Italics added).

---

common to the entire class. Therefore, the shared attributes of the claim would be the main focus of the litigation.").

[17] Certifying this case would reduce the burden on the courts that would arise from many separate, yet virtually identical TCPA claims; would avoid duplicate discovery requests; provide an efficient method for prompt resolution of the issue regarding the propriety of Defendant's conduct; and likely result in an expedient recovery for class members who would not have to seek individual legal representation once they were to become aware of their rights against Defendant.

A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [is] based on the same legal theory." H. Newberg, *Newberg on Class Actions* § 1115(b) (1st Ed. 1977).[18]

"[W]hen the commonality prong is satisfied under Rule 23 (a)(2), the typicality prong…generally follows suit." *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596 (N.D. Ill. Feb. 7, 2008) . Typicality "should be determined with reference to [the defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 534 (7th Cir. Ill. 1996). Typicality is established in a TCPA class where a "plaintiff brings the same TCPA claim that will be advanced by the class." *Holtzman v. Turza*, 2009 U.S. Dist. LEXIS 95620, *13 (N.D. Ill. Oct. 14, 2009).

Plaintiffs' TCPA claims are typical of those of the Class members. The harm suffered by Plaintiffs, the proposed class representatives, is identical to the harm suffered by the Class members, in that their statutory right to privacy (*see Meyer*, 696 F.3d at 951) was invaded by Defendant when its call center agent called their phones using an autodialer dialer (i.e., ATDS calls) without prior express consent, to try and sell them cruises. Further, this case is similar to *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. Cal. 2012) where the Ninth Circuit affirmed provisional class certification of an autodialed TCPA case where there was no prior express consent.

Each Class member claims statutory damages for invasion of a statutory right to privacy that resulted from Defendant's solicitation calls. Thus, there is no danger the named Plaintiffs will be preoccupied with a unique defense (*see Hanon*, 976 F.2d

---

[18] The burden imposed by the typicality requirement is not great. *See id.* at 1020. Typicality is met if the claims of each class member arise from the same "course of conduct" (*Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. Cal. 2001), and the defendant's liability turns on "similar legal argument" (*Id.* at 868.)) Typicality focuses on comparing plaintiffs' claims with those of the class. *Id.* at 868-69. "[T]he injuries [must] result from the same, injurious course of conduct." *Id.* at 869.

at 508.), as the only defense here is the defense that Royal Seas does not meet any of the thresholds for vicarious liability, which will be identically applied to all Class Members.[19]  Thus, the typicality requirement is also satisfied here.

### E. **Adequacy**

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a) (4); *Hanlon*, 150 F.3d at 1020.  The Court asks two questions: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Staton v. Boeing Co.*, 327 F.3d at 957; Fed. R. Civ. P. 23(g)(1)(B); *Yoshioka v. Charles Schwab Corp.*, 2011 U.S. Dist. LEXIS 147483, *18 (N.D. Cal. Dec. 22, 2011).

Counsel for Plaintiffs will fairly, responsibly, vigorously, and adequately represent the interests of the Class members whose statutory rights under the TCPA were violated by Defendant.  Friedman Decl., ¶¶ 3, 22-28; Swigart Decl. ¶¶ 9-15; Kazarounian Decl. ¶¶ 10-23; Loker Decl. ¶¶ 10-57.  Plaintiffs share the same interests of all Class members comprised of consumers who were all harmed in the same way by Defendant's solicitation calling practices.  Plaintiffs also understand the duties of acting as class representatives, including the responsibility to see that their legal counsel prosecute the case on behalf of the entire class, not just themselves.  Deforest Decl., ¶¶ 12-15; McCurley Decl ¶¶ 32-38

There are no known conflicts in this case (Friedman Decl., ¶ 28; Swigart Decl. ¶ 13; Kazarounian Decl. ¶ 20; Loker Decl. ¶ 54; Deforest Decl., ¶ 13; McCurley

---

[19] Defendant will argue that there are individualized issues of consent, but again, this is a fiction, because the database of Prospects DM is so riddled with demonstrable inaccuracy, incompleteness and manipulation that none of these records could satisfy Defendant's affirmative defense burden.  Even if they could, Defendant's position is that they had consent to call everyone, and Plaintiffs' position is that they had consent to call nobody, so a jury could decide easily one way or another whether the data was either manipulated or is reliable.  This too is a single factual issue.

