**GREENSPOON MARDER LLP**
Richard W. Epstein, Esq. (Admitted *Pro Hac Vice*)
richard.epstein@gmlaw.com
Jeffrey A. Backman, Esq. (Admitted *Pro Hac Vice*)
jeffrey.backman@gmlaw.com
200 E. Broward Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel: 954.527.2427
Fax: 954.333.4027

Attorneys for Defendant Royal Seas Cruises, Inc.
[additional Defendant's counsel on signatory line]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John McCurley, Individually and and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>Royal Seas Cruises, Inc.,<br><br>          Defendant.<br>---------------------------------------------<br>Dan DeForest, Individually and and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>Royal Seas Cruises, Inc.,<br><br>          Defendant. | Case No.:  3:17-cv-01988-AJB-AGS<br><br>*consolidated with*<br><br>Case No.:  3:17-cv-00986-BAS-AGS<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ROYAL SEAS CRUISES, INC.'S MOTION TO EXCLUDE THE TESTIMONY AND REPORTS OF WESLEY WEEKS AS INADMISSIBLE UNDER F.R.E 702** |

36801491.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ......................................................................i

**TABLE OF AUTHORITIES** ..............................................................ii

**PRELIMINARY STATEMENT** ........................................................1

**STATEMENT OF FACTS** .................................................................3

**ARGUMENT** .......................................................................................6

**I.   THE *DAUBERT* STANDARD** .................................................7

**II.  WEEKS IS NOT QUALIFIED TO OFFER
     EXPERT TESTIMONY** ...............................................................8

**III. WEEKS'S OPINIONS ARE UNRELIABLE
     AND INADMISSIBLE** .............................................................11

   **A. The "Smoking Gun" Opinion** ..............................................11

   **B. The "Anticipated Leads" Opinion** .......................................14

**IV. WEEKS'S OPINIONS ARE IRRELEVANT** ..........................21

**CONCLUSION** ................................................................................23

**CERTIFICATE OF SERVICE** ......................................................24

36801491.1

1
2

**<u>TABLE OF AUTHORITIES</u>**

3
4

**<u>Cases</u>**

5
6

*Claar v. Burlington N. R. Co.*,
 29 F.3d 499 (9th Cir. 1994)................................................................ 13, 16

7
8

*Cooper v. Brown*,
 510 F.3d 870 (9th Cir. 2007)............................................................. 8, 21

9
10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) .......................................................... *passim*

11
12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 43 F.3d 1311 (9th Cir. 1995)............................................................. 8

13
14

*Domingo ex rel. Domingo v. T.K.*,
 289 F.3d 600 (9th Cir. 2002)............................................................. 15

15
16

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011)............................................................. 7, 11

17
18

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) ........................................................... 7, 13, 15

19
20

*Grodzitsky v. American Honda Motor Co., Inc.*,
 2014 WL 718431 (C.D. Cal. February 19, 2014) ............................ 7

21
22

*In re Montage Technology Group Limited Securities Litigation*,
 2016 WL 1598666 (N.D. Cal. April 21, 2016) ................................ 7

23
24

*Jenkins v. State Farm Mut. Auto. Ins. Co.*,
 No. C15-5508 BHS, 2018 WL 526993 (W.D. Wash. Jan. 24, 2018).....16

25
26

*Kirola v. City & County of San Francisco*,
 860 F.3d 1164 (9th Cir. 2017)........................................................... 16

27
28

*Kumho Tire Co., Ltd., v. Carmichael*,
 526 U.S. 137 (1999) ......................................................... 7

36801491.1

*Lucido v. Nestle Purina Petcare Co.*,
  217 F. Supp. 3d 1098 (N.D. Cal. 2016) ............................................ 10

*Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996)............................................................. 8

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988)...................................................... 12, 21

*Ollier v. Sweetwater Union High School Dist.*,
  768 F.3d 843 (9th Cir. 2014)........................................................... 8

*Salinas v. Amteck of Kentucky, Inc.*,
  682 F. Supp. 2d 1022 (N.D. Cal. 2010) ............................................ 10

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
  950 F. Supp. 981 (C.D. Cal. 1996)................................................... 18

*Sterner v. U.S. Drug Enf't Agency*,
  467 F. Supp. 2d 1017 (S.D. Cal. 2006) ............................................ 10

*United States v. Miller*,
  874 F.2d 1255 (9th Cir. 1989).......................................................... 8

*United States v. Redlightning*,
  624 F.3d 1090 (9th Cir. 2010).......................................................... 8

*United States v. Vallejo*,
  237 F.3d 1008 (9th Cir. 2001).......................................................... 21

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987)........................................................... 16

**Statutes/Other Authorities**

Telephone Consumer Protection Act, 47 U.S.C. §227................................ 1

Federal Rule of Evidence 702 .................................................... *passim*

Federal Rule of Evidence 702, Advisory Comm. Note (2000) .................. 8

iii

36801491.1

Defendant ROYAL SEAS CRUISES, INC. ("Royal"), hereby moves to exclude the reports and testimony of Plaintiffs' proposed expert witness, Wesley Weeks, as inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT

Weeks is offered by Plaintiffs as an expert witness in the field of web traffic analysis to develop opinions to support their bid for certification of a class holding claims against Royal for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Plaintiffs rely *entirely* upon Weeks to attack the evidence of consent that exists for every call.[1] But Weeks is entirely unreliable; he also does not say what Plaintiffs represent in their Motion – not even close.

Weeks has rendered opinions in an area outside of his expertise, based upon insufficient data he does not understand to reach unreliable, inaccurate, and biased opinions.[2] Weeks, who holds no college degree and has never been offered as an

---

[1] *See* Motion for Class Certification [DE 49-1], at 2 (Weeks's opinions shows consent data "most assuredly were not sound"); at n. 2 (citing Weeks's opinions as evidence of "a shocking case of fraudulently-manufactured consent"); at 3 (consent "tainted by manipulation"); at 6 (Weeks's "findings were shocking and definitively prove that consent data for the leads being called by Prospects DM was manufactured"); at pp. 7-9 (summarizing Weeks's findings to conclude "consent had to have been manufactured"); at 12 ("consent data was unquestionably being manufactured"); at 16 (Plaintiffs "can further demonstrate that the data produced by Prospects DM is entirely unreliable and manufactured with respect to any assertion that it evidences prior express consent."); at 17 ("websites used to supposedly generate consent were demonstrably used to manufacture consent for Plaintiffs and other class members"); at n. 19 ("the database of Prospects DM is so riddled with demonstrable inaccuracy, incompleteness and manipulation that none of the records could satisfy [consent]"); at 21 ("Prospects DM's data is undeniably riddled with obvious problems"); at 24 (it is "abundantly clear" that Prospects was "fabricating evidence of compliance"); at 25 ("The findings of Mr. Weeks… make it clear that consent was being manufactured").

