**GREENSPOON MARDER LLP**
Richard W. Epstein, Esq. (Admitted *Pro Hac Vice*)
richard.epstein@gmlaw.com
Jeffrey A. Backman, Esq. (Admitted *Pro Hac Vice*)
jeffrey.backman@gmlaw.com
200 E. Broward Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel: 954.527.2427
Fax: 954.333.4027

Attorneys for Defendant Royal Seas Cruises, Inc.
[additional Defendant's counsel on signatory line]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John McCurley, Individually and and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Royal Seas Cruises, Inc.,<br><br>Defendant.<br>---------------------------------------------<br>Dan DeForest, Individually and and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Royal Seas Cruises, Inc.,<br><br>Defendant. | Case No.:  3:17-cv-01988-AJB-AGS<br><br>*consolidated with*<br><br>Case No.:  3:17-cv-00986-BAS-AGS<br><br><br>**DEFENDANT ROYAL SEAS CRUISES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**HON. CYNTHIA A. BASHANT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ...................................................................i

**TABLE OF AUTHORITIES** ...........................................................iii

**I.  INTRODUCTION** ........................................................................1

**II. FACTUAL BACKGROUND** .......................................................5

   **a.  The Opt-in Consent Marketing Program** ...........................6

   **b. Digital Marketing Companies Corroborate Substantial
      Evidence of Consent and Demonstrate Legitimacy of
      their Opt-In Lead Generation Websites** ...............................9

   **c.  Plaintiffs' "Manufactured-Consent" Theory
      Is Manufactured and Has a Fatal "Weeksness"** .................12

   **d.  A Real Expert Shows Weeks is Unqualified and
      His Opinions are Unreliable** ...................................................15

**III. ARGUMENT** ...............................................................................16

   **a. The Law Governing Class Certification** ...............................16

   **b. Plaintiffs' Motion Withers under a Rigorous Analysis
      and Fails to Satisfy Rule 23's Prerequisites for
      Class Certification** ....................................................................17

      **1.  Individualized Issues Will Overwhelm the Proceedings
         if a Class Were Certified, as Plaintiffs Lack a
         Plausible Classwide Means of Addressing Consent
         for Every Putative Class Member** .....................................17

      **2. Plaintiffs' Class Descriptions Fail to Clearly Define
         any Class that Can Be Ascertained by Objective
         Criteria** .............................................................................22

36798925.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**3. Plaintiffs' Pure Speculation that Calls Were Made without Consent Fails to Satisfy Numerosity under Rule 23(a)(1)** .................................................. 27

**4. Plaintiffs Fail to Describe Any Means of Generating Common Answers to the Only Common Questions** ............................................................ 28

**5. By Disputing Evidence of Consent for Calls They Received, Plaintiffs' Claims Are Atypical of any Putative Class** ............................................ 28

**6. Plaintiffs and their Counsel Cannot Satisfy Rule 23(a)(4)'s Adequacy Requirement** .......................... 29

**7. Individualized Issues Make Class Litigation Unmanageable and Undermine Plaintiffs' Superiority Argument** ........................................... 30

**Conclusion** ................................................................................ 30

**Certificate of Service** ................................................................ 31

ii

36798925.1

1

## **TABLE OF AUTHORITIES**

2

3

**Cases**

4

*Adickes v. S.H. Kress & Co.*,
5
    90 S.Ct. 1598 (1970) ......................................................................... 22

6

*Amchem Prods. v. Windsor*,
7
    117 S.Ct. 2231 (1997) ...................................................................... 17

8

*Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*,
    No. 16 C 9281, 2018 WL 3474444 (N.D. Ill. July 19, 2018) .......... 24
9

10

*AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ........................................................... 22
11

12

*Bee, Denning, Inc. v. Capital Alliance* Group,
    310 F.R.D. 614 (S.D. Cal. 2015) ......................................... 3, 16, 22
13

14

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ........................................................... 17
15

16

*Blair v. CBE Group, Inc.*,
    309 F.R.D. 621 (S.D. Cal. 2015) ..................................................... 22
17

18

*Blow v. Bijora*,
    191 F. Supp. 3d 780 (N.D. Ill. 2016) ............................................... 25
19

20

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ......................................................... 23
21

22

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
    137 S. Ct. 1773 (2017) ............................................................. 23, 27
23

24

*Carter v. Butz*,
    479 F.2d 1084 (3d Cir. 1973) ........................................................... 17
25

26

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ......................................................... 5, 16-17
27

28

36798925.1

*Connelly v. Hilton Grand Vacations Co.*, LLC,
    294 F.R.D. 574 (S.D. Cal. 2013) ....................................................... 5, 17, 20

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ........................................................................ 24

*DeBernardis v. NBTY, Inc.*,
    No. 17 C 6125, 2018 WL 461228 (N.D. Ill. Jan. 18, 2018).............. 24

*Fitzhenry v. ADT*,
    2014 WL 6663379 (S.D. Fla. Nov. 3, 2014)...................................... 30

*Gates v. Rohm and Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) .............................................................. 17

*Gene and Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir.2008) ............................................................. 3, 17, 20

*G.M. Sign, Inc. v. Brink's Mfg. Co.*,
    No. 09 C 05528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011)............ 24

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................ 29

*Harris v. Circuit City Stores, Inc.*,
    2008 U.S. Dist. LEXIS 12596 (N.D. Ill. Feb. 7, 2008)..................... 29

*Jamison v. First Credit Servs., Inc.*,
    290 F.R.D. 92 (N.D. Ill. 2013) .......................................................... 18

*Kristensen v. Credit Payments Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) .................................................. 19

*Legg v. PTZ Ins. Co.*,
    321 F.R.D. 572 (N.D. Ill. 2017) ........................................................ 18

*Mazur v. eBay, Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) ...................................................... 22

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012)............................................................. 24

iv

36798925.1

*O'Connor v. Boeing N. Am. Inc.*,
    184 F.R.D. 311 (C.D. Cal. 1998) ........................................................ 22

*Schwartz v. Upper Deck Co.*,
    183 F.R.D. 672 (S.D. Cal. 1999)...................................................... 22, 27

*Selby v. LVNV Funding, LLC*,
    2016 WL 6677928 (S.D. Cal. June 22, 2016)................................... *passim*

*Shamblin v. Obama for America*,
    2015 WL 1909765 (M.D. Fla. April 27, 2015)................................. 22

*Spokeo Inc. v. Robins*,
    136 S.Ct. 1540, 1549 (2016) ............................................................ 21

*Stemple v. QC Holdings, Inc.*,
    2016 WL 4059345 (S.D. Cal. April 25, 2016)................................. 16, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ...................................................................... 16

*Ybarra v. Dish Network*,
    807 F.3d 636 (5th Cir. 2015)............................................................. 21, 25

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)........................................................... 18

## Statutes/Other Authorities

Telephone Consumer Protection Act, 47 U.S.C. §227................................ *passim*

Fed. R. Civ. 23 .......................................................................................... *passim*

S.D. Cal. Civil Local Rule 7.1 .................................................................... 1

California Invasion of Privacy Act, Cal. Pen. Code §632.7........................ 24

36798925.1

## I. __INTRODUCTION__

"Alexa – certify a class."  Like a voice command in the familiar TV ads for the Amazon Echo virtual assistant, Plaintiffs call upon another Amazon product named "Alexa" to support their flawed bid for class certification for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Based upon the Alexa[1] rankings of only *five* opt-in websites used to generate consent for a fraction of the calls alleged to be at issue, Plaintiffs wildly proclaim that *all* evidence of consent in this case has been "manufactured."

Their conclusion is demonstrably false.[2]  It also contradicts the very expert upon whom they rely for this claim, Wesley Weeks ("Weeks"), who testified that it was ***NOT*** even his opinion that *all* of the opt-in leads generated by the five websites are fabricated, let alone every other lead generated from every other website.[3]  In fact, he could not pinpoint any specific lead as "fake."[4]  Rather, he merely opined that *some* of the leads from the five websites he analyzed based on their Alexa rank *might* have been falsified.[5]  However, Weeks offers no opinion on the validity of

---

[1] Alexa is an internet search technology acquired by Amazon in 1999 that shows nothing more than how popular the website is during the prior 90 days compared to other websites (based upon the number of users that actually have the Alexa toolbar – in other words, Alexa does not analyze all internet users but rather only a select group).  *Alexa Rank – a thorough examination*, Vladimir Luchaninov, http://netberry.co.uk/alexa-rank-explained.htm (last updated May 4, 2013) (**Ex. 1**).

