# "EXHIBIT 3"

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John McCurley, Individually and and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Royal Seas Cruises, Inc.,<br><br>Defendant.<br>---------------------------------------------<br>Dan DeForest, Individually and and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Royal Seas Cruises, Inc.,<br><br>Defendant. | Case No.:  3:17-cv-01988-AJB-AGS<br><br>*consolidated with*<br><br>Case No.:  3:17-cv-00986-BAS-AGS<br><br><br><br>**DECLARATION OF JOSHUA GRANT OF PROSPECTS DM, INC.** |

Pursuant to 28 U.S.C. § 1746, I, Joshua Grant, declare as follows:

1.    My name is Joshua Grant.  I am over the age of 18 and fully competent to make this declaration.

2.    I am the President of Prospects DM, Inc. ("Prospects").  This Declaration is based on my personal knowledge or upon my review of records over which I have care, custody or control.

1

36769231:1

3.      I also reviewed the two (2) reports authored by Mr. Wesley Weeks and Plaintiffs' Motion for Class Certification and Memorandum in Support ("Motion for Class Certification") that have been filed in the above-captioned case.

4.      Prospects is a lead generation company and has a wide variety of clients, including Royal Seas Cruises, Inc. ("Royal").   As part of its business operations, Prospects enters into agreements with third-party web publishers/providers that generate leads in a wide variety of ways, including but not limited to, via email, social media, direct solicitations, and online lead generation.  Prospects enters into agreements with these third-party web publishers through various trade names, including Yodel and Helping Hands Association.

5.      Prospects has been in business since 2011.   On average, Prospects receives, and makes TCPA-compliant telephone calls for, tens of millions of leads every year.  Prospects works with dozens of third-party web publishers and those web publishers, in turn, control thousands of web pages.  Prospects' biggest lead supplier (more than 50% of its leads) is Fluent, LLC, a publicly-traded company.

6.      Prospects, either directly or through one its affiliate companies such as Yodel and Helping Hands Association, has agreements with and purchases leads from Fluent, LLC, Citadel Marketing Group, LLC, f/k/a Transparent Data Services, Flex Marketing Group, LLC, Landfall Data, LLC, and Mojo Media, LLC, among others.

2

7.    In November 2016, Prospects and Royal entered into an Exit Read Lead Generating Marketing Agreement (the "Agreement") under which Royal purchases certain types of leads from Prospects.  For a lead to be purchased by Royal, the lead must have been generated in a TCPA-compliant manner.  Royal's Agreement with Prospects precludes Prospects from generating and sending to Royal any leads that are not TCPA compliant, and Prospects has honored the Agreement at all times.  Prospects has similar agreements with its other clients, and has over the course of its existence had similar agreements with many clients.

8.    Prospects and Royal are two separate and distinct companies.  They share no ownership or common employees. Royal is not affiliated with Prospects, and does not direct or control Prospects' marketing and lead generation.  The relationship between Prospects and Royal is reflected only by the terms of the Agreement.

9.    To generate a lead for Royal, Prospects first provides necessary information to the web publishers with whom Prospects has relationships. Prospects furnishes those web publishers with Royal's name so that the consent generated by those web publishers, in whatever form, includes a TCPA-compliant consent to be contacted by, or regarding, Royal.

10.   All of the web publishers utilized by Prospects have fully compliant TCPA consent language on their respective web pages.   On the web publishers'

websites, consumers are offered an opportunity to register to receive information on promotions and products by completing a form including their full names, telephone number, and other information.   After inputting their personal information, consumers wishing to complete the registration process on these websites must check a box expressly consenting to receive telephone calls from identified companies and organizations, including Royal, at the telephone numbers provided, and then click "submit."[1]  If the consumer does not check the box, the submit button will not function, and no lead will be generated.  If the consumer checks the box and clicks the submit button, a lead is generated and sent by a web publisher to Prospects.

11.    Before Prospects enters into a relationship with a third-party web publisher, it visits the web publisher's websites and/or web pages and conducts a video examination of the web publisher's opt-in process.  For example, prior to Prospects entering into a relationship with web publisher Flex Marketing Group, LLC, I reviewed the opt-in process for www.dealzingo.com as demonstrated on the video at the following link:  https://spaces.hightail.com/space/2MW2L2GbVk.

