**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Matthew M. Loker, Esq. (279939)
ml@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone:  (800) 400-6808
Facsimile:   (800) 520-5523

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Todd M. Friedman, Esq. (216752)
tfriedman@toddflaw.com
Adrian R. Bacon, Esq. (280332)
abacon@toddflaw.com
21550 Oxnard Street, Suite 780
Woodland Hills, CA 90212
Telephone:  (877) 206-4741
Facsimile:   (866) 633-0228

[ADDITIONAL PLAINTIFFS' COUNSEL ON SIGNATORY LINE]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN MCCURLEY, DAN DEFOREST, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>Plaintiff,<br><br>v.<br><br>**ROYAL SEAS CRUISES, INC.,**<br><br>Defendant. | **Case No.:** 17-cv-986 BAS (AGS)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**HON. CYNTHIA A BASHANT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

I. INTRODUCTION .................................................................1

II. FACTUAL BACKGROUND .................................................4

  A. Defendant's New "Evidence" Is Evidence of Nothing Except Its Intention To Hide Evidence And Suborn Perjury .................................................................4

    1. Ms. Poole and Mr. Grant Have No Personal Knowledge And/Or Are Perjuring Themselves. ...........................................5

    2. Kevin Brody Was "Harassed" Into Falling On The Sword By Signing A Prepared Sham Declaration, Which He Since Recanted ................................6

      a. Mr. Brody's Declaration Does Not Evidence Consent............................6

      b. Plaintiff's Rebuttal Expert Proves Consent Was Manufactured For www.diabeteshealth.info ........................................8

    3. Brody Retracted All Pertinent Testimony In Deposition After Being Impeached With This Irrefutable Reality. ....................................10

  B. www.yourautolifehealthinsurance.com Does Not Gather Prior Express Consent for Royal Seas Cruises ......................................11

  C. Defendant's Expert's Testimony Lacks Meaningful Import ....................12

III. LEGAL ARGUMENT .......................................................14

  A. What Is Meant By "Manufactured Consent?".......................15

  B. Plaintiffs' Narrowed Class Definition Identifies a Numerous Ascertainable Class of Consumers, of Whom Plaintiffs Are Typical ...........15

  C. Plaintiffs and Counsel Are Adequate ......................................16

  D. Defendant Presents Zero Evidence Of Individualized Issues of Consent. 16

  E. Whether Consent Was Manufactured Is A Merits Issue............................18

  F. *Bristol-Myers Squibb Co.* Does Not Hold That Courts Lack Jurisdiction To Certify Nationwide Classes Actions.................................19

IV. CONCLUSION ...............................................................20

1

2

## TABLE OF AUTHORITIES

**Cases**

*Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) .............18

*Alvarez v. NBTY, Inc.*,  2017 WL 6059159 (S.D. Cal. Dec. 6, 2017)......................20

*Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614 (S.D. Cal. 2015) .............18

*Blaire v The CBE Group, Inc.* 309 F.R.D. 621 (S.D. Cal. 2015) ...........................17

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ...........................16

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct.
   1773 (2017)......................................................................................................19

*Casso's Wellness Store & Gym, L.L.C. v. Spectrum Laboratory Products*, Inc.,
   2018 WL 1377608 (E.D. LA. March 19, 2018) ..................................................20

*Connelly v. Hilton Grand Vacations Co.,* LLC, 294 F.R.D. 574 (S.D. Cal. 2013).17

*Doe v. Cotterman*, 2018 WL 1235014 (N.D. Ill. March 9, 2018) ..........................20

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) .............................19

*Feller v. Transamerica Life Insurance Company*, 2017 WL 6496803 (C.D. Cal.
   Dec. 11, 2017) ..................................................................................................20

*Fitzhenry–Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 WL 4224723 (N.D. Cal.
   Sep. 22, 2017) ..................................................................................................20

*Forcellati v. Hyland's, Inc*., 2014 WL 1410264 (C.D. Cal. April 9, 2014)............18

*Gene & Gene LLC v. BioPay, LLC*, 541 F.3d 318 (5th Cir. 2008) ........................17

*In re Chinese–Manufactured Drywall Prods. Liability Litig.*, 2017 WL 5971622
   (E.D. La. Nov. 30, 2017) ..................................................................................20

*In re Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2018 WL
   1382746 (March 19, 2018) ...............................................................................20

*Kevin Amini, et al. v. Heart Savers, LLC*, 2016 WL 10621698 (C.D. Cal. Oct. 17,
   2016) ................................................................................................................18

1  *Kline v. Wolf*, 702 F.2d 400 (2d Cir.1983)..............................................................16

2  *Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 645 (N.D. Ill. 2017)...............20

3  *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228 (C.D. Cal. 2018) ...........................18

4  *Molock v. Whole Foods Market, Inc.*, 2018 WL 1342470 (D. D.C. March 15,

5     2018) ...................................................................................................................20

6  *Peters v. Wells Fargo Bank, N.A.*, 2018 WL 398238 (N.D. Cal. Jan. 12, 2018) ....20

7  *Polanco v. Schneider Nat. Carriers, Inc.*, 2012 WL 10717265 (C.D. Cal. Apr. 25,

8     2012) ...................................................................................................................16

9  *Raffin v. Medicredit, Inc.*, 2017 WL 131745 (C.D. Cal. Jan. 3, 2017)...................19

10  *Sanchez v. Launch Technical Workforce Solutions, LLC*, 2018 WL 942963(N.D.

11     GA, Feb. 14, 2018) .............................................................................................20

12  *Sloan v. Gen. Motors LLC*, 287 F.Supp.3d 840, (N.D. Cal. Feb. 7, 2018) .............20

13  *Stern v DoCircle, Inc.*, 2014 WL 486262 (C.D. Cal. Jan. 29, 2014)........................18

14  *Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th Cir. 2014) .......18

15  *Swamy v. Title Source, Inc.*, Case No. 17-01175 WHA, 2017 WL 5196780 (N.D.

