1
2
3
4
5
6
7
8
**UNITED STATES DISTRICT COURT**
9
**SOUTHERN DISTRICT OF CALIFORNIA**
10

JOHN MCCURLEY, DAN DEFOREST,

11

Case No. 17-cv-00986-BAS-AGS

Plaintiffs,

**ORDER:**
12

v.

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' RULE 23 MOTION FOR CLASS CERTIFICATION**
13

ROYAL SEAS CRUISES, INC.
14

Defendant.
15

**[ECF No. 49];**
16

**AND**
17

**(2) DENYING ROYAL'S RULE 702 MOTIONS TO EXCLUDE EXPERT TESTIMONY**
18
19
20

**[ECF Nos. 56, 57]**
21    This case stems from telemarketing calls for Defendant Royal Seas Cruises,
22 Inc.'s ("Royal") cruise vacation packages and services allegedly made to cellular
23 telephone numbers.  Plaintiffs John McCurley ("McCurley") and Dan DeForest
24 ("DeForest") (together, "Plaintiffs"), are California residents who allege that Royal
25 and its agents allegedly made such calls to Plaintiffs with the use of an automatic
26 telephone dialing system and/or an artificial or prerecorded voice and without
27 Plaintiffs' prior express consent.  On behalf of a putative nationwide class, McCurley
28 and DeForest bring this consolidated action against Royal for alleged violations of

the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq*. (ECF No. 31, Consolidated Complaint [*hereinafter* the "Complaint" or "Compl."] ¶¶ 94–101.)[1]

Plaintiffs move for class certification of their TCPA claims pursuant to Rule 23. (ECF Nos. 49, 76.) They request certification of Rule 23(b)(2) and (b)(3) classes. (ECF Nos. 49, 76.) Royal opposes class certification. (ECF Nos. 58, 84-1.) In connection with its opposition to Plaintiffs' Rule 23 motion, Royal moves to exclude the testimony of Wesley Weeks and Christina Peters-Stasiewicz, individuals who Plaintiffs offer as experts in support of class certification. (ECF Nos. 56, 57, 70, 71.) Plaintiffs oppose Royal's motions to exclude. (ECF Nos. 68, 69.) All motions are suitable for determination on the papers submitted, without the need for oral argument. *See* S.D. Cal. L.R. 7.1(d)(1). After careful consideration, the Court (1) grants in part and denies in part Plaintiffs' Rule 23 motion for class certification and (2) denies Royal's Rule 702 motions to exclude the testimony of Plaintiffs' experts.

## RELEVANT BACKGROUND[2]

### A. Relevant TCPA Provisions and Implementing Regulations

Relevant provisions of the TCPA and its implementing regulations provide the legal contours of the claims for which Plaintiffs seek class certification. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic

---

[1] For a putative California class, DeForest also alleges that Royal violated California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630 *et seq*. (Compl. ¶¶ 102–111.) DeForest does not move to certify a California CIPA class and thus this order does not address that issue.

[2] The Court outlines the relevant background by drawing on, as appropriate, allegations in the Complaint and various declarations submitted in connection with class certification. (ECF Nos. 31 49-2, 49-6, 49-7, 58-3, 58-4, 58-7.) The relevant background is not an exhaustive treatment of the facts in this case. Additional facts are discussed in the Court's Rule 23 analysis as necessary.

telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an "automatic telephone dialing system" ("ATDS") as "equipment which has the capacity (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." 47 U.S.C. § 227(a)(1).

The Federal Communications Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. 47 U.S.C. § 227(b)(2). The FCC has promulgated a comprehensive set of rules governing telemarketing and telephone solicitation calls, which require "prior express written consent" for such calls. *See* 47 C.F.R. § 64.1200(a)(1), (2). "Telemarketing" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). "Prior express written consent" means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8). A "signature" may include "an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law." 47 C.F.R. § 64.1200(f)(8)(ii).

**B.     Royal's Lead Generation Program with Prospects**

Royal is a Fort Lauderdale, Florida-based company which sells vacation packages through various marketing programs. (ECF No. 58-4 Jennifer Poole Decl. ("Poole Decl.") ¶ 22.) In November 2016, Royal hired Prospects DM ("Prospects"),

a "lead generation company," to provide lead generation services for telemarketing and solicitation concerning Royal's vacation packages. (ECF No.49-2 Friedman Decl. Ex. B; ECF No. 51 Ex. B (Royal's "lead generating marketing agreement" with Prospects); ECF No. 58-3 Joshua Grant Decl. ("Grant Decl.") ¶¶ 4, 7; Poole Decl. ¶¶ 4–5.) Prospects provides lead generation services for Royal through a Royal inbound transfer call program in exchange for a fee, which is calculated based on the number of calls that result in a "live transfer" for "qualifying customers." (ECF No. 49-2 Ex. A Jennifer Poole Dep. ("Poole Dep.") at 12:9–16, 13:5–25; Poole Decl. ¶ 5; Grant Decl. ¶ 7.)

Prospects receives and makes telephone calls for "tens of millions of leads every year." (Grant Decl. ¶ 5.) Prospects generates leads for its customers, like Royal, through websites operated by digital marketing companies, including companies like Fluent LLC ("Fluent"), Citadel Marketing Group ("Citadel"), Landfall Data LLC ("Landfall"), and Helping Hands Association. (Grant Decl. ¶¶ 4–6, 9.) Landfall operates thousands of websites, including, in relevant part, www.diabeteshealth.info. (ECF No. 58-7 Kevin Brody Decl. ("Brody Decl.") ¶ 8.) Prospects provides the name of a given customer, like Royal, to the digital marketing companies, which in turn incorporate the customer's name into their websites. (Grant Decl. ¶ 9.)

The websites generate leads by using a form through which a user can register a telephone number for promotional and product information related to companies identified with the form. (Grant Decl. ¶ 10; Brody Decl. ¶ 11.) The form generally asks for an individual's full name and telephone number and may also ask for an email address. (Grant Decl. ¶ 10; Brody Decl. ¶ 12.) The form contains a box, and expressly indicates that checking the box constitutes consent to receive communications from one of several identified companies and organizations, whether

as a text or call to a cell phone using an automated dialer or an artificial or prerecorded voice. (Grant Decl. ¶ 10; Brody Decl. ¶ 12.) The form does not submit if the box is left unchecked. (Grant Decl. ¶ 10.) A lead is generated when the user completing the form checks the box and clicks the submit button. (Grant Decl. ¶ 10; Brody Decl. ¶ 12.)

When a lead is generated from a third-party web publisher, the information from the lead is transferred to Prospects through an interface provided by Prospects, which allows the web publisher to transmit the information directly into Prospects' database "indexed by the appropriate marketing campaign." (Grant Decl. ¶ 14.) Prospects refers to these leads as "opt-in" data, which Prospects maintains in an "opt-in database." (*Id.* ¶¶ 24, 31.) Prospects "calls the opted-in telephone number" to inquire about interest in a particular company associated with the lead, which in this case is Royal. (*Id.* ¶¶ 12, 14.) If the individual expresses interest in receiving more information, then Prospects transfers the call to a Royal representative. (*Id.* ¶ 12.) Prospects transfers leads to Royal during the normal business hours of Royal's call centers, generally 9:00 a.m. to 9:00 p.m. Monday through Friday and certain business hours on Saturdays. (*Id.* ¶ 33.)

When Prospects transfers a call to Royal, Prospects electronically transmits "the relevant opt-in data to Royal"—*i.e.* "information that Prospects and Royal agreed would be provided." (*Id.* ¶ 13; Poole Decl. ¶ 8.) The "opt-in data" Prospects provides to Royal does not include all information Prospects receives from a third-party web publisher. (Grant Decl. ¶ 13.)[3] For example, Prospects did not provide

---

[3] Although Fluent provides over half of Prospects' leads, Fluent restricts Prospects from providing information to its customers, like Royal, about the URL of the website which generated a lead provided by Fluent. (Grant Dec. ¶ 13 n.2.) Fluent, however, does not appear to manage, own, or operate either of the websites for which Plaintiffs have limited the proposed class and subclass.

Royal with the URL for the website which generated a given lead until January 9, 2017. (*Id.*) "Opt-in data" Prospects ostensibly provided to Royal after this date shows the name of the website which generated a lead for Royal, including the websites www.diabeteshealth.info and www.myhealthcareauthority.com. (*Id.* ¶ 28.) Prospects sends this "opt-in data" to Royal using an interface, which is received, stored and maintained by a third-party hired by Royal, Support Services Corp. ("SSC"). (Poole Decl. ¶ 8.) After a consumer has decided to purchase a package from Royal, Royal and SSC "match" the "opt-in data" received from Prospects with the "customer sales data" Royal receives from any customers who actually purchase a package from Royal. (*Id.* ¶¶ 7, 11–12.) The customer sales data includes information such as name, address, city, state, zip code, and phone number. (*Id.* ¶ 12.)

## C.    Plaintiffs' Case Against Royal

McCurley filed his putative nationwide class action complaint on May 12, 2017, solely alleging TCPA claims. (ECF No. 1.) DeForest filed his putative nationwide class action complaint on June 7, 2017 in the Central District of California, alleging violations of the TCPA and CIPA. (*DeForest v. Royal Seas Cruises, Inc.* [hereinafter "*DeForest*"], No. 17-cv-1988-BAS-AGS, ECF No. 1.) Royal filed answers to each complaint on July 28, 2017. (ECF No. 17; *DeForest*, ECF No. 19.) Thereafter, DeForest's case was transferred to the Southern District of California at the stipulation of the parties and assigned to Judge Battaglia. (*DeForest*, ECF No. 21–23.) At the parties' request, the cases were consolidated before this Court and Plaintiffs filed a consolidated complaint (the "Complaint"). (ECF No. 31.) As the Court has indicated, Plaintiffs allege that they did not provide their prior express consent to receive certain calls from Royal allegedly made to their cellular telephone numbers with an ATDS or an artificial or prerecorded voice. (Compl. ¶¶ 53–54, 66.)

1

2      McCurley specifically alleges that he received a call to his cell phone on May

3      3, 2017 at 1:37 p.m. from Royal, which he sent to voicemail.  (*Id*. ¶¶ 27–29.)  When

4      McCurley called the 5700 number back, "someone" offered him an opportunity to go

5      on a free cruise on Grand Celebration Cruise lines.  (*Id*. ¶ 33.)  McCurley realized he

6      was speaking with a recorded voice and ended the call.  (*Id*. ¶ 35.)  McCurley received

7      another call from Royal immediately thereafter from the same 5700 number, which

8      McCurley answered.  (*Id*. ¶¶ 37–39.)  The voice was "different," but asked the same

9      questions "at the exact same pace" and when McCurley answered "yes" to three

10     questions—none of which referred to Royal—he was transferred to a live Royal

11     representative named David, who tried to offer McCurley the same cruise

12     opportunity.  (*Id*. ¶¶ 40–43.)  McCurley rejected the offer and asked to be placed on

13     a do-not call list.  (*Id*. ¶ 46.)  McCurley alleges that all calls he received were placed

14     with an automatic telephone dialing system ("ATDS").  (*Id*. ¶¶ 27, 37, 50–51, 62.)

15

16     DeForest alleges that in May 2017 he received calls to his cell phone number

17     from at least two numbers which belong to Royal. (*Id*. ¶¶ 57, 63, 69.)  These calls

18     solicited DeForest to purchase Royal's services.  (*Id*. ¶¶ 57, 63, 69.)  DeForest alleges

19     that Royal used a third party, Helping Hands, to generate leads to place calls on

20     Royal's behalf, using prerecorded messages and an ATDS, and then transferred the

21     calls to Royal.  (*Id*. ¶¶ 58–61.)

22

23     Based on this conduct, Plaintiffs claim that Royal violated Section 227(b)(1)

24     of the TCPA.  (*Id*. ¶¶ 56, 64–66.)[4]  Plaintiffs contend that Royal is liable for negligent

25     _____

26         [4] DeForest additionally alleges a TCPA claim pursuant to Section 227(c)(5), which
       authorizes "[a] person who has received more than one telephone call within any 12-month period
27     by or on behalf of the same entity in violation of the regulations prescribed" under the subsection
       which concerns "residential subscribers' privacy right" to bring a private cause of action. 42 U.S.C.
28     § 227(c)(5); (Compl. ¶¶ 69–71.)  DeForest contends that by placing multiple calls to his cell phone,

and intentional violations of the TCPA. (*Id.* ¶¶ 94–97 (negligent violations); *id.* ¶¶ 98–101 (intentional violations).) They seek damages and injunctive relief. (*Id.* ¶¶ 1–2, 96–97, 100–01, 113–14, 116–17.)

## LEGAL STANDARD

Rule 23 governs federal class actions. Fed. R. Civ. P. 23. Federal courts possess broad discretion over class certification under this Rule. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) ("The decision to grant or deny class certification is within the trial court's discretion."); *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001) ("[Rule] 23 provides district courts with broad discretion to determine whether a class should be certified[.]"), *abrogated on other grounds by*, *Johnson v. California*, 543 U.S. 499, (2005).

Plaintiffs bear the burden of demonstrating that their proposed TCPA class comports with both Rule 23(a) and (b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Plaintiffs also seek certification of a TCPA transfer subclass. "[A] class may be divided into subclasses that are each treated as a class" pursuant to Rule 23(c)(5). Fed. R. Civ. P. 23(c)(5). Plaintiffs generally bear the burden to show that their proposed subclass "independently meet[s] the requirements for the maintenance of a class action." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982).

---

Royal violated 47 C.F.R. § 64.1200(c)(2), a regulation which makes it unlawful to "initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2). DeForest does not seek certification related to this claim in the present motion. (*See* ECF No. 49-1 at 10.) Moreover, the Court notes that DeForest has not alleged a violation of the regulation because he alleges calls were placed to his cell phone, not to a "residential telephone subscriber." (Compl. ¶¶ 57, 65, 69.)

