**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Matthew M. Loker, Esq. (279939)
ml@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone:   (800) 400-6808
Facsimile:   (800) 520-5523

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Todd M. Friedman, Esq. (216752)
tfriedman@toddflaw.com
Adrian R. Bacon, Esq. (280332)
abacon@toddflaw.com
21550 Oxnard Street, Suite 780
Woodland Hills, CA 90212
Telephone:   (877) 206-4741
Facsimile:   (866) 633-0228

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

JOHN MCCURLEY AND DAN DEFOREST, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

ROYAL SEAS CRUISES, INC.,

Defendant.

**Case No.:** 17-cv-986 BAS (AGS)

**FIRST AMENDED DECLARATION OF ADRIAN R. BACON IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE WITNESS DECLARATIONS, FOR RESTRAINING ORDER, FOR MONETARY SANCTIONS, AND FOR DISQUALIFICATION OF COUNSEL**

# DECLARATION OF ADRIAN R. BACON

**I, ADRIAN R. BACON declare:**

1. I am an attorney in good standing duly admitted to the State Bar of California and an attorney of record for Plaintiffs Dan Deforest and John McCurley ("Plaintiffs") in this action against Royal Seas Cruises, Inc. ("Defendant"). I am a Partner at The Law Offices of Todd M. Friedman, and one of the counsel for Plaintiffs and the certified Class and Subclass in this action.

2. I have personal knowledge of the following facts and, if called upon as a witness, could and would competently testify thereto, except as to those matters which are explicitly set forth as based upon my information and belief and, as to such matters, I am informed and believe that they are true and correct.

3. I am writing this declaration in support of Plaintiffs' First Amended Motion To Strike Witness Declarations, For Restraining Order, For Monetary Sanctions, And For Disqualification of Counsel.

4. On Friday, January 17, 2020 at 1:22 p.m., Defendant served by email its Second Supplemental Disclosure. A true and correct copy of the disclosure is attached hereto as Exhibit A.

5. In this disclosure, Defendant identified as relevant witnesses for the first time Gary Little, David Calderon, and Dan Gieger. These three individuals are members of the Class and Subclass.

6. Additionally, attached to the Second Supplemental Disclosure were three signed and sworn declarations of the three new witnesses which were signed in August, September, and October of 2019.

7.  Defendant has not served written discovery seeking testimony from Class or Subclass Members on Class Counsel at any point, including following Class Certification.

8.  Prior to receiving the Second Supplemental Disclosure, Plaintiffs were unaware that Defendant had either contacted or obtained declarations from the three witnesses.

9.  Because the Fact Discovery Completion deadline is February 18, 2020, written discovery must be served by January 17, 2020 to timely receive a response.  Thus, by waiting until January 17, 2020, Defendant ensured that Plaintiffs would have eleven (11) hours to serve written discovery.

10. Class Counsel were outraged by Defendant's conduct, and immediately drafted and sent a meet and confer email at 5:21 p.m. on January 17, 2020 requesting a call the following week, and noting that Plaintiffs would be seeking monetary sanctions, discovery sanctions, and disqualification sanctions, and providing the grounds for those sanctions.  A true and correct copy of this email is attached hereto as Exhibit B.

11. Class Counsel additionally drafted and sent Defendant a 30(b)(6) deposition notice on all of Defendant's contact with the Class and Subclass, including post-certification, which included a request for documents on the same subject.  A true and correct copy of this deposition notice is attached hereto as Exhibit C.

12. Class Counsel and Defendant's counsel telephonically met and conferred on January 22, 2020.  I emailed a summary of the conversation to Defendant's counsel and noted that we would not bring this Motion if Defendant agreed to withdraw its declarations and not seek discovery

-2-

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

from the tampered witnesses.  A true and correct copy of this email is attached hereto as Exhibit D.

13. Defendant responded and stated that it would not use the declarations if it could conduct depositions.  Class Counsel responded and stated we would have to proceed with the motion.  A true and correct copy of these emails is attached hereto as Exhibit E.

14. On February 18, 2019, Class Counsel Thomas Wheeler conducted the deposition of Defendant's 30(b)(6) representative in Fort Lauderdale, Florida pursuant to the notice of deposition attached as Exhibit C. Attached hereto as Exhibit F is a true and correct copy of the Transcript of the Deposition of Defendant's 30(b)(6) representative Melissa Hanson.

15. Attached hereto as Exhibit G is a true and correct copy of the calling script used to contact Class Members produced by Defendant in response to the document request in Exhibit C.

16. Attached hereto as Exhibit H is an audio file numbered 300000000151480-7046270980 which is a call recording of Defendant's call with Mr. Geiger and was produced by Defendant in response to the document request in Exhibit C.

17. Attached hereto as Exhibit I is an audio file numbered 300000000172377-4049353474 which is a call recording of Defendant's call with Mr. Wilder and was produced by Defendant in response to the document request in Exhibit C.

## **MONETARY SANCTIONS**

18. Thomas E. Wheeler, a fourth year senior associate, from our offices took lead on researching and drafting this immediate motion.  In total, Mr.

Wheeler spent 7.1 hours conducting legal research for the motion and 9.1 hours drafting and revising the Motion and an additional 4.5 hours amending the Motion. Mr. Wheeler also spent 14.5 hours traveling to and from Fort Lauderdale for the deposition of Defendant's 30(b)(6) regarding its Class contact, 2 hours preparing for the deposition, and 2.3 hours conducting it. Mr. Wheeler was recently approved by the Courts in *Edward Makaron v. Enagic USA, Inc.*, Case No. 2:15-cv-05145-DDP-E (C.D. Cal. 2020) and *Nicole Romano et. al. v. SCI Direct Inc. et. al.*, Case No. 2:17-cv-03537-ODW-JEM (C.D. Cal. 2019) at the rate of $425 per hour. Thus, in total Mr. Wheeler incurred $16,787.50 in attorney's fees for 39.5 hours of work.

19. Additionally, Plaintiffs incurred $795.80 in flight costs, $258.77 in hotel costs, and $1,269.15 in deposition taking and transcript costs associated with the 30(b)(6) deposition regarding Class contact, totaling $2,323.72 in costs.

20. As noted above, I am a partner at the Law Offices of Todd M. Friedman P.C.. I spent approximately 1 hour reviewing the Motion and 1 hour discussing it with Mr. Wheeler. I have also been recently approved by the Courts in *Edward Makaron v. Enagic USA, Inc.*, Case No. 2:15-cv-05145-DDP-E (C.D. Cal. 2020) and *Nicole Romano et. al. v. SCI Direct Inc. et. al.*, Case No. 2:17-cv-03537-ODW-JEM (C.D. Cal. 2019) at the rate of $625 per hour.

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed on January 31, 2020.

Date: January 31, 2020                    By: /s/ Adrian R. Bacon

                                                    Adrian R. Bacon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

**GREENSPOON MARDER LLP**
Richard W. Epstein, Esq. (Admitted *Pro Hac Vice*)
richard.epstein@gmlaw.com
Jeffrey A. Backman, Esq. (Admitted *Pro Hac Vice*)
jeffrey.backman@gmlaw.com
200 E. Broward Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel: 954.527.2427
Fax: 954.333.4027

Attorneys for Defendant Royal Seas Cruises, Inc.
[additional Defendant's counsel on signatory line]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John McCurley, Individually and and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> Royal Seas Cruises, Inc., <br><br> Defendant. <br> ----------------------------------------------- <br><br> Dan DeForest, Individually and and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> Royal Seas Cruises, Inc., <br><br> Defendant. | Case No.:  3:17-cv-01988-AJB-AGS <br> *consolidated with* <br> Case No.:  3:17-cv-00986-BAS-AGS <br><br><br><br> **DEFENDANT ROYAL SEAS CRUISES, INC.'S SECOND SUPPLEMENTAL DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(1) AND (e)** |

1

Pursuant to Fed. R. Civ. P. 26 (a)(1) and (e), Defendant ROYAL SEAS CRUISES, INC. ("RSC"), supplements its Initial Disclosures served on September 22, 2017, and its Supplemental Disclosure served on November 27, 2018, with this Second Supplemental Disclosure. This disclosure is made based on the information available to RSC at this time. RSC reserves the right to rely on additional discovery and investigations, and to supplement its disclosures as warranted thereby. The disclosure is made in a good faith effort to supply as much information and specification as is presently known but shall not prejudice RSC in relation to further discovery and investigations. Should other information become available during the course of ongoing investigation and discovery, it will be disclosed to other parties pursuant to Federal Rule 26(e).

**1.    WITNESSES**

**Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

a.    Gary Little, 511 Shaver Drive, Florence, NJ 08518, (609) 638-0625. Mr. Little has knowledge of his purchasing a travel package from RSC on February 25, 2017, and enjoying a vacation using the travel package purchased from RSC, after visiting the website diabeteshealth.info, entering his phone

number, (609) 638-0625, on the website, and requesting to be contacted regarding RSC.

b.     David Calderon, 1136 Stillman Avenue, Plainfield, NY 07060, (908) 331-1177.  Mr. Calderon has knowledge of his purchasing a travel package from RSC on July 26, 2017, after visiting the website diabeteshealth.info, entering his phone number, (908) 331-1177, on the website, and requesting to be contacted regarding RSC.

c.     Dan Geiger, 1203 S Main Street, Mt. Vernon, OH 43050, (740) 627-0980.  Mr. Geiger has knowledge of his purchasing a travel package from RSC on August 16, 2017, after visiting the website diabeteshealth.info, entering his phone number, (740) 627-0980, on the website, and requesting to be contacted regarding RSC.

**2.     DOCUMENTS**

**Provide a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

a.  Declaration of Gary Little (Aug. 7, 2019) (attached as **Exhibit "A"**).

b.  Declaration of David Calderon (Oct. 2, 2019) (attached as **Exhibit "B"**).

c.  Declaration of Dan Geiger (Sept. 23, 2019) (attached as **Exhibit "C"**).

DATED:  January 17, 2019

Respectfully Submitted,

**GREENSPOON MARDER LLP**

JEFFREY A. BACKMAN (Fla. Bar No. 662501)
Jeffrey.Backman@gmlaw.com
RICHARD W. EPSTEIN (Fla Bar No. 229091)
Richard.Epstein@gmlaw.com
200 E. Broward Blvd, Suite 1800
Fort Lauderdale, Florida 33301
Tel: 954.527.2427
Fax: 954.333.4027
*Admitted Pro Hac Vice*

 /s/ *Brian R. Cummings*
BRIAN R. CUMMINGS (Fla. Bar No. 25854)
Brian.Cummings@gmlaw.com
401 E. Jackson St., Suite 1825
Tampa, Florida 33602
Tel: 813.769.7020
Fax: 813.426.8582
*Admitted Pro Hac Vice*

ANTON N. HANDAL, ESQ. (Bar No. 113812)
Tony.Handel@gmlaw.com
750 B Street, Suite 250
San Diego, CA 92101
Tel: 619.544.6400
Fax: 619.696.0323

Attorneys for Defendant *Royal Seas Cruises, Inc.*

1
2
3

## CERTIFICATE OF SERVICE

4

   I HEREBY CERTIFY that a true and correct copy of the foregoing has

5
6

been served via email and U.S. regular mail on this 17th day of January, 2020, to

7

all counsel of record set forth on the Service List below.

8

By:  _/s/ Brian R. Cummings_

9

Brian R. Cummings, Esq.

10
11

## SERVICE LIST

12

Joshua B. Swigart, Esq.

13

josh@westcoastlitigation.com
Kevin Lemieux, Esq.

14

kevin@westcoastlitigation.com

15

**HYDE & SWIGART**
2221 Camino Del Rio South, Suite 101

16

San Diego, CA 92108

17

Telephone: (619) 233-7770
Facsimile: (619) 297-1022

18
19

Abbas Kazerounian, Esq.

20

ak@kazlg.com
Matthew M. Loker, Esq.

21

ml@kazlg.com

22

**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue

23

Costa Mesa, CA 92626

24

Telephone: (800) 400-6808
Facsimile: (800) 520-5523

25
26

_Attorneys for Plaintiff John McCurley_

27

 Todd M. Friedman, Esq.

28

 Adrian R. Bacon, Esq.

5

Meghan E. George, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
(877) 206-4741
tfriedman@toddflaw.com
abacon@toddflaw.com
mgeorge@toddflaw.com

*Attorneys for Plaintiff Dan DeForest*

41294404

# "EXHIBIT A"

1.  My name is <u>Gary Little</u>.  I am over the age of 18 and fully competent to make this declaration. This Declaration is based on my personal knowledge or upon my review of records over which I have care, custody or control.

2.  I purchased a vacation package from Royal Seas Cruises, Inc. ("Royal Seas") on <u>February 25, 2017</u>.

3.  Prior to purchasing my vacation package from Royal Seas I went to the webpage diabeteshealth.info where I entered my phone number, <u>(609) 638-0625</u>, and requested to be contacted regarding Royal Seas.

4.  I **have** traveled on my vacation as of the date I sign this document.

5.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury and of the laws of the United States that the foregoing is true and correct.

Dated this <u>7th</u> day of <u>August</u>, 2019.

_____(E-sign here)
Gary Little
(Print Name)

 **HELLOSIGN**

<span style="float:right">Audit Trail</span>

| | |
|---|---|
| **TITLE** | Royal Seas Cruises - Gary Little |
| **FILE NAME** | Royal Seas Cruises - Gary Little.pdf |
| **DOCUMENT ID** | aca49f0fec41455818442dd85d6d34af8732ead7 |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **08/13/2019**<br>14:31:49 UTC | Sent for signature to Gary Little (MUSIC123G@MSN.COM) from customerservice@royalseas.com<br>IP: 12.219.62.139 |
| **VIEWED** | **08/17/2019**<br>17:11:46 UTC | Viewed by Gary Little (music123g@msn.com)<br>IP: 99.203.116.107 |
| **SIGNED** | **08/17/2019**<br>17:12:14 UTC | Signed by Gary Little (music123g@msn.com)<br>IP: 99.203.116.107 |
| **COMPLETED** | **08/17/2019**<br>17:12:14 UTC | The document has been completed. |

# "EXHIBIT B"

1.   My name is <u>David Calderon</u>.  I am over the age of 18 and fully competent to make this declaration. This Declaration is based on my personal knowledge or upon my review of records over which I have care, custody or control.

2.   I purchased a vacation package from Royal Seas Cruises, Inc. ("Royal Seas") on <u>July 26, 2017</u>.

3.   Prior to purchasing my vacation package from Royal Seas I went to the webpage diabeteshealth.info where I entered my phone number, <u>(908) 331-1177</u>, and requested to be contacted regarding Royal Seas.

4.   I <u>have not</u> traveled on my vacation as of the date I sign this document.

5.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury and of the laws of the United States that the foregoing is true and correct.

Dated this <u>2</u> day of <u>October, 2019</u>.

*David calderon* (E-sign here)

David Calderon

 **HELLOSIGN**

Audit Trail

**TITLE**  Royal Seas Cruises - David Calderon

**FILE NAME**  Royal Seas Cruises - David Calderon.pdf

**DOCUMENT ID**  58692c4bcbf8784af6c1d7d01dd3144be7c05eaf

**STATUS**  • Completed

## Document History

| | | |
|---|---|---|
| **SENT** | **10 / 02 / 2019**<br>19:24:22 UTC | Sent for signature to David Calderon (DJC1136@YAHOO.COM)<br>from customerservice@royalseas.com<br>IP: 12.219.62.139 |
| **VIEWED** | **10 / 03 / 2019**<br>23:58:59 UTC | Viewed by David Calderon (djc1136@yahoo.com)<br>IP: 172.58.238.192 |
| **SIGNED** | **10 / 04 / 2019**<br>00:00:34 UTC | Signed by David Calderon (djc1136@yahoo.com)<br>IP: 172.58.238.192 |
| **COMPLETED** | **10 / 04 / 2019**<br>00:00:34 UTC | The document has been completed. |

# "EXHIBIT C"

1. My name is ___Dan Geiger___.  I am over the age of 18 and fully competent to make this declaration. This Declaration is based on my personal knowledge or upon my review of records over which I have care, custody or control.

2. I purchased a vacation package from Royal Seas Cruises, Inc. ("Royal Seas") on August 16, 2017

3. Prior to purchasing my vacation package from Royal Seas I went to the webpage diabeteshealth.info where I entered my phone number, (740)627-0980 and requested to be contacted regarding Royal Seas.

4. I have not traveled on my vacation as of the date I sign this document.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury and of the laws of the United States that the foregoing is true and correct.

Dated this 23 day of September, 2019.

_____(E-sign here)
SignNow e-signature ID: 698c24fe2b...
(Print Name)



SignNow E-Signature Audit Log
Document name: Royal Seas Cruises - Dan Geiger
Document ID: 4b7e195a7cb71343e6967890109ab4ab679bbbdf
Document page count: 1

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded Document | customerservice@royalseas.com | 2019-10-03 09:39:26 pm UTC | 2019-10-03 09:39:25 pm UTC | 100.26.28.45 |
| SignNow Web Application | Viewed the Document | customerservice@royalseas.com | 2019-10-03 09:39:32 pm UTC | 2019-10-03 09:39:32 pm UTC | 12.219.62.139 |
| SignNow Web Application | Document Saved | customerservice@royalseas.com | 2019-10-03 09:41:22 pm UTC | 2019-10-03 09:41:21 pm UTC | 54.210.71.240 |
| SignNow Web Application | Viewed the Document | dangeiger@embarqmail.com | 2019-10-04 01:47:54 pm UTC | 2019-10-04 01:47:37 pm UTC | 65.131.221.130 |
| SignNow Web Application | Signed the Document, Signature ID: 698c24fe2b593b2ac8e1 | dangeiger@embarqmail.com | 2019-10-04 01:52:05 pm UTC | 2019-10-04 01:51:47 pm UTC | 100.26.28.45 |
| SignNow Web Application | Document Saved | dangeiger@embarqmail.com | 2019-10-04 01:52:10 pm UTC | 2019-10-04 01:51:46 pm UTC | 100.26.28.45 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

**Tom Wheeler**

| | |
|---|---|
| **From:** | Tom Wheeler |
| **Sent:** | Friday, January 17, 2020 5:21 PM |
| **To:** | Jeffrey Backman; Brian Cummings |
| **Cc:** | Moneka Simpson; josh@westcoastlitigation.com <josh@westcoastlitigation.com>; kevin@westcoastlitigation.com <kevin@westcoastlitigation.com>; Abbas Kazerounian; ml@kazlg.com <ml@kazlg.com>; Todd Friedman; Adrian Bacon; mgeorge@toddflaw.com <mgeorge@toddflaw.com>; Khia Joseph; 38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_ 1 E_Mail; Moneka Simpson |
| **Subject:** | Meet and Confer re: Motion for Sanctions |

Counsel,

We are writing to schedule a meet and confer call for next week, and request you provide dates and times to meet and confer telephonically prior to next Thursday regarding Plaintiffs' Motion for Sanctions, including monetary sanctions, discovery sanctions, and disqualification sanctions, against Defendant and its attorneys regarding their illegal contact with represented parties.

We are in receipt of your belated Second Supplemental Disclosure dated January 17, 2020, which discloses three new witnesses and includes three declarations signed September 23, 2019, October 2, 2019, and August 7, 2019. As you are aware, on March 27, 2019, the Court certified a Class action consisting of all individuals called between November 2016 and December 2017 on behalf of Royal Seas Cruises (and a sub-class of all calls that were transferred to Royal Seas Cruises). All three new witnesses fall within this Class Definition and thus were Class Members following the Certification of the Class on March 27, 2019. Despite this, you seemingly have communicated with at least three of our clients, who are represented by counsel, namely our offices.

The law is exceedingly clear on this topic for post-certification contact. "[D]efense counsel ha[s] an ethical duty to refrain from discussing the litigation with members of the class as of the date of class certification . . . ." Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1206–07 (11th Cir. 1985).  To reiterate, "[o]nce a class has been certified, the rules governing communications [with class members] apply as though each class member is a client of the class counsel." Harris v. Vector Mktg. Corp., 716 F. Supp. 2d 835, 847 (N.D. Cal. 2010) (citing Manual of Complex Litig. § 21.33, at 300 (4th ed. 2004)). See, e.g., Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1207 n. 28 (11th Cir.1985) (stating that, "[a]t a minimum, class counsel represents all class members as soon as a class is certified"); Erhardt v. Prudential Group, 629 F.2d 843, 845 (2d Cir.1980) (stating that, "[o]nce a class has been certified, the rules governing communications apply as though each class member is a client of the class counsel"); Parks v. Eastwood Ins. Servs., 235 F.Supp.2d 1082, 1083 (C.D.Cal.2002) (stating that, "[i]n a class action certified under Rule 23, ... absent class members are considered represented by class counsel unless they choose to 'opt out' ").

Additionally, you also seemingly chose to wait until today, January 17, 2020, to make a disclosure that you were communication with represented individuals contrary to the requirements of the rules of professional conduct and laws of this Court back in the fall of 2019. It seems likely you chose today, which happens to fall exactly thirty (30) days before the discovery deadline, to deprive us of the ability to conduct any discovery into your illegal actions. Instead, this choice only highlights the willful nature of such misconduct and your attempt to hide it.

Again, please advise us of a date prior to next Thursday for a telephonic meet and confer ahead of filing our Motion, as required by Judge Bashant's local rules. Also, to reiterate, it is a violation of the rules of professional conduct and the rules of the 9th Circuit to engage in any further contact with Class Members.