Decl. ¶ 35), and it is highly unlikely that a conflict would exist, given the common practice of Defendant, fixed statutory damages, and requested injunctive relief. Plaintiffs haves retained competent class counsel experienced in TCPA litigation and class actions to represent the interests of the Class (Friedman Decl., ¶ 28; Swigart Decl. ¶ 13; Kazarounian Decl. ¶ 20; Loker Decl. ¶ 54; Deforest Decl., ¶ 13; McCurley Decl. ¶ 35) and are prepared to represent the class.  Deforest Decl., ¶¶ 12-15; McCurley Decl. ¶ 32-38.  The adequacy prerequisite has been satisfied.

### F.    Hybrid Class Certification Under Rules 23(b)(2) and (b)(3) Should Be Granted

Plaintiffs seek hybrid certification pursuant to FRCP 23(b)(2) and (b)(3).[20]

#### 1.    Rule 23(b)(2)

Certification under Rule 23(b)(2)[21] requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b).  Royal Seas acknowledged in sworn testimony that it blindly relies on Prospects DM to properly gather authentic prior express consent from consumers before calling them, and undertakes no compliance oversight measures for the lead generators that it employs to robocall consumers to sell Royal Seas' services. Prospect DM's data is undeniably riddled with obvious problems, ranging from thousands of different consumers' "consent" from the same website source somehow being provided by the same IP address, to the amount of consent being generated from a website exceeding by multiple factors the number of visitors that website would have even experienced during the time frames in question, to the vast majority of the consent data not being linked to a website at all, and thus

---

[20] The TCPA permits for injunctive relief.  *Los Angeles Lakers, Inc. v. Federal Insurance Company*, 869 F.3d 795, 810 (9th Cir. 2017); 47 U.S.C. § 227(b)(3).

[21] It is well established that Rule 23(b)(2) classes "need not meet the predominance and superiority requirements."  *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 263–64 (3rd Cir. 2011).

being meaningless and legally insufficient. *See Generally* Weeks 1 and 2. Moreover, how could Prospects DM have even gotten 53 million people to willingly, in writing, agree to get robodialed to sell them Royal Seas' products? The answer is that they couldn't. The house of cards falls with but a gentle breeze of inquiry.

Royal Seas should have known. There are too many red flags to even list in this brief. And yet, they buried their heads in the sand, and enjoyed the huge influx of business generated from these illegal marketing efforts, with willful ignorance. Plaintiffs take issue with this approach, and seek an injunction requiring more. Royal Seas should be prohibited from hiring robodialers altogether, or at the very least, ordered to implement much stricter compliance oversight protocols to prevent this sort of massive abuse in the future. An order requiring these very simple changes to Royal Seas' policies would resolve this deficiency in Defendant's TCPA policies and procedures. In *Yoshioka*, 2011 WL 6748984 at *6, the court explained, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (citing *Dukes*, 131 S. Ct. at 2557).[22] Therefore, class certification under Rule 23(b)(2) is necessary and appropriate here.

## 2.     Rule 23(b)(3)

Rule 23 (b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *Wolin v. Jaguar Land Rover N. Am.,*

---

[22] The *Yoshioka* Court found that plaintiffs satisfied the requirement because the requested relief, and the relief to be provided, would apply class-wide. *Id.* Plaintiffs' requested remedy is the appropriate remedy for a case under Rule 23(b)(2), which "applies only when a single injunction or declaratory judgment would provide relief to each member of the class" (*Dukes*, 131 S.Ct. at 2557), as it does here, based upon Royal Sea's policy of complicity permitting DM Prospects to violate the TCPA on its behalf.

*LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d at 1022 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). "Individual questions need not be absent." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). "Court[s] looks at common factual link[s] between all class members and the defendants for which the law provides a remedy." *Abels v. JBC Legal Group, P.C.*, 227 F.R.D. 541, 547 (N.D. Cal. 2005). "Implicit in…the predominance test is…that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "Generally, when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation."[23]

There can be absolutely no debate that cold calling people with an ATDS and using a prerecorded voice to broadcast such intrusive solicitation messages to people without permission is illegal as a matter of law. There are only two issues in this case, one legal and one factual. The singular legal issue in this case is whether Royal Seas is vicariously liable for the millions of illegal telemarketing calls placed to the general public by Prospects DM without consent.[24] The only

---

[23] *See CE Design Ltd. V. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (citing *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). Rule 23(b)(3) does not require that all issues of law and fact be subject to common proof, as even the rule itself recognizes that there may be some issues that are individualized. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) (recognizing that the predominance question is not one of scale; instead it is whether certification would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. N.Y. 2002).