[2] *See* Dec. Margaret Daley (October 19, 2018) (**Ex. "1"**) (offering her expert opinion with a reasonable degree of scientific certainty that Weeks's opinions are "unreliable, inaccurate and biased.")

1

expert witness in any field, has no experience or specialized knowledge relating to website traffic analysis.  Rather, Weeks specializes in installing Customer Service Management software as an independent consultant, and one of his customers – expert witness services company Humatec – was apparently short of experts when Plaintiffs' counsel came calling.   Although Weeks is not listed among 168 expert witnesses on Humatec's website,[3] he was offered as an expert by Humatec and retained by Plaintiffs in this case.

To develop his opinions for Plaintiffs, Weeks was instructed to review 634 million call log records and analyze traffic on websites cherry-picked by Plaintiffs. Weeks was not told, and did not investigate, who produced the data, what the fields in the data represented, or why he was asked to review only five websites when he himself noted there were more than 600 websites identified in the call log records, and there were 1,125 websites identified in the actual consent data that was provided to him.[4]  He did not know, and did not inquire, who produced the 2.1 million consent records in this case.  He also assumed, incorrectly, that the call logs represented calls made by or on behalf of Royal.  They did not.[5]  Nevertheless, Weeks conducted an *internet traffic analysis* of five websites, only three of which generated consent for calls in this case, and offered an opinion based upon speculation and faulty assumptions from online research that any layperson could do that *some* of the leads from the five websites he analyzed based on their *might* have been falsified.[6]  From this narrow opinion, Plaintiffs wildly proclaim that *all* evidence of consent in this case has been "manufactured."

Plaintiffs make this disingenuous extrapolation of Weeks's opinions as their

---

[3] *See* http://www.humatec.com/experts-2/ (accessed Oct. 17, 2018)
[4] In the Report of Wesley Weeks (DE49-9), Weeks refers to the call log data from which he derives his opinions as being "largely of minimal value" and the consent data, which he received three days before issuing his reports and did not give a "thorough analysis," as being "of significant value."  *Id*., at ¶¶65, 67.
[5] Dec. Joshua Grant (Oct. 18, 2018) (**Ex. 2**), at ¶¶20- 22.
[6] Depo. Wesley Weeks (Sept. 12, 2018) (**Ex. 3**), at 64:15-21.

1   sole "evidence" in a failed effort to address glaring individualized issues of consent

2   that preclude class certification in this case.  In doing so, they blindly ignore the

3   fatal flaws with Weeks's methodology and qualifications, and layers of faulty

4   assumptions underlying the vague and totally unreliable opinions in his Reports.

5        Royal's expert Margaret Daley ("Daley") establishes unequivocally that

6   Weeks's opinions are entirely unreliable – based upon an unreliable analysis of data

7   he did not understand, applied in a unscientific, incoherent, and biased manner.[7] As

8   set forth in detail her Expert Report, Daley found that Weeks's reports were replete

9   with errors, his methodology lacked scientific rigor, and his reporting and findings

10   tainted by bias.[8]  As such, she found that "Mr. Weeks' analysis is unscientific and

11   uses demonstrably unreliable and outdated data to support his claim that the leads

12   in this case are fraudulent."[9] Daley's review of Weeks's reports, analysis of opt-in

13   consent data, and her own independent research of Weeks's methodology and

14   conclusions, together with the actual evidence of consent in this case, demonstrate

15   that Weeks's Reports should be stricken and his testimony should be excluded

16   under Federal Rule of Evidence 702 and *Daubert* as unreliable, subjective,

17   amorphous, incomplete, and not capable of being reliably applied.

18                          **STATEMENT OF FACTS**

19        Plaintiffs served two reports from Weeks on July 29, 2018.  The first report is

20   titled "Report of Wesley Weeks."  *See* DE 49-9 (without exhibits) (**Ex. 4**). In this

21   report, Weeks analyzed records for data regarding over 634 million telephone calls

22   that he believed were all placed by Royal Seas.  Weeks also considered data

23   containing consent records for only the subset of telephone calls related to Royal

24   Seas, totaling 2,112,696 records from December 22, 2016 through June 12, 2018.

25   This data set includes the telephone number, name, and state of the person that was

26

27   [7] Dec. Daley, at §I, ¶¶2-5.

28   [8] *Id*., at ¶98.

     [9] *Id.*

                                        3

36801491.1

called, the date and time that call was connected to an RSC agent, and the website and IP address captured at the time of the opt-in, for each of the consumers who were called by non-parties Prospects DM or Helping Hands and subsequently transferred to Royal Seas customer service operators.  Weeks refers to this data in his report as the "Consent Data," and the initial, larger set of data as the "Lead Data."[10]

Weeks noted that the Lead Data records contained references in one field to more than 600 websites that he assumed were the referral sources for each of the calls, and Weeks further assumed that another field signified what Weeks calls "lead creation time," i.e., the date and time when the consumer for the corresponding call record purportedly gave consent to be called.  However, he never compared the date and times in the Lead Data with the dates and times in the Consent Data.[11]  Instead, in reviewing the Consent Data that he said he received late and did not have time to thoroughly analyze, Weeks observed that a date and time field he wrongly assumed was the date and time the lead was created never had an entry showing a "lead has ever been created prior to 9:00 AM and no lead has ever been created after 9:00 PM."  Ex. 4, at 44.  From that, Weeks leaped to the conclusion that "[t]his is a smoking gun example of electronic, or submissions through an automated application or script to simulate user site interactions verses organic lead submissions."  *Id.*  Accordingly, Weeks opines that the "lead records" reflecting opt-ins and consent to be called "had to have been falsified in some manner to generate the volume of leads attributed to them" and "the only explanation for the leads supposedly generated by this site are electronic submission and the majority were not the result of user submissions through the website."  *Id.* at 47.  But, of course, as shown below, his assumptions were

---

[10] Confusingly, at his deposition Weeks referred to the larger set of data as a "call log data," and the smaller set of data the "lead data."  *See* Ex. 3, at 8:21-9:1, 12:17-17:16.

[11] Dec. Daley, at ¶35.

absolutely wrong.