[2] *See supra*, at §II(a)-(d) (summarizing substantial evidence proving the legitimacy of the consent procedures and consent records at issue in this case, and fatal flaws underlying the assumptions and speculation of Plaintiffs' "expert's" opinions).

[3] Depo. Wesley Weeks (Sept. 12, 2018) (**Ex. 2**), at 64:15-20.

[4] *Id*. at 103:11-106:6.

[5] *Id*. at 64:15-21.  Even if Weeks' Alexa methodology were sound (it is not), he acknowledged that his speculation about leads from these websites would need to be verified through individual analyses based on the date that each lead was created online and the Alexa ranking of that website *on the same date*. *Id.*, 334:6-18; 334:19-25; 232:10-11.  He did not do this.  Rather, Weeks pulled Alexa rankings for these five websites in July 2018 to make "conclusions" about leads generated on these websites many months, and even years, earlier.

leads generated by some 1,125 other websites identified in the 2.1 million consent records in this case.  While he noted that roughly 600 websites were identified among only .5% of the 634 million call log records he reviewed, he did not know whose data he was reviewing and, fatally, *he erroneously assumed every one of the 634 million calls were made by or on behalf of Defendant Royal Seas Cruises, Inc.* ("Royal").  ***They were not***; rather the records he reviewed were produced by lead generator Prospects DM, Inc. ("Prospects"), reflecting calls it placed on behalf of many clients, including Royal.[6]  The records are also *not* Prospects' consent records – so the references to websites (and a negative inference of ".5%") in that data are irrelevant.  As such, Weeks did not know that two of the five websites Plaintiffs' lawyers asked him to review did not generate any leads relating to Royal.  He also did not know why Plaintiffs' counsel instructed him to review only five websites, which represented a mere .004% of the 634 million records he was asked to review and give "expert" opinions.  Most critically, and contrary to the argument made by Plaintiffs' counsel in their Motion, Weeks testified there was *"no way" to link his speculative opinion about those five websites to the more than 2.1 million leads* generated from other websites. (*Id*. at 61:21-62:12).[7]

Aside from the fact that the calls themselves do not fall within the ambit of the TCPA because they were not made with an ATDS or with a prerecorded voice as defined by the Statute, Plaintiffs take enormous liberties with the narrow and flawed opinions of their purported [8] expert because they cannot address the

---

[6] Dec. Joshua Grant (Oct. 18, 2018) (**Ex. 3**), at ¶¶20-22.

[7] Weeks testified he was never consulted on the content of Plaintiffs' Motion and just saw it after it was filed. Depo. Weeks, at 118:15-21.  Plaintiffs' counsel have twisted and manufactured facts, not just in the conclusions they asked Weeks to reach, but in the extent to which they have stretched his very limited analysis far beyond any of the opinions he actually rendered in his Reports.

[8] *See* Royal's Motion to Exclude Testimony and Reports of Wesley Weeks (DE 55) ("Weeks Motion") (noting fatal flaws with Weeks' qualifications and layers of faulty assumptions underlying his inadmissible opinions).

2

overriding issue in this case: Consent.  They face a wall of individualized issues raised by the vast evidence of consent, including more than 2.1 million consent records produced so far.[9]  They are well aware that this is not a case where the defendant is merely speculating, without evidence, that consent exists.  *See i.e. Bee, Denning, Inc. v. Capital Alliance* Group, 310 F.R.D. 614, 629 (S.D. Cal. 2015). Instead, substantial competent evidence shows that every telephone call at issue was placed as a part of a 100% opt-in consent marketing program – more than "some evidence of prior express consent" which prompted denial of class certification by this Court in *Selby v. LVNV Funding, LLC*.  *See* 2016 WL 6677928 **10-11 (S.D. Cal. June 22, 2016). The Plaintiffs are outliers – they contest the consent records for their telephone numbers with lengthy arguments in multi-page declarations,[10] raising various individualized questions that would be required for each and every member of an alleged class.

Lacking a "viable theory of generalized proof" to establish lack of consent,[11] Plaintiffs have "manufactured" a phony argument, based on a review of only *five* websites, that all consent records were fabricated based on an inaccurate extrapolation of their expert's dubious opinions, which rely on illogical and unsupported "assumptions" resulting from Plaintiffs' counsel's lack of due diligence in discovery.   But "Alexa" cannot certify a class here.  As their own expert admits, Alexa does not rank traffic, and is "unreliable" for analyzing websites with high ranks – like the five websites he reviewed.  *See* DE 49-10, at

---

[9] *See* Dec. Jennifer Poole (Oct. 18, 2018) (**Ex. 4**), at ¶9.  In their Motion, Plaintiffs turn a "blind eye" (to borrow their phrase) to Royal's unrefuted consent evidence, actually stating that "Royal Seas has no evidence **whatsoever** that even a single consumer consented [to be called]."  Motion, at 6 (emphasis added).  This goes beyond mere hyperbole – it is a blatant misrepresentation.

[10] *See* DE 49-6, at ¶¶10-30; DE 49-7, ¶¶6-8.

[11] *See Gene and Gene LLC v. BioPay LLC,* 541 F.3d 318, 329 (5th Cir. 2008) (denying certification of TCPA class because consent could only be resolved on a case-by-case basis and plaintiff lacked class-wide proof to address consent).

3

¶39.  Although Weeks relied upon Alexa to reach his opinion that *some* consent records from these websites *appear* to be fake, Weeks did not know how Alexa rankings worked or if Alexa could be blocked from "crawling" a website.[12] Nevertheless, Weeks relied on Alexa and an algorithm published by a Ukrainian internet marketer in a 2013 blog post to estimate traffic from the five websites and guess how many leads they could generate.[13]  Weeks' homemade Alexa methodology is unscientific, and his speculative opinions are totally unreliable.[14]

By comparison, Royal has substantial evidence showing consent was validly obtained for every call in a 100% opt-in consent marketing program.  Royal has sworn declarations from the digital marketing companies, including a publicly-traded company, that generated the majority of the 2.1 million records of consent in this case.[15]  These companies control thousands of webpages and drive traffic to opt-in "landing pages" through a variety of marketing techniques and, as they attest under oath, they neither manufacture consent nor generate a single lead unless a consumer expressly opts in and consents to receive calls from disclosed parties, including Royal.[16]  When consent is provided, the lead information and consent record is transmitted to Prospects and retained on the web servers of the digital

---

[12] Depo. Weeks, at 251:14-252:13; 249:7-14.  Obviously, then, Weeks was not aware that two of the websites he reviewed employ technology to prevent third parties like Alexa from accessing internal traffic information on their websites, which they deem proprietary.  Dec. David Andras (Oct. 10, 2018) (**Ex. 5**), at ¶7.

[13]  Weeks failed to disclose in his report the formula that he claims to have used in a spreadsheet, which he did not retain, and he pasted a graph reflecting the conversion rate into one of his reports without attribution.  *See* Ex. 1 [Alexa blog authored by Vladimir Luchaninov].

[14] Dec. Margaret Daley (Oct. 19, 2018) (**Ex. 6**), at ¶¶63-71;78-86; 89-91; 98-99.

[15] Dec. Grant, at ¶¶5-6; *see generally* Dec. Andras; Dec. Kevin Brody (Oct. 10, 2018) (**Ex. 7**); Dec. Daniel Barsky (Oct. 8, 2019) (**Ex. 8**); Dec. Aaron Slemboski (October 18, 2018) (**Ex. 9**).

[16] *See infra*, at n. 15.

4

marketing company, as reflected in the declarations.[17]   When a call is made with consent by Prospects, and the consumer expresses an interest in, and qualifies for, an offer from Royal, the call and the consent records are transmitted to Royal by Prospects.[18]   These consent records – more than 2.1 million of them – have been produced in this case.

Based upon this substantial evidence of consent, this Court should apply the same analysis employed in *Selby* and reach the same result.   Plaintiffs' Motion, which invites this Court to ignore the mountain of consent evidence in this case and dispense with its obligation to conduct a rigorous analysis under Rule 23,[19] must be denied.   The Court will find that the Motion can never withstand any analysis, let alone the rigorous analysis required under Rule 23.

## II.   FACTUAL BACKGROUND

Royal is a Fort Lauderdale, Florida-based company engaged in the sale of vacation packages through various marketing programs, including inbound lead generation using third-parties.[20]   One such lead generator is Prospects, which Royal has used to generate inbound call transfers since November 2016.[21]   Prospects specializes in generating live consumer telephone calls through opt-in consent internet marketing and transferring live calls to clients for a fee.[22]   Royal is not

---

[17] Dec. Grant, at ¶¶13-14; Dec. Brody, at ¶13, Ex. B; Dec. Barsky, at ¶¶21-28.