12.    In the case of a Royal lead, a real human being from Prospects calls the opted-in telephone number to inquire of the individual as to his/her interest in hearing more about Royal.   If the individual is interested in receiving more

---

[1] Some of the web pages use the terms "next" or "continue".

information, Prospects will "live transfer" the call to a representative at Royal.  If the individual is not interested, Prospects will indicate in its system that the individual is not interested.  The platform that Prospects utilizes to make telephone calls does not have the capacity to randomly or sequentially generate telephone numbers.

13.    At the time of the live transfer to Royal, Prospects electronically transmits the relevant opt-in data to Royal (the information that Prospects and Royal agreed would be provided, which is not the entirety of the data that Prospects receives from the third-party web publishers).  The information that Prospects would send over has evolved over time.  For example, Prospects did not provide Royal with the URL from where the opt-in lead was originally generated until January 9, 2017.[2]

14.    When one of Prospects' web publishers generates a lead from an opt-in consent landing pages, the consumer's information is transferred to Prospects most commonly through an Application Programming Interface (API) that Prospects has provided, which allows the web publishers to transmit the consumer's information directly into Prospects' database indexed by the appropriate marketing campaign.   When Prospects calls a consumer who has expressed an interest in an offer from Royal, and the person qualifies for the offer,

---

[2] At the request of Fluent, LLC, Prospects still does not transmit the url for any lead generated by Fluent.

Prospects opens a conference channel and "warm transfers" the call to Royal and contemporaneously transmits consent data for the consumer to Royal through an API that Prospects provides.

15.     In the Motion for Class Certification, Plaintiffs state that "Prospects DM Manufactured Consent."  This is an absolutely false statement.

16.     Prospects did not produce "records of over 630 million phone calls it placed on behalf of Royal Seas Cruises, comprised of over 53 million unique phone numbers (class members)," as claimed by the Plaintiffs.

17.     As more fully explained below, the call logs produced by Prospects are not intended to be, and are not utilized as, opt-in data.  Instead, Prospects maintains a separate database for storing opt-in consent data for the leads received from its web publishers, and Plaintiffs never requested this information from Prospects.  Prospects does not make any telephone call to any individual unless that individual provides proper TCPA-compliant consent.  The statement by Mr. Weeks in one of his reports that "a small fraction of the [call log] data (.5%) shows a website affiliated with the consumer's phone number. ... [or that] the rest contain no meaningful information regarding the source that the phone number came from" is irrelevant to whether a person provided his/her opt-in consent to be contacted.

18.     Mr. Weeks has never spoken to me or, as far as I know, anyone associated with my companies.

6

19.    In his Reports, Mr. Weeks makes countless false assumptions, and, more troubling, innumerable false, reckless, and unfounded accusations about the data he was apparently reviewing without even knowing who provided the data or what it represented.

20.    I have never spoken with counsel for Plaintiffs.  I did receive a Subpoena, addressed to Prospects, in connection with the above-captioned case, seeking call records going back to roughly 2013.  Prospects produced its "call logs" reflecting nearly 600 million telephone calls – not limited to any particular Prospect client – going back to 2016.  Counsel for Plaintiffs never contacted me or my attorney suggesting in any way that the documents produced were insufficient or that something was missing.  Counsel for Plaintiffs never contacted me or my attorney asking for any details relating to the documents produced.

21.    Every one of the nearly 600 million telephone calls by Prospects reflected in the call logs produced to the Plaintiffs were placed to consumers by Prospects after Prospects had obtained their express written consent to call their telephone numbers.

22.    Contrary to Mr. Weeks' "assumptions" in his Reports, the "call logs" do not reflect the calls made by Prospects "on behalf of" or "for the benefit of" Royal.  Instead, the "call logs" produced by Prospects reflect all calls made by Prospects on behalf of all of its clients for whom Prospects was also generating

7

leads.  All of those calls are reflected in the "call logs,"  and there is nothing in the "call logs" that identifies which calls related to Royal.  What is absolutely certain is that not all of them related to Royal.