16     Cal. Nov. 10, 2017) ............................................................................................20

17  *Tickling Keys, Inc. v. Transamerica Financial Advisors, Inc.*, 2018 WL 1701994

18     (M.D. Fl. April 4, 2018) .....................................................................................20

19  *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) .............18

20  *Wright v. Renzenberger, Inc.*, 656 F. App'x 835 (9th Cir. 2016) ............................18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant's Opposition to Plaintiffs' Motion for Certification is an exercise in misdirection.  Instead of producing actual evidence of individualized issues of consent, Defendant doubles down on its facially implausible position that 100% of the calls it placed were made with prior express consent.  However, Defendant has presented evidence of nothing and is overstating what it has produced to the Court.  Its "consent" data is merely a call transfer list, with quadruple hearsay speculation that a third party of a third party of a third party, of a third party, was supposed to have compliant methods of gathering the data.  The third parties provided no direct evidence showing the data was a result of legitimate consent being provided by any of the recipients of these otherwise facially illegal calls.

Defendant sandbagged Plaintiffs with multiple undisclosed witnesses, but as has been demonstrated by the record, this "evidence" is hardly indicative of anything anyways.  There remain numerous inexplicable inconsistencies in the data and more holes in Defendant's story than Swiss cheese.  Most shocking, third party witness Kevin Brody was caught in a lie forcing him to recant his testimony, after Plaintiffs demonstrated consent was manufactured for diabeteshealth.info, based on the very exhibits attached to his declaration.[1]  The individual that actually "generated" the leads purporting to have come from diabeteshealth.info was supposed to be the one to sign Mr. Brody's Declaration, but upon being asked to

---

[1] Plaintiff respectfully submits that once the Court reads the transcript of Mr. Brody (Wheeler Dec. Ex G), the Report of Nathan Bacon, watches the three videos created by Mr. Bacon submitted on a flash drive that accompany Mr. Bacon's report, and navigates diabeteshealth.info for itself before ruling on this Motion, it will have no doubt that diabeteshealth.info did not generate the data used to call consumers on behalf of Royal Seas. It is technologically impossible. Mr. Brody acknowledged as much during his deposition and recanted all of his testimony, admitted he was "harassed" into signing the declaration, and "one million percent" relied on others to tell him what to say and had no personal knowledge of where the leads came from.

---

do so, referred to the declaration Defendant was pressuring him sign as a "shady" "setup" and told Mr. Brody "I'm not signing that" and to "go fuck [himself.]"  Mr. Brody was then "harassed" into signing the declaration instead after barely reading it, despite having no idea whether was he was signing was accurate (It wasn't).

In order to simplify the Rule 23 analysis and reduce the scope of issues, Plaintiffs voluntarily narrow the class definition for which they seek certification to only those consumers whose numbers were "generated" by the two websites Defendant now contends the named Plaintiffs' phone numbers came from.  These websites clearly did not generate the leads.[2]  The case should be certified, because Defendant provided zero evidence of individualized issues, unless you count the recanted perjury of Mr. Brody.  Defendant takes the position that "100%" of its "consent" data is legitimate.  That is neither an "individualized" nor tenable position.[3]  Prevailing case law amongst Courts in certifying TCPA class actions, including decisions by This Court, hold that Defendant bears the burden, because

---

[2] Defendant sent Plaintiff DeForest on a wild goose chase throughout litigation by providing discovery responses which indicated Mr. DeForest's number came from an entirely different website.  Defendant's cryptic explanation is telling: "there was apparently an error."  Defendant is clearly just making things up as they go–more proof of manufactured consent.  DeForest's internet browsing history and testimony shows he never went to either site, which begs the question–how did this "error" occur?  Who else did it occur to? And why didn't Defendant provide any actual evidence that even a single lead was the product of legitimate lead generation, despite having every opportunity and incentive to do so?

[3] Defendant's "evidence" is a complete farce by the admission of its own witness. Defendant lined up a witness with no personal knowledge, "harassed" him into signing a prepared sham declaration under oath, and attached definitive proof that the testimony is false.  This goes beyond a sham.  The lawyers should have known; it was obvious after spending five minutes navigating www.diabeteshealth.info that the "consent" data in Exhibit B of Brody's Declaration could not have come from that website.  Instead, defense counsel had the nerve to serve Plaintiffs' counsel with a frivolous Rule 11 Motion contemporaneous to filing their Opposition Brief. Wheeler Decl Ex H.  Defendant is the one who should be sanctioned.  The duty of candor requires that false testimony be withdrawn.  Such duty has not been fulfilled.

---

consent is an affirmative defense, and because proving a negative, as Defendant suggests, is impossible.[4]  Defendant cannot meet its burden because the "consent" has demonstrably been manufactured, as evidenced by the very data itself.

Defendant makes a lot of noise about Plaintiffs' expert and asserts that his methodologies are flawed.  However, Defendant never challenges Mr. Weeks' ultimate conclusions that the websites Plaintiffs' numbers were "generated" by could not have generated the number of leads claimed.  Nor does its expert attempt to do so, admitting that she was not hired to do a web traffic analysis, merely to debunk Mr. Weeks' methodologies.  In fact, Defendant's own expert agrees with Plaintiffs - that proof of consent (if any) at trial will come from matching up the web traffic data from the servers of the websites in question with the call records from Prospects DM.  This will either prove or disprove Plaintiffs' theory regarding calls being placed without consent.  It is a single question that can be answered uniformly, manageably, and with the stroke of a pen.  Plaintiffs believe they already have enough proof to conclusively evidence the merits of such a theory, as described herein.  But the fact that Defendant does not put forth such evidence from the lead generators, despite apparently being in contact with them sufficient to put forth vague declarations, is telling and demonstrative of the recurring theme throughout Defendant's brief: we didn't do anything wrong, you can't prove we did, and pay no attention to the man behind the curtain.  That's not good enough.  It is also debunked by the experiences of Plaintiffs.  Based on the record of the case, Defendant has presented no evidence that there are individualized issues of consent, only a thick smoke screen.  The data has serious and obvious flaws, indicative of fraud and a lack of legitimate consent.  Defendant contends that 100% of its calls were made with consent.  Defendant can attempt to prove so after

---

[4] If it is Plaintiffs' burden to show a lack of individualized issues, certification should still be granted, as Plaintiffs can show lead data for diabeteshealth.info was manufactured, and leads data for www.yourautohealthlifeinsurance.com contained no references to Royal Seas Cruises having consent to solicit with a robodialer.

the class is certified.  This Court certified the *Stemple* matter on identical grounds.