Pursuant to Rule 23(a), "one or more members of a class may sue . . . as representative parties" if four prerequisites are satisfied: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). If the proposed class does not satisfy even one of these prerequisites, a court's Rule 23 analysis ends and certification must be denied. If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b); *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 979–80 (9th Cir. 2011). Plaintiffs seek certification of TCPA classes pursuant to Rules 23(b)(2) and (b)(3). Pursuant to Rule 23(b)(2), certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) is satisfied if the court finds that common "questions of law or fact" of the class "predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Class certification "is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites'" of Rule 23(a) and (b) are satisfied. *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). A court need not accept conclusory or generic allegations regarding the suitability of a litigation for class action resolution. *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 447 (N.D. Cal. 2012). But a court "is required to consider the nature and range of proof necessary to establish [the] allegations" of the complaint. *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig*., 691 F.2d 1335, 1342 (9th Cir. 1982) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.7 (9th Cir. 1975)).

As part of a rigorous Rule 23 analysis, it "may be necessary for the court to probe behind the pleadings." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at

160). A court may therefore consider evidentiary submissions as part of its Rule 23 analysis. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010). However, a court has "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* at 466 (quoting *Dukes*, 564 U.S. at 351 (internal quotation marks omitted)); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Ellis*, 657 F.3d at 980. Ultimately, "[t]he district court's class certification order, while important, is also preliminary" because "'[a]n order that grants or denies class certification may be altered or amended before final judgment.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23(c)(1)(C)).

## PRELIMINARY EVIDENTIARY ISSUES[5]

The parties raise a number of evidentiary issues which pertain to Plaintiffs' class certification motion. The Court first disposes of Plaintiffs' various objections to each declaration Royal submits to oppose class certification. The Court then addresses Royal's Rule 702 motions to exclude the testimony of Wesley Weeks ("Weeks") and Christina Peters-Stasiewicz ("Peters").

---

[5] Plaintiffs request judicial notice of a Securities and Exchange Commission order "making findings and imposing remedial sanctions pursuant to Section 15(b) of the Securities Exchange Act of 1934" as a public record subject to judicial notice. (ECF No. 80 Ex. A.) The record pertains to Kevin Brody, one of Royal's declarants. (*Id.*; *see also* ECF No. 76 at 10 (contending that the record shows that Brody "is a felon, who was previously convicted of Enterprise Corruption[.]").) The Court denies the request for judicial notice because the document does not affect the Court's resolution of the class certification motion. The Court denies as moot Royal's related request to respond to the document under Rule of Evidence 201. (ECF No. 84-1 at 13.)

## A. Plaintiffs' Objections

Plaintiffs have lodged a swath of evidentiary objections to the declarations of various individuals on which Royal relies to oppose class certification, including Kevin Brody, Joshua Grant, Aaron Sembloksi, Daniel Barksy, and David Andras. (ECF Nos. 79, 79-1, 79-2, 79-3, 79-4.) Plaintiffs also object to the declaration of Brian Cummings, one of Royal's attorneys who submitted a declaration with Royal's surreply, which describes his personal use of www.diabeteshealth.info on February 12, 2019 and includes pictorial screenshots. (ECF No. 84-2 (Cummings declaration and screenshots); ECF No. 85-2 (Plaintiffs' objection).)

Formalistic evidentiary objections which might have merit at a successive stage of the litigation, such as a motion for summary judgment or trial, make little sense at the class certification stage.[6] *See Sali*, 909 F.3d at 1004–06; *In re Zurn Pex Plumbing Prod. Liab. Litig*., 644 F.3d 604, 613 (8th Cir. 2011) (observing that a class certification decision "is far from a conclusive judgment on the merits of the case, it is 'of necessity . . . not accompanied by the traditional rules and procedure applicable to civil trials.'"). Accordingly, "a district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met." *Sali*, 909 F.3d at 1005; *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975); *Gonzalez v. Millard Mall Servs., Inc*., 281 F.R.D. 455, 459 (S.D. Cal. 2012) (citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974)); *Keilholtz v. Lennox Hearth Prods*., 268 F.R.D. 330, 337 (N.D. Cal. 2010)). Thus, the Court summarily overrules

---

[6] The Court rejects Royal's objections to Plaintiffs' reply brief and the rebuttal report of Nathaniel Bacon for this reason as well. Royal argues in surreply that Plaintiffs' reply and all associated filings, including Bacon's report, should be stricken because they are "new evidence" offered in reply. (ECF No. 84 at 2 n.3; ECF No. 84-1 at 15.) A district court should not "rely[] on formalistic evidentiary objections," including objections that evidence is "'new evidence' submitted in reply" to exclude evidence that may support class certification. *See Sali*, 909 F.3d at 1006. Thus, the Court will not strike Bacon's report or any associated filings on this basis. Moreover, the Court does not find that Bacon's report is necessary to the resolution of Plaintiffs' class certification motion.

1    Plaintiffs' objections.

2

3        Plaintiffs also object that Cummings's declaration should be excluded pursuant

4    to Rule 702 because Cummings "has no technical background in web design or

5    database management" and thus fails the standard for admission of expert testimony

6    set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

7    (ECF No. 85-2.)  Cummings, however, does not offer any opinions in his declaration

8    that would trigger a Rule 702 or *Daubert* analysis.  He merely attests to his own

9    experience using one of the websites through which Prospects allegedly generates

10   leads for Royal.  (*See* ECF No. 84-2.)  Royal uses this information to explain one

11   means in which a lead could be generated.  (*See* ECF No. 84-1 n.23 (citing

12   Cummings's declaration as showing that a lead can be generated from

13   www.diabeteshealth.info by simply pressing the space bar in each field without

14   providing specific information.)  Royal's use of Cummings's declaration to respond

15   to factual assertions in the report of Plaintiffs' rebuttal expert, Nathaniel Bacon, does

16   not render Cummings's factual account an expert opinion.  Accordingly, the Court

17   overrules this objection as well.

18

19       With this said, the Court underscores that it will not rely on legal conclusions

20   contained in declarations submitted in support of or opposition to class certification.[7]

21   *See Martino v. Ecolab, Inc.*, No. 14-cv-04358-PSG, 2016 WL 614477, at *6 (N.D.

22   Cal. Feb. 16, 2016) (disregarding legal conclusions in party's declarations submitted

23   at class certification stage).

24   _____

25       [7] For example, multiple declarants who Royal offers in opposition to class certification
     parrot the statutory elements of the TCPA to make legal conclusions about "consent," "bona fide
26   opt-in consent," and "fully TCPA-compliant" conduct.  (*See* Grant Decl. ¶¶ 9–10, 17, 21–22; ECF
     No. 58-5 Andras Decl. ¶¶ 4, 6; Brody Decl. ¶ 10; Poole Decl. ¶ 3.)  Royal relies on these assertions
27   to argue that it is not liable for any conduct.  (*See* ECF No. 84-1 at 6 n.15 (citing Grant Decl. ¶¶ 21–
     22.).)  The Court, however, does not rely on these legal conclusions, nor is the Court entitled to
28   make freestanding merits conclusions at this stage.

**B.     Royal's Rule 702 Objections to Plaintiffs' Expert Testimony**

Plaintiffs offer two experts in support of class certification.  First, Plaintiffs offer Weeks as an expert in website traffic and data log analysis.  (ECF No. 49-9; ECF No. 49-10.)  Second, Plaintiffs offer Peters as an expert who can determine which numbers in the relevant call log records are for cellular telephone numbers and who can assist in identification of class members.  (ECF No. 49–9.)  Royal moves to exclude Weeks and Peters pursuant to Federal Rule of Evidence 702.  (ECF Nos. 56, 57.)

The Court first construes Royal's motions to exclude as Rule 702 objections. "[A] district court should evaluate admissibility under the standard set forth in *Daubert*" for expert testimony offered at the class certification stage. *Sali*, 909 F.3d at 1006; *Ellis*, 657 F.3d at 982; *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1068 (C.D. Cal. 2015).  However, it is an abuse of discretion to decline to consider evidence offered in support of class certification "solely on the basis of inadmissibility," including inadmissibility based on Rule 702. *Sali*, 909 F.3d at 1006.  A court's evaluation of "admissibility must not be dispositive," but rather it "should go to the weight that evidence is given at the class certification stage" because a district court is ultimately tasked with "analyz[ing] the 'persuasiveness of the evidence presented' at the Rule 23 stage." *Id.* (quoting *Ellis*, 657 F.3d at 982).  Thus, the Court construes Royal's Rule 702 motions as objections and assesses Royal's objections with a view toward their impact on the weight and persuasiveness of testimony offered in relation to Rule 23's requirements.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise . . .." Fed. R. Evid. 702.  The Rule imposes four constraints. First, "the expert's

scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Second and third, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods." *Id*. Fourth, the expert must have "reliably applied the principles and methods to the facts of the case." *Id.*

These requirements "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation, and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted). "[A] district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp*., 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc*., 738 F.3d 960, 969 (9th Cir. 2013)). "[E]xpert testimony is liberally admitted[.]" *Daubert*, 509 U.S. at 588 (noting that Rule 702 is part of the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony").

**1. Wesley Weeks**

Plaintiffs offer Wesley Weeks ("Weeks") as an expert in website traffic and data log analysis. Weeks has issued two reports in support of Plaintiffs' class certification motion. (*See* ECF No. 49-9, Report of Wesley Weeks ("WR1"); ECF No. 49-10, Report of Wesley Weeks Re: Lead Generation Sites ("WR2").) Weeks was asked to analyze whether (1) the websites used by third parties Royal has identified as generating leads could "attract the number of visitors stated by" Royal and (2) whether the personal information identified in the database records could be

generated from the third-party websites.  (WR1 ¶ 1; WR2 ¶ 1.)  Weeks's reports indicate that he has relied on his 25 years of education, experience, consulting and training as a website and software developer and as database and systems engineer to provide his opinions.  (WR1 ¶ 2; WR2 ¶ 2; *see also* WR2 at 56–59 (Weeks's resume).)

Royal vehemently objects to Weeks's reports and offers a 201-page rebuttal report from Margaret Daley, whom Royal offers as an expert to discredit Weeks's reports as a matter of "scientific certainty."  (ECF No. 56-1 at 1 n.2; ECF No. 56-2 Ex. 1.)  Royal contends that (1) Weeks is not qualified to offer expert testimony, (2) Weeks's opinions are irrelevant, and (3) Weeks's methods are unreliable.  (ECF No. 56-1.)  The Court overrules Royal's relevance objection.  The Court sustains Royal's particular objections on qualifications and methodology, yet finds that the objections are largely immaterial.  Weeks has relevant knowledge for website traffic analysis which could be used to test Plaintiffs' assertions about Royal's lead generation program, but the data from servers of the websites that purportedly generated leads was not available at the time of his reports.

***Relevance.***  Royal's relevance objection largely collapses under the weight of Royal's extended attack on Weeks's reports, which spans Royal's formal Rule 702 motion, a brief in opposition to class certification and a surreply, a 201-page rebuttal report, and all but one of Royal's declarants who specifically respond to Weeks's reports—all for two reports that Royal contends are not relevant.  (ECF No. 56-1; ECF No. 56-2 Ex. 1 (Daley rebuttal report); ECF No. 58.)

The standard for relevance is not demanding.  *See* Fed. R. Evid. 401 ("Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  This Rule simply requires that any evidence offered "logically advance a

material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotations and citation omitted).

The thrust of Weeks's reports is that there is a fundamental discrepancy between the number of leads generated by the websites used in Royal's marketing program and the actual website traffic. As Royal acknowledges, "Plaintiffs rely entirely upon Weeks to attack the evidence of consent that exists for every call." (ECF No. 56-1 at 1.) Plaintiffs specifically contend that the leads are "manufactured" in that "the data did not come from a consumer through the source by which it is being represented." (ECF No. 76 at 15.) Setting aside issues with Weeks's qualifications and methodology, Weeks's reports are relevant to the issue for which Plaintiffs offer Weeks as an expert. (ECF No. 49-1 at 6–9, 24; ECF No. 76 at 3, 12–13.) Weeks's reports otherwise contain data that may be relevant to class certification and which does not otherwise appear in the parties' submissions. Even if Weeks' opinions are inadmissible under Rule 702, a district court abuses its discretion at the class certification stage when it declines to consider evidence offered in support of class certification "solely on the basis of inadmissibility." *Sali*, 909 F.3d at 1006. Thus, a wholesale disregard of Weeks's report on the basis of inadmissibility is especially inappropriate.

***Qualifications and Methodology.*** As for Royal's objections regarding Weeks's qualifications and methodology, a nuanced approach shows that while Royal's objections are technically correct, the objections are immaterial.

The Court agrees, as an initial matter, that Weeks is not qualified on the issue of "website traffic conversion," an issue which Plaintiffs effectively concede. (*Compare* ECF No. 56-1 at 8–11 *with* ECF No. 68 at 3–6.) The Court therefore declines to reach the issue of the reliability of converting Amazon's Alexa website

traffic rankings into estimates of website traffic—the primary focus of Royal's briefing and Daley's rebuttal report.

Notwithstanding the Court's agreement with Royal on the issue of website traffic conversion, the Court's agreement is not dispositive. "The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd*., No. C 10-00544 JW, 2011 WL 5417090, *4 (N.D. Cal. Oct. 27, 2011). That an individual lacks relevant experience in one area, therefore, does not render him inadmissible as an expert if he has other relevant experience. *See Wildman v. Am. Century Servs*., No. 4:16-CV-00737-DGK, 2018 WL 2326628, at *1–2 (W.D. Mo. May 22, 2018) (finding that witness with experience providing consulting services to investment advisors was qualified to testify as an expert even though he lacked experience consulting with plan committees and "had no experience with the practices of fiduciaries of a retirement plan for a mutual fund company.").

Royal concedes that Weeks "might have specialized knowledge about . . . analyzing a company's internal data about its website traffic." (ECF No. 56-1 at 10.) In the same breath, Royal contends that Weeks's specialized "knowledge plays no role in this case." (*Id*.) The Court fundamentally disagrees with Royal on this point.