Warm regards,

Tom Wheeler, Esq.
Law Offices of Todd M. Friedman P.C.
21550 Oxnard St., Ste. 780
Woodland Hills, CA 91367
Tel: (213) 988-0007

# EXHIBIT C

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

1   Todd M. Friedman (SBN 216752)
2   Adrian R. Bacon (SBN 280332)
    Meghan E. George (SBN 274525)
3   LAW OFFICES OF TODD M. FRIEDMAN, P.C.
4   21550 Oxnard St., Suite 780
    Woodland Hills, CA 91367
5   Phone: 877-206-4741
6   Fax: 866-633-0228
7   tfriedman@ toddflaw.com
    abacon@ toddflaw.com
8   mgeorge@toddflaw.com
9   **Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOHN MCCURLEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>Plaintiff,<br><br>vs.<br><br>**ROYAL SEAS CRUISES, INC.,**<br><br>Defendant.<br><br>**DAN DEFOREST, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>Plaintiff,<br><br>v.<br><br>**ROYAL SEAS CRUISES, INC.,**<br><br>Defendant. | Case No.: 17-cv-1988 AJB (AGS)<br>*consolidated with*<br>17-cv-986 AJB (AGS)<br><br>**PLAINTIFFS' NOTICE OF TAKING THE DEPOSITION OF DEFENDANT'S REPRESENTATIVE WITH MOST KNOWLEDGE**<br><br>Date: February 18, 2020<br>Time: 10:00 AM (Eastern Time)<br>Location: Veritext Legal Solutions,<br>    One East Broward Boulevard<br>    Suite 1101<br>    Fort Lauderdale, FL 33301 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs, DAN DEFOREST and JOHN MCCURLEY, through his attorney of record herein, will take the deposition of Defendant's Representative(s) most knowledgeable on February 18, 2020, beginning at 10:00 AM (Eastern Time) at Veritext Legal Solutions, One East Broward Boulevard, Suite 2250, Fort Lauderdale, FL 33301, before a Notary Public, or any other officer authorized to administer an oath. The deposition will be taken upon oral examination before a certified shorthand reporter and will continue from day-to-day thereafter at the same place—Sundays and holidays excepted—until completed.

As used herein, the "Class" is defined as set forth in the Court's Order Granting Class Certification on March 27, 2019, as:

> All persons within the United States who received a telephone call (1) from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. (2) on said Class Member's cellular telephone (3) made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, (4) between November 2016 and December 2017, (5) where such calls were placed for the purpose of marketing, (6) to non-customers of Royal Seas Cruises, Inc. at the time of the calls, and (7) whose cellular telephone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

As used herein, the "Transfer Subclass" is defined as set forth in the Court's Order Granting Class Certification on March 27, 2019, as:

> All members of the Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.

As used herein, "Defendant" means ROYAL SEAS CRUISES, INC., ITS OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES AND AGENTS.

**PLEASE TAKE FURTHER NOTICE** that the designated representative(s) of Defendant must be prepared to testify regarding "matters known or reasonably available to" Defendant including but not limited to:

1. Defendant's contact with the Class following March 27, 2019.

2. Defendant's contact with the Transfer Subclass following March 27, 2019.

3. Defendant's contact with the Class since March 6, 2017.

4. Defendant's contact with the Transfer Subclass since March 6, 2017.

5. Any and all information regarding Defendant's contact with the Class following March 27, 2019.

6. Any and all information regarding Defendant's contact with the Transfer Subclass following March 27, 2019.

7. Any and all information regarding Defendant's decision to contact the Class following March 27, 2019.

8. Any and all information regarding Defendant's decision to contact the Transfer Subclass following March 27, 2019.

9. Any and all memoranda, emails, letters, or other documents concerned Defendant's contact with the Class following March 27, 2019.

10. Any and all memoranda, emails, letters, or other documents concerned Defendant's contact with the Transfer Subclass following March 27, 2019.

11. The identity of each Class member contacted by Defendant following March 27, 2019.

12. The identity of each Transfer Subclass member contacted by Defendant following March 27, 2019.

**PLEASE TAKE FURTHER NOTICE** that Defendant and/or Defendant's designated representative(s) under F.R.C.P. 30(b)(6) are to produce the following categories of documents at the time and place of the above-listed deposition:

1. Produce any and all DOCUMENTS relating to or regarding Defendant's contact with the Class following March 27, 2019.

2. Produce any and all DOCUMENTS, including letters, emails, phone records, recordings, or other documents, sent by Defendant to any Class Member following March 27, 2019.

3. Produce any and all DOCUMENTS relating to or regarding Defendant's contact with the Transfer Subclass following March 27, 2019.

4. Produce any and all DOCUMENTS, including letters, emails, phone records, recordings, or other documents, sent by Defendant to any Transfer Subclass Member following March 27, 2019.

5. Produce any and all DOCUMENTS, including letters, emails, phone records, recordings, or other documents, received by Defendant from any Transfer Subclass Member following March 27, 2019.

6. Produce any and all DOCUMENTS, including letters, emails, phone records, recordings, or other documents, received by Defendant from any Class Member following March 27, 2019.

7. Produce any and all DOCUMENTS relating to or regarding the identities of each Class member contacted by Defendant following March 27, 2019.

8. Produce any and all DOCUMENTS relating to or regarding the identities of each Transfer Subclass member contacted by Defendant following March 27, 2019.

9. Produce any and all DOCUMENTS, including memoranda, emails, letters, or other documents, concerning Defendant's decision to contact Transfer Subclass Members following March 27, 2019.

10. Produce any and all DOCUMENTS, including memoranda, emails, letters, or other documents, concerning Defendant's decision to contact Class Members following March 27, 2019.

11. Produce any and all DOCUMENTS relating to or regarding Defendant's contact with the Class following March 6, 2017.

12. Produce any and all DOCUMENTS, including letters, emails, or other documents, sent by Defendant to any Class Member following March 6, 2017.

13. Produce any and all DOCUMENTS relating to or regarding Defendant's contact with the Transfer Subclass following March 6, 2017.

14. Produce any and all DOCUMENTS, including letters, emails, or other documents, sent by Defendant to any Transfer Subclass Member following March 6, 2017.

15. Produce any and all DOCUMENTS relating to or regarding the identities of each Class member contacted by Defendant following March 6, 2017.

16. Produce any and all DOCUMENTS relating to or regarding the identities of each Transfer Subclass member contacted by Defendant following March 6, 2017.

17. Produce any and all DOCUMENTS, including memoranda, emails, letters, or other documents, concerning Defendant's decision to contact Transfer Subclass Members following March 6, 2017.

18. Produce any and all DOCUMENTS, including memoranda, emails, letters, or other documents, concerning Defendant's decision to contact Class Members following March 6, 2017.

**PLEASE NOTE:** If an interpreter will be necessary, please notify this office within five days of deposition and specify the language and dialect that will be required.

Please be advised that if you cancel the deposition less than 48 business hours prior to the deposition date, you will be fully liable for the fees of the interpreter and the court reporter.

**PLEASE TAKE FURTHER NOTICE** that Plaintiffs and/or Defendant may videotape such deposition to be used at the time of trial.

Dated: January 17, 2020        **The Law Offices of Todd M. Friedman, P.C.**

By: /s/Todd M. Friedman, Esq.
Todd M. Friedman, Esq.
Attorney for Plaintiffs and the Class

**PROOF OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. On January 17, 2020, I served a true copy of **Plaintiff's Notice of Taking the Deposition of Defendant's Representative With Most Knowledge** by email to the following addresses:

Jeffrey A. Backman
GREENSPOON MARDER
Jeffrey.Backman@gmlaw.com

Brian Cummings
GREENSPOON MARDER
Brian.Cummings@gmlaw.com

Executed on January 17, 2020, at Woodland Hills, CA

[x] I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

[x] I hereby certify under the penalty of perjury that the foregoing is true and correct.

By:\_s/ Thomas E. Wheeler\_\_\_\_\_
Thomas E. Wheeler

---

Plaintiffs' Notice of Taking the Deposition of Defendant's Representative With Most Knowledge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

From: Adrian Bacon <abacon@toddflaw.com>
Sent: Thursday, January 23, 2020 2:03 PM
To: Jeffrey Backman <Jeffrey.Backman@gmlaw.com>
Cc: Abbas Kazerounian, Esq. <ak@kazlg.com>; Todd Friedman <tfriedman@toddflaw.com>; Tom
Wheeler <twheeler@toddflaw.com>; Matthew M. Loker, Esq. <ml@kazlg.com>
Subject: RE: McCurley/Royal

Jeff,

Thank you for the call yesterday and confirming a few things that we suspected.  First, you confirmed
that your client reached out to and discussed this case with clients of ours to secure these declarations.
You also have agreed that there will be no further discussion with any class members by you, your client,
or any other agents of your client.  I take that to mean no other law firms you enlist through back
channels, no other companies who work with your client and are doing this for them, or any other type
of communication at all.  Thank you for agreeing to stop doing this.  I would suggest that this
"agreement" is by default what the rules require.

We've discussed your proposal on our end and are not amenable to letting your office seek to depose
these three class members, or use any testimony or evidence from them in this case.  For reasons that I
stated yesterday during our call, there are innumerable red flags here that are facially apparent from
the declarations you and your client improperly procured and then withheld from us since August.  I
stand by my comment to you that this was intentional on your part - to withhold the evidence until
discovery was virtually over, and prevent us from having the opportunity to review any of this or
meaningfully respond to it.  During the call you numerously told me that you and your client were trying
to be transparent with us by disclosing the declarations.  I disagreed during our call and I disagree now,
as do the rest of us.  As I said during our call, you did the bare minimum under the rules with respect to
the timing of your disclosure, because if you hadn't turned it over at all, then you couldn't use this
"evidence" at trial or in any motions, as it would be excluded under Rule 26 jurisprudence.  The offer
you made to me on our call to avoid the sanctions motion we plan to file , i.e. to depose these
individuals to cure your own unethical conduct, smells like an orchestrated ploy.  It is one that we
cannot agree to.

As I said on our call, you and your client have tainted the well by speaking with clients of ours who were
represented parties in a certified class action.  According to case law we have read, this sort of improper
conduct is highly unethical, and the result that courts have agreed upon as a remedy by our review
seems to be a complete exclusion of that line of evidence from the trier of fact, monetary sanctions, and
even in some instances, a disqualification of counsel (your office) from further representation of the
defendant.  That is what we plan to seek with our motion.  You can respond to it once we file, as the
meet and confer has been satisfied by our 26 minute call yesterday.

I will also say, had you wished to speak with any of our clients or gather evidence from them, the only
proper method of doing so would have been to communicate directly with us, such as by noticing a
deposition, requesting an inspection of documents, or otherwise communicating through proper
channels.  That ship as sailed now with anyone who you or your clients spoke to or attempted to speak
to without our involvement.  You must admit, if a member of our team tried to circumvent the ethical
bar to discussing the case with your client and start talking to your client through alternate channels,
you'd probably ask the court to sanction us for that.  I don't see how this is any different.  Once a class is
certified, you can't talk to the class because they are our clients.

At this stage, if you want to conduct discovery on any class member, you are going to need to follow the
federal rules.  We'll review any discovery requests served on us and respond under the same
rules.  There is one way to avoid the motion - withdraw the declarations, and do not seek discovery from
these three individuals or anyone else who you or your client improperly spoke to after the class was
certified.  If you do not agree to this proposal, which I made yesterday, then we'll proceed with our
motion and you can explain yourself to the Court.

Please let us know if you will agree to the relief outlined herein, or if the motion is necessary.  We plan to file on Wednesday of next week.

Regards,

Adrian R. Bacon, Esq.
LAW OFFICES OF TODD M. FRIEDMAN, P.C.
Tel.  (866)598-5042 ext 648
Fax  (866)633-0228
https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Furldefense.com%2Fv3%2F__http%3A%2F%2Fwww.toddflaw.com__%3B!!K7bXOScpug!zaokx8y6ljynVBxyMp0Q16rk3fAWo1yGwzEyrickHz-Z00OTudfEedGwhtK_JDhA9oSjTQ%24&amp;data=02%7C01%7C%7C0522f76c7a214f375e7808d7a2cb6821%7Cfab1bebdb18945a695c7f8d18dd3e607%7C0%7C0%7C637156866834192024&amp;sdata=lmG%2BL6fvj2ldQiNxFYS%2FVKpyKHgbkuig%2FlvfA49v%2B6c%3D&amp;reserved=0
[nam12.safelinks.protection.outlook.com]

1
2
3
4
5
6
7
8
9
10
11
12
# EXHIBIT E
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

On Jan 26, 2020, at 8:59 PM, Adrian Bacon <abacon@toddflaw.com> wrote:

Thanks for the email Jeff.  We will proceed with our motion.  My email was accurate and unfortunately necessary under the circumstances.  I'm disappointed that we couldn't work this one out in light of the clear case law governing similar situations.

Regards,

Adrian

Get Outlook for iOS [aka.ms]

**From:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>
**Sent:** Sunday, January 26, 2020 5:51:13 PM
**To:** Adrian Bacon <abacon@toddflaw.com>
**Cc:** Abbas Kazerounian, Esq. <ak@kazlg.com>; Todd Friedman <tfriedman@toddflaw.com>; Tom Wheeler <twheeler@toddflaw.com>; Matthew M. Loker, Esq. <ml@kazlg.com>; Brian Cummings <Brian.Cummings@gmlaw.com>; Richard Epstein <Richard.Epstein@gmlaw.com>; 38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail <{F11005533}.Active@gmlaw.imanage.work>
**Subject:** RE: McCurley/Royal 38541.0019 [IWOV-Active.FID11005533]

Adrian, it's unfortunate that you chose to write an email that is factually inaccurate.  We did have what I thought was a nice conversation the other day.  Neither one of us agreed with the other as to who is right or wrong.  Instead I thought we had a productive conversation to find a way to resolve the dispute.  I did not "confirm that my client reached out to and discussed this case with clients of [y]ours to secure these declarations".  That's because it didn't happen.  I also have no idea what you mean by "back channels".  I did tell you that in light of your accusations and contention that you represent, apparently, everyone - though you can't identify anyone - any discussions regarding someone hearing about Royal Seas through diabeteshealth.info prior to that person becoming a customer of Royal Seas, would stop for the moment.  But, as you know, Royal Seas has many customers.  Is your position now that you represent all of them?  Can you provide us with a list of every Royal Seas customer that you claim to represent.  That could help avoid this situation in the future.  Are you taking the position now that Royal Seas cannot communicate with its customers?  I don't think so and didn't get that impression

1

when we spoke, but your statements and positions below are not in line with our phone call.

On our call, I agreed that we would be willing to not use the three declarations we voluntarily disclosed (hardly nefarious) if we could all coordinate dates for these depositions.  On our call, you actually thought this was a good way to resolve your concerns.  But now you say no way to the three declarants being deposed and also object in totality to any "class member" from being deposed.  That's concerning considering the testimony provided by these three declarants.  Even if you think we did something wrong (we didn't), isn't the truth important?  I also told you that neither my law firm nor my client did anything wrong.  Your accusations are not based on fact.  You also never said a word to me about asking to have my firm disqualified as counsel.

We've asked you for deposition dates and even sent you notices of deposition.  You've not provided dates.

I'd also note that while our call lasted about 20 minutes or so, the majority of that discussion was you asking me to get my client to consider a private mediation and find a way to settle this case.  To suggest that we spoke for 26 minutes about the issue regarding the Declarations is not accurate.  You even made the point to suggest that this issue you've raised of purported improper conduct was something that we should consider in settlement since it's "looming over our head".

We don't agree to be disqualified as counsel.  The proper way to resolve this is to take the depositions.

Separately, we'd like to confer with you on conducting discovery on class members so that the consent issues can be properly developed and considered by the court.  And, in light of the fact that SCOTUS has taken up the Petition relating to the constitutionality of the TCPA, we'd like to discuss the possibility of a motion to stay pending the resolution of that Petition.  Please let me know times you're available on Monday and Tuesday so these issues don't get delayed.

Sincerely,

Jeffrey A. Backman, Esq.
Partner
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL  33301
Toll Free - (888)491-1120
Direct Fax - (954)213-0140
Direct Dial - (954)734-1853
Email:   jeffrey.backman@gmlaw.com
https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.gmlaw.com&amp;data=02%7C01%7C%7C0522f76c7a214f375e7808d7a2cb6821%7Cfab1bebdb18945a695c7f8d18dd3e607%7C0%7C0%7C637156866834182023&amp;sdata=XCkEkuY1dsGjX%2FnOO652BQ0XSZcWWnke4eg8esgKlLE%3D&amp;reserved=0 [nam12.safelinks.protection.outlook.com]

1
2
3
4
5
6
7
8
9
10
11
12
13
14

# EXHIBIT F

16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF CALIFORNIA
 2             CASE No.  17-cv-1988 AJB (AGS)
                              consolidated with
 3                       17-cv-986 AJB (AGS)PP
 4      JOHN MCCURLEY, individually
        and on behalf of all others
 5      similarly situated,
                       Plaintiff,
 6      vs.
 7      ROYAL SEAS CRUISES, INC.,
 8                     Defendant.
        _____
 9      DAN DEFOREST, individually
        and on behalf of all others
10      similarly situated
                       Plaintiff,
11       v.
12      ROYAL SEAS CRUISES, INC.,
13                     Defendant
        _____/
14                              One East Broward Blvd.
15                              Fort Lauderdale, Florida
                                February 18, 2020
16                              10:10 a.m. - 12:25 p.m.
17             DEPOSITION OF MELISSA HANSON
18          Taken before SUZANNE VITALE, R.P.R., F.P.R.
19      and Notary Public for the State of Florida at Large,
20      pursuant to Notice of Taking Deposition filed in the
21      above cause.
22
23
24
25      PAGES 1 - 84