[24] Plaintiff believes this can be proven in Plaintiff's favor as a matter of law as well. But this is a merits issue which can be determined at a later stage.

individual issue here is the identification of the Class members, which will be accomplished by a review of records already in possession of Plaintiffs. The predominance of common legal and factual questions is evidenced in this case by the nature of Plaintiffs' TCPA claims. Class Members, like Plaintiffs, were called by Royal Sea's through DM Prospects using an ATDS without prior express consent. The issues making up Plaintiff's claims are common to Class members, who have allegedly been injured in the same way and in virtually the same manner by Defendant's common practices. Through a class action, the Court may resolve important common questions to which all parties seek an answer, thus serving the policy goal of judicial economy as explained by the Ninth Circuit (*Valentino*, 97 F.3d at 1234).

Factually, the only dispute will be the integrity of Prospect DM's consent data, and whether it is even admissible evidence of prior express written consent, given the extraordinary unreliability and demonstrable fraud that pervade. As evidenced by the testimony of Plaintiff's expert Mr. Weeks, it is abundantly clear that Prospects DM was not acting above board, and was fabricating evidence of compliance. Defendant may dispute this, but it is a single factual question for a jury to decide. Moreover, the evidence used to dispute any affirmative defense of consent for Plaintiffs will be the same evidence used to dispute the defense for absent class members. There simply are no individualized issues. Therefore, the common issues predominate in this action, and certification under Rule 23(b)(3) is appropriate.

### a.  A Class Action Is Superior To Numerous Individual Actions

"Class actions were designed for these types of claims." *G.M. Sign, Inc. v. Group C Communs., Inc.*, 2010 U.S. Dist. LEXIS 17843, *16 (N.D. Ill. Feb. 25, 2010) (quoting *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("'Rule 23 (b) was designed for situations … in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate.'")). This inquiry calls for a comparison of alternative methods for resolution of the

dispute (*Hanlon*, 150 F.3d at 1023), such as the TCPA claims common to the Class.

Certification here is superior to numerous individual TCPA actions and serves the efficient resolution of Defendant's alleged violations of the TCPA, which implicates the rights of hundreds of thousands, if not millions of persons throughout the nation, and will provide no difficulty in allocating fixed statutory damages under 47 U.S.C. § 227(b)(3)(B).[25]  The Class members are individual consumers who are not likely able to successfully maintain a TCPA action against Defendant where the maximum statutory damages per negligent violation of the TCPA is only $500, or $1,500 for a willful violation.  A class action is a superior means of resolution.

## VI.    CONCLUSION

Defendant cannot be permitted to wash its hands of the millions of illegal cold calls placed with a dialer to consumers to sell its goods, simply due to the calling entity having promised it would only place calls when it had consent.  Royal Seas undertook absolutely no efforts whatsoever to confirm the veracity of any methods of gathering consent.  The findings of Mr. Weeks, coupled with common sense intuition and the evidence of the case make it clear that consent was being manufactured, and that Royal Seas should have known.  Royal Seas needs to be held accountable monetarily (Rule 23(b)(3)), and needs to be forced (by injunction) to engage in meaningful compliance oversight with its third party dialers in order to prevent this sort of abuse from continuing further (Rule 23(b)(2)), so Class Members' privacy rights are not further invaded.  Nothing short will do.  For the foregoing reasons, Plaintiffs respectfully request the Court grant the Motion for Class Certification under Rule 23 (b)(2) and (b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' attorneys as Class Counsel.

---

[25] If multiple TCPA suits were filed, there would be a risk of inconsistent results arising from injunctive relief regarding the numerous consumers affected by Defendant's solicitation calling practices. *See e.g.*, *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 236-37 (C.D. Cal. 2003) ("Where common questions 'predominate,' a class action can…avoid inconsistent outcomes…").

Dated**:** July 30th, 2018          **Law Offices of Todd M. Friedman, P.C.**

                                   By: /s/ Todd M. Friedman
                                       Todd M. Friedman, Esq.
                                       Adrian R. Bacon, Esq.
                                       Attorneys for Plaintiff


**[ADDITIONAL COUNSEL FOR PLAINTIFFS]**

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Ste 101
San Diego, CA 92108
Telephone:   (619) 233-7770
Facsimile:   (619) 297-1022

# CERTIFICATE OF SERVICE

Filed electronically on this 30th day of July, 2018, with:

United States District Court CM/ECF system

Notification sent electronically via the Court's ECF system to:

Honorable Cynthia A Bashant
United States District Court
Southern District of California

And All Counsel of Record As Recorded On The Electronic Service List.


This 30th day of July, 2018

s/Todd M. Friedman, Esq.
Todd M. Friedman