The second report issued by Mr. Weeks is entitled "Report of Wesley Weeks Re: Lead Generation Sites."  *See* DE 49-10 (**Ex. 5**).  In this report, Mr. Weeks analyzes five websites and opines, as he did in his first report, that some of the leads associated with these websites must have been fraudulent.  With one exception, the websites he analyzed were not selected by him but by Plaintiffs' counsel.  Only three of the sites ever provided leads to Royal Seas.  *See* Ex. 3 at 318:6-319:12.  Generally stated, Week's methodology was to:  (1) visit the websites on the Internet; (2) look up the Alexa rankings for each of the websites as of July 2018 (Alexa rankings cover only the preceding 90 days);[12] (3) look up the historical website traffic for the websites, in the number of visitors, as estimated by internet marketing company SEMrush, which he selected because he could access those estimates for free;[13] (4) conclude the websites were "suspicious" because the traffic estimated by SEMrush failed his unidentified subjective standards for normal and expected traffic patterns, reject the volume of traffic estimated by SEMrush, and calculate the websites' "anticipated traffic per day" using the Alexa ranking (ranging from one to 30 for the five websites);[14]and (5) calculate the "anticipated

---

[12] Amazon's Alexa service purports to provide a global ranking system of internet sites based upon perceived traffic.  Google.com is ranked number one and is therefore identified as the most popular site on the Internet.  The Report of Margaret Daley details how Alexa ranking system works, but briefly stated, it is based on data submitted in two ways:  (1) by people, referred to as panel members, who install a feature on their browser and agree to have their browsing history captured and analyzed; and (2) by traffic data obtained through scripts that web designers embed in their sites, which track and transmit the traffic data directly to Alexa.  Websites that are not visited by a panel member and that do not have these scripts are not tracked by Alexa.  *See* Dec. Daley, at 28-30 and Ex. 7.

[13] He did this for some, even though he ultimately disregarded this portion of his research in favor of using an algorithm he stumbled across in a 2013 blog post by a Ukrainian internet marketer, the "work" for which he has never shown.

[14] In a later supplement, Weeks disclosed that in order to estimate website traffic (the number of visitors) from the Alexa rankings, he applied an equation he

5

leads per year" for each website, multiplying the "anticipated traffic per day" figure by an opt-in/consent conversion rate of 2.35%, a figure that Weeks located on a blog post entry from 2014, on an annualized basis.  Weeks concluded that those opt-ins/consents are fraudulent and likely electronically entered onto a web server by someone using a computer script "to provide the appearance of consent."  Ex. 5 at 36.

## ARGUMENT

Weeks cannot satisfy the requirements of *Daubert* and Federal Rule of Evidence 702, and therefore this Court must exercise its gate-keeper function by excluding Weeks's unreliable opinions and testimony.   Weeks provides very narrow and vague opinions that consent data and web traffic from opt-in consent website appear to be suspicious and likely were electronically fabricated.  Although Weeks's opinions on their face are speculative and are limited to only five websites, only two of which referred any leads to Royal Seas, his report and testimony are "critical to class certification" because they are Plaintiffs' sole "evidence" offered to counter the overwhelming evidence of consent for all of the calls at issue in this case.  Weeks's opinions not only fail to support Plaintiffs' gigantic extrapolation to conclude that all consent records were fake – something Weeks himself disputes – but they also fail to satisfy the requirements of Rule 702 for admitting expert testimony.

The five websites he reviewed were not a representative or statistically meaningful sample of the 1,125 websites that generated consent for calls at issue. His calculations relied upon unreliable data, his analysis lacked scientific rigor and consistency, and was tainted by bias.  He did not save and produce his work papers so that his conclusions could be tested, and he did not rely upon – or even identify –

---

discovered on a blog posting from May 2013. *See Alexa Rank – a thorough examination*, Vladimir Luchaninov, http://netberry.co.uk/alexa-rank-explained.htm (last updated May 4, 2013).

1    any formal studies or reliable authorities for his internet research that he relied upon

2    entirely for his opinion.  He lacks qualifications as an expert in the field in which he

3    opines, and misapplied his erroneous methodology to the facts of the case, ignoring

4    obvious alternative explanations for erroneous assumptions supporting Plaintiffs'

5    preordained conclusions.

6    **I.      THE DAUBERT STANDARD**

7          An expert's testimony is admissible only if he or she satisfies the

8    requirements under Rule 702 of the Federal Rules of Evidence:

9          A witness who is qualified as an expert by knowledge, skill,
10    experience, training, or education may testify in the form of an opinion
     or otherwise if: (a) the expert's scientific, technical, or other
11    specialized knowledge will help the trier of fact to understand the
     evidence or to determine a fact in issue; (b) the testimony is based on
12    sufficient facts or data; (c) the testimony is the product of reliable
     principles and methods; and (d) the expert has reliably applied the
13    principles and methods to the facts of the case.

14    Fed. R. Evid. 702.

15          The Supreme Court has clarified that the district court must act as an

16    evidentiary "gatekeeper" to ensure that an expert's testimony is reliable and

17    relevant. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 148 (1999); *Daubert*,

18    509 U.S. at 589.  The court must "make certain that an expert, whether basing

19    testimony upon professional studies or personal experience, employs in the

20    courtroom the same level of intellectual rigor that characterizes the practice of an

21    expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Moreover, where an

22    expert opinion is "connected to existing data only by the *ipse dixit* of the expert,"

23    "there is simply too great an analytical gap between the data and the opinion

24    proffered," and it cannot be admitted by the Court.  *Gen. Elec. Co. v. Joiner*, 522

25    U.S. 136, 146 (1997).

26          When an expert's testimony is "critical to class certification," the court must

27    rule on any challenge to the expert's qualifications before certifying the class.  *In re*

28    *Montage Technology Group Limited Securities Litigation*, 2016 WL 1598666, *8

7

(N.D. Cal. April 21, 2016); *Grodzitsky v. American Honda Motor Co., Inc.*, 2014 WL 718431, \*6 (C.D. Cal. February 19, 2014); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (vacating the district court's certification of a class due to certification relying on challenged expert testimony and the district court's failure to address persuasiveness and admissibility of the testimony under rule 702 and *Daubert*). To comply with *Daubert* and Rule 702, the Ninth Circuit requires courts to analyze an expert's methodology, reliability, and relevance in assisting the trier of fact. *United States v. Redlightning*, 624 F.3d 1090, 1111 (9th Cir. 2010). The court should strike an expert's testimony if it fails to satisfy Rule 702. *See, e.g.*, *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 860 (9th Cir. 2014).