[18] Dec. Grant, at ¶¶12-14; Dec. Poole, ¶¶5-8.

[19] *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (Court must apply a "rigorous analysis" in scrutinizing class certification under Rule 23(b)(3).   While Plaintiffs contend that "hybrid certification" under Rule 23(b)(2) and (b)(3) is "necessary and appropriate" (Motion, at 21-22), it is not – when each plaintiff is independently entitled to pursue statutory damages under the TCPA, "Plaintiffs' TCPA claims are ineligible for Rule 23(b)(2) certification, regardless of Plaintiffs' parallel request for injunctive relief."   *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 579 (S.D. Cal. 2013).

[20] Dec. Poole, at ¶4.

[21] *Id*., at ¶5; Dec. Grant, at ¶7.

[22] Dec. Poole, at ¶5; Dec. Grant, at ¶¶4-5.

5

affiliated with Prospects, does not direct or control Prospects' marketing and lead generation, and is just one of many clients of Prospects, which places many lead calls unrelated to Royal.[23]  Plaintiffs' Motion and "experts" erroneously assume that Prospects placed more than 634 million calls on behalf of Royal.[24]  In fact, the records Prospects produced in response to Plaintiffs' subpoena contained logs for every lead call it has ever placed during the time frame reflected in those logs *for all of its many clients*, including Royal.[25]   All live calls transferred to Royal as leads from Prospects were generated in strict compliance with the TCPA and only after obtaining prior express written consent.[26]

### a. The Opt-in Consent Marketing Program

Consumers called by Prospects' live agents are leads generated from hundreds, if not thousands, of websites operated by digital marketing companies.[27] These websites contain "landing pages" upon which consumers may sign up and opt-in to receive inbound, TCPA-compliant telephone calls from Prospects for companies offering products and services for which they expressed an interest.[28] The digital marketing companies drive traffic to these landing pages through a variety of direct marketing, including online display advertising, email advertising,

---

[23] Id., at ¶¶8, 22.

[24] Motion, at 1, 6, 16; Depo. Weeks 119:4-11; Depo. Peters-Stasiewizc (Aug. 16, 2018) (**Ex. 10**), at 71:12-73:6.

[25] Dec. Grant, at ¶¶20-22.

[26] *Id.* at ¶¶7, 21; *see also* Royal's Ans. & Obj. to Pls.'s 1st Interrogs. (March 6, 2018), at No. 3 (**Ex. 11**); Depo. Jennifer Poole (June 19, 2018) (**Ex. 12**), at 10:25-15:10.  Additionally, the platform that Prospects uses to make telephone calls does not have the capacity to randomly or sequentially generate telephone numbers. Dec. Grant, at ¶12.  Thus, Prospects does not make calls using an automated telephone dialing system as that term is defined under the TCPA.

[27] Dec. Grant, at ¶¶5, 9.

[28] *Id.*, at ¶10; Dec. Brody, at ¶12, Ex. A; Dec. Andras, at ¶6; Dec. Barsky, at ¶11-18.

36798925.1

social media, and co-registration paths.[29]   Before entering into a relationship with one of these digital marketing companies and accepting leads, Prospects verifies the opt-in consent procedures on their websites.   For example, before accepting leads from www.dealzingo.com, Prospects reviewed the opt-in process of the website's owner, Flex Marketing Group, LLC, as demonstrated on the video viewable at the following link: https://spaces.hightail.com/space/2MW2L2GbVk.[30]

On these websites, consumers are offered an opportunity to register to receive information on promotions and products by completing a form including their full name, telephone number, and other information,[31] and then checking a box expressly consenting to receive telephone calls from identified companies and organizations, including Royal, and hitting "submit" or "next."[32]  If the consumer does not check the box, the submit button will not function, and no lead will be generated. [33]   For example, on www.MyHealthcareAuthority.com, one of five websites "analyzed" by Weeks, the following consent language has been in use for the past two years:[34]

By clicking Submit I hereby consent to have a representative from Eximia Health, Med Hub Supplies, Teladoc, OneTouch Direct, Diabetic Connect, Support First, Gerber Life Insurance, Helping Hands Association, Eximia Health, Royal Seas Cruises and other marketing partners contact me for marketing purposes and other opportunities on my landline or wireless number regardless if I am on the company, national or state do not call registry and agree to the terms of the privacy policy. I understand these contacts may be generated via pre-recorded message, automated dialer, email and SMS text.



---

[29] Dec. Grant, at ¶4; Dec. Andras, at ¶3; Dec. Brody, at ¶11; Dec. Barsky, at ¶6.
[30] Dec. Grant, at ¶11.
[31] Dec. Grant, at ¶10; Dec. Andras, at ¶6; Dec. Brody, at ¶12, Ex. A; Dec. Barsky, at ¶¶11-16.
[32] Dec. Grant, at ¶10; Dec. Andras, at ¶6; Dec. Brody, at ¶12; Dec. Barsky, at ¶16.
[33] Dec. Grant, at ¶10; Dec. Andras, at ¶6; Dec. Brody, at ¶12; Dec. Barsky, at ¶16.
[34] Dec. Andras, at ¶6.   *See also* Dec. Brody, at Ex. A (similar consent language used on diabeteshealth.info, which generated the lead for McCurley's number); Dec. Barsky, at ¶17 (showing sample of opt-in form of person called by Prospects).

After consumers submit their information on one of these websites and expressly consent to be contacted, Prospects' live agents will place telephone calls to the telephone numbers.[35]  For those customers who have expressed an interest in travel and qualify for an offer from Royal, Prospects will transfer the live calls to Royal; Prospects receives a fee from Royal for each qualified lead.[36]  Prospects also transmits to Royal an electronic consent record for the lead containing certain information that the consumer provided on the opt-in website.[37]

Consent records for Plaintiffs have been produced in this case: the consent record for Daniel DeForest ("DeForest") reflects that his telephone number, name, and other information was submitted on December 9, 2016, at www.yourautohealthlifeinsurance.com,[38] and the consent record for John McCurley ("McCurley") reflects that his telephone number, name, and other information was submitted on April 30, 2017, at www.diabeteshealth.info.[39]  Additionally, Royal produced to Plaintiffs more than 2.1 million opt-in consent records of leads it received from Prospects.[40]  These records reference more than 1,100 websites and, for those opt-in records that do not have an associated website, they would have been leads generated by Fluent, LLC, which has requested that Prospects not

---

[35] Dec. Grant, at ¶¶10, 12.

[36] *Id*., at ¶12; *see* Dec. Todd Friedman (July 30, 2018) (DE 49-2), at Ex. B, at ¶4.

[37] Dec. Grant, at ¶13; Dec Poole, at ¶8; Depo. Poole, at 34:20-41:12; 51:9-53:8.

[38] This is the correct website associated with the opt-in record for DeForest, although an opt-in record produced by Royal as RSC-McCurley.000016 (*see* DE 49-9, at p. 54), contained an error in regard to identification of the opt-in website in the data transmitted to Royal by Prospects.  Dec. Grant, at ¶30, Ex. A.

[39] *See* RSC-McCurley.000011-15 (DE 49-9, at pp. 49-53); Dec. Grant, at Ex. B.  Moreover, the company that owns diabeteshealth.info has produced a web server record of McCurley's number being submitted on the webpage on April 30, 2017. *See* Dec. Brody, at ¶13, Ex. B.

[40] Plaintiffs complain in their Motion that this information was produced late in an act of "gamesmanship."  Motion, at n. 5.  They never filed a motion with the court (not to challenge the production or to ask for more time) and never held any type of conference with the undersigned counsel relating to these records.

transmit url information in consent data to its client.[41]  Plaintiffs deny providing consent, each raising a variety of factual issues in declarations to contest the validity of their consent records.  However, Plaintiffs fail to identify any other person who claims they were called without consent or disputes any of the 2.1 million-plus consent records produced.

### b. Digital Marketing Companies Corroborate Substantial Evidence of Consent and Demonstrate Legitimacy of their Opt-In Lead Generation Websites

Plaintiffs' Motion fails to cite to any record evidence, and instead attempts to "create" "evidence" through a purported "expert."   Conversely, this Memorandum is supported by actual record evidence of consent for every call at issue and a clear, consistent description of the opt-in consent marketing program that generated the calls, including but not limited to: a declaration, interrogatory answers and deposition testimony from Royal; more than 2.1 million records of consent; a declaration from Prospects, the lead generator that placed the calls; and declarations from several digital marketing companies that generated the majority of the consent leads, including records of web server logs showing specific consumer information was submitted on these websites that matched the information contained in the consent records received by Royal from Prospects and produced in this case.