23.    Mr. Weeks also provided a Table in one of his Reports guessing as to what certain column headings in the Prospects call logs mean.  Once again, his assumptions are wrong.  Of particular importance to him, as he seemed to self-servingly rely upon it for many of his "opinions," was the "foreign_id" column, which does not represent what he thinks it means: the "foreign_id" field in the call logs is not a column heading associated with the consent that is obtained by the third-party web publishers.

24.    Prospects maintains an "opt-in/consent" database that is separate from the call logs.  Although some of the information transmitted to Prospects from the third-party web publishers includes data that Prospects does not use or rely upon in its call logs, Prospects does not delete or alter the data that comes over from those third parties.  Because the call logs are not kept as, or intended to be, opt-in data, there is no reason for each call to be "relatable" to a particular website.  There is therefore no reason for the "foreign_id" column for the 630 million calls reflected in the call logs to have any information at all.  The "assumption" of Mr. Weeks in paragraphs 2, 6, 7, 8, and 9 of his 47-page report, along with all the irrelevant

8

"tables" associated with those paragraphs, are wrong and meaningless in connection with his "opinions".

25.    When Prospects is asked to retrieve information relating to a particular opt-in/consent lead, Prospects does not go to its call logs; instead, it retrieves the information from its opt-in data or from the third party web publisher directly.

26.    In paragraphs 10 – 14 of Mr. Weeks' 47-page Report, he appears to be trying to compare the opt-in lead information associated with the telephone number belonging to Mr. McCurley to the call logs.  This comparison is meaningless and a waste of time because, as stated above, the call logs are not intended to be utilized as opt-in data.

27.    Additionally, Mr. Weeks incorrectly refers to documents from Royal attached as Exhibit A to his 47-page report as examples of actual opt-in data maintained by Prospects in its opt-in database.  However, Exhibit A contains only information that was furnished by Prospects to Royal, which produced its own document to Plaintiffs that contained this information.  Nonetheless, the relevant portions of the data in Exhibit A do in fact match up to the relevant data in the call logs.

28.    Mr. Weeks' false assumptions continue to permeate his 47-page Report and his "analysis" throughout Sections III and IV.  In paragraph 17 of that

9

Report, he refers to the "five sites" he "analyzed" in his 55-page report and notes that only one of those sites appears in the "call logs." It is unclear what inference he seeks to draw by pointing this out, but it means nothing for the reasons explained above. It's also worth noting that no leads were generated for Royal from two of the five websites Mr. Weeks "analyzed" – specifically, no leads from www.myeducationauthority.com and www.mycreditauthority.com generated call transfers and opt-in transmissions from Prospects to Royal. Since there were no leads generated from these two websites, there would be no reason for those sites to appear in any of Prospects' data relating to Royal. Of the five websites reviewed by Weeks, only www.myhealthcareauthority.com, www.diabeteshealth.info, and www.pinpointschool.com appear in opt-in data related to leads generated by Prospects and transmitted to Royal.

29.    For the same reasons as stated above, any analysis by Mr. Weeks of the "other sites found in the foreign_id column" is irrelevant to the issue of consent/opt-in data.

30.    Exhibit A to Mr. Weeks' 47-page Report contains lead information for the Plaintiffs. The first five pages of Exhibit A comprise a consent record associated with John McCurley's telephone number that was produced by Prospects. The last page of Exhibit A, reflecting consent information associated with Dan Deforest's telephone number, is not a document produced by Prospects.

It is more likely that this document came from Royal's database directly, after the information was sent over to Royal with a live transfer and stored by Royal. Prospects has reviewed its opt-in/consent database and has located the December 2016 lead information associated with Mr. Deforest. A true and accurate copy of the information retrieved directly from Prospects' database is attached as **Exhibit "A"**. As reflected in Exhibit A, there was apparently an error with respect to identification of the website in the data transmitted to Royal. The correct website for the December 2016 opt-in lead associated with Mr. Deforest is www.yourautohealthlifeinsurance.com. Regardless, Mr. Deforest or someone using his telephone number, opted-in, provided his telephone number, and agreed to be contacted about Royal.