It should do so again here.  Accordingly, Plaintiffs respectfully request The Court

certify the following narrowed[5] Class Definitions pursuant to Rule 23:

> Narrowed Class:
> All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018, whose phone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.
> Narrowed Transfer Subclass:
> All members of the Narrowed Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.

## II.    FACTUAL BACKGROUND

### A. Defendant's New "Evidence" Is Evidence of Nothing Except Its Intention To Hide Evidence And Suborn Perjury

Defendant numerously refers to its "consent" generation methods as a "100% opt-in consent marketing program" throughout its Brief, implying that it has consent from 100% of the consumers whom Prospects DM calls on its behalf.  Plaintiffs are obligated to point out the realities of what Defendant and the numerous Third parties have actually produced, which is not evidence of prior express written consent, but something much different, and which is legally insufficient to meet Defendant's burden of proving its affirmative defense for even a single consumer.  There are two pieces of data in this case – 1) calls records showing that Prospects DM placed calls to consumers, and 2) transfer records showing that qualified leads were transferred from Prospects DM to Royal Seas.  These are the only documents and

---

[5] District courts regularly find class definitions may be narrowed at the certification phase *See e.g., Wolf v. Hewlett Packard Co.*, No. CV1501221BROGJSX, 2016 WL 7743692, at \*14 (C.D. Cal. Sept. 1, 2016); *Raffin v. Medicredit, Inc*., No. 15-cv-4912-GHK-PJW, 2017 WL 131745 at \*7-9 (C.D. Cal. Jan. 3, 2017); *Abdeljalil v. Gen. Elec. Capital Corp*., 306 F.R.D. 303, 306 (S.D. Cal. 2015); *Zaklit v. Nationstar Mortgage LLC,* 2017 WL 3174901 at \*7-8 (C.D. Cal. July 24, 2017).

data that exist in the record.  Neither are proof of consent.  Royal Seas has merely proven that people were called and transferred to Royal Seas.  Nothing more.[6]

### 1. Ms. Poole and Mr. Grant Have No Personal Knowledge And/Or Are Perjuring Themselves.

Ms. Poole, Defendant's Rule 30(b)(6) witness, is four parties removed from the websites which supposedly "generated" the "consent" of the consumers called by Prospects DM.  She testified that she has no knowledge of the sufficiency of consent records.  (See Dkt. No. 49-2 Pg 60).[7]  Ms. Poole's attempts to add credence to the position that calls were placed with consent are pure speculation.

Mr. Grant fares no better.  He possesses no knowledge of the lead generation sites at the target of the Class Definition (more speculation like Ms. Poole).  He admits in his Declaration that Prospect DM's third party web publisher partners supply all of the consent data, tacitly acknowledging that yet another third party is the one with knowledge of the methods by which data is gathered.  Dkt. No. 58-3 ¶¶ 4-11, 25.  He produces no evidence of consent, shifting the ultimate blame one more party removed from Royal Seas.  Things get worse from there.  Mr. Grant states under oath that consent data is maintained by Prospects DM in a separate database (*Id*. at ¶ 17) and perjures himself multiple times by stating under oath that Plaintiffs did not subpoena Prospects DM for consent data, or for data pertaining only to calls placed for Royal Seas.  *Id*. at ¶¶ 17-20.  The records of the case shows definitively to the contrary.  Wheeler Dec. ¶¶ 8-10, Ex. A and B.  It is unclear why Mr. Grant is perjuring himself when his company's credibility is at issue.  Consent

---

[6] Because the Class definition has been narrowed, evidence and testimony relating to any third party lead generation sites other than diabeteshealth.info or www.yourautohealthlifeinsurance.com are irrelevant to the Certification analysis.  Accordingly The Honorable Court can and should ignore the Declarations of Andras (Dkt. 58-5), Barksy (Dkt. 58-8) and Slemboski (Dkt. 58-9), as well as portions of the other declarations in support of Defendant's Opposition.

[7] "Q: Are there any other documents that would show when consumers visited those websites?  A: Those aren't my sites, I don't know."

data was requested but never produced. Even Prospects DM's attorney suggested that it did not exist. Now Mr. Grant changes his story, but still produces bupkis.[8]

But wait, there's more. Mr. Grant provided evidence in the case showing DeForest's "consent" was "generated" from myhealthcareauthority.org. Plaintiffs went through nine months of discovery, including depositions, written discovery, and document production where this lie was perpetuated by Royal Seas, wasting considerable resources. Only after Mr. Weeks reviewed the data and found inconsistencies, did Prospect DM indicate that the website which "actually" "generated" DeForest's information was www.yourautohealthlifeinsurance.com.[9] Instead of offering an explanation, Mr. Grant cryptically glosses over this by stating "there was apparently an error." Dkt. No. 58-3 ¶ 30. Such an "error" is technologically impossible. Defendant is making things up as they go.

### 2. Kevin Brody Was "Harassed" Into Falling On The Sword By Signing A Prepared Sham Declaration, Which He Since Recanted

The remainder of Defendant's witnesses were never disclosed to Plaintiffs in Defendant's Initial Disclosures, or anywhere else throughout discovery until months after Defendant filed its Opposition including their declarations. Only one of those witnesses presents any information which relates to the narrow class: Kevin Brody. Mr. Brody's Declaration proves Plaintiffs' case further, and the facts that came out of his testimony should be all The Court needs to see in order to certify the Class and later grant summary judgment for the Plaintiffs and the Class.