Plaintiffs seek to offer Weeks as an expert who can opine on website traffic analysis. *See Lucido v. Nestle Purina Petcare Co*., 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016) ("[a]dmittedly, [the expert] does have scientific, technical, or other specialized knowledge; she is, after all, a veterinarian. However, Plaintiffs have not asked [the expert] to provide opinions based on that specialized knowledge."). Royal readily acknowledges Weeks's deposition testimony that "the best place to get the amount of traffic that visited a site is from the website server itself[.]" (ECF No. 56-

1 at 14 (quoting Weeks Dep. 297:5–14; *see also* Daley Report ¶ 90 ("Mr. Weeks agreed that using the web traffic data from the time the opt-in leads were obtained is preferable."). Royal's expert acknowledges that the actual website traffic data—as opposed to an Alexa-based estimate of website traffic through application of a conversion formula—would be the appropriate measure "to determine if the opt-in leads are supported by the web traffic of the websites from which they are originated" and she acknowledges that "[t]he amount of actual traffic experienced by any website is captured in logs maintained on the server that hosts the website." (Daley Report ¶¶ 3.b, 26, 92 ("Without historical data it is impossible to estimate the web traffic at the time the opt-in leads were obtained.").)[8] Royal therefore cannot seriously contend that such web traffic data does not exist or would not bear on Plaintiffs' theory of "manufactured consent."

A review of the parties' submissions underscores that Weeks was not able to draw on his area of specialized knowledge because the web traffic data from the web servers associated with the websites that allegedly provided the leads for class members was not available to him. Weeks's and Plaintiffs' reliance on Amazon's Alexa web traffic rankings and a conversion formula is therefore entirely understandable as a proxy for the data that would directly address Plaintiffs' theory. Plaintiffs have represented that they had subpoenas to Google and Amazon outstanding at the time of their reply brief, which are intended to obtain "actual web

_____

[8] Daley nevertheless opines that reviewing website traffic would require "individualized analysis" to review each lead record and the associated "opt-in traffic." (Daley Report ¶¶ 3.b, 92.) The Court does not credit what appears to be a fundamentally freestanding legal conclusion calculated to defeat the predominance requirement of Rule 23(b)(3). *See In re Conagra Foods, Inc.*, 302 F.R.D. 537, 557–58 (C.D. Cal. 2014) (striking legal conclusion in an expert report that defendant "falsely and deceptively labeled" its products because the terms "are judicially defined terms" and thus the expert "offer[ed] an improper legal opinion that usurps the role of the court."); *F.T.C. v. Stefanchik*, No. C04-1852RSM, 2007 WL 4570879, *1 (W.D. Wash. Feb. 15, 2007) (expert's opinion that defendant's materials are not unfair, false, misleading or deceptive was an impermissible legal conclusion).

traffic data from the servers of the websites themselves." (ECF No. 76 at 14 n.20.)[9] Although the Court sustains Royal's objections to Weeks's website traffic conversion-based opinions, the premise underlying Weeks's testimony is a relevant consideration to whether Plaintiffs have shown class certification is appropriate.

### 2.    Testimony of Christina Peters-Stasiewicz

Plaintiffs offer Christina Peters-Stasiewicz ("Peters") as an expert who can determine which numbers in Royal's call records are for cellular telephone numbers. (ECF No. 49–9, Report of Christina Peters-Stasiewicz (the "Peters Report").)  The Peters Report expressly notes that Peters was asked to identify a process for determining which of the telephone numbers in Royal's data were wireless numbers at the time of the call.  (*Id.* ¶¶ 1, 14–25.)  Peters also describes a means for identification of class members.  (*Id.* ¶¶ 26–33.)

Peters is the Vice President of Class Experts Group, LLC ("CEG"), an entity which provides litigation support services with a primary focus on data management and data analysis. (*Id.* ¶ 2.)  Peters has ten years of experience coordinating analysis of call records. (*Id.* ¶ 3 Ex. A.)  She routinely analyzes call records to identify class members, for which she partners with data vendors, such as LexisNexis, Experian, Nexxa Group, Inc., Microbilt Corporation, TransUnion, and others (the "Data Partners").  (*Id.* ¶¶ 4–5.)  Interactive Marketing Solutions ("IMS") provides Peters access to the wireless block file and landline-to-wireless and wireless-to-landline ported numbers files.  (*Id.* ¶ 7.)  Royal does not object to Peters' qualifications to

---

[9] In opposition to Plaintiffs' class certification motion, Landfall's CEO offers a single-row spreadsheet, which he contends shows that "there were approximately 2,275,987 visitors to www.diabeteshealth.info web page" in April 2017.  (Brody Decl. ¶ 15 Ex. D.)  The exhibit does not contain much detail.  Nevertheless, the provision of this information suggests to the Court that the third-party webpage publishers may have data that can be used to test Plaintiffs' "manufactured consent" theory.

serve as an expert.  (*See generally* ECF No. 57-1.)  The Court finds that Peters' experience in call record analysis and provides her with specialized knowledge that is relevant to the present TCPA case, which requires analysis of a call log record produced by Prospects.

Royal objects that (1) Peters' testimony is not based on sufficient data or facts and (2) her proposed methodology for identification of cellular telephone numbers and class members is flawed.  (ECF No. 57-1.)  The Court overrules both objections.

**Sufficient Facts or Data.**  Royal objects that Peters' testimony is not based on sufficient facts or data because her opinions account for too much data.  (ECF No. 57-1 at 3–4.)  During class discovery, Prospects provided call log data going back to 2016 for 634 million calls it placed on behalf of all the customers to which it provides lead generation services—not just Royal.  (Grant Decl. ¶¶ 20–22.)  As is evident from Peters' report, Peters relied on the entire call log to ascertain how many of the numbers in the call log are cellular telephone numbers.  (*See* Peters Report ¶ 14.) According to Royal, Peters' testimony is flawed because it assumes that all 634 million calls were made by or on Royal's behalf.  (ECF No. 57-1 at 1, 4.)  The Court rejects this objection.

The fact that Peters assumed all 634 millions calls in Prospects' call log were placed on Royal's behalf does not render Peters' testimony inadmissible under Rule 702(b).  *See Stollings v. Ryobi Techs., Inc*., 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible.").  Peters seeks to show that there is a means to identify which calls in the log are associated with a cell phone number and, to that end, Peters applies her proposed methodology to a sample of the 634 million calls. (Peters Report ¶¶ 15–16.)  Royal concedes that 2.1 million calls were placed on its

behalf. These calls are necessarily subsumed within the data on which Peters relied to apply her methodology for identifying class members. "[T]here is no need to evaluate an expert's underlying data or factual assumptions so long as 'there is a basis in the record supporting the [expert's] factual assumption[s].'" *Martin v. F.E. Moran, Inc.*, No. 13 C 03526, 2017 WL 1105388, at *6 (N.D. Ill. Mar. 24, 2017) (quoting *Artunduaga v. Univ. of Chicago Med. Ctr.*, No. 12 C 8733, 2016 WL 7384432, at *5 (N.D. Ill. Dec. 21, 2016)). Thus, as long as Peters' methodology is otherwise valid, the Court will not exclude her testimony.

*Methodology.* Royal also objects that Peters' methodologies for identifying class members based on information available through the Data Partners and for identifying cell phone numbers is flawed and not reliable. (ECF No. 56-1 at 5–8.) The Court summarily rejects this argument. As Peters acknowledges, (Peters Report ¶¶ 9, 12, Exs. A, B), federal courts have accepted her methodologies under *Daubert* in TCPA cases. *See Bakov v. Consol. World Travel*, No. 15 C 2980, 2019 WL 1294659, at *12–13 (N.D. Ill. Mar. 21, 2019); *Shamblin v. Obama For Am.,* No. 13-cv-2428, 2015 WL 1909765, at *3 (M.D. Fla. Apr. 27, 2015) (finding that expert "employ[ed] generally reliable methodologies which entail, inter alia, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by [expert's] company[.]"); *Krakauer v. DishNetwork, L.L.C.*, 311 F.R.D. 384, 391 (N.D.N.C. 2015) (approving use of "Lexis data to obtain the names and addresses of most persons associated with these numbers during the class period"); *see also Reyes v. BCA Fin. Servs., Inc*., No. 16-cv-24077, 2018 WL 3145807, at *12–13 (S.D. Fla. June 26, 2018) (finding that company "employed generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by [that] company"); *AbanteRooter & Plumbing, Inc. v. Alarm.com Inc*., No. 15-cv-6314, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) (approving "use of

Lexis Nexis" to identify class members).  Royal offers no persuasive reason why the Court should depart from these conclusions.  Accordingly, the Court overrules Royal's objections to Peters' methodologies.

### DISCUSSION

Before delving into the various issues and arguments relevant to Rule 23, the Court observes that Royal scatters various merits arguments throughout its briefing. For example, Royal argues that it cannot be liable because "[e]very call at issue in this case was by a Prospects live agent[.]" (ECF No. 58 at 18; ECF No. 84-1 at 6 n.15 ("And, all of those calls were placed with consent.").)  Second, Royal argues that Prospects' platform "does not have the capacity to randomly or sequentially generate telephone numbers" and thus Prospects does not make calls using an automated telephone dialing system ("ATDS") as defined by the TCPA.  (ECF No. 58 at 6 n.26.) Third, Royal questions whether it can be liable "for conduct of a third party four times removed[.]"  (ECF No. 84-1 at 8, 12 n.34.)  To the extent Royal is asking for the Court to make merits conclusions, Royal's arguments are inappropriate here because "[a] motion for class certification is not . . . a motion for summary judgment or a mini-trial." *Makaron v. Enagic USA, Inc*., 324 F.R.D. 228, 231 (C.D. Cal. 2018) (rebuking defendant that challenging Rule 23 certification in a TCPA case for raising substantially similar arguments as Royal).  So long as Rule 23 is satisfied, Royal should embrace class certification to resolve in one fell-swoop the claims asserted against it if Royal believes it can prevail on these merits issues.

### A.    Standing to Assert TCPA Claims

Royal raises a threshold challenge about Article III standing to assert TCPA claims.  Under the guise of an argument about the individualized inquiries that Royal asserts will be necessary "for each putative class member," Royal points to the Supreme Court's decision in *Spokeo Inc. v. Robbins*, 136 S. Ct. 1540, 1549 (2016),

and argues that "Plaintiffs will need to prove that each class member suffered an injury[.]" (ECF No. 58 at 21 & n.92.)

Royal's argument fails at the outset because it ignores well-settled rules about the Article III showing required in the class action context. "Standing is satisfied if at least one named plaintiff meets the requirements" of Article III. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 619 (N.D. Cal. 2015). In contrast, "[unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief], because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." *Lewis v. Casey*, 518 U.S. 343, 395 (1996) (internal quotation marks and citation omitted) (brackets in original). Therefore, the only relevant Article III standing inquiry is whether McCurley and DeForest may pursue TCPA claims on behalf of the classes for which they seek certification. Royal conspicuously does not challenge McCurley's or DeForest's Article III standing.

The question of standing, however, is a threshold jurisdictional issue which federal courts have a duty to examine *sua sponte*. *See D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008); *United Investors Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 967 (9th Cir. 2004) (stating that "the district court had a duty to establish subject matter jurisdiction . . . *sua sponte*, whether the parties raised the issue or not"). The Court will therefore assure itself of the named Plaintiffs' standing to seek relief on behalf of the putative class members.

To have standing under Article III of the Constitution, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo*, 136 S.Ct. at 1547.  "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973).  "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1543.  A plaintiff asserting a "bare procedural violation" of a statute "divorced from any concrete harm" will not satisfy Article III.  *Id.* at 1549–50.

Violations of the TCPA, however, are not bare procedural violations of a statutory right.  "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients.  A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'"  *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (citing *Spokeo*, 136 S. Ct. at 1549)); *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1062 (C.D. Cal. 2016) ("[The TCPA] establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive.").  McCurley and DeForest easily satisfy Article III's requirements for the TCPA claims they assert.  Both Plaintiffs have submitted declarations in which they attest that they (1) did not provide their personal information to Royal or Prospects, (2) did not consent to be called by Royal, (3) received calls to their cellular telephones made by Royal or on Royal's behalf, (4) which played prerecorded voice messages.  (McCurley Decl. ¶¶ 4–21, 25–26; DeForest Decl. ¶¶ 3–4, 6–8.)  Plaintiffs found the calls to be harassing and intrusive. (McCurley Decl. ¶¶ 27–29; DeForest Decl. ¶ 10.)  Accordingly, the Court rejects Royal's standing challenge.

**B.    The Class Definition**

Plaintiffs move to certify "a 47 U.S.C. § 227(b)(1)(A)(iii) Class" and a "Transfer Subclass" pursuant to Rule 23(a), (b)(2), and (b)(3).  (ECF Nos. 49, 76.)

In response to Royal's opposition to class certification, Plaintiffs have narrowed the proposed class and subclass definitions "to simplify the Rule 23 analysis and reduce the scope of issues[.]" (ECF No. 76 at 2.)[10] The Court focuses on these proposed class definitions.

Plaintiffs request that the Court certify:

Narrowed Class:
All persons within the United States who received a telephone call from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. on said Class Member's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, between November 2016 and June 2018, whose phone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

Narrowed Transfer Subclass:
All members of the Narrowed Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.
(ECF No. 76 at 4.)

Two overarching issues bear on the propriety of these proposed classes. First, the Court must consider whether the proposed classes are consistent with the class alleged in the pleadings. The Court concludes they are not and therefore the Court must amend the proposed class definitions to make them consistent. The Court otherwise rejects Royal's challenges to the class definitions. Second, the Court must consider whether it can certify the nationwide classes Plaintiffs propose. Royal contends that this Court lacks the requisite personal jurisdiction over Royal to certify the proposed nationwide classes in light of *Bristol-Myers Squibb Company v.*

---

[10] The classes Plaintiffs proposed in their opening motion for class certification are identical in all aspects to the classes Plaintiffs propose in their reply with the exception of the website limitations. (*Compare* ECF No. 49-1 *with* ECF No. 76 at 4.)

*Superior Court of California*, 137 S.Ct. 1773 (2017).  The Court rejects Royal's personal jurisdiction challenge as untimely.

### 1.    Consistency with the Class Allegations

District courts in this Circuit treat the definition of a class specifically alleged in a complaint as limiting the class for which a plaintiff may seek Rule 23 certification absent a request for leave to amend.  "The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."  *Reyes v. Educ. Credit Mgmt. Corp.*, 322 F.R.D. 552, 559 (S.D. Cal. 2017); *Costelo v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D. Cal. 2009).  "The primary exception to this principle is when a plaintiff proposes a new class definition that is narrower than the class definition originally proposed, and does not involve a new claim for relief."  *Bee, Denning, Inc. v. Capital All. Grp*., 310 F.R.D. 614, 621 (S.D. Cal. 2015) (emphasis in original); *Abdeljalil v. Gen. Elec. Capital Corp*., 306 F.R.D. 303, 306 (S.D. Cal. 2015) (permitting the plaintiff to propose a new class definition in his motion for class certification when the new definition was "simply a narrower version of the class definition presented in the [amended complaint]").