                                            Page 1
```

1  APPEARANCES:
2  On behalf of Plaintiffs:
3  LAW OFFICES OF TODD M. FRIEDMAN, PC
4  21550 Oxnard Street
5  Suite 780
6  Woodland Hills, California 91367
7  BY:  THOMAS WHEELER, ESQ.
8
9  On behalf of Defendants:
10  GREENSPOON MARDER, LLP
11  200 East Broward Boulevard
12  Suite 1800
13  Fort Lauderdale, Florida 33301
14  BY:  RICHARD EPSTEIN, ESQ.
15  ALSO PRESENT:  Geoff Pette
16
17
18
19
20
21
22
23
24
25
Page 2

1  Thereupon:
2            MELISSA HANSON
3  a witness named in the notice heretofore filed,
4  being of lawful age and having been first duly
5  sworn, testified on her oath as follows:
6            DIRECT EXAMINATION
7  BY MR. WHEELER:
8      Q.  Good morning.
9      A.  Good morning.
10      Q.  My name is Tom Wheeler.  I'm an attorney
11  in this action that my client Dan DeForest and --
12  sorry -- John McCurley have brought against Royal
13  Sea Cruises, Inc.
14          Can you please state and spell your name
15  for the record?
16      A.  Melissa Hanson.  M-E-L-I-S-S-A
17  H-A-N-S-O-N.
18      Q.  Have you ever been deposed before?
19      A.  Yes.
20      Q.  How many times?
21      A.  This is my third.
22      Q.  And when was the other most recent time?
23      A.  I don't remember exactly.  A few months.
24      Q.  A few months ago, okay.
25          Do you want me to go over the ground rules
Page 4

1
2            I N D E X
3
4  Examination                    Page
5  Direct        By Mr. Wheeler:        4
6  Cross         By Mr. Epstein:       81
7
8          PLAINTIFF EXHIBITS
9  No.                        Page
10  Exhibit 1     Notice of Deposition      8
11  Exhibit 2     Script            16
12  Exhibit 3     Call List           21
13  Exhibit 4     Screenshot of Customer    24
14     Contact
15  Exhibit 5     Cecelia Hetchler Affidavit  38
16  Exhibit 6     Second  Disclosure      43
17  Exhibit 7     Wilder Affidavit        75
18  Exhibit 8     SignNow Sheet        76
19  Exhibit 9     Thumb Drive          82
20
21
22
23
24
25
Page 3

1  of a deposition or do you know them?
2      A.  You can go over them.
3      Q.  So the purpose of this deposition today is
4  to learn facts about the case that support or don't
5  support my clients' position.  In particular today,
6  we're here to explore contact made between Royal Sea
7  Cruises, Inc., and class members.
8          I'm going to ask questions and I'll try to
9  ask them clearly and concisely but I'll probably
10  fail a bunch.  If you ever don't understand a
11  question, please ask me to rephrase it and I'm happy
12  to do so, okay?
13      A.  Okay.
14      Q.  It's not a marathon.  You can take a break
15  whenever you want.  The only request I have is that
16  if a question is pending, please answer it and then
17  we can go over it, okay?
18      A.  Okay.
19      Q.  The oath you just took is the same oath
20  you'd take in a court of law, so although we're in a
21  more informal conference setting, the testimony you
22  give today would have the same effect as if we were
23  in court.
24      A.  Okay.
25      Q.  Do you know what the difference between an
Page 5

2 (Pages 2 - 5)

1   estimate and a guess is?
2       A.   Yes.
3       Q.   After we're done today, you'll have the
4   chance to review your testimony.  If there's
5   anything that you need to correct, you're more than
6   welcome to do so.  Though, if it's a substantive
7   change from a yes to a no, I may comment on it at
8   the time of trial, okay?
9       A.   Okay.
10      Q.   We're doing just fine.  I imagine it's
11  because it's your fourth time.  We don't want to
12  talk over each other and also we want to make sure
13  we give verbal answers.  Nods of the heads, shrugs
14  of the shoulder don't show up on the transcript,
15  okay?
16      A.   Okay.
17      Q.   Have you taken any drugs, alcohol or other
18  medication that would impact your ability to give
19  your best testimony today?
20      A.   No.
21      Q.   Is there any reason why you can't give
22  your complete and full testimony today?
23      A.   No.
24      Q.   Thank you.
25          MR. EPSTEIN:  Let's be clear about

Page 6

1   something.  She's here in a capacity as a
2   30(b)(6) designee of Royal Seas Cruises.  She's
3   not here in any individual capacity.  This is
4   also pursuant to a notice that details what the
5   subject matter and the topics with a deposition
6   are going to be and we are going to insist that
7   the inquiry remain very much consistent with
8   the topics that are listed there.
9          There's already been a fully developed
10  30(b)(6) deposition taken of Royal Seas in this
11  case.  This is not a second chance for a
12  30(b)(6) inquiry with respect to the merits or
13  other substance of the case.
14          As you said, it deals with one very
15  specific sequence of events and they were
16  outlined in motions that you have filed,
17  motions to strike, et cetera.
18          So let us just understand that this is
19  going to be limited and focused on that.
20  Ms. Hanson is here in a representative capacity
21  speaking on behalf of the company and that
22  we're going to pretty much hold you to your
23  notice.
24          MR. WHEELER:  I'm only here to ask
25  questions about what happened as outlined in

Page 7

1       this notice.  We already took a 30(b)(6).  I
2       want to say it's been almost two years.
3           Literally the only reason we're here today
4       is to basically find out what notice or contact
5       was had between Royal Seas Cruise members and
6       class members that we're not otherwise aware of
7       and, specifically, after class certification.
8   BY MR. WHEELER:
9       Q.   Do you understand that you were designated
10  as the 30(b)(6) representative with respect to
11  certain topics for defendant?
12      A.   Yes.
13      Q.   Do you mind if I refer to Royal Sea
14  Cruises, Inc. as Royal Seas?
15      A.   That's fine.
16      Q.   It's just easier.
17          MR. WHEELER:  Let's go ahead and just
18      start with that then.  Introducing Exhibit 1.
19          (Thereupon, the referred-to document was
20      marked by the court reporter for Identification as
21      Plaintiff's Exhibit 1.)
22  BY MR. WHEELER:
23      Q.   So marked as Exhibit 1 is a notice of
24  deposition for today.  If you turn to page 3 -- let
25  me ask this first.

Page 8

1           Have you seen this document before?
2       A.   Yes.
3       Q.   If you look at the topics numbered 1
4   through 12, are you prepared to testify about those
5   topics today on behalf of defendant?
6           MR. EPSTEIN:  Let me kind of, I guess, ask
7       a question first.
8           She has the ability to testify concerning
9       the topics with one sort of caveat.  What does
10      March 6, 2017 have to do with this case?
11          MR. WHEELER:  March 6, 2017 is when this
12      case was filed.
13          MR. EPSTEIN:  No, that's not exactly
14      right.  The complaints were filed in May and in
15      June of 2017.
16          MR. WHEELER:  Let me rephrase it then.
17      March 6, 2017 -- let me actually check.
18          MR. EPSTEIN:  You can see it actually
19      predates the filing of the lawsuit so it's kind
20      of difficult question for her to be able to
21      answer if it has nothing to do with the
22      lawsuit.
23          MR. WHEELER:  Well, it's within the class
24      period.
25          MR. EPSTEIN:  It may be within the class

Page 9

3 (Pages 6 - 9)

1    period but there was no class, there was no
2    lawsuit.  There was no information that there
3    was going to be a class and the relevant time
4    period is really March -- or the relevant date
5    is March 27, 2019.  That's the date of the
6    class certification order.
7         But, you know, again, she'll kind of
8    struggle with that because basically these
9    people were prospective customers, existing
10   customers, you know, actual customers, people
11   they were arranging travel for, so they would
12   have had contact with them in any number of
13   different ways.
14        And in reality, I don't think you're
15   asking us for that.  You're not really asking
16   for what has been done in the context of
17   marketing their products or fulfilling the
18   services and products that they sell so ...
19        MR. WHEELER:  No, I mean, our position in
20   this case generally, which I think is correct,
21   is that you're more than welcome to sell these
22   people products and service their products.
23   You just can't talk about the lawsuit,
24   especially after we certified the class.
25        The only thing I wanted to cover my base

Page 10

1         Are you prepared to testify regarding
2    topics 1 through 12 withstanding your counsel's note
3    regarding the March 6, 2017 date being somewhat
4    arbitrary?
5         A.  Yes.
6         Q.  Thank you.
7              If you'd look at the next set -- next part
8    of that page 4 and continuing on for three pages.
9    There are 18 requests for production.
10            Do you know if all the documents that were
11   produced by your counsel prior to deposition are all
12   responsive documents to those requests?
13            MR. EPSTEIN:  They are responsive
14   non-privileged documents.  There are internal
15   communications, communications with counsel to
16   which a privilege is and will be asserted.
17            They are not being produced.  Other than
18   that, you pretty much have the full range of
19   everything that was documented.
20            MR. WHEELER:  Just because I have to ask
21   her because she's under oath.
22   BY MR. WHEELER:
23        Q.  Is what your counsel just said your
24   understanding of what was produced?
25        A.  Yes.

Page 12

1    on -- and I'll slow down -- by proposing that
2    date was -- there's an open question that I
3    don't know, which we'll find out in this
4    deposition, as to whether Royal Seas otherwise
5    had contact with class members prior to class
6    certification regarding this lawsuit.
7         I just don't know and that's what I'm
8    trying to make sure I assess out fully.
9         MR. EPSTEIN:  Which is exactly why the
10   March 6, 2017 date kind of befuddles us because
11   it's at least two months before any lawsuit was
12   filed.
13        I can tell you that -- let me find my
14   notated one.  The DeForest lawsuit was filed on
15   May 12, 2017 and McCurley was filed on June 7,
16   2017.  Maybe there was some digits that were
17   transposed, I don't know.
18        MR. WHEELER:  I'm not going to hold you to
19   that March 6, 2017 date.  I just want to know
20   what contact was made with regards to -- when I
21   ask the question, if there is a problem with
22   it, let's discuss it, is that better.
23        MR. EPSTEIN:  Yes.
24   BY MR. WHEELER:
25        Q.  Back on the topic.

Page 11

1         Q.  Thank you.
2              Following class certification, which
3    occurred on March 27, 2019, what contact has Royal
4    Seas had with class members regarding this
5    litigation?  If it's unclear what I mean by
6    regarding this litigation, let me know.
7         A.  Unclear.
8         Q.  Let me ask a more broad question just to
9    make sure I understand.
10            Does Royal Seas follow up with its clients
11   after they purchase cruise programs?
12        A.  Yes.
13        Q.  How often do you usually follow them?
14        A.  That's a pretty broad question also.
15   There's numerous reasons that we would follow up
16   with a customer.
17        Q.  What reasons would those be?
18        A.  To verify travel.  They could possibly
19   call into our customer service to have questions
20   about traveling, travel dates.  I mean, numerous
21   questions.
22        Q.  Do you also follow up to try and sell them
23   more cruises or what have you?
24        A.  Yes.
25        Q.  Excluding -- let's just focus on that.

Page 13

4 (Pages 10 - 13)

1      Do you regularly, as in a normal monthly
2  or yearly interval, call your current clients to
3  inquire about further cruises?
4      A.  Yes.
5      Q.  How often?
6      A.  It also depends on a lot of things.  If
7  they've traveled.  I mean, the date where they are
8  in their contract with us.  There's a lot of
9  different reasons.
10     Q.  Do you normally contact them prior to them
11 having travel if they've already purchased services
12 from you for the purposes of soliciting more
13 cruises?
14     A.  Yes.
15     Q.  Can you give me any kind of an estimate?
16 Can it be as quickly or as often as a month?  How
17 often are you contacting people again with regards
18 to cruises?
19     A.  It would be very difficult for me to
20 narrow it down.  I can't really say.
21     Q.  But either way, Royal Seas will continue
22 to communicate with its clients, correct?
23     A.  Correct.
24     Q.  How much time is there usually between the
25 purchase and actual travel date?

1      A.  It depends on the person as well.
2      Q.  I'm just trying to get an understanding as
3  to how often you actually are talking.
4      MR. EPSTEIN:  Again, I'll give you some
5  leeway here.  I understand that you're talking
6  about potential post class certification
7  communications which are normal and in the
8  ordinary course and which, as I understand it,
9  as we understand it, you're not -- you're not
10 arguing should not be occurring, that they're
11 allowed to contact their customers about
12 business things.
13     MR. WHEELER:  Of course.  That would be
14 absurd.
15 BY MR. WHEELER:
16     Q.  Following class certification, which
17 occurred on March 27, 2019, did Royal Seas contact
18 class members regarding this litigation?
19     A.  Yes.
20     Q.  How did they contact class members, what
21 method did they use?
22     A.  Can you, like, narrow it for me?
23     Q.  Phone, e-mail, letter?
24     A.  Phone.
25     Q.  So Royal Seas places calls to class

1  members, correct?
2      A.  To our clients.
3      Q.  When these calls are being -- let me just
4  start with this because I think this is helpful.
5      MR. EPSTEIN:  That's the script?
6      MR. WHEELER:  Yes.  I'm going to introduce
7  this as Exhibit 2.
8      (Thereupon, the referred-to document was
9  marked by the court reporter for Identification as
10 Plaintiff's Exhibit 2.)
11 BY MR. WHEELER:
12     Q.  Marked as Exhibit 2 is a document that was
13 produced this morning in response to our request for
14 production.
15     Have you seen this document before?
16     A.  Yes.
17     Q.  What is it?
18     A.  A script that we would use to contact our
19 customers.
20     Q.  If you look at this script, after the
21 first two paragraphs, it begins mentioning
22 diabeteshealth.info.
23     Do you see that?
24     A.  Yes.
25     Q.  Was this script specifically made to be

1  read or used to contact class members regarding that
2  website?
3      A.  It was specifically made to contact people
4  that opted in on diabeteshealth.
5      Q.  How did Royal Seas know if people had
6  opted in on diabeteshealth.info?
7      A.  Through our source that transferred those
8  calls, we received information on the websites that
9  they visited to opt in.  We collected the
10 information from any transfers that we had with
11 that -- with the opt in for that site.
12     Q.  Did you have a preexisting database of
13 that or did you have to reach out to those
14 individuals to get that information?
15     A.  What individuals?
16     Q.  The transfer partners?
17     A.  We have that information.
18     Q.  So you store it?
19     A.  Correct.
20     Q.  When was this script prepared?
21     A.  I don't remember the date.
22     Q.  Was it after March 27, 2019?
23     A.  I don't know.
24     Q.  When were the calls placed to individuals
25 using this script?

1    A.   Over several months.  July approximately.
2    Q.   July of last year?
3    A.   Correct.
4    Q.   Who drafted this script?
5    A.   My attorneys.
6    Q.   And by your attorneys, you mean your
7  outside counsel or in-house counsel?
8    A.   Collectively.
9    Q.   Do you know who decided that this script
10  needed to be made, as in was it a managerial
11  decision or do you know?
12   A.   No.
13   Q.   Do you know if there are any drafts of
14  this script?
15   A.   No.
16   Q.   Let me rephrase that question because that
17  was a bad question.
18        Were there any drafts of this script?
19   A.   I don't know.
20   Q.   How was this script actually used, with
21  respect to I mean how were these calls placed?
22   A.   One of my customer service agents used it
23  and contacted -- called the people.
24   Q.   I realize I forgot a really important
25  foundational question.

Page 18

1        What is your position at Royal Seas?
2    A.   Vice president.
3    Q.   Just vice president or vice president of
4  something?
5    A.   Vice president.
6    Q.   What's your job duties?
7    A.   I'm sorry?
8    Q.   What are your job duties?
9    A.   Gosh, mostly operational things,
10  everything from payroll, dealing with employees,
11  signing checks, pretty much everything, all of
12  operations.
13   Q.   With regards to operations, does that
14  include the call center?
15   A.   Yes.
16   Q.   And is the call center both fielding
17  telemarketing inquiries and handling customer
18  service?
19   A.   I don't understand your question.
20        MR. EPSTEIN:  Object to the form of that
21  question.
22        MR. WHEELER:  I'll rephrase.
23  BY MR. WHEELER:
24   Q.   With regards to the call center, let just
25  ask it open ended, what does the call center do?

Page 19

1    A.   Customer service.
2    Q.   Are you also fielding inbound calls with
3  regards to people potentially buying cruises?
4    A.   In our corporate center?  We have outside
5  call centers as well, so you have to tell me
6  specifically what you mean.
7    Q.   Let's go with the corporate center.  Are
8  they fielding these inbound calls?
9    A.   For the purpose of sales?
10   Q.   Yes.
11   A.   No.
12   Q.   They're just handling customer service?
13   A.   Correct.
14   Q.   Do you oversee both the outside call
15  centers and the corporate call center?
16   A.   Like, I'm not actually in any of the
17  outside call centers.  If they have issues or
18  questions, they will call me for something but they
19  have their own individual owners.
20   Q.   With regards to the representative who
21  placed these calls, were they in the corporate call
22  center?
23   A.   Yes.
24   Q.   Was it just one representative?
25   A.   Yes.

Page 20

1    Q.   How many calls did they place?
2    A.   I don't know.  I know we pulled quite a
3  few.  I believe 560 or so.
4    Q.   I'll check my math.
5    A.   Okay.
6    Q.   I'm not going to introduce it currently --
7  well, yeah, why not.  Let's introduce this.
8        (Thereupon, the referred-to document was
9  marked by the court reporter for Identification as
10  Plaintiff's Exhibit 3.)
11  BY MR. WHEELER:
12   Q.   Marked as Exhibit 3 is another document
13  that was produced this morning in response to a
14  request for production.
15        Have you seen this document before?
16   A.   Yes.
17   Q.   What is it?
18   A.   List of calls that -- the list of clients
19  for her to call.
20   Q.   So there are around 500 or so entries in
21  this list.  It's about 32 per page.
22   A.   Correct.
23   Q.   This is a list of every person she called
24  for the purpose of using this script that's Exhibit
25  2?

Page 21

6 (Pages 18 - 21)

1    A.  Attempted to call, yes.
2    Q.  And by attempted, you mean she called them
3  and they may not have picked up?
4    A.  Correct.
5    Q.  How was it determined that this would be
6  the list of people that would be called?
7    A.  We pulled the transfers that had that
8  specific opt in and of those, we took the people
9  that had sales with us.
10    Q.  So this is actually a list of all the
11  people who were transferred from diabeteshealth.info
12  to whom a sale was actually made?
13    A.  Correct.
14    Q.  If a call was not successful with regards
15  to reaching the person, would the call
16  representative call again?
17    A.  I'm not sure of everyone.
18    Q.  What were her general instructions with
19  regards to contacting these people?
20    A.  To contact them and read the script that
21  we provided.
22    Q.  And there was no how many times she did
23  call.  Would she leave a voice mail?
24    A.  No.
25    Q.  So she would have just done whatever -- we

Page 22

1    What I'm a going to look at now is this
2  document and introduce it as Exhibit 4.
3    (Thereupon, the referred-to document was
4  marked by the court reporter for Identification as
5  Plaintiff's Exhibit 4.)
6  BY MR. WHEELER:
7    Q.  Marked as Exhibit 4 is another set of
8  documents that was produced this morning in response
9  to our request for production.
10    Have you seen this before?
11    A.  Yes.
12    Q.  What is it?
13    A.  Screenshots of the customers that our
14  representative made contact with.
15    Q.  So if she made contact with them -- let me
16  start with a more basic question.
17    So is DevDex the system by which you're
18  recording the results of any contact or attempted
19  contact?
20    A.  Yes.
21    Q.  Is this automated?
22    A.  I don't know what that means.
23    Q.  Does a computer automatically generate
24  these entries or does your agent enter in what the
25  result of the call is?

Page 24

1  don't know for certain?
2    A.  Correct.
3    Q.  It may have been different or it may have
4  been the same between different people?
5    A.  Correct.
6    Q.  The only requirement was that she call
7  these people and if she'd contact them, she'd read
8  this script that's Exhibit 2?
9    A.  Correct.
10    Q.  Was she supposed to record -- I'll use the
11  term disposition -- the disposition of the calls?
12    A.  I don't know what you mean.
13    Q.  Was she supposed to record whether she
14  reached them or not?
15    A.  We have a CRM that she would make notes
16  into.
17    MR. EPSTEIN:  I got something?
18    MR. WHEELER:  You have it on digital for
19  me?
20    MR. EPSTEIN:  These are all of the
21  recordings.
22    MR. PETTE:  Those are all of the
23  recordings of the individuals that she, the
24  agent, spoke to.
25    MR. WHEELER:  Thank you.

Page 23

1    A.  The agent entered her notes.
2    Q.  Looking at these -- let's just start with
3  the first page.  The second entry says "COMP 12 MNTH
4  EXT.
5    What does that mean?
6    A.  That she gave them a 12-month extension to
7  travel.
8    Q.  This is just background for me.
9    When people purchase cruises from Royal
10  Seas, are they for a specific date or a voucher?
11    A.  They have 18 months to use their package,
12  to travel on their package once they purchase it.
13    Q.  So they'll call up and figure out a date
14  if there's availability to actually do it; is that
15  right?
16    A.  Correct.
17    Q.  And if the 18 months runs out, they can
18  get an extension, correct?
19    A.  Correct.
20    Q.  Is an extension always given out?
21    A.  No.
22    Q.  Why might an extension be given?
23    A.  Why would an extension be given?
24    Q.  Yes.
25    A.  Say you have someone in the military and

Page 25

7 (Pages 22 - 25)

1 they're being deployed overseas, so then they are
2 not going to be available in the 18-month period, we
3 would give them an extension. They have a health
4 issue maybe and they need more time. Many reasons
5 that we give them.
6     Q. Why wouldn't an extension be given?
7     A. If they just didn't -- they just ran out
8 of time for no reason, just didn't travel, forgot
9 about it, whatever the case.
10    Q. So it's sort of discretionary?
11    A. Correct.
12    Q. Looking at the first entry here or first
13 page, how can we tell that this script was called
14 and used with this person? Is there a way to tell
15 from this page?
16    A. That the script was used, no.
17    Q. That the person was called for the purpose
18 of reading the script?
19    A. No.
20    Q. Why was this person produced, this
21 individual person's notes produced?
22    A. Because she contacted them based on the
23 list that we gave her.
24    Q. When calling -- let me start with this.
25        Does Royal Seas call clients if they

Page 26

1 haven't traveled by the time their cruise package is
2 going to expire?
3     A. Say it one more time.
4     Q. Sure. Does Royal Seas always call people
5 when their cruise package is about to expire?
6     A. Typically, yes.
7     Q. With regards to this script, was she
8 instructed to give extensions to people who asked
9 for them when she read them this script?
10    A. No.
11    Q. Was it communicated that clients of Royal
12 Seas for whom this script was used should be given
13 some sort of preference?
14    A. Preference?
15    Q. For this extension?
16    A. No.
17    Q. Looking at this first page, I see that
18 there was a call -- it just says on September 23,
19 2019, that entry that said COMP 12 MNTH EXT, right?
20        Does that entry reflect a call?
21    A. She would need to speak with them in order
22 to give them an extension so, yes.
23    Q. Do you know if that entry corresponds to
24 this script being read?
25    A. Not offhand.

Page 27

1     MR. WHEELER: I don't actually want to
2 know specifically what was redacted.
3        What kind of information was being
4 redacted from these sheets?
5     MR. EPSTEIN: Basically prior. These are
6 existing customers, so if it dealt with
7 anything regarding their existing travel
8 package, booking arrangements. There's some
9 that it's more extensive. Some that you will
10 see no other ones means that there was no other
11 activity. So it's basically anything prior
12 that relates to the actual customer
13 relationship.
14    MR. WHEELER: To the extent there was any
15 contact following March 2017, 2019, would
16 that --
17    MR. EPSTEIN: It should be reflected here.
18    MR. WHEELER: It should not have been
19 redacted?
20    MR. EPSTEIN: Well, if it related to them
21 booking a cruise, I would say yes, it would
22 have been redacted, but I don't know that there
23 was in truth much or any of that.
24        The purpose of the redaction was to
25 isolate the calls that were placed off of the

Page 28

1 list that is Exhibit Number 3 and provide the
2 CRM notes that relate to those calls and to
3 exclude the normal customer relationship kind
4 of contact.
5        In some of these, it was fairly extensive.
6 It just didn't necessarily show on the way the
7 scroll bar was.
8     MR. WHEELER: Got it.
9     MR. EPSTEIN: But if you look at the
10 fourth page, I believe it's the fourth page,
11 yeah, the fourth page, you'll see there's
12 nothing else there. That means that person,
13 after the purchase, there was no further
14 contact.
15    MR. WHEELER: Okay, great.
16    MR. EPSTEIN: The third page, you can see
17 there was fairly extensive contact and, in
18 fact, I remember this one in particular, it
19 goes down quite a bit. These people traveled.
20 I think they upgraded. They did a lot of stuff
21 so that's all we did.
22        Nothing sinistry. You have what was
23 related to the calls that were made off the
24 list that's Exhibit 3.
25 BY MR. WHEELER:

Page 29

8 (Pages 26 - 29)

1    Q.  So looking through this -- let me ask it
2  more generally.
3        When did that call service representative
4  start actually making these calls?
5    A.  I don't remember the exact date.  It was
6  July and it was for several months, obviously to get
7  through the list.
8    Q.  Like July to October; is that right?
9    A.  Further than that, actually.
10    Q.  If you turn to -- I really wish this was
11  Bates stamped.  It's the Roy Lloyd page.  I think
12  it's the sixth page.
13        If you see there, his second entry says
14  "Spoke with Miss Lloyd and she agreed to sign
15  affidavit 12 MNTH EXT."
16        Do you see that?
17    A.  Yes.
18    Q.  What does that entry reflect?
19    A.  I don't understand your question.
20    Q.  I have a guess as to what it reflects with
21  regards to what's written there.  I'm just trying to
22  make sure that's right.  So I can tell you what I
23  think it says.
24        Does this say that Miss Lloyd in response
25  to this call for the script agreed to sign an

Page 30

1  affidavit and also a 12-month extension was given to
2  her for the use of a cruise?
3    A.  Yes.
4    Q.  And again, as we see here, without the
5  actual use of the word affidavit which -- strike
6  that.
7        Let me ask it this way.  Has Royal Seas
8  ever called in the relevant time period, which I'm
9  going to say is from 2017 on, their clients for the
10  purposes of gathering affidavits besides via this
11  script?
12    A.  No.
13    Q.  So if it says "affidavit," we know it was
14  because they were being called using this script
15  asking for them to sign an affidavit, correct?
16    A.  I would assume.
17    Q.  I don't think clients normally just
18  volunteer to give you affidavits, I hope so -- okay.
19        With regards to -- let me strike that.
20  Let me ask a broader question because I don't want
21  to leaf through this right now.
22        How many people responded to this script
23  and said they would sign affidavits?
24    A.  Six.
25    Q.  How many actually did sign affidavits?

Page 31

1    A.  I believe four.
2    Q.  I'm just trying to avoid to have to look
3  through this packet right now.
4        What other kinds of response were received
5  in response to the script from your clients?
6    A.  That she spoke with?
7    Q.  Yes.
8    A.  That they didn't remember.
9    Q.  Do you know -- and I may eventually find
10  out.
11        Do you know if anyone responded that they
12  did not recall entering their information on
13  diabeteshealth.info?
14    A.  I don't recall.
15    Q.  Do you know if anyone explicitly stated
16  they did not enter the information on
17  diabeteshealth.info?
18    A.  Not that I'm aware of.
19    Q.  I'm not going to go and listen to them
20  right now.  With regard to these recordings that
21  were produced, is that recordings of every
22  conversation that actually occurred with a client
23  using this script?
24    A.  Yes.
25    Q.  How do you know that that's a full and

Page 32

1  complete set of that -- of those calls?
2    A.  Based on what the representative told me,
3  what she put in her notes.
4    Q.  So again, is there a way to know whether a
5  call in this CRM database was for or rather using
6  this script?
7    A.  I don't understand your question.
8    Q.  Let me rephrase it.  With regards to
9  producing these recordings, was that by looking at
10  who on this list -- and by this list, I mean Exhibit
11  3 -- who on this exhibit list responded to or has a
12  customer service entry following, say, July of 2019,
13  is that how it was determined whether there was a
14  response or not?
15    A.  Say it one more time.
16    Q.  Sure.
17        MR. EPSTEIN:  I don't want to preempt her
18  but Geoff -- we talked about this.  I believe
19  it was done the other way around, just to make
20  clear for your questions.
21        There was 500 and however many other
22  people.  I believe there was 25 that she
23  actually spoke to.  She spoke to 25.
24        MR. PETTE:  I think it was 23, I believe.
25        MR. EPSTEIN:  23, whatever.  That's what

Page 33

9 (Pages 30 - 33)

1    that is, so we reversed it.  We identified the
2    people that she actually spoke to and then
3    provided the CRM notes for them, as opposed to
4    doing it the other way around.
5        Because the rest of the people, she didn't
6    speak to anybody.  They were all no answers or
7    whatever, so of all the people that she called,
8    and we're not sure exactly how many she did
9    call, but there's no records of those.  Those
10   are just people that she didn't connect with.
11   So the people she actually spoke to, we were
12   able to identify and we pulled the CRM notes,
13   right?
14       MR. PETTE:  Correct.  And to clarify,
15   there's, I believe, 30 recordings because some
16   had multiple communications, so that's why
17   there will be more calls than CRM screenshots.
18   Maybe that will help you out.
19       MR. EPSTEIN:  Again, I'm trying to work
20   through it.  I wasn't trying to preempt her but
21   it's simpler than it appears.
22       MR. WHEELER:  That's helpful.  I'm going
23   to ask her some point questions.
24       MR. EPSTEIN:  Of course.
25 BY MR. WHEELER:

*Page 34*

1    Q.  So for this call service representative,
2    was her job solely to call these people for a month
3    or two and try to reach them?
4    A.  No, she has other duties as well.
5    Q.  Just because I have to know, what is her
6    name?
7    A.  Dionne.
8        MR. EPSTEIN:  Her name is right there.
9 BY MR. WHEELER:
10   Q.  Dionne Mattingly?
11   A.  Yes.
12   Q.  What is her position?
13   A.  Customer service agent.
14   Q.  How long has she been with the company?
15   A.  Since the beginning, since March of '16.
16   Q.  By beginning, you mean the beginning of
17   this litigation?
18   A.  The beginning of our company.
19   Q.  When did your company begin?
20   A.  March of 2016.
21   Q.  Is there a specific reason she was chosen
22   to place these calls?
23   A.  She's one of our save team agents so she's
24   used to -- she's been with us a long time.  She's
25   very versed in all of our customer service needs.

*Page 36*

1    Q.  How many people were actually reached for
2    the purposes of reading this script?
3    A.  23.
4    Q.  And of those 23, six responded they would
5    sign an affidavit?
6    A.  Yes.
7    Q.  Of those 6, only three actually did?
8    A.  Correct.
9    Q.  For these call recordings we have, those
10   reflect the 23 -- the calls to the 23 individuals
11   either that could use this script or followed up on
12   this script, correct?
13   A.  Correct.
14   Q.  So you don't actually know if the call
15   service representative called all the people in
16   Exhibit 3, the 500 or so?
17   A.  That is my understanding.
18   Q.  It's your understanding that -- it's your
19   understanding she did or didn't?
20   A.  That she attempted to contact them.
21   Q.  Does she still work for the company?
22   A.  Yes.
23   Q.  Was she doing anything else when she was
24   placing these calls?
25   A.  She didn't tell me.

*Page 35*

1    Q.  What is the save team?
2    A.  Particularly difficult clients, she would
3    handle them.
4    Q.  Try and save the relationship?
5    A.  Correct.
6    Q.  So she's a very good customer service
7    representative?
8    A.  Correct.
9    Q.  You should show her that in your
10   testimony.  She'd appreciate that, I'm sure.
11       Once a person had responded that they
12   would be willing to sign an affidavit, what would
13   happen to that information?  I can clarify.
14   A.  Okay.
15   Q.  What's the next thing Royal Seas would do
16   after a customer responded they would sign the
17   affidavit in response to the script?
18   A.  We send it to them.
19   Q.  Who sends it?
20   A.  Our customer service agent or her manager.
21   Q.  So Dionne or manager?  Yes?
22   A.  Yes.  Sorry.
23   Q.  With regards to the affidavit -- let's
24   introduce one just so we have it.  Exhibit 5.
25       MR. PETTE:  You want to go off and I'll

*Page 37*

1    explain what these documents are?
2        MR. WHEELER:  I'm fine with that.  Let me
3    introduce this and then we'll go off.
4        (Thereupon, the referred-to document was
5    marked by the court reporter for Identification as
6    Plaintiff's Exhibit 5.)
7    BY MR. WHEELER:
8        Q.  So introduced as Exhibit 5 is an affidavit
9    that appears to be signed by Cecelia Hetchler after
10   that editorializing.
11       What is this?
12       A.  I'm sorry?
13       Q.  What is this document?
14       A.  A document that we sent to Cecelia
15   Hetchler.
16       MR. WHEELER:  Let's go off the record for
17   a second.
18       (Short discussion off the record.)
19   BY MR. WHEELER:
20       Q.  So off the record, we discussed briefly
21   this document produced so I can hopefully ask better
22   questions.
23       Let me start with this.  Did Royal Seas
24   use two different websites to send these affidavits
25   to the individuals who said they would sign them?

Page 38

1        A.  I don't know.
2        Q.  With regards to this one for Miss
3    Hetchler, let's turn to the second page -- so
4    looking at this page, this document was sent to Miss
5    Hetchler on October 2, 2019, correct?
6        A.  Correct.
7        Q.  And customerservice@royalseas.com, is that
8    just the generic intake box for your customer
9    service?
10       A.  Correct.
11       Q.  Based off this, you can see that on
12   October 18, 2019, Miss Hetchler signed, correct?
13       A.  Correct.
14       Q.  I wanted to quickly look and see if I can
15   find the CRM notes.
16       Cecelia Hetchler, so on the top left of
17   her page, it says Cecelia Hetchler, have you found
18   it?
19       A.  Yes.
20       Q.  So looking at this CRM entry from Exhibit
21   4, we see that there's an initial contact with
22   regards to this on October 2, 2019.
23       Do you see that?
24       A.  Yes.
25       Q.  It says 12-month extension, correct?

Page 40

1        A.  Yes.
2        Q.  Why was it two different websites?
3        A.  Cost.
4        Q.  What was cost consideration?
5        A.  They had a limited number that they could
6    get without getting charged.
7        Q.  Got it.  Back to this affidavit.  Who
8    drafted this affidavit?
9        A.  My attorneys.
10       Q.  With regards to the underlying spaces, why
11   is certain information on here blank?
12       A.  Those are blank for them to fill in for
13   the specific customer.
14       Q.  Who filled those in?
15       A.  I don't know.
16       Q.  So you don't know if it was you -- you
17   don't know if it was Royal Seas or Ms. Hetchler who
18   filled those in?
19       A.  Correct.
20       Q.  But these blanks existed in the original
21   form affidavits which were to be sent to these
22   clients, correct?
23       A.  Correct.
24       Q.  Do you know if any clients who received
25   these affidavits called back to discuss the form?

Page 39

1        A.  Yes.
2        Q.  Or it's the notes that reflect a 12-month
3    extension was given, correct?
4        A.  Yes.
5        Q.  If you look up, there's an e-mail address.
6        Is this -- well, let me ask this more
7    generally -- does Royal Seas -- did Miss Hetchler
8    give that e-mail address to be sent this affidavit?
9        A.  I would assume.  I don't know.  I would
10   assume.
11       Q.  I can listen to the call recording
12   probably, right?
13       A.  Okay.
14       Q.  On the next entry, it says "sent
15   affidavit."
16       Do you see that?
17       A.  Yes.
18       Q.  It says Tara Marciales, do you see that?
19       A.  Yes.
20       Q.  Is that the supervisor of Miss Mattingly?
21       A.  Yes.
22       Q.  So this reflects that Ms. Marciales sent
23   the affidavit, correct?
24       A.  Correct.
25       Q.  And then there's a follow-up on

Page 41

11 (Pages 38 - 41)

1  October 3rd.
2      Do you see that?
3      A.  Yes.
4      Q.  And a follow-up on October 18th.
5      Do you see that?
6      A.  Yes.
7      Q.  It's not reflected in here but based off
8  the affidavit we have, she did end up completing it
9  on October 18th, correct?
10     A.  Correct.
11     Q.  Was Ms. Mattingly instructed to follow up
12  with the six people who said they would sign
13  affidavits if they had not signed them yet?
14     A.  I don't personally know.
15     Q.  Do you know -- strike that.
16         This is kind of a weird question.  Why
17  don't you personally know?
18     A.  She has a manager.  Her manager would have
19  instructed her.
20     Q.  So her manager may or may not have told
21  her to do that, we don't know?
22     A.  Correct.
23         MR. WHEELER:  Mark this as Exhibit 6.
24
25
                                    Page 42

1      (Thereupon, the referred-to document was
2  marked by the court reporter for Identification as
3  Plaintiff's Exhibit 6.)
4  BY MR. WHEELER:
5      Q.  Marked as Exhibit 6 is a document that was
6  produced by defendant entitled "Defendant Royal
7  Sales Cruises, Inc.'s Second Supplemental
8  Disclosure" and it was sent to our office on
9  January 17, 2019.
10     Have you seen this before?
11     A.  No.
12     Q.  Turn to the second page where it says
13  "Witnesses."
14     Do you see that?
15     A.  Yes.
16     Q.  So under "Witnesses," it identifies three
17  under A, B and C; Gary Little, David Calderon and
18  Dan Geiger.
19     Do you see that?
20     A.  Yes.
21     Q.  You can look and confirm that attached to
22  this disclosure are those three affidavits that are
23  signed, okay?  Why don't you just check to make
24  sure.
25     A.  Okay.
                                    Page 43

1      Q.  In reality, Royal Seas actually contacted
2  and got affidavits from four people, correct?
3      A.  Correct.
4      Q.  Cecelia Hetchler was also contacted and
5  signed an affidavit, correct?
6      A.  Correct.
7      Q.  Once a signed affidavit was received, what
8  happened to it internally?
9      A.  I don't know.
10     Q.  You don't know who it was sent to?
11     A.  No.
12     Q.  But the customer service at Royal Seas
13  account, who controls that account?
14     A.  IT department.
15     Q.  Who has access to it?
16     A.  Tara.
17     Q.  That's the supervisor, right?
18     A.  Right.
19     Q.  Does Miss Mattingly also have access to
20  it?
21     A.  I don't believe so.  I'm not sure.
22     Q.  Do you know if there was any process or
23  procedure put in place with regards to what would
24  happen to these affidavits once they were signed?
25     A.  I'm sure -- no, I don't know what the
                                    Page 44

1  procedure was.
2      Q.  But as of October -- actually, that's
3  wrong.
4      As of October 18th, you would have been --
5  by you, I mean Royal Seas would have been in
6  possession of this affidavit, correct?
7      A.  Correct.
8      Q.  I'm going to use this document to make my
9  life easier.  Look at the back again.
10     A.  Which document is that?
11     Q.  The supplemental disclosure, the most
12  recent one.
13     If you look at the back of it, there's A,
14  B and C exhibits.
15     Exhibit A appears to be an affidavit
16  signed by Gary Little.
17     Do you see that?
18     A.  Yes.
19     Q.  If you turn the page, there's the
20  HelloSign tracking page, correct?
21     Do you see that?
22     A.  Yes.
23     Q.  So does this also reflect that on
24  August 13th, Mr. Little was sent this affidavit and
25  he signed on or about August 17, 2019, correct?
                                    Page 45

12 (Pages 42 - 45)

Page 46