A court is required to do more than simply "tak[e] the expert's word for it." Fed. R. Evid. 702, Advisory Comm. Note (2000). Instead, a Court must assess the reliability of the expert's opinion and methodology by looking at factors such as whether the proffered theory can be and has been tested, whether the relevant expert community has accepted the theory and whether the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation. Fed. R. Evid. 702, Advisory Comm. Note (2000); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). The party offering the expert testimony bears the burden of proving its reliability. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (quoting *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) and citing *Daubert*, 43 F.3d at 1316).

## II.   WEEKS IS NOT QUALIFIED TO OFFER EXPERT TESTIMONY

Rule 702 permits expert testimony only if, among other things, the proposed expert has "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." A district court may therefore exclude testimony on the ground that the witnesses is not

1    qualified as an expert on the relevant subject.  *See United States v. Miller*, 874 F.2d

2    1255, 1268 (9th Cir. 1989) (affirming district court's exclusion of witness on the

3    ground that where he "lacked significant practical experience in the field and had

4    not made any special study of the subject" of "KGB recruitment tactics").  Here, the

5    first reason for the exclusion of Weeks's testimony is that he lacks any such

6    scientific, technical, or specialized knowledge.

7         Although Weeks's two reports offer opinions in the field of website traffic

8    analysis, Weeks has no education or training in this field – in fact, he does not have

9    a college degree – has never performed this sort of website traffic analysis, and

10   admits "I am not an expert in conversation rates."  Ex. 3 at 273:3-10.  Weeks has

11   never before served as an expert witness on website traffic, conversation rates, or

12   any other field.  *Id.* at 30:10-12.  For the last 15 years, Weeks has installed client

13   resource management ("CRM") systems for clients, and on a few occasions has

14   helped clients analyze ***their own*** internal website traffic data.  *Id.* at 22:1-24:8,

15   31:17-34:24.  This case is the first time that Weeks had ever attempted to analyze

16   and quantify a website's traffic from anything other than its own internal data, what

17   he refers to as analysis of "competitor traffic for other sites."  *Id.* at 34:25- 35:6.

18        This is unquestionably Weeks's first foray into this field, and he brings no

19   experience, training, or specialized knowledge.  As detailed below, his lack of

20   experience, training, or specialized knowledge led Weeks to confuse the evidence

21   and make a host of unsupported assumptions while stumbling through this

22   assignment.  Indeed, when asked what authoritative materials in the field he

23   considered – a question that should have been easily answered by someone with

24   knowledge in the field – Weeks testified that he simply searched the Internet (using

25   Google) for resources that were previously unknown to him, and he does not "know

26   of anybody that has performed or done an analysis like this at this point."  *Id.* at

27   38:10-40:6.  Any layman could do that – indeed, that is exactly what Weeks is –

28   meaning no specialized knowledge or expertise was utilized that would be helpful

9

to the Court.  *See Spin Master, Ltd. v. Zobmondo Entm't, LLC*, No. CV 06-3459 ABC PLAX, 2012 WL 8134012, *22 (C.D. Cal. Apr. 27, 2012) (excluding opinion of witness that "did not draw on his expertise in the toy industry, so his testimony would not assist the jury" where witness "merely searched the internet to find references" from which he unreliably extrapolated).  To further prove the point of lack of expertise, although Weeks was sourced through an expert witness consulting firm, he is not affiliated with Humatec, is not included in the list of 168 expert witnesses on its website, and appears to have come to Humatec's attention as the person who recently installed its CRM database. Ex. 3, at 5:16-6:13, 22:1-10.

While Weeks might have specialized knowledge about CRMs or analyzing a company's internal data about its website's traffic, that knowledge plays no role in this case.  Plaintiffs instead are asking him to offer opinions that require specialized knowledge that he simply lacks, which precludes him from being qualified to present an expert opinion.  *Accord Lucido v. Nestle Purina Petcare Co*., 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016) ("The Court agrees with Purina that Dr. Questen is not qualified as an expert to provide opinions about what a reasonable consumer would consider material when deciding whether to purchase dog food. Admittedly, Dr. Questen does have scientific, technical, or other specialized knowledge; she is, after all, a veterinarian. However, Plaintiffs have not asked Dr. Questen to provide opinions based on that specialized knowledge."); *Salinas v. Amteck of Kentucky, Inc.*, 682 F. Supp. 2d 1022, 1030 (N.D. Cal. 2010) ("While Mr. Fulghum appears qualified by his experience, training, and education to be a forensics expert or a workplace safety expert, there is no indication in the record that he is a warnings expert, a human factors expert, or a licensed engineer, nor that he has the professional training or expert qualifications to opine on the formulation or design of warning or safety labels. Moreover, there is no indication in the record that he has ever investigated a case with similar facts, or that he has ever testified as a warnings expert."); *Sterner v. U.S. Drug Enf't Agency*, 467 F. Supp. 2d 1017,

1034 (S.D. Cal. 2006) (excluding expert opinion calculating plaintiff's tax burden and net profits or losses where, although witness passed qualifying examinations for Treasury Agent and IRS Special Agent positions, he did not have tax or business accounting training or experience).

## III.    WEEKS' OPINIONS ARE UNRELIABLE AND INADMISSIBLE

In addition to lack of expert qualifications, or, rather, because of it, Weeks' opinions that the consent records are fraudulent (based on the review of one document and his estimations of traffic of five websites) also are unreliable, and therefore inadmissible.  Weeks's opinions represent either a preordained conclusion in search of explanations, or an astounding series of errors by an "expert."  Either way they are inadmissible.  Far from being the product of a reliable methodology supported by sufficient facts and data, Weeks's opinions about estimated leads per year and that the consent data is fraudulent are the result of a host of mistaken assumptions, outdated "data," and unprecedented "junk science."  Even the years-old "sources" Weeks relies upon disclaim any reliability or statistical significance when used in the way Weeks has done so.  Weeks's expert opinions are precisely the type of "junk science that does not meet Federal Rule of Evidence 702's reliability standards" that *Daubert* instructs a trial court must exclude under its role as a "gatekeeper."  *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011).