Weeks' unreliable opinions, and Plaintiffs' false and reckless claim that all consent leads generated for Prospects are fake, directly impugns the reputations of multiple lead generation companies and questions the integrity of their services. The owners of the five websites reviewed by Weeks unequivocally dispute his suggestion that their leads were fabricated.  Moreover, all of them provide actual evidence demonstrating the legitimacy of their opt-in process and consent records.

Fluent, Inc. ("Fluent"):  Prospects[42] gets more than fifty percent (50%) of its

---

[41] Dec. Grant, at n. 2.

[42] Prospects contracted with Fluent through an affiliate, Yodel.  Dec. Barsky, at ¶4.

9

consent leads from Fluent, a publicly-traded digital marketing company (Nasdaq: FLNT).[43]   Fluent has developed a proprietary ad serving and lead generation system, which ensures that leads are only generated with express written consent and stores records of consent (and revocation of consent) in a database maintained on redundant servers.[44]   Fluent queried its database on six randomly-selected users who consented to be called by Royal, and has produced screenshots from its database showing that six specific consumers visited one of its websites and provided consent to be called about Royal; none of them revoked consent.[45] Prospects does not transmit website information for Fluent leads in consent records its transmits to Royal, so Weeks could not have reviewed any websites from Fluent, which provides more than half of Prospects' leads, to develop his opinions.[46]

   Landfall Data, LLC ("Landfall"):   Landfall operates multiple websites, including www.diabeteshealth.info, and works with a large network of web publishers that control thousands of websites, to generate consent leads online for its customers, including Prospects.[47]   Landfall has furnished evidence from its own web server showing the number of times that Mr. McCurley's telephone number was opted-in to receive telephone calls, including the April 2017 opt-in that led to the telephone call at issue here.[48]   Landfall also provided evidence that there were approximately 2,275,987 visitors to that website in April 2017,[49] the month in the consent record McCurley's telephone number was provided.[50]   Weeks has testified

---

[43] *Id.* at ¶4; Dec. Grant, at ¶5.

[44] *Id*. at ¶¶7-16.

[45] Dec. Barsky, at ¶¶21-28.

[46] Dec. Grant, at ¶13, n.2.

[47] Dec. Brody, at ¶¶8,11; Dec. Grant, at ¶6.

[48] Dec. Brody, at ¶¶13-14, Ex. B.

[49] *Id*., at ¶15, Ex. D. Weeks did not analyze any data from 2017, basing his "opinions" on Alexa Rankings he pulled in July 2018 (going back only 90 days).

[50] Dec. Brody, at ¶15, Ex. D.

that web server logs like this are the best evidence of a website's traffic.[51]

Citadel Marketing Group, LLC ("Citadel"):   Citadel operates multiple websites, including three of the five websites reviewed by Weeks, to develop bona fide opt-in consent leads for its customers, including Prospects.[52]  Weeks opined that one of these websites, www.MyHealthcareAuthority.com, could only have had an estimated one visitor a day based on his findings that it had no Alexa rank in 2018 and did not appear on the first 10 pages of results from searches on Google and Bing.[53]  However, Citadel has provided evidence from its web server showing that an average of about 20,000 consumers per day visited this website in September 2017.[54]

Employment Hub:  Employment Hub owns and operates various consumer-facing websites, including https://employmenthub.co, and drives traffic to its websites using various marketing, including Google display advertisements, Facebook, and Instagram marketing.[55]  Employment Hub employs proprietary processes, procedures, and networks to develop *bona fide* opt-in consent leads on its websites, including leads resulting in call-transfers to Royal, and has never electronically manufactured its opt-in data.[56]  Employment also uses in-house proprietary technology to prevent "robots" and third parties, like Alexa, from gleaning information from its websites' "internal site metrics and traffic sources."[57]

---

[51] Depo. Weeks, at 298:15-299:2.  To be clear, this information that Weeks says he asked for was not requested by Plaintiffs' counsel in this case.  Plaintiffs' counsel did not send any subpoenas to any of the companies mentioned in Weeks' Reports.

[52] Dec. Andras, at ¶¶3-6; Dec. Grant, at ¶6.

[53] DE 49-10.

[54] Dec. Andras, at ¶9.  The website could not provide earlier statistics, having "undergone wholesale technology, website, and marketing changes" since September 2017.  *Id.*, at ¶10.

[55] Dec. Slemboski, at ¶3.

[56] *Id.*, at ¶¶4-6, 12-14.

[57] *Id.*, at ¶7.

11

### c. Plaintiffs' Manufactured-Consent Argument Is Manufactured and Suffers from a Fatal "Weeksness"

The gist of Weeks' "opinion," contained in two separate reports, is that five websites generating leads for Prospects, based solely on an Alexa Ranking from July 2018, do not have enough *traffic* "to generate the volume of leads attributed to them" and some of the leads are "likely computer generated" and "had to have been falsified in some manner." (*see* DE 49-10, ¶83;  DE 49-9, ¶¶71-72).  To reach this opinion, Weeks relied upon Alexa Rankings from July 2018 – not any information about the websites on the dates that leads were actually created.[58]  Weeks acknowledged that anyone can use Alexa, Alexa is not reliable, and Alexa does not actually rank website traffic.[59]  Thus, to estimate traffic using the Alexa rankings of the websites, Weeks testified that he used a formula he found in a blog by a Ukrainian internet marketer in 2013,[60] described as follows:  "Daily Reach = 145.42 x AlexaRank$^{-1.008}$ R$^2$ = 0.9791."[61]  Weeks is not a mathematician, could not explain or use the formula during his deposition, did not know how the formula was created, or its source, and knew nothing about the author of the blog or the website

---

[58] Again, two of the five websites (four chosen by Plaintiffs' attorneys) are not identified in the "call logs" or the consent data.  This begs the obvious question: Why did Plaintiffs' counsel select these two websites for Weeks to "analyze"?

[59] Depo Weeks, at 84:13-19; 266:19-268:21; *see* DE 49-10, at ¶7 ("Converting Alexa Rank to traffic is an estimate only and an Alexa rank does not directly translate to traffic").

[60] *See Alexa Rank – a thorough examination*, Vladimir Luchaninov, http://netberry.co.uk/alexa-rank-explained.htm (last updated May 4, 2013). A copy of the article, print out of the blog is as Exhibit "A" to this Memorandum.

[61] Depo. Weeks, at 209:25-211:14, Ex. 8.  Weeks failed to include the formula in either of his reports, only disclosing it in a "Supplement" produced by Plaintiffs in early September after Royal counsel sought omitted information required under Fed. R. Civ. P. 26(a)(2).  *Id.*, at Ex. 8.  However, his "Supplement" did not show if or how Weeks actually used the formula to calculate numbers in his Reports, and when asked at his deposition to actually use the algorithm and "show his work," he could not do so.  *Id.* at 236-239.

on which it was found.[62]  In fact, as noted in the blog, this formula was developed based upon a 2012 estimated total of 2.4 billion known internet users worldwide, compared to an estimated 4.1 billion users currently, so even if the formula was reliable in 2013 – which Weeks did nothing to determine – the formula could not accurately calculate internet traffic in 2018.[63]  Nonetheless, Weeks relied on this formula to calculate the supposed traffic for each of the five websites, then estimated the number of leads each website could be expected to generate by using a conversion rate of 2.35% – another number he found in another blog from 2014.[64]

For a host of reasons,[65] the result of Weeks' dubious method for estimating traffic and leads using Alexa has no evidentiary value in this case, and it does not support his narrow opinion that *some* leads from these five websites *may* have been fabricated.  First, he is comparing apples to oranges – Alexa only shows how popular a website is during the prior 90 days compared to other websites, yet Weeks estimates traffic and leads from the five websites based upon Alexa rankings obtained in late June or early July 2018 to conclude the websites lacked the capacity to generate traffic and leads resulting in calls going back to November 2016.[66]  Second, Weeks himself notes that Alexa is "unreliable" for analyzing websites like the five websites he reviewed.  *See* DE 49-10, at ¶39.  Third, two of

---

[62] *Id.*, at 219:3-24; 236:1-241:1; 242:9-244:13.

[63] Dec. Daley, at ¶50 (variation of *1.7 billion* internet users renders formula obsolete, assuming it was accurate in 2013).

[64] Although Weeks knew nothing about the blog's author or the website on which he found the conversion rate, and he is not an expert on website conversion rates, he nonetheless relied on it and cut and pasted a graph from the blog into one of his reports as "Figure 3," without attribution, giving the false impression he had compiled the data and prepared the chart.  Depo Weeks, at 276:3-9.