31.     The "consent data" referenced in Section V of Mr. Weeks' 47-page Report was not produced by Prospects and is not a record from a Prospects-maintained database. As set forth above, Prospects maintains its own opt-in database for consent records.

32.     Prospects' opt-in database for consent records includes date information fields using both the standard month/day/year date format and in the "European" day/month/year date format. For instance, the "Act date" column reflects the date a consumer opted-in on a web publisher's website in a standard format as YYYY-MM-DD, while the "Created at" column reflecting the date the

11

opt-in record was downloaded into Prospects' database in a European format as DD-MM-YYYY. Thus, in Exhibit A, the "Act date" field reflects that DeForest's telephone number was provided through an online opt-in on December 9, 2016, stated as "2016-12-09," while the "Created at" field reflects that the opt-in record was downloaded in Prospects database on December 9, 2016, stated as "09/12/2016." Likewise, in the first five pages of Exhibit A of Mr. Weeks' 47-page Report, the "Act date" field reflects that McCurley's telephone number was provided through an online opt-in on December 9, 2016, stated as "2016-12-09," while the "Created at" field reflects that the opt-in record was downloaded in Prospects database on May 2, 2017, stated as "02/05/2016."

33.     Prospects only live transferred leads to Royal during the normal business hours of Royal's call centers during times in which Royal could accept the live transfers from Prospects. These hours were generally 9:00 a.m. - 9:00 p.m. Monday through Friday and certain business hours on most Saturdays. The Royal call centers are not open on Sundays, and Prospects does not live transfer leads to Royal on Sundays. The chart and assumptions made by Mr. Weeks in paragraphs 56 - 63 of his 47-page report is nonsensical, based upon his reckless and mistaken assumption that the dates and times in the consent records provided by Royal referred to the dates and times the opt-in consent was provided on the websites. They were not. Rather, the dates and times that he references and relies upon to

12

suggest some sort of impropriety are not the dates and times that the "leads were generated." Rather, they are the dates and times associated with the live transfers from Prospects to Royal. The information has nothing to do with the dates and times that a person would have been on the internet completing a particular opt-in form.

34.    In paragraph 64 of Mr. Weeks' 47-page Report, Weeks notes as an "additional finding" that approximately 1,300 consent records produced by Royal were associated with the website getmysolarpower.com and contained the same IP address for each record. Prospects receives opt-in consent data from all of the data sources it works with that operates opt-in consent websites, and when Prospects receives data from a new data source, it creates a "tag" associated with that particular new source that is associated with the data in its database. When Prospects first received consent data from a digital marketing company called Employment Hub, the data was tagged incorrectly as getmysolarpower.com. As a result, the leads Prospects received from Employment Hub and later transmitted to Royal as being associated with getmysolarpower.com were in fact leads from Employment Hub. I understand from Employment Hub that it transmitted data to Prospects for multiple opt-in records that incorrectly assigned its server IP address to those leads due to a temporary technical error with the company's computer system that has since been corrected.

35.     Prospects has never received any information to suggest that any of its third party web publishers is fraudulently "electronically generating" opt-in leads. Prospects itself has never engaged in such practices.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury and of the laws of the United States that the foregoing is true and correct.

Dated this  18th  day of October, 2018.

_____
Joshua Grant

14

# "EXHIBIT A"

| ID | Status | Foreign ID | First name | Last name | Phone number | Address 1 | Address 2 | City | State | Postal code | Date of birth | Alt phone | Email | GMT | DST | Called count | Metrix couchdb ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 421520518 | 0 | yourautohealthlifeinsurance.com | daniel | deforest | 7143627192 | | | POWDER SPRINGS | GA | 30127 | | | dan.deforest@yahoo.com | -8 | Y | 0 | |

| Last local call time | Created at | Updated at | Outbound lead group ID | IP address | URL | Gross income | Act date | Import log ID | Campaign ID | Area of study | Education level | Degree sought |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 09/12/2016 01:26 a | 09/12/2016 01:26 a | 781 | 108.198.53.39 | yourautohealthlifeinsurance.com |  | 2016-12-09 01:16:04 |  | 23 |  |  |  |

| Universal lead ID | IMS student ID | Metadata |
|---|---|---|
|  |  | {} |