### a. Mr. Brody's Declaration Does Not Evidence Consent

Mr. Brody claims the website diabeteshealth.info had 2.275 million visitors in the month of April 2017, which if true, would have been 7.6% of the U.S.

---

[8] It is notable that Prospects DM was asked for all call records for Royal Seas, and instead apparently produced records for all clients. Why did it do this? Who knows?
[9] That website does not include opt in language for Royal Seas. Deforest never went to the site, but even if he did, that is not a legitimate source of prior express consent.

population of diabetics.[10]  This alone is an unbelievable statement for a website with no search engine visibility, no backlinks, and no Alexa ranking.  But the evidence of this "fact" presented by Mr. Brody does not even prove that to be accurate.  As "proof" of the number of visitors to his website in April 2017, Mr. Brody attached Exhibit D to his Declaration, which is an SQL database query results screen capture.  This does not show what he claims it to show.  First, the query results purport to show the number of leads, i.e. the number of people who provided their data to diabeteshealth.info, *not the amount of web traffic*.  Wheeler Decl. Ex H at 85:18-86:22.  Second, Databases do not inherently have any connection to websites.  Any spreadsheet can be contained in an SQL database.  For instance here is one now:

| Name | Phone | Address | Website | IP address |
|---|---|---|---|---|
| Joe Shmoe | 123-456-7899 | 123 Makebelieve Lane | Diabeteshealth.info | 123.45.678 |
| 1 | | | | |
| 1 | | | | |

A query run on this table if it were contained in a database would show three entries in the aggregate function "count" run by Mr. Brody, even though two of the rows are blank.  None of them were gathered from diabeteshealth.info.  Undersigned counsel simply wrote them into this Brief.  Databases can be named anything chosen by the creator of the database.  The name has nothing to do with the source, except that it may lend some verisimilitude to a story like Mr. Brody's.  What Mr. Brody has proven with his Exhibit D is merely that somebody queried a database which someone named "diabeteshealth," which has 2.275 million rows in a table, which was labeled "leads" for the date field April 2017.  He has not proven such data originated from consumers who visited diabeteshealth.info.[11]

[10]  *See*  https://www.webmd.com/diabetes/news/20180919/30-million-americans-now-have-diabetes.

[11] Just because Mr. Brody could potentially prove that he has access to a database containing 2.275 million people's information does not prove that he generated it by way of valid consent opt-ins through diabeteshealth.info.  One does not even need a website to do this.  The rows could be blank, or filled with data purchased elsewhere.  One way to verify this would be to match the database up with data gathered directly and organically by Amazon through the Alexa source code embedded in Mr. Brody's

### b. Plaintiff's Rebuttal Expert Proves Consent Was Manufactured For www.diabeteshealth.info

Things get even worse for Mr. Brody, and for Royal Seas. The data that was "queried" relating to Mr. McCurley's phone number shows that the data **could not have come from a consumer through a submission on diabeteshealth.info**. Notably, the data in Ex. B of Brody's declaration (Dkt. No. 58-7 Pg 18) contains two irrefutable anomalies that prove consent was being manufactured: 1) it contains consumer data that cannot be captured by the www.diabeteshealth.info portal, and 2) it is missing fields that would have to have been provided by a consumer for the lead to be processed. Either these circumstances would be indicative that the data came from another source than diabeteshealth.info. Both prove it with certainty.

Plaintiffs hired rebuttal expert Nathan Bacon, a web designer and software engineer, to analyze the truthfulness of Mr. Brody's testimony.[12] Mr. Bacon navigated www.diabeteshealth.info and pulled the source code for the site both in present time, as well as in the time periods preceding and proceeding the alleged time period that Mr. McCurley's number supposedly was generated.[13] Bacon Report ¶¶ 15-22; Ex A-I. Exhibit B to Mr. Brody's Declaration, and his

---

site, or with Google's Analytics (same), which is what both Plaintiffs' and Defendant's experts both propose doing at trial.

[12] None of this evidence was produced until Defendant's Opposition Brief was filed. Thus, the Report of Nathan Bacon is merely used to rebut Mr. Brody.

[13] Mr. Bacon accounted for the chance that the website had been reprogrammed over the course of the last two years, by reviewing historic archives of the website through www.waybackmachine.org. The source code and functionality of the website had not changed. See Bacon Report ¶¶ 15-20, Ex A-I and Videos 1-3. "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," *Erickson v. Nebraska Machinery Company*, Case No. 2015 WL 4089849 Fn. 1 (N.D. Cal. July 6, 2015), citing Fed.R.Evid. 201; *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13–31229, 2014 WL 2863871, at *4 (E.D.Mich. Jun. 24, 2014); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013).

accompanying testimony show that the database from which the line of data was pulled include fields of data for "address" "state" and "city," yet the website never asks a consumer to provide this information. Dkt. No. 58-7 Pg. 18; Bacon Report ¶¶ 23 and 39; Ex A-I.  The only conclusion to be drawn is that the data referenced in Exhibit B to Mr. Brody's declaration did not come from a consumer providing their personal information, phone number, and therefore, *consent* through diabeteshealth.info.    The data came from some other unknown place. *Id.* Additionally, Exhibit B to Brody's declaration contains blank data fields for "gember" and "relationship." (Dkt. No. 58-8 Pg 18).  As Mr. Bacon confirmed, if one actually goes to diabeteshealth.info and attempts to enter their information and opt in, they would not be permitted to do so unless they entered in every field. Bacon Report ¶¶ 25-39; Ex A-I.  If the field "gender" is left blank, then the website does not permit the "consent" to be processed.  *Id*.  In other words, the data fields cannot possibly be blank, because if they were blank, the source code for the website would not have permitted the data to have been transmitted to the server.  *Id*.[14]

There is only one conclusion that can be drawn: Mr. Brody's Declaration is a lie – Royal Seas did not have consent to call the consumers whose information is contained in the diabeteshealth database referenced by Mr. Brody because that data did not come from any consumers providing it through that website.  Plaintiffs have proven their theory of liability is correct with technological certainty, and that consent was being manufactured, at least with respect to diabeteshealth.info. Private data of 2.275 million consumers was misappropriated, their privacy was invaded via intrusive robocalls, and the callers then used the misappropriated data to make the consumers doubt whether they had given permission for this to occur.