In the Complaint, Plaintiffs allege the following TCPA Class:

> All persons within the United States who had or have a number assigned to a cellular telephone service, who received at least one telephone call using an ATDS and/or an artificial or prerecorded voice from Royal Seas Cruises, Inc., or their agents calling on behalf of Royal Seas Cruises, Inc., *between the date of filing this action and the four years preceding*, where such calls *were placed for the purpose of marketing, to non-customers of Royal Seas Cruises, Inc., at the time of the calls*.
> (Compl. ¶ 77 (emphasis added).)

A cursory review of the class alleged in Plaintiffs' Complaint shows that the

classes proposed in Plaintiffs' reply brief, as well as Plaintiffs' original motion, are not consistent with the pleadings. First, as Royal acknowledges, the alleged class is limited to calls placed for marketing purposes to non-Royal customers. (ECF No. 58 at 24; Compl. ¶ 77.)[11] Yet, Plaintiffs' proposed classes do not contain either the marketing or non-Royal customer limitation. (ECF No. 76 at 4.) Second, the proposed classes include persons who received calls through June 2018, the month preceding Plaintiffs' motion for class certification. (ECF No. 76 at 4.) Yet, the class period of the alleged class extends to the four years preceding the filing of the complaint up to the date of the Complaint's filing. (Compl. ¶ 77.) Plaintiffs filed the Complaint on December 20, 2017 and thus this date is the outer limit of the class period. (ECF No. 31.) The Court will therefore amend the class definitions accordingly.

Royal objects strenuously to consideration of the class definitions in Plaintiffs' reply brief. According to Royal, Plaintiffs have "abandoned nearly the entirety of the" classes initially proposed and the proposed classes in Plaintiffs' reply are "an entirely different class." (ECF No. 84-1 at 2–4.) Relying on *City of Fairview Heights v. Orbitz, Inc*., 2008 WL 895650 (S.D. Ill. Mar. 31, 2008), Royal argues that the Court should strike Plaintiffs' reply brief and all related filings. (ECF No. 84-1 at 2–4, 15.) The Court will not do so.

Far from making the proposed class definition a "moving target," Plaintiffs' reply simply narrows the class alleged in the Complaint. A plaintiff may properly narrow the class for which it seeks class certification even in a reply brief. *See Abdeljalil*, 306 F.R.D. at 306 (rejecting defendant's argument that the class plaintiff

---

[11] Royal raises this point under its argument that the proposed class is not ascertainable. (ECF No. 58 at 24.) As the Court will explain, ascertainability is not a free-standing requirement of class certification.

proposed in a reply brief was improper because court found that the class "is simply a narrower version of the class definition presented in the [complaint], which is allowable."). Plaintiffs have plainly added limitations in their reply brief that make the proposed classes subsets of the broader class alleged in the Complaint. Neither the Court, nor Royal is left to guess about the precise contours of the classes for which Plaintiffs seek certification. *See Richard v. Xerox Bus. Servs. LLC*, No. C12-1798-JCC, 2014 WL 3396112, at *3 (W.D. Wash. July 10, 2014) (expressing concern that plaintiffs' "shifts" in the class definition "left the Court unsure of the precise contours of Plaintiffs' proposed classes").

Royal's concerns about apparent prejudice in Plaintiffs' narrowed proposed classes are moot because Royal has had the opportunity to address the propriety of certification of the narrowed classes in surreply briefing. *See Sarviss v. General Dynamics Info. Tech., Inc*., 663 F. Supp. 2d 883, 902 (C.D. Cal. 2009) (considering Rule 23 certification of narrowed class proposed in reply brief when defendant had the opportunity to address narrowed class).

As a final matter, Royal also objects that Plaintiffs' class descriptions "describe absolutely lawful conduct" as "[t]here is no *per se* prohibition on making telephone calls, as seemingly implied by this [class] definition; only calls utilizing an ATDS and/or utilizing a prerecorded or artificial voice—and even then only if made without express written consent—would violate the TCPA." (ECF No. 58 at 24 & n.96 (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)); *see also* ECF No. 84-1 at 5 n.13.) Royal effectively objects that the class definitions are overbroad because a substantial number of individuals in the classes would have no claim against Royal. *See Messner*, 669 F.3d at 825 ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." (quoting *Kohen v. Pacific Investment Mgmt. Co*., 571

F.3d 672, 677 (7th Cir. 2009)).  However, the Court has little doubt that Royal's view regarding the evidence it proffers as "consent evidence" for "every call" made in this case undergirds Royal's overbreadth objection.  As the Court discusses in its Rule 23(b)(3) predominance analysis, the Court does not agree that Royal's "consent evidence" offered at this stage shows actual prior express consent of any class member.  Thus, the Court rejects Royal's overbreadth objection.  Accordingly, the Court proceeds with the class definitions proposed in Plaintiffs' reply, subject to the Court's amendments.

\*       \*       \*

Based on the foregoing, the Court analyzes the merits of Rule 23 certification based on the following classes:

> Class:
> All persons within the United States who received a telephone call (1) from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. (2) on said Class Member's cellular telephone (3) made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, (4) between November 2016 and December 2017, (5) where such calls were placed for the purpose of marketing, (6) to non-customers of Royal Seas Cruises, Inc. at the time of the calls, and (7) whose cellular telephone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

> Transfer Subclass:
> All members of the Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.

**2.     Royal's *Bristol-Myers* Personal Jurisdiction Challenge to the Proposed Nationwide Classes**

Relying on *Bristol-Myers Squibb Company v. Superior Court of California*, 137 S.Ct. 1773 (2017), Royal argues that the Court is "precluded from certifying the[]

– 29 –

nationwide classes described by Plaintiffs" because "the Court lacks general personal jurisdiction over Royal to do so." (ECF No. 58 at 23–24, 27 n.108.) The Court rejects Royal's argument.

In *Bristol-Myers*, a group of plaintiffs brought a state law "mass tort" action in California state court for injuries allegedly caused by Plavix, a drug manufactured and distributed by the defendant company incorporated in Delaware and headquartered in New York. *Bristol-Myers*, 137 S. Ct. at 1777–78. The 678 plaintiffs included 86 California residents and 592 non-California residents from other states. *Id.* at 1778. The defendant sold Plavix and engaged in other business activities in California, but the defendant "did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California." *Id.* The defendant company asserted lack of personal jurisdiction and moved to quash service of the summons on the nonresidents' claims, which was denied and subsequently litigated through two sets of appeals in the California courts. *Id.* at 1778. Ultimately, in the second appeal, the California Supreme Court found jurisdiction existed on the ground that the company's "extensive contacts with California" permitted the exercise of specific jurisdiction "based on a less direct connection between BMS's forum activities and plaintiffs' claims than might otherwise be required." *Id.* In reversing the California Supreme Court, the Supreme Court determined that "[t]he mere fact that other [California] plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1781. Rather, "[w]hat is needed . . . is a connection between the forum and the specific claims at issue." *Id.*

Applying due process principles through the lens of the Fourteenth

Amendment's Due Process Clause—which "acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment"—the Supreme Court found the requisite connection was lacking. The Supreme Court concluded that the California state courts lacked specific personal jurisdiction over the out-of-state defendant for claims brought by the out-of-state plaintiffs because there were insufficient contacts between the defendant's conduct in connection with those claims and California. *Id*. at 1779–83. The Supreme Court, however, expressly declined to answer whether the "Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84; *see also id.* at 1789 n.4 ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there.") (Sotomayor, J., dissenting).

Notwithstanding the express reservation in *Bristol-Myers*, federal courts have become preoccupied with divining the impact of *Bristol-Myers* on federal class actions, resulting in a split amongst federal district courts. Several courts have adopted the view Royal presses and limited the scope of a proposed class to residents of the state in which the federal court sits. *See Bakov*, 2019 WL 1294659, at *13–14 (limiting proposed TCPA class to Illinois residents on the basis of *Bristol-Myers*); *Am.'s Health and Res. Ctr., Ltd. v. Promologics, Inc*., No. 16 C 9281, 2018 WL 3474444, at *2–4 (N.D. Ill. July 19, 2018) (same); *Practice Mgmt. Support Servs. v. Cirque Du Soleil, Inc.*, 301 F. Supp. 3d 840, 866 (N.D. Ill. 2018); *Maclin v. Reliable Reports of Tex., Inc*., 314 F. Supp. 3d 845, 850 (N.D. Ohio 2018) (finding that *Bristol-Myers* "applies to FLSA claim, in that it divests courts of specific jurisdiction over the FLSA claims of non-Ohio plaintiffs against Reliable"); *DeBernadis v. NBTY, Inc*., No. 17 CV 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018); *McDonnell v. Nature's Way Prods., LLC*, No. 16 CV 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct.

26, 2017); *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 874 (N.D. Ill. 2017).

But many other federal courts have generally rejected the notion that *Bristol-Myers* precludes nationwide federal class actions or have more narrowly determined that *Bristol-Myers* does not preclude nationwide class actions for federal claims. *See Dennis v. IDT Corp.*, 343 F. Supp. 3d 1363, 1364–67 (N.D. Ga. 2018) (rejecting argument that *Bristol-Myers* commanded dismissal of a putative nationwide class action); *Becker v. HBN Media, Inc.*, 314 F. Supp. 3d 1342, 1344–45 (S.D. Fla. 2018); *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, 305 F. Supp. 3d 1342 (M.D. Fla. 2018); *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1363–69 (N.D. Ga. Feb. 14, 2018); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126–27 (D.D.C. 2018); *Swamy v. Title Source, Inc.*, No. C 17-01175 WHA, 2017 WL 5196780, at *2 (N.D. Cal. Nov. 10, 2017) ("This order finds that *Bristol-Myers* does not apply to divest courts of personal jurisdiction in FLSA collective actions. Unlike the claims at issue in *Bristol-Myers*, we have before us a federal claim created by Congress specifically to address employment practices nationwide.").

This Court, however, is not called upon to wade into this jurisprudential dispute because Royal has waived any personal jurisdiction challenge. "Lack of personal jurisdiction" is a "defense to a claim for relief" that the Federal Rules expressly recognize. Fed. R. Civ. P. 12(b)(2). Challenges to alleged defects in a district court's personal jurisdiction are expressly waived unless a defendant timely asserts the defense in a motion to dismiss or in a responsive pleading. *See* Fed. R. Civ. P. 12(h)(1); *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1983) ("[Rule 12(h)(1) ] provide[s] a strict waiver rule with respect to [the lack of personal jurisdiction] defense . . . . defendants wishing to raise [this] defense[ ] must do so in their first defensive move, be it a Rule 12 motion or a responsive pleading."); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986); *Braver v. Northstar Alarm Servs.*,

329 F.R.D. 320 (W.D. Okla. 2018). An exception to this rule exists when a defense or objection was unavailable at the time the defendant filed its earlier motion or responsive pleading. Fed. R. Civ. P. 12(g)(2). A defense is considered "available" unless its legal basis did not exist at the time of the answer or earlier pre-answer motion. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016) (A defense is "available" unless "its legal basis did not exist at the time of the answer or pre-answer motion, or the complaint does not contain facts sufficient to indicate that a defense was possible."); *Tinn v. EMM Labs, Inc.*, No. 07-cv-00963-AC, 2008 WL 3861889, at *3 (D. Or. Aug. 19, 2008).

The mere fact that the Supreme Court resolved the personal jurisdiction defense asserted in *Bristol-Myers* in a particular manner does not mean a personal jurisdiction defense was unavailable to Royal before *Bristol-Myers*. *See Gilmore*, 843 F.3d at 964 (rejecting argument that personal jurisdiction defense was unavailable until decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). Indeed, despite Royal's suggestion that the issuance of *Bristol-Myers* caused a seismic shift in personal jurisdiction, the Supreme Court concededly undertook a "straightforward" application of "settled principles" of specific personal jurisdiction to decide *Bristol-Myers*. *Bristol-Myers*, 137 S.Ct. at 1781–82 (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). And Royal's personal jurisdiction challenge in fact relies on the articulation of specific jurisdiction in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), which was decided years before the instant litigation. (ECF No. 58 at 24 n.95.) Thus, Royal could have asserted a personal jurisdiction challenge to Plaintiffs' initial May and June 2017 pre-consolidation complaints, each of which alleged nationwide TCPA classes. (ECF No. 1; *DeForest*, ECF No. 1.) Royal, however, did not do so. (ECF No. 17; *DeForest*, ECF No. 19.)

An untimely personal jurisdiction defense—regardless of whether it is based on *Bristol-Myers*—is waived at the later stages of a litigation if the defense was not timely asserted. *See LaVigne v. First Cmty. Bancshares, Inc.*, No. 1:15-cv-00934-WJ/LF, —F. Supp. 3d—, 2019 WL 1075600, at *4 (D.N.M. Mar. 7, 2019) (rejecting argument asserted at the class notice stage that *Bristol-Myers* precluded the court from exercising personal jurisdiction over non-New Mexico class members in part because it "was not appropriately raised"); *Mussat v. Enclarity, Inc*., No. 16-cv-07643, —F. Supp. 3d—, 2019 WL 277728, at *3–5 (N.D. Ill. Jan. 22, 2019) (finding defendant waived *Bristol-Myers* personal jurisdiction challenge and could not assert it in a Rule 12(c) motion for judgment on the pleading because "*Bristol-Myers* cannot reasonably be characterized as an intervening change in the law and so was 'available' to Enclarity" for earlier Rule 12(b)(6) motion); *Braver v. Northstar Alarm Servs*., 329 F.R.D. 320, 326–27 (W.D. Okla. 2018) (finding defendant waived argument raised at class certification stage that court lacked personal jurisdiction over defendants based on *Bristol-Myers*); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 855 (N.D. Cal. 2018) (finding defendant waived personal jurisdiction challenge based on *Bristol-Myers* asserted for the first time in a successive motion to dismiss claims of original plaintiffs). Royal's failure to assert personal jurisdiction in its first responsive pleadings to McCurley's and DeForest's original complaints constitutes a waiver of such a defense.