```
 1      A.  Correct.
 2      Q.  So as of August 17, 2019, Royal Seas would
 3  have been in possession of this document, correct?
 4      A.  Correct.
 5      Q.  Just to close the loop, turn back a page
 6  to the actual document.
 7          On this one, the name, the date and the
 8  phone number are underlined, but the word "have" is
 9  bold.
10          Do you know why it's bold?
11      A.  No.
12      Q.  But that is information which was blank in
13  the original affidavit which was to be used,
14  correct?
15      A.  I'm not sure.
16      Q.  If you look here, it says "Dated the 7th
17  day of August," correct?
18      A.  Yes.
19      Q.  If you turn to the next page, it says
20  "Sent August 13, 2019."
21          Do you know why those two dates don't
22  match?
23      A.  No.
24      Q.  Turn to Exhibit B.  This is going to be
25  repetitive.
```

Page 47

```
 1          Just to confirm again, there are various
 2  fields underlined on this first page of this
 3  affidavit.  You don't know who filled out those
 4  entries, correct?
 5      A.  Correct.
 6      Q.  But this appears to be an affidavit signed
 7  by Mr. David Calderon, correct?
 8      A.  Correct.
 9      Q.  Turn the page.
10          And it was sent on October 2, 2019,
11  correct?
12      A.  Correct.
13      Q.  And signed on -- it looks like October 4th
14  after midnight.
15          Do you see that?
16      A.  Yes.
17      Q.  But either way, by October 4th, Eastern
18  Standard Time at least, you would have been in
19  possession of this document, correct?
20      A.  Yes.
21      Q.  Turn to Exhibit C.  On this one, the "have
22  not" is not underlined.
23          Do you know why it's not underlined?
24      A.  No.
25      Q.  But otherwise, to your knowledge, the
```

Page 48

```
 1  underlined fields were fields that were entered,
 2  correct?
 3      A.  Correct.
 4      Q.  I will also represent to you -- I actually
 5  think they're highlighted on this one, you can kind
 6  of see it a little bit, correct?  It's very, very
 7  light.
 8      A.  Okay.
 9      Q.  Do you know why they were highlighted?
10      A.  No.
11      Q.  Turn the page.
12          So this was sent using SignNow, correct?
13      A.  Correct.
14      Q.  Based off that, it appears that it was
15  sent October 3, 2019, correct?
16      A.  Correct.
17      Q.  And it was signed October 4, 2019,
18  correct?
19      A.  Correct.
20      Q.  So Royal Seas was in possession of this
21  document as of October 4, 2019, correct?
22      A.  Correct.
23      Q.  Just to close the loop on this, besides
24  this script which is Exhibit 2, Royal Seas has not
25  otherwise contacted its clients with regard to this
```

Page 49