### A.    The "Smoking Gun" Opinion

Weeks admitted at his deposition that he undertook no inquiry into the meaning of the "Lead Data" that Plaintiffs' counsel had given him or the "Consent Data" that he was later provided, or how Royal Seas obtained leads/customers to call.  *See* Ex. 3 at 119:4-120:1, 124:20-125:16, 127:8-128:6, 136:15-24, 158:7-16.  The "Lead Data" had been produced by Prospects DM, Inc. ("Prospects DM") in response to a subpoena issued by Plaintiffs' counsel.  *See* Declaration of Joshua Grant at ¶¶ 15-22.  Had Weeks bothered to ask where the "Lead Data" came from,

11

1   he would have learned that, contrary to Plaintiffs' counsel representation that they

2   came from Royal Seas and all calls related to Royal Seas, (Ex. 3 at 119:4-120:1),

3   only a small subset of over 2.1 million calls transferred by Prospects DM to Royal

4   Seas, and the rest were calls related to companies other than Royal Seas.  *See* Grant

5   Decl. at ¶¶ 17, 20, 22.

6        That was just the first of a number of not only unsupported, but mistaken,

7   assumptions that Weeks made in lieu of even a minimal investigation with respect

8   to the "Lead Data" and "Consent Data."  It is settled that an expert cannot base an

9   opinion on "unsupported assumptions and unsound extrapolation . . . ."  *McGlinchy*

10  *v. Shell Chem. Co*., 845 F.2d 802, 807 (9th Cir. 1988).  Likely the most significant

11  is Weeks's unsupported supposition that a particular timestamp in the "Lead Data"

12  represents "lead creation time," i.e., the date and time when the consumer for the

13  corresponding call record purportedly gave consent to be called.  Ex. 4 at 7, 44.

14  Weeks claims that he based this assumption on "industry database standards," (*id.*

15  at 6), but he never identified any such standards, and admitted that "to know the

16  exact meaning" of an ambiguous column heading in a spreadsheet "[y]ou would

17  have to ask the company what they mean," which he never did.  Ex. 3, at 129:18-

18  130:21.  Weeks's observation that that field never had an entry showing a "lead has

19  ever been created prior to 9:00 AM and no lead has ever been created after 9:00

20  PM," (Ex. 4 at 44), is the primary basis of his opinion that the consents to be called

21  are fraudulent.  Indeed, Weeks colorfully wrote that the temporal limitations of that

22  timestamp present "a smoking gun example of electronic, or submissions through

23  an automated application or script to simulate user site interactions verses organic

24  lead submissions."  *Id.*

25       Rather than investigate and learn how the calls and records at issue were

26  made, or consider other obvious alternative explanations, Weeks simply assumed

27  what the timestamps meant based on unidentified "industry database standards."

28  Ex. 4 at 6.  The attempt to give Weeks's assumption some support by casually

1   referring to unidentified "industry database standards" is unavailing, and fails to

2   render his conclusion anything other than unsupported *ipse dixit*.[15]   Far from

3   reflecting a "smoking gun," the timestamps that Weeks erroneously assumed to be

4   something other than what they were evidences a "shoot first, ask questions later …

5   if ever" approach by Weeks.

6         But it was not even reasonable for Weeks to infer from the "nine to nine"

7   timestamps that automated scripts were used to generate the leads, because surely

8   *automated* scripts can run past "nine to nine" and can run on Sundays.  Indeed, one

9   would have expected that to be the case.  That should have led him to consider

10  other reasonable alternative explanations.  It is well-settled that when an expert fails

11  to explain his conclusion and makes no "effort to rule out other possible causes" or

12  obvious alternative explanations, his report is unreliable and therefore should be

13  excluded.  *Claar v. Burlington N. R. Co*., 29 F.3d 499, 502 (9th Cir. 1994).

14        Not only is this conclusion improperly based on an assumption, the

15  assumption is incorrect.  A declaration from Prospects DM makes clear that the

16  timestamp refers to "the dates and time associated with the live transfers from

17  Prospects to Royal," and explains that "Prospects only live transferred leads to

18  Royal during the normal business hours of Royal's call centers during times in

19  which Royal could accept the live transfers from Prospects."  Grant Decl. at ¶33.

20  ***That*** is why the column that Weeks focused upon showed dates and times that

21  "were generally 9:00 a.m. – 9:00 p.m. Monday through Friday and certain business

22  hours on most Saturdays," and none on Sundays because "[t]he Royal call centers

23  are not open on Sundays . . . ."  *Id.*   Weeks did not know how the leads were

24  generated, who made the calls reflected in the documents he reviewed, or if they

25  were transferred to Royal Seas.  *See* Ex. 3 at 166:9-167:17.

26  _____

27  [15] *See Gen. Elec. Co.* 522 U.S. at 146 (stating that when an expert opinion is
    "connected to existing data only by the *ipse dixit* of the expert," "there is simply too

28  great an analytical gap between the data and the opinion proffered," and it cannot
    be admitted by the Court).

13

1    Weeks admitted that if the timestamps he relied upon do not reflect when
2    consent was given, but the date and time of transfers to Royal, then his conclusion
3    is "flawed" and the "smoking gun" language is incorrect. Ex. 3 at 164:6-19,
4    165:16-22, 168:24-170:2, 178:17-182:22, 189:21-190:14. The testimony in the
5    Grant Declaration confirms the actual facts and the invalidity of Weeks's
6    "methodology" and conclusion. The timestamps refer to when outbound calls
7    placed by Prospects DM were transferred to Royal Seas (or another company for a
8    call not related to Royal Seas).

9    **B.    The "Anticipated Leads" Opinion**

10    Weeks's other opinion in support of his ultimate conclusion that the evidence
11    of consent is falsified is his conclusion that five websites that he examined are
12    incapable, based on his plugging of July 2018 Alexa rankings into some Ukrainian
13    2013 algorithm[16], to generate the volume of website visits that he believes were
14    required to generate the number of leads claimed to have been generated by those
15    five websites. *See* Ex. 5. This opinion, too, is unreliable and the product of
16    unsupported assumptions and speculation. It is also irrelevant, as Weeks concedes
17    this opinion is limited to the volume of ***these*** five websites, when there are
18    thousands of websites at which putative class members provided consent to be
19    called regarding Royal Seas, and two of ***these*** five websites are not among them
20    (*i.e.*, they never referred any leads to Royal Seas).