[65] *See Generally* Weeks Motion; Dec. Daley, at ¶¶1-99.

[66] Moreover, Alexa rankings fluctuate wildly over short periods of time (Dec. Daley. ¶89) and *Weeks was not even aware that historical Alexa rankings are available* that would have allowed him to measure Alexa rankings of websites at the time opt-in consent leads were generated. Depo. Weeks, at 334:6-335:9.

the five websites he reviewed did not generate any of the more than 2.1 consent records in this case, and so his analysis of those websites is irrelevant.  Lastly, two of the websites Weeks reviewed use technology to prevent third parties like Alexa from accessing internal traffic information on their websites.[67]  As such, the Alexa rankings of these websites, and Weeks' opinions based thereon, are meaningless. [68]

Apart from his defective Alexa analysis, Weeks' opinions rely on unfounded assumptions about the consent data.   For instance, Weeks opined that the consent data reflected "clear patterns" of leads being created only between 9 a.m. and 9 p.m. on weekdays, for a shorter duration on Saturdays, and never on Sundays, which he called a "smoking gun example" of leads being fabricated through "electronic submission."[69]  He did not comprehend that dates and times in the consent data reflect when the records were transmitted to Royal by Prospects – consistent with a call center's hours of operation – not when the original lead was created online.[70]  When confronted with this fact as a hypothetical, Weeks, who did not know the source of the consent data, testified that his analysis of the consent records would be "flawed" and "that changes my conclusion that that would be a smoking gun example of electronic submissions." [71]

Weeks also suggests, based on a "cursory review" of the consent data, that multiple leads from www.getmysolarpower.com were suspicious because they all

---

[67] Dec. Andras, at ¶7.

[68] Even if his opinions were accepted as it relates to the three websites for which leads were generated, individualized issues nonetheless exist.   Weeks said he doesn't know and hasn't identified which of the leads from those websites are, in fact, fake.   He acknowledged though that not all of them are.   And, he acknowledged that any analysis of his Alexa-traffic theory would need to be conducted by analyzing rankings and traffic on the dates associated with each lead.

[69] *See* Weeks Report, DE 49-9, at ¶58.

[70] Dec. Poole, at ¶¶15-19; Dec. Grant, at ¶33; Dec Daley, at ¶¶36-38.

[71] Depo Weeks, at 161:9-165:20; 182:2-11; 189:21-190:14.

14

contained the same IP address, but he did not investigate further.[72]   Upon investigation by Royal, however, the digital marketing company that generated these leads, Employment Hub, reveals that this anomaly was due to a technical glitch with the company's server, which caused the server's IP address to be transmitted to Prospects, but all leads the company had provided to Prospects had genuine opt-in consent records.[73]

### d. A Real Expert Shows Weeks is Unqualified and His Opinions are Unreliable, Inaccurate and Biased

Peggy Daley is the Managing Director of a leading global advisory and expert services firm that works with Fortune 500 companies, governmental agencies, and regulatory bodies throughout the world.[74] Daley is a nationally recognized digital forensic investigative expert with substantial experience serving as an expert witness in state and federal cases, including TCPA cases involving the analysis of consent data and lead lists derived from website opt-ins; unlike Weeks, Daley holds multiple degrees, licenses (including a law license) and certifications; and unlike Weeks, Daley has written scholarly articles on data analysis.[75]

As detailed in her Expert Report, and discussed in Royal's Motion to Exclude Testimony and Report of Wesley Weeks, Daley found that Weeks' reports were replete with errors, his methodology lacked scientific rigor, and his reporting and findings were  tainted by bias.[76]  As such, she found that "Mr. Weeks' analysis is unscientific and uses demonstrably unreliable and outdated data to support his

---

[72] Weeks Report, DE 49-9, at ¶64, Ex. C.

[73] Dec. Aaron Slemboski (Oct. 18, 2018), at ¶14.  Additionally, when those leads from Employment Hub were received by Prospects, they were erroneously identified as leads from getmysolarpower.com when saved in Prospects' database when they were in fact generated by employmenthub.co.  Dec. Grant , at ¶34.

[74] *Id*., at ¶6.

[75] *Id*., at ¶¶6-11, Ex. 1

[76] *Id*., at ¶98.

15

claim that [some of] the leads in this case are fraudulent."[77]  Based upon Daley's review of Weeks' reports, analysis of opt-in consent data, and her own independent research of Weeks' methodology and conclusions, Daley opined with a reasonable degree of scientific certainty that Weeks' opinions are "unreliable, inaccurate and biased."[78]

## III.    **ARGUMENT**

### a.    **The Law Governing Class Certification**

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Comcast*, 133 S.Ct. at 1432.  To come within this exception, a representative plaintiff must "affirmatively demonstrate his compliance" with all the elements of Rule 23, subject to a "rigorous analysis" by the Court  *Id*. (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-2552 (2011)).  Rule 23 "does not set forth a mere pleading standard." *Id*.  Rather, a party seeking to maintain a class action must be prepared to show that Rule 23(a)'s numerosity, commonality, typicality, and adequacy-of-representation requirements have been met, and satisfy through "evidentiary proof of at least one of Rule 23(b)(3)'s provisions."  *Id*.  Courts also require that a plaintiff seeking class certification must demonstrate that a class is 'adequately defined and clearly ascertainable' to be certified." *Bee, Denning,* 310 F.R.D. at 622.

In addition to satisfying the four elements of Rule 23(a) and ascertainability, a party seeking class certification must satisfy one of the three elements of Rule 23(b).  Here, Plaintiffs improperly seek "hybrid certification" of a putative class under Fed. R. Civ. P. 23(b)(2) and (3).  *See  Wal-Mart*, 131 S.Ct. at 2557.  *See Stemple v. QC Holdings, Inc.*, 2016 WL 4059345 *4 (S.D. Cal. April 25, 2016) (applying this exclusion to TCPA cases like this one where each putative class

---

[77] *Id*.

[78] *Id*., at ¶99.

member would be individually entitled to statutory damages) (citing *Connelly*, 294 F.R.D. at 579).[79]

Thus, for Plaintiffs to maintain a class under Rule 23(b)(3), this Court must determine that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy;" the predominance and superiority requirements are "far more demanding" than is rule 23(a)(2)'s commonality requirement. *Amchem Prods. v. Windsor*, 117 S.Ct. 2231, 2250 (1997).  In seeking a class for claims under the TCPA, predominance will not be satisfied if individualized inquiries into the issue of consent are necessary.  *Selby*, 2016 WL 6677928 at *10.

### b. Plaintiff's Motion Withers under a Rigorous Analysis and Fails to Satisfy Rule 23's Prerequisites for Class Certification

### 1. Individualized Issues Will Overwhelm the Proceedings if a Class Were Certified, as Plaintiffs Lack a Plausible Classwide Means of Addressing Consent for Every Putative Class Member

A plaintiff seeking to certify a class under Rule 23(b)(3) has the burden of demonstrating *with evidence* that common issues predominate over individual issues, based upon a rigorous analysis by the Court  *Comcast*, 133 S. Ct. at 1428-29.  "The predominance inquiry requires a court to consider 'how a trial on the merits would be conducted if a class were certified.'"  *Gene and Gene,* 541 F.3d at 326 (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)).  If a trial would entail "the separate adjudication of each class member's individual

---

[79] Plaintiffs seek "hybrid certification" as a hedge because they cannot satisfy Rule 23(b)(3)'s predominance and superiority elements, but the result would be the same under Rule 23(b)(2).  *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 269-270 (3d Cir. 2011); *see also Carter v. Butz*, 479 F.2d 1084, 1089 (3d Cir. 1973) ("disparate factual circumstances of class members" can prevent class from being sufficiently cohesive to support certification of a Rule 23(b)(2) class).

claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).

In this case, consent is the predominant issue for resolving class certification, and Plaintiffs lack any evidence or a *plausible* classwide method of proof to overcome the individualized issues of consent that can only be resolved on a case-by-case basis. Every call at issue in this case was made by a Prospects live agent[80] and arose from a 100% opt-in consent marketing program – through hundreds, if not thousands, of web pages. This is not a case where consent was obtained from a single source, at a single time, or where the defendant has not provided any evidence of consent. Royal has provided evidence of express written consent for more than 2.1 million calls transferred to it by Prospects, including records for Plaintiffs' telephone numbers, and numerous declarations and exhibits showing the legitimacy of the consent records and the website opt-in marketing program that generated them.[81] Plaintiffs cannot identify, or show a means of identifying, any other person besides themselves who claims to have been called without consent. Aware of their dilemma, Plaintiffs concoct a wholly implausible theory of "classwide proof" –consent records are fake – without any evidentiary support.[82] But even Weeks contradicts Plaintiffs' arguments[83] – testifying that not all leads

---

[80] This begs the question as to whether or not the telephone calls are in anyway violative of the TCPA, even if consent were not properly obtained (it was).