---

[14] Mr. Bacon made three videos of himself navigating the www.diabeteshealth.info website during the three pertinent time periods that were analyzed in his Report.  The videos show Mr. Bacon trying to submit "consent" with incomplete data fields, and also show that the website never asks for address, city or state.

### c. Brody Retracted All Pertinent Testimony In Deposition After Being Impeached With This Irrefutable Reality.

Kevin Brody is a felon, who was previously convicted of Enterprise Corruption, a count of fraud for stock violations. Wheeler Decl. Ex G ("Brody Depo") at 14:21-15:20; RJN Ex A. Mr. Brody now owns and operates Landfall Data, LLC, a lead broker, which hires publishers of lead generation websites to generate "leads" and brokers deals whereby it sells these leads for a 30% markup. Brody Depo at 40:19-41:1, 173:11-176:8.[15] One publisher is Rocky Mountain Marketing, operated by Danny Lance, and which designed and operates diabeteshealth.info. *Id*. at 17:17-27:3, 36:4-37:5. Mr. Brody does not operate diabeteshealth.info, has no visibility into the back end, does not know where the database is housed, has no experience with SQL databases or web traffic analysis, did not take any part in designing diabeteshealth.info, and said he would have an easier time reading Hebrew than reading the source code of a website. *Id*. at 36:4-37:5, 49:7-52:10, 67:15-71:24, 98:7-18. He also took no part in querying the databases or generating the reports attached to his declaration. *Id*. Rather, in September 2018, Landfall started "getting harassed" by Prospects DM, and the CEO of Catalyst (an undisclosed company who sold lead data to Prospects DM) to pressure Danny Lance to sign an already-prepared declaration, of unknown origin, and act as a witness in this case. Brody Depo 19:18-26:24, 42:10-43:18. Mr. Brody reached out to Danny Lance about the declaration, and Mr. Lance refused to sign it, referring to the declaration as a "shady" "setup" and telling Mr. Brody "I'm not signing that…go fuck yourself." *Id*. Prospects DM and Catalyst then began harassing Mr. Brody and "driving [him] crazy" which was why he signed the declaration. *Id*. Mr. Brody did not thoroughly review the declaration before signing it, merely "vaguely" scanned over it. *Id*. at 39:2-14. During deposition,

---

[15] Publishers typically charge a penny a lead ($22,000) and Landfall charges a 30% markup to broker the sale to a client (Catalyst). *Id*. at 173:11-176:8.

Mr. Brody was asked to navigate diabeteshealth.info, and confirm that the data attached as Exhibit B to his Declaration could not have come from that website. *Id.* at 63:15-98:18. After doing so, Mr. Brody admitted he did not know where the data came from (*Id.* at 95:7-98:9) and recanted the testimony regarding express consent:

> Q Do you want to change any of your testimony before we go off?
> A Yes. I mean, I relied on people within my company to help me with this and obviously, at the end of the day as the CEO of the company, they asked for my signature, so I signed it.
> Q Okay. So you're not -- are you -- are you withdrawing your statement that the data that we were looking at in Exhibit B definitely came from the diabeteshealth.info site or are you just not sure?
> THE WITNESS: I'm not sure. I'm not sure because I see what you're -- you know, with -- when you walked me through there, right, and I see that there's, you know, on the, on the form, there's not a collection for address, I have no idea if that happened way back when…I have no idea. That's not what I do…again, but I don't have any control over that. I don't have any knowledge to that, so I don't know the answer.
> Q Okay. So if the data came from somewhere else, you wouldn't have any idea if that was the case, but you also don't know if it actually came from diabeteshealth.info?
> A: I do not know that. One million percent, I do not know that.

*Id.* at 106:7-108:22. Stated otherwise, after being faced with the irrefutable reality that the website could not have generated the consent records attached to his declaration, Mr. Brody, no doubt concerned of perjury charges, unequivocally recanted all testimony that he had any knowledge of where the "consent" data really came from, and even agreed that it looked manufactured. He had no choice but to come clean. Royal Seas will have a lot of explaining to do at oral argument. It appears they harassed a witness with no personal knowledge of events into perjuring himself as their sacrificial lamb to try to avoid billions of dollars in liability.

## B. www.yourautolifehealthinsurance.com Does Not Gather Prior Express Consent for Royal Seas Cruises

With respect to DeForest, Defendant does not put forth a witness from yourautohealthlifeinsurance.com. The call transfer data shows over 200 consumers who were called and transferred to Royal Seas, and whose data was provided to

Prospects DM by the operator of that site. No Compliant opt in procedure has been produced, nor have there been any individualized issues of consent presented. Defendant has completely failed to put forth any evidence on this website. Plaintiffs' position with respect to at least that website is unrebutted. DeForest's data also leaves glaring questions. Why were there two different websites? What was the error? How could Deforest's number, email address, and name appear with a Georgia address he has never lived, when Deforest never provided that information or visited either website?[16] Ultimately, even if Deforest provided his number, the website does not constitute compliant prior express written consent anyways because it does not disclose that a consumer is providing their consent to Royal Seas or Prospects DM, listing only a bunch of other unrelated companies.[17]

Let's be clear--the data produced to date is not consent evidence. Even according to Prospects DM, these are not consent records. No consent records were ever produced, despite Plaintiffs asking for them from both Prospects DM and Royal Seas. Defendant's attempts to argue that these are records of consent is a blatant misrepresentation to the Court. Defendant's 100% opt in marketing program is a complete illusion. They have not produced evidence of "consent" for even a single class member. **Not one**. That's because there isn't any.