Six months after *Bristol-Myers*, Plaintiffs filed the operative Complaint in December 2017, which once more alleges a nationwide TCPA class. (ECF No. 31 ¶ 77.) Even if the Court charitably construed the Complaint's filing as a new opportunity for Royal to raise its *Bristol-Myers*-based personal jurisdiction challenge, Royal's assertion of the defense remains untimely. Royal's January 2018 answer to the operative Complaint is entirely silent on personal jurisdiction. (*See generally*

ECF No. 32.) Under a straightforward application of Rule 12(h), Royal has waived its personal jurisdiction challenge to alleged defects in this Court's authority to exercise personal jurisdiction over Royal, including for the purposes of certifying the proposed nationwide classes.

The Court recognizes that a number of federal courts outside of the Ninth Circuit have excused failures by various defendants to raise personal jurisdictional objections based on *Bristol-Myers*—i.e., excused unequivocal waivers of a personal jurisdiction defense—on the ground that federal courts "retain[] the independent power to identify and apply the proper construction of governing law,' even where the parties 'fail[ ] to advert' to the applicable rule in their own briefing." *Bakov*, 2019 WL 1294659, at *14 (excusing defendant's failure to raise *Bristol-Myers* personal jurisdiction objection to nationwide class action in earlier motion to dismiss for this reason and limiting proposed class to Illinois residents); *America's Health & Res. Ctr., Ltd. v. Promologics, In*c., No. 16 C 9281, 2018 WL 3474444, at *3 (N.D. Ill. July 19, 2018) (excusing failure to raise personal jurisdiction defense in pre-*Bristol Myers* motion to dismiss for same reason); *Greene v. Mizuho Bank, Ltd*., 289 F. Supp. 3d 870, 874 (N.D. Ill. 2017) (excusing failures to raise *Bristol-Myers* personal jurisdiction objection in earlier Rule 12(b)(2) motion to dismiss and at subsequent point when plaintiffs added a new named plaintiff).

This Court respectfully departs from this line of cases. Personal jurisdiction is a bread and butter defense to a claim for relief asserted in a pleading, including relief a plaintiff seeks on behalf of a putative class. *See* Fed. R. Civ. P. 12(b)(2). Unlike subject matter jurisdiction, "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest" that "can, like other such rights, be waived," by a person or entity who "submits to the power of the court by appearance." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).

Federal courts, therefore, are not required to assure themselves of their power to exercise personal jurisdiction over an appearing defendant that has not (timely) raised the issue of personal jurisdiction. *Pakootas v. Teck Cominco Metals, Ltd*., 452 F.3d 1066, 1076 (9th Cir. 2006) ("Because a party can waive personal jurisdiction, we are not required to consider it *sua sponte*."). This proposition is baked into Rule 12b)(2), which calls on the party to assert a personal jurisdiction challenge early in the litigation, and Rule 12(h), which "is unequivocal that waiver follows" from the failure to promptly assert a personal jurisdiction defense. *See Mussa*,—F. Supp. 3d—, 2019 WL 277728, at *5–6 (declining to excuse waiver of personal jurisdiction defense and suggesting that the defendant's "inaction suggests either that for months after *Bristol-Myers* was decided it still did not realize it had a personal jurisdiction defense to assert or, more likely, that [the defendant] opted to hold that arrow in its quiver to use in the event its 12(b)(6) motion did not carry the day as filed."). The Court sees no reason why *Bristol-Myers* permits the Court to excuse Royal's failure to timely and promptly vindicate its own rights and the Court will not unilaterally wield it on Royal's behalf to strike down portions of the proposed classes.

## C.    Whether Plaintiffs Satisfy Rule 23(a)'s Requirements

Before considering whether the proposed classes satisfy the actual requirements of Rule 23(a)'s text, the Court addresses two housekeeping matters.

First, there is a point of confusion between Plaintiffs and Royal regarding the role of ascertainability under Rule 23. Despite recognizing that the Ninth Circuit made clear in *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1133 (9th Cir. 2017), that there is no express ascertainability requirement under Rule 23, Plaintiffs affirmatively argue that "the proposed class" is certifiable because it is ascertainable through objective criteria and an administratively feasible manner. (ECF No. 49-1 at 14–15.) Citing this Court's decision in *Bee, Denning*, 310 F.R.D. at 622, Royal

argues that ascertainability is a requirement for class certification, disputes what *Briseno* says, and pigeonholes into ascertainability several disparate arguments, some of which have nothing to do with ascertainability. (ECF No. 58 at 16, 22–27 & n.94.)[12]  In its surreply, Royal doubles down on its ascertainability argument and asserts that *Briseno* does not apply "to all consumer class actions, especially a TCPA action alleging a class of persons who can each seek statutory damages." (ECF No. 84-1 at 6.)

Notwithstanding earlier decisions of this Court which have addressed ascertainability, *Briseno* and its progeny—all of which post-date the Court's decisions—are binding Ninth Circuit precedent which dispose of the parties' dispute about ascertainability.  Under this precedent, "[t]here is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23." *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) (citing *Briseno*, 844 F.3d at 1133); *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 517 n.3 (C.D. Cal. 2017) (citing *Briseno*, 844 F.3d at 1124).  Thus, contrary to Royal's misguided arguments about *Briseno* and what Plaintiffs are required to show, the Court will not subject the proposed classes to a separate, non-existent ascertainability requirement.  *See Makaron*, 324 F.R.D. at 231–32 ("Defendant's arguments regarding the ascertainability and administrative feasibility of the proposed class . . . ignore binding Ninth Circuit authority." (citing *Briseno*, 844 F.3d at 1133)).  To the extent the parties' ascertainability arguments bear upon an actual

---

[12] For example, Royal asserts its *Bristol-Myers* challenge to the authority of this Court to certify a nationwide class as an argument about a purported inability to ascertain a class. (ECF No. 58 at 23–24.)  Not only has the Court rejected Royal's *Bristol-Myers* challenge, Royal's argument would not show that a class cannot be ascertained.  The courts which have applied *Bristol-Myers* in federal class actions have limited the class to residents of the forum state.  *See Bakov*, 2019 WL 1294659, at *14 (limiting proposed class to Illinois residents); *America's Health & Res. Ctr., Ltd.*, 2018 WL 3474444, at *3 (same); *Greene*, 289 F. Supp. 3d at 874 (same).  Thus, setting aside that ascertainability is not a free-floating requirement and this Court's rejection of Royal's *Bristol-Myers* challenge, a class would be "ascertainable."

requirement imposed by Rule 23, it is subsumed within the Court's analysis of a relevant requirement.

Second, the parties largely do not differentiate between the Class and the Transfer Subclass in their briefing. (*See* ECF Nos. 49-1, 58, 76, 84-1.) The Transfer Subclass is necessarily subsumed within the larger Class, with the relevant distinction being that an individual is part of the Transfer Subclass because he or she was transferred to Royal by Prospects. Unless the Court specifically indicates otherwise, the Court's analysis applies to both the Class and the Transfer Subclass.

### 1. Numerosity

Numerosity requires that the proposed class be so numerous that joinder of all members individually would be "impracticable." Fed. R. Civ. P. 23(a)(1). Courts do not set a strict numerical cut-off. *In re Cooper Companies Inc. Sec. Litig*., 254 F.R.D. 628, 633 (C.D. Cal. 2009) (citing *Gen. Tel. Co. of the Nw. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 324 (1980)). Generally, "the numerosity factor is satisfied if the class comprises 40 or more members and [courts] will find that it has not been satisfied when the class comprises 21 or fewer." *Celano v. Marriott Int'l, Inc*., 242 F.R.D. 544, 549 (N.D. Cal. 2007).

Royal represents that it "produced to Plaintiffs more than 2.1 million opt-in consent records of leads it received from Prospects." (ECF No. 58 at 20; Poole Decl. ¶ 9.) Royal explains that these records effectively represent calls placed to consumers. In describing its "opt-in consent marketing program," Royal explains that "[a]fter consumers submit their information on one of these websites and expressly consent to be contacted," Prospects "will place telephone calls to the

telephone numbers." (ECF No. 58 at 8.)[13]  Royal further represents that "[w]hen a call is made with consent by Prospects, and the consumer expresses an interest in and qualifies for, an offer from Royal, the call and the consent records are transmitted to Royal by Prospects.  These consent records—more than 2.1 million of them—have been produced in this case." (ECF No. 58 at 5.)

Although the 2.1 million "consent records" contain leads which span 1,100 websites and the June 2018 class period which the Court has amended out of the class definition, Royal concedes that there are 80,081 "consent records" for www.disabeteshealth.info for 2017.  (ECF No. 58 at 20; Poole Decl. ¶ 20.)  The 80,081 "consent records" for www.disabeteshealth.info during the class period plainly pertain to numerosity of the Class and Transfer Subclass.  Numerosity will exist for both classes if the Transfer Subclass is sufficiently numerous.  Therefore, Plaintiffs need only show that the Transfer Subclass is sufficiently numerous.[14]

With respect to the Transfer Subclass, it is not yet clear precisely how many of the calls reflected in the 80,081 "consent records" were placed to cellular telephone numbers.  Peters, however, has proffered a means to identify cellular telephone

---

[13] Faced with the narrowed classes in Plaintiffs' reply, Royal argues in its surreply that Plaintiffs have failed to identify "what telephone calls, if any, were made to telephone numbers associated with the two websites."  (ECF No. 84-1 at 6 n.16.)  This suggestion flatly contradicts Royal's representations regarding its marketing program in its initial opposition to class certification, which are buttressed by various declarations.  The Court rejects Royal's attempt to backtrack in its surreply.

[14] With respect to the size of the Class, Prospects has produced a call log of some 634 million calls it placed based on leads it obtained.  (Friedman Decl. ¶ 10.)  Although Plaintiffs' initial motion misconstrued all calls as reflecting calls Prospects made on behalf of Royal, it has since become clear based on Royal's opposition papers that the log covers all of Prospects's clients.  Even so, Prospects admits that it maintains lead data by marketing campaign on which Prospects relies when it calls a telephone number associated with a lead.  (Grant Decl. ¶ 14.)  Therefore, there is a means to identify the Class, *i.e.* all individuals associated with the marketing campaign for Royal who Prospects called on Royal's behalf.  In any event, the size of the Transfer Subclass is the floor for the size of the larger Class that includes individuals who were not transferred by Prospects to Royal.

numbers.  (Peters Report ¶¶ 14–25.)  The proposed Class and Transfer Subclass will satisfy the numerosity requirement even if only a fraction of the identified calls during the class period were made to cellular telephone numbers.  *See Bauman v. Saxe*, No. 14-cv-1125-RFB-PAL, 2019 WL 157923, at \*4 (D. Nev. Jan. 10, 2019) (rejecting defendant's argument that determining which text messages were actually sent to a cellular telephone number and who owned each number was a fact-intensive inquiry that precluded certification).  Thus, the number of leads Royal concedes came from Prospects for www.diabeteshealth.info during the class period provides an adequate basis to estimate a class size that exceeds forty members.  *See Makaron v. Enagic USA, Inc*., 324 F.R.D. 228, 232 (C.D. Cal. 2018) (finding plaintiff's "identification of hundreds of thousands of phone calls made by third party dialing systems on behalf of only a small number of Enagic distributors is a sufficient basis to estimate a class size well in excess of forty members."); *Abdeljalil*, 306 F.R.D. at 308 (finding it "clearly reasonable that at least 40 class members or more can be identified from defendant's 340 million account holders.").  Accordingly, Plaintiffs have satisfied Rule 23(a)(1).[15]

## 2.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The Rule does not require that a class have all

_____

[15] Insofar as it is necessary for the Court to specifically address numerosity for class members whose leads were generated by yourautohealthlifeinsurance.com, Plaintiffs were unable to address numerosity in their opening motion.  As the Court will discuss in its Rule 23(b)(3) predominance analysis, Royal did not disclose yourautohealthlifeinsurance.com as the website which purportedly generated DeForest's lead until Royal opposed class certification.  Plaintiffs, however, represent that "the call transfer data shows over 200 consumers who were called and transferred to Royal [], and whose data was provided to Prospects [] by the operator of" yourautohealthlifeinsurance.com." (ECF No. 76 at 11–12.)  This number is effectively a floor for the number of class members for this website.  Royal's surreply is silent on numerosity—as well as all other Rule 23 requirements—for class members whose telephone numbers are associated with yourautohealthlifeinsurance.com.  The Court construes numerosity as unopposed on this point.  *See Amador v. Baca*, 299 F.R.D. 618, 623 (C.D. Cal. 2014) (finding numerosity satisfied when defendant did not dispute it).

questions of fact and law in common. *Ellis*, 657 F.3d at 981. A single common issue will suffice for Rule 23(a)(2). *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999). Although the text of Rule 23(a)(2) requires only common questions, these questions must nevertheless be capable of "generat[ing] common answers apt to drive the resolution of the litigation." *Dukes*, 546 U.S. at 350. The proof required for commonality under Rule 23(a) is "less rigorous" than the showing required for predominance under Rule 23(b)(3). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–20 (9th Cir. 1998). Rule 23(a)(2) is satisfied when there is a "common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The common denominator for the class members is that each member received a call to his or her cell phone number from Prospects made on Royal's behalf as part of Royal's marketing program in which Prospects obtained the member's cell phone number from a lead generated through similar "opt-in" forms across two websites. Plaintiffs identify the following common questions that arise from this common course of conduct: "(1) whether Prospects DM placed ATDS (prerecorded voice) calls (2) to the (cellular) telephones numbers (3) of consumers (4) without prior express consent and whether (5) Royal Seas is vicariously liable for the calls." (ECF No. 49-1 at 17.) These questions are exemplary of common questions identified in certified TCPA class actions. *See Makaron*, 324 F.R.D. at 232; *Abdeljalil*, 306 F.R.D. at 308–09; *Knutson v. Schwan's Home Serv.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *7 (S.D. Cal. Sept. 5, 2013); *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 567 (W.D. Wash. 2012). The Court additionally finds that whether Royal's lead generation program is a valid means of obtaining consent for calls by a third party concerning Royal's services and whether the leads constitute consent are common questions whose answers are "apt to drive resolution of the case." *Dukes*, 564 U.S.

at 350.