```
 1  litigation specifically, correct?
 2      A.  Correct.
 3      Q.  And the only time this script was used --
 4  this is a little repetitive.  I just want to make
 5  sure I'm right -- was from around July until around
 6  November of 2019, correct?
 7      A.  Correct.
 8      Q.  Let's take a break for a minute.
 9          (Short recess taken.)
10  BY MR. WHEELER:
11      Q.  Let's look at the script, which is Exhibit
12  2.  I'm going to ask a more broad question first.
13          You see the first two paragraphs and the
14  last paragraph after "ending the call"?
15      A.  Yes.
16      Q.  Are those portions of the script pretty
17  standard in the calls you place to your clients for
18  other purposes too?
19      A.  In some instances, yes.
20      Q.  Because Royal Seas often calls its clients
21  to inquire whether they've traveled or not and how
22  they enjoyed their experience, correct?
23      A.  Correct.
24      Q.  And they also ask if the client would be
25  interested in purchasing another cruise, correct?
```

13 (Pages 46 - 49)

1    A.   Correct.
2    Q.   Looking at the portion beginning with "In
3  reviewing your information" and continuing on to
4  just about "ending your call," this portion was
5  drafted by your attorneys, correct?
6    A.   Correct.
7    Q.   So you have no independent knowledge from
8  whatever your attorneys did with regards to how this
9  was created or phrased, correct?
10   A.   Correct.
11   Q.   If you look at the -- I'm just going to
12 read it, I guess.  That's probably the easiest way.
13      It says, "In reviewing your information,
14 we show you visited diabeteshealth.info and provided
15 your information so that Royal Seas could contact
16 you at (phone number) regarding a complimentary
17 cruise promotion."
18      Did I read that correct?
19   A.   Yes.
20   Q.   And then you ask is that correct.
21      It then says if person responds yes, the
22 representative is asked to -- so the script says
23 that if the person responds yes, the representative
24 is to ask, "Would you be kind enough to complete a
25 brief survey, basically saying that you went to

Page 50

1  attorneys did or they told you.  I just want to know
2  if you have any independent knowledge and the answer
3  is probably no, so that's fine.  If there's an
4  issue, obviously Richard will object.
5      MR. EPSTEIN:  You've asked and answered
6   your own question.
7      MR. WHEELER:  I'm fine with that.  That's
8   fine.
9  BY MR. WHEELER:
10   Q.   So the next thing says, "If yes, great,
11 the address we have is blank and we show your e-mail
12 address as blank?  Would you prefer us to e-mail or
13 mail this document to you?"
14      Do you see that?
15   A.   Yes.
16   Q.   Did you actually physically mail any of
17 these to anyone?  And by these, I mean these
18 affidavits.
19   A.   No.
20   Q.   In response to this script, the document
21 that was sent was the affidavits of the form you
22 were looking at previously, correct?
23   A.   Correct.
24   Q.   There's no other document that was sent to
25 these people, correct, in response to this script?

Page 52

1  diabeteshealth.info website and requested more
2  information about Royal Seas complimentary cruise
3  promotion."
4      Do you see that?
5    A.   Yes.
6    Q.   In this script, it nowhere describes there
7  is a pending lawsuit against Royal Seas, correct?
8    A.   Correct.
9    Q.   In this script, it does not describe that
10 a class has been certified for which the person
11 who's being called is a member, correct?
12   A.   Correct.
13   Q.   In this script, it doesn't even mention
14 what an affidavit is, does it?
15   A.   Correct.
16   Q.   And it doesn't advise the person who's
17 being called that the affidavit will be used by --
18 will potentially be used by Royal Seas in this
19 litigation, correct?
20   A.   Correct.
21   Q.   Do you know why it was decided that this
22 affidavit will be referred to as a brief survey?
23   A.   No.
24   Q.   It's most likely attorney.  I mean, we've
25 basically covered -- I don't want to know what your

Page 51

1    A.   Correct.
2    Q.   So there's no other survey, right?
3    A.   Correct.
4    Q.   And there's no letter with the affidavits,
5  correct?
6    A.   Correct.
7    Q.   And there's no e-mails besides an e-mail,
8  perhaps, from these document-signing companies that
9  went with them, correct?
10   A.   Correct.
11   Q.   I don't know the answer to this.
12 Hopefully you do.  I'm going to give you an example.
13      When you use DocuSign, it will send an
14 e-mail to the person stating Hey, Tom wants you to
15 sign this document, click this link to sign it.
16      Do you know what e-mail was actually sent
17 to the people who received contact from either
18 SignNow or HelloSign?
19   A.   No.
20   Q.   Do you know if a specific e-mail form that
21 would be used was ever drafted to be sent?
22   A.   No.
23   Q.   If you look at the next paragraph, which
24 begins with, "If no, try to rephrase the question."
25 I'll probably find out when I actually get to listen

Page 53

14 (Pages 50 - 53)

1 to this and by this, I mean the recordings in a
2 minute.
3          Are these just suggestions of various ways
4 Ms. Mattingly could rephrase the question or was she
5 supposed to go through all of these specifically?
6     A.   To use these specifically.
7     Q.   So she was supposed to work through one
8 after another, isn't it possible, and then if you
9 are unsure and then keep going; is that right?
10    A.   Correct.
11    Q.   Is Ms. Mattingly a lawyer?
12    A.   No.
13    Q.   Do you know if Ms. Mattingly was told that
14 she could go off script at all?
15    A.   No.
16    Q.   Ms. Mattingly was supposed to follow the
17 scripts exactly, correct?
18    A.   Correct.
19    Q.   Do you know if you ever heard back from
20 the two people you sent affidavits to who did not
21 sign them with regards to signing the affidavits?
22    A.   I don't know.
23    Q.   Did anyone who was sent an affidavit call
24 in response to ask specifically what the document
25 was?

Page 54

1     A.   Yes.
2     Q.   How do you know that?
3     A.   We provided it to you.
4     Q.   Do you know if at the time, they listened
5 to the calls?
6     A.   No.
7     Q.   When you said yes, you meant just because
8 it was previous to this litigation right now, so
9 obviously they listened to it before giving it to
10 me?
11    A.   Correct.
12    Q.   Thank you for clarifying it for me.
13         You mentioned the calls began being placed
14 around July of 2019.
15         Do you know when there were -- let me just
16 ask this.
17         When was there originally discussions
18 about making these calls in the first place?
19    A.   I don't remember.
20    Q.   Was it around the same time in July?
21    A.   No, it would have been before that.
22    Q.   Do you have an estimate of how long before
23 that, a few months?
24    A.   I don't remember.
25    Q.   The same year, at least?

Page 56

1     A.   I don't know.
2     Q.   But the recordings will reflect that, fair
3 enough?
4     A.   Okay.
5     Q.   Do you know if defendant's lawyers
6 listened in on any of Miss Mattingly's calls?
7     A.   Say it one more time.
8     Q.   Do you know if Royal Seas' lawyers -- let
9 me strike that.  Let me start with this.
10         Is it possible to monitor an active call
11 using Royal Seas, whatever they use for calling?
12    A.   Yes.
13    Q.   Do you know if Royal Seas' attorneys ever
14 monitored any of the calls placed by Miss Mattingly?
15    A.   No.
16    Q.   I'm going to rephrase it because I asked a
17 poor question.
18         Did Royal Seas' lawyers ever monitor a
19 call placed by Miss Mattingly with regards to the
20 script?
21    A.   No.  A live call?
22    Q.   Yes.
23    A.   No.
24    Q.   Did Royal Seas' lawyers ever listen to a
25 recording of a call placed by Miss Mattingly?

Page 55

1     A.   I don't remember.
2     Q.   But either way, the calls did not begin
3 until 2019, correct?
4     A.   Correct.
5         MR. WHEELER:  Off the record for a second.
6         (Short recess taken.)
7 BY MR. WHEELER:
8     Q.   Back on the record.  You understand you're
9 still under oath, correct?
10    A.   Correct.
11    Q.   Does Ms. Mattingly have the ability to
12 give extensions whenever she wants?
13    A.   Yes.
14    Q.   Is there any limitation on when she can
15 choose to give an extension?
16    A.   No.
17    Q.   If she gives out too many, will she be
18 talked to about it?
19    A.   No.
20    Q.   So it's purely discretionary?
21    A.   Correct.
22    Q.   What was Miss Mattingly told about the
23 purpose of this script that she was supposed to
24 read?
25    A.   Nothing other than to call the customers

Page 57

15 (Pages 54 - 57)

1  and read the script, give the information to send
2  out the document to them.
3      Q.  She wasn't told what or it wasn't to be
4  used for?
5      A.  No.
6      Q.  Was she told it was important?
7      A.  I mean, everything she does in her job is
8  important.
9      Q.  She was just told she was to do this?
10     A.  Correct.
11     Q.  When an extension is given to a customer,
12  how is it reflected in the CRM database?
13     A.  Exactly as you saw in the notes.
14     Q.  The 12-month extension?
15     A.  Correct.
16     Q.  Just looking at the CRM database, there's
17  three other tabs which we can't see, will those tabs
18  reflect when the cruise actually would normally
19  expire?
20     A.  No.  It's on upon the sale date.
21     Q.  So my question just is, how do you know
22  when their cruise expired?
23     A.  From the sale date.
24     Q.  And the sale date is reflected -- where is
25  it reflected?  Even if I can't see it.

*Page 58*

1      A.  The number next to his name.  So the
2  BZ081617, that was sold on August 16, 2017.
3          MR. EPSTEIN:  We're looking at the first
4      page.
5          MR. WHEELER:  Of exhibit?
6          MR. EPSTEIN:  4.
7  BY MR. WHEELER:
8      Q.  Is everyone 18 months to use?
9      A.  Correct.
10     Q.  Does Royal Seas send any correspondence to
11  its customers after it grants them an extension?
12     A.  As far as?
13     Q.  E-mails, letters confirming extensions?
14     A.  Not usually.
15     Q.  If you did you send the correspondence,
16  any correspondence, would it be reflected in this
17  CRM information?
18     A.  Should be.
19     Q.  Does Royal Seas send letters to its
20  customers?
21     A.  Yes.
22     Q.  I imagine -- let me rephrase this.  One of
23  those letters is probably marketing, correct, one
24  type of letter?
25     A.  I'm sorry?

*Page 59*

1      Q.  Let me just ask you actually.
2          What kind of letters does Royal Seas send
3  to its customer?
4      A.  Letters confirming their sales, letters
5  regarding an itinerary.  There's numerous.
6      Q.  And Royal Seas also sends e-mails to its
7  clients?
8      A.  Correct.
9      Q.  Same purposes?
10     A.  Correct.
11     Q.  And those e-mails would not be reflected
12  in this CRM database, correct?
13     A.  It would depend.  I mean, it may.  It may
14  not.
15     Q.  But otherwise, if there is a 12-month
16  extension, CRM note, that would be honored?
17     A.  Correct.
18     Q.  And just so I understand a little more
19  about your business.  So when people purchase, they
20  then will call and schedule a date for the cruise,
21  correct?
22     A.  Correct.
23     Q.  How much ahead -- how much lead time do
24  they have to give you to actually be able to get on
25  a cruise?  Can they go on a cruise in the same month

*Page 60*

1  or what?
2      A.  We ask for 60 days.
3      Q.  If they call and make a reservation
4  outside of their -- let's say they book it but it
5  falls outside the 18 months, would you still let
6  them go?
7      A.  Yes.
8      Q.  As long as they have it on the calendar?
9      A.  Correct.
10     Q.  I just wanted to know.
11         MR. EPSTEIN:  We're getting a little far
12     afield but no harm done.
13  BY MR. WHEELER:
14     Q.  So I'm going to start with a recording
15  that was produced this morning which is numbered
16  300000000, so eight zeros, 151480-7406270980.
17         If you look at the front page of this
18  document, of the account notes, Mr. Geiger's phone
19  number is 740-627-0980, correct?
20     A.  I don't know.
21     Q.  Doesn't it look like the top left after
22  Dan Geiger?
23     A.  Say it again.
24     Q.  Is it (740)627-0980?
25     A.  Correct.

*Page 61*

1    Q.  I don't know if you actually answered
2 this, but do you know if the file number I just read
3 you for the call recording reflects that it was a
4 call with that phone number, if that number was in
5 the file name?
6    A.  I don't recall.
7    Q.  That's fine.
8        So that is the phone number at least for
9 Mr. Geiger, correct?
10    A.  Right.
11    Q.  Does Royal Seas record all of its calls?
12    A.  Yes.
13    Q.  I am going to pull this up and see how it
14 sounds.  It doesn't sound good.  I'm just trying to
15 figure out how to -- as I said, you don't have to
16 record this.
17        (Whereupon audio was played for the
18 witness of the record.)
19 BY MR. WHEELER:
20    Q.  So that is a call recording of the call
21 between Mr. Geiger and Miss Mattingly, correct?
22    A.  Yes.
23    Q.  And the woman on that call is
24 Miss Mattingly, correct?
25    A.  Yes.

Page 62

1    Q.  I see what you're saying, okay, because
2 it's August 16, 2017 is the sale date?
3    A.  Correct.
4    Q.  Because that's the 8/16/17 reflected in
5 the header, right?
6    A.  Yes.
7    Q.  So this call is placed in September, which
8 is seven months after his cruise is expired.
9        Is there any restriction on extending a
10 cruise already after it is expired?
11    A.  No.
12    Q.  So it's completely discretionary based on
13 your customer service reps?
14    A.  Yes.
15    Q.  More generally speaking, will Royal Seas
16 call people whose cruises have expired?
17    A.  Yes.
18    Q.  And when they have these calls, is it for
19 purposes of giving them extensions so they take the
20 cruise?
21    A.  Could be.
22    Q.  What other reasons?
23    A.  Sell them additional things to go with
24 their vacation.
25    Q.  When they sell additional things to go

Page 64

1    Q.  And looking at the account notes, that
2 call would have occurred on September 23, 2019 at
3 around 3:43 p.m., correct?
4    A.  Yes.
5    Q.  Listening to that call and looking at this
6 script, would you agree that Miss Mattingly did not
7 exactly follow the script in how she was handling
8 the call until we paused it?  She wasn't reading the
9 script verbatim, correct?
10    A.  Almost verbatim but, yeah, a few words in
11 there maybe.
12    Q.  I mean, when you talk to a customer, a lot
13 of things can happen off the script; is that
14 fair?
15    A.  Fair.
16    Q.  Do you know if -- strike that.
17        Miss Mattingly offered him a 12-month
18 extension since his cruise had expired, correct?
19    A.  Correct.
20    Q.  And looking at Mr. Geiger's account, his
21 cruise would have expired in February of 2018,
22 correct?
23    A.  No.
24    Q.  When would his cruise have expired?
25    A.  February of '19.

Page 63

1 with their vacation for a cruise that is expired,
2 will they also extend the cruise at that point, too?
3    A.  Yes.
4    Q.  So the extension of the cruise deadline is
5 used to encourage them to use the services they're
6 purchased for, correct?
7    A.  Correct.
8    Q.  Was Miss Mattingly told that her job of
9 reading the script was to obtain affidavits?
10    A.  She was just told to read the script and
11 if the people agreed, to let Tara know so she could
12 send them information.
13    Q.  So my question is more broad, which is,
14 this script is special because of the affidavit --
15 not the affidavit -- the diabetes health info
16 portion in the middle, correct, that's unique?
17    A.  Yes.
18    Q.  Did Miss Mattingly understand that that
19 unique portion of the script meant that she was
20 trying to obtain these affidavits?
21        MR. EPSTEIN:  Objection, form, competence
22    of the witness and foundation.  If you can
23    answer.
24        THE WITNESS:  Repeat it, please.
25 BY MR. WHEELER:

Page 65

17 (Pages 62 - 65)

1     Q.   Sure.  Did Ms. Mattingly know -- strike
2  that.
3          Was Miss Mattingly told that the purpose
4  of this script was to obtain the affidavits?
5     A.   That she was told that she needed to read
6  the script and that if they agreed, we would be
7  sending them something.
8     Q.   Was she ever told specifically that the
9  actual purpose behind this script was the obtaining
10  of the affidavits?  I can try and make it a little
11  clearer.
12         This script is unique because of the
13  portion regarding collecting the affidavits.
14  Therefore, did Miss Mattingly know that obtaining
15  the affidavits -- that she was reading this script
16  for the purpose of obtaining affidavits?
17         MR. EPSTEIN:  Objection, form, competence,
18     lacking foundation.  Go ahead, if you know.
19         THE WITNESS:  Again, the same thing.  She
20     was reading a script so we could send them
21     something.
22  BY MR. WHEELER:
23     Q.   Was she told specifically that she should
24  try and increase the amount of people that responded
25  such that they would actually provide affidavits?

Page 66

1  fill out the survey, correct?
2     A.   Correct.
3     Q.   And she does offer him a 12-month
4  extension while also telling him he needs to fill
5  out the survey, correct?
6     A.   Correct.
7     Q.   And Mr. Geiger ended up filling out an
8  affidavit, correct?  I think.
9     A.   I don't remember.
10     Q.   It's Exhibit C to the supplemental.
11     A.   Okay, yes.
12     Q.   Let's look at Exhibit C, the supplemental
13  that you have in front of you.
14         With regards to point 3, it reads, "Prior
15  to purchasing my vacation package from Royal Seas, I
16  went to the web page diabeteshealth.info where I
17  entered my phone number, 908-331-1177 and requested
18  I can be contacted by Royal Seas."
19         Do you see that?
20     A.   Not that phone number.
21     Q.   (908)331-1177 -- I'm looking at the wrong
22  one.  Sorry.  My mistake.
23         (704)627-0980, correct?
24     A.   Correct.
25     Q.   That paragraph, except maybe the phone

Page 68

1     A.   No.
2     Q.   Do you know if she understood that based
3  off of what was in the script?
4     A.   No.
5     Q.   Only she would know that?  She hasn't
6  voiced it otherwise?
7     A.   Correct.
8     Q.   But you're saying that you directly -- or
9  none of her supervisors told her you are to obtain
10  as many affidavits as possible using the script?
11     A.   No.
12     Q.   I'm going to play the call.  I paused it
13  at one minute 45 seconds into the call.
14         (Whereupon audio was played for the
15     witness off the record.)
16  BY MR. WHEELER:
17     Q.   Just to confirm, after listening to the
18  call, she had at no point tells Mr. Geiger that
19  there's litigation pending against Royal Seas
20  Cruise, correct?
21     A.   Correct.
22     Q.   She doesn't actually tell him that this
23  survey is actually an affidavit, correct?
24     A.   Correct.