21    Weeks admits that that "the best place to get the amount of traffic that visited
22    a site is from the website server itself" and the logs it maintains, to the extent they
23    exist. Ex. 3 at 297:5-14. But rather than seek to obtain those logs to discern
24    historic information to estimate *historical* website traffic, Weeks came up with an
25    unprecedented methodology that utilized *current* Alexa rankings. Before turning to

---

[16] In violation of Federal Rule of Civil Procedure 26(a)(2)(B)(ii), Weeks never produced any documents "showing his work" and could not recreate his "work" when asked to do so at his deposition. Even a child has to "show her work" in order to get credit for her math homework.

the unreliability of that methodology, it must be noted that Weeks did have access to some historical website traffic, namely estimates from a marketing company called SEMrush, which showed over 100,000 visits to the websites. *See* Ex. 5 at 6, 13, 18, 24, 28, 32. SEMrush is far from the only firm that provides historical web traffic information, and, as Daley notes, others are considered more reliable. Dec. Daley, at 31-33. Weeks suggested, however, that he reviewed only SEMrush's data because it was free. Ex. 3 at 97:3-98:5. After reviewing the data, though, he concluded the traffic figures were "suspicious" because they fell short of his subjective standards for normal and expected traffic patterns for websites that he concluded were "poor quality," lacked reported keywords, and the backlinks were also from "poor quality" websites. *See generally* Ex. 5. Thus, based solely on his subjective beliefs, Weeks discarded the SEMrush data when it suited him and elected to create what he believes to be the "real" historical traffic using the current Alexa ranking for the websites that was reported in July 2018 and plugging it in to the 2013 algorithm.[17]

Such a subjective and conclusions-oriented approach raises numerous red flags under Rule 702 and *Daubert*. An expert's testimony may be excluded where it is based on "subjective belief or unsupported speculation" that is no more than unreliable *ipse dixit* guesswork. *See Gen. Elec. Co.*, 522 U.S. at 146 (holding that trial court may properly exclude *ipse dixit* opinions where "there is simply too great an analytical gap between the data and the opinion proffered"); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming exclusion of plaintiff's expert as *ipse dixit* that was not based upon objective, verifiable

---

[17] Royal Seas does not suggest that the SEMrush data itself was reliable. The research conducted by Royal's expert, Margaret Daley, shows that SEMrush is unreliable and regularly undercounts website visits. Indeed, SEMrush itself admits that if a website gets less than 10,000 visits a month, the SEMrush data for that website should not be used even to obtain "basic insights. *See* Dec. Daley, at 32 & Ex. 10.

1    evidence).   And   the   entire   current   Alexa   ranking-based   methodology   is
2    contaminated by a subjective and biased conclusion that website traffic could not
3    have been high.  "Coming to a firm conclusion first and then doing research to
4    support it is the antithesis of [the scientific] method."  *Claar*, 29 F.3d at 502-03.
5    *See also Viterbo v. Dow Chem. Co*., 826 F.2d 420, 423 n.2 (5th Cir. 1987) ("We
6    agree that an expert who forms an opinion before he begins his research is biased
7    and lacking in objectivity.").

8         Separate   and   apart   from   any   predisposition   or   bias,   the   Alexa-based
9    methodology has its own shortcomings that render it wholly unreliable even if it
10   had been undertaken with full objectivity.  Weeks concedes, as he must, that Alexa
11   rankings are based on only **the last 90 days**, so in this case from April to July 2018,
12   when Weeks obtained them.   *See* Ex. 5 at 6.   Weeks's approach was akin to
13   attempting to measure last year's rainfall by figuring out a way to measure the
14   water on the ground today.  Even Weeks admits that using the Alexa rankings from
15   the time the opt-in leads were obtained would have been preferable (but he believed
16   they were not available).  *See* Ex. 3 at 334:6-335:9, 344:2-25.

17        Given the volatile nature of website traffic, particularly for lead generation
18   websites tied to short-lived marketing campaigns well before April 2018 as is the
19   case here, as Weeks concedes in his report may be the case (Dec. Daley, at 31, 34-
20   39, and Ex. 5, at 13, 18), this temporal incongruence renders Weeks's methodology
21   unreliable.  *See Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1183
22   (9th Cir. 2017) (affirming exclusion of expert report that "relied on outdated data");
23   *Jenkins v. State Farm Mut. Auto. Ins. Co*., No. C15-5508 BHS, 2018 WL 526993,
24   *3 (W.D. Wash. Jan. 24, 2018) (excluding part of expert's regression analysis
25   because the data it relied upon "is outdated and a poor 'fit' for the facts of this
26   case").   Indeed, Weeks noted that the SEMrush historical data reported several
27   months – including three-month periods – for the five websites when there was *no*
28   *measureable traffic* at all.  *See* Ex. 5 at 13, 18, 24, 28, 32.  Weeks admitted that

16

1   Alexa rankings fluctuate, (Ex. 3 at 232:10-11), and his supplemental report served

2   in September showed significant differences in the Alexa rankings for the five

3   websites he analyzed from two months' prior.  *See* Dec. Daley, at 37-38; Weeks

4   Supplement (**Ex. 6**).   And, as Daley further details, the great volatility in the

5   website traffic of the five websites Weeks analyzed and some others, such as noting

6   an Alexa ranking for pinpointschool.com that was as high as 118,058, far higher

7   than the ranking of 11,142,802 that Weeks used in his analysis.  Dec. Daley, at 34-

8   35.

9         Moreover, Alexa Internet itself clearly states that Alexa rankings below

10   100,000 are inaccurate and should not be relied upon for statistical purposes:

11         There are limits to statistics based on the data available. Sites with
12         relatively low measured traffic will not be accurately ranked by
          Alexa. We do not receive enough data from our sources to make
13         rankings beyond 100,000 statistically meaningful. (However, on the
          flip side of that, the closer a site gets to #1, the more reliable its rank.)
14         This means that, for example, the difference in traffic between a site
15         ranked 1,000,000 and a site ranked 2,000,000 has low statistical
          significance. Sites ranked 100,000+ may be subject to large ranking
16         swings due to the scarcity of data for those sites. It is not unusual for
17         such sites to decline to "No data" Traffic Ranks, or to improve
          suddenly.
18

19

20   Dec. Daley, at 29 and Ex. 7.

21         Weeks ignored this warning, did not disclose it in his report, and instead

22   based his entire analysis on websites whose Alexa rankings are at or below

23   *11,142,802*, well past the point of statistical meaningfulness according to Alexa.