[81] *See* Infra, at §II(a)-(c). "Generally, when the defendant provides specific evidence showing that a significant percentage of the putative class consented to giving calls, issues of individualized consent predominate." *Legg v. PTZ Ins. Co.,* 321 F.R.D. 572, 577 (N.D. Ill. 2017) (citing *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106–07 (N.D. Ill. 2013)).

[82] Depo. Weeks, at 60:23-63:19 (confirming there is "no way" to link his conclusions about the five websites he reviewed to any of the other more than 1,100 known websites that generated consent in this case, and admitting that websites he did not analyze "could very well generate a significant number of leads").

[83] *See i.e.* Weeks Motion.

from the five websites are fake, that he doesn't know which ones are, and that his analysis cannot be extrapolated beyond the five websites he reviewed.[84]

Plaintiffs further conflate the burden of proof on consent.[85] Royal does not have the burden to prove consent for purposes of class certification, as Plaintiffs imply. Regardless, the unrefuted evidence demonstrates that every call by Prospects, whether for Royal or other clients, was made with consent.[86] Indeed, Royal has end-to-end evidence showing how consent was obtained in this opt-in marketing program.[87] Under this Court's analysis in *Selby*, Royal has "adequately established [its] position that predominance is not satisfied because individualized inquiries into the issue of prior express consent will be necessary." 2016 WL 6677928, *10. In *Selby*, this Court denied class certification because the defendant had provided "some evidence of consent" for the debt collection calls underlying the TCPA claims at issue, the debts arose in varying contexts, and the plaintiff failed to show a uniform process for resolving consent on a classwide basis. *Id.*, at *10-11. Here, Royal has provided *overwhelming* evidence of consent. Likewise, the 2.1 million consent records were generated on hundreds, if not thousands, of different websites using similar but differently-worded consent language, over the

---

[84] Depo Weeks, at 61:21-62:12; 64:15-21; 103:11-106:6.

[85] Whether consent is an affirmative defense or an element of a TCPA claim is "immaterial at the class certification phase." *Selby*, 2016 WL at *4 (citing *Kristensen v. Credit Payments Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014)) (for purposes of class certification, plaintiff must prove consent, or lack thereof, with evidence and theories applicable to the entire class).

[86] Dec. Grant, at ¶21.

[87] For instance, Fluent, Inc., a publicly-traded company that provides Prospects with more than half of its leads, has provided a sampling of its web server records showing that six specific consumers visited one of its websites and provided consent to be called by Prospects about Royal. Dec. Barsky, at ¶¶21-28; Dec. Grant, at ¶5. The same consumers are included among 2.1 million consent records transmitted to Royal and produced in this case.

period of nearly two years.[88]   As such, there is simply no plausible classwide method for addressing consent.

For an illustration of how a trial on the merits would be conducted if a class were certified in this case, the Court need only review Plaintiffs' declarations and multiply by 2.1 million.  To dispute the consent record for his telephone number, DeForest states that he never gives out his telephone number unless "I am trying to do business with somebody or build up one of my businesses," and makes six other fact-specific statements personal to him.[89]   McCurley's declaration uses 21 paragraphs to contest facts in his consent record, averring that he never went to diabeteshealth.info, does not have diabetes, does not know anyone with diabetes, and never sought information about diabetes on the internet.[90]  Similar personalized inquiries will be required for the consumers identified in more than 88,000 other consent records generated by diabeteshealth.info[91] that were called by Prospects and transferred to Royal (and the rest of the 2.1 million records).

In addition to the host of individualized questions raised by McCurley and DeForest regarding the consent records for them, individualized inquiries for each putative class member would be required to answer the following questions:

- Did the consumer identified in the consent record provide consent to be called at the telephone number identified in the consent record? If not:

---

[88] *See Gene and Gene*, 541 F.3d at 329 (class-wide proof of consent not possible because defendant "culled fax numbers from a variety of sources over a period of time"); *Connelly*, 294 F.R.D. at 578 (individualized issues of consent found to predominate because defendant obtained putative class members' telephone number from a variety of sources over a period of time).

[89] DE 49-7, at ¶8

[90] Dec. McCurley (DE 49-6), at ¶¶10-21.  Regardless of McCurley's averments that he did not furnish his telephone number at this website, the consent record for his number transmitted to Royal and produced in this case is an exact match to the web server record produced by the owner of diabeteshealth.info.  Dec. Brody, at ¶ and Ex. B.  Moreover, the company has records showing McCurley's telephone number was furnished through multiple opt-ins on several websites. *Id*., at Ex. C.

[91] Dec. Poole, at ¶20.

- o Did someone else provide consent to be called at the telephone number identified in the consent record?
- Is the number in the consent record a cellular number?
- Is the consumer identified in the consent record the subscriber of the telephone number?  The user?
- Does the consumer dispute the validity of the consent record for the consumer's telephone number?
  If so:
  - Is the address identified in the consent record the consumer's address?
    - o Is the address associated with the telephone number?
  - Is the email identified in the consent record the consumer's email?
    - o Is the email associated with the telephone number?
  - Is the IP address identified in the consent record match the IP address of the consumer's computer or other device capable of accessing the internet at the date of the opt-in?  Currently?
  - Is there a website identified in the consent record?  If so:
    - o Did the consumer visit that website on the date of the opt-in?  Did someone else?
    - o Did the consumer retain records reflecting of the browsing history of the consumer's computer or other device capable of accessing the internet at the time of the opt-in?
    - o Does the owner of the website have a web server log showing the creation of the opt-in?
    - o What the Alexa ranking of that website on the date of the opt-in?
- Did the consumer suffer a concrete injury.[92]

"[T]he predominance inquiry in TCPA actions often turns on whether individualized inquiries – rather than generalized proof applicable to the entire class

---

[92] *See Spokeo Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016) (Article III of the U.S Constitution requires a concrete injury even in the context of a statutory violation). *Spokeo* raises a host of additional individual inquiries.  To assert TCPA claims of a putative class, Plaintiffs will need to prove that each class member suffered an injury, which is not possible in one broad stroke, necessitating scrutiny of every call to determine the nature of the injury, including whether or not each person answered a call, was called on a cellular phone, was called by use of a prerecorded voice within the meaning of the TCPA, where reach persons was located at the time of the call, and if the call was answered, what did each person heard (for prerecorded voice claims, the call must be answered and the recording must actually play).  *See Ybarra v. Dish Network*, 807 F.3d 636 (5th Cir. 2015).

21

– are required to demonstrate an individual class member's prior express consent." *Blair v. CBE Group, Inc.*, 309 F.R.D. 621, 628 (S.D. Cal. 2015). Based on the evidence, it is clear that a trial would devolve into individual mini trials for every putative class member on the issue of consent, which is inimical to the policies served by class actions.[93] Plaintiffs' failed attempt to create a phony form of classwide proof by asserting that consent was "manufactured" is not even supported by their own expert. As such, Plaintiffs fail to meet their burden of demonstrating *with evidence* or a *plausible* method of showing common issues predominant over individual issues.

### 2.   Plaintiffs' Class Descriptions Fail to Clearly Define any Class that Can Be Ascertained by Objective Criteria

"Apart from the express requirements of Rule 23, federal courts have also held that a class must be 'adequately defined and clearly ascertainable' to be certified." *Bee, Denning*, 310 F.R.D. at 622 (quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-680 (S.D. Cal. 1999). As noted by this Court, "'the party seeking class certification must demonstrate that an identifiable and ascertainable class exists,'" and "[c]ertification is improper if there is 'no definable class'." *Stemple v. QC Holdings, Inc.*, 2016 WL 4059345 * 4 (S.D. Cal. April 25, 2016) (quoting *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009), and *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007)). A definable class is one that is "precise, objective, and presently ascertainable." *Id.* (quoting *O'Connor v. Boeing N. Am. Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)).[94]

---

[93]   Indeed, mini trials would be required here if putative class members sought to dispute the validity of their consent records, as Royal has a right to cross examine each class member. *See Shamblin*, 2015 WL 1909765 at *7 (defendants in TCPA case have a constitutional right to a jury trial to determine issues of consent); *see also Adickes v. S.H. Kress & Co.*, 90 S.Ct. 1598, 1618 (1970) (the right to confront adverse witnesses is a fundamental right preserved under the Seventh Amendment for civil cases).