## C. Defendant's Expert's Testimony Lacks Meaningful Import

With respect to Defendant's expert witness, Ms. Daley is a licensed attorney, with no formal educational background in computer science, database management, marketing or web development. She is not a statistical expert, an expert in conversion rates, or an expert in web traffic analytics. Wheeler Decl. Ex I 19:22-20:23. Ms. Daley was not asked to, and did not conduct a web traffic analysis on any of the websites visited by the named plaintiffs or analyzed by Mr. Weeks. *Id*.

---

[16] Plaintiffs attach DeForest's web history, which shows he never visited either site. Wheeler Ex A. If DeForest never provided this data, then where did it come from?

[17] *See* http://www.yourautohealthlifeinsurance.com/companies/index.html.

at 112:20-119:16, 126:9-23, 164:17-165:4, 172:13-18.  She expressly stated during her deposition that she had no opinions about whether his ultimate conclusions were true or false, merely that she believed his methods of arriving at those conclusions were flawed.[18]  *Id*.  Moreover, Ms. Daley does not testify that Alexa rankings are meaningless, merely that they are not a perfect proxy for emulating web traffic above a threshold where Amazon has deemed web traffic patterns to be "scarce," i.e. where an Alexa rank is greater than 100,000.  But Ms. Daley has no idea how much web traffic would trigger a 100,000 Alexa rank.   *Id*. at 167:9-23.  Accordingly, she ultimately has no opinions about whether Mr. Weeks' extrapolations are accurate.  Ms. Daley testified that the best way to ultimately prove or disprove the legitimacy of any assertions of "consent" generated through a particular website is to compare the actual web traffic data (either from the server, from Google or from Amazon) with the call records data.  *Id*. at 54:8-56:15, 73:20-82:23.  Ms. Daley ultimately admitted in her deposition, that despite her testimony about the limitations with Alexa rankings to accurately predict web traffic patterns, at a certain point, Alexa rankings data which is grossly out of line with what is being represented with respect to traffic patterns for a particular website warrants a deeper inquiry into the web server data to test the validity of the assertions of the website operator.  *Id*. at 201:2-208:3.[19]

---

[18] Mr. Weeks did not testify that Alexa rankings were a substitute for web traffic analytics, merely an informative proxy to evidence assertions about the websites at issue not being able to generate the amount of traffic contended by the website operators.  Ultimate proof at trial will compare web traffic data to the call records. While it is true that Mr. Weeks testified that he could not pinpoint a specific lead that was manufactured with data and information he had at the time, he also said definitively that his opinion was that leads had been manufactured.

[19] As Mr. Weeks pointed out: "To generate the traffic necessary to create 80,000 leads would require at least 3.4 million visitors a year using an optimistic conversion rate of 2.35%. This would be an Alexa Ranking of at least 55,000, a ranking over 200 times higher than the current ranking for the site."  However, this is merely the number of leads which were warm-transferred to Royal Seas.  Even assuming a very

## III.   LEGAL ARGUMENT

This case is simple.  There is a list of people whose phone numbers were called by Prospects DM on behalf of Royal Seas Cruises, whom Plaintiffs allege were called without prior express written consent.  Defendant asserts that it received such consent from 100% of the leads that were being called.  However, despite having every incentive and opportunity to do so, Defendant has not provided any actual evidence of this, merely hearsay and speculation.  Instead, what evidence was provided in Opposition proves that diabeteshealth.info was, with absolute technological certainty, manufacturing leads.  Defendant's expert testified that the only way to prove the legitimacy of online "consent" was with the actual web traffic data from the servers of the websites themselves.[20]  Prospects DM does not have this data, nor does Royal Seas.  The operators of the websites in question have not produced the data either, nor even produced a single example of legitimate prior express consent.  Royal Seas has only proven that people were called and that people who were called were transferred to Royal Seas.  That is all.

The websites that supposedly generated Plaintiffs' phone numbers exhibit a number of phenomena which prove they could not have legitimately gathered the volume of organic web traffic to their sites necessary to convert such traffic to the number of calls actually placed to those consumers affiliated with the sites in Prospect DM's call record data.  Plaintiffs themselves have proven that neither of them went to those websites, using testimony and data, and yet, their phone numbers inexplicably show up in Prospect DM's call data.  As Mr. Weeks concluded, if a website was capable of generating a thousand visitors, but a hundred thousand people were called (requiring more than a million visitors), then

---

generous 10% hit rate, that would equate to 34 million people visiting the diabeteshealth.info website in April 2017, in order to generate data of this nature (more than the number of people in America with diabetes).

[20] Google and Amazon are in possession of this data; Plaintiffs subpoenaed this data, and are engaged in a meet and confer, after having been served with objections.

the "consent" data was being manufactured.   Moreover, an analysis of Diabeteshealth.info proves that the "consent" data in Ex. B of Brody's Declaration was not gathered through that web portal, but from elsewhere.

This case is about the importance of ensuring robodialers are kept honest and that they don't call millions of people to solicit, unless those consumers have consented, and that consumer data cannot be misappropriated and misused to shield them from accountability.  Facebook recently opened our eyes to the misuse of consumer data, and importance of privacy.  Defendant vigorously defends itself as can be expected, but boisterous hollering does not an evidentiary record make.

### A. What Is Meant By "Manufactured Consent?"

Manufactured consent means just that – that the "consent" i.e. the process of a consumer organically and voluntarily agreeing to receive robocalls, is being emulated and replaced with some other process by which their private data is obtained through other sources.  Such sources may be misusing consumer data, for economic gain, and covering it up by creating the appearance of legitimacy.  In this day and age, with the number of privacy breaches that occur regularly, or even the number of companies (Facebook for example) who sell data without consumer knowledge, consumer data is widely available for purchase through a number of legitimate and illegitimate channels.  In this scenario, the data ultimately used by a company is legitimate in the sense that it contains accurate information of the consumer.  It may have even been voluntarily provided by a consumer, to someone, somewhere.  What is manufactured is that the data did not come from a consumer through the source by which it is being represented.  This is what happened in the case of Mr. McCurley's phone number.  That much is irrefutable from the evidence in the record of the case.  It may be imprecise to say that Defendant is manufacturing consent, but it is accurate to say that the consent that is used as the basis for Defendant's affirmative defense was manufactured.