Royal does not challenge that there are common questions. Rather, Royal argues that Plaintiffs "fail to describe any means of generating common answers[.]" (ECF No. 58 at 28.) In making this argument, Royal invokes the specter of its consent defense and points to information which Royal contends shows "evidence of consent for *every* call." (*Id.* (emphasis added).) A defense advanced by a defendant can satisfy Rule 23(a)(2) when "evaluating it will require answering a number of common questions." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 604 (C.D. Cal. 2015); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 686, 688 (S.D. Fla. 2013) (finding commonality satisfied because defendant's contention regarding consent was "itself subject to common resolution" and "th[e] issue/defense is common to [plaintiff] and all putative class members"). The "consent evidence" on which Royal concededly relies is the 2.1 million records it has produced, all of which were generated from the same lead generation program. Royal's contention about this evidence—one that bleeds throughout Royal's opposition to class certification—implicitly recognizes that the evidence provides a means to generate a common answer to Plaintiffs' claim that the class did not consent to receive calls from or on behalf of Royal. Accordingly, the Court concludes that Rule 23(a)(2) is satisfied.

### 3.    Typicality

A named plaintiff must show that his claims are typical of the class's claims. Fed. R. Civ. P. 23(a)(3). To satisfy this requirement, the named plaintiff must be a class member and must "possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quotation marks and citation omitted). "[W]hether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named

plaintiffs, and whether other class members have been injured by the same course of conduct" inform the typicality analysis. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted). Rule 23(a)(3) is "permissive" and requires nothing more than that a named plaintiff's claims be "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. The relevant question is whether McCurley and DeForest raise claims and legal theories typical of the class they seek to represent—a class of individuals who did not consent to receive calls to their cellular telephones made by or on behalf of Royal with a prerecorded voice and/or an ATDS.

Royal raises two typicality arguments that merit discussion, but which are unavailing.[16] First, Royal argues that McCurley and DeForest are atypical of the proposed class because they have disputed Royal's "consent evidence," thus making them "the outliers." (ECF No. 58 at 28.) Royal's typicality argument necessarily falters because it assumes the merits of Royal's argument that the evidence it has provided regarding its lead generation program shows prior express consent. As the Court discusses in its Rule 23(b)(3) predominance analysis, the evidence Royal submits at the class certification stage does not show prior express consent from either

---

[16] Royal argues in a footnote that McCurley and DeForest are atypical of the class "given their histories of filing other class actions as serial plaintiffs for the same attorneys." (ECF No. 58 at 29 n.111.) Even if Royal's argument is factually true, Royal fails to explain how it would preclude a finding of typicality based on the injury Plaintiffs allege and have demonstrated at the class certification stage. Royal also argues that McCurley's and DeForest's claims "are not even typical of each other." (ECF No. 58 at 29.) This argument also ignores the relevant focus of typicality. Even if there are factual circumstances which differ for the Plaintiffs, the *injury* they allege—i.e., receipt of unconsented calls to their cellular telephone number with a prerecorded voice or ATDS—is the same. This injury allegedly resulted from the common course of conduct the Court has discussed, i.e. Royal's lead generation marketing program with Prospects.

Plaintiff or any putative class member.

Far from making them "outliers," Plaintiffs' declarations are consistent with their burden at the class certification stage. Both Plaintiffs allege they did not consent to receive telemarketing and solicitation calls from Royal or its agents made using an ATDS or with an artificial or prerecorded voice. (Compl. ¶¶ 27–29, 33, 35, 37–39, 40–43, 46, 57–61, 63, 69.) Of course, at the class certification stage, a plaintiff must move beyond the pleadings to show that Rule 23's requirements are satisfied. *See Sali*, 909 F.3d at 1006. McCurley and DeForest have moved beyond their pleadings by submitting declarations which attest that they did not consent to receive calls to their cellular telephones with a prerecorded voice or made by or on behalf of Royal, but they received such calls. (McCurley Decl. ¶¶ 4–21, 25–26; DeForest Decl. ¶¶ 3–4, 6–8.) Plaintiffs specifically attest that they did not consent through the websites for which leads were purportedly generated for them. (McCurley Decl. ¶¶ 4–21, 25–26; DeForest Decl. ¶¶ 3–4, 6–8.) These declarations thus underscore that Plaintiffs' alleged injuries are typical of those allegedly suffered by the class.

Second, Royal argues that McCurley is atypical because he will be preoccupied with defenses unique to him. (ECF No. 58 at 29 n.111.) "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citation omitted). "Defendants need not show that these unique defenses will necessarily succeed, but rather that they will shape the focus of litigation in a way that may harm class members and ultimately risk the class' chance of recovery." *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 129 (S.D. Cal. 1996).

According to Royal, McCurley is subject to unique defenses because he "submitted multiple opt-in forms consenting to be called, presumably to generate this

TCPA lawsuit[.]"  (ECF No. 58 at 29 n.111 (citing Brody Decl. ¶ 14 Ex. C).)  The TCPA requires in relevant part "prior express content of the called party[.]"  47 U.S.C. § 227(b)(1)(A)(iii).  The purported "consent record" for McCurley from www.diabeteshealth.info on which Royal relies does not facially identify McCurley by name, but rather identifies "Jose Fernandez."  (Brody Decl. ¶ 13 Ex. B.)  The additional "opt-in form" submissions Royal identifies similarly do not facially identify McCurley by name.  Of the 15 entries in Prospects' data log associated with the number McCurley attests is his, there are 12 entries for "Jose Fernandez," 1 entry for "Fernandez," 1 entry for "Heather Smith," and 1 entry for "Fabian Fagan," none of which are associated with www.diabeteshealth.info.  (Brody Decl. ¶ 14 Ex. C).)  The Court does not understand how these submissions will subject McCurley to a unique defense for his TCPA claim for which McCurley's fundamental contention is that he did not provide prior express consent for the calls Prospects made to his cell phone number on Royal's behalf.  Accordingly, the Court rejects Royal's argument that McCurley is subject to unique defenses that would defeat typicality.  Both Plaintiffs have satisfied Rule 23(a)(3).

### 4. Adequacy

Rule 23(a)(4) permits the certification of a class only if the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy exists if (1) the class representative and counsel do not have any conflicts of interest with other class members and (2) the representative plaintiff and counsel will prosecute the action vigorously on the class's behalf.  *Staton v. Boeing, Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

#### a. Plaintiffs

McCurley and DeForest attest that they do not have conflicts of interest with members of the proposed class and are willing and prepared to represent the class.

(McCurley Decl. ¶¶ 32–38; DeForest Decl. ¶¶ 12–15.)  Royal asserts that Plaintiffs are not adequate for the same reasons that they are atypical.  (ECF No. 58 at 29.)  Royal fails to explain how its atypicality arguments show that the Plaintiffs have a conflict of interest with other class members or that the Plaintiffs will not vigorously prosecute the action.  The Court has already rejected Royal's atypicality arguments and thus rejects Royal's challenge to the adequacy of the named Plaintiffs.  Accordingly, the Court finds that McCurley and DeForest are adequate representatives of the proposed class.

### b.    Plaintiffs' Counsel

Rule 23(g) identifies four factors a court "must consider" in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions . . . ; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  A court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  Courts addressing the adequacy of class counsel in ruling on a motion for class certification necessarily consider Rule 23(g).  *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 919 (7th Cir. 2011); *Practice Mgmt. Support Servs. v. Cirque Du Soleil, Inc.*, 301 F. Supp. 3d 840, 853 (N.D. Ill. 2018).  Plaintiffs' attorneys have submitted declarations which attest to their experience in class action litigation and the absence of conflicts of interest with the proposed class.  (ECF No. 48-2 Todd. Friedman Decl. ¶¶ 3, 22–28; ECF No. 48-3 Abbas Kazerounian Decl. ¶¶ 10–23; ECF No. 48-4 Matt Loker Decl. ¶¶ 10–57; ECF No. 48-5 Josh Swigart Decl. ¶¶ 9–15.)  Royal does not rebut this evidence.  Accordingly, the Court concludes that Plaintiffs' counsel are adequate.  Having concluded that Plaintiffs satisfy Rule 23(a), the Court turns to whether Plaintiffs satisfy the requirements of one of the types of class actions

1    Rule 23(b) permits.

2

3    **D.    Whether Plaintiffs Satisfy Rule 23(b)(3)**

4         Plaintiffs move to certify their TCPA classes pursuant to Rule 23(b)(3).  Under

5    Rule 23(b)(3), Plaintiffs must show that "the questions of law or fact common to class

6    members predominate over any questions affecting only individual members, and that

7    a class action is superior to other available methods for fairly and efficiently

8    adjudicating the controversy."  *Amgen Inc.*, 568 U.S. at 460 (citation omitted).  The

9    Court considers these requirements in turn.

10

11        **1.    Predominance of Common Questions of Law or Fact**

12        The crux of Royal's opposition to class certification focuses on Rule 23(b)(3)'s

13   predominance requirement.  (ECF No. 58 at 17–22; ECF No. 84-1 at 5–6.)  "[T]here

14   is substantial overlap between" the Rule 23(a)(2) commonality test and the Rule

15   23(b)(3) predominance test.  *Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168,

16   1172 (9th Cir. 2010) (citation omitted).  But "[R]ule 23(b)(3)'s predominance

17   criterion is even more demanding than Rule 23(a)."  *Comcast Corp.*, 569 U.S. at 33

18   (citing *Amchem Products, Inc.*, 521 U.S. at 623–24).  Whereas "Rule 23(a)(2) asks

19   whether there are issues common to the class, Rule 23(b)(3) asks whether these

20   common questions predominate."  *Wolin*, 617 F.3d at 1172.  Predominance "focuses

21   on the relationship between the common and individual issues in the case and tests

22   whether proposed classes are sufficiently cohesive to warrant adjudication by

23   representation."  *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013)

24   (quoting *Hanlon*, 150 F.3d at 1022) (internal quotation marks omitted).  "The main

25   concern of the predominance inquiry . . . is 'the balance between individual and

26   common issues.'"  *Id.* at 545–46 (quoting *In re Wells Fargo Home Mortg. Overtime*

27   *Pay Litig.*, 571 F.3d 935, 959 (9th Cir. 2009)).  "Implicit in the satisfaction of the

28   predominance test is the notion that the adjudication of common issues will help

achieve judicial economy." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1305–06 (D. Nev. 2014) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

"Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). And to resolve predominance, the Court must "probe behind the pleadings." *Dukes*, 564 U.S. at 351 (citation and internal quotation marks omitted).

### a.    The Burden of Proof on Consent for TCPA Claims

The parties raise a threshold issue regarding the elements of a TCPA claim and the burden of proof on consent, which bears upon the Court's predominance analysis.

In *Meyer v. Portfolio Recovery Associates, LLC*, the Ninth Circuit explained that "the [] elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." 707 F.3d 1036, 1043 (9th Cir. 2012). This Court has previously acknowledged *Meyer* and the disagreement it sparked amongst district courts in the Ninth Circuit regarding "whether either (a) the plaintiff has the burden to prove the absence of 'prior express consent' or (b) the defendant has the burden to show prior express consent was given." *Selby v. LVNV Funding, LLC*, No. 13-cv-01383-BAS(BLM), 2016 WL 6677928, at *4 (S.D. Cal. June 22, 2016); *also compare Gossett v. CMRE Fin. Servs.*, 142 F. Supp. 3d 1083, 1087–88 (S.D. Cal. 2015) (concluding the defendant has the burden to prove prior express consent as an affirmative defense) *with Smith v. Microsoft Corp.*, 297 F.R.D. 464, 471 n.2 (S.D. Cal. 2014) (interpreting *Meyer* to place the burden on the plaintiff to prove the absence of express prior consent). This Court did not stake a side, but instead

reasoned that "this issue is ultimately immaterial at the class certification stage." *Selby*, 2016 WL 6677928, at *4. In the time since *Meyer* and this Court's *Selby* decision, the Ninth Circuit has squarely addressed the burden of proof on consent in a TCPA case and its application at the class certification stage.

In *Van Patten v. Vertical Fitness Group, LLC*, the Ninth Circuit clarified that "[e]xpress consent is not an element of a plaintiff's *prima facie* [TCPA] case but is an affirmative defense for which the defendant bears the burden of proof." 847 F.3d 1037, 1044 (9th Cir. 2017). *Van Patten* expressly observed that *Meyer*'s statement arose in the context of a plaintiff seeking a preliminary injunction and thus the absence of prior express consent was "pertinent to the likelihood of success on the merits" factor. *Id.* at 1044 n.3. The burden to show consent otherwise remains with the defendant. *Id.* at 1044. The Ninth Circuit is not alone in placing the burden of proving express consent on a TCPA defendant. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017) ("Express consent is an affirmative defense on which the defendant bears the burden of proof.").

Although *Van Patten* did not concern Rule 23 class certification, the Ninth Circuit subsequently considered *Van Patten* in relation to Rule 23 certification of a TCPA class on the specific issue of predominance. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931–32 (9th Cir. 2018). *McKesson* expressly observed that although "[p]utative class members . . . retain the burden of showing that the proposed class satisfies [] Rule 23," since the defendant "bears the burden, we assess predominance by analyzing the consent defenses [the defendant] has actually advanced and for which it has presented evidence." *Id.* at 931. Such evidence may "allow [the plaintiff] to satisfy the predominance requirement of Rule 23(b)(3) with respect to those defenses." *Id.* at 932.

In the wake of *Van Patten* and *McKesson*, it is clear that the evidence Royal offers as evidence of consent "strongly affects" the Court's predominance analysis. *Van Patten*, 896 F.3d at 932; *see also Makaron*, 324 F.RD. at 232–33; *Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 313 (N.D. Cal. 2017) ("[O]ur court of appeals clarified that, notwithstanding *Meyer* . . . prior express consent 'is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.' Neither Odiase nor Allstate addressed *Van Patten* in briefing, but that decision, not [] *Meyer*, controls here." (citations omitted)); *Caldera*, 320 F.R.D. at 519; *see also Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) ("The existence of affirmative defenses which require individual resolution can be considered as part of the court's analysis to determine whether individual issues predominate under Rule 23(b)(3)."). The Court, therefore, considers Royal's evidence of consent. In doing so, the Court is mindful that Royal's evidence may allow the Plaintiffs to satisfy predominance.