25     Q.   But she does tell them that he needs to

Page 67

1  number, was drafted by Royal Seas, correct?
2     A.   Our attorneys.
3     Q.   Ms. Geiger did not draft that paragraph,
4  correct?
5     A.   Correct.
6     Q.   Let's listen to another call.  I'm going
7  to play a recording that was produced which the file
8  number is 300000000, eight zeros, 172377-4049353474.
9         This corresponds to Ms. Wilder, so let's
10  pull up the account or the CRM while we're on it.
11  Also it's Mr. Wilder, I think.  It's about four
12  pages in.
13         Do you have it?
14     A.   Yes.
15     Q.   So just to confirm on the top left of this
16  page, it reads, Britten Wilder (404)935-3474,
17  correct?
18     A.   Yes.
19     Q.   And that number corresponds to the phone
20  number, correct?
21     A.   Yes.
22     Q.   And looking at the header of the actual
23  CRM database, it says 8/10/17?
24         Do you see that?
25     A.   Yes.

Page 69

1    Q.  And that reflects the purchase date was
2  August 10, 2017, correct?
3    A.  Correct.
4    Q.  So much later, Mr. Geiger, that means that
5  the expiration date was February of 2019?
6    A.  Correct.
7      MR. WHEELER:  I'm playing the recording.
8      (Whereupon audio played for the witness
9  off the record.)
10  BY MR. WHEELER:
11   Q.  I'm pausing it on 56 seconds.  So that's
12  Miss Mattingly on the phone, correct?
13   A.  Correct.
14   Q.  And that is a recording between
15  Miss Mattingly and Mr. Wilder, correct?
16   A.  Correct.
17   Q.  Based off this, that call is from
18  October 21, 2019, correct?
19   A.  Correct.
20   Q.  Miss Mattingly says that Royal Seas is
21  running a promotion to book dates on complimentary
22  cruises in particular.
23      That was not the purpose of her call, was
24  it?
25   A.  No.

1    Q.  There's no other promotion regarding these
2  specific complimentary cruises, correct?
3    A.  We do sometimes, yes.
4    Q.  But the purpose of this call was to read
5  that script and the affidavit, correct?
6    A.  I believe so, yes.
7    Q.  I'm going to keep playing at 56 seconds.
8      (Whereupon audio was played for the
9  witness off the record.)
10  BY MR. WHEELER:
11   Q.  I'm going to pause it at 240.  Just to
12  make sure, to the extent Ms. Mattingly e-mailed
13  Mr. Wilder regarding the extensions separately,
14  that's not reflected in the CRM notes, correct?
15   A.  She just makes notes in there.
16   Q.  I know.  My question is, Miss Mattingly
17  mentions that she will e-mail him regarding --
18  sending him an e-mail regarding the extension, okay?
19   A.  Okay.
20   Q.  Where is that -- where would that e-mail
21  be reflected?
22   A.  We don't normally send an e-mail.
23   Q.  But she said she would.  Do you know if
24  she did send an e-mail?
25   A.  I have no idea.

1    Q.  And you don't know if that e-mail said
2  anything besides you get a 12-month extension?  Let
3  me strike that.  Let me ask this.
4      Do you have a normal formal e-mail you
5  send when you give someone an extension?
6    A.  No.
7    Q.  So how does an e-mail regarding an
8  extension get drafted?
9    A.  Usually would not.
10   Q.  You just don't normally send -- you don't
11  normally send e-mails regarding 12-month extensions?
12   A.  Correct.
13   Q.  Would Royal Seas store copies of any
14  e-mails it sent out to its clients?
15   A.  I'm not sure.
16   Q.  Do you know if to the extent
17  Miss Mattingly actually sent this e-mail regarding
18  the 12-month extension, you would have a copy of it?
19   A.  I wouldn't know.
20   Q.  Miss Mattingly would know?
21   A.  I don't think so.
22   Q.  She wouldn't know if she sent an e-mail?
23   A.  That's not -- okay.  She would know if she
24  sent the e-mail.
25   Q.  Where are these e-mails normally stored --

1  let me rephrase this.
2      I use Outlook.  There is a "sent" folder.
3  Does Royal Seas have a "sent" folder that reflects
4  outgoing e-mails?
5    A.  Individually.
6    Q.  Individually, you mean -- does each
7  customer service representative have their own
8  e-mail account?
9    A.  No.
10   Q.  Is there just the one, Royal Seas'
11  customer one?
12   A.  Right.
13   Q.  That's the one we saw on the DocuSign or
14  the signature thing, okay.
15      Do you know if that e-mail will keep
16  records of sent e-mails from it?
17   A.  As far as I know.
18   Q.  Similar to Mr. Geiger in regards to
19  Mr. Wilder, he received a 12-month extension, right?
20   A.  Yes.
21   Q.  But he was also told he needed to fill out
22  a survey, correct?
23   A.  Yes.
24   Q.  I'm 99 percent sure the rest of this call
25  is useless but it's only 40 seconds so I'm going to

1  play it.
2     (Whereupon audio played for the witness
3  off the record.)
4  BY MR. WHEELER:
5     Q.  So that actually brings up another
6  question.  She does mention that she's going to send
7  an e-mail to him.
8        To the extent that e-mail mentioned what
9  is termed as a survey but is an affidavit, would it
10 have been produced today, do you know?
11    A.  I don't understand the question.
12    Q.  My question is, when the documents were
13 being decided that were being produced today in
14 response to a request for production, were e-mails
15 also searched?
16    A.  I don't know.
17       MR. WHEELER:  Counsel, do you know?
18       MR. EPSTEIN:  I think there was a search
19 of e-mails but I think we're also confused
20 here.
21       The CRM says that she was sent the
22 affidavit.  That's what happened.
23       MR. WHEELER:  My question is more --
24       MR. EPSTEIN:  No, I understand.  We didn't
25 find and we don't believe that there is a

Page 74

1        (Thereupon, the referred-to document was
2  marked by the court reporter for Identification as
3  Plaintiff's Exhibit 7.)
4  BY MR. WHEELER:
5     Q.  Marked as Exhibit 7 is a document that was
6  produced this morning which appears to be a form
7  affidavit from Mr. Britten Wilder.
8        Have you seen this document before?
9     A.  No.
10       MR. WHEELER:  Can we also introduce the
11 SignNow sheet.
12       (Thereupon, the referred-to document was
13 marked by the court reporter for Identification as
14 Plaintiff's Exhibit 8.)
15 BY MR. WHEELER:
16    Q.  Marked as Exhibit 8 is a screenshot of a
17 website for SignNow reflecting two affidavits sent,
18 one to Mr. Wilder and one to Mr. Geiger, that was
19 produced this morning in response to our request for
20 production.
21       Have you seen this document before?
22    A.  No.
23    Q.  Reviewing this now, do you know what it
24 is?
25    A.  Yes.

Page 76

1  separate e-mail here.  What happened was she
2  used the whatever -- SignNow and that's how it
3  was transmitted.
4        MR. WHEELER:  Okay.  There was no --
5        MR. EPSTEIN:  No separate e-mail that we
6  could find or that we're aware of.
7        MR. WHEELER:  I'm going to take your
8  representation that there is no separate e-mail
9  and if there were, you would have produced it?
10       MR. EPSTEIN:  Yes.  I mean, the way from
11 the on standpoint, all of this is e-mail, you
12 know, these SignNow, these sites are e-mail.
13 She wasn't physically involved with them.  That
14 went, I guess, to Tara, as it shows there,
15 Tara, but that's how it comes across to the
16 recipient as an e-mail.
17       MR. WHEELER:  Got it.
18       MR. EPSTEIN:  From our standpoint, that's
19 all she's referring.  There were no separate
20 e-mails to any of these people.
21 BY MR. WHEELER:
22    Q.  Let's look at the blank affidavit for
23 Mr. Wilder, Exhibit 7, I think.
24
25

Page 75

1     Q.  What is it?
2     A.  It's a record of when we sent e-mails.
3     Q.  And by e-mails, we mean the blank
4  affidavits to the class members, correct?
5     A.  Correct.
6     Q.  This is two of them, right, Mr. Wilder and
7  Mr. Geiger, correct?
8     A.  Correct.
9     Q.  Then there was also four others similar
10 ones signed, correct?
11    A.  Correct.
12    Q.  Looking at Exhibit 7, which is the blank
13 affidavit, given that Mr. -- let's start with the
14 this.
15       Mr. Wilder never signed the affidavit,
16 correct?
17    A.  Correct.
18    Q.  So looking at the blank field which -- not
19 blank fields.  Looking at the underlying fields
20 which is the name, the date and the phone number, do
21 you see those?
22    A.  Yes.
23    Q.  Looking at those fields, given that
24 Mr. Wilder never filled out -- never signed the
25 affidavit, do you now believe that those fields are

Page 77

20 (Pages 74 - 77)

1   put in by Royal Seas?
2      A.  It appears that way.
3      Q.  You don't know for certain?
4      A.  Correct.
5      Q.  But we know that Mr. Wilder never did sign
6   this affidavit, correct?
7      A.  Correct.
8      Q.  And then it reflects -- the affidavit
9   based off Exhibit 8 was sent, as the CRM notes, was
10  sent October 21, 2019, correct?
11     A.  Correct.
12     Q.  And based off of Exhibit 7, the date the
13  affidavit was to be signed was also October 21,
14  2019, correct?
15     A.  Correct.
16     Q.  And in the call we listened a minute ago
17  with Mr. Wilder, he was never informed that this
18  document being sent to him was an affidavit,
19  correct?
20     A.  Correct.
21     Q.  He was never informed of that there was
22  active pending litigation against Royal Sea Cruises,
23  correct?
24     A.  Correct.
25     Q.  And he was never informed that he is a

*Page 78*

1      Q.  To the extent a decision was made either
2   way with regards to how this script was written,
3   your attorneys are the ones who drafted it, right?
4      A.  Correct.
5      Q.  And this script does not inform people in
6   any way that what they're signing which is a survey
7   is actually an affidavit, correct?
8         MR. EPSTEIN:  Objection, best evidence,
9      asked and answered.
10        THE WITNESS:  Correct.
11  BY MR. WHEELER:
12     Q.  And the reason why, to the extent there is
13  one, would have been determined by your attorneys
14  who drafted this script, correct?
15     A.  Correct.
16     Q.  One more in that vein, slightly different
17  though.
18        And this script does not inform these
19  individuals who are class members that they are
20  represented by counsel following class
21  certification, correct?
22     A.  Correct.
23     Q.  The reason why that information was not
24  provided would have been, once again, determined by
25  your attorneys who drafted this script, correct?

*Page 80*

1   member of a class, correct?
2      A.  Correct.
3         MR. WHEELER:  Off the record.
4         (Short recess taken.)
5   BY MR. WHEELER:
6      Q.  You understand that you are still under
7   oath, correct?
8      A.  Yes.
9      Q.  So after listening to the calls and
10  reading the script, we can agree that, at least in
11  the calls we listened to, Miss Mattingly, again, did
12  not inform the people she called that there was a
13  class action lawsuit pending against Royal Seas
14  Cruises; is that correct?
15        MR. EPSTEIN:  Objection, asked and
16     answered and recordings are the best evidence
17     and their contents.
18        Answer the best you can.
19        THE WITNESS:  Yes.
20  BY MR. WHEELER:
21     Q.  Do you know why she didn't?
22     A.  No.
23     Q.  To the extent there is a reason why, it
24  would have been made by the attorneys, correct?
25     A.  Say that again.

*Page 79*

1      A.  Correct.
2         MR. WHEELER:  I have nothing else.
3            CROSS EXAMINATION
4   BY MR. EPSTEIN:
5      Q.  Just a couple of questions.
6         For those people for whom the CRM reflects
7   received a 12-month extension of their travel
8   package, was that 12-month extension granted and
9   honored regardless of whether they provided an
10  affidavit or declaration?
11     A.  Yes.
12     Q.  And as to Gary Little, I believe it was --
13  Gary Little, he did not receive an extension, did
14  he?
15     A.  No.
16     Q.  And that was because?
17     A.  He traveled.
18     Q.  He had already traveled?
19     A.  Correct.
20     Q.  So he didn't need it?
21     A.  Correct.
22     Q.  Nothing further.
23        MR. WHEELER:  I'm fine.  Thank you.
24        MR. EPSTEIN:  She will read.
25        THE COURT REPORTER:  Do you need a copy?

*Page 81*

21 (Pages 78 - 81)

| | |
|---|---|
| 1      MR. WHEELER:  Yes, electronic.  Can you | 1            CERTIFICATE |
| 2   get it by Friday? | 2   STATE OF FLORIDA  ) |
| 3      THE COURT REPORTER:  Yes. | 3   COUNTY OF BROWARD ) |
| 4      (Thereupon, the referred-to document was | 4 |
| 5   marked by the court reporter for Identification as | 5 |
| 6   Plaintiff's Exhibit 9.) | 6      I, SUZANNE VITALE, R.P.R., F.P.R. do |
| 7      THE COURT REPORTER:  Do you need a copy of | 7   hereby certify that I was authorized to and did |
| 8   the transcript? | 8   stenographically report the foregoing deposition |
| 9      MR. EPSTEIN:  Yes, please, PDF, mini. | 9   of MELISSA HANSON; that a review of the |
| 10      (Concluded at 12:25 p.m.) | 10   transcript was requested; and that the transcript |
| 11 | 11   is a true record of my stenographic notes. |
| 12 | 12      I FURTHER CERTIFY that I am not a |
| 13 | 13   relative, employee, attorney, or counsel of any |
| 14 | 14   of the parties, nor am I a relative or employee |
| 15 | 15   of any of the parties' attorney or counsel |
| 16 | 16   connected with the action, nor am I financially |
| 17 | 17   interested in the action. |
| 18 | 18      Dated this 20th day of February, 2020. |
| 19 | 19 |
| 20 | 20      *Suzanne Vitale* |
| 21 | 21 |
| 22 | 22      SUZANNE VITALE, R.P.R., F.P.R. |
| 23 | 23   My Commission No. DD179981 |
| 24 | 24   Expires: 5/24/2020 |
| 25                    Page 82 | 25                    Page 84 |

1         AFFIDAVIT
2
3   STATE OF FLORIDA       )
    COUNTY OF _____ )
4
5      I, _____, being
   first duly sworn, do hereby acknowledge that I did
6    read a true and certified copy of my deposition
   which was taken in the case of MCCULREY V. ROYAL
7    SEAS, taken on the 18th day of February, 2020, and
   the corrections I desire to make are as indicated on
   the attached Errata Sheet.
8    _____
          (Deponent)
9
10    + + + + + + + + + + + + + + + + + +
11       CERTIFICATE
12
13   STATE OF FLORIDA       )
    COUNTY OF _____ )
14
15
16     Before me personally appeared
   _____,
17   to me well known / known to me to be the person
   described in and who executed the foregoing
18   instrument and acknowledged to and before me that he
   executed the said instrument in the capacity and for
   the purpose therein expressed.
19
20     Witness my hand and official seal, this
    ____ day of _____, _____.
21
22
23     _____
          (Notary Public)
24
   My Commission Expires:
25
                   Page 83

22 (Pages 82 - 84)

**[1 - actual]**

| 1 |
|---|
| **1**  1:25 3:10 8:18 8:21,23 9:3 12:2 |
| **10**  70:2 |
| **10:10**  1:16 |
| **12**  9:4 11:15 12:2 25:3,6 27:19 30:15 31:1 40:25 41:2 58:14 60:15 63:17 68:3 72:2 72:11,18 73:19 81:7,8 |
| **12:25**  1:16 82:10 |
| **13**  46:20 |
| **13th**  45:24 |
| **151480-740627...**  61:16 |
| **16**  3:11 36:15 59:2 64:2 |
| **17**  1:2,3 43:9 45:25 46:2 |
| **172377-404935...**  69:8 |
| **18**  1:15 12:9 25:11 25:17 26:2 40:12 59:8 61:5 |
| **1800**  2:12 |
| **18th**  42:4,9 45:4 83:6 |
| **19**  63:25 |
| **1988**  1:2 |

| 2 |
|---|
| **2**  3:11 16:7,10,12 21:25 23:8 40:5 40:22 47:10 48:24 49:12 |
| **200**  2:11 |
| **2016**  36:20 |
| **2017**  9:10,11,15 9:17 11:10,15,16 |

11:19 12:3 28:15 31:9 59:2 64:2 70:2
**2018**  63:21
**2019**  10:5 13:3 15:17 17:22 27:19 28:15 33:12 40:5 40:12,22 43:9 45:25 46:2,20 47:10 48:15,17,21 49:6 56:14 57:3 63:2 70:5,18 78:10,14
**2020**  1:15 83:6 84:18
**20th**  84:18
**21**  3:12 70:18 78:10,13
**21550**  2:4
**23**  27:18 33:24,25 35:3,4,10,10 63:2
**24**  3:13
**240**  71:11
**25**  33:22,23
**27**  10:5 13:3 15:17 17:22

| 3 |
|---|
| **3**  3:12 8:24 21:10 21:12 29:1,24 33:11 35:16 48:15 68:14 |
| **30**  7:2,10,12 8:1 8:10 34:15 |
| **300000000**  61:16 69:8 |
| **32**  21:21 |
| **3249**  84:21 |
| **331-1177**  68:21 |
| **33301**  2:13 |
| **38**  3:15 |

**3:43**  63:3
**3rd**  42:1

| 4 |
|---|
| **4**  3:5,13 12:8 24:2 24:5,7 40:21 48:17,21 59:6 |
| **40**  73:25 |
| **404**  69:16 |
| **43**  3:16 |
| **45**  67:13 |
| **4th**  47:13,17 |

| 5 |
|---|
| **5**  3:15 37:24 38:6 38:8 |
| **5/24/2020**  84:24 |
| **500**  21:20 33:21 35:16 |
| **56**  70:11 71:7 |
| **560**  21:3 |

| 6 |
|---|
| **6**  3:16 7:2,10,12 8:1,10 9:10,11,17 11:10,19 12:3 35:7 42:23 43:3,5 |
| **60**  61:2 |
| **627-0980**  61:24 68:23 |

| 7 |
|---|
| **7**  3:17 11:15 75:23 76:3,5 77:12 78:12 |
| **704**  68:23 |
| **740**  61:24 |
| **740-627-0980**  61:19 |
| **75**  3:17 |
| **76**  3:18 |
| **780**  2:5 |

**7th**  46:16

| 8 |
|---|
| **8**  3:10,18 76:14,16 78:9 |
| **8/10/17**  69:23 |
| **8/16/17**  64:4 |
| **81**  3:6 |
| **82**  3:19 |
| **84**  1:25 |

| 9 |
|---|
| **9**  3:19 82:6 |
| **908**  68:21 |
| **908-331-1177**  68:17 |
| **91367**  2:6 |
| **935-3474**  69:16 |
| **986**  1:3 |
| **99**  73:24 |

| a |
|---|
| **a.m.**  1:16 |
| **ability**  6:18 9:8 57:11 |
| **able**  9:20 34:12 60:24 |
| **absurd**  15:14 |
| **access**  44:15,19 |
| **account**  44:13,13 61:18 63:1,20 69:10 73:8 |
| **acknowledge**  83:5 |
| **acknowledged**  83:17 |
| **action**  4:11 79:13 84:16,17 |
| **active**  55:10 78:22 |
| **activity**  28:11 |
| **actual**  10:10 14:25 28:12 31:5 46:6 66:9 69:22 |

**[additional - bz081617]**

**additional** 64:23
  64:25
**address** 41:5,8
  52:11,12
**advise** 51:16
**affidavit** 3:15,17
  30:15 31:1,5,13
  31:15 35:5 37:12
  37:17,23 38:8
  39:7,8 41:8,15,23
  42:8 44:5,7 45:6
  45:15,24 46:13
  47:3,6 51:14,17
  51:22 54:23 65:14
  65:15 67:23 68:8
  71:5 74:9,22
  75:22 76:7 77:13
  77:15,25 78:6,8
  78:13,18 80:7
  81:10 83:1
**affidavits** 31:10
  31:18,23,25 38:24
  39:21,25 42:13
  43:22 44:2,24
  52:18,21 53:4
  54:20,21 65:9,20
  66:4,10,13,15,16
  66:25 67:10 76:17
  77:4
**afield** 61:12
**age** 4:4
**agent** 23:24 24:24
  25:1 36:13 37:20
**agents** 18:22
  36:23
**ago** 4:24 78:16
**agree** 63:6 79:10
**agreed** 30:14,25
  65:11 66:6
**ags** 1:2,3

**ahead** 8:17 60:23
  66:18
**ajb** 1:2,3
**alcohol** 6:17
**allowed** 15:11
**amount** 66:24
**answer** 5:16 9:21
  52:2 53:11 65:23
  79:18
**answered** 52:5
  62:1 79:16 80:9
**answers** 6:13 34:6
**anybody** 34:6
**appearances** 2:1
**appeared** 83:15
**appears** 34:21
  38:9 45:15 47:6
  48:14 76:6 78:2
**appreciate** 37:10
**approximately**
  18:1
**arbitrary** 12:4
**arguing** 15:10
**arrangements**
  28:8
**arranging** 10:11
**asked** 27:8 50:22
  52:5 55:16 79:15
  80:9
**asking** 10:15,15
  31:15
**asserted** 12:16
**assess** 11:8
**assume** 31:16 41:9
  41:10
**attached** 43:21
  83:7
**attempted** 22:1,2
  24:18 35:20
**attorney** 4:10
  51:24 84:13,15

**attorneys** 18:5,6
  39:9 50:5,8 52:1
  55:13 69:2 79:24
  80:3,13,25
**audio** 62:17 67:14
  70:8 71:8 74:2
**august** 45:24,25
  46:2,17,20 59:2
  64:2 70:2
**authorized** 84:7
**automated** 24:21
**automatically**
  24:23
**availability** 25:14
**available** 26:2
**avoid** 32:2
**aware** 8:6 32:18
  75:6

**b**

**b** 7:2,10,12 8:1,10
  43:17 45:14 46:24
**back** 11:25 39:7
  39:25 45:9,13
  46:5 54:19 57:8