24   Despite anchoring his ersatz calculation of website traffic on Alexa rankings,

25   Weeks testified to a lack of knowledge of much in the way about how Alexa

26   obtains data used for rankings, whether Alexa can be blocked, and how Alexa

27   rankings are computed.  *See* Ex. 3 at 245:1-252:21.   Weeks does at one point

28   acknowledge that "Alexa is unreliable with rankings" as large as "over 14 million,"

17

and concludes that the unreliability means it is possible that the number of visitors to a website with such a ranking (or worse) might be "substantially smaller" than the 8-10 visitors per day that he pulled out of thin air, without any support, for websites without Alexa rankings.  *See* Ex. 5 at 19, Ex. 3 at 209:13-19.  Weeks ignores, for the reasons detailed by Daley in her rebuttal report, that it is far more likely for various reasons, given how Alexa works and how it collects traffic data, that the Alexa ranking *understates* a website's ranking.  *See* Dec. Daley, at 29-30.

In order to turn Alexa rankings into estimated number of visitors, Weeks utilized an algorithm in a blog post from 2013 written by an employee of a marketing firm, Netberry, which Weeks found on the Web in connection with this case.  *See* Ex. 3 at 240:2-17.  Although he relied upon that information to calculate his estimated visits and leads, that information was first disclosed in a supplement served by Weeks on September 7, 2018.  *See* Ex. 6.   The blog post is not an academic or scholarly writing, and does not present any validation of the algorithm.  Nor did Weeks attempt to corroborate the purported validity of the algorithm or do anything to investigate whether it is reliable.  *See* Ex. 3 at 219:3-220:14, 244:11-13.  Weeks was unable to even describe the algorithm at his deposition without having it in front of him.  *See id.* at 242:17-244:13.  His uncritical adoption of this five-year old algorithm from a casually written blog posting, despite the author's warnings, further renders his methodology unreliable.  *See*, *e.g.*, *Sanderson v. Int'l Flavors & Fragrances, Inc*., 950 F. Supp. 981, 1001 (C.D. Cal. 1996) (finding expert opinions to be unreliable where "[n]one of the experts did his own study on any of the issues in this case" and the authors of the few "even marginally relevant animal studies . . . caution[ed] not to extrapolate for human purposes and which don't involve the specific injuries claimed by plaintiff").

As detailed by Daley, this algorithm is highly suspect because of the substantial changes made to Alexa Rankings in the intervening five years, and the substantial increase in internet traffic since 2013.  The blog post states that the

1   values in the algorithm were based on the number of known internet users in 2012,

2   which was 2.4 billion people, but it is currently estimated that that figure has nearly

3   doubled in the last six years to more than 4.1 billion internet users.  *See* Dec. Daley,

4   at 22 and Ex. 3.  Consequently, the algorithm uses two billion four hundred million

5   as the value of 100, representing a hundredth of the then-estimated total of internet

6   users.  Therefore, even if the Netberry algorithm had been reliable in 2013, which

7   Weeks made no effort to find out, using it now would calculate traffic using a

8   standard that is materially erroneous.  *See* Dec. Daley, at 22.

9          Moreover, the Netberry blog post specifically warns readers not to use the

10  algorithm to estimate traffic on sites that have an Alexa Ranking past the top

11  500,000 sites (which is precisely what Weeks did):

12

13          It is clear that the more data Alexa has the more precise the data is.
            That is why data will be more accurate for popular sites. Alexa claims

14          that they have good data for the TOP 100,000. According to my
            experience, you can trust them for far more - up to the TOP 500,000.

15

                              *      *      *      *      *

16

17          Still before coming up with conclusions, make sure that the analyzed
            site is very popular. Otherwise the data will be way too approximate.

18          Therefore, if the ordering party will get the real numbers from the
            offline channels, you might be ashamed of making 10-100 wrong

19          estimations.

20

21  *Id.* at 23 and Ex. 3.

22          The blog post contains yet more warnings that Weeks ignored.  It states, **"*do

23  not use this formula for sites far from the TOP 100,000 expecting precise

24  values.*"**  *Id.*  And the conclusion of the blog states "Alexa Rank is a good tool to

25  analyze competitors and make some estimates, but it becomes very unpredictable

26  for the sites with Alexa Rank more than 1,000,000."  *Id.*  Again, Weeks ignored

27  these warnings, failed to disclose them, and used the algorithm in ways that even its

28  own creator stated would be unreliable and should not be employed.  An already

19

1    unreliable methodology based on current ranking information that is statistically
2    meaningless (or, when there was no ranking, based on a visits figure that Weeks
3    concocted) now became even more unreliable by applying it to an algorithm with
4    outdated data and underpinnings and additional magnitudes of statistical
5    unreliability.   The results were estimated website visitors for the five websites
6    analyzed by Weeks.  *See* Ex. 5 at 34-35.

7        Weeks then compounded his errors by applying the estimated visit figures he
8    calculated for the five websites to a flat "conversion rate" of 2.35% to reflect his
9    assumption that only 2.35% of the "real" website traffic would be converted into
10   opt-ins who consented to be called about Royal Seas.   *See id.* at 9-10, 34-35.
11   Weeks admitted that he is not an expert on conversion rates.  *See* Ex. 3 at 273:3-10.
12   The only support for this conversation rate figure in his report is a chart with no
13   citation.  *See* Ex. 5 at 9.  The chart reports the 2.35% is the "median" conversion
14   rate, and it indicates that the top 10% of sites have conversion rates of 11.45% and
15   the top 25% have conversion rates of 5.31%.  Daley found the chart in yet another
16   blog posting on the Internet.  *See* Dec. Daley, at 25 and Ex. 6.  The basis for the
17   chart, such as the number of sites analyzed, is not disclosed, and the source data is
18   vaguely described as being from corporate "accounts that we can analyze." *Id.*  No
19   further description of the methodology used to create the chart, which Weeks
20   copied and pasted into his report, or to calculate the conversion rates, including the
21   one that Weeks blindly accepted, is provided.  And Weeks conducted no research or
22   investigation to confirm the accuracy of the chart in the blog post.  *See* Ex. 3 at
23   276:3-279:2.

24       Weeks provides no explanation why the same "median" conversion rate
25   should be applied to all five websites, which are in substantially different industries
26   (higher education, healthcare, financial services) and without conducting any
27   investigation into the nature of the marketing conducted by the individual websites
28   to generate traffic.  It is not unreasonable to believe that a website created as a

1   landing page for a marketing campaign (whether social media or otherwise), and
2   therefore has a self-selected audience that is more likely to be interested in opting in
3   to whatever is being offered, would have a far higher conversion rate, such as
4   perhaps the top 10% rate in the same chart that Weeks copied and pasted.  *See* Dec.
5   Daley, at 25 and Ex. 6.  Weeks, however, testified that he never considered these
6   distinctions and assumed the same conversion rate of 2.35% applies to all five
7   websites, further rendering his report unreliable.  *See* Ex. 3 at 275:6-276:2.  *See*
8   *also McGlinchy*, 845 F.2d at 807 (affirming exclusion of expert witness because
9   "[h]is study rests on unsupported assumptions and ignores distinctions crucial to
10  arriving at a valid conclusion").