[94] Plaintiffs suggest that they do not have to present a "feasible methodology" for

The Motion proposes no such objective criteria or means of presently ascertaining members of a class or subclass Plaintiffs define as follows:

> All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018.

> All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018, and whose call resulted in a Transfer to Royal Seas Cruises, Inc. (Motion, at 10).

As an initial matter, the Court is precluded from certifying these nationwide classes described by Plaintiffs, as the Court lacks general personal jurisdiction over Royal to do so. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017) (a court can validly exercise personal jurisdiction over a non-resident's claims only where the court has general jurisdiction over the defendant or specific jurisdiction over the non-resident's claims). Royal is undisputedly not within this Court's general personal jurisdiction: it is incorporated under the laws of the State of Florida, has its principal place of

---

identifying class members because this is a "consumer class action." Motion, at 14 (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123, 1132-33 (9th Cir. 2017)). However, in *Briseno* the plaintiff proposed aggregating damages for false marketing of cooking oil as "natural," such that the number of class members would no impact the amount of damages and the identity of class members would not implicate the defendant's due process rights. Nothing in *Briseno* supports Plaintiffs' broad interpretation that it applies to all consumer class actions, especially a TCPA action alleging a class of persons seeking statutory damages.

36798925.1

business in Florida, and has no other systematic contacts (to the extent relevant) in California.[95]

Plaintiffs' class descriptions also fail on multiple other fronts. First, they describe absolutely lawful conduct. There is no *per se* prohibition on making telephone calls, as seemingly implied by this definition; only calls utilizing an ATDS and/or utilizing a prerecorded or artificial voice – and even then only if made without express written consent – would violate the TCPA.[96] Second, the TCPA class Plaintiffs proposed in their Complaint was limited to calls to "non-customers" that were "placed for the purpose of marketing,"[97] but the above class descriptions would include calls to customers and calls for non-marketing purposes. This is an improper expansion of the class espoused in their Complaint, which Plaintiffs have made no effort to amend. *See G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09 C 05528, 2011 WL 248511, *4 (N.D. Ill. Jan. 25, 2011). Third, while there is substantial evidence of consent for every call made by Prospects, Plaintiffs can only dispute the consent records for their own telephone numbers. They cannot identify any objective criteria for challenging the validity of any other consent record. Fourth, Plaintiffs fail to provide a single piece of evidence that any calls,

---

[95] Dec. Poole, at ¶¶22-25, Ex. A. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (for purposes of "specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*."); *see also DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, *2 (N.D. Ill. Jan. 18, 2018) ("[I]t is more likely than not . . . that the courts will apply *Bristol–Myers Squibb* to outlaw nationwide class actions . . . where there is no general jurisdiction over the Defendants."); *Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*, No. 16 C 9281, 2018 WL 3474444, *2 (N.D. Ill. July 19, 2018) (collecting cases).

[96] *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) ("[w]here a class is overbroad and could include a substantial number of people who have no claim under the theory advanced by the named plaintiff, the class is not sufficiently definite").

[97] Compl. (DE 31), at ¶77. Plaintiffs' Complaint also describes a class of persons, represented by DeForest only, with claims under the California Invasion of Privacy Act (Cal. Pen. Code §632.7), but they do not seek to certify such a class in their Motion.

including calls they received, were made via an ATDS or a prerecorded voice.[98]  To the extent Plaintiffs' claims are predicated upon the use of a prerecorded voice, however, individualized issues exist to ascertain if such calls were in fact answered, and if so, was a prerecorded message played on the telephone call.  *See Ybarra*, 807 F.3d at 640-41.  They merely conclude, without explanation, that "[c]lass membership may be readily determined by objective criteria."  Motion, at 14.

As their "objective information" to define a class, Plaintiffs and their experts rely upon records produced by Prospects that they assume consist "of over 630 million phone calls it placed on behalf of Royal Seas Cruises, comprised of over 53 million unique phone numbers (class members)."  Motion, at 6, 15.  They are grossly mistaken.[99]  The "630 million" records produced by Prospects were logs of *all* calls made by Prospects *on behalf of all of its clients*.[100]  Not all of the calls were related to Royal and according to Prospects there is nothing in the "call logs" to identify which calls did.[101]

In light of this glaring flaw underlying the arguments of Plaintiffs, they cannot possibly describe a class that is precise, objective, and presently

---

[98] Plaintiffs have no evidence to show Prospects used an ATDS.  However, Prospects' President has averred that it does not use prerecorded messages prohibited under the statute, all calls are placed by "a real human being," and "[t]he platform that Prospects utilizes to make telephone calls does not have the capacity to randomly or sequentially generate telephone numbers."  Dec. Grant, at ¶12.  Thus, the *only* evidence in the record concerning the use of an ATDS, a necessary element of the TCPA claims of Plaintiffs and a putative class, shows an ATDS was not used.  *See Blow v. Bijora*, 191 F. Supp. 3d 780, 788-789 (N.D. Ill. 2016) (granting summary judgment for defendants in TCPA text message case because plaintiff provided no evidence that the software program used to transmit text messages constituted an ATDS).

[99] Dec. Grant, at ¶16 (Prospects did not make 630 million on behalf of Royal).

[100] *Id.*, at ¶20 (Prospects produced calls logs not related to any particular client in response to a subpoena from Plaintiffs, who never complained that the production was incomplete or sought details about the records).

[101] *Id.*, at ¶22.  And, all of those calls were placed with consent.  *Id.*, at ¶21.

ascertainable – they do not understand the very records they rely upon as their "objective information" for ascertaining a class.  Worse yet, Plaintiffs' experts have rendered opinions relying upon this very data without knowing its source or what it represents, other than what Plaintiffs' attorneys told them without any basis in fact for their assumptions.  For instance, Plaintiffs offer Christina Peters-Stasiewicz as an expert for ascertaining cellular telephone numbers from the telephone numbers in the call log data, and identifying names and addresses from third-party sources.  In her deposition, she testified that her opinions were based upon an assumption that the call logs represent calls placed by or on behalf of Royal, and she relied upon Plaintiffs' counsel for this assumption.[102]   Their expert Weeks derived his opinions upon erroneous assumptions that the call logs constituted records of consent, which they do not.[103]

Moreover, Plaintiffs were apparently so impressed by the volume of the call log data that they failed to examine its contents, falsely claiming it "includes name[,] address and phone number of the broad class, as well as data regarding the website or 'consent' source associated with each data entry."  Motion, at 15. This statement is simply not true – there are no names, addresses, or consent information associated with the telephone numbers in the call log data.[104]  Indeed, as Weeks himself admitted, most of the 26 fields for each record were "of little to no value". DE 49-9, at ¶7.[105]  And, if there were names and addresses in the call logs, there would be no purpose for Ms. Peters-Stasiewicz to provide an opinion that it would

---

[102] Depo. Peters-Stasiewicz, at 72:11-73:6.  She also did not know the source of the records she was asked to review.  *Id*., at 31:18-32:4.

[103] *See* Dec. Grant, at ¶23 ("the "foreign_id" field in the call logs is not a column heading associated with the consent that is obtained by the third-party web publishers"); Depo Weeks, at 119:4-120:1.

[104] Dec. Grant, at 23; Weeks Report (DE 49-9), at Table 2 ("Explanation of Fields").

[105] Weeks Report (DE 49-9), at §II(b), ¶7.  Weeks also stated that the call log data "was largely of minimal value."  *Id*., at §VI, ¶65.

be "feasible to identify the names and addresses" associated with the telephone numbers in the call logs.[106]  Plaintiffs' false representation that the call logs contain this information is highly pertinent, as it underpins their conclusion that "[t]his data would allow Plaintiffs and/or The Honorable Court to certify a class."  Motion, at 15.  Clearly, it would not.  Neither Plaintiffs nor their experts can define a class that is precise, objective, or presently ascertainable.

### 3. Plaintiffs' Pure Speculation that Calls Were Made without Consent Fails to Satisfy Numerosity under Rule 23(a)(1)

Plaintiffs have not identified a single class member other than themselves, or articulated a plausible means of identifying one.  Plaintiffs assert that class members can be determined from "a database of over 630 million phone calls, with numerous columns of data that can be filtered with relative ease."  Motion, at 16.  However, they cannot identify a single one of these calls relating to Royal, and their own expert opined the data is "of "minimal value.""[107]  While more than 2.1 million consent records have been produced to Plaintiffs – who chose not to provide those to the Court – those records only identify persons who consented to be called and could not be a part of the class.[108]

Plaintiffs are speculating, but mere speculation about the size of the class is insufficient to satisfy the numerosity requirement."  *Schwartz*, 183 F.R.D. at 681.