### B. Plaintiffs' Narrowed Class Definition Identifies a Numerous Ascertainable Class of Consumers, of Whom Plaintiffs Are Typical

The majority of Defendant's Brief challenges the scope of Plaintiffs' Class definition as being overbroad and thus unmanageable.  These issues are easily addressed by Plaintiffs' "Narrowed Class" of those consumers whose phone numbers were supposedly "generated" by the two websites which Defendant's records indicate as a source of Plaintiffs' information.  Anything argued by Defendant in its Brief with respect to anything other than diabeteshealth.info or yourautohealthlifeinsurance.com is irrelevant to certification and merits issues in this case.  There are over 88,000 class members in the Transfer Subclass.  Both classes are sufficiently numerous.  Plaintiffs are typical of these groups because according to Defendant itself, the data shows they received calls and their numbers are associated with these websites like other class members.  Finally, Defendant argues that the Class is not ascertainable, despite Ninth Circuit authority that says there is no such requirement.  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).  This argument should be ignored.

### C. Plaintiffs and Counsel Are Adequate

Defendant finishes its brief with a spurious swipe at Plaintiffs and their counsel on the basis of adequacy, which is unsupported by evidence or authority.  "[A] court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be to eliminate any class representation."  *Kline v. Wolf*, 702 F.2d 400 (2d Cir.1983).[21]   Plaintiffs are adequate because they have no conflicts and will represent the interests of the Class.  Counsel are adequate because they have and continue to vehemently litigate this case for the Class.

### D. Defendant Presents Zero Evidence Of Individualized Issues.

There is a philosophical difference of opinion legally between Plaintiffs and

---

[21] Courts are skeptical of unsubstantiated character attacks. *Polanco v. Schneider Nat. Carriers, Inc.,* 2012 WL 10717265, at *5 (C.D. Cal. Apr. 25, 2012) ("We do not look with sympathy upon these types of unsubstantiated character attacks by Defendant in opposing class certification, given that they are made for the purpose of defeating class certification, not out of any genuine concern for the interests of the class.")

Defendant with respect to where to place the burden at certification, on an affirmative defense. Defendant's entire position at certification boils down to whether there are individualized issues of consent. Defendant has not produced evidence that such individualized issues exist. Ms. Poole's testimony is, by her own admission, speculation and premised on quadruple hearsay. Mr. Grant's testimony is one less party removed from such speculation and hearsay, but his credibility is called into question by the numerous demonstrable falsehoods in his declaration, which suggest that his company has been withholding evidence and playing games. Finally, there is Mr. Brody, who ultimately recanted the testimony that served as the hearsay basis for Mr. Grant and Ms. Poole, after having been confronted with the irrefutable truth. Ultimately, none of this proves individualized issues, it just proves that Defendant does not know what is going on, that Prospects DM is hiding something, and that at least some of the lead generators are manufacturing consent, and willing to lie under oath to cover it up. The rabbit hole is deep, but Plaintiffs have proven that at least with respect to any "consent" data from the websites their numbers supposedly came from, that the "consent" data is not legitimate.

Defendant's cases are all factually distinguishable. *Blaire v The CBE Group, Inc.* 309 F.R.D. 621 (S.D. Cal. 2015) involved a high level of factual showing from the defendant as to numerous actual instances of individualized consent problems with the class definition, which is not the case in this matter since the evidentiary showing in this Matter is completely absent. *Gene & Gene LLC v. BioPay, LLC*, 541 F.3d 318 (5th Cir. 2008)*, and *Connelly v. Hilton Grand Vacations Co.,* LLC, 294 F.R.D. 574 (S.D. Cal. 2013) suffer from a similar issue, as there was clear evidence of individualized consent on the record, and moreover, where the class definition was overbroad (an issue Plaintiffs corrected by narrowing the Class). These cases play into Defendant's strawman position. But, that does not make this argument compelling. Prevailing case law holds that the burden of using an affirmative defense to defeat certification on predominance grounds rests solely on

the defendant.  Since Defendant produced only supposition, perjury and hot air in support of its position, certification is an easy decision for The Court.[22]

**E. Whether Consent Was Manufactured Is A Merits Issue**

Let us consider what it means to say there are individualized issues of consent.  It means that Defendant has records that can be used to prove that some of the Members within the proposed class definition legitimately consented to receive calls, and that challenging those records needs to occur by way of unmanageable individualized testimony.  As described herein, Defendant has not come even close to showing that is the case for the narrowed Class.  Plaintiffs on the other hand have presented proof that consent was being manufactured, and that Defendant's witnesses have perjured themselves.

While it is tempting to jump ahead, as the Ninth Circuit recently observed in a decision overturning a district court's denial of class certification, "[w]hether Renzenberger's policies complied with the law was a common question, whatever its merits." *Wright v. Renzenberger, Inc.*, 656 F. App'x 835, 837 (9th Cir. 2016) (citing *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1113- 14 (9th Cir. 2014)).  Defendant clearly disagrees with Plaintiffs' view of facts regarding the legitimacy of consent from the lead generation websites.  There is a proper place for such arguments: summary judgment.  "Such an argument that challenges the merits of Plaintiffs' allegation…has no bearing on the Rule 23 predominance inquiry." *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264 (C.D. Cal. April 9, 2014).