### b.    Royal's "Opt-In Procedure" and "Consent Records"

Royal argues that "consent is the predominant issue for resolving class certification" in this case. (ECF No. 58 at 18.)[17] At the heart of Royal's consent

---

[17] In addition to Royal's argument that individualized issues of consent will predominate, Royal ticks off a list of individualized questions it contends will be necessary for each class member. (ECF No. 58 at 20–21.) The Court cannot find that class certification is inappropriate simply because Royal has listed a dozen questions *in seriatim* without any meaningful development through record evidence or legal analysis. Moreover, the questions Royal ticks off—such as, whether a number is a cell phone number or whether the individual identified is the phone number subscriber, *etc.*—are questions that do not go to predominance, but rather "whether someone belongs to the class." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 254 (N.D. Ill. 2014). Arguments on this issue "do not speak to whether common questions predominate among class members," but rather to manageability. *Id.* Royal's two-sentence manageability argument, (ECF No. 58 at 30), lacks any meaningful development that could show there would be practical problems that render the class action format inappropriate for this suit. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) (observing that the manageability question "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.").

argument is that its marketing program with Prospects obtains consent.

"Whether issues of individualized consent defeat the predominance requirement in a TCPA case is made on a case-by-case basis after evaluating the specific evidence available to prove consent." *Legg v. PTZ Ins. Agency, Ltd*., 321 F.R.D. 572, 577 (N.D. Ill. 2017) (citing *Jamison v. First Credit Servs., Inc*., 290 F.R.D. 92, 106-07 (N.D. Ill. 2013)); *Selby v. LVNV Funding, LLC*, No. 13-cv-01383-BAS(BLM), 2016 WL 6677928, at *4 (S.D. Cal. June 22, 2016) ("Whether the issue of prior express consent can be resolved on evidence and theories applicable to the entire class necessarily depends on the circumstances of each case."). "Violations of the TCPA 'are not *per se* unsuitable for class resolution,' and 'there are no invariable rules regarding the suitability of a particular case . . . for class treatment; the unique facts of each case generally will determine whether certification is proper.'" *Manno*, 289 F.R.D. at 687 (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 327–28 (5th Cir. 2008)). Two principles guide a court's evaluation of a consent defense asserted to defeat predominance.

First, a defendant must actually produce evidence which shows prior express consent by the named plaintiffs or at least some putative class members. "Where a party has not submitted any evidence of . . . express consent, courts will not presume that resolving such issues requires individualized inquiries." *Bee, Denning*, 310 F.R.D. at 629; *see also Caldera*, 320 F.R.D. at 519 (same). "[I]n the absence of any evidence of consent by the defendant, consent is a common issue with a common answer." *Kristensen*, 12 F. Supp. 3d at 1305.

Second, even if a defendant provides evidence of consent, whether the issue of consent is likely to devolve into individualized inquiries turns on the nature of the evidence provided. Consent can be resolved on a classwide basis if consent was

obtained in an identical or substantially similar manner from class members. *See Stemple v. QC Holdings, Inc.*, No. 12cv1997–BAS WVG, 2014 WL 4409817 (S.D. Cal. Sept. 5, 2014) (finding predominance test satisfied when all class member filled out the same loan application); *Bee, Denning*, 310 F.R.D. at 628 (finding predominance satisfied for junk fax class because of "the striking similarity of the various fax advertisements and the frequency with which toll-free numbers listed on these fax advertisements connected to a Capital Alliance representative."); *Manno*, 289 F.R.D. at 688, 691 (finding that defendant's argument that all class members consented during an admissions process in which the class members provided their phone numbers was suitable for resolution on a classwide basis); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc*., 279 F.R.D. 442, 446 (N.D. Ohio 2012) (finding "no questions of individual consent" when the defendant faxed an advertisement to more than 16,000 recipients via a fax advertising company and the advertising company obtained the "recipient fax numbers from another source, InfoUSA").

Evidence that will typically defeat predominance is evidence that prior express consent was provided in a variety of contexts and, as such, would likely require highly individualized inquiries. *See Gene & Gene LLC*, 541 F.3d at 328–29 (agreeing that individualized consent inquires would predominate because "the evidence shows that BioPay culled fax numbers from purchased databases but also periodically culled fax numbers from various other sources—from information submitted by merchants through BioPay's website, from information submitted at trade shows BioPay attended, and also from lists of companies with which BioPay or its affiliates had an established business relationship."); *Selby*, 2016 WL 6677928, at *10 (finding that individualized issues of consent would predominate because, *inter alia*, the debts for which telephone numbers were allegedly provided arose in varying contexts and in connection with different creditors); *Blair v. CBE Grp., Inc*., 309 F.R.D. 621, 629 (S.D. Cal. 2015) (finding that individualized issues would predominate because, *inter*

*alia*, "Plaintiffs' respective debts arose in different contexts, and therefore require extensive individual inquires to determine whether a particular class member provided her wireless number to the underlying creditor); *Shamblin v. Obama*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *11 (M.D. Fla. Apr. 27, 2015) (refusing to certify class whether defendants showed that "consent was obtained in a multitude of ways—such as website signups, signups at events, campaign contributions, contest submissions, online petitions, and 'offline' signups (e.g., door to door field signups)—through which individuals provided their cell phone numbers to either [defendant]."); *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 577–78 (S.D. Cal. 2013) (finding common questions did not predominate because class members had provided their phone numbers to the defendant in a variety of different scenarios, only some of which constituted prior consent).

With these guiding principles in mind, Royal has not shown that the issue of consent will likely require individualized inquires that will predominate at trial because (1) Royal has not provided actual evidence of prior express consent and (2) the issue of consent is otherwise capable of classwide resolution.

### i.    No Actual Evidence of Prior Express Consent

"Express consent is consent that is clearly and unmistakably stated." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (internal punctuation and citation omitted). Royal is "in the best position to come forward with evidence" that it received such consent before calling the class members. *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL 1466247, at *12 (W.D. Wash. Mar. 30, 2015). Royal, however, has not come forward with such evidence.

"[T]he precise type of evidence which could do [the] greatest harm" to Plaintiffs' TCPA claims is absent from Royal's opposition to class certification.

*Kristensen*, 12 F. Supp. 3d at 1307. Royal has not provided a single affidavit from a proposed class member who expressly attests that he or she opted to receive calls for Royal's services through the lead generation program. *See Legg*, 321 F.R.D. at 577 (finding that proposed class failed to meet predominance requirement because the defendants submitted affidavits from a number of proposed class members who "agreed to and expected to receive calls on their [cell] phones from defendants," and therefore "the trial in [the] case [would] be consumed and overwhelmed by testimony from each individual class member . . . to determine whether the class member consented to receive the calls in question[.]").

Instead, Royal has submitted the declarations of Jennifer Poole, the Director of Marketing for Royal; Joshua Grant, the President of Prospects; and Kevin Brody, the CEO of Landfall. (ECF Nos. 58-3, 58-4, 58-7.) The declarants discuss in the abstract how they believe the lead generation program should work for "consumers," "the consumer," "the opted-in telephone number," "a person" or "individual users" using a website. (Grant Decl. ¶¶ 11, 12; Brody Decl. ¶ 10, 12; Poole ¶¶ 12, 16.) The fundamental problem with the information provided by these individuals is that none of them has personal knowledge of whether Plaintiffs or any class member actually visited and completed the forms available at the two websites which Royal contends are the lead generation sources for the cell phone numbers of the class members. Royal's declarations therefore cannot constitute evidence that class members provided consent before they were contacted on Royal's behalf.[18] *See Kristensen*, 12

---

[18] The Court also notes that Poole's explanation of Royal's cross-matching of sales data from customers who purchase packages from Royal with the "opt-in" data Prospects transmits to Royal largely sidesteps the relevant inquiry for consent. As the Court has discussed, Prospects only transfers data for individuals who express an interest in Royal after Prospects has already called the individual based on the lead with the "opted-in" telephone number. Individualized issues of consent, however, cannot arise if consent was not provided before the call was placed. *See Meyer*, 707 F.3d at 1042 (finding that the issue of individual consent did not preclude class certification when defendant "did not show a single instance where express consent was given before the call was placed."). Therefore, the relevant focus must be on information which can address whether consent

F. Supp. 3d at 1307 (rejecting defendants' argument that declarations offered by companies who had numbers of class members constituted evidence of express consent); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 298–99 (N.D. Ill. 2014) (defendant failed "to present any specific evidence—as opposed to mere speculation—that this purportedly individualized issue predominate[d] over common issues."); *Cabrera v. Gov't Employees Ins. Co.*, No. 12-61390-CIV, 2014 WL 11894430, at *5 n.4 (S.D. Fla. Sept. 29, 2014) (rejecting consent argument because, given the lack of relationship between the defendants and the class members, "the Court believes that consent is unlikely to be a major issue at trial," and because one defendant "offered only bare assertions of consent, without identifying a single instance in which consent was in fact obtained.").

The Court therefore departs from the consent conclusion in *Gordon v. Caribbean Cruise Line, Inc*., No. 14 C 5848, 2019 WL 498937 (N.D. Ill. Feb. 8, 2019), a case on which Royal relies for the first time in its surreply and which involves a lead generation program for a defendant strikingly similar to Royal.  (ECF No. 84-1 at 3 n.8, 7 (citing *Gordon*, 2019 WL 498937, at *10).)[19]  In *Gordon*, the court declined to certify a Rule 23(b)(3) TCPA class for several reasons, including because the court reasoned that individualized issues of consent would predominate. *Id.* at *10.  The court anchored its predominance analysis in a declaration from the president of the defendant's lead generator, Adsource, which the *Gordon* court described as "specific evidence" of consent.  *Id.*  The declarant "attest[ed] that that Adsource [the lead generator] sent text messages only to those who entered their names and phone numbers on Adsource's landing page and checked the box

---

was obtained *before* Prospects placed calls to numbers associated with leads for Royal.

[19] Three of Royal's attorneys in this case also represent the *Gordon* cruise line company defendant. *See Gordon,* 2019 WL 498937 *1.  Jennifer Poole, the director of marketing for Royal, is also the director of marketing for the *Gordon* defendant.  *Id.* at *2.

indicating their consent to receive text messages via an auto-dialer" and lead lists provided by the company. *Id.* The *Gordon* court's foregoing characterization of the declaration suggests that the declarant lacked personal knowledge that any class member actually filled out the "opt-in" form. This Court finds *Kristensen*'s approach to requiring personal knowledge of consent more compelling and persuasive for the online "opt-in" forms at issue in this case.[20] Accordingly, this Court will not credit bare assertions by a lead generator or Royal regarding who completed an online "opt-in" form in the absence of evidence from an actual class member who completed such a form and attests to providing consent before he or she received a call made on Royal's behalf.

Royal's evidence is not analogous to evidence this Court has previously found to constitute actual evidence of prior express consent. For example, in *Selby*, the defendants showed that "at least some debtors provid[ed] prior express consent during the initial transaction or the debt collection process" when the debtors provided their telephone numbers on various records, including credit card applications or credit agreements and servicing or collection records. *Selby*, 2016 WL 6677928, at *10. The Court found further evidence that some class members directly provided consent as part of the collection process, as reflected by a review of debtor records and call recordings. *Id.* As Plaintiffs suggest, unlike the records and

---

[20] The program described in *Gordon* appears to be distinguishable from Royal's lead generation program here. According to *Gordon*, "[a]fter the person provided a phone number, Adsource's toll-free number would appear on the screen. When the person called Adsource, a representative would explain the vacation offer, and, if the caller wished to hear additional information, Adsource would transfer the call to a CCL representative." *Gordon*, 2019 WL 498937, at *2. The lead generator produced "lead lists" of people who called Adsource, which included data collected from the online "opt-in" forms as well "the data and time the person had called Adsource." *Id.* at *3. In addition to the lead generator's declaration, the *Gordon* court also relied on this evidence to find that individualized issues of consent would predominate in light of the plaintiff's challenge to the legitimacy of the lead lists by submitting the names of 50 people who appeared on the lists, yet who the plaintiff asserted had not provided their consent. *Id.* at *10.

telephone conversation recordings in *Selby*, online "opt-in" forms present a unique risk in which data may pertain to a particular consumer, but ultimately may have actually been obtained through sources other than the consumer. (ECF No. 76 at 15.) Thus, a defendant asserting prior express consent must marshal different evidence to meet its burden to show prior express consent. *See Johansen v. One Planet Ops, Inc*., No. 2:16-CV-00121, 2018 WL 1558263, at *5 (S.D. Ohio Mar. 5, 2018) ("In order to demonstrate that individuals consented to the calls, Defendants must marshal some evidence of prior express consent, such as a screenshot of a completed consent form for an individual plaintiff or a list of IP addresses of individual plaintiffs who consented to the calls. They have not."). Here, Royal has not produced evidence that either Plaintiff is in fact associated with the IP addresses in their "consent records."

More problematically, the key premise underlying Royal's consent argument falters for the website that allegedly generated the lead for DeForest. Royal's "consent record" identified myhealthcareauthority.com as the lead generation website for DeForest and Royal's discovery response was to the same effect. Nevertheless, the Court accepts Royal's and Prospects' newfound agreement in their opposition to class certification—and after Plaintiffs moved for class certification— that Prospects' data links the lead for DeForest's cell phone number with www.yourautohealthlifeinsurance.com.[21]   Unlike Royal's submissions regarding

---

[21] Whereas Royal's records show myhealthcareauthority.com, Prospects' records show www.yourautohealthinsurance.com.   (*Compare* ECF No. 49-9 at 45 (showing myhealthcareauthority.com) *with* Grant Decl. ¶ 30 Ex. A (showing www.yourautohealthinsurance.com).) Royal's March 6, 2018 interrogatory response, submitted by Royal's counsel, similarly contends that its "TCPA-compliant leads are generated through various websites, including but not limited to, diabeteshealth.info and *myhealthcareauthority.com—the websites through which Plaintiffs' telephone numbers were furnished to Prospects*." (ECF No. 77-5 Wheeler Decl. Ex. E at 13 (emphasis added).) In Royal's October 22, 2018 opposition to class certification, Royal and Prospects contend that the website discrepancy is an "error" which resulted from the transmission of data from Prospects to Royal. (ECF No. 58 at 8 n.38; Grant Decl. ¶ 30 Ex. A.) And they contend that "[t]he correct website for the December 2016 opt-in lead associated with Mr. DeForest is www.yourautohealthinsurance.com." (ECF No. 58 at 8 n.38; Grant Decl. ¶ 30 Ex.

www.diabeteshealth.info, which include a "consent form" that identifies Royal by name, (*see* Brody Decl. Ex. A), Royal conspicuously omits from its submissions any evidence regarding the "consent form" available on www.yourautohealthlifeinsurance.com.