**background** 25:8
**bad** 18:17
**bar** 29:7
**base** 10:25
**based** 26:22 33:2
  40:11 42:7 48:14
  64:12 67:2 70:17
  78:9,12
**basic** 24:16
**basically** 8:4 10:8
  28:5,11 50:25
  51:25
**bates** 30:11
**befuddles** 11:10
**began** 56:13
**beginning** 36:15
  36:16,16,18 50:2

**begins** 16:21
  53:24
**behalf** 1:4,9 2:2,9
  7:21 9:5
**believe** 21:3 29:10
  32:1 33:18,22,24
  34:15 44:21 71:6
  74:25 77:25 81:12
**best** 6:19 79:16,18
  80:8
**better** 11:22 38:21
**bit** 29:19 48:6
**blank** 39:11,12
  46:12 52:11,12
  75:22 77:3,12,18
  77:19
**blanks** 39:20
**blvd** 1:14
**bold** 46:9,10
**book** 61:4 70:21
**booking** 28:8,21
**boulevard** 2:11
**box** 40:8
**break** 5:14 49:8
**brief** 50:25 51:22
**briefly** 38:20
**brings** 74:5
**britten** 69:16 76:7
**broad** 13:8,14
  49:12 65:13
**broader** 31:20
**brought** 4:12
**broward** 1:14
  2:11 84:3
**bunch** 5:10
**business** 15:12
  60:19
**buying** 20:3
**bz081617** 59:2

[c - continuing]

| c | | | |
|---|---|---|---|
| **c** 43:17 45:14 47:21 68:10,12 | 64:18 79:9,11 | 15:20,25 17:1 51:10 77:4 79:1 79:13 80:19,20 | **completely** 64:12 |
| **calderon** 43:17 47:7 | **capacity** 7:1,3,20 83:18 | **clear** 6:25 33:20 | **completing** 42:8 |
| **calendar** 61:8 | **case** 1:2 5:4 7:11 7:13 9:10,12 10:20 26:9 83:6 | **clearer** 66:11 | **complimentary** 50:16 51:2 70:21 71:2 |
| **california** 1:1 2:6 | **cause** 1:21 | **clearly** 5:9 | **computer** 24:23 |
| **call** 3:12 13:19 14:2 19:14,16,24 19:25 20:5,14,15 20:17,18,21 21:19 22:1,14,15,16,23 23:6 24:25 25:13 26:25 27:4,18,20 30:3,25 33:5 34:9 35:9,14 36:1,2 41:11 49:14 50:4 54:23 55:10,19,21 55:25 57:25 60:20 61:3 62:3,4,20,20 62:23 63:2,5,8 64:7,16 67:12,13 67:18 69:6 70:17 70:23 71:4 73:24 78:16 | **caveat** 9:9 | **click** 53:15 | **concerning** 9:8 |
| | **cecelia** 3:15 38:9 38:14 40:16,17 44:4 | **client** 4:11 32:22 49:24 | **concisely** 5:9 |
| | **center** 19:14,16,24 19:25 20:4,7,15 20:22 | **clients** 5:5 13:10 14:2,22 16:2 21:18 26:25 27:11 31:9,17 32:5 37:2 39:22,24 48:25 49:17,20 60:7 72:14 | **concluded** 82:10 |
| | **centers** 20:5,15,17 | **close** 46:5 48:23 | **conference** 5:21 |
| | **certain** 8:11 23:1 39:11 78:3 | **collected** 17:9 | **confirm** 43:21 47:1 67:17 69:15 |
| | **certificate** 83:11 84:1 | **collecting** 66:13 | **confirming** 59:13 60:4 |
| | **certification** 8:7 10:6 11:6 13:2 15:6,16 80:21 | **collectively** 18:8 | **confused** 74:19 |
| | **certified** 10:24 51:10 83:5 | **comes** 75:15 | **connect** 34:10 |
| | **certify** 84:7,12 | **comment** 6:7 | **connected** 84:16 |
| | **cetera** 7:17 | **commission** 83:24 84:23 | **consideration** 39:4 |
| **called** 18:23 21:23 22:2,6 26:13,17 31:8,14 34:7 35:15 39:25 51:11 51:17 79:12 | **chance** 6:4 7:11 | **communicate** 14:22 | **consistent** 7:7 |
| | **change** 6:7 | **communicated** 27:11 | **consolidated** 1:2 |
| | **charged** 39:6 | **communications** 12:15,15 15:7 34:16 | **contact** 3:14 5:6 8:4 10:12 11:5,20 13:3 14:10 15:11 15:17,20 16:18 17:1,3 22:20 23:7 24:14,15,18,19 28:15 29:4,14,17 35:20 40:21 50:15 53:17 |
| **calling** 26:24 55:11 | **check** 9:17 21:4 43:23 | **comp** 25:3 27:19 | |
| | **checks** 19:11 | **companies** 53:8 | |
| **calls** 15:25 16:3 17:8,24 18:21 20:2,8,21 21:1,18 23:11 28:25 29:2 29:23 30:4 33:1 34:17 35:10,24 36:22 49:17,20 55:6,14 56:5,13 56:18 57:2 62:11 | **choose** 57:15 | **company** 7:21 35:21 36:14,18,19 | **contacted** 18:23 26:22 44:1,4 48:25 68:18 |
| | **chosen** 36:21 | **competence** 65:21 66:17 | **contacting** 14:17 22:19 |
| | **clarify** 34:14 37:13 | **complaints** 9:14 | **contents** 79:17 |
| | **clarifying** 56:12 | **complete** 6:22 33:1 50:24 | **context** 10:16 |
| | **class** 5:7 8:6,7 9:23,25 10:1,3,6 10:24 11:5,5 13:2 13:4 15:6,16,18 | | **continue** 14:21 |
| | | | **continuing** 12:8 50:3 |

Veritext Legal Solutions
866 299-5127

[contract - deposition]

contract  14:8
controls  44:13
conversation
  32:22
copies  72:13
copy  72:18 81:25
  82:7 83:5
corporate  20:4,7
  20:15,21
correct  6:5 10:20
  14:22,23 16:1
  17:19 18:3 20:13
  21:22 22:4,13
  23:2,5,9 25:16,18
  25:19 26:11 31:15
  34:14 35:8,12,13
  37:5,8 39:19,22
  39:23 40:5,6,10
  40:12,13,25 41:3
  41:23,24 42:9,10
  42:22 44:2,3,5,6
  45:6,7,20,25 46:1
  46:3,4,14,17 47:4
  47:5,7,8,11,12,19
  48:2,3,6,12,13,15
  48:16,18,19,21,22
  49:1,2,6,7,22,23
  49:25 50:1,5,6,9
  50:10,18,20 51:7
  51:8,11,12,15,19
  51:20 52:22,23,25
  53:1,3,5,6,9,10
  54:10,17,18 56:11
  57:3,4,9,10,21
  58:10,15 59:9,23
  60:8,10,12,17,21
  60:22 61:9,19,25
  62:9,21,24 63:3,9
  63:18,19,22 64:3
  65:6,7,16 67:7,20
  67:21,23,24 68:1

68:2,5,6,8,23,24
69:1,4,5,17,20
  70:2,3,6,12,13,15
  70:16,18,19 71:2
  71:5,14 72:12
  73:22 77:4,5,7,8
  77:10,11,16,17
  78:4,6,7,10,11,14
  78:15,19,20,23,24
  79:1,2,7,14,24
  80:4,7,10,14,15
  80:21,22,25 81:1
  81:19,21
corrections  83:7
correspondence
  59:10,15,16
corresponds  27:23
  69:9,19
cost  39:3,4
counsel  12:11,15
  12:23 18:7,7
  74:17 80:20 84:13
  84:15
counsel's  12:2
county  83:3,13
  84:3
couple  81:5
course  15:8,13
  34:24
court  1:1 5:20,23
  8:20 16:9 21:9
  24:4 38:5 43:2
  76:2,13 81:25
  82:3,5,7
cover  10:25
covered  51:25
created  50:9
crm  23:15 29:2
  33:5 34:3,12,17
  40:15,20 58:12,16
  59:17 60:12,16

69:10,23 71:14
  74:21 78:9 81:6
cross  3:6 81:3
cruise  8:5 13:11
  27:1,5 28:21 31:2
  49:25 50:17 51:2
  58:18,22 60:20,25
  60:25 63:18,21,24
  64:8,10,20 65:1,2
  65:4 67:20
cruises  1:7,12 4:13
  5:7 7:2 8:14 13:23
  14:3,13,18 20:3
  25:9 43:7 64:16
  70:22 71:2 78:22
  79:14
current  14:2
currently  21:6
customer  3:13
  13:16,19 18:22
  19:17 20:1,12
  28:12 29:3 33:12
  36:13,25 37:6,16
  37:20 39:13 40:8
  44:12 58:11 60:3
  63:12 64:13 73:7
  73:11
customers  10:9,10
  10:10 15:11 16:19
  24:13 28:6 57:25
  59:11,20
customerservice
  40:7
cv  1:2,3

d

d  3:2
dan  1:9 4:11 43:18
  61:22
database  17:12
  33:5 58:12,16
  60:12 69:23

date  10:4,5 11:2
  11:10,19 12:3
  14:7,25 17:21
  25:10,13 30:5
  46:7 58:20,23,24
  60:20 64:2 70:1,5
  77:20 78:12
dated  46:16 84:18
dates  13:20 46:21
  70:21
david  43:17 47:7
day  46:17 83:6,20
  84:18
days  61:2
dd179981  84:23
deadline  65:4
dealing  19:10
deals  7:14
dealt  28:6
decided  18:9
  51:21 74:13
decision  18:11
  80:1
declaration  81:10
defendant  1:8,13
  8:11 9:5 43:6,6
defendant's  55:5
defendants  2:9
deforest  1:9 4:11
  11:14
department  44:14
depend  60:13
depends  14:6 15:1
deployed  26:1
deponent  83:8
deposed  4:18
deposition  1:17,20
  3:10 5:1,3 7:5,10
  8:24 11:4 12:11
  83:5 84:8

[describe - existed]

**describe**  51:9
**described**  83:17
**describes**  51:6
**designated**  8:9
**designee**  7:2
**desire**  83:7
**details**  7:4
**determined**  22:5
   33:13 80:13,24
**devdex**  24:17
**developed**  7:9
**diabetes**  65:15
**diabeteshealth**
   17:4
**diabeteshealth.i...**
   17:6 22:11 32:13
   32:17 50:14 51:1
   68:16
**diabeteshealth.i...**
   16:22
**difference**  5:25
**different**  10:13
   14:9 23:3,4 38:24
   39:2 80:16
**difficult**  9:20
   14:19 37:2
**digital**  23:18
**digits**  11:16
**dionne**  36:7,10
   37:21
**direct**  3:5 4:6
**directly**  67:8
**disclosure**  3:16
   43:8,22 45:11
**discretionary**
   26:10 57:20 64:12
**discuss**  11:22
   39:25
**discussed**  38:20
**discussion**  38:18

**discussions**  56:17
**disposition**  23:11
   23:11
**district**  1:1,1
**document**  8:19
   9:1 16:8,12,15
   21:8,12,15 24:2,3
   38:4,13,14,21
   40:4 43:1,5 45:8
   45:10 46:3,6
   47:19 48:21 52:13
   52:20,24 53:8,15
   54:24 58:2 61:18
   76:1,5,8,12,21
   78:18 82:4
**documented**  12:19
**documents**  12:10
   12:12,14 24:8
   38:1 74:12
**docusign**  53:13
   73:13
**doing**  6:10 34:4
   35:23
**draft**  69:3
**drafted**  18:4 39:8
   50:5 53:21 69:1
   72:8 80:3,14,25
**drafts**  18:13,18
**drive**  3:19
**drugs**  6:17
**duly**  4:4 83:5
**duties**  19:6,8 36:4

**e**

**e**  3:2 4:16 15:23
   41:5,8 52:11,12
   53:7,7,14,16,20
   59:13 60:6,11
   71:12,17,18,20,22
   71:24 72:1,4,7,11
   72:14,17,22,24,25
   73:4,8,15,16 74:7

74:8,14,19 75:1,5
   75:8,11,12,16,20
   77:2,3
**easier**  8:16 45:9
**easiest**  50:12
**east**  1:14 2:11
**eastern**  47:17
**editorializing**
   38:10
**effect**  5:22
**eight**  61:16 69:8
**either**  14:21 35:11
   47:17 53:17 57:2
   80:1
**electronic**  82:1
**employee**  84:13
   84:14
**employees**  19:10
**encourage**  65:5
**ended**  19:25 68:7
**enjoyed**  49:22
**enter**  24:24 32:16
**entered**  25:1 48:1
   68:17
**entering**  32:12
**entitled**  43:6
**entries**  21:20
   24:24 47:4
**entry**  25:3 26:12
   27:19,20,23 30:13
   30:18 33:12 40:20
   41:14
**epstein**  2:14 3:6
   6:25 9:6,13,18,25
   11:9,23 12:13
   15:4 16:5 19:20
   23:17,20 28:5,17
   28:20 29:9,16
   33:17,25 34:19,24
   36:8 52:5 59:3,6
   61:11 65:21 66:17

74:18,24 75:5,10
   75:18 79:15 80:8
   81:4,24 82:9
**errata**  83:7
**especially**  10:24
**esq**  2:7,14
**estimate**  6:1 14:15
   56:22
**et**  7:17
**events**  7:15
**eventually**  32:9
**evidence**  79:16
   80:8
**exact**  30:5
**exactly**  4:23 9:13
   11:9 34:8 54:17
   58:13 63:7
**examination**  3:4
   4:6 81:3
**example**  53:12
**exclude**  29:3
**excluding**  13:25
**executed**  83:17,18
**exhibit**  3:10,11,12
   3:13,15,16,17,18
   3:19 8:18,21,23
   16:7,10,12 21:10
   21:12,24 23:8
   24:2,5,7 29:1,24
   33:10,11 35:16
   37:24 38:6,8
   40:20 42:23 43:3
   43:5 45:15 46:24
   47:21 48:24 49:11
   59:5 68:10,12
   75:23 76:3,5,14
   76:16 77:12 78:9
   78:12 82:6
**exhibits**  3:8 45:14
**existed**  39:20

Veritext Legal Solutions
866 299-5127

[existing - going]

**existing**   10:9 28:6
   28:7
**experience**   49:22
**expiration**   70:5
**expire**   27:2,5
   58:19
**expired**   58:22
   63:18,21,24 64:8
   64:10,16 65:1
**expires**   83:24
   84:24
**explain**   38:1
**explicitly**   32:15
**explore**   5:6
**expressed**   83:18
**ext**   25:4 27:19
   30:15
**extend**   65:2
**extending**   64:9
**extension**   25:6,18
   25:20,22,23 26:3
   26:6 27:15,22
   31:1 40:25 41:3
   57:15 58:11,14
   59:11 60:16 63:18
   65:4 68:4 71:18
   72:2,5,8,18 73:19
   81:7,8,13
**extensions**   27:8
   57:12 59:13 64:19
   71:13 72:11
**extensive**   28:9
   29:5,17
**extent**   28:14 71:12
   72:16 74:8 79:23
   80:1,12

**f**

**f.p.r.**   1:18 84:6,22
**fact**   29:18
**facts**   5:4

**fail**   5:10
**fair**   55:2 63:14,15
**fairly**   29:5,17
**falls**   61:5
**far**   59:12 61:11
   73:17
**february**   1:15
   63:21,25 70:5
   83:6 84:18
**field**   77:18
**fielding**   19:16
   20:2,8
**fields**   47:2 48:1,1
   77:19,19,23,25
**figure**   25:13 62:15
**file**   62:2,5 69:7
**filed**   1:20 4:3 7:16
   9:12,14 11:12,14
   11:15
**filing**   9:19
**fill**   39:12 68:1,4
   73:21
**filled**   39:14,18
   47:3 77:24
**filling**   68:7
**financially**   84:16
**find**   8:4 11:3,13
   32:9 40:15 53:25
   74:25 75:6
**fine**   6:10 8:15 38:2
   52:3,7,8 62:7
   81:23
**first**   4:4 8:25 9:7
   16:21 25:3 26:12
   26:12 27:17 47:2
   49:12,13 56:18
   59:3 83:5
**florida**   1:15,19
   2:13 83:2,13 84:2
**focus**   13:25

**focused**   7:19
**folder**   73:2,3
**follow**   13:10,13,15
   13:22 41:25 42:4
   42:11 54:16 63:7
**followed**   35:11
**following**   13:2
   15:16 28:15 33:12
   80:20
**follows**   4:5
**foregoing**   83:17
   84:8
**forgot**   18:24 26:8
**form**   19:20 39:21
   39:25 52:21 53:20
   65:21 66:17 76:6
**formal**   72:4
**fort**   1:15 2:13
**found**   40:17
**foundation**   65:22
   66:18
**foundational**
   18:25
**four**   32:1 44:2
   69:11 77:9
**fourth**   6:11 29:10
   29:10,11
**friday**   82:2
**friedman**   2:3
**front**   61:17 68:13
**fulfilling**   10:17
**full**   6:22 12:18
   32:25
**fully**   7:9 11:8
**further**   14:3 29:13
   30:9 81:22 84:12

**g**

**gary**   43:17 45:16
   81:12,13
**gathering**   31:10

**geiger**   43:18 61:22
   62:9,21 67:18
   68:7 69:3 70:4
   73:18 76:18 77:7
**geiger's**   61:18
   63:20
**general**   22:18
**generally**   10:20
   30:2 41:7 64:15
**generate**   24:23
**generic**   40:8
**geoff**   2:15 33:18
**getting**   39:6 61:11
**give**   5:22 6:13,18
   6:21 14:15 15:4
   26:3,5 27:8,22
   31:18 41:8 53:12
   57:12,15 58:1
   60:24 72:5
**given**   25:20,22,23
   26:6 27:12 31:1
   41:3 58:11 77:13
   77:23
**gives**   57:17
**giving**   56:9 64:19
**go**   4:25 5:2,17
   8:17 20:7 32:19
   37:25 38:3,16
   54:5,14 60:25
   61:6 64:23,25
   66:18
**goes**   29:19
**going**   5:8 7:6,6,19
   7:22 10:3 11:18
   16:6 21:6 24:1
   26:2 27:2 31:9
   32:19 34:22 45:8
   46:24 49:12 50:11
   53:12 54:9 55:16
   61:14 62:13 67:12
   69:6 71:7,11

Veritext Legal Solutions
866 299-5127

[going - know]

73:25 74:6 75:7
**good**   4:8,9 37:6
    62:14
**gosh**   19:9
**granted**   81:8
**grants**   59:11
**great**   29:15 52:10
**greenspoon**   2:10
**ground**   4:25
**guess**   6:1 9:6
    30:20 50:12 75:14

### h

**h**   4:17
**hand**   83:20
**handle**   37:3
**handling**   19:17
    20:12 63:7
**hanson**   1:17 4:2
    4:16 7:20 84:9
**happen**   37:13
    44:24 63:13
**happened**   7:25
    44:8 74:22 75:1
**happy**   5:11
**harm**   61:12
**header**   64:5 69:22
**heads**   6:13
**health**   26:3 65:15
**heard**   54:19
**hellosign**   45:20
    53:18
**help**   34:18
**helpful**   16:4 34:22
**heretofore**   4:3
**hetchler**   3:15 38:9
    38:15 39:17 40:3
    40:5,12,16,17
    41:7 44:4
**hey**   53:14
**highlighted**   48:5,9

**hills**   2:6
**hold**   7:22 11:18
**honored**   60:16
    81:9
**hope**   31:18
**hopefully**   38:21
    53:12
**house**   18:7

### i

**idea**   71:25
**identification**   8:20
    16:9 21:9 24:4
    38:5 43:2 76:2,13
    82:5
**identified**   34:1
**identifies**   43:16
**identify**   34:12
**imagine**   6:10
    59:22
**impact**   6:18
**important**   18:24
    58:6,8
**inbound**   20:2,8
**inc.'s**   43:7
**include**   19:14
**increase**   66:24
**independent**   50:7
    52:2
**indicated**   83:7
**individual**   7:3
    20:19 26:21
**individually**   1:4,9
    73:5,6
**individuals**   17:14
    17:15,24 23:23
    35:10 38:25 80:19
**info**   65:15
**inform**   79:12 80:5
    80:18
**informal**   5:21

**information**   10:2
    17:8,10,14,17
    28:3 32:12,16
    37:13 39:11 46:12
    50:3,13,15 51:2
    58:1 59:17 65:12
    80:23
**informed**   78:17,21
    78:25
**initial**   40:21
**inquire**   14:3 49:21
**inquiries**   19:17
**inquiry**   7:7,12
**insist**   7:6
**instances**   49:19
**instructed**   27:8
    42:11,19
**instructions**   22:18
**instrument**   83:17
    83:18
**intake**   40:8
**interested**   49:25
    84:17
**internal**   12:14
**internally**   44:8
**interval**   14:2
**introduce**   16:6
    21:6,7 24:2 37:24
    38:3 76:10
**introduced**   38:8
**introducing**   8:18
**involved**   75:13
**isolate**   28:25
**issue**   26:4 52:4
**issues**   20:17
**itinerary**   60:5

### j

**january**   43:9
**job**   19:6,8 36:2
    58:7 65:8

**john**   1:4 4:12
**july**   18:1,2 30:6,8
    33:12 49:5 56:14
    56:20
**june**   9:15 11:15

### k

**keep**   54:9 71:7
    73:15
**kind**   9:6,19 10:7
    11:10 14:15 28:3
    29:3 42:16 48:5
    50:24 60:2
**kinds**   32:4
**know**   5:1,25 10:7
    10:10 11:3,7,17
    11:19 12:10 13:6
    17:5,23 18:9,11
    18:13,19 21:2,2
    23:1,12 24:22
    27:23 28:2,22
    31:13 32:9,11,15
    32:25 33:4 35:14
    36:5 39:15,16,17
    39:24 40:1 41:9
    42:14,15,17,21
    44:9,10,22,25
    46:10,21 47:3,23
    48:9 51:21,25
    52:1 53:11,16,20
    54:13,19,22 55:1
    55:5,8,13 56:2,4
    56:15 58:21 61:10
    61:20 62:1,2
    63:16 65:11 66:1
    66:14,18 67:2,5
    71:16,23 72:1,16
    72:19,20,22,23
    73:15,17 74:10,16
    74:17 75:12 76:23
    78:3,5 79:21

[knowledge - mini]

**knowledge** 47:25
50:7 52:2
**known** 83:16,16

**l**

**l** 4:16
**lacking** 66:18
**large** 1:19
**lauderdale** 1:15
2:13
**law** 2:3 5:20
**lawful** 4:4
**lawsuit** 9:19,22
10:2,23 11:6,11
11:14 51:7 79:13
**lawyer** 54:11
**lawyers** 55:5,8,18
55:24
**lead** 60:23
**leaf** 31:21
**learn** 5:4
**leave** 22:23
**leeway** 15:5
**left** 40:16 61:21
69:15
**letter** 15:23 53:4
59:24
**letters** 59:13,19,23
60:2,4,4
**life** 45:9
**light** 48:7
**limitation** 57:14
**limited** 7:19 39:5
**link** 53:15
**list** 3:12 21:18,18
21:21,23 22:6,10
26:23 29:1,24
30:7 33:10,10,11
**listed** 7:8
**listen** 32:19 41:11
53:25 55:24 69:6

**listened** 55:6 56:4
56:9 78:16 79:11
**listening** 63:5
67:17 79:9
**literally** 8:3
**litigation** 13:5,6
15:18 36:17 49:1
51:19 56:8 67:19
78:22
**little** 43:17 45:16
45:24 48:6 49:4
60:18 61:11 66:10
81:12,13
**live** 55:21
**lloyd** 30:11,14,24
**llp** 2:10
**long** 36:14,24
56:22 61:8
**look** 9:3 12:7
16:20 24:1 29:9
32:2 40:14 41:5
43:21 45:9,13
46:16 49:11 50:11
53:23 61:17,21
68:12 75:22
**looking** 25:2 26:12
27:17 30:1 33:9
40:4,20 50:2
52:22 58:16 59:3
63:1,5,20 68:21
69:22 77:12,18,19
77:23
**looks** 47:13
**loop** 46:5 48:23
**lot** 14:6,8 29:20
63:12

**m**

**m** 2:3 4:16
**mail** 15:23 22:23
41:5,8 52:11,12
52:13,16 53:7,14

53:16,20 71:17,18
71:20,22,24 72:1
72:4,7,17,22,24
73:8,15 74:7,8
75:1,5,8,11,12,16
**mailed** 71:12
**mails** 53:7 59:13
60:6,11 72:11,14
72:25 73:4,16
74:14,19 75:20
77:2,3
**making** 30:4
56:18
**manager** 37:20,21
42:18,18,20
**managerial** 18:10
**marathon** 5:14
**march** 9:10,11,17
10:4,5 11:10,19
12:3 13:3 15:17
17:22 28:15 36:15
36:20
**marciales** 41:18
41:22
**marder** 2:10
**mark** 42:23
**marked** 8:20,23
16:9,12 21:9,12
24:4,7 38:5 43:2,5
76:2,5,13,16 82:5
**marketing** 10:17
59:23
**match** 46:22
**math** 21:4
**matter** 7:5
**mattingly** 36:10
41:20 42:11 44:19
54:4,11,13,16
55:14,19,25 57:11
57:22 62:21,24
63:6,17 65:8,18

66:1,3,14 70:12
70:15,20 71:12,16
72:17,20 79:11
**mattingly's** 55:6
**mcculrey** 83:6
**mccurley** 1:4 4:12
11:15
**mean** 10:19 13:5
13:20 14:7 18:6
18:21 20:6 22:2
23:12 25:5 33:10
36:16 45:5 51:24
52:17 54:1 58:7
60:13 63:12 73:6
75:10 77:3
**means** 24:22
28:10 29:12 70:4
**meant** 56:7 65:19
**medication** 6:18
**melissa** 1:17 4:2
4:16 84:9
**member** 51:11
79:1
**members** 5:7 8:5,6
11:5 13:4 15:18
15:20 16:1 17:1
77:4 80:19
**mention** 51:13
74:6
**mentioned** 56:13
74:8
**mentioning** 16:21
**mentions** 71:17
**merits** 7:12
**method** 15:21
**middle** 65:16
**midnight** 47:14
**military** 25:25
**mind** 8:13
**mini** 82:9

[minute - pausing]

| | | | |
|---|---|---|---|
| **minute** 49:8 54:2 67:13 78:16 | **nods** 6:13 | **obviously** 30:6 52:4 56:9 | **outgoing** 73:4 |
| **mistake** 68:22 | **non** 12:14 | **occurred** 13:3 | **outlined** 7:16,25 |
| **mnth** 25:3 27:19 30:15 | **normal** 14:1 15:7 29:3 72:4 | 15:17 32:22 63:2 | **outlook** 73:2 |
| **monitor** 55:10,18 | **normally** 14:10 31:17 58:18 71:22 | **occurring** 15:10 | **outside** 18:7 20:4 20:14,17 61:4,5 |
| **monitored** 55:14 | 72:10,11,25 | **october** 30:8 40:5 40:12,22 42:1,4,9 | **overseas** 26:1 |
| **month** 14:16 25:6 26:2 31:1 36:2 40:25 41:2 58:14 60:15,25 63:17 68:3 72:2,11,18 73:19 81:7,8 | **notary** 1:19 83:23 | 45:2,4 47:10,13 47:17 48:15,17,21 70:18 78:10,13 | **oversee** 20:14 |
| | **notated** 11:14 | | **owners** 20:19 |
| | **note** 12:2 60:16 | **offer** 68:3 | **oxnard** 2:4 |
| | **notes** 23:15 25:1 26:21 29:2 33:3 34:3,12 40:15 41:2 58:13 61:18 63:1 71:14,15 78:9 84:11 | **offered** 63:17 | |
| **monthly** 14:1 | | **offhand** 27:25 | **p** |
| **months** 4:23,24 11:11 18:1 25:11 25:17 30:6 56:23 59:8 61:5 64:8 | | **office** 43:8 | **p.m.** 1:16 63:3 82:10 |
| | | **offices** 2:3 | **package** 25:11,12 27:1,5 28:8 68:15 81:8 |