11      The conclusion to this error-filled methodology of mistaken assumptions,
12  speculation, blind acceptance of unconfirmed, outdated, and undifferentiated
13  figures from the Internet, and exponential compounding of statistically meaningless
14  numbers is Weeks's calculation of the estimated leads per year from the five
15  websites.  *See* Ex. 5 at 35.  That figure is far less than what the Consent Data
16  indicates, but for the reasons that have been set forth above, it should be
17  resoundingly clear that Weeks's calculations and methodology are not only lacking
18  in the rigor and reliability required to be admitted as expert testimony, they are flat
19  out wrong.

20  **IV.    WEEKS'S OPINIONS ARE IRRELEVANT**

21      Finally, Weeks's opinions should also be excluded as irrelevant.  Rule 702
22  requires that "[e]xpert testimony . . . be both relevant and reliable."  *United States v.*
23  *Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).   Relevancy requires that "[t]he
24  evidence . . . logically advance a material aspect of the party's case."  *Cooper v.*
25  *Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

26      For the reasons set forth above, Weeks's opinion that the consents were false
27  based on his review of the Lead Data is simply based on his surmise and is not
28  connected to the facts of the case, which demonstrates that the timestamps he refers

to reflect when a live call was transferred to Royal Seas. If his opinion is merely that all the call transfers were made during the hours of operations of Royal Seas call centers, that is hardly helpful or relevant to any material aspect of the case.

Weeks's opinion of the "anticipated leads per year" that he calculated is also not relevant. Weeks made calculations for only five of the websites at issue, four of whom were selected by counsel for reasons he does not know. *See* Ex. 3 at 56:24-60:13. Two of the websites selected by counsel – Myeducationauthority.com, and Mycreditauthority.com – did not even generate any opt-ins for Royal Seas, so any testimony about them is irrelevant. *See id.* at 318:13-19. There is no asserted basis to extrapolate Weeks's conclusion from those five websites to the 1,200 plus websites in the record, and it would be improper to do so on this paltry and statistically insignificant record. *Accord Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). *See also* Dec. Daley, at 27.

But Weeks admits that his opinion about the purported falseness of the consents is limited to consents obtained through only those five websites, and cannot be applied to other websites. *See* Ex. 3 at 61:18-63:3 (testifying that there is "no way to link these conclusions" to a website he did not analyze). And even then, Weeks further limits the utility of his opinion by conceding that he is not opining that *all* of the consents obtained through the five (really three) websites he investigated are false, but only some of them are, and he has no proposal for the Court to identify which consents are genuine and which are problematic. *See id.* at 63:11-67:17, 105:19-106:18. To say that Weeks's opinions about a relative handful of unidentifiable opt-ins in a case with more than 2.1 million opt-ins is not helpful or relevant would be an understatement. The Court should therefore exclude Weeks's opinion on this ground as well.

1
2
## CONCLUSION

3    For the foregoing reasons, Royal Seas respectfully requests the Court to

4 exclude the two reports of Wesley Weeks, exclude his testimony from the case, and

5 grant any further relief it deems appropriate.

6    DATED: October 22, 2018.

7                                          Respectfully Submitted,

8                                          **GREENSPOON MARDER LLP**

9
                                             /s/ *Jeffrey A, Backman*
10                                         JEFFREY A. BACKMAN (Fla. Bar No. 662501)
                                           Jeffrey.Backman@gmlaw.com
11                                         RICHARD W. EPSTEIN (Fla Bar No. 229091)
                                           Richard.Epstein@gmlaw.com
12
                                           200 E. Broward Blvd, Suite 1800
13                                         Fort Lauderdale, Florida 33301
                                           Tel: 954.527.2427
14                                         Fax: 954.333.4027
                                           *Admitted Pro Hac Vice*
15
16
                                           BRIAN R. CUMMINGS (Fla. Bar No. 25854)
17                                         Brian.Cummings@gmlaw.com
                                           401 E. Jackson St., Suite 1825
18                                         Tampa, Florida 33602
                                           Tel: 813.769.7020
19                                         Fax: 813.426.8582
20                                         *Admitted Pro Hac Vice*
21
22                                         ANTON N. HANDAL, ESQ. (Bar No. 113812)
23                                         Tony.Handel@gmlaw.com
                                           LAUREN G. KANE, ESQ. (Bar No. 286212)
24                                         Lauren.Kane@gmlaw.com
                                           750 B Street, Suite 250
25                                         San Diego, CA 92101
                                           Tel: 619.544.6400
26                                         Fax: 619.696.0323
27
28                                         Attorneys for Defendant *Royal Seas Cruises, Inc.*

23

1
2
3

### CERTIFICATE OF SERVICE

4
5

     I HEREBY CERTIFY that a true and correct copy of the foregoing was has

6

been served electronically filed with the Clerk of Court by using CM/ECF service

7

which will provide copies to all counsel of record set forth on the Service List

8
9

below who are registered to receive CM/ECF notification as reflected on the

10

Service List on this 22nd day of October, 2018.

11
12

               By: _/s/ Brian R. Cummings_

13

               Brian R. Cummings, Esq.

14

### SERVICE LIST

15
16

Joshua B. Swigart, Esq.
josh@westcoastlitigation.com

17

Kevin Lemieux, Esq.
kevin@westcoastlitigation.com

18

**HYDE & SWIGART**

19

2221 Camino Del Rio South, Suite 101
San Diego, CA 92108

20

Telephone: (619) 233-7770

21

Facsimile: (619) 297-1022

22

Abbas Kazerounian, Esq.

23

ak@kazlg.com

**KAZEROUNI LAW GROUP, APC**

24

245 Fischer Avenue

25

Costa Mesa, CA 92626
Telephone: (800) 400-6808

26

Facsimile: (800) 520-5523

27
28

_Attorneys for Plaintiff John McCurley_

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Todd M. Friedman, Esq.
Adrian R. Bacon, Esq.
Meghan E. George, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
(877) 206-4741
tfriedman@toddflaw.com
abacon@toddflaw.com
mgeorge@toddflaw.com

*Attorneys for Plaintiff Dan DeForest*

36801491.1