---

[106] Peters-Stasiewicz Report (DE 49-8), at ¶36.

[107] In the prior sentence, they attack the veracity of the same data they would use to determine a class – "the data produced by Prospects DM is entirely unreliable and manufactured with respect to any assertion that it evidence prior express consent," ignoring the actual consent evidence produced by Royal.  *Id.*, at 16.

[108] Moreover, in light of *Bristol-Myers*, and the Court's lack of general jurisdiction over Royal, Plaintiffs fails to explain how they would identify persons who were in California at the time they received a call.

### 4. Plaintiffs Fail to Describe Any Means of Generating Common Answers to the Only Common Questions

Common questions underpinning commonality "must be of such a nature that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551.  Lacking common answers to address dispositive issues of consent, Plaintiffs pretend the evidence does not exist, blindly and falsely assert that Royal has "no evidence" of consent to skirt the issue altogether, then cite to a collection of cases in which defendants lacked evidence of consent. [109]  But this case is the polar opposite – Royal has evidence of consent for every call, including calls to Plaintiffs.  As discussed at length,[110] Plaintiffs lack any evidence or plausible answers to the highly individualized questions of consent that factor so prominently in this case, and cannot satisfy their burden to show commonality under Rule 23(a)(2).

### 5. By Disputing Evidence of Consent for Calls They Received, Plaintiffs' Claims Are Atypical of any Putative Class

Royal has evidence that more than 2.1 million people consented to be called, while Plaintiff has no evidence to show that any other person identified in those records dispute their record of consent.   Thus, Plaintiffs are the outliers, and their claims cannot be deemed typical of the putative class to satisfy Rule 23(a)(3).   As noted by Plaintiffs, there is significant overlap between the typicality and commonality element, such that a finding of one normally supports a finding of the other.  Motion, at p. 19 (citing *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist.

---

[109] Motion, at 17-18.  Plaintiffs cite cases that are plainly distinguishable from this action, where Royal has substantial competent evidence of consent,.  *See i.e. Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (defendant failed to show "a single instance" of consent); *Caldera v. American Medical Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017) ("Defendant submits no evidence that any class member in this case consented")

[110] *Infra*, at §III(b)(1).

LEXIS 12596 (N.D. Ill. Feb. 7, 2008)).  Thus, to the extent Plaintiffs cannot satisfy commonality, they cannot establish typicality.  In fact, McCurley and Deforest's claims are not even typical of each other.  DeForest claims his consent record is not valid because he only give out his telephone number for business purposes, while McCurley focused on issues relating to his health and other personal matters to explain why he claims his consent record in not valid.  There is nothing to suggest that either of these claims would be typical of other putative class members.[111]  As such, they have no basis to claim that the essential characteristics of their claims are typical of a putative class.

### 6. Plaintiffs and their Counsel Cannot Satisfy Rule 23(a)(4)'s Adequacy Requirement

Plaintiffs will not "fairly and adequately protect the interests of the class" for the same reasons Plaintiffs do not satisfy typicality, as set forth in the prior section.  Their attorneys fail to satisfy the adequacy element based upon their utter failure to pursue basic discovery, or ask basic questions about records they received, before retaining an expert witness to give unreliable opinions.

---

[111] Additionally, both DeForest and McCurley are atypical given their histories of filing other class actions as serial plaintiffs for the same attorneys.  *See McCurley v. Impetus Enterprise, Inc.*, Case No. 3:16-CV-02603-JLS-BLM (S.D. Cal. 2016); *McCurley v. Assoc. Microbreweries, Inc.*, Case No. 37-2017-00020640-CU-MC-CTL (Cal. Super. Ct. 2017); *Deforest v. Paradise Cruise Line Operator Ltd.*, 8:18-cv-01431-JLS-JDE (C.D. Cal. 2018); *Deforest v. Smile Brands, Inc.*, Case No. 8:18-CV-00472-JVS-RAO (C.D. Cal. 2018); *Deforest v. Global Exchange Vacation Club*, Case No. 8:18-CV-00895-SJO-AS (C.D. Cal. 2017); *Deforest v. Pepper Tree, Inc.*, Case No. 8:17-CV-02092-CJC-JDE (C.D. Cal. 2017).  Also, evidence shows that McCurley would be atypical of putative class members, and preoccupied with unique defenses, as evidence shows that he submitted multiple opt-in forms consenting to be called, presumably to generate this TCPA lawsuit and pursue a putative class action in furtherance of his personal pecuniary interests.  *See* Dec. Brody, at ¶14, Ex. C; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (class certification should not be granted if "there is a danger that absent class members will suffer if there representative is preoccupied with defenses unique to it.").

### 7.   Individualized Issues Make Class Litigation Unmanageable and Undermine Plaintiff's Superiority Argument

The superiority analysis centers on the manageability of the litigation as a class, which is dubious when there is a host of individualized issues like in this case. *Fitzhenry v. ADT*, 2014 WL 6663379 *7 (S.D. Fla. Nov. 3, 2014).   Plaintiffs' contention that a class action is a superior method of adjudicating their claims is sheer hyperbole, as they have no evidence, or classwide means of developing evidence, showing a single other person claims to have been called without consent. Superiority is not met – the class is unmanageable and putative class members cannot be identified.

## CONCLUSION

Plaintiffs' Motion fails under the "rigorous analysis" standard this Court must apply.  Individualized issues of consent predominate and Plaintiffs' purported expert's "theory" does not create sufficient proof demonstrating that consent can be resolved on a classwide basis.  Moreover, the failure to objectively define a class of persons that can be readily identified as having suffered an actual injury, along with a failure of Plaintiffs to satisfy any of the elements of Rule 23(a) or Rule 23(b)(2) or (3), requires the denial of Plaintiffs' Motion for Class Certification.


DATED: October 22, 2018.


Respectfully Submitted,

**GREENSPOON MARDER LLP**

 /s/ *Jeffrey A. Backman*
JEFFREY A. BACKMAN (Fla. Bar No. 662501)
Jeffrey.Backman@gmlaw.com
RICHARD W. EPSTEIN (Fla Bar No. 229091)
Richard.Epstein@gmlaw.com
200 E. Broward Blvd, Suite 1800

36798925.1

Fort Lauderdale, Florida 33301
Tel: 954.527.2427
Fax: 954.333.4027
*Admitted Pro Hac Vice*

BRIAN R. CUMMINGS (Fla. Bar No. 25854)
Brian.Cummings@gmlaw.com
401 E. Jackson St., Suite 1825
Tampa, Florida 33602
Tel: 813.769.7020
Fax: 813.426.8582
*Admitted Pro Hac Vice*

ANTON N. HANDAL, ESQ. (Bar No. 113812)
Tony.Handel@gmlaw.com
LAUREN G. KANE, ESQ. (Bar No. 286212)
Lauren.Kane@gmlaw.com
750 B Street, Suite 250
San Diego, CA 92101
Tel: 619.544.6400
Fax: 619.696.0323

Attorneys for Defendant *Royal Seas Cruises, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was has been served electronically filed with the Clerk of Court by using CM/ECF service which will provide copies to all counsel of record set forth on the Service List below who are registered to receive CM/ECF notification as reflected on the Service List on this 22nd day of October, 2018.

By:  /s/ *Brian R. Cummings*
Brian R. Cummings, Esq.

31

36798925.1

1

2

## <u>SERVICE LIST</u>

3

4   Joshua B. Swigart, Esq.
josh@westcoastlitigation.com
5   Kevin Lemieux, Esq.
kevin@westcoastlitigation.com
6   **HYDE & SWIGART**
2221 Camino Del Rio South, Suite 101
7   San Diego, CA 92108
Telephone: (619) 233-7770
8   Facsimile: (619) 297-1022

9

10   Abbas Kazerounian, Esq.
ak@kazlg.com
11   **KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue
12   Costa Mesa, CA 92626
Telephone: (800) 400-6808
13   Facsimile: (800) 520-5523

14

15   *Attorneys for Plaintiff John McCurley*

16

17   Todd M. Friedman, Esq.
Adrian R. Bacon, Esq.
18   Meghan E. George, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
19   21550 Oxnard St., Suite 780
20   Woodland Hills, CA 91367
(877) 206-4741
21   tfriedman@toddflaw.com
22   abacon@toddflaw.com
mgeorge@toddflaw.com

23

24   *Attorneys for Plaintiff Dan DeForest*

25

26

27

28

36798925.1