Indeed, merits issues can only be decided at class certification where they

---

[22] *Stern v DoCircle, Inc.*, 2014 WL 486262 (C.D. Cal. Jan. 29, 2014); *Kevin Amini, et al. v. Heart Savers, LLC*, 2016 WL 10621698 ( C.D. Cal. Oct. 17, 2016); *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228 (C.D. Cal. 2018);  *Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303, 308-309 (S.D. Cal. 2015); *Stemple v. QC Holdings, Inc.*, 2014 WL 4409817 (S.D. Cal. Sept. 5, 2014); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. Cal. 2012); *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 629 (S.D. Cal. 2015); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

overlap with Rule 23 requirements.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).  Merits only overlaps with Rule 23 in this case insofar as Plaintiffs would have to demonstrate that their theory of liability can be subject to common evidence.  Whether a block of leads, as identified in the class definition, were manufactured is a single merits question.  Plaintiffs already have proof that their leads were manufactured, and Defendant has presented no evidence that even a single other lead from the two websites that "generated" Plaintiffs' "consent" were legitimate.  Thus, the question turns on common proof.[23]

### F. *Bristol-Myers Squibb Co.* Does Not Hold That Courts Lack Jurisdiction To Certify Nationwide Classes Actions.

Defendant makes a passing argument that the ruling in *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty*., 137 S. Ct. 1773 (2017) holds that courts are now precluded from certifying nationwide classes.  That is not what the case held.  It involved a group of 86 California residents and 592 residents from 33 other states who "filed eight separate complaints in California Superior Court," alleging products liability, negligent misrepresentation, and misleading advertising claims against the Defendant. *Id*. at 1778. The Court analyzed whether personal jurisdiction applied to the claims of non-residents of California and determined that with respect to *these non-resident's claims only*, there was no basis for specific jurisdiction against Defendant. *Id*. at 1777.  The Court determined that the nonresident plaintiffs did not allege that they purchased the relevant products in California or that they were injured in California. *Id*. at 1778.  The case was not a class action, and the majority of the named plaintiffs had no connection whatsoever with California. Justice Sotomayor stated the holding would have no application to class actions in her dissenting opinion.  *Id*. at 1789 footnote 4.  Courts analyzing

---

[23] The Court could alternatively rule in Plaintiffs' favor on the merits, given the overwhelming evidence that consent was manufactured, and find predominance is satisfied.  *See Raffin v. Medicredit, Inc.*, 2017 WL 131745 (C.D. Cal. Jan. 3, 2017).

1  cases involving federal statutes (like this one) have in fact held just the opposite.[24]

2      Defendant's passing remark is unsupported by case law.[25]

3  ## VI.   CONCLUSION

4      If Defendant wanted to challenge certification on individualized issues of

5  prior express consent, it was required to do what the defendants in *Blair* did: provide

6  actual evidence of individualized issues.  Instead, Defendant presents supposition,

7  demonstrable perjury, and hot air.  Speculation and perjury cannot serve as a basis

8  to deny certification, when the individualized issues are the Defendant's burden to

9  prove.  Accordingly, Certification must be granted.

10  Dated**:** January 14th, 2019          **Law Offices of Todd M. Friedman, P.C.**

11                                    By: _/s/ Todd M. Friedman_____

12                                         Todd M. Friedman, Esq.

13                                         Attorneys for Plaintiff

14  [24] See *Sloan v. Gen. Motors LLC*, 287 F.Supp.3d 840, (N.D. Cal. Feb. 7, 2018),

15  *order clarified*, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5,

16  2018); *Doe v. Cotterman*, 2018 WL 1235014 (N.D. Ill. March 9, 2018); *In re
   Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2018 WL 1382746

17  (March 19, 2018); *Fitzhenry–Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 WL

18  4224723 (N.D. Cal. Sep. 22, 2017) (rejecting the argument that *Bristol–Myers*
   precludes a court from exercising personal jurisdiction over the claims of absent

19  class members who are out-of-state); *In re Chinese–Manufactured Drywall Prods.
   Liability Litig.*, 2017 WL 5971622, at *12–14 (E.D. La. Nov. 30, 2017); *Swamy v.*

20  *Title Source, Inc.*, Case No. 17-01175 WHA, 2017 WL 5196780 (N.D. Cal. Nov.

21  10, 2017); *Peters v. Wells Fargo Bank, N.A.*, 2018 WL 398238 (N.D. Cal. Jan. 12,

22  2018); *Feller v. Transamerica Life Insurance Company*, 2017 WL 6496803 (C.D.
   Cal. Dec. 11, 2017); *Tickling Keys, Inc. v. Transamerica Financial Advisors, Inc.*,

23  2018 WL 1701994 (M.D. Fl. April 4, 2018); *Broomfield v. Craft Brew Alliance,*

24  *Inc.*, 2017 WL 3838453 (N.D. Cal., Sept. 1, 2017); *Alvarez v. NBTY, Inc.*, 2017

25  WL 6059159 (S.D. Cal. Dec. 6, 2017); *Molock v. Whole Foods Market, Inc.*, 2018
   WL 1342470 (D. D.C. March 15, 2018); *Casso's Wellness Store & Gym, L.L.C. v.*

26  *Spectrum Laboratory Products*, Inc., 2018 WL 1377608 (E.D. LA. March 19,

27  2018); Newberg on Class Actions § 2:6 (5th ed. 2017).

28  [25] In the event the Court agrees with Defendant, Plaintiff respectfully requests the
   case be transferred to Florida instead of having non-California claims dismissed.

**[ADDITIONAL COUNSEL FOR PLAINTIFFS]**

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Ste 101
San Diego, CA 92108
Telephone:   (619) 233-7770
Facsimile:    (619) 297-1022

# CERTIFICATE OF SERVICE

Filed electronically on this 14th day of January, 2019, with:

United States District Court CM/ECF system

Notification sent electronically via the Court's ECF system to:

Honorable Cynthia A Bashant
United States District Court
Southern District of California

And All Counsel of Record As Recorded On The Electronic Service List.

This 14th day of January, 2018

s/Todd M. Friedman, Esq.
Todd M. Friedman