The Court, however, has reviewed the "opt-in" form available on www.yourautohealthlifeinsurance.com that Plaintiffs identify in their reply and that Royal has not disputed is the relevant form. (*Compare* ECF No. 76 at 11–12 & n.17 *with* ECF No. 84-1.) The form links to a list of hundreds of companies, but there is no reference to Royal, Prospects, or any of the third-party digital marketing companies that Prospects has identified as companies from which it purchases leads. *See* http://www.yourautohealthlifeinsurance.com/companies/index.html (last accessed March 24, 2019). Thus, even assuming the form obtains consent for the companies identified, the form would not establish consent for DeForest or any class member for which this website generated a lead. *See Satterfield*, 569 F.3d at 955 (finding no express consent where the original scope of consent did not extend to unrelated third-party contacts).

Without actual evidence of prior express consent from Royal, "[c]lass members could provide individual affidavits averring lack of consent, and Defendants would be unable to rebut with anything other than the unfounded testimony" of individuals who lack personal knowledge of who visited the websites generating the leads in this case. *Kristensen*, 12 F. Supp. 3d at 1307. Indeed, McCurley and

---

A.) Curiously, Grant does not definitively contend that DeForest provided consent through www.yourautohealthinsurance.com, but rather speculates that "[r]egardless, Mr. DeForest *or someone using his telephone number*, opted-in, provided his telephone number, and agreed to be contacted by Royal." (*Id*. (emphasis added).) This speculation is plainly not adequate here. *See Agne v. Papa John's Intern., Inc*., 286 F.R.D. 559, 567 (W.D. Wash. 2012) ("Defendants' speculation that customers may have given their express consent . . . is not sufficient to defeat class certification.").

DeForest have done precisely this by submitting declarations in support of class certification, which aver that neither of them provided consent, including for the website which Royal contends generated a lead for their respective cellular telephone number. (McCurley Decl. ¶¶ 4–21, 25–26; DeForest Decl. ¶¶ 3–4, 6–8.) Thus, the Court rejects Royal's argument that Plaintiffs' declarations show why individualized inquiries into consent will be necessary. (ECF No. 58 at 20; ECF No. 84-1 at 3 (citing *Gordon*, 2019 WL 498937, at *11).)

### ii. Consent is Otherwise Likely Capable of Classwide Resolution

The Court does not believe that an additional showing is warranted for Plaintiffs to satisfy Rule 23(b)(3)'s predominance of common questions requirement given that Royal has not provided evidence of actual prior express consent. *See Kristensen*, 12 F. Supp. 3d at 1305. Nevertheless, the Court observes that the parties' theories of consent are otherwise classwide in nature.

The basic premise of Royal's consent argument is that its 2.1 million "consent records" are "substantial evidence showing consent was validly obtained for every call in a 100% opt-in consent marketing program." (ECF No. 58 at 4, 18–19.) The marketing program utilizes "opt-in" "consent" forms on the underlying websites to obtain leads, which trigger calls made by Prospects on Royal's behalf. Thus, "[a] review of the entities' procedures as to obtaining consent should produce a common answer." *Kristensen*, 12 F. Supp. 3d at 1307; *see also Moore*, 311 F.R.D. at 611–12 (observing that "[c]ourts routinely hold that proof of a defendant's uniform policy 'is not plagued by individual inquiry, but is often sufficient to satisfy the predominance requirement.'" (citation omitted)); *Birchmeier v. Caribbean Cruise Line, Inc*., 302 F.R.D. 240 (N.D. Ill. 2014) ("[T]he common question among class members is whether they received calls fitting the description in the class definitions. These

definitions do not leave much room for variation and are undoubtedly common to each class member: offer of a free cruise; . . . use of a prerecorded or artificial voice; date of call; by, on behalf of, or for the benefit of defendants.").

Plaintiffs have also proffered a theory regarding the validity of consent obtained through Royal's marketing program, which even Royal acknowledges is classwide in nature. Plaintiffs contend are leads generated for Royal are "manufactured" and assert that this theory can be tested by comparing the number of leads generated for a particular website with the website traffic data from the servers associated with the website. (ECF No. 76 at 13 n.18.) This theory no longer appears to be necessary to show that the issue of consent can be resolved on a classwide basis for any class member associated with a lead obtained from www.yourautohealthlifeinsurance.com. The theory, however, remains relevant to class members with leads generated from www.diabeteshealth.info. As the Court has discussed in its Rule 702 analysis, there is no fundamental disagreement that Weeks has specialized knowledge in web traffic analysis that could be applied to historical website traffic data. Although Weeks's present website traffic conversion opinions are not useful on this point, "[i]t is not necessary that expert testimony resolve the merits of plaintiff's claims; instead, the testimony must be relevant in assessing 'whether there was a common pattern and practice that could affect the class as a whole.'" *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d at 1069 (quoting *Ellis*, 657 F.3d at 983). Plaintiffs have offered a compelling theory that would apply to all class members linked to www.diabeteshealth.info and for which there is no indication at this stage that highly individualized inquiries would be necessary. *Bee, Denning*, 310 F.R.D. at 628. Accordingly, the Court concludes that Plaintiffs have met their burden to show that common questions are likely to predominate over individualized inquiries for these additional reasons.

## 2. Superiority of Class Resolution

"Rule 23(b) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon*, 150 F.3d at 1023 (quoting Fed. R. Civ. P. 23(b)(3)). The Court must determine "whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.* (citation omitted). The four factors for the Court's examination are: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir. 2001).

Royal argues that Plaintiffs have not shown that a class action is superior because "there is a host of individualized issues." (ECF No. 58 at 30.) The Court has rejected Royal's underlying premise and thus Royal has not shown that a class action is not superior for Plaintiffs' TCPA claims.

The Court agrees with Plaintiffs that a class action for the TCPA claims in this case is superior to individual litigation. First, "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover." *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). Statutory damages under the TCPA are limited to $500 for each negligent violation and $1,500 for each willful violation. *See* 47 U.S.C. § 227(b)(3)(B); 47 U.S.C. § 227(b)(3)(C). Courts recognize that given these damages relative to the costs of litigation, a class action is a superior means of adjudicating TCPA claims against a defendant. *See Knutson*, 2013 WL 4774763, at *10; *G.M. Sign, Inc. v.*

*Group C Commc'ns., Inc*., No. 08-cv-4521, 2010 WL 744262, at *6 (N.D. Ill. Feb. 25, 2010). Second, and precisely because the TCPA "provides for a relatively small recovery," this Court has recognized that "[i]n the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions." *Bee, Denning*, 310 F.R.D. at 630. The TCPA "can only be effectively enforced if consumers have available a mechanism that makes it economically feasible to bring their claims." *Id.* The Court's view about the superiority of TCPA class actions—in cases for which certification is appropriate—is no different today.

**E.    Whether Plaintiffs Satisfy Rule 23(b)(2)**

Finally, Plaintiffs "seek hybrid certification" of an injunctive class pursuant to Rule 23(b)(2). (ECF No. 49-1 at 21.) Rule 23(b)(2) requires plaintiffs to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs contend that they seek an injunction prohibiting Royal from "hiring robodialers, or at the very least" an order that Royal "implement much stricter compliance oversight protocols[.]" (ECF No. 49-1 at 21.) Royal argues that Plaintiffs cannot seek Rule 23(b)(2) certification because each plaintiff is independently entitled to pursue statutory damages under the TCPA. (ECF No. 58 at 5 n.19, 17 n.79.) The Court concludes that Plaintiffs have not shown that Rule 23(b)(2) class certification is appropriate.

"Class certification under Rule 23(b)(2) is appropriate only where *the primary relief* sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195 (citations omitted) (emphasis added); *In re First Am. Home Buyers Prot. Corp. Class Action*

17cv986

*Litig.*, 313 F.RD. 578, 612 (S.D. Cal. 2016). Plaintiffs' class certification motion is conspicuously silent on this particular issue. (*See* ECF No. 49-1 at 21–22.) Instead, Plaintiffs contend that the TCPA permits injunctive relief. (*Id.* (citing *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 810 (9th Cir. 2017).) Whether the TCPA permits injunctive relief is not the relevant issue. *L.A. Lakers* indicated that the TCPA permits "any person" that a receives a call in violation of the TCPA "to bring a claim for damages or injunctive relief." *L.A. Lakers*, 869 F.3d at 810. The case did not address the propriety of a Rule 23(b)(2) injunctive class when monetary relief is also sought. The only other case on which Plaintiffs rely involved certification of only a Rule 23(b)(2) injunctive class and thus is inapposite. *See Yoshioka v. Charles Schwab Corp.*, No. C-11-1625 EMC, 2011 WL 6748984, at *4 (N.D. Cal. Dec. 22, 2011). Plaintiffs fail to otherwise address Royal's argument in their reply. (*See generally* ECF No. 76.)

The primary relief Plaintiffs seek in this case is monetary, not injunctive. Plaintiffs expressly seek statutory damages for each alleged TCPA violation. (Compl. ¶¶ 96, 100, 113, 116.) A TCPA plaintiff who seeks an award of statutory damages for each alleged TCPA violation is primarily interested in monetary damages. *Knutson*, 2013 WL 4774763, at *9. Relatedly, because "[e]ach plaintiff is independently entitled to statutory damages under the TCPA . . . per unlawful call," their claims are "ineligible for Rule 23(b)(2) certification, regardless of Plaintiffs' parallel request for injunctive relief." *Connelly*, 294 F.R.D. at 579; *see also Abdeljalil*, 306 F.R.D. at 310 (denying Rule 23(b)(2) certification in TCPA case) (citing *Connelly*, 294 F.R.D. at 579); *Stemple*, 2014 WL 4409817, at *9 (same). Accordingly, the Court declines to certify a Rule 23(b)(2) injunctive relief class for Plaintiffs' TCPA claims. [22]

---

[22] The Court acknowledges that other courts have departed from the approach in *Connelly* and certified an injunctive relief Rule 23(b)(2) class along with a damages Rule 23(b)(3) class. *See*

**CONCLUSION & ORDER**

For the foregoing reasons, the Court **ORDERS** that:

1.      The Court **GRANTS IN PART and DENIES IN PART** Plaintiffs' motion for class certification (ECF No. 49) as follows:

        a.      The Court **DENIES** certification of a Rule 23(b)(2) TCPA class.

        b.      The Court **GRANTS** certification of a Rule 23(b)(3) TCPA class.

2.      The Court **CERTIFIES** the TCPA claims pursuant to Rule 23(b)(3) as follows:

> Class:
> All persons within the United States who received a telephone call (1) from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. (2) on said Class Member's cellular telephone (3) made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, (4) between November 2016 and December 2017, (5) where such calls were placed for the purpose of marketing, (6) to non-customers of Royal Seas Cruises, Inc. at the time of the calls, and (7) whose cellular telephone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

> Transfer Subclass:

---

*Makaron*, 324 F.R.D. at 233–34 & n.1 (expressly disagreeing with *Connelly*). *Marakon*, however, fails to provide any reason other than that "[c]ourts may, and often do, utilize this type of 'hybrid' certification." *Id.* at 234 (citing *Zepeda v. PayPal*, Inc., No. C 10-1668 SBA, 2017 WL 1113293 at *17 (N.D. Cal. Mar. 24, 2017); *Raffin v. Medicredit*, Inc., No. CV 15-4912 GHK, 2017 WL 131745 at *10 (C.D. Cal. Jan. 3, 2017)). Other courts, however, have reached the same conclusion as *Connelly* by specifically addressing the primary relief issue. *See Ung v. Universal Acceptance Corp*., 319 F.R.D. 537, 543–44 (D. Minn. 2017); *see also Holt v. Noble House Hotels & Resort*, *Ltd*., No. 17-cv-2246-MMA (BLM), 2018 WL 5004996, at *8–9 (S.D. Cal. Oct. 16, 2018) (finding Rule 23(b)(2) certification appropriate because the primary relief plaintiff sought was injunctive and certifying incidental damages claims under Rule 23(b)(3)). This Court has also previously adopted *Connelly*'s reasoning in another TCPA class action to deny Rule 23(b)(2) class certification when the Court had certified a Rule 23(b)(3) class. *See Stemple*, 2014 WL 4409817, at *9. Plaintiffs have made no showing that the Court should depart from this prior decision.

All members of the Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.

Further division of the Class and Transfer Subclass based on the two websites may likely streamline the litigation. *See Moore*, 311 F.R.D. at 609 (noting that "while the litigation as a whole is dominated by factual and legal issues raised by [the defendant's] policies, the slight variance in [class members'] experiences makes proceeding with subclasses a preferable solution for streamlining litigation[.]"). The Court **ADVISES** the parties that, subject to further order, it may be appropriate for the Court to revise this certification order. *See* Fed. R. Civ. P. 23(c)(1)(C); Fed. R. Civ. P. 23(c)(5).

3.      Plaintiffs McCurley and DeForest are **APPOINTED** as class representatives for the Class and the Transfer Subclass presently certified.

4.      Pursuant to Rule 23(g), Plaintiffs' counsel are **APPOINTED** as Class Counsel.

5.      Pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), the parties **ARE ORDERED** to meet and confer, and submit to the Court an agreed-upon form of class notice that will advise individual members of, among other things, the nature of the action, the relief sought, the right of class members to intervene or opt out, and the binding effect of a class judgment on members under Rule 23(c)(3). The parties shall also jointly submit a plan for dissemination of the proposed notice. The proposed notice and plan of dissemination shall be filed with the Court **no later than April 30, 2019**.

6.      The Court **DENIES** Royal's Rule 702 motions. (ECF Nos. 56, 57.)

**IT IS SO ORDERED.**

**DATED:  March 27, 2019**

Hon. Cynthia Bashant
United States District Judge