| | **notice** 1:20 3:10 4:3 7:4,23 8:1,4 8:23 | **official** 83:20 | |
| **morning** 4:8,9 16:13 21:13 24:8 61:15 76:6,19 | | **okay** 4:24 5:12,13 5:17,18,24 6:8,9 6:15,16 21:5 29:15 31:18 37:14 41:13 43:23,25 48:8 55:4 64:1 68:11 71:18,19 72:23 73:14 75:4 | **packet** 32:3 |
| | **november** 49:6 | | **page** 3:4,9 8:24 12:8 21:21 25:3 26:13,15 27:17 29:10,10,11,16 30:11,12 40:3,4 40:17 43:12 45:19 45:20 46:5,19 47:2,9 48:11 59:4 61:17 68:16 69:16 |
| **motions** 7:16,17 | **number** 10:12 29:1 39:5 46:8 50:16 59:1 61:19 62:2,4,4,8 68:14 68:17,20 69:1,8 69:19,20 77:20 | | |
| **multiple** 34:16 | | | |
| **n** | | **once** 25:12 37:11 44:7,24 80:24 | |
| **n** 3:2 4:17,17 | | **ones** 28:10 77:10 80:3 | |
| **name** 4:10,14 36:6 36:8 46:7 59:1 62:5 77:20 | **numbered** 9:3 61:15 | **open** 11:2 19:25 | **pages** 1:25 12:8 69:12 |
| | **numerous** 13:15 13:20 60:5 | **operational** 19:9 | **paragraph** 49:14 53:23 68:25 69:3 |
| **named** 4:3 | | **operations** 19:12 19:13 | |
| **narrow** 14:20 15:22 | **o** | | **paragraphs** 16:21 49:13 |
| | **o** 4:17 | **opposed** 34:3 | **part** 12:7 |
| **necessarily** 29:6 | **oath** 4:5 5:19,19 12:21 57:9 79:7 | **opt** 17:9,11 22:8 | **particular** 5:5 29:18 70:22 |
| **need** 6:5 26:4 27:21 81:20,25 82:7 | | **opted** 17:4,6 | |
| | **object** 19:20 52:4 | **order** 10:6 27:21 | **particularly** 37:2 |
| | **objection** 65:21 66:17 79:15 80:8 | **ordinary** 15:8 | **parties** 84:14,15 |
| **needed** 18:10 66:5 73:21 | | **original** 39:20 46:13 | **partners** 17:16 |
| | **obtain** 65:9,20 66:4 67:9 | | **pause** 71:11 |
| **needs** 36:25 67:25 68:4 | | **originally** 56:17 | **paused** 63:8 67:12 |
| | **obtaining** 66:9,14 66:16 | | **pausing** 70:11 |
| **never** 77:15,24,24 78:5,17,21,25 | | | |

Veritext Legal Solutions
866 299-5127

[payroll - question]

**payroll** 19:10
**pc** 2:3
**pdf** 82:9
**pending** 5:16 51:7
  67:19 78:22 79:13
**people** 10:9,10,22
  14:17 17:3,5
  18:23 20:3 22:6,8
  22:11,19 23:4,7
  25:9 27:4,8 29:19
  31:22 33:22 34:2
  34:5,7,10,11 35:1
  35:15 36:2 42:12
  44:2 52:25 53:17
  54:20 60:19 64:16
  65:11 66:24 75:20
  79:12 80:5 81:6
**percent** 73:24
**period** 9:24 10:1,4
  26:2 31:8
**person** 15:1 21:23
  22:15 26:14,17,20
  29:12 37:11 50:21
  50:23 51:10,16
  53:14 83:16
**person's** 26:21
**personally** 42:14
  42:17 83:15
**pette** 2:15 23:22
  33:24 34:14 37:25
**phone** 15:23,24
  46:8 50:16 61:18
  62:4,8 68:17,20
  68:25 69:19 70:12
  77:20
**phrased** 50:9
**physically** 52:16
  75:13
**picked** 22:3
**place** 21:1 36:22
  44:23 49:17 56:18

**placed** 17:24
  18:21 20:21 28:25
  55:14,19,25 56:13
  64:7
**places** 15:25
**placing** 35:24
**plaintiff** 1:5,10 3:8
**plaintiff's** 8:21
  16:10 21:10 24:5
  38:6 43:3 76:3,14
  82:6
**plaintiffs** 2:2
**play** 67:12 69:7
  74:1
**played** 62:17
  67:14 70:8 71:8
  74:2
**playing** 70:7 71:7
**please** 4:14 5:11
  5:16 65:24 82:9
**point** 34:23 65:2
  67:18
**poor** 55:17
**portion** 50:2,4
  65:16,19 66:13
**portions** 49:16
**position** 5:5 10:19
  19:1 36:12
**possession** 45:6
  46:3 47:19 48:20
**possible** 54:8
  55:10 67:10
**possibly** 13:18
**post** 15:6
**potential** 15:6
**potentially** 20:3
  51:18
**pp** 1:3
**predates** 9:19
**preempt** 33:17
  34:20

**preexisting** 17:12
**prefer** 52:12
**preference** 27:13
  27:14
**prepared** 9:4 12:1
  17:20
**present** 2:15
**president** 19:2,3,3
  19:5
**pretty** 7:22 12:18
  13:14 19:11 49:16
**previous** 56:8
**previously** 52:22
**prior** 11:5 12:11
  14:10 28:5,11
  68:14
**privilege** 12:16
**privileged** 12:14
**probably** 5:9
  41:12 50:12 52:3
  53:25 59:23
**problem** 11:21
**procedure** 44:23
  45:1
**process** 44:22
**produced** 12:11
  12:17,24 16:13
  21:13 24:8 26:20
  26:21 32:21 38:21
  43:6 61:15 69:7
  74:10,13 75:9
  76:6,19
**producing** 33:9
**production** 12:9
  16:14 21:14 24:9
  74:14 76:20
**products** 10:17,18
  10:22,22
**programs** 13:11
**promotion** 50:17
  51:3 70:21 71:1

**proposing** 11:1
**prospective** 10:9
**provide** 29:1
  66:25
**provided** 22:21
  34:3 50:14 56:3
  80:24 81:9
**public** 1:19 83:23
**pull** 62:13 69:10
**pulled** 21:2 22:7
  34:12
**purchase** 13:11
  14:25 25:9,12
  29:13 60:19 70:1
**purchased** 14:11
  65:6
**purchasing** 49:25
  68:15
**purely** 57:20
**purpose** 5:3 20:9
  21:24 26:17 28:24
  57:23 66:3,9,16
  70:23 71:4 83:18
**purposes** 14:12
  31:10 35:2 49:18
  60:9 64:19
**pursuant** 1:20 7:4
**put** 33:3 44:23
  78:1

|  q  |
| --- |

**question** 5:11,16
  9:7,20 11:2,21
  13:8,14 18:16,17
  18:25 19:19,21
  24:16 30:19 31:20
  33:7 42:16 49:12
  52:6 53:24 54:4
  55:17 58:21 65:13
  71:16 74:6,11,12
  74:23

[questions - reviewing]

**questions** 5:8 7:25 13:19,21 20:18 33:20 34:23 38:22 81:5
**quickly** 14:16 40:14
**quite** 21:2 29:19

**r**

**r.p.r.** 1:18 84:6,22
**ran** 26:7
**range** 12:18
**reach** 17:13 36:3
**reached** 23:14 35:1
**reaching** 22:15
**read** 17:1 22:20 23:7 27:9,24 50:12,18 57:24 58:1 62:2 65:10 66:5 71:4 81:24 83:5
**reading** 26:18 35:2 63:8 65:9 66:15,20 79:10
**reads** 68:14 69:16
**reality** 10:14 44:1
**realize** 18:24
**really** 10:4,15 14:20 18:24 30:10
**reason** 6:21 8:3 26:8 36:21 79:23 80:12,23
**reasons** 13:15,17 14:9 26:4 64:22
**recall** 32:12,14 62:6
**receive** 81:13
**received** 17:8 32:4 39:24 44:7 53:17 73:19 81:7

**recess** 49:9 57:6 79:4
**recipient** 75:16
**record** 4:15 23:10 23:13 38:16,18,20 57:5,8 62:11,16 62:18 67:15 70:9 71:9 74:3 77:2 79:3 84:11
**recording** 24:18 41:11 55:25 61:14 62:3,20 69:7 70:7 70:14
**recordings** 23:21 23:23 32:20,21 33:9 34:15 35:9 54:1 55:2 79:16
**records** 34:9 73:16
**redacted** 28:2,4,19 28:22
**redaction** 28:24
**refer** 8:13
**referred** 8:19 16:8 21:8 24:3 38:4 43:1 51:22 76:1 76:12 82:4
**referring** 75:19
**reflect** 27:20 30:18 35:10 41:2 45:23 55:2 58:18
**reflected** 28:17 42:7 58:12,24,25 59:16 60:11 64:4 71:14,21
**reflecting** 76:17
**reflects** 30:20 41:22 62:3 70:1 73:3 78:8 81:6
**regard** 32:20 48:25

**regarding** 11:6 12:1,3 13:4,6 15:18 17:1 28:7 50:16 60:5 66:13 71:1,13,17,18 72:7,11,17
**regardless** 81:9
**regards** 11:20 14:17 19:13,24 20:3,20 22:14,19 27:7 30:21 31:19 33:8 37:23 39:10 40:2,22 44:23 50:8 54:21 55:19 68:14 73:18 80:2
**regularly** 14:1
**relate** 29:2
**related** 28:20 29:23
**relates** 28:12
**relationship** 28:13 29:3 37:4
**relative** 84:13,14
**relevant** 10:3,4 31:8
**remain** 7:7
**remember** 4:23 17:21 29:18 30:5 32:8 56:19,24 57:1 68:9
**repeat** 65:24
**repetitive** 46:25 49:4
**rephrase** 5:11 9:16 18:16 19:22 33:8 53:24 54:4 55:16 59:22 73:1
**report** 84:8
**reporter** 8:20 16:9 21:9 24:4 38:5 43:2 76:2,13

81:25 82:3,5,7
**represent** 48:4
**representation** 75:8
**representative** 7:20 8:10 20:20 20:24 22:16 24:14 30:3 33:2 35:15 36:1 37:7 50:22 50:23 73:7
**represented** 80:20
**reps** 64:13
**request** 5:15 16:13 21:14 24:9 74:14 76:19
**requested** 51:1 68:17 84:10
**requests** 12:9,12
**requirement** 23:6
**reservation** 61:3
**respect** 7:12 8:10 18:21
**responded** 31:22 32:11 33:11 35:4 37:11,16 66:24
**responds** 50:21,23
**response** 16:13 21:13 24:8 30:24 32:4,5 33:14 37:17 52:20,25 54:24 74:14 76:19
**responsive** 12:12 12:13
**rest** 34:5 73:24
**restriction** 64:9
**result** 24:25
**results** 24:18
**reversed** 34:1
**review** 6:4 84:9
**reviewing** 50:3,13 76:23

Veritext Legal Solutions
866 299-5127

[richard - short]

**richard** 2:14 52:4
**right** 9:14 25:15
　27:19 30:8,22
　31:21 32:3,20
　34:13 36:8 41:12
　44:17,18 49:5
　53:2 54:9 56:8
　62:10 64:5 73:12
　73:19 77:6 80:3
**roy** 30:11
**royal** 1:7,12 4:12
　5:6 7:2,10 8:5,13
　8:14 11:4 13:3,10
　14:21 15:17,25
　17:5 19:1 25:9
　26:25 27:4,11
　31:7 37:15 38:23
　39:17 41:7 43:6
　44:1,12 45:5 46:2
　48:20,24 49:20
　50:15 51:2,7,18
　55:8,11,13,18,24
　59:10,19 60:2,6
　62:11 64:15 67:19
　68:15,18 69:1
　70:20 72:13 73:3
　73:10 78:1,22
　79:13 83:6
**royalseas.com**
　40:7
**rules** 4:25
**running** 70:21
**runs** 25:17

**s**

**s** 4:16,16,17
**sale** 22:12 58:20
　58:23,24 64:2
**sales** 20:9 22:9
　43:7 60:4
**save** 36:23 37:1,4

**saw** 58:13 73:13
**saying** 50:25 64:1
　67:8
**says** 25:3 27:18
　30:13,23 31:13
　40:17,25 41:14,18
　43:12 46:16,19
　50:13,21,22 52:10
　69:23 70:20 74:21
**schedule** 60:20
**screenshot** 3:13
　76:16
**screenshots** 24:13
　34:17
**script** 3:11 16:5,18
　16:20,25 17:20,25
　18:4,9,14,18,20
　21:24 22:20 23:8
　26:13,16,18 27:7
　27:9,12,24 30:25
　31:11,14,22 32:5
　32:23 33:6 35:2
　35:11,12 37:17
　48:24 49:3,11,16
　50:22 51:6,9,13
　52:20,25 54:14
　55:20 57:23 58:1
　63:6,7,9,13 65:9
　65:10,14,19 66:4
　66:6,9,12,15,20
　67:3,10 71:5
　79:10 80:2,5,14
　80:18,25
**scripts** 54:17
**scroll** 29:7
**sea** 4:13 5:6 8:13
　78:22
**seal** 83:20
**search** 74:18
**searched** 74:15

**seas** 1:7,12 7:2,10
　8:5,14 11:4 13:4
　13:10 14:21 15:17
　15:25 17:5 19:1
　25:10 26:25 27:4
　27:12 31:7 37:15
　38:23 39:17 41:7
　44:1,12 45:5 46:2
　48:20,24 49:20
　50:15 51:2,7,18
　55:8,11,13,18,24
　59:10,19 60:2,6
　62:11 64:15 67:19
　68:15,18 69:1
　70:20 72:13 73:3
　73:10 78:1 79:13
　83:6
**second** 3:16 7:11
　25:3 30:13 38:17
　40:3 43:7,12 57:5
**seconds** 67:13
　70:11 71:7 73:25
**see** 9:18 16:23
　27:17 28:10 29:11
　29:16 30:13,16
　31:4 40:11,14,21
　40:23 41:16,18
　42:2,5 43:14,19
　45:17,21 47:15
　48:6 49:13 51:4
　52:14 58:17,25
　62:13 64:1 68:19
　69:24 77:21
**seen** 9:1 16:15
　21:15 24:10 43:10
　76:8,21
**sell** 10:18,21 13:22
　64:23,25
**send** 37:18 38:24
　53:13 58:1 59:10
　59:15,19 60:2

　65:12 66:20 71:22
　71:24 72:5,10,11
　74:6
**sending** 66:7
　71:18
**sends** 37:19 60:6
**sent** 38:14 39:21
　40:4 41:8,14,22
　43:8 44:10 45:24
　46:20 47:10 48:12
　48:15 52:21,24
　53:16,21 54:20,23
　72:14,17,22,24
　73:2,3,16 74:21
　76:17 77:2 78:9
　78:10,18
**separate** 75:1,5,8
　75:19
**separately** 71:13
**september** 27:18
　63:2 64:7
**sequence** 7:15
**service** 10:22
　13:19 18:22 19:18
　20:1,12 30:3
　33:12 35:15 36:1
　36:13,25 37:6,20
　40:9 44:12 64:13
　73:7
**services** 10:18
　14:11 65:5
**set** 12:7 24:7 33:1
**setting** 5:21
**seven** 64:8
**she'd** 23:7,7 37:10
**she'll** 10:7
**sheet** 3:18 76:11
　83:7
**sheets** 28:4
**short** 38:18 49:9
　57:6 79:4

[shoulder - three]

shoulder  6:14
show  6:14 29:6
  37:9 50:14 52:11
shows  75:14
shrugs  6:13
sign  30:14,25
  31:15,23,25 35:5
  37:12,16 38:25
  42:12 53:15,15
  54:21 78:5
signature  73:14
  84:21
signed  38:9 40:12
  42:13 43:23 44:5
  44:7,24 45:16,25
  47:6,13 48:17
  77:10,15,24 78:13
signing  19:11 53:8
  54:21 80:6
signnow  3:18
  48:12 53:18 75:2
  75:12 76:11,17
similar  73:18 77:9
similarly  1:5,10
simpler  34:21
sinistry  29:22
site  17:11
sites  75:12
situated  1:5,10
six  31:24 35:4
  42:12
sixth  30:12
slightly  80:16
slow  11:1
sold  59:2
solely  36:2
soliciting  14:12
somewhat  12:3
sorry  4:12 19:7
  37:22 38:12 59:25
  68:22

sort  9:9 26:10
  27:13
sound  62:14
sounds  62:14
source  17:7
southern  1:1
spaces  39:10
speak  27:21 34:6
speaking  7:21
  64:15
special  65:14
specific  7:15 22:8
  25:10 36:21 39:13
  53:20 71:2
specifically  8:7
  16:25 17:3 20:6
  28:2 49:1 54:5,6
  54:24 66:8,23
spell  4:14
spoke  23:24 30:14
  32:6 33:23,23
  34:2,11
stamped  30:11
standard  47:18
  49:17
standpoint  75:11
  75:18
start  8:18 16:4
  24:16 25:2 26:24
  30:4 38:23 55:9
  61:14 77:13
state  1:19 4:14
  83:2,13 84:2
stated  32:15
states  1:1
stating  53:14
stenographic
  84:11
stenographically
  84:8

store  17:18 72:13
stored  72:25
street  2:4
strike  7:17 31:5,19
  42:15 55:9 63:16
  66:1 72:3
struggle  10:8
stuff  29:20
subject  7:5
substance  7:13
substantive  6:6
successful  22:14
suggestions  54:3
suite  2:5,12
supervisor  41:20
  44:17
supervisors  67:9
supplemental  43:7
  45:11 68:10,12
support  5:4,5
supposed  23:10,13
  54:5,7,16 57:23
sure  6:12 11:8
  13:9 22:17 27:4
  30:22 33:16 34:8
  37:10 43:24 44:21
  44:25 46:15 49:5
  66:1 71:12 72:15
  73:24
survey  50:25
  51:22 53:2 67:23
  68:1,5 73:22 74:9
  80:6
suzanne  1:18 84:6
  84:22
sworn  4:5 83:5
system  24:17

t

tabs  58:17,17
take  5:14,20 49:8
  64:19 75:7

taken  1:18 6:17
  7:10 49:9 57:6
  79:4 83:6,6
talk  6:12 10:23
  63:12
talked  33:18 57:18
talking  15:3,5
tara  41:18 44:16
  65:11 75:14,15
team  36:23 37:1
telemarketing
  19:17
tell  11:13 20:5
  26:13,14 30:22
  35:25 67:22,25
telling  68:4
tells  67:18
term  23:11
termed  74:9
testified  4:5
testify  9:4,8 12:1
testimony  5:21 6:4
  6:19,22 37:10
thank  6:24 12:6
  13:1 23:25 56:12
  81:23
thing  10:25 37:15
  52:10 66:19 73:14
things  14:6 15:12
  19:9 63:13 64:23
  64:25
think  10:14,20
  16:4 29:20 30:11
  30:23 31:17 33:24
  48:5 68:8 69:11
  72:21 74:18,19
  75:23
third  4:21 29:16
thomas  2:7
three  12:8 35:7
  43:16,22 58:17

Page 13

**[thumb – willing]**

**thumb**  3:19
**time**  4:22 6:8,11
  10:3 14:24 26:4,8
  27:1,3 31:8 33:15
  36:24 47:18 49:3
  55:7 56:4,20
  60:23
**times**  4:20 22:22
**today**  5:3,5,22 6:3
  6:19,22 8:3,24 9:5
  74:10,13
**todd**  2:3
**told**  33:2 42:20
  52:1 54:13 57:22
  58:3,6,9 65:8,10
  66:3,5,8,23 67:9
  73:21
**tom**  4:10 53:14
**top**  40:16 61:21
  69:15
**topic**  11:25
**topics**  7:5,8 8:11
  9:3,5,9 12:2
**tracking**  45:20
**transcript**  6:14
  82:8 84:10,10
**transfer**  17:16
**transferred**  17:7
  22:11
**transfers**  17:10
  22:7
**transmitted**  75:3
**transposed**  11:17
**travel**  10:11 13:18
  13:20 14:11,25
  25:7,12 26:8 28:7
  81:7
**traveled**  14:7 27:1
  29:19 49:21 81:17
  81:18

**traveling**  13:20
**trial**  6:8
**true**  83:5 84:11
**truth**  28:23
**try**  5:8 13:22 36:3
  37:4 53:24 66:10
  66:24
**trying**  11:8 15:2
  30:21 32:2 34:19
  34:20 62:14 65:20
**turn**  8:24 30:10
  40:3 43:12 45:19
  46:5,19,24 47:9
  47:21 48:11
**two**  8:2 11:11
  16:21 36:3 38:24
  39:2 46:21 49:13
  54:20 76:17 77:6
**type**  59:24
**typically**  27:6

**u**

**unclear**  13:5,7
**underlined**  46:8
  47:2,22,23 48:1
**underlying**  39:10
  77:19
**understand**  5:10
  7:18 8:9 13:9 15:5
  15:8,9 19:19
  30:19 33:7 57:8
  60:18 65:18 74:11
  74:24 79:6
**understanding**
  12:24 15:2 35:17
  35:18,19
**understood**  67:2
**unique**  65:16,19
  66:12
**united**  1:1
**unsure**  54:9

**upgraded**  29:20
**use**  15:21 16:18
  23:10 25:11 31:2
  31:5 35:11 38:24
  45:8 53:13 54:6
  55:11 59:8 65:5
  73:2
**useless**  73:25
**usually**  13:13
  14:24 59:14 72:9

**v**

**v**  1:11 83:6
**vacation**  64:24
  65:1 68:15
**various**  47:1 54:3
**vein**  80:16
**verbal**  6:13
**verbatim**  63:9,10
**verify**  13:18
**versed**  36:25
**vice**  19:2,3,3,5
**visited**  17:9 50:14
**vitale**  1:18 84:6,22
**voice**  22:23
**voiced**  67:6
**volunteer**  31:18
**voucher**  25:10
**vs**  1:6

**w**

**want**  4:25 5:15
  6:11,12 8:2 11:19
  28:1 31:20 33:17
  37:25 49:4 51:25
  52:1
**wanted**  10:25
  40:14 61:10
**wants**  53:14 57:12
**way**  14:21 26:14
  29:6 31:7 33:4,19
  34:4 47:17 50:12

57:2 75:10 78:2
  80:2,6
**ways**  10:13 54:3
**we've**  51:24
**web**  68:16
**website**  17:2 51:1
  76:17
**websites**  17:8
  38:24 39:2
**weird**  42:16
**welcome**  6:6 10:21
**went**  50:25 53:9
  68:16 75:14
**wheeler**  2:7 3:5
  4:7,10 7:24 8:8,17
  8:22 9:11,16,23
  10:19 11:18,24
  12:20,22 15:13,15
  16:6,11 19:22,23
  21:11 23:18,25
  24:6 28:1,14,18
  29:8,15,25 34:22
  34:25 36:9 38:2,7
  38:16,19 42:23
  43:4 49:10 52:7,9
  57:5,7 59:5,7
  61:13 62:19 65:25
  66:22 67:16 70:7
  70:10 71:10 74:4
  74:17,23 75:4,7
  75:17,21 76:4,10
  76:15 79:3,5,20
  80:11 81:2,23
  82:1
**wilder**  3:17 69:9
  69:11,16 70:15
  71:13 73:19 75:23
  76:7,18 77:6,15
  77:24 78:5,17
**willing**  37:12

**[wish - zeros]**

| |
|---|
| **wish**   30:10<br>**withstanding**   12:2<br>**witness**   4:3 62:18<br>  65:22,24 66:19<br>  67:15 70:8 71:9<br>  74:2 79:19 80:10<br>  83:20<br>**witnesses**   43:13,16<br>**woman**   62:23<br>**woodland**   2:6<br>**word**   31:5 46:8<br>**words**   63:10<br>**work**   34:19 35:21<br>  54:7<br>**written**   30:21 80:2<br>**wrong**   45:3 68:21 |
| **x** |
| **x**   3:2 |
| **y** |
| **yeah**   21:7 29:11<br>  63:10<br>**year**   18:2 56:25<br>**yearly**   14:2<br>**years**   8:2 |
| **z** |
| **zeros**   61:16 69:8 |

Page 15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT G

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

Good morning/afternoon Mr./Mrs. _____.  My name is _____ and I am with the customer service department of Royal Seas Cruises.

We see that you purchased your vacation package from Royal Seas Cruises on ___(date)____ and you have (already traveled/ not travel).
- If Traveled:
  - How was your trip?
  - What was your favorite part?
  - Are there areas we can improve on?
- If not Traveled:
  - Is there a reason you have not traveled yet?
  - Is there anything Royal Seas can do to help you book your vacation?

In reviewing your information, we show you visited diabeteshealth.info and provided your information so that Royal Seas could contact you at ___(phone number)___ regarding a complimentary cruise promotion.  Is that correct?
- If Yes:
  - Great!  I am glad to see we have the correct information regarding your purchase.  We always like to show thanks to those that help promote our vacations.  Would you be kind enough to complete a brief survey, basically stating that you went to diabeteshealth.info website and requested more information about Royal Seas complimentary cruise promotion?
    - If Yes, great, the address we have is_____ and we show your email address as_____? Would you prefer us to email or mail this document to you?
    - We will have that sent out shortly. It will require a signature.
    - We greatly appreciate your time today and the information you have provided.

- If no, (try to rephrase the question)
  - Isn't it possible you visited diabeteshealth.info website around the time you purchased?
  - If you are unsure about that site, do you remember how you received Royal Seas information? Was it a different site?
    - IF NO...
      - Mr/Mrs _____ I understand you may not remember, but could it be possible you provided your contact information to diabeteshealth.info
      If no..
      - Thank you for your time, we appreciate the information provide.

- If absolutely no, then just finish the call and move to next consumer.

**Ending the call:**

Would you be interested in traveling on another cruise in the future?
- If yes – is the number provide today a good contact number to discuss other promotions in the future?
Are there any other comments or suggestions you have that would make travel experiences with Royal Seas better?

Thank you so much for your time today Mr./Mrs. _____, we hope you have a great day.

EXHIBIT

#2

2-18-20

# EXHIBIT H

**Recording Electronically Produced
By Mailing of USB Drive to Court**

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

**Recording Electronically Produced
By Mailing of USB Drive to Court**

FIRST AMENDED DECLARATION OF ADRIAN R. BACON

## CERTIFICATE OF SERVICE

Filed electronically on this 4th day of March, 2020, with:

United States District Court CM/ECF system

Notification sent electronically via the Court's ECF system to and Exhibits H & I transmitted by USB Drive to:

Honorable Cynthia A Bashant
United States District Court
Southern District of California

Notification sent electronically via the Court's ECF system to and Exhibits H & I transmitted by Email to all Counsel of Record As Recorded On The Electronic Service List.

This 4th day of March, 2020,

s/Todd M. Friedman, Esq.
Todd M. Friedman

FIRST AMENDED DECLARATION OF ADRIAN R. BACON