**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Matthew M. Loker, Esq. (279939)
ml@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone:   (800) 400-6808
Facsimile:   (800) 520-5523

**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Todd M. Friedman, Esq. (216752)
tfriedman@toddflaw.com
Adrian R. Bacon, Esq. (280332)
abacon@toddflaw.com
21550 Oxnard Street, Suite 780
Woodland Hills, CA 90212
Telephone:   (877) 206-4741
Facsimile:   (866) 633-0228

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**JOHN MCCURLEY AND DAN DEFOREST, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

Plaintiff,

v.

**ROYAL SEAS CRUISES, INC.,**

Defendant.

**Case No.:** 17-cv-986 BAS (AGS)

**DECLARATION OF ADRIAN R. BACON IN SUPPORT OF PLAINTIFFS' MOTION TO DECERTIFY CLASS IN PART AND AMEND ORDER RE: CLASS NOTICE AS TO THE SUBCLASS**

## <u>DECLARATION OF ADRIAN R. BACON</u>

**I, ADRIAN R. BACON declare:**

1. I am an attorney in good standing duly admitted to the State Bar of California and an attorney of record for Plaintiffs Dan Deforest and John McCurley ("Plaintiffs") in this action against Royal Seas Cruises, Inc. ("Defendant"). I am a Partner at The Law Offices of Todd M. Friedman, and one of the counsel for Plaintiffs and the certified Class and Subclass in this action.

2. I have personal knowledge of the following facts and, if called upon as a witness, could and would competently testify thereto, except as to those matters which are explicitly set forth as based upon my information and belief and, as to such matters, I am informed and believe that they are true and correct.

3. I am writing this declaration in support of Plaintiffs' Motion to Decertify Class In Part And Amend Order Re: Class Notice As To The Subclass

4. Attached hereto as Exhibit A is a true and correct copy of the Affidavit of Joshua Grant Kidd submitted in the Supreme Court of British Columbia in opposition to Plaintiffs' Motion to Enforce the Letters Rogatory.

5. Attached hereto as Exhibit B is a true and correct copy of the Order of the Supreme Court of British Columbia on January 22, 2020 Granting Plaintiffs' Motion to Enforce the Letters Rogatory.

6. I, Abbas Kazerouni, and Thomas Wheeler flew to Vancouver to take the deposition of Mr. Grant. Attached hereto as Exhibit C is a true and correct copy of excerpts from the transcript of deposition of Mr. Joshua Grant Kidd taken on February 12, 2020.

7. During the deposition, Defendant's attorney, Jeffrey Backman, multiply asserted a joint defense objection and indicated that Mr. Grant had met with Mr. Backman to prepare for multiple hours a day prior to the deposition.

8. In response to the Order of the Court, Mr. Grant produced a database purportedly showing all leads generated by the two websites in the Class Definition, however it was evident on its face that this database was missing both columns of data as well as rows of data when compared against the Source Data originally produced by Prospects DM in this matter.

9. Attached hereto as Exhibit D is a true and correct copy of an excerpt from the database produced by Prospects DM that it indicated showed all leads generated by the two websites in the Class Definition.

10. Mr. Grant also produced a transfer database, however this database was also clearly incomplete because it did not contain all of the information contained in the Royal Seas database produced during discovery. Attached hereto as Exhibit E is a true and correct copy of excerpts from this transfer database that was produced by Prospects DM in response to the Court's Order.

11. Attached hereto as Exhibit F is a true and correct copy of an excerpt from the original database of 600 million phone calls produced by Prospects DM in this litigation, referred to as the "Source Data" by Ms. Peters-Stasiewicz in her report.

12. Plaintiffs have provided the Transfer List produced by Defendant in this litigation to Class Expert Group, who has conducted a reverse lookup on the database and scrubbed it for cellphones, and then to KCC for purposes

DECLARATION OF ADRIAN R. BACON

of sending direct postcard notice to the Subclass.  KCC estimates that it will complete notice on March 10, 2020.

13. On February 26, 2020, I emailed counsel for Defendant laying out the basis for this Motion and requesting a meet and confer.  On March 3, 2020, I had a call with counsel for Defendant regarding the immediate motion.  Defendant did not indicate whether it would oppose this Motion.  A true and correct copy of the email exchange memorializing these efforts is attached hereto as Exhibit G.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed on March 4, 2020.

Date: March 4, 2020                          By:/s/ Adrian R. Bacon

Adrian R. Bacon

# EXHIBIT A

*This is the 1st Affidavit of Joshua Grant Kidd in this case and was made on January 15, 2020*

No. S-1914397
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

JOHN MCCURLEY and DAN DEFOREST,
on behalf of themselves and all other similarly situated

PETITIONERS

AND:

PROSPECTS DM INC., JOSHUA GRANT
and ROYAL SEAS CRUISES, INC.

RESPONDENTS

## AFFIDAVIT

I, Joshua Grant Kidd, business person, of Suite 360 – 400 Dominion St., Burnaby, BC,

SWEAR THAT:

1. I am one of the respondents in this Petition, as well as President of the Respondent, Prospects DM, Inc. ("**Prospects CA**"), and as such have personal knowledge of the facts deposed to in this affidavit except where such facts are stated to be made on information and belief and where so stated I verily believe them to be true.

2. Prospects CA is federally incorporated under the laws of Canada.

3. I am also the president of Prospects DM, Inc., a company incorporated under the laws of Ohio ("**Prospects OH**"). For the purpose of this affidavit, I will refer to Prospects CA and Prospects OH collectively as ""**Prospects**", except where I refer to one entity specifically.

4. My legal name is Joshua Grant Kidd. Professionally, I go by "Joshua Grant". I am the only "Joshua Grant" associated with Prospects.

5. Prospects is a lead generation company. As part of its business operations, Prospects enters into agreements with third-party web publishers/providers that generate leads in a variety of ways, including but not limited to, via email, social media, direct solicitations, and online lead generation. Prospects enters into agreements with these third-party web publishers through various trade names, including Senior Care Authority.

6. The respondent, Royal Seas Cruises, Inc. ("**Royal**") became a client of Prospects in November 2016, when Prospects and Royal entered into an Exit Read Lead Generating Marketing Agreement (the "**Agreement**"). Under the Agreement, Royal purchases certain types of leads from Prospects.

7. Under the Agreement, Prospects was required to obtain TCPA consent for potential leads to receive calls from Royal.

8. It is my understanding that the California Lawsuit relates to leads Prospects obtained from third-party web publishers associated with www.yourautohealthlifeinsurance.com and diabeteshealth.info which resulted in phone calls relating to Royal between November 2016 and December 2017.

<u>Prospects cannot determine which calls were made "on behalf of Royal"</u>

9. Each of the orders sought in paragraphs 1-30 of Schedule A to the Petition relate to "calls placed by Prospects on behalf of Royal", either directly through the language of the order or in the definition provided for "Class" and "Transfer

Subclass". The language used in these orders demonstrates a fundamental misunderstanding of Prospects' business model.

10. Prospects has no way of knowing which calls were made on behalf of Royal, except to the extent those calls were transferred to Royal. Documentation surrounding calls transferred to Royal has already been provided to the Petitioners.

11. When a phone call is made by a Prospects agent to a lead obtained from a web publisher, the agents calls the opted-in phone number. The call scripts relied upon by Prospects do not make reference to any particular client. Based upon answers received by the agent, the call may be live transferred to one of Prospect's clients.

12. The live transfer is partially automated through Prospects' calling system in such a way that the agent does not know who exactly the lead will be transferred to. For example, an agent would advise a lead that they qualified for a promotion from a travel partner, and if the lead is interested, the lead would be transferred to one of Prospects' travel partners based upon an automated weighing system. From the perspective of the agent directing the call, this transfer is 'blind', in that they transfer to a category of client, rather than a particular client. During the period from November 2016 to December 2017, Prospects had numerous travel partners.

13. The Petitioners have already been provided with a list of all calls where it was determined that it was appropriate to transfer the phone call to Royal.

14. In specific consideration of the requests set out in paragraphs 1-14 of Schedule A to the Petition, in May 2018, Prospects produced a full list of all calls going back to 2016. Prospects does not maintain a separate database for calls relating to a particular client. To the extent that there were "calls on behalf of Royal", Prospects has already provided the Petitioners with a complete call log and a log of calls that were transferred to Royal. These are the only document in Prospects' possession or control which would fall under the scope of these requests.

15. In response to the document requests set out in paragraphs 23-30, although Prospects is unable to determine which calls were made "on behalf of Royal," Prospects could provide the Petitioners with a larger set of opt-in consent data relating to leads obtained from www.yourautohealthlifeinsurance.com or diabeteshealth.info between November 2016 and December 2017 which were associated with underlying consent for Royal to contact the lead. It is unlikely that this larger data set would be valuable to the Petitioners, because in interpreting that opt-in consent data, it is certain that:

   a. a significant proportion of these calls would not in any way have been associated with any travel promotion; and

   b. aside from the list of calls that were transferred to Royal, none of these calls would have included any explicit reference to Royal.

   <u>Information about the system used to make calls</u>

16. Prospects relies upon a custom-built cloud based service to make calls (the "**Dynamic Dialer**").

17. The company that created and continues to run the Dynamic Dialer is S.C. Objects Data S.R.L. ("**S.C. Objects**"), a company based out of Romania.

18. My primary contact at S.C. Objects is Vladimir Nicolici. My understanding is that Mr. Nicolici is the software engineer primarily responsible for creating and maintaining the Dynamic Dialer.

19. I am not aware of any manuals, guides, or other documents related to the Dynamic Dialer.

20. I am informed by Mr. Nicolici, and verily believe, that S.C. Objects does not have any manuals, guides, or other documents related to for the Dynamic Dialer. It was designed to be an intuitive tool that our agents could learn without needing instructional materials.

21. Consequently, even ignoring the issues arising from the reference to calls being "on behalf of Royal", Prospects does not have any documents relating to the Dynamic Dialer, so does not have any documents to produce in response to the requests in paragraphs 15-22 of Schedule A to the Petition.

Ability to respond to document requests

22. To the extent that the Court might order me to produce certain documents, I do not believe I will be able to produce these documents before the January 24, 2020 deadline set out in the Petition.

23. I will make my best efforts to produce any documents ordered as soon as possible. I expect that I will be able to provide any document production ordered by February 11, 2020.

Deposition

24. In response to the Petitioner's description of attempts to depose me, it is my understanding that to date there has been no prior orders which actually compel me to attend a deposition.

25. I first became aware of the Petitioner's interest in deposing me when he purported to serve Prospects OH with a subpoena for Notice of Deposition. The Notice of Deposition was addressed to me personally, rather than to Prospects OH. This Notice of Deposition was delivered to Mr. Allen by email, and to Mr. Allen's office. Neither Mr. Allen's office nor his email are registered to accept service on behalf of Prospects.

26. Attached and marked as **Exhibit "A"** to this affidavit is a true copy of an email chain between Eric Allen, attorney for Prospects in relation to the California Lawsuit, and Adrian Bacon and Tom Wheeler, attorneys for the Petitioners in relation to the California Lawsuit dated between August 27, 2019 and September 3, 2019.

27. Mr. Allen does not represent me personally, and I did not agree to allow him to accept service on my behalf. This was pointed out to Mr. Bacon in Exhibit A.

28. If Prospects OH receives a valid court order requiring a representative to be deposed, Prospects OH will comply with that order and make available a knowledgeable representative.

29. I believe that there are other representatives of Prospects OH who could address the topics for deposition identified in Schedules B and D to the Letter Rogatory.

30. I am informed by Mr. Allen, and verily believe, that there had been verbal discussions between Mr. Allen and Mr. Bacon about providing written discovery rather than attending a deposition. Mr. Allen offered, on my behalf, to provide written discovery, but my offer was rejected. This discussion is contained in Exhibit A.

31. I remain willing to provide written answers to the Petitioners' written questions.

<u>Willingness to attend at trial</u>

32. It is my understanding that the California Lawsuit remains at a preliminary discovery phase.

33. When this matter goes to trial, I am willing to attend at trial if required to provide testimony. To avoid inconvenience, I am hopeful that arrangements can be made for any such attendance to be by video conference.

34. I will undertake to attend at trial if I am served with a subpoena from the Petitioners, even though it may not, on its face, be enforceable in Canada.

**SWORN BEFORE ME**                            )
**at North Vancouver, British Columbia**       )
**this 15th day of January, 2020.**            )
                                               )
                                               )
                                               )
_____               )   _____
                                               )   **JOSH GRANT KIDD**
**A Commissioner for taking Affidavits**       )
**for British Columbia.**                      )
                                               )

# EXHIBIT B

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

JAN 2 2 2020

ENTERED

No. S1914397
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

Between:

JOHN MCCURLEY and DAN DEFOREST,
on behalf of themselves and all others similarly situated

Petitioners

And

PROSPECTS DM INC., JOSHUA GRANT and ROYAL SEAS CRUISES, INC.

Respondents

## ORDER MADE AFTER APPLICATION

|  | ) |  | ) |  |
|---|---|---|---|---|
|  | ) |  | ) |  |
| BEFORE | ) | THE HONOURABLE JUSTICE DLEY | ) | 22 JAN 2020 |
|  | ) |  | ) |  |
|  | ) |  | ) |  |

ON THE APPLICATION OF the Petitioners coming on for hearing at Vancouver, BC on 17 Jan 2020, and on hearing Wade D. Simpson, counsel for the Petitioners, and Clark T. Hartnett, counsel for the Respondents, Prospects DM Inc. and Joshua Grant;

THIS COURT DECLARES that:

1. The following documents are validly served on Royal Seas Cruises, Inc. ("Royal"):

    a. Petition to the Court bearing court stamp dated 20 Dec 2019;

    b. Notice of Hearing bearing court stamp dated 20 Dec 2019;

    c. Affidavit #1 of Todd Friedman made 19 Dec 2019 and bearing court stamp dated 20 Dec 2019.

    d. Affidavit #2 of Todd Friedman made 20 Dec 2019 and bearing court stamp dated 23 Dec 2019;

1

     e.  Affidavit #1 of Rachel Chen made 14 Jan 2020 and bearing court stamp dated 14 Jan 2020; and

     f.  Endorsement on Originating Pleading or Petition for Service Outside British Columbia.

THIS COURT ORDERS that:

1. Joshua Grant aka Joshua Grant Kidd shall be examined orally, under oath or affirmation, by counsel for the Petitioners and the Respondent, Royal Seas Cruises, Inc. ("Royal"), including any United States counsel, in the matter requested by the Letter Rogatory made on November 14, 2019 by the United States District Court Southern District of California in Case No. 17-cv-986 BAS (AGS).

2. Joshua Grant aka Joshua Grant Kidd shall attend before a court reporter on February 12, 2020 at 9:00 AM at Allwest Reporting at 1200 – 1125 Howe Street, Vancouver, BC, and be examined under oath.

3. The time for the examination of Joshua Grant aka Joshua Grant Kidd shall not exceed seven hours, with Petitioners' counsel to be granted 3.5 hours for their examination and Royal's counsel to be granted 3.5 hours for their examination,

4. Joshua Grant aka Joshua Grant Kidd shall produce to Wade Simpson, counsel for the Petitioners, and to Royal, by 4:00 PM on February 7, 2020, all the documents in his possession, custody or control, and which are not privileged, specified in Schedule "A" to this Order.

5. Prospects DM Inc. shall produce to Wade Simpson, counsel for the Petitioners and to Royal, by 4:00 PM on February 7, 2020, all the documents in its possession, custody or control, and which are not privileged, specified in Schedule "A" to this Order.

6. A verbatim transcript of the examination of Joshua Grant aka Joshua Grant Kidd shall be recorded by the court reporter.

7. The examination of Joshua Grant aka Joshua Grant Kidd may be recorded by videotape by the court reporter or its agent.

8. The examination of Joshua Grant aka Joshua Grant Kidd shall be conducted pursuant to the discovery rules as provided for in the Federal Rules of Civil Procedure of the United States, except to the extent such procedure is incompatible with the laws of Canada. The examination may be by cross examination.

9. The time provided for petition responses be abridged and all Respondents shall file and serve any petition responses on or before January 16, 2020.

10. The hearing of this petition be set for January 17, 2020.

11. Service of a copy of this Order may be effected on Royal by email to Jeffrey Backman at jeffrey.backman@gmlaw.com.

12. The Petitioners shall send a copy of the following to the Honorable Judge Andrew G. Schopler, United States District Magistrate Judge, United States District Court for the Southern District of California, 221 West Broadway, San Diego, CA 92101, United States of America:

   a. this Order;

   b. transcript of the examination of Joshua Grant aka Joshua Grant Kidd;

   c. videotape of the examination of Joshua Grant aka Joshua Grant Kidd; and

   d. copies of documents produced by Joshua Grant aka Joshua Grant Kidd, and Prospects DM Inc.

13. Each party shall bear their own costs.

14. Leave is granted for the Petitioners, Prospects DM Inc. or Joshua Grant aka Joshua Grant Kidd to apply for further orders regarding the application of orders 1 -12 above as they apply to Prospects DM Inc. an Ohio corporation.

THE PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ~~ANY, THAT~~ ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of Wade D. Simpson
Lawyer for the Petitioners

Signature of Clark T. Hartnett
Lawyer for the Respondents,
Prospects DM Inc. and Joshua Grant

By the Court.

Registrar

3



**SCHEDULE A TO THE ORDER**

Documents to be produced by Joshua Grant aka Joshua Grant Kidd and

Prospects DM Inc.

1.  All documents, including databases and outbound dial lists, relating to calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of Defendant Royal Seas Cruises, Inc. ("RSC") from November 2016 to December 2017.

2.  All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls, whether answered or not, associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 may be determined.

3.  All documents, including databases and outbound dial lists, relating to calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017.

4.  All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls, whether answered or not, associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 may be determined.

5.  All documents, including databases and outbound dial lists, relating to calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were live transferred ("live transferred" is defined as the process described by Joshua Grant of Prospects DM Inc. in his Declaration submitted in the above captioned matter) to RSC.

6.  All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls, whether answered or not, associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were live transferred to RSC may be determined.

7.  All documents, including databases and outbound dial lists, relating to calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were live transferred to RSC.

8.  All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls, whether answered or not, associated with

4

diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were live transferred to RSC may be determined.

9. All documents, including databases and outbound dial lists, relating to calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC.

10. All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC may be determined.

11. All documents, including databases and outbound dial lists, relating to calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC.

12. All documents, including databases and outbound dial lists, from which the phone number, date, and time of calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC may be determined.

13. All documents, including databases and outbound dial lists, relating to calls associated with the Class placed by Prospects DM Inc.

14. All documents, including databases and outbound dial lists, relating to calls associated with the Transfer Subclass placed by Prospects DM Inc.

15. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017.

16. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017.

17. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals,

relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were live transferred to RSC.

18. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were live transferred to RSC.

19. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were transferred to RSC.

20. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC,  from November 2016 to December 2017 that were transferred to RSC.

21. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls to the Class.

22. All documents, including technical manuals, network architecture diagrams, booklets, guidelines, memoranda, system administration manual, and architectural manuals, relating to the software, software systems, or dialer manuals, for the device Prospects DM Inc. used to place calls to the Transfer Subclass.

23. Prospects DM Inc.'s opt-in consent database for calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017.

24. Prospects DM Inc.'s opt-in consent database for calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017.

25. Prospects DM Inc.'s opt-in consent database for calls associated with

www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were lived transferred to RSC.

26. Prospects DM Inc.'s opt-in consent database for calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were live transferred to RSC.

27. Prospects DM Inc.'s opt-in consent database for calls associated with www.yourautohealthlifeinsurance.com placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC.

28. Prospects DM Inc.'s opt-in consent database for calls associated with diabeteshealth.info placed by Prospects DM Inc. on behalf of RSC, including for any campaigns run pursuant to its contract with RSC, from November 2016 to December 2017 that were transferred to RSC.

29. Prospects DM Inc.'s opt-in consent database for calls associated with the Transfer Subclass.

30. Prospects DM Inc.'s opt-in consent database for calls associated with the Class.

31. Any and all communications between Prospects DM Inc. and RSC.

32. Any and all communications between Prospects DM Inc. and anyone relating to its performance of services or sales of leads to RSC.

33. Any and all contracts between Prospects DM Inc. and anyone relating to its performance of services or sales of leads to RSC.

The word "document" or "documents" above should be interpreted in its broadest sense and include(s), but is not limited to, handwritten or electronic notes, memoranda, e-mails, calendar invitations and appointments, records of meetings, promotional and sales materials, planning and strategy documents, focus group information, press releases, analyst reports, competitive analyses, schematics, engineering drawings, product and performance specifications, teardown specifications, operational and service manuals, technical guides, electronic recordings, instant messages, phone messages, call recordings, source code and electronic files.

The Class is defined as:

> All persons within the United States who received a telephone call (1) from Prospects DM Inc. on behalf of Royal Seas Cruises, Inc. (2) on said Class Member's cellular telephone (3) made through the use of any automatic telephone dialing system or an artificial or prerecorded voice,

7

(4) between November 2016 and December 2017, (5) where such calls were placed for the purpose of marketing, (6) to non-customers of Royal Seas Cruises, Inc. at the time of the calls, and (7) whose cellular telephone number is associated in Prospects DM Inc.'s records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

The Transfer Subclass is defined as:

All members of the Class whose call resulted in a Transfer to Royal Seas Cruises, Inc.

No. 1914397
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

Between:

JOHN MCCURLEY and DAN DEFOREST,
on behalf of themselves and all others similarly situated

Petitioners

And

PROSPECTS DM INC., JOSHUA GRANT and ROYAL SEAS CRUISES, INC.

Respondents

## ORDER MADE AFTER APPLICATION

Filed by
WADE D. SIMPSON LAW CORPORATION
1400 – 1125 Howe Street
Vancouver, BC V6Z 2K8

Tel:   604-602-0206
Fax:   604-673-5828

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Vancouver, B.C.
February 12, 2020

Case No. 17-3V-00986-BAS-AGS

BETWEEN:

JOHN McCURLEY and DAN DeFOREST,

Plaintiffs;

AND

ROYAL SEAS CRUISES INC.

Defendant.

---

## VIDEOTAPED DEPOSITION OF JOSHUA GRANT KIDD

---

APPEARANCES:

| | |
|---|---|
| Mr. A. Bacon | |
| Mr. T. Wheeler, | |
| Mr. A. Kazerounian, | |
| Mr. W. Simpson, | Appearing for the Plaintiffs; |
| Mr. J. Backman, | Appearing for the Defendant; |
| Mr. G. Pette, | Appearing by telephone for the Defendant; |
| Mr. E. Allen, | Appearing by telephone for Mr. Grant and Prospects DM. |

Allwest Reporting Ltd.
12th Floor 1125 Howe Street
Vancouver, B.C. Canada
V6Z 2K8

9    Q    Before we get started with any real questioning,

          do you have any questions for me?

     A    I do not.

10   Q    That was your only chance.  You're not going to

          get another one.

               All right.  So, let me start by asking

          you, what is your position with Prospects DM

          Inc.?

     A    President.

11   Q    Okay, and my understanding is there is a Canadian

          corporation and there's also an Ohio corporation.

          Can you tell me what each of those are and where

          they're located?

     A    Yes, so the United States corporation is

          registered in Ohio, and the Canadian corporation

          is registered as a separate company and that's

          registered here in Canada.

12   Q    With respect to the work that is done by those

          companies, is it one in the same and you just

          have a different corporate entity in each country

          for business purposes or do they actually do

          different things than one another?

MR. BACKMAN:    Object to form.

     A     Same industry, different clients.

MR. BACON:

13   Q    Okay, do you have separate physical offices for

           each?

A    Yes.

14    Q    Where is the -- well, the Canadian company, where is the office?

A    Is in Burnaby, B.C.

15    Q    Can you give me the address, please?

A    Yeah, 4400 Dominion Street.

16    Q    And the Ohio company, can you provide me the address?

A    The address used to be in North Bridgeville but we don't have a corporate office there anymore.

17    Q    Okay.

A    We use our attorney office address there.

18    Q    Is that Mr. Allen's office?

A    No, that's Nuvall Gonzallo.

19    Q    And what's their address?

A    I don't know it off, off by hand.

20    Q    Okay.  What's the attorney's name?

A    Nuvall Gonzallo.

21    Q    Do they have -- are they a firm who has a firm name or is it just the sole --

A    Gonzallo Law, sorry.

22    Q    Thank you.  Make sure and let me finish my questions first.  I know that's going to happen and it's okay.

A    Right.

8

MR. BACKMAN:    And just pause in case I have an objection
          to make or Mr. Allen has an objection to make as
          well.

     A    Understood.   Thank you.

MR. BACKMAN:    And can I just ask one thing.   Mr. Court
          Reporter, in the States, and this is under the
          Federal Rules of Civil Procedure of the States as
          far as I'm concerned, but we just object to the
          form of the question, as I did earlier.   Is that
          standard practice for you?   You're fine with
          that?

THE COURT REPORTER:    Yes.

MR. BACKMAN:    Okay.   I just want to make sure you could
          get it.

MR. BACON:

23   Q    You say the two companies have different clients.
          Can you describe in a little more detail what you
          mean by that?

     A    We have different client base.   The work we do
          here from Canada is for different clients than we
          do in the United States.

24   Q    Is it the same type of work being done but just a
          different packet of clients, or is there a
          difference between the work that is done?

MR. BACKMAN:    Object to form.

MR. BACON:

```
25    Q    You can answer.

      A    It is the same type of work.  Lead generation or

           sales campaigns.

26    Q    My understanding is that you're in the lead

           generation business, is that correct?

      A    That's correct.

27    Q    Where is the data relating to your business

           maintained?

      A    Offshore with our dialer provider.

28    Q    Is that the one in Romania?

      A    Yes.

29    Q    What's the name of the dialer provider?

      A    It's SC Objects.

30    Q    Do you have an address for that company?

      A    I do not.

31    Q    How do you normally contact them if you need to

           speak about business matters?

      A    Through the phone.

32    Q    Do you have an e-mail address for a point of

           contact?

      A    I do, but not on -- I don't know it off, off by

           hand.

33    Q    Who is the person who you normally speak to?

      A    His name is hard to sound.  It's -- I can't

           remember it.  It's a Romanian name.

34    Q    I figured it would be.
```

```
        A    Yeah, sorry.
35      Q    Maybe at some point I can come back to this, you
             can go on break and you can refresh your memory
             probably through your phone.  Would you okay
             doing that if I asked you in maybe an hour or so?
        A    Yes.
36      Q    Okay.  All right, I want to go ahead and mark
             this document as Exhibit 1.
             (ORDER MADE AFTER APPLICATION, DATED JANUARY 22,
             2020 MARKED EXHIBIT 1 FOR IDENTIFICATION)
```

MR. BACON:

```
37      Q    Mr. Grant, you don't need to read the whole
             thing, I'll direct you to the portions that I
             want to go over, but just familiarize yourself
             with it briefly and let me know when you're
             ready.
                  For those on the phone it's the order made
             after application in the Supreme Court of British
             Columbia.  Looks like it was dated January 22nd of
             this year.
        A    All right.
```

MR. WHEELER:    Can we go off for one second.

        (DISCUSSION OFF THE RECORD)

MR. BACON:    Back on.

```
38      Q    Mr. Grant, have you seen Exhibit 1 before?
        A    Which, which -- is this -- this is the exhibit?
```

39   Q   This whole document, yeah, have you seen this before?

     A   I believe so, yes.

40   Q   Okay, and just for reference, this is the order that the British Columbia court issued with respect to the procedures and whatnot regarding today's deposition.

              There is a Schedule A to the order starting on page 4.  Can you turn to that.

     A   Yes.

41   Q   And there are categories of documents and data that are described for the next few pages.  I understand through your counsel you produced some documents pursuant to this order, is that correct?

     A   Yes.

42   Q   Can you describe for me what was produced?

     A   I believe we produced a transfer -- a list of transfers that we sent to Royal Seas, and I believe we produced opt-in records for the two websites that are listed, Diabetes Health and Ureteral Health Life Insurance.  And some e-mails between myself and my contact at Royal Seas.

43   Q   Okay.

     A   That's all I remember.  There could have been other though.

44   Q   There was a contract between Prospects DM and
         Royal Seas that was produced as well, right?

     A   That's correct.

45   Q   Okay.  What did you do to conduct a search for
         the documents described in Schedule A of Exhibit
         1?

     A   Which documents are you referring to?

46   Q   Any of them.  What steps did you take to go and
         look for the documents that would be described in
         the schedule?

     A   I requested from our tech the transfer
         information and the opt-in information and the
         e-mails.  The e-mails I searched for myself and
         produced those.

47   Q   How did you go about searching for e-mails?

     A   Just in my inbox.

48   Q   Did you search your deleted messages?

     A   I believe I searched everything.

49   Q   What did you search for?

     A   Any e-mails from Royal Seas.

50   Q   Did you conduct a search by way of a search box
         where you typed in something and then looked at
         what the output was?

     A   I don't remember the exact way I searched, but I
         did a search for anything with the Royal Seas
         URL.

13

51   Q   Okay.  Did you search for anything -- let me ask
         you a different question.

             Have you had any communications with any
         of Royal Seas' attorneys throughout this case?

     A   I have.

52   Q   Okay, and how many times have you spoken with
         them, if you could give me an estimate?

     A   I don't recall.

53   Q   Is it more than five?

     A   I don't recall.

54   Q   Is it more than two?

     A   I don't recall.

55   Q   Can you give me your best estimate?

     A   No.

56   Q   When was the first time that you spoke with Royal
         Seas' attorneys?

     A   It was quite a while ago.  It would have been
         related -- sometime back when I was made aware of
         this case.

57   Q   Can you give me your estimate as to when you
         first became aware of this case?

     A   I can't.  It was a long time ago.

58   Q   More than a year ago?

     A   Yes.

59   Q   What was the nature of the first communication
         that you had with Royal Seas?  And when I say

                                                              14

       Royal Seas, I mean --

MR. ALLEN:  I'm going to -- this is Mr. Allen.  I'm going
       to object on the basis of privilege of the joint
       defense document.

MR. BACKMAN:  As am I.

MR. ALLEN:  And I would ask Mr. Grant to not answer
       anything about the context or nature of the
       communications.

MR. BACON:

60 Q Mr. Grant, do you have an attorney/client
     relationship with Royal Seas Cruises' attorneys
     at Greenspoon Marder?

  A Can you ask that again?  I'm not -- I don't
     understand the question.

61 Q Have you signed a retainer agreement for
     Greenspoon Marder to represent you in any
     capacity with respect to this case?

  A No.

62 Q Are they your lawyers?

  A No.

MR. BACON:  So I'm going to ask these questions and I'm
       going to expect that the witness answer them
       because he just said that Greenspoon Marder is
       not his attorneys, and so any communications that
       he had with them, whether you were on the phone
       or not, Mr. Allen, are not privileged because

they were disclosed to a non-attorney
representing Mr. Grant.  And you can state your
objections for the record, but I'm going to ask
the questions anyways.

MR. ALLEN:    Yeah, go ahead and state your objections, Mr.
Bacon.  We're going to have the same -- your
questions, rather.  We will have the same
objection because there is a joint defense
agreement in place, and even if there wasn't, I
believe the common interest doctrine applies.
But go ahead.

MR. BACKMAN:    Yeah, and to be clear, the position is not
that Greenspoon Marder and Mr. Grant have a
direct attorney/client relationship.  As Mr.
Allen said, there's a common interest and joint
defense privilege.  I think you know that that's
recognize in the law, and that's the privilege
being asserted.

So go ahead, make your record.

MR. BACON:

63    Q    Mr. Grant, can you tell me the nature of the
first communication that you had with Royal Seas'
attorneys about this case?

MR. BACON:    Objection.

MR. ALLEN:    Same objection, and I would ask you to please
not answer.

16

           A    I don't recall.

MR. BACON:     Don't answer, that's what Mr. Allen said.

MR. ALLEN:     No, no.  Josh, if I tell you not to answer,
               that's the only occasion when you will not.

           A    Okay.

MR. BACON:

64    Q    Are you going to listen to your attorney's advice
           and not answer my questions on these issues?

      A    When it comes to the privilege information, yes.

65    Q    Have you exchanged any e-mails with Royal Seas
           Cruises' attorneys?

      A    No.

66    Q    Have you exchanged any written communications
           with Royal Seas Cruises' attorneys?  And by "you"
           I mean you personally, not your attorney.

      A    No.

67    Q    Have you ever had a phone conversation with Royal
           Seas Cruises that did not have Mr. Allen on the
           call?

      A    No.

68    Q    Have you ever sent text messages with any of
           Royal Seas Cruises' attorneys?

      A    No.

69    Q    Can you give me an estimate as to how many times
           you've spoken with Royal Seas Cruises' attorneys
           during the pendency of this case, about this

                                                              17

case?

A    I cannot.

MR. BACON:    We'll mark the document Exhibit 2.

(TWO-PAGE LETTER FROM GREENSPOON MARDER TO MR. GRANT DATED JULY 24, 2017 MARKED EXHIBIT 2 FOR IDENTIFICATION)

MR. WHEELER:    Exhibit 2 is a letter sent by Greenspoon Marder to us.  Or no, sorry, to Prospects DM.

MR. BACON:

70    Q    Mr. Grant, just briefly review this and let me know when you've looked it over.  No need to read everything in there.  We'll go over some specifics.

A    Sure.

71    Q    Can you tell me, have you ever seen Exhibit 2 before?

A    Not to my knowledge, no.  I don't remember this.

72    Q    The address that is listed at the top, the Northridge, Ohio address, is that Prospect DM's former address?

A    That's an old address, yes.

73    Q    Was that address been used by Prospects DM at the time that this letter says that it was sent?

A    I don't remember the day that we closed down that office, but I never received this letter.

74    Q    Hundred percent sure of that?

A    I do not recall.

75   Q    You don't recall receiving it?

A    I don't recall seeing this.

76   Q    Okay.  Does the date on this letter refresh your recollection in any way as to when you may have first discussed this case with Greenspoon Marder's attorneys?

A    No.

77   Q    When did you first become aware of this lawsuit?

MR. BACKMAN:    Object to form.

A    I don't know the date.

MR. BACON:

78   Q    Was it sometime in 2017?

A    I don't remember the date.

79   Q    Do you remember if it was before or after this letter?

A    I don't remember this letter, so I'm not sure if it was before or after.

80   Q    Do you remember if it was before or after the date on this letter?

A    I do not.

81   Q    What's your understanding of what this lawsuit's about?

A    My understanding about the lawsuit is that Royal Seas is being sued for a TCPA violation.

82   Q    Do you have any further understanding as to the

nature of the TCPA violations that are alleged by the plaintiffs?

A   Just what I've read in Mr. Weeks' report.

83   Q   Did you ever review the class certification order in this case?

A   I did a long time ago.

84   Q   Did you review -- besides Mr. Weeks' report, did you review any of the other filings in this case?

A   I reviewed many documents with my lawyer, Eric Allen.

85   Q   Okay, and I don't want to ask you about your discussions with Mr. Allen, but I do want to ask you what you've reviewed.  Did you ever review the expert report of Nathan Bacon?

A   I would have to see it to know if -- to try and jog my memory.  There's many, many documents.

86   Q   Did you ever review Kevin Brody's deposition transcript?

A   Again, I'd have to see it and go through it to jog my memory.

87   Q   Do you know who Kevin Brody is?

A   I do from -- I recognize his name from documents that I've reviewed.

88   Q   Are you familiar with his company Landfall Data?

A   I became familiar with them -- yes, I am now.  I became familiar with them by reviewing the

20

documents.

89   Q   Do you remember which documents?

      A   No.

90   Q   This letter says, in the first paragraph, "As you may know, various lawsuits have been filed against Royal Seas alleging violations of the *Telephone Consumer Protection Act* for calls being placed by Prospects, which among other things offer a Royal Seas vacation package."

Does that language jog your memory as to whether you became aware of this lawsuit prior to July 24th, 2017?

      A   No.

MR. BACKMAN:   Object to form.

MR. BACON:

91   Q   The letter goes on to say that the plaintiffs in the lawsuit were opted-in on websites managed and controlled by Prospects.

      A   Can you point that out, where that says that?

92   Q   Down at the second paragraph.

"Royal Seas, as you know, relied on those representations and promises when it entered into the marketing agreement and IO.  Nonetheless, the lawsuits described above have been filed and

21

> Royal Seas has been forced to defend
> itself."
>
> And there's a footnote that says, "Royal Seas
> reserves all rights."  What do you make of that?

MR. BACKMAN:    Object to form.

   A   This is the -- I don't remember ever reading
that, so I don't make anything of it.

MR. BACON:

93   Q   Reading it now what do you make of that?

MR. BACKMAN:    Object to form.

   A   I don't make anything of it.

MR. BACON:

94   Q   Do you find it to be threatening?

   A   No.

95   Q   Do you understand what "Royal Seas reserves all
rights" means?

   A   I do not.

96   Q   So, I think I know the answer to this based on
your prior answers, but I have to ask anyways.
Did you ever respond to this letter?

   A   I don't remember.

97   Q   But you never received it, right?

   A   Not to my knowledge.

98   Q   So if you didn't receive it and you weren't aware
of it, then you wouldn't have responded to it, is
that correct?

MR. BACKMAN:    Object to form.

    A   No, that's not what I'm saying.  I'm saying I do not remember if I responded to this or not because I can't remember receiving it.

MR. BACON:

99  Q   Mr. Grant, this class action lawsuit alleges that your company sold bogus lead to Royal Seas, and we've got it class certified that gives credence to the notion, at least, that those allegations may be accurate.  So, forgive me if I find it a little unbelievable that you don't have any recollection of any of these events.  You know, I'm going to keep asking you questions and I want you to do the best you can, and of course I understand if you can't remember things, but I just -- I would like you to be as forthcoming with your recollection of events as you possibly can so that we don't have to come back for a second day to look at any of these things again, okay?

    A   Okay.

MR. BACKMAN:    I move to strike Mr. Bacon's diatribe on what he believes happened and his interpretation of a class certification order, and what it sounds to me is insinuations that the witness that he's asking the questions of is lying.  I

don't know that you have any basis to say that.

It's quite improper what you just did.

MR. BACON:    Thank you for your --

MR. BACKMAN:    You're welcome.

MR. BACON:    -- comments, Jeff.

MR. BACKMAN:    You're welcome.

MR. BACON:    I'm going to introduce two exhibits.  Mark

this Exhibit 3.

(DOCUMENT ENTITLED "EXIT READ LEAD GENERATING

MARKETING AGREEMENT" PAGES STAMPED RSC-MCCURLEY

.000001 THROUGH .000010 MARKED EXHIBIT 3 FOR

IDENTIFICATION)

MR. BACON:    And we'll mark this Exhibit 4.

(DOCUMENT ENTITLED "EXIT READ LEAD GENERATING

MARKETING AGREEMENT" PAGES STAMPED RSC-MCCURLEY

.000001 THROUGH .000010 MARKED EXHIBIT 4 FOR

IDENTIFICATION)

MR. BACKMAN:    Do you know that they're the same?

MR. BACON:    Well --

MR. BACKMAN:    Okay.

MR. BACON:  I'd like to ask the witness about them.

MR. BACKMAN:    Let me just say, Exhibit 3 is a document

entitled "Exit Read Lead Generating Marketing

Agreement" Bates stamped RSC-McCurley .000001

through .000010.

MR. BACON:

100   Q    No need to read the whole thing, we can go
           through it a little bit in detail, but just
           familiarize yourself with it.

      A    Is this a different document?

101   Q    Well, I'm going to ask you if it is or not.

      A    Okay.

102   Q    So no need to look at Exhibit 4 yet.  I will
           represent to you that these appear to me to be
           identical documents.  However, Exhibit 3 is the
           one that was produced in discovery by Royal Seas
           Cruises and Exhibit 4 is the one that you
           produced in response to the subpoena and the
           court order, okay?

                Do you see that the marking on the very
           bottom right corner of the document that says
           "confidential" and then has a number below it?

      A    Yes.

103   Q    Do you know what that is?

      A    No.

104   Q    All right, that's what's referred to as a Bates
           stamp, which was applied by Royal Seas Cruises
           when they produced this document to my office in
           discovery.

      A    Okay.

105   Q    And do you see that that Bates stamp is on both
           documents?

```
            A    Yes, sir.

      106   Q    Exhibit 3 and 4?

            A    Yes.

      107   Q    So my question is, how did you come into

                 possession of Exhibit 4 to produce it to my

                 office in response to the subpoena?

            A    I believe I received this from my attorney.

      108   Q    Mr. Allen?

            A    I believe so.

      109   Q    Do you know how he received it?

            A    I do not.

      110   Q    Did you look for a copy of the marketing

                 agreement that we're looking at here in Prospects

                 DM's files in response to the court order?

            A    No, I would have asked our attorney.  That's

                 usually where we have all of our agreements.

      111   Q    Is this the only contract that Prospects DM has

                 with Royal Seas Cruises?

            A    I believe so.

      112   Q    The first line of it says,

                     "This agreement is made and entered

                     into this 10th day of November, 2016."

                 Is that consistent with your recollection of when

                 Prospects DM first started doing business with

                 Royal Seas Cruises?

            A    Yes.
```

26

113   Q   And with respect to any termination of a
          relationship, if there was one, can you tell me
          when that occurred?

      A   Sometime in 2018 we stopped working with Royal
          Seas.

114   Q   Can you tell me about the circumstances as to why
          you stopped working with Royal Seas Cruises?

      A   I don't recall the exact reason.

115   Q   Was it an amicable parting or was there some sort
          of -- in other words, was it a mutual agreement
          or was Prospects DM terminated?

MR. BACKMAN:     Object to form.

      A   I don't remember the exact reason.

MR. BACON:

116   Q   Are there any documents memorializing why you
          stopped doing business with Royal Seas Cruises?

      A   No.

117   Q   Any e-mails?

      A   No.

118   Q   And you have no recollection as to why?

      A   I do not.

119   Q   Did your contract expire?

      A   I don't remember the reason.

120   Q   Tell me a little bit about, in your own words,
          what you were hired to do for Royal Seas Cruises?

      A   Generate leads of people that were interested in

taking travel and live transfer those leads to Royal Seas call center.

121   Q   Were you also responsible for placing the calls to those individuals to whom you were generating interest?

MR. BACKMAN:     Object to form.  Go ahead

    A   We used third party call centers that we outsource the work to, to make those calls.

MR. BACON:

122   Q   But part of this contract was that you guys were to be responsible for making those calls, is that accurate to say?

    A   That is accurate.

123   Q   Okay.  Of course, you can outsource that as part of the contract too, but ultimately you were responsible for doing that under the terms of this agreement, correct?

MR. BACKMAN:     Object to form.

    A   Correct.

MR. BACON:

124   Q   And who did you out source those to?  Was it the Romanian company we talked about earlier?

MR. BACKMAN:     Object to form.

    A   No.

125   Q   Who were the calls out sourced to?

    A   Multiple call centers, and I don't know the name

28

off the top of my head.

126   Q   How many call centers besides SC Objects did you
          do business with under your Royal Seas contract
          for purposes of placing calls?

      A   I don't remember the amount.

127   Q   You have contracts with them, with those
          companies?

      A   We should have contracts with those companies.

128   Q   So, section 2 of the first page talks about an
          exclusive license to market Royal Seas products.
          Do you see that?

      A   In A?

MR. BACKMAN:    Object to form.

MR. BACON:

129   Q   It's in section 2, about two-thirds of the way
          down the first page.  You see where it says "Lead
          generation marketing".

      A   I see that section.  I'm just not seeing the
          language that you're pointing to.

130   Q   The first sentence says that "Royal Seas grants
          to Lead Generator a non-exclusive…" et cetera, et
          cetera, "license to market" Royal Seas packages.

      A   I see that.

131   Q   Okay.  And it says that the lead generator shall
          have the right to present Royal Seas' offers to
          consumers through its advertising methods.  So my

question is, can you tell me what advertising methods did you, Prospects DM, utilize to present Royal Seas' offers to consumers?

A    Through phone calls.

132  Q    Walk me through how a phone call with a successful lead that was generated would go from start to finish, to the point where it was handed off to Royal Seas.

A    We initiate a phone call. We go through a series of qualifying questions, and depending on the response of the consumer we'll transfer it to -- the lead to an offer that they've asked to receive more information.

133  Q    How did you go about gathering the phone numbers for the individuals to whom calls of the nature you just described were placed?

A    Through third party web publishers.

134  Q    Would you purchase leads data bases from them and then provide those numbers to your call center?

MR. BACKMAN:    Object to form.

A    The data would be sent through an API into our database.

MR. BACON:

135  Q    Tell me what an API is.

A    It's an electronic submission of data from one party to another.

136   Q   What program did you use to do that?

     A   I'm not sure which program the data venders --
         the third party web publishers would use.

137   Q   What data would you receive from the, I guess
         I'll call them lead venders?

MR. BACKMAN:      Object to form.

     A   It could vary depending on the third-party web
         publisher.  Typically we would receive a phone
         number, and then contact information for the
         consumer who opted in, and some third-party web
         publishers provided the full opt-in and some upon
         request.

MR. BACON:

138   Q   What do you mean by the full opt-in?

     A   The full opt-in information, time stamp, URL
         where the consumer opted in.

139   Q   We'll go through some examples of that in a
         little bit.  When you received an API -- or the
         transfer through the API, where would that
         information be stored by Prospects DM?

     A   In the servers from the phone system provider.

140   Q   The Romanian dialer?

     A   That's correct.

141   Q   Did Prospects DM have direct access to that
         database?  In other words, did you have an
         administrative log-in where you could go in there

31

yourself or did you have to contact the third party dialer in order to request information?

A   We have to request certain information and certain information we can access ourself.

142   Q   Which information can you access yourself?

A   Basic search functions.

143   Q   Such as?

A   The searching for calls, calls made, agent performance.  That's all I can remember off the top of my head.

144   Q   So you mentioned that the data that you would receive, just a minute ago, would contain phone numbers and contact information, sometimes it would have other opt-in info, including the time stamp and URL and other related items.  Do you have access to that through an administrator log-in?

A   No, we have to request that information in big batches.  We can pull small batches, but any big files we would have to request.

145   Q   There are some initials at the bottom of the first page, on the bottom right.  Do you see those?

A   I do.

146   Q   Is that your initial that says "JG"?

A   Yes.

147   Q   Do you know who the other initial is?

      A   I do not.

148   Q   There's a signature page on those -- there are
          two, actually.  The second to last page, page 9,
          and then there's an addendum on the next page.
          Did you sign both of those documents?

      A   I did.

149   Q   Okay.  Describe for me in your own words how
          Prospects DM complied with the TCPA.

      A   Through purchasing TCPA compliant data from
          third-party web publishers.

150   Q   How involved were you in confirming with those
          web publishers whether or not their data had been
          compliantly gathered?

      A   To the extent of I personally did some site
          visits and reviewed the opt-in language and
          verified that our company name was listed on the
          opt-in language.

151   Q   Do you have any recollection as to whether you
          did that with respect to the two websites that
          are at issue in the class definition in this
          case?

      A   Which websites are you referring to?

152   Q   For reference it's on page 8 of Exhibit 1.  I'll
          turn you to it, exactly the reference.

      A   Thank you.

33

153   Q   It's DiabetesHealth.info and
          YourAutoHealthLifeInsurance.com, and just to ask
          the question again for your reference.  Do you
          have any recollection as to looking at either of
          those websites to determine whether there was
          TCPA compliant language with respect to marketing
          calls placed for Royal Seas Cruises?

      A   I do not recall if it was myself or someone else
          from my company that reviewed these sites.

154   Q   Is it standard procedure for somebody at
          Prospects DM to have done that?

      A   Yes.

155   Q   Who else besides yourself would have been
          involved in it?

      A   I'm not sure back then who would have been
          involved in it.

156   Q   How many employees does Prospects have?

      A   Around 20.

157   Q   Is there a particular job title of employee who -
          - whose job task it would be to assist you in
          reviewing the websites for your clients to
          determine TCPA compliance?

      A   No.

158   Q   Do you have a recollection as to how many people
          you would, let's say, split that task amongst
          besides yourself?

34

A     I do not.

159   Q     When you're doing this compliance review that we
            just talked about, do you ever look at the
            website to determine if it's even capable of
            producing the data that you're receiving from the
            lead broker who is selling it to you?

MR. BACKMAN:     Object to form.

A     I'm not sure what you mean by that.

MR. BACON:

160   Q     So one of the issues in this case, I will tell
            you and we'll get to it in a minute, is that one
            of the class representatives data has extra
            columns in it for address and other things, that
            the website in the class definition isn't capable
            of generating.

            So my question is, do you look for that
            sort of thing when you're doing a compliance
            review or are you just looking to see if the opt-
            in language has the company that you're going to
            be selling these leads to?

MR. BACKMAN:     Object to form.

A     We're looking to make sure that the TCPA opt-in
            language is there and our DVA is listed on the
            site.

MR. BACON:

161   Q     You can put Exhibit 1 back down.  Let's go back

to number 3.  Other than what you just described

to me, are there any other measures taken to

comply with the TCPA?  That Prospects DM takes, I

should say.

MR. BACKMAN:    Object to form.

A    We employ TCPA attorneys who handle all of that

for us.  Any complaints that come in, we make

sure that those complaints are taken seriously

and handled by our attorneys.

MR. BACON:

162   Q    If you could flip to the second page of Exhibit

3, and under section 3(a) it describes how Royal

Seas under this contract will make available to

your business offers that include a description

of the component of the vacation package in

scripts detailing the terms of the offer.  So can

you tell me, was anything like that provided to

Prospects DM by Royal Seas in conjunction with

this contract?

MR. BACKMAN:    Object to form.

A    I don't recall ever seeing any scripts sent from

Royal Seas.

MR. BACON:

163   Q    The next section says:

"Lead Generator's representatives will

use only such scripts in vacation

package details as Royal Seas has

approved in writing prior to their

use."

Did Royal Seas Cruises approve the scripts that

were used during the calls that Prospects DM was

placing to potential customers of Royal Seas on

their behalf?

A    I don't recall.

164   Q    Do you have any recollection of whether there are

any written documents approving any of the

language that was to be used during the calls

that were placed on Royal Seas' behalf?

A    I do not.

165   Q    I'm going to fast forward just a little bit and

go to the last page of the document.  Under where

it says "Test Budget/Cap" in the middle?

A    Yes.

166   Q    It describes a publisher's perfect pitch pre-

recorded audio program.  Do you see that?

A    I do.

167   Q    Prospects used a pre-recorded audio program as

part of its dialing platform when it placed the

calls to Royal Seas' customers, is that accurate?

MR. BACKMAN:    Object to form.

A    Some calls would have been placed by an agent, by

a live agent using voice prompts.

MR. BACON:

168   Q   What's a voice prompt?

        A   The agent has the ability to instead of speaking, using the agents voice to use a voice prompt to respond to the consumer on the line.

169   Q   Those are pre-recorded responses that you can press on a switchboard, correct?

MR. BACKMAN:   Object to form.

        A   I'm not sure if it works exactly that way.

MR. BACON:

170   Q   What's your understanding of how it works?

        A   That there's voice prompts available for them to choose, if needed.

171   Q   If they click one of those, what happens?

        A   The voice prompts would play.

172   Q   And that's a prompt that is a pre-recorded voice? In other words, it's one that somebody recorded, programmed it into the prompt and then the agent can select that and play it for the consumer, correct?

MR. BACKMAN:   Object to form.

        A   I'm not sure exactly how it gets there because I didn't -- I didn't set it up.  I know that there's a voice prompt that they can press to respond instead of using their own voice.

MR. BACON:

173   Q   Okay, and it's not the voice of the agent or any
          other live person speaking, it's something that's
          done through the computer, right?

MR. BACKMAN:   Object to form.

      A   If they choose to use that, yes.

MR. BACON:

174   Q   And that's what you -- and you, I say Prospects
          DM.  That's what Prospects DM was contracted to
          do for Royal Seas under page 10 of this contract,
          correct?

MR. BACKMAN:   Object to form.

      A   We were contracted to generate leads for Royal
          Seas Cruises.

MR. BACON:

175   Q   How does a dialing campaign get set up with your
          third-party dialer?

      A   I'm not sure.  I don't set it up.

176   Q   Do you have any knowledge as to how the dialing
          campaign is conducted?

MR. BACKMAN:   Object to form.

      A   I may have basic knowledge on the direct question
          to be able to answer that.

MR. BACON:

177   Q   Okay.  Can you tell me what your basic knowledge
          is?

      A   That the agents log in to a phone system.  They

39

put themself into ready mode, and can hit a
button to accept a call.  After they finish the
call, they disposition the call and hit another
button to go to ready and hit a button to
initiate another call.

178   Q   Do you know what a predictive dialer is?

      A   I do.

179   Q   What's your understanding of what a predictive
          dialer is?

      A   Very basic knowledge of a predictive dialer is a
          dialing system.

180   Q   Do you have any further understanding than that?
          How it functions in other words.

      A   No.

MR. BACKMAN:   We've been going about an hour, at a good
          break, I could use one.

MR. BACON:   I'll take one in a minute.

181   Q   Go to page 4 of Exhibit 3, if you could, please.

      A   Yes.

182   Q   You'll see section 7 where it says "Reporting"?

      A   I do.

183   Q   It says,

              "Royal Seas will provide to Lead
              Generator weekly reports detailing the
              total number of Qualified Exit Read
              Transfers."

Did Royal Seas provide Prospects DM with weekly reports?

A    I don't recall.

184  Q   Did you search for any weekly reports when you conducted your search for documents in compliance with the court's order in Exhibit 1?

A    I did.

185  Q   Did you find anything that would memorialize a weekly report?

A    No.  What I found, I produced.

186  Q   Do you know what "indemnification" means?

A    I have basic knowledge of what it means.

187  Q   Do you understand that pursuant to this agreement Prospects DM has agreed to the fullest extent permitted by law to indemnify Royal Seas Cruises from any damages sustained as a result of a breach of this agreement?

A    Where is that in this agreement?

188  Q   It's in section 12 on pages 6 and 9 -- 6 and 7, I should say.

A    I see it here.  Yes, I'm aware of that.

189  Q   Do you understand the gravity of that clause with respect to the certified class that we're here today to talk about?

MR. BACKMAN:   Object to form.

A    No.

41

MR. BACON:

190   Q   Go to the last page of the document if you could,
          please.  The one marked Bates stamp 10 at the
          bottom.

      A   Got it.

191   Q   This document appears to set forth the
          compensation rates for Prospects DM by Royal Seas
          Cruises and sets a percentage and dollar amount
          per exit read transfer.  Do you see that?

MR. BACKMAN:   Object to form.

      A   I do see it.

MR. BACON:

192   Q   Can you tell me in your own words how Prospects
          DM was compensated by Royal Seas Cruises for the
          calls it was placing?

      A   Per billable transfer that lasted 60 seconds or
          longer.

193   Q   Okay, and do you remember which one of these
          percentage thresholds that you fell into with
          respect to the percentage of calls that
          translated into sales?

MR. BACKMAN:   Object to form.

      A   I do not recall being paid based on any
          percentage.  It was always a static amount.

MR. BACON:

194   Q   What was the static amount?

A    I believe it was $3.20 per billable call.  So a
     call that lasted 60 seconds or greater.

195  Q    Do you have an estimate as to how much money
          Prospects DM made under this contract with Royal
          Seas Cruises in aggregate?

A    I do not.

196  Q    Do you have any sort of an estimate at all?

A    No.

197  Q    Do you have records that you maintained that
          would be able to be used to determine that
          number?

A    Should have something.

198  Q    How often were you compensated by Royal Seas
          Cruises?  During this contract.

A    Weekly, I believe.

MR. BACON:    Let's go ahead and go off, take a break.

MR. BACKMAN:    Thank you.

     (PROCEEDINGS ADJOURNED AT 10:07 A.M.)

     (PROCEEDINGS RESUMED AT 10:18 A.M.)**(Video 2 Begins)**

MR. BACON:

199  Q    Mr. Grant, did you speak to anybody during the
          break?

A    No.

200  Q    Can you tell me -- I know you don't remember how
          many times you had a conversation involving a
          member of the Greenspoon Marder firm, but can you

43

tell me when was the last time you had a
conversation involving a member of their firm?

A    A couple days ago.

201  Q    Was your attorney present for that call or --

A    Yes.

202  Q    What did you talk about?

MR. BACKMAN:    Objection.

MR. ALLEN:    Objection.  This is Eric Allen.  We'll renew
our previous objection about joint defense and
common interests privilege and I would ask you,
Mr. Grant, not to respond.

MR. BACON:

203  Q    Are you going to follow your attorney's advice?

A    I am.

204  Q    Do you know whether every single time you spoke
to an attorney from Greenspoon Marder if Mr.
Allen was present for every single one of those
communications?

A    I believe he was.

205  Q    Before today have you ever met Mr. Backman in
person?

A    I -- yes, yes.

206  Q    When?

A    I don't remember when.  It was a long time ago.

207  Q    How long?

A    I don't -- I don't remember.

44

208   Q   Six months?

      A   I don't remember.

209   Q   Two years?

      A   It was a long time.

210   Q   How long?  How long in your best estimate?

      A   Over a year ago I would say.

211   Q   And was it just once or was it more than once?

      A   Just once I believe.

212   Q   Was your attorney present during that meeting?

      A   Yes.

213   Q   Does Prospects DM have any financial interest in Royal Seas Cruises?

      A   No.

214   Q   Can you tell me what is Prospects DM's document and data retention policy?

      A   I can't, I can't speak to that.  All of that is handled by our attorneys.

215   Q   Do you know whether there is a document and data retention policy?

      A   I'm not sure.

216   Q   Do you ever purge your databases of old leads or would it all still be there under your standard protocols?

      A   I'm not sure.

217   Q   Apart from the dialing company that you contract with in Romania, can you name any other dialing

company that you've worked with during the last three years?

A   That was the only dialing system we worked with for this type of lead.

218   Q   Okay.  Okay, thank you for clarifying.  Because I don't want to go outside of the scope of what's relevant in this case, so let me go back to something you said earlier and make sure I understand.

A   Okay.

219   Q   Is it accurate to say that the Romanian dialing company would have been the only dialing company that you would have worked with under the Royal Seas contract?

MR. BACKMAN:    Object to form.

A   To my knowledge, yes.

MR. BACON:

220   Q   You recall earlier we talked about the inspection of the websites and the opt-in information that's on them, matrix, TCPA compliance.  You recall that?

A   Yes.

221   Q   Okay, and my recollection is you couldn't remember how many employees or who they were who would assist you with that task, but let me ask you a slightly different question.  How many of

46

Prospects DM's employees are qualified to make the determination that a website that they are looking at for purposes of TCPA compliance is in fact TCPA compliant?

MR. BACKMAN:    Object to form.

A    I'm not sure on the number of employees we would use for that, and we also would rely on our TCPA attorneys to confirm certain pieces to make sure we're TCPA compliant.

MR. BACON:

222  Q    Okay, you said that you employ TCPA attorneys to assist you with compliance.  Can you tell me who are they?

A    Eric Allen.

223  Q    Is that the only firm?

A    For TCPA compliance, yes.

224  Q    Do you know whether they reviewed either of the websites that are in the class definition on your behalf as to whether they were TCPA compliant?

A    I'm not sure if they reviewed either of those websites.

225  Q    When we were talking about the voice prompt used by the dialing platform, is it accurate to say that the first voice that a consumer would hear when they pick up the phone from a call made using that system would be an artificial voice as

opposed to a live agent?

MR. BACKMAN:    Object to form.

    A   It's always a live agent on all of the calls.

MR. BACON:

226  Q   That's not my question.  Is it accurate to say
that the first voice that they would hear would
be an artificial voice doing a voice prompt as
opposed to the voice of the live agent?

MR. BACKMAN:    Object to form.

    A   No.

MR. BACON:

227  Q   How do you know that?

    A   Because the agents have the ability to use their
voice.  We have agents that only use their voice,
and there was other people that had the ability
to do either.  So, that's how I know.

228  Q   The Royal Seas contract says you were going to be
using pre-recorded voice style.  So, to narrow my
question, is it accurate to say that under the
Royal Seas contract the voice prompts were used
for all of the outbound calls?

MR. BACKMAN:    Object to form as well. It's what his
contract says.

MR. BACON:    Please don't instruct the witness or --

MR. BACKMAN:    I'm not instructing him.  It doesn't say
that.

48

MR. BACON:    Jeff, you've been objecting to form throughout this whole deposition and every time you do the witness says he can't recall.  So I'm going to just --

MR. BACKMAN:    Am I not allowed to object?

MR. BACON:    You are as long as there's no coaching involved, and you know, secret codes like that or things that we take very seriously.

MR. BACKMAN:    Are you kidding?  So far you've accused the witness of lying without any foundation, any basis.  You've gone on a rant, self-servingly on the record, and now you're accusing me of secret codes?

MR. BACON:    I'm just saying --

MR. BACKMAN:    Is that what you're doing?  Say it.

MR. BACON:    I am saying --

MR. BACKMAN:    Say it.

MR. BACON:    -- that you should please not coach the witness.

MR. BACKMAN:    Have I coached the witness?  Is that your position?

MR. BACON:    My position is that the witness seems to not recall things as soon as you object to form on any question, and that seems like a coincidence.  That may be a coincidence or may not be, and I'm simply stating that for the record.

49

MR. BACKMAN:    Is it a coincidence that your questions are
          bad and they require objections to form?

MR. BACON:    I'm not going to get in an argument with you.

MR. BACKMAN:    It sounds like you are.

MR. BACON:    No, I'm not.

MR. BACKMAN:    If you want to accuse me of something, go
          ahead.

MR. KAZEROUNIAN:    Excuse me --

MR. BACKMAN:    No, no, no, no.  You're completely
          inappropriate.

MR. KAZEROUNIAN:     No, no, no.

MR. BACKMAN:    Secret codes?

MR. KAZEROUNIAN:    Why are you raising your voice?

MR. BACKMAN:    Secret code?

MR. KAZEROUNIAN:    There's no reason to raise you --

MR. BACKMAN:    Because you just accused me --

MR. KAZEROUNIAN:    Okay, you've made --

MR. BACKMAN:    -- of having secret codes with this witness.

MR. KAZEROUNIAN:    You disagree.  You've made a record,
          let's continue, because this is our time.

MR. BACKMAN:    The deposition is going to stop if Mr. Bacon
          continues to accuse me of things like that.

MR. KAZEROUNIAN:    You know (inaudible - simultaneous
          voices)

MR. BACKMAN:    Of course not.  Of course not.

MR. BACON:    I would like this time not to be cut into my

50

three and a half hours.

MR. BACKMAN:   You should talk to your counsel, that's what
you should do.

MR. KAZEROUNIAN:   I'm just saying --

MR. BACKMAN:   And you should advise him to act
appropriately --

MR. KAZEROUNIAN:   Raising your voice is not going to --

MR. BACKMAN:   Okay, that's all right.

MR. KAZEROUNIAN:   Let's continue.

MR. BACKMAN:   Transcript will be clear.

MR. BACON:   Let's let him look at another document.  We'll
mark this as Exhibit, we're on 5, I think.
(E-MAIL CHAIN ROYAL SEAS AND PROSPECTS DM
REGARDING "DO NOT CALL LIST NUMBERS" DATED
OCTOBER 23, 2017 MARKED EXHIBIT 5 FOR
IDENTIFICATION)

MR. BACON:

229  Q   So, this is one of the e-mails that we talked
about earlier that your counsel produced to us in
response to the court's order.  Do you recognize
this document?

     A   Yes.

230  Q   So, this appears to be a list of 114 numbers that
you were asked to put on the DNC list by Royal
Seas Cruises.  Do you agree with that
characterization of this e-mail chain?

A    Yes.

231  Q    There is some references here that say, that three of these numbers should be on the never call list.  Can you tell me what that means?

A    I can't.  That's not a reference -- that means nothing to me on my side.

232  Q    But you respond to this and said "done", so what had you done in response to this e-mail?

A    We would just simply take all the telephone numbers and put them on our internal do not call list.

233  Q    This e-mail from Deb Dillow at royalseas.com asked you to remove them from all programs.  Do you know what that means?

A    I don't.  That's their language they use.

234  Q    Is there more than one program with Royal Seas that Prospects DM was working on?

A    Not to my knowledge, no.

235  Q    Does Royal Seas Cruises have any involvement in any other programs other than the calls that were placed under the contract we just looked at in Exhibit 3?

MR. BACKMAN:    Object to form.

A    No.

MR. BACON:

236  Q    So you have absolutely no idea why there are

52

three numbers that are in all bold, all
underlined, that say "never call list" under
them?  You don't know what that means?

A    I don't.  That doesn't come from us.

237  Q    What is this e-mail address SSC Data in the "To"
line halfway down the page?

A    I'm not sure.  That's not anyone that from me.
That must be someone from the Royal Seas side.

238  Q    You were not on this e-mail chain in the original
message.  Do you agree?

A    I'm not sure.

239  Q    Well, look at it.

A    I'm not sure by looking at this.

240  Q    Do you see where it says "original message"
halfway down the page?  On the first page.

A    I do see that.

241  Q    Do you see that it's from Deb Dillow to SSC Data
with Jennifer Poole carbon copied?

A    I see that.

242  Q    And your e-mail address is not there, correct?

A    I do not see my e-mail address, no.

243  Q    Yet you responded to this e-mail, correct?

A    I'm not sure if I did or not.

244  Q    Well, you did because jgrant@prospectsdm.com is
the from line on the top.  Do you see that?

A    I do see that.

245   Q    That's your e-mail address, right?

       A    That's right.

246   Q    So how was this message sent to you if you weren't on the original message?

       A    I'm not sure.

247   Q    Did you look for the original copy of this message as it was originally sent to you when you conducted your search for documents?

       A    I would have, yes.

248   Q    And you didn't find anything?

       A    No.

249   Q    Do think it's alarming that 114 people on this particular day were asked to be placed on the DNC list after they warn transferred --

MR. BACKMAN:    Object to form.

MR. BACON:

250   Q    -- to Royal Seas Cruises?

MR. BACKMAN:    Object to form.

       A    This DNC list doesn't represent exclusive calls from calls made from us.  There's nothing in here that says that.  This is an e-mail from our client telling us to put these phone numbers on a DNC list.  That doesn't mean they came from us.

MR. BACON:

251   Q    So -- okay.  Can someone -- well, strike that. I'll put another exhibit.  Mark this as

Exhibit 6.

(E-MAIL CHAIN REGARDING "DO NOT CALL" DATED

AUGUST 22, 2017 MARKED EXHIBIT 6 FOR

IDENTIFICATION)

MR. BACON:

252  Q    This is another e-mail that you produced in

response to the subpoena.  It's dated August 22nd,

2017 from Jennifer Poole to you and Deb Dillow.

There's a description below that says:

      "Customer states she pressed zero to be

      placed on the "Do not call" list.

      Customer was still transferred to speak

      with a rep"

And then it has a phone number.  Is the press

zero feature part of the dialing campaign that

the Romanian dialer was conducting for you under

the Royal Seas contract?

MR. BACKMAN:    Form.

      A    I'm not sure what she means by "press zero"

      there.

MR. BACON:

253  Q    Are you familiar with the term "IVR"?

      A    I am familiar with the term "IVR".

254  Q    Okay, and are you familiar with the concept that

a consumer hearing a voice on the phone can

press, you know, zero, one, two, something like

that to initiate a response during a phone call?
Are you familiar with that concept?

A    Yes, sir.

255  Q    So she appears to be referring to something like
that, wouldn't you agree?

MR. BACKMAN:    Form.

A    I'm not sure exactly what she's referring to.

MR. BACON:

256  Q    You're not sure whether the dial, dialing
campaigns that were conducted had an IVR that
allowed a consumer to press a number to initiate
a response?

A    There was no IVR on the dialing system that we
used.

257  Q    So you haven't -- do you believe that Ms. Rowe is
mistaken with respect to this content of this e-
mail?

A    I'm not sure --

MR. BACKMAN:    Object to form.

A    I'm not sure what she was thinking.  It didn't
come from me.

MR. BACON:

258  Q    Do you know who Tawanna Rowe is?

A    No idea who that is.

259  Q    Do you know who Lawrence Hansen is?

A    No.

56

260  Q   Do you know who Melissa Hanson is?

    A   No.

261  Q   Do you know who Todd Centeio is?

    A   No.

262  Q   Do you know who Deb Dillow is?

    A   No.

263  Q   You had e-mail exchanges with Ms. Dillow,
       correct?

    A   I believe she was on some of the e-mail
       exchanges, yes.

264  Q   Do you know who Jennifer Poole is?

    A   Yes.

265  Q   Who is she?

    A   That was my primary contact at Royal Seas.

266  Q   You were asked to please DNC this person.  Do you
       remember whether you did that or not?

    A   I don't recall.  I can go back, but any DNC
       requests that come in, standard business practice
       for us would be to place the number on our
       internal DNC list.

MR. BACON:   Mark this as Exhibit 7.

       (E-MAIL CHAIN REGARDING "DNCS FOR 10/26/17 - 6
       TOTAL (5 NEVER CALL LIST)" DATED OCTOBER 26, 2017
       MARKED EXHIBIT 7 FOR IDENTIFICATION)

MR. BACON:

267  Q   This is another e-mail that you produced in

response to the subpoena, dated October 26, 2017.
The original message on the bottom half of this
page, first being an e-mail from Deb Dillow to
SSC Data, copying Jennifer Poole, do you see
that?

A    I do.

268   Q    And you said earlier you don't know what the SSC
Data is.

A    I don't.

269   Q    Is it possible that that's the address for your
Romanian dialing company?

MR. BACKMAN:    Form.

A    No, I do not believe that it is.

MR. BACON:

270   Q    Okay.  Does looking at this e-mail refresh your
recollection as to what SSC Data is?

A    No.

271   Q    Again, there are references to several of these
numbers that should be placed on a never call
list, and are in bold.  And then your response to
it is, "Will master DNC right now."  What do you
mean by that?

A    We'll DNC.

272   Q    What's "master DNC"?

A    Just means that internal database, they'll never
dial those numbers again.

273   Q   For any client?

      A   We place all DNC requests from any client on our
          internal database DNC list to not call them for
          anybody.

274   Q   Does your procedure to do that with respect to
          any DNC request or do you treat the never call
          list, all the items differently than the "Do not
          call" list items?

      A   Everything is treated the same.

275   Q   Who is Kenny Johnson?

      A   I don't recall who Kenny Johnson is.

276   Q   Is he an employee of Prospects DM?

      A   No.

277   Q   Is he an individual who works for your third
          party dialing company?

      A   I can't remember.

278   Q   On October 12th, 2017 you sent an e-mail telling
          him to master DNC on all campaigns and sent him a
          list of 65 numbers.  Does that refresh your
          recollections as to who Kenny Johnson is?

MR. BACKMAN:   Object to form.

      A   No.

MR. BACON:

279   Q   When you get a DNC request, what's the procedure?
          How do you handle it?

      A   Typically we take the phone numbers and enter

59

them into the phone system's DNC file.

280   Q   Is that something Prospects does or does
          Prospects ask the third party dialing company to
          do?

      A   No, we would do it typically.

281   Q   How would you go about letting the dialing
          company know that you'd updated that information
          so that they didn't presumably make -- continue
          making calls to those numbers?

      A   I don't think that we had to let them know this.
          When we upload those into the system, that's what
          stops those phone numbers from being called.

282   Q   Okay, so you have two-way access to that
          particular data and you're inputting it into
          something that they can see in real time that
          you've changed it?

      A   Yes.

MR. BACON:   I'd like to introduce this as Exhibit 8.

             For the record -- well.

             (CALL LOG RECORD BATES STAMPED RC-MCCURLEY 000011
             TO 000016 MARKED EXHIBIT 8 FOR IDENTIFICATION)

MR. BACON:

283   Q   For the record this is a document that has been
          Bates stamped RC-McCurley 000011 to 16.  This was
          produced by Royal Seas Cruises in the litigation.

             So Mr. Grant, this appears to actually be

two separate documents.  So I think for convenience what I'd like you to do is take the last page of it, to put it aside, and to put the other pages in sequential order, lining them up one right next to the other, because my understanding is that this is a single line of data.

A   Okay.

284   Q   And if you can't get it all in one spot, that's okay.

A   I got it.  There we go.

285   Q   Okay.  All right, so let's start with an easy one.  Can you tell me what this is?

A   This appears to be a call log record.

286   Q   Okay.  How do you know it's a call log record and not something else?

A   Because that's how I've seen our call logs before.

287   Q   Okay.  My understanding is that this document was produced to Royal Seas Cruises by Prospects DM early in the litigation, and that this is in fact a lead for the consumer who is identified in the data.  Is that inaccurate?

MR. BACKMAN:   Object to form.

A   I don't know, I don't recall producing this or if this was produced by us to Royal.  This to me

61

looks like something that would have been pulled from a call log record.

MR. BACON:

288  Q  Well, I have call log records and they're different than this, and we can go over them in a minute, and we will.  I just want to make sure that you're recalling things accurately.  I'm going to try and help you do that.

A  Okay.

289  Q  Let me ask you a different question.  Do you remember sending consent data for a particular consumer to Royal Seas Cruises early on in this litigation at some point?  Upon their request.

A  I do not remember sending anything directly to them.  I may have sent something to my attorney, Eric Allen, that may have been forwarded to them.

290  Q  Okay.  Let's go through these columns.  I want to understand what they are.  The first column is "ID".  Can you tell me what that represents?

A  Just looks like a lead ID.

291  Q  What's that mean?

A  It's just internal number that we use for lead ID.

292  Q  And what does it represent?

A  Just the record ID.

293  Q  Of what?

A    Of the lead.

294  Q    Is this an ID that is unique to a particular lead for a specific consumer, or is this a lead ID that is in relationship to the source of the lead, i.e. the publisher?

MR. BACKMAN:    Object to form.

A    This would not be -- have anything to do with the publisher.

MR. BACON:

295  Q    Okay.  Is there a particular ID that is assigned to each unique consumer whose information is contained in a lead?

A    No, this lead ID would be for the -- this lead ID would be from the call log, like a call log record ID for the call that was made, I believe.

296  Q    I'm going to get a call log out so we can look at it because I want to make sure your testimony is accurate.  These data points are very important I think to the case, and I want to make sure I'm understanding what we're looking at.

A    Okay.

MR. BACON:    So we'll mark this Exhibit 9.

(CALL LOG RECORD MARKED EXHIBIT 9 FOR IDENTIFICATION)

MR. BACON:

297  Q    You can just keep that as it is, because I'm not

going to make you flip through all of this.

A    Thank you.

298   Q    So, you testified as to this issue in your declaration from about a month ago, and I'll refresh your recollection.  There was a database of data that was produced to my office by your attorney Mr. Allen, probably about a year and a half ago, that contained about 600 million rows of data in it.  And my understanding is that that represented an outbound call log for all the calls that were placed during the time periods that we requested in this case.  And I think that's what you said that it was in your declaration.  Do you recall that?

A    I do.

299   Q    This first page of Exhibit 9 is the data that we pulled out for Dan DeForest by searching for his number out of that database that was produced.  So this represents all of the -- what I understand to be all of the phone calls that were placed to Dan DeForest.  And this, as I understand it, is the call log.

              Can you tell me if that's inaccurate?

MR. BACKMAN:    Object to form.

A    This would be from call logs, yes.

MR. BACON:

300   Q   Okay.  So, this appears to contain different
          information than Exhibit 8.  Can you tell me what
          these two separate things are?  Does this refresh
          your recollection as to anything in particular?

      A   This looks like what I've also seen on call logs
          for consumers.  I've seen it in this version as
          well.

301   Q   Okay.  Do you know how to pull a data query out
          of your database?

      A   No.

302   Q   Who would, from Prospects DM, be responsible for
          that?

      A   Nobody.  It would be the dialer provider.

303   Q   Do you know -- do you remember whether you
          requested the dialer provider produce data for
          the consumer identified in Exhibit 8 at some
          point early in this case, that you then provided
          to Mr. Allen?  Do you remember that happening?

      A   I do not.

304   Q   Let's go back to Exhibit 8.  Yeah, just keep that
          one handy, we're going to look at that in a
          little bit.

              The ID number in the first column, what do
          these numbers represent?

MR. BACKMAN:   Object to form.

      A   To me they would represent a lead ID.

65

MR. BACON:

305   Q    Who generates that number and assigns it to this particular lead?

       A    The dialer company.

306   Q    Do you know how it's created?

       A    No.

307   Q    Do you know what the numbers in there represent?

       A    No.

308   Q    Who would?

       A    The dialer provider.

309   Q    Who?

       A    The SC Objects company.

310   Q    The second column says "Status".  Do you know what that represents?

       A    I do not know what the status means.

311   Q    Do you know what the number in the status column represents?

       A    No.

312   Q    "Foreign ID", can you tell me what that means?

       A    It -- to my knowledge that means it's a list ID, a calling list ID.

313   Q    What's that?

       A    Where the leads go into to be dialed.

314   Q    Where does the number that's in the foreign ID row or column represent?

       A    The 002R on this record?

66

315   Q   Yes.

      A   To me, represents a calling list number.

316   Q   Is there a particular calling list that is used for each client?

      A   No.

317   Q   Tell me what a calling list is exactly in your own words?

      A   It's where data goes in that can be dialed.

318   Q   How many calling lists are created, I guess -- let me ask my question differently.

          Are there a lot of different varieties of foreign ID, or is there just one that's assigned for everything?  In other words, if we looked at this database, would that foreign ID be different throughout the database?

MR. BACKMAN:   Object to form.

      A   It should be.

MR. BACON:

319   Q   How is the foreign ID generated?

      A   I'm not sure.

320   Q   "First name" is self-explanatory, so is "last name", so is "phone number", so is "address."  So let's go to the second page.  "GMT", can you tell me that is?

      A   I think that's -- has something to do with time zone.

321   Q   Okay.   What does "-8" mean, do you know?

    A   No.

322   Q   "DST", what does that mean?

    A   Daylight savings time I think.

323   Q   Okay.   There's a -- on the next page there's something that says "Called count", do you see that?

    A   Yes.

324   Q   Does that represent the number of times that this lead was called under -- by Prospects DM?

    A   Yes.

325   Q   "Metrics couchdb ID", do you see that?

    A   Yes.

326   Q   What is that?

    A   I'm not sure.

327   Q   Do you have any idea what the numbers and letters in this column represent?

    A   No idea.

328   Q   Who would?

    A   The dialer provider.

329   Q   "Local call last time" [sic], can you tell me what that means?

    A   That would be the last time that we've dialed this phone number based on the called counts that you see.

330   Q   "Created at", can you tell me what that means?

68

A    It would be when the lead was created in the list.

331  Q    Can you tell me what that means?

A    I -- it just means that the lead went -- was created and sent into the list.

332  Q    Okay.  So this would have been when -- well, let me back up.  What list?

A    The list inside of the dialer to be dialed.

333  Q    Is there one master list or are there multiple different lists depending on client?

A    There's no list for each client.  It's a master list or lists that the leads go into.

334  Q    But there are different types of campaigns that you run, correct?  You don't just run one campaign for every single company that you have as a client, correct?

MR. BACKMAN:   Object to form.

A    Can you repeat that?  I'm not sure what you mean.

MR. BACON:

335  Q    Let me ask a foundational question.  How many clients does Prospects DM do business with on average in a given year?  How many different clients?

A    During what time period?  Just --

336  Q    Any time period.  Let's just say 2017, just to pick a year.

A     Could be -- I'm not sure of the exact amount, but maybe a couple dozen.

337   Q     Are they all involved in the cruise or travel business?

A     No.

338   Q     So you have different types of businesses that you do business with as a dialer, correct?

MR. BACKMAN:     Form.

MR. BACON:

339   Q     As a lead generator, correct?

A     Yes.

340   Q     And is it accurate to say that you have to have different voice prompts depending on the industry that you're advertising for, correct?

A     No.

341   Q     It's not accurate to say that?

A     The way that you asked it, no.

342   Q     Okay, what's inaccurate about it?

A     You asked if we had different -- I'm not sure -- can you re-ask the question?

343   Q     Do you use different voice prompts for different industries that you have as clients?

A     There's different qualifying questions that would be asked dependent on the type of client.

344   Q     Right, because you don't want to ask a client who is selling computers if they want a cruise,

right?  Doesn't really make sense.

A     No, we do.  We do ask.  There's multiple
      qualifying questions in a script, with all kinds
      of different types of offers.

345   Q     How many different types of scripts did Prospects
            DM use in 2017?

A     I'm not sure.

346   Q     Can you give me an estimate?

A     No.

347   Q     You gave me an estimate as to the number of
            businesses that you did business with, so
            presumably it's less than a few dozen.  Would you
            agree with that?

A     Can you ask that again?

348   Q     Your testimony was that in 2017 you did business
            with a few dozen clients, correct?

A     I believe I said a couple dozen.

349   Q     Okay.  So, couple dozen to me is about 24, right?
            Give or take.

A     Yes, that's an estimate, yes.

350   Q     Okay.  So, you couldn't have used more scripts
            during that time period than you had clients for.
            Would you agree with that?

A     I do not agree because there's variations of
      scripts that we've used over the past and I don't
      know the number of them.

351   Q   How do you know what script to use for what
          campaign?

      A   We come up with the scripting to use for every
          campaign that we do.

352   Q   How do you keep track of them?  To make sure that
          the right script is played for the right client.

      A   It's all done in the flow of the script that's
          created for the agent.

353   Q   What do you mean by that?

      A   I mean the agent has a script that they're
          trained to follow, and that's the script that
          they use.

354   Q   But there are -- would you agree with me that
          there is more than one script that is in place
          for your business across all clients at any given
          time?

      A   I would agree with that, yes.

355   Q   Okay, so how do they know which script to read
          from when they are discussing a promotion with a
          consumer?

      A   The script would -- they would either have a copy
          of the script on their desk or the script would
          come up on their computer screen.

356   Q   Do they have copies of all of the scripts lying
          about in front of them and they have to select
          it?

A    No.

357  Q    How do they know which one to pick?

A    Whatever is put in front of them to use.

358  Q    How is it put in front of them?

A    It's typically on a computer screen.

359  Q    How does the computer know which scripts to put in front of them?

A    Because the script is input into the phone system.

360  Q    Okay, and how is that memorialized in the database?

A    It's not.

361  Q    Is there data that is maintained that would tell us, if we wanted to know, which script was applied to a particular call?

A    No.

362  Q    There is data that exists at the time that the call is placed, though.  Would you agree with that?

A    It's not data.  It's a script that pops up on the screen.

363  Q    Right, but something has to tell the computer to put that script, as opposed to a different script, on the screen.  Do you agree with that?

A    I agree.

364  Q    Okay, so how does it know?

A    I'm not sure.

365  Q    Is there somebody from Prospects DM who
          coordinates the scripts and the instructions
          given on -- to the dialing company to make sure
          that the right script is put in front of the rep
          for the right call?

A    Someone from our team, either myself or somebody
          else would come up with the script that's
          supposed to be used and would have directed that
          script to be used.

366  Q    How do you direct that script to be used?

A    We would have given it to the dialer company to
          upload into the -- into the phone system.

367  Q    Okay, and you're doing TCPA compliance as part of
          your job, right?  You're making sure that these
          websites have the name of your client on them and
          that they follow the TCPA, right?

A    We make sure that they have our name on the TCPA
          opt-in, yes.

368  Q    Okay, and so is a part of what you're doing when
          you are giving those instructions to the dialing
          company to provide them a particular script for a
          block of leads and say, these leads get this
          script, do you do that?

A    I mean, there's many scripts that they use, so we
          would provide the script to use on the campaign,

yes.

369    Q    Okay, how do you provide those instructions to your dialing company?

      A    We would have either e-mailed it to them or sent it to them somehow.

370    Q    How is a campaign identified by you during that communication?

      A    How is a campaign identified?

371    Q    Right.  So, what do you mean when you say the word "campaign"?

      A    So the agents have the authority to log into the phone system, and the phone system will put them into the queue to be called, and they'll follow the script that's provided to them.

372    Q    So, let me describe what I imagine you're trying to tell me happens.

      A    Okay.

373    Q    You got a block of leads.  You say, "I want these leads to be called for these clients using this script."  Presumably you have to tell the dialing company, "Here's the leads, I'm identifying them because this is campaign X and here's the script, it's script Y.  Make sure this script goes with this campaign."  Is that generally the nature of the discussion on the topic that we're talking about right now?

MR. BACKMAN:    Object to form.

    A   Yes.

MR. BACON:

374   Q   Okay, and how do you identify those campaigns when you're telling the dialing company to do what we just talked about?

    A   I'm not sure how -- what do you mean by "identify"?

375   Q   Let's ask a different way.  How do you, how do you denominate one campaign from another?

    A   With a campaign name.

376   Q   Okay, and can you give me some examples of campaign names and how they're identified?  The formatting of them in other words.

    A   We'll typically name them off of the call center that would have been calling.  Or any name that we came up with for the campaign.

377   Q   And that campaign name is unique to that group of calls that's going to be placed for that group of clients using that script, would you agree with that?

    A   Can you repeat that?

378   Q   A particular campaign is unique to a group of leads that is going to be called for a group of clients using a particular script that you've identified for that campaign, correct?

76

A    Yes.

379   Q    Look back at Exhibit 9.  I think it's here.  And apologize for how small this is.  We were trying to get the data all to appear in one page, so it was convenient.  Do you see that there is a column that says "campaign" about 40 percent of the way from left to right, where it has all caps letters that say "PRORT1226"?

A    I do see that.

380   Q    Okay.  Can you tell me what that column represents?

A    It looks to be like a campaign name.

381   Q    Okay, and the campaign name that's identified under there, what do those numbers and letters mean?

A    I'm not sure.

382   Q    Is there a particular rhyme or reason as to why you might name a campaign a specific thing?

A    No, the dialer company would have come up with the campaign name on how to sort it.

383   Q    The numbers, 12-26, do those represent a date that a campaign might have first been initiated?

A    I'm not sure.

MR. BACKMAN:   Where are you?

MR. BACON:   I'm looking at page 1.

MR. BACKMAN:   Next to the PRO, okay.

MR. BACON:

384   Q   PRORT, does that mean anything to you?

       A   It doesn't.

385   Q   You would be personally have been involved in coming up with a name for this campaign, correct?

       A   That's correct.

386   Q   So, I'll represent to you Mr. DeForest was transferred to Royal Seas Cruises after receiving at least one of these phone calls that are identified in Exhibit 9, and so presumably that would mean that this particular campaign identified in the campaign column would have included Royal Seas Cruises' contract as one of the companies that this campaign was run on behalf of.  Do you agree with that?

MR. BACKMAN:   Form.

       A   I can't say for certain, no.

MR. BACON:

387   Q   But the call was transferred to Royal Seas Cruises, so that, if your system was working, wouldn't have happened unless the campaign was one that included Royal Seas, would you agree with that?

MR. BACKMAN:   Form.

       A   I'm not sure.

MR. BACON:

388   Q    Isn't that how it's supposed to work?

      A    I don't set this up or manage how this is

           supposed to work.

389   Q    But we just talked about this.  You're playing a

           particular script for a particular block of leads

           under a particular campaign, and Prospects DM is

           trying to coordinate that in an effort to make

           sure that the right script is being played to the

           right consumers, because you're trying to make

           sure that there's TCPA compliance, right?

MR. BACKMAN:    Form.

      A    That's correct, but I'm not certain if this

           campaign and Royal Seas' offer would have been

           run for every call made in this campaign, based

           on looking at this.  I don't know if that's the

           case or not.

390   Q    That's not my question.

      A    Okay.

391   Q    You make sure you listen carefully to my

           question.  My question is -- and I understand

           your testimony and we're going to get to that in

           a little bit, about how more than one company

           might fall under a campaign.

      A    Okay.

392   Q    I'm asking something more narrow than that.  Is

           it accurate to say that Royal Seas would have

been one of the clients — not the only client
necessarily — one of the clients who fell under,
I'll just say the round robin system that you had
for this particular campaign identified in
Exhibit 9.

MR. BACKMAN:    Object to form.

 A I'm not sure.  How we track to know which leads
went to certain clients is based on our transfer
data.

MR. BACON:

393 Q Okay, but the script that Royal Seas was supposed
to have applied to their campaigns was the script
that was used in this campaign, correct?

 A No.

MR. BACKMAN:    Object to form.

MR. BACON:

394 Q How do you know?

 A Maybe I'm not understanding you properly, but I
believe that you just referenced to this script
that Royal Seas -- Royal Seas never gave me a
script to use.

395 Q Not my question.

 A Okay.

396 Q The script that was supposed to apply to Royal
Seas calls, the ones that you told the dialer,
"Use this script for these calls, for these

clients" in this campaign that we just talked
about, that script would have been used during
these campaign calls.

MR. BACKMAN:   Object to form.

    A   If this call resulted in a transfer to Royal
Seas, we would have presented the Royal Seas
offer at some point in this call.

MR. BACON:

397  Q   Right, at least one of these calls.  The one that
was transferred.  Are we agreed on that much?

    A   Yes.

MR. BACKMAN:   Object to form.

MR. BACON:

398  Q   Okay.  Now let's go back to Exhibit 8.

    A   This is the one you asked me to spread out?

399  Q   Yes, thank you.  There's an "updated at" column
in the third page, right in the middle.  Do you
see that?

    A   I do.

400  Q   Do you know what that means?

    A   I believe that means when the call was updated,
when we dispositioned the call on our end.

401  Q   That would have been the date of the last call as
identified in the call count?

    A   I believe so, yes.

402  Q   The "outbound lead group ID" column, do you see

> that?

    A    I do.

403   Q    What does that mean?

    A    I'm not sure.  That's something that the dialer providers would have set up and used for internal tracking.

404   Q    What are they tracking?

    A    I'm not sure.

405   Q    Do you know what that number represents?

    A    I do not.

406   Q    Does that number represent the publisher who provided the lead data to your dialing company?

    A    I'm not sure.

407   Q    Who would know the answer to that?

    A    The dialing company.

408   Q    "IP address", what does that represent?

    A    I'm not sure.  It's an IP address.  I'm not sure if that means it's the consumer's or the call center's.

409   Q    "URL", what does that represent?

    A    That looks like a website URL.

410   Q    Right.  What does it mean in the context of this data?

    A    That would mean the URL of the data, I believe.

411   Q    So this would identify the publisher who sold you the data contained in this lead?

MR. BACKMAN:    Object to form.

    A   I'm not sure if it would identify the publisher. I don't rely on -- we've never relied on call logs for this type of record, to identify where the lead came from.

MR. BACON:

412  Q   Is the data that's memorialized in Exhibit 8 still in existence?

    A   I believe so, but I don't have it.

413  Q   Is it still in existence for everybody who is in the class definition?

MR. BACKMAN:    Object to form.

MR. BACON:

414  Q   To the best of your knowledge.

MR. BACKMAN:    Form.

    A   To the best of my knowledge, yes.

MR. BACON:

415  Q   And how would you go about requesting this data be produced by your dialing company in electronic format similar to the way that you've produced data to us through your attorney just a few days ago?

    A   I would have to make a phone call and request them and explain what I need.  That's typically how I would do it.

416  Q   Do you have any objection to doing that?

A      I would take the advice of my lawyer and do what
       he asked me to do or whatever the court orders me
       to do.

417    Q    Okay, but I'm asking you what --

MR. ALLEN:      Eric Allen.  We can review the order and if he
       has an obligation to do, we're happy to make that
       request, yes.

MR. BACON:      Okay.  I mean, I would really like to get a
       firm commitment on this if we could, because
       there are columns of data in here, Eric, that are
       relevant to allowing us to at least undertake
       efforts to try and identify, even if it is in the
       broad capacity, a group of people who may be
       class members in this case.  And so we want to
       take every step that we can, as class counsel, to
       make sure that we're exhausting the ability to
       give notice under the court's order, and so I
       think this data would actually help us a great
       deal in doing that if we had it.

       And I do think it also falls under the
       court's order, with the caveat that I understand
       that your client is taking the position that they
       can't identify specific calls only to Royal Seas
       under campaigns, but we can certainly figure out
       which campaigns were Royal Seas campaigns, cross-
       referencing on this data and then have a broader

group that may be broader than the whole class, and then figure out what to do from there.

So I would ask if you could, maybe during the next break, talk about this with your client and let me know today if this is something that you're willing to produce.  You don't have to give me an answer right this minute.

MR. ALLEN:    Yeah, I understand what you're saying, Adrian, and I know why the data is important to you, and if Josh could get it through reasonable effort and if he's required to by the applicable order, and we will get into, and yes, I can review the order again with him during the next break.

MR. BACON:    Thank you.

418  Q   Mr. Grant, there's also on the next page, the fourth page of this document, there's a campaign ID.  Do you see that?

A   I do.

419  Q   And it says "165".  Does that mean anything to you?

A   It doesn't mean anything to me.

420  Q   Okay.  Turn to page 3 of Exhibit 9, which is right here, and you can keep those where they are.  I'm going to go back and forth between them.  And this is the call record data that was produced for Jose Fernandez, and I'll represent

to you the phone number, it belongs the plaintiff
McCurley, even though his name is not represented
here.

A    Okay.

421  Q    There's a campaign that's identified halfway
through the data that says "PRORT 0503".  Do you
see that?

A    I do see that.

422  Q    That's a different number than the campaign ID in
the other data.  Do you see the difference
between those?

A    Which document was the other one?

423  Q    It's page 4 of Exhibit 8.

A    Yes, I see that.

424  Q    Do you have an explanation as to why those
numbers are different?

A    I don't.

425  Q    Do you have any idea what the numbers represent
in looking at them and seeing that they're
different numbers?

A    No, this is not how we would have tracked
anything.  I believe this is internal tracking
for the dialer provider.

426  Q    Okay.  Is it accurate to say that Prospects DM
would use campaign ID information in Exhibit 8
instead of the one for Exhibit 9, which is the

one for the dialer company?

A   No, both of those came from the dialer company.

427   Q   Okay, and you don't know why they have different numbers?

A   I don't.

428   Q   Presumably the numbers -- well, I don't want to ask you to speculate.

A   Okay, thank you.

429   Q   My question already was asking you to speculate.

All right.  So, remember I had you set aside the last page of Exhibit 8.

A   Yes.

430   Q   I want you to turn to that, and let me put this all back in order so that the Court Reporter doesn't strangle me when we're done, while you're doing that.  Thank you.

Can you tell me what that page represents?

A   This looks like an opt-in record.

431   Q   Okay, and what is an opt-in record?

A   Information that would have been provided to us from the third-party web publisher.

432   Q   How is that information produced to you by a web publisher?

A   Either by request or API.

433   Q   Do you typically request web publishers to give you all of their opt-in data when you purchase

those leads from them?

A   Typically, yes, with the rare occasion of
    agreeing upon request.

434  Q   Do you know whether you did that with respect to
         the two web publishers identified in the class
         definition?  In other words, do you have all the
         opt-in data somewhere in your records for the two
         websites identified in the class definition?

A   I believe we do, yes.

435  Q   This last page that's Bates stamped 16, has opt-
         in data for Daniel DeForest and it has some
         information in it, including a URL opt-in, do you
         see that?

A   I do.

436  Q   And it says that the opt-in came from
         www.myhealthcareauthority.com.  Do you see that?

A   I do.

437  Q   That's not accurate, would you agree?

A   I'm not sure.

438  Q   You testified about this issue in one of your
         declarations.  You said that an error was made
         and that this is actually not the correct web
         publisher who gave you the data, that it was
         somebody else.  Do you remember that?

MR. BACKMAN:   Object to form.

A   I would need to see the document put in front of

me to jog my memory on it.

MR. BACON:

439   Q   Okay. Did you give this document, the one that you're holding right now, page 16, did you give this to Royal Seas Cruises in the course of litigation upon a request for consent data?

      A   I don't recall if I gave it to them.

440   Q   Is this in a format that you would typically see opt-in data presented in, that would give rise to a presumption on your part that that's what this represents?

      A   These are the data fields that typically we would see from a data provider as an option for them to be able to provide to us with the opt-in, yes.

441   Q   Okay.  So you don't have any reason to dispute that you gave this document to Royal Seas Cruises based on looking at it, you just don't recall?

      A   I don't recall if it came from me or not.

           Can I take a quick washroom break?  I'll be like two minutes.

442   Q   Sure, no problem.  Yeah, let's take a ten-minute break.

      (PROCEEDINGS ADJOURNED AT 11:14 A.M.)

      (PROCEEDINGS RESUMED AT 11:38 A.M.) **(Video 3 Begins)**

MR. BACON:

443   Q   Okay, Mr. Grant, you understand you're still

under oath?

A   I do.

444  Q   Your counsel says that you have something you'd like to correct on the record?

A   Yeah, I misunderstood the client privilege and when you asked me how many times I've met with Jeff Backman in person, and I only mentioned the original time and I met in person with him a couple days ago, before this case at my office.

445  Q   Here in Vancouver?

A   Yes, sir.

446  Q   Okay, how long was that meeting?

A   About half a day.

447  Q   Was your counsel present?

A   He was on -- connected through a conference call the whole time.

448  Q   For every single second of the discussion?

A   For every single second, yeah.

449  Q   You didn't even say hello to Mr. Backman before Mr. Allen was on the line?

A   Mr. Backman arrived, my administration directed him to my conference room.  I went into the conference room and immediately dialed Eric Allen in on the line.

450  Q   Look at Exhibit 9 for me.

A   First page?

451   Q   Yes.  There are -- I want to go through these
          columns real quick.

      A   Sure.

452   Q   There's one that's about a third of the way
          through that says "found" and the whole column is
          blank.  Can you tell me what that means?

      A   I don't know what that means.

453   Q   The next column says "ink found" and it has an X
          in it.  Do you know what that means?

      A   No.

454   Q   Then there's a column that says "outbound lead",
          starts with 4217.

      A   I see that.

455   Q   What does that mean?

      A   Well, it says outbound lead ID, and I believe
          that would be similar to what I mentioned on the
          lead ID on the other records we looked at.  It
          would be a lead ID created from a phone system
          provider.

456   Q   Okay, so that's unique to the consumer?

      A   I believe so.  I didn't create it and wouldn't
          use that for reference internally, but --

457   Q   Okay, you can put that to the side.  Royal Seas
          produced some data to us in the case relating to
          call transfers.  We're going to mark an example
          of this as Exhibit 10.

(CALL TRANSFER DATA REGARDING JOSE FERNANDEZ,

MARKED EXHIBIT 10 FOR IDENTIFICATION)

MR. BACON:

458   Q   Before we get into specifics on this, I just want

to ask you, what kind of volume of calls does

Prospects DM place generally to consumers, not

just for Royal Seas, but generally over the past,

let's say, four years?

MR. BACKMAN:      Adrian, I've just got to take one minute.

MR. BACON:   Do we need to go off?

MR. BACKMAN:      Yeah, please.

(OFF THE RECORD FOR A FEW MOMENTS)

MR. BACON:

459   Q   Mr. Grant, before we went off the record I had

asked you what volume of calls has Prospects DM

placed over the last four years, across all

clients?

      A   Over the last four years to date?

460   Q   Yeah.

      A   I'm not sure of the volume.

461   Q   You produced a database in this case of call

records for a two year period of time that we

talked about earlier.  Do you remember producing

that?

      A   I need you to jog my memory, but I'm not sure

which call records.  There was a few different

call records that I produced.

462   Q   It's the one in Exhibit 9 that we pulled the example out of.  There was a database of information that you produced to a year and a half ago through your attorney, Eric Allen.

A   That was from 2016 through 2017, so --

463   Q   Right, a two-year period of time, right?

A   It's a four-year period of time.

464   Q   2016 to 2017?

A   No, I produced -- I was asked to produce records from -- going back to 2013.

465   Q   Okay, well in any case, that database had 600 million phone calls in it.

A   Yes.

466   Q   So, over, over that period of time, whatever's in that database, Prospects DM placed 600 million phone calls on behalf of its clients, right?

A   That's right.

467   Q   What kind of capacity is -- does -- do you guys have to place calls, let's say in a single day?

Somebody's got this on speaker, can you please mute?

Sorry, I'll ask my question again.

A   Thank you.

468   Q   What kind of capacity does your dialing system have, and I say "your dialing system", I mean the

third party you contract with; what kind of
capacity do they have in a day to place phone
calls?  In other words, how many could they place
in a single day if they wanted to maximize it
out?

A    I'm not sure what their maximum potential is for
phone calls.

469  Q    A million in a day?

A    I'm not sure.

470  Q    They were able to place 600 million calls over a
period of a couple years though, right?

MR. BACKMAN:    Form.

A    That's right.

MR. BACON:

471  Q    And those calls don't involve somebody pushing a
bunch of buttons to manually dial them, do they?

A    Can you re-ask that question?  I'm not sure
exactly what you mean.

472  Q    The calls don't involve somebody picking up a
phone and dialing the numbers by hand, do they?

A    No.

473  Q    It's all automatically generated through a
campaign that's programmed into the dialing
platform, right?

MR. BACKMAN:    Form.

A    It's done -- the agent initiates when a call --

94

when they're available for a call and when the
system is available to give them another call.

MR. BACON:

474   Q   And when they're available, the system which is
making these calls, will then transfer it over to
that agent upon their availability, correct?

MR. BACKMAN:     Form.

A   The call comes into the agents when they're --
hit dial to receive another call.

MR. BACON:

475   Q   The agent's not the one placing the call, are
they?

MR. BACKMAN:     Form.

A   The agents hits dial to receive the call, but
they do not dial a phone number like you or I
would with a cell phone, I guess would be the
best way to explain it.

MR. BACON:

476   Q   Okay.  I may have asked you this already, but do
you know what a predictive dialer is?

A   I have basic knowledge of a predictive dialer.

477   Q   Would you agree that you just described a
predictive dialer?

MR. BACKMAN:     Form.

A   I'm not sure.

MR. BACON:

478   Q   Let's go ahead and look at Exhibit 10.  Get this all in the right order.  So go ahead and hand me all those pages.  I'll do that later.  I'll get them in the right order, promise. Thank you.

This is, as it's identified in the top left corner, call transfer data produced by Royal Seas Cruises for one of the plaintiffs, Ryan McCurley, and I'll represent to you that the plaintiffs extracted this data in its original format from an Excel spreadsheet that was produced by the defendant as identified in the Bates stamp number on the top left.  And my understanding is this represents data of the calls that were transferred to Royal Seas by Prospects DM.

MR. BACKMAN:   But you're not representing that the top two lines were in the file that you pulled out, right?  It's just the one line item with the spreadsheet?

MR. BACON:   The lines at the top were not in the document.  This is simply the identification of the Bates number.

MR. BACKMAN:   Thank you.

MR. BACON:   And then our notation saying this is call transfer data for Ryan McCurley.  The data is not altered, it's just transposed.

479   Q    Do you have an understanding of -- an independent understanding of what this document is, aside from what I've just told you?

         A    No, this document didn't come from me or my system.

480   Q    But isn't it accurate to say that when a call is warm transferred over to Royal Seas but by Prospects dialing company that the data that's contained in here will be electronically transferred over to Royal Seas Cruises in some manner?

         A    Certain pieces of the data in here, yes.

481   Q    Okay, which ones?

         A    Phone, first name, last name, address, city, state, zip, e-mail, the URL, its listed site here, but that must be how they name it internally at Royal Seas, time stamp of the opt-in and the IP address.

482   Q    For this -- is there any data in here that you don't transfer over to Royal Seas on your normal course of business when a call is transferred over?

         A    This field right here looks like a date field.

483   Q    Date, "DTE"?

         A    Yeah.  I'm not sure if that came from us or not.

484   Q    But maybe -- it appears to be a date and time.  I

don't want you to speculate, but is it possible
that that's the date and time that the call was
transferred to Royal Seas and that may be what it
means?  Or you're not sure.

A    I'm not sure.

485  Q    Okay.

A    And the import date would not have came from us,
I don't believe.

486  Q    All right, but the rest of it would?

A    Well, found, I-N-C found, incfound, that would
not have came from us either.

487  Q    Those data fields were in the one we just looked
at, though.

A    Yeah, I just don't recognize them.  Like I'm not
familiar with them.

488  Q    Okay, you don't know whether or not they did or
did not come from Prospects?

A    Correct.

489  Q    Tell me how the data is transferred when a call
is warm transferred to Royal Seas?

A    When the call center agent hits the transfer
button, the data is automatically sent via API to
Royal Seas.

490  Q    And is it your understanding that the agent who
is receiving the transferred call, who works for
Royal Seas, would have visibility into that so

they know who they're talking to during that
call?

A    I'm not sure what shows.  I'm not sure what shows
on Royal Seas end.  I have never seen their
system.

491   Q    Okay.  You can put that to the side.  There are
two more data exhibits.  These are ones that
you've just produced very recently.  that one.
The first we'll mark Exhibit 11.  This is from a
data file, I believe, in Excel format, which was
labeled "Royal Seas Transfer File" and was
produced yesterday.
(EXCERPT FROM AN EXCEL DATA FILE LABELED "ROYAL
SEAS TRANSFER FILE" PRODUCED FEBRUARY 11, 2020
MARKED EXHIBIT 11 FOR IDENTIFICATION)

MR. ALLEN:   Eric Allen.  You're either breaking up a little
bit or I'm not hearing right. Can you speak up
like maybe 10 percent.

MR. BACON:    Sure.

492   Q    I will represent to you, Mr. Grant, that this is
just a snapshot of the first 20 or so rows of
that database that your -- well, that Excel file
that your counsel produced to our office.  So all
we did was print out the first several rows.

A    Okay.

493   Q    So this is in the original form as it was

produced.  Just put onto one sheet of paper for convenience, so we didn't have to have 40,000 pages of stuff.

A    Okay, understood.

494  Q    And there were two transfer files that were produced yesterday.  This is from one of them. They appear to have, in one of them, 600,000, give or take, rows of data, and in the other one approximately 700,000 rows of data, for something around 1.3 million lines of data.  That's what we're looking at the example of. So can you tell me what does this data represent that's in this data set that was produced?

A    It would represent calls that were transferred to Royal Seas.

495  Q    This would be Prospect DM's record of the calls that were transferred to Royal Seas, correct?

A    Yes.

496  Q    As opposed to the one we just looked at, which is Royal Seas' record, right?

A    Yes.

497  Q    Okay.  How did you go about pulling this data?

A    I requested it from the data company.

498  Q    What did they produce to you when you requested it?

A    The date range.  I can't remember the date range

that I asked for, but the date range we were asked to produce the files, they produced this to us.

499    Q    Did they produce it to you in the exact same format that you produced it to us, or were there any changes made to it?

A    No.  They produced it like this.

500    Q    There were no other columns of data included in there?

A    No.  This is a basic transfer file.

501    Q    Is there a reason why they didn't produce all of the other data that we just looked at in Exhibit 10 for each one of these leads?

A    I'm not sure why.

502    Q    Did you request them to produce everything, or what exactly did you say?

A    I requested a transfer file for all calls that were made, transferred to -- all calls transferred to Royal Seas for the time period that was requested.

503    Q    Did you tell them you want every single piece of data on all those transfer records, or did you just generally tell them you wanted a transfer list?

A    I wanted the transfer file, that's what I asked for.

504   Q   How did you make that request?

      A   By phone call.

505   Q   Who did you speak to?

      A   Nicolai.

506   Q   Okay.  And what did Nicolai say?

      A   That he'll prepare it and send it over to us.

507   Q   How long did that take him, between when you made the phone call and when you got it?

      A   I can't remember when I made the phone call to him, but it took some time.

508   Q   Can you be more specific about what "some time" means?

      A   Maybe a couple of weeks, or I started to gather the documents that I was required to gather when I received the court order.

509   Q   I see the transfer date column?

      A   Yes, sir.

510   Q   Do you understand what that represents?

      A   It looks like it was the date that we transferred the call to Royal Seas.

511   Q   So, and that has a time stamp on it as well?  You see that?

      A   Yes.

512   Q   But this seems to suggest that Prospects DM was transferring three, four, five, six -- something in that range -- calls per minute over to Royal

Seas Cruises.  Does that sound accurate?

MR. BACKMAN:    Objection.

A    For these records?  Absolutely, yeah.  That's
what it looks like.

513   Q    What percentage -- I mean, you're in the data and
lead generation business -- what sort of hit rate
do you get on these things?

MR. BACKMAN:    Object to form.

Do you know what I mean by that?

A    I don't.

514   Q    You're not familiar with the term hit rate?

A    No.

515   Q    Hit rate is one way I've seen people in the
industry refer to the successful live transfer
rate of a call placed by a dialing system.  So in
other words, some percentage of people won't pick
up the phone, right?  Yes?

A    I understand what you're saying.  I refer to it
as the conversion rate.

516   Q    Okay.  So what's your conversion rate?

A    I'm not sure what the conversion rate on these
calls would have been.

517   Q    What's your conversion rate generally speaking in
this business?

A    It's all over the place.

518   Q    Give me a range.

A   It can be -- it's all over the place, I wouldn't be able to give you a range.

519  Q   Well, you're the president of this company, you've got to have some idea of what the conversion rate is?

A   It could be as low as a percent, it could be as high as ten percent, if I was going to give you a range.

520  Q   Okay.  And that, can you get any more specific than that with respect to the Royal Seas contract, or is that your best estimate?

MR. BACKMAN:   Object to form.

A   That's my best estimate.

521  Q   Okay, so, using that estimate, that would mean that you would have to have been placing at least ten times as many calls as were transferred.  Would you agree with that?

A   Well, I'm not sure how many calls would have been placed to generate these calls.  These transfers, sorry.

522  Q   Okay.  Do either you or your dialing company maintain data to determine -- that would allow somebody if they wanted to -- to determine which lead generator the names in this list came from?

A   Do you, what do you mean by lead generator?

523  Q   Well, for instance, in the transfer data that we

looked at in Exhibit 10, there's a site and there's also a URL in some of these other data sites that have been produced, so is there a way to figure out which one of your publishers sold you the data for each of these people?

A    That would be the opt-in data.

524  Q    Okay.  So you do have that data?

A    The opt-in data would be searchable by telephone number.

525  Q    Okay.  And it would have a column in it that would have the publisher's information in it, or the website that they --

A    The third -party web publisher, yes.

526  Q    So if I were to tell you, "Mr. Grant, I want you to produce all of the data for all of the leads that you got from Landfall Data for DiabetesHealth.info, you'd be able to get that correct?  Because you could go in and figure out all the leads that have that information connected to it?

MR. BACKMAN:    Objection.

A    I would have to put a request in for the opt-in data for those two websites.

527  Q    Yeah.

A    It's possible that I'd be able to go and get it.

528  Q    Okay.  Do you have a recollection as to how the

data -- let's just focus on the Diabetes Health

dot now, which came from Landfall Data.  Do you

have a recollection as to how that data was

originally provided to Prospects DM and/or their

third party data?

MR. BACKMAN:      Object to form.

      A      No.   All data from any vendor would have been

provided through an API directly into the dialer

system.

529   Q      Is the data organized in a manner that would

allow you to figure out -- in other words, to

look at the original transfer that happened on

whatever date that was and say, "This is the API

transfer associated with this vendor?"

      A      I'm sorry, can you ask that one more time?   I

want to make sure.

530   Q      Let me give you an example.   Let's say you ask

me, "Hey, can you send me your phone records from

December of last year," and I say, "Sure" and I

send you an e-mail and I attach it to it.

There's an electronic copy of an e-mail that

exists that would memorialize me sending you that

file, right?   So what I'm trying to ask is, is

there an electronic record that memorializes the

transfer of a particular data set from a vendor

to your Romanian dialing company?

A       The opt-in records is what you're -- is what I
        believe you're referring to.

531     Q       Okay.  And so, those opt-in records, do they
        identify in some fashion that would allowing you
        to accurately get it with data, the identity of
        the vendor or of their website?

A       All opt-in data, the URL in the opt-in data would
        tell us where the opt-in came from.

532     Q       Why didn't you produce that to us for the two
        websites at issue in this case?

MR. BACKMAN:     Object to form.

A       I did produce the opt-ins for calls that were
        related to Royal Seas from those two websites.
        That's what I produced.

533     Q       But you didn't produce it in the format of
        Exhibit 10, you produced something else, right?

A       I produced a -- I produced what was given to me.

534     Q       There's no reason that you wouldn't be able to go
        and request that the Romanian dialing company
        give it to you in its complete unaltered format,
        as in Exhibit 10 is there?

MR. BACKMAN:     Object to form.

A       Can I take a look at Exhibit 10?

535     Q       Well sure, we can look at -- let's look at 8.
        Actually here's 8 and here's 10.  So, it would
        come in one of these formats presumably.

                                                        107

A    Again, this is not records from the dialer

company or from Prospects DM.  These are Royal

Seas records.

536   Q    Let's look at 8 then, that's the opt-in data,

correct?

A    No, I don't recognize this as opt-in data.

537   Q    You testified that it was opt-in data earlier.

A    I believe I said that this is call log data

earlier.

538   Q    Okay.  But the data that's contained in both

Exhibit 10 and Exhibit 8 would be the same type

of data that would be contained in the opt-in

data, right?

MR. BACKMAN:    Object to form.

A    No.  This has many fields that typically would

not be contained within an opt-in file.

539   Q    Okay.  Which ones?

A    Foreign ID.  Status ID.  IMS student ID.  GMT,

DST.  I think -- I don't know if I mentioned

that.  Foreign ID.

540   Q    Okay.  But the rest of the data, the rest of

these fields, came from the opt-in data, correct?

MR. BACKMAN:    Object to form.

A    I can't say for certain that the rest of these

fields came from the opt-in data.  This looks

like a call-on record to me.

541   Q    Okay.  What is the call-on record data?  Where
           does the data that's contained in call-on log
           record come from?

      A    Inside the phone system.

MR. BACKMAN:    Object to form.  Just give me a second to
           object.

MR. BACON:    Right, so, let me be more specific.

      A    Okay.

542   Q    You've got name.  You've got phone number.
           You've got address.  These things, you don't just
           create, they come from the lead vendor and
           they're provided to you, right?

MR. BACKMAN:    Object to form.

      A    This information inside of call logs is not
           static information, it can change by user level.
           So, that's why we do not rely on these call logs
           and refer to them as opt-ins.

543   Q    Okay.  If I wanted the original opt-in data,
           would you -- for the entire group of people who
           would fall under the two websites that are at
           issue in the class definition -- could you
           logistically produce that to us?

MR. BACKMAN:    Object to form.

      A    I'm not sure.

544   Q    But you think that it exists with the Romanian
           dial-in company?

109

A    It's possible it exists.

545   Q    Let's look at another exhibit quickly.  I believe
          we're on 12.

          (EXCERPT FROM AN EXCEL DATA LABELED "CONSENT FOR
          THE DIABETES HEALTH AND YOUR AUTO HEALTH LIFE
          INSURANCE URL DATABASE" MARKED EXHIBIT 12 FOR
          IDENTIFICATION)

546   Q    Thank you.  And for the record, this is similarly
          a snapshot of the first 20 or so rows of data
          from another database in Excel that was produced
          in response to the subpoena on February 4th by Mr.
          Grant's attorney.  The document was labeled
          Consent for the Diabetes Health and Your Auto
          Health Life Insurance -- whatever that URL is --
          databases.

               So, do you have a recollection as to the
          first Excel sheet that your attorney produced to
          us about a week ago of what that contained?

A    The opt-in file?  This file that we're looking at
          here, correct?  Sorry.

547   Q    Well, I want to understand what this is, if you
          could explain that for me.

A    These look like opt-in records.

548   Q    So this was an Excel spreadsheet that was
          produced by your attorney.  Do you remember
          producing that?

                                                          110

```
           A    Yes.
     549   Q    And the data that's contained in here has the URL
                in the second column, right?
           A    Yes.
     550   Q    So that identifies that the company that provided
                it to Prospects DM?
MR. BACKMAN:    Object to form.
           A    That identifies the third-party web publisher's
                URL.
     551   Q    Okay.  But, if I'm understanding correctly, this
                is not a complete data set for each one of these
                opt-ins, would you agree?
MR. BACKMAN:    Form.
           A    No.  This does appear to be a complete data set
                for opt-ins.  But I've seen different publisher's
                opt-in records, they don't always look identical.
     552   Q    Well, there's no address column here, right?
           A    That's correct.
     553   Q    But there is an address column in the lead we
                just looked at for Jose Fernandez.  Would you
                agree with that?
MR. BACKMAN:    Object to form.
           A    That's a call log though.  Like call --
     554   Q    Right, but this had to have come from the opt-in
                data originally, didn't it?
MR. BACKMAN:    Object to form.
```

A    Like I said earlier, the call logs, there's always a data field for address that our agents -- that the call center agents have visibility to.  It's not a pre-requisite that we accept full address from data vendors, the third party publishers who supply that data.  That's why I keep referring to that as a call log.  And this is opt-in.  They're two completely different sets of data.

555   Q    But they have to derive from the publisher, wouldn't you agree?

MR. BACKMAN:    Object to form.

A    Not all of the information in the call log has to come from the third party web publisher.  And not all of the data in those call logs would have came from the third party publishers.

556   Q    What data did come from the third party publisher who operated DiabetesHealth.info.  What columns of data came from that?

A    To my knowledge, the columns of data that are on the opt-ins that I provided.

557   Q    What other data came with them?

A    This.

558   Q    You're telling me, under penalty of perjury, there is no other data that was provided from DiabetesHealth.info's publisher to Prospects DM

or its dialing company when they did the transfer
through the API?

A    To my knowledge.  I don't know exactly what came
over when they sent it.  When I requested the
opt-ins, this is what I was provided.  And to me,
I have personally seen opt-ins that only look
like this.  I've also seen opt-ins from third-
party publishers that we work with that have more
information than this as well.

559  Q    Both of our clients' data sets that were produced
in discovery have addresses in them and
additional information that's not in this data
set that you just produced last week.  So, my
question is, if it didn't come from the
publisher, where did it come from?

MR. BACKMAN:   Object to form.

A    I need to see the documents that you're referring
to.

MR. ALLEN:   Well, that's been asked and answered.  He said
specifically the phone agent enters additional
data.

MR. BACON:   No, he didn't.

MR. ALLEN:   I think it's been answered.

A    I'll be quiet.

MR. BACON:

560  Q    You can go ahead and answer that one.

113

          A    Can I see the documents that you're referring to?

561   Q    Sure.

MR. ALLEN:    Or I think you said at the user level, so
              maybe we should ask him what the --

MR. BACON:    We have recordings of these calls, counsel, so
              we know what was and was not provided to people
              during them.  So, I would be very cautious in
              coaching your client to say something that's
              inaccurate.

MR. ALLEN:    I'm not trying to coach, I want to make sure
              he understands your question.  Go ahead.

          A    I'm just waiting for the documents so I can take
              a look at them to -- I want to understand fully
              what he's referring to.

MR. BACON:

562   Q    So here.  Number 8, number 9 and number 10, these
              are the three exhibits.  And I understand that
              these are not opt-in data.

          A    Thank you.  Can you please ask your question
              again?

563   Q    Sure.  So, there is data in the three exhibits I
              just handed you, 8, 9 and 10, which shows address
              data for both of our clients, the plaintiffs.
              And my question is where did that information
              come from if it didn't come from the publisher?

MR. BACKMAN:    Object to form.

                                                      114

A     I can't answer where it came from because I didn't put it in there.  But I want to make sure that when we're talking about the documents, one of them that you showed me appears to be an opt-in to me.  The other one appears to be a call log, not an opt-in.

MR. BACON:

564   Q     A call log showing a call that was placed by your dialing company to our client, right?

MR. BACKMAN:    Object to form.

A     Can you please point to me which one that you're referring -- there's multiple documents in front of me.

565   Q     Okay.  Let's look at the call transfer data first.

A     Which is document?

566   Q     The one that says, "Call Transfer Data" on it, which I think is number 9.

A     I've got number 9 here.

567   Q     Then it's number 10. It's underneath that one.

A     Okay, that's why I didn't see it.

568   Q     All right.  So, you've got address, city, state in this document as columns right?

A     Yes, sir.

569   Q     And there's information in these columns right?

A     Some of them are blank and some of them have

115

information.

570   Q   Right.  Okay.  And so, my question is, this is --
well, this is data that you testified earlier is
sent to Royal Seas cruises by your dialing
company when they warm transfer the call over to
Royal Seas, right?

MR. BACKMAN:    That is referring to what exhibit, please?

MR. BACON:    Exhibit 10.

MR. BACKMAN:    Object to form.

   A   Yeah.

MR. BACON:

571   Q   Yeah?

   A   Sorry.  I believe I testified earlier that this
document wasn't produced by us, and this is not
from our system.  This is, this appears to be
from Royal Seas' system and I don't know how they
organize their data.

572   Q   Right, but we went over this.  We spent a lot of
time on this document and you said with the
exception of two of the columns, the rest of this
would have been transmitted by your dialing
company over to Royal Seas during the time that
it was transferred, correct?

   A   That's correct.

MR. BACKMAN:    Object to form.

573   Q   Okay.  So that means that the dialing company

sent in, in this case of Mr. Fernandez, sent the
name and the address and zip over to Royal Seas,
correct?

MR. BACKMAN:   Object to form.  Where is the address?  Are
you still looking at Exhibit 10?

MR. BACON:   Well, it's a blank field, but I'm looking
at --

MR. BACKMAN:   Okay, I just want to be accurate, are you
referring to exhibit 10?

MR. BACON:   I'm referring to Exhibit 10, Jeff.  Please
stop interrupting my questioning.

MR. BACKMAN:   Okay.  I keep making my objections.

       A   Yes, some of this information would have been
API'd from the dialer into Royal Seas.  That's
right.

MR. BACON:

574   Q   Right, so, is it your position that the data
that's contained in here that would have been
API'd over to Royal Seas, didn't come from the
opt-in data?

MR. BACKMAN:   Object to form.

       A   I don't know what Royal Seas does on their end
after we send them the data.  I don't know if
they alter the data.  If they have the ability to
alter the data.  So, I don't know -- I can't say
for certain that all this information in here is

exactly how we sent it over to Royal Seas.

MR. BACON:     Why don't we take a two-minute break?

(PROCEEDINGS ADJOURNED AT 12:20 P.M.)

(PROCEEDINGS RESUMED AT 12:31 P.M.) **(Video 4 Begins)**

MR. BACON:

575   Q   Okay, Mr. Grant, you understand that you're still under oath?

      A   I do.

576   Q   Did you speak to anybody during the break?

      A   No.

577   Q   I'm going to mark this as Exhibit 13.  This is a copy of your affidavit in the Supreme Court of British Columbia action that says that you've -- this is dated January 15th, 2020.

          (AFFIDAVIT OF JOSHUA GRANT DATED JANUARY 15, 2020 MARKED EXHIBIT 13 FOR IDENTIFICATION)

MR. BACON:     Thank you.

578   Q   So, I'm sure you've seen this before.  Is that accurate?

      A   Yes.

579   Q   Who drafted this document?

      A   I did with my attorney.

580   Q   Which attorney?

      A   Eric Allen and Canadian counsel up here.  I can't remember his last name -- first name Clark.

581   Q   Did Mr. Backman have any involvement in the

drafting of this document?

A    Not to my knowledge.

582  Q    Let's go -- we've talked about a lot of this stuff.  Let's go to the second page, at the bottom right above paragraph 9 it says:

"Prospects cannot determine which calls were made on behalf of Royal."

Do you see that?

A    I do see that.

583  Q    Okay, so, without looking at this, in your own words tell me why that is the case?

A    I would have to read the full statement before I'm going to answer that.  Where, where that's the full --

584  Q    Right, but I'm asking you for your own independent knowledge, without referencing your declaration, I want you to tell me why can your company not identify what calls were made on behalf of Royal Seas Cruises?

A    The only calls that we can accurately say were made on behalf of Royal are calls that we transferred to them.

585  Q    Okay.  So you can accurately determine some of the calls that were made on behalf of Royal Seas Cruises, correct?

A    The transferred calls, that's correct.

119

586   Q   Okay.  And for the non-transferred calls, why is
          it the case that you can't determine which calls
          were made on behalf of Royal Seas Cruises?

      A   Because I don't have a way to see which outbound
          calls the Royal Seas offer was presented on, or
          not presented on.

587   Q   Now again, I want to go off your memory and then
          we're going to go through this too.  I just want
          your, your own words, just based on your being
          the president of this company, just looking at
          this stuff and obviously taking it seriously,
          just what you understand to be the case.  Why is
          it that there's no information or data that you
          could attribute a particular call to being made
          on behalf of Royal Seas Cruises versus a
          different client of your business?

      A   I'm not aware of anything in the system that can
          do that.  I didn't create the system, so I'm not
          sure why it's set up that way, but that's the way
          that it's set up.

588   Q   Factually speaking, did you make certain calls
          that were on behalf of Royal Seas Cruises, aside
          from the transfers that we know about?  Were
          there certain calls that were definitively made
          from an objective standpoint, if you knew all the
          facts, on behalf of Royal Seas Cruises or not?

120

MR. BACKMAN:     Object to form.

A    Again, we had many different versions of scripts
that we were using.  I can't recall if any calls
were made solely on the behalf of Royal Seas or
if they were only included in a down-sell, cross-
sell, up-sell type of script.

589   Q    You would agree with me that we do have data that
you've produced that has a campaign in it that
would have been run for a particular group of
leads, right?  So you could identify which
campaign a call was placed under -- is that
accurate?

MR. BACKMAN:     Object to form.

A    Again, that campaign idea was created by the
dialer system.  I'm not sure what they're using
that information to reference to.

590   Q    Well, we talked about it earlier.  You said that
a campaign would be run for a particular block of
leads, using a particular script and in
accordance with the instructions that you would
give your dialing company for that campaign.  We
had a whole discussion about that.  So are you
changing your testimony?

MR. BACKMAN:     Object to form.

A    I'm not saying I'm changing my testimony.  I need
to -- ask me the question again to see if I can

understand.

591  Q   There's a line of data in -- or a column of data
in the database that was produced by Prospects DM
to our office, that identifies a campaign ID for
a particular campaign that was run by your
dialing platform.

MR. BACKMAN:   Object to form.

A   I've looked at multiple documents today, so
again, I want to make sure that I can give you an
honest answer.  Can you point out?

592  Q   Exhibit 9.  Campaign.

A   Okay.

593  Q   Remember going over this?

A   I do.  I'm just looking for the campaign field.
Okay.

594  Q   Okay.  So, there's data in the 600 million calls
database that you produced to us that shows which
campaign a particular call was placed under,
correct?

MR. BACKMAN:   Object to form.

A   Yes.  And I do recall talking about that earlier,
and I believe I said that isn't generated from my
company.  I don't know what the, I believe what I
said was "I'm not sure what that means" when you
asked me that.

595  Q   How many companies were using the same script as

122

        Royal Seas Cruises during the December 2016 to

        December 2017 time period?

MR. BACKMAN:    Object to form.

      A   I don't know.

596   Q   How would you go about finding the answer out to

        that if you wanted to?

MR. BACKMAN:    Object to form.

      A   I don't believe I could go back and see any

        legacy data that would tell me that.

597   Q   But you have contracts with companies that are

        clients of yours, right?

      A   I do, yes.

598   Q   And those companies presumably are involved in

        approving the scripts, just like Royal Seas'

        contract says they are?

MR. BACKMAN:    Object to form.

        Is that generally the case with most companies

        that you do business with?

      A   No.

MR. BACKMAN:    Object to form.

599   Q   They don't have any involvement in the scripts?

      A   No.

600   Q   They don't even know what's being said to

        potential leads that are being called on their

        behalf?

      A   No.  Typically we're giving a guideline of

          qualifying questions that the lead would have to
          answer to be qualified, but the rest of the
          script is left up to our marketing company
          typically.

601   Q   Okay.  But you have to follow some sort of
          guidelines, so there's only, there are only
          certain companies for which you would use the
          same script, where those guidelines wouldn't
          conflict with each other?  Wouldn't you agree
          with that?

MR. BACKMAN:    Object to form.

     A   Not all of our scripts would have contained all
          of our clients, if that's what you're asking.

602   Q   Let me ask you a different question.  How many
          scripts do you have in place right now against
          all -- across all clients?

     A   I'm not sure of the answer to that.

603   Q   Give me an estimate?

     A   I'm not going to give you an estimate.  I'm not
          sure on the answer.

604   Q   Do you have any knowledge as to approximately how
          many scripts you have in place at any given time?
          Let's say at any time over the last five years?

     A   No, it just could be multiple versions and it
          changes.  It could change on a daily basis.  It
          could change weekly.  It could change monthly.

And again, we don't track that data, how many
scripts we're using at any given time.

605   Q   Do you keep drafts of your old scripts?

      A   We might have some drafts of certain scripts.

606   Q   Do you provide those scripts to your dialing
          company?

      A   We would have provided the scripts to the dialing
          company, yeah.

607   Q   Okay.  And you, presumably you'd have to e-mail
          that to them, right?

      A   E-mail them or someone from our team would
          transmit them electronically sometimes, yeah.

608   Q   Would there be a record of that?

      A   Possibly there's a record of it somewhere.

609   Q   So you could go back and you could figure out
          when you had what scripts in place for your
          dialing company by looking back through your e-
          mails?  That'd be one way, right?

      A   Possibly.

610   Q   Right.  But as you sit here right now, you have
          absolutely no idea how many scripts were in place
          during the class period, how many clients were
          using the same script as Royal Seas; you don't
          know any of that stuff?

MR. BACKMAN:   Object to form.

      A   We're going back a couple of years now.  I don't

125

remember those types of details from a couple of years ago.  Nor would there be any reason for me to keep track of that.  It's not part of our business standard.

611  Q   You have a pending class action lawsuit that involves calls that were placed by the company that you hired through your contract with Royal Seas.  You haven't at any time over the last three years gone back and tried to figure out what happened during that time period with respect to the leads that were used and dialed on behalf of Royal Seas Cruises?

MR. BACKMAN:    Object to form.

A   I have went back for anything that we were asked for, and that's the work that I did.  I was, I'm -- exactly what I was asked for, that's what I went back and searched for.

612  Q   So, how do you know that Prospects cannot determine which calls are made on behalf of Royal Seas if you don't even know whether the script that was in place was used for more than one company, or whether the campaigns that were run involved more than one company, and you haven't done any research into that?  How do you actually know that what you're testifying here is accurate?

MR. BACKMAN:    Object to form.

A   Because the only way for us to identify -- as I
said earlier -- per client, is based on calls
transferred to the client.  That's how we track
our data.

613   Q   Name for me one other company besides Royal Seas
that was using the same script as them during the
class period?

MR. BACKMAN:    Object to form.

MR. ALLEN:    I'll object on the basis of relevance, even
under the liberal standard in deposition.  I
don't think the name of any separate client is
relevant, but you can answer if you want, Josh.

MR. BACON:    It's highly relevant.

A   I'm not going to name any of my other clients.

614   Q   Why not?  This is under, we can put this under
confidential protective order for purposes of
your answer.  You know, I'm not looking to bring
any of your other clients into this case or
impede in any way on your private corporate
affairs, I just want to know the veracity of this
line of reasoning that you've got in your
declaration and I think that, you know, at the
very least you should be able to identify at
least one company that you think would
corroborate from a data perspective your position

on this.

A    Well, I know there was multiple companies that
would have been in various scripting, but I'm not
going to name any of our other clients past or
present.  At least, I'm here to talk about Royal
Seas Cruises.  I'll answer any question as it has
to do with Royal Seas Cruises, but not to any
other client that is not named in this case.

615  Q    I'll go on an under seal, attorney's eyes only
line of reasoning and have the court reporter
designate your answer confidential, highly
confidential pursuant to the protective order
to only be filed under seal and not to be shared
with anybody but the attorneys in this action.  I
don't think -- I think that would ameliorate any
issue that you have with respect to privacy or
confidentiality concerns.  If I were to do that,
would you be willing to answer my question?

MR. ALLEN:    I want to make sure I understand your question
so I can advise Mr. Grant, right?  Are you asking
him to name at least one client for whom the same
or similar scripts would have been used ever?  Or
are you saying during the class period or what?

MR. BACON:    Well, the variations of that question will be
answered if we can agree in principle that he can
answer it.  But all I'm trying to do is figure

out what steps he took to actually think about the issues that he testifies to under oath in these various paragraphs under this section we're talking about, starting on page 2 and ending on page 4.  And I think I'm entitled to ask these questions.  He hasn't had a good recollection of several things during today's deposition and I want to understand if he's speculating on this topic or not?  So if --

MR. ALLEN:   What if he's got a client now that he knows the name of and he's still using a similar script?  Are you asking for the name of a current client that might not have even been the name of a client back then?

MR. BACON:   No, I'm asking about things that happened during the class period that would help us narrow down the data in a meaningful fashion and figure out if there's a way to identify the broader class.  And if there's not, then there's not.  But I have to exhaust that possibility.

MR. ALLEN:   I'm obviously okay with him answering questions about approximately how many other clients would have been part of that general group or campaign at the time.

MR. BACON:   He already said he didn't remember that.  So I need some more specific line of questioning on

129

this topic.

MR. ALLEN:     Right.  I'm okay if you ask him to answer.

MR. BACON:     I asked him that, he said he couldn't remember.  So, I'm asking you to let me ask something under seal where we can probe into this a little more.  Which I think is a fair request.

MR. ALLEN:     Josh, I'm okay if you remember back that far and want to remember a name of a client that was part of that campaign group back then.  Then I'm okay if you are.

A     Again, I, I don't want to try and name certain clients that we would have been doing business with specifically between those time periods, because I can't remember for certain.  I can give an example of other travel offers that we would have presented, or other types of offers, if that would help?

MR. BACON:

616   Q    Do you want to go under seal for any of this stuff, so that you, I don't ask you anything that impedes your -- I'm not trying to invade your company's private business affairs.  I'm just trying to ask questions and get information. So, do you want to go under seal for any of these questions or are you okay testifying openly?

A     I'm okay testifying openly about other types of

offers that we would have been running so that
you can understand other types of -- what else
could have been happening on those calls but I'm
not -- I don't want to give clients' names up but
you're asking me to go a back couple years from
now and say which clients we were working with.
I don't know.

617   Q   Well, if you don't know then why did you say
under oath that you can't determine which calls
were made on behalf of Royal Seas?  Do you in
fact remember -- as you sit here right now, do
you have in your mind the name of a client who
you know with certainty you were running the same
script for on the same dialing campaigns as Royal
Seas during the class period?

MR. BACKMAN:     Object to form.

A   I don't recall the name of any specific client.
I know that we were running multiple clients, we
always have ran multiple clients.  Before we
started doing business with Royal Seas and
throughout the relationship we had with Royal
Seas.

MR. BACON:

618   Q   How many companies were on the same campaigns as
Royal Seas during the time period of November,
2016 to December, 2017?

MR. BACKMAN:      Form.

    A   I'm not sure of the exact number.

MR. BACON:

619  Q  Give me your best estimate.

    A   I don't know an estimate.

MR. ALLEN:      Josh, it's Derek Allen, I would encourage you
to really think hard and give your best estimate,
the very best you can even if it takes a moment
to reflect.

    A   Okay.  Typically it would be anywhere from three
upwards to eight different companies at any
different time on a call.  We wouldn't be running
all of our clients on the same call.

MR. BACON:

620  Q  When you run a -- okay, well, explain that last
thing you just said.  You wouldn't be running all
your clients on the same call, what do you mean
by that?

    A   Yeah, well, if -- we wouldn't run upwards to 24
different offers on the same call.

621  Q  Mm-hmm.  If you make a single call, let's just
talk about one phone call.  If you make one phone
call to one consumer using one script, how many
clients is that call being made on behalf of at
that time?

MR. BACKMAN:      Object to form.

132

A       It could be anywhere from one, depending on the
        script that would be used or it could be upwards
        to many.  It could be upwards to seven, eight,
        and I'm estimating on the upwards, but it could
        be made on behalf of one client or many clients.

MR. BACON:

622   Q   How is the determination made during the call as
          to which one of those clients, if there are more
          than one, the call is transferred to?

      A   Based on the set of qualifying questions that we
          would have in place.  We would run through a set
          of qualifying questions in an order that,
          depending on the responses from the lead,
          whichever offer they qualified for, we would
          live-transfer the lead to that client.

623   Q   Okay, but if the scripts are the same for those
          calls across multiple clients -- as we just
          talked about, right?  Or am I misunderstanding
          that?

MR. BACKMAN:     Object to form.

      A   Certain scripts would be identical and there's
          been multiple variations of scripts that we have
          used over the years.

MR. BACON:

624   Q   So if the script is identical, how do you
          determined which client to send it to?

133

A    Based on a weighting system.  So, for example, if we're calling for a home improvement product and the consumer answers that they need a new set of windows, we may transfer that call to a windows partner, a home improvement partner.  If they don't answer that they need new windows, we would present another offer to them.  If they're not interested in that we present another offer, for example, we go down the pipe until they -- with the hope that they answer, "Yes," that they're interested in one of those offers and live transfer the call to whatever client that fell into.

625  Q    How many cruise companies were you doing business with in the November, 2016 to December, 2017 time period?

A    I'm not sure how many cruise clients.  I know that we had multiple travel partners, some of them own resorts and some of them were cruise clients.

626  Q    How many that fall into that same general category you just described?

A    I don't know the exact number.  It would be maybe a handful.

627  Q    The three to eight range sound about right as an estimate or more or less?

A    Yeah, it would -- that's a fair estimate, three
     to eight.

628   Q    Okay, and do you remember who any of them are?
          I'm not going to ask you to tell me who they are
          but do you have a specific memory that you can
          think of right now that you're like, "I know they
          were one of them"?

A    I know different names of companies that we have
     worked with in the past in the travel industry.
     I don't know for certain today which ones we were
     working for in the date ranges that we're talking
     about.

629   Q    How would you go about figuring that out?

A    I would have to do some research on my end to see
     who we were working with during those periods.

630   Q    How would you do that?

A    By trying to go back and find agreements or
     documentation from those clients during those
     time periods.

631   Q    Did you do that before you assisted in the
          drafting of this declaration?

A    I didn't go back for specific travel partners
     that we were working with but I know that during
     this time period we would have been running
     multiple offers because Royal Seas was not our
     only client and has never been our only client.

632    Q    In paragraph 15, which is on page 4 --

       A    I'm here.

633    Q    -- you offered to give me the very underlying opt

            in data that I just asked for and that your

            counsel said he wouldn't produce to us.  So will

            you reconsider that request?

MR. BACKMAN:    Object to form.

MR. ALLEN:    Which paragraph?  I'm sorry, Adrian.

MR. BACON:    Paragraph 15.

       A    I'll get with my counsel and what they recommend

            we do we'll do.  I mean, I'm not prepared to say

            I will or I won't today.

634    Q    But here you say Prospects could provide the

            petitions with a larger set of opt-in consent

            data relating to leads obtained from these two

            websites.  So you could do it and you believe

            that it's not relevant for the reasons you

            identified below but we disagree and we think

            it's highly relevant.  So I would make a strong

            urge to your counsel and you to have a discussion

            on this issue since you've said that it could be

            produced.

       A    Okay.

635    Q    Okay?  And --

MR. BACKMAN:    Object to form.  That was a question?

MR. ALLEN:    Yes, and I'll object to the extent you're

136

# EXHIBIT D

| Phone number | URL | IP address | Act date | First name | Last name |
|---|---|---|---|---|---|
| 2012009430 | diabeteshealth.info | 64.155.54.17 | 17-02-10 9:16 | CRISTINA | REYES |
| 2012064603 | diabeteshealth.info | 19.33.206.105 | 17-03-05 14:13 | LOU | CONFORTINI |
| 2012070632 | diabeteshealth.info | 192.197.199.175 | 17-09-28 0:11 | robin | roble |
| 2012073823 | diabeteshealth.info | 174.57.41.41 | 17-01-29 12:17 | Nyree | Padilla |
| 2012075182 | diabeteshealth.info | 208.167.239.238 | 17-05-11 2:38 | Everett | Johnson |
| 2012076281 | diabeteshealth.info | 166.182.80.121 | 17-04-06 0:01 | KEVIN | WALDON |
| 2012135684 | diabeteshealth.info | 71.53.114.251 | 17-06-21 3:44 | LISA | BURROUGHS |
| 2012140447 | diabeteshealth.info | 64.86.45.17 | 17-07-15 10:52 | george | christiano |
| 2012140447 | diabeteshealth.info | 64.86.45.17 | 17-07-15 10:52 | george | christiano |
| 2012141147 | diabeteshealth.info | 67.143.226.90 | 17-04-08 15:15 | ZANIFA | PYNDUS |
| 2012141388 | diabeteshealth.info | 72.232.137.246 | 17-02-26 11:52 | D | Thanjan |
| 2012143720 | diabeteshealth.info | 64.34.145.7 | 17-04-17 0:12 | Narciso | Merciadez |
| 2012147839 | diabeteshealth.info | 72.20.18.205 | 17-01-25 8:03 | leonard | clarke |
| 2012149845 | diabeteshealth.info | 206.182.126.128 | 17-07-05 14:11 | Cesare | Sottile |
| 2012170178 | diabeteshealth.info | 18.43.197.77 | 17-02-09 13:14 | Stephen | Hartman |
| 2012181168 | diabeteshealth.info | 63.250.172.156 | 17-07-21 14:39 | fred | barskaia |
| 2012183257 | diabeteshealth.info | 200.12.224.2 | 17-02-19 14:42 | Janine | Powlis |
| 2012184924 | diabeteshealth.info | 192.108.251.192 | 17-04-04 4:19 | jack | shapiro |
| 2012186324 | diabeteshealth.info | 204.45.246.50 | 17-07-13 7:45 | Dan | Reusch |
| 2012200736 | diabeteshealth.info | 108.62.235.33 | 17-04-04 3:51 | Lefko | Vafides |
| 2012200907 | diabeteshealth.info | 192.152.46.254 | 17-07-31 13:31 | Ayumi | Kishida |
| 2012202013 | diabeteshealth.info | 63.214.229.42 | 17-04-20 4:52 | Renee | Asiel |
| 2012202013 | diabeteshealth.info | 63.214.229.42 | 17-04-20 4:52 | Renee | Asiel |

Email
12717957@noemail.com
lpac33@msn.com
george.morgan@concentric.net
padillny@gmail.com
everett.johnson@verizon.net
lancey664@yahoo.com
lisaburroughs@optonline.net
gchristiano@msn.com
gchristiano@msn.com
zanifap@hotmail.com
dthanjan@ipa.net
nmerciadez@cox.net
leonard.clarke@yahoo.com
cesares@cs.com
edwsolhartman@gmail.com
fbarskaia@cs.com
jpowlis@earthlink.net
jshealth@aol.com
dan.reusch@yahoo.com
lvafides@hotmail.com
ayumik@yahoo.com
reneea@angelfire.com
reneea@angelfire.com

# EXHIBIT E

| TELEPHONE | FIRST NAME | LAST NAME | TRANSFER DATE |
|---|---|---|---|
| 7184512154 | LYMA | MACK | 1/10/2017 10:02 |
| 7572972479 | GWENDOLYN | KIDD | 1/10/2017 10:02 |
| 4434657926 | CHRISTINE | POLLOCK | 1/10/2017 10:02 |
| 7069809789 | ANGEL | DALTON | 1/10/2017 10:03 |
| 2672316710 | LAURIE | MILLER | 1/10/2017 10:03 |
| 2012187240 | BRIAN | BARRY | 1/10/2017 10:03 |
| 4105044450 | TANYA | VICARINI | 1/10/2017 10:03 |
| 7068575777 | BILL | KOONCE | 1/10/2017 10:03 |
| 8284488050 | TRUDY | BILLS | 1/10/2017 10:03 |
| 2023518264 | BANTU | OPIOTENNIONE | 1/10/2017 10:04 |
| 318205934 | KAREN | TRAMIEL | 1/10/2017 10:04 |
| 8606334031 | EDWIN | LOMERSON | 1/10/2017 10:04 |
| 9186375359 | DAVID | R BERRY | 1/10/2017 10:04 |
| 6147353870 | VALERIE | DAVIS | 1/10/2017 10:04 |
| 7329002484 | MARSHELLA | EATO | 1/10/2017 10:04 |
| 2569751613 | LARRY | COTTEN | 1/10/2017 10:05 |
| 8166824110 | DONNA | HARRIS | 1/10/2017 10:05 |
| 2022649772 | KENNETH DALE | BRISTOW | 1/10/2017 10:05 |
| 4014659956 | DAN | KEOUGH | 1/10/2017 10:05 |
| 3045257076 | PEGGY | MCCOLLINS | 1/10/2017 10:05 |

# EXHIBIT F

| source_file | id | outbound_lead_id | metrix_couchdb_id | status_original | status_final | dial_start |
|---|---|---|---|---|---|---|
| oll_165_archive.csv | 663881887 | 440802271 | 038ca52a19ba439b4bdb3d220b6a94b5 | 0 | 10 | 1/9/2017 18:04 |
| oll_165_archive.csv | 826401574 | 440802271 | 9be10ccee18d704505f5bef8f9a437297 | 10 | 50 | 2/25/2017 11:43 |
| oll_165_archive.csv | 1325912974 | 440802271 | d90f0438aace2fd403df8abe0b56186 | 50 | 10 | 5/27/2017 10:01 |
| oll_165_archive.csv | 1329812056 | 440802271 | 6290109ecd2032605b23d6e10aca9066 | 10 | 50 | 5/30/2017 9:19 |
| oll_165_archive.csv | 2095073094 | 440802271 | 725c3a39f179961b12b51186b2f4b1ee | 50 | 30 | 8/30/2017 9:28 |
| oll_165_archive.csv | 2137762417 | 440802271 | 2e207014042a307467f3ec096f47f51d | 30 | 30 | 9/5/2017 15:03 |
| oll_206_archive.csv | 48278490 | 440802271 | bd3b32283a63c1dfa067222fc55c8d92 | 30 | 30 | 9/13/2017 11:05 |
| oll_206_archive.csv | 91175979 | 440802271 | 7c75f9b92dee6d3c2beaa0b6f505c9ca | 30 | 10 | 9/19/2017 11:20 |
| oll_165_archive.csv | 110891119 | 440802271 | a7305f4610247 5adf2126bddd7dca1cb | 10 | 10 | 9/21/2017 9:25 |
| oll_165_archive.csv | 134839863 | 440802271 | 309f1992b67eb04a71f24bf73ea7998d | 10 | 13 | 9/25/2017 9:51 |
| oll_165_archive.csv | 161217934 | 440802271 | f86784460633c28e09117004 4f33a44f | 13 | 10 | 9/27/2017 13:11 |
| oll_165_archive.csv | 180705413 | 440802271 | aef8d41f17088b91ae1ac444d8e52f8a | 10 | 10 | 9/29/2017 9:47 |
| oll_165_archive.csv | 202868119 | 440802271 | 97712729 1aed23edd968e8ab2365cc35 | 10 | 13 | 10/2/2017 17:35 |
| oll_206_archive.csv | 241285543 | 440802271 | 7db716459c6d02d3e02ef766599c5e81 | 13 | 13 | 10/6/2017 10:22 |
| oll_206_archive.csv | 253185250 | 440802271 | 964af14addd9d36c3c753a227c97e759 | 13 | 3 | 10/7/2017 14:59 |
| oll_206_archive.csv | 256685025 | 440802271 | ab85a6fa34d8ed3a95987395143ffbb0 | 3 | 10 | 10/9/2017 11:32 |

| dial_end | created_at | updated_at | outbound_lead_group_id | campaign_id | cc_agent | dial_time |
|---|---|---|---|---|---|---|
| 1/9/2017 18:06 | 1/9/2017 18:04 | 1/9/2017 18:06 | 844 | 165 | | 1.48E+15 |
| 2/25/2017 12:24 | 2/25/2017 11:43 | 2/25/2017 12:24 | 844 | 165 | Naveen3@165 | 1.49E+15 |
| 5/27/2017 10:04 | 5/27/2017 10:01 | 5/27/2017 10:04 | 844 | 165 | | 1.50E+15 |
| 5/30/2017 9:28 | 5/30/2017 9:19 | 5/30/2017 9:28 | 844 | 165 | cruise161@165 | 1.50E+15 |
| 8/30/2017 9:32 | 8/30/2017 9:28 | 8/30/2017 9:32 | 844 | 165 | cruise23@165 | 1.50E+15 |
| 9/5/2017 15:07 | 9/5/2017 15:03 | 9/5/2017 15:07 | 844 | 165 | cruisegiri123@165 | 1.50E+15 |
| 9/13/2017 11:08 | 9/13/2017 11:05 | 9/13/2017 11:08 | 844 | 206 | 4400057@206 | 1.51E+15 |
| 9/19/2017 11:23 | 9/19/2017 11:20 | 9/19/2017 11:23 | 844 | 206 | | 1.51E+15 |
| 9/21/2017 9:27 | 9/21/2017 9:25 | 9/21/2017 9:27 | 844 | 165 | | 1.51E+15 |
| 9/25/2017 9:53 | 9/25/2017 9:51 | 9/25/2017 9:53 | 844 | 165 | cruisesushmitha01@165 | 1.51E+15 |
| 9/27/2017 13:17 | 9/27/2017 13:11 | 9/27/2017 13:17 | 844 | 165 | | 1.51E+15 |
| 9/29/2017 9:50 | 9/29/2017 9:47 | 9/29/2017 9:50 | 844 | 165 | | 1.51E+15 |
| 10/2/2017 17:38 | 10/2/2017 17:35 | 10/2/2017 17:38 | 844 | 165 | cruise187@165 | 1.51E+15 |
| 10/6/2017 10:26 | 10/6/2017 10:22 | 10/6/2017 10:26 | 844 | 206 | kar66@206 | 1.51E+15 |
| 10/7/2017 15:01 | 10/7/2017 14:59 | 10/7/2017 15:01 | 844 | 206 | | 1.51E+15 |
| 10/9/2017 11:35 | 10/9/2017 11:32 | 10/9/2017 11:35 | 844 | 206 | | 1.51E+15 |

| answer_time | bridge_time | hangup_time | sip_gateway | switch | channel_uuid | hangup_cause |
|---|---|---|---|---|---|---|
| 1.48E+15 | | 1.48E+15 | 247talk3 | pd-dialer06 | b732255b-fa6c-45ca-80ef-5522aaa8addb | SUBSCRIBER_ABSENT |
| 1.49E+15 | | 1.49E+15 | 247talk1 | pd-dialer01 | 13143ecc-4b2b-415b-9bfe-b8bad9c5db20 | NORMAL_CLEARING |
| 1.50E+15 | | 1.50E+15 | 247talk2 | pd-dialer06 | 4a015df3-5979-4308-a40a-639d059072fe | SUBSCRIBER_ABSENT |
| 1.50E+15 | | 1.50E+15 | 247talk3 | pd-dialer03 | 12ac432d-e737-40c8-8ad6-13233577a4d6 | NORMAL_CLEARING |
| 1.50E+15 | 1.50E+15 | 1.50E+15 | png1 | pd-dialer09 | ac19186d-df7c-4d6d-a70a-a2cb16ece6d2 | NORMAL_CLEARING |
| 1.50E+15 | 1.50E+15 | 1.50E+15 | icon1 | pd-dialer21 | f5567814-3232-4497-b7a4-f00c85c89d58 | NORMAL_CLEARING |
| 1.51E+15 | 1.51E+15 | 1.51E+15 | magna1 | pd-dialer29 | 4168949d-af63-44fb-b0a0-3b1ec12f57ad | NORMAL_CLEARING |
| 1.51E+15 | | 1.51E+15 | impact1 | pd-dialer14 | daf914cb-3cd5-402c-840c-43b99a01846e | SUBSCRIBER_ABSENT |
| 1.51E+15 | | 1.51E+15 | touch2 | pd-dialer06 | d8c0a62c-df8d-4738-a14b-254096ab8699 | SUBSCRIBER_ABSENT |
| 1.51E+15 | 1.51E+15 | 1.51E+15 | 247talk3 | pd-dialer24 | 5b81ffad-1f1f-4be3-aa1c-725f5596de2f | NORMAL_CLEARING |
| 1.51E+15 | | 1.51E+15 | 247talk1 | pd-dialer32 | c1eaaff0-1313-4f08-b976-2df1d647894a | SUBSCRIBER_ABSENT |
| 1.51E+15 | | 1.51E+15 | png1 | pd-dialer14 | f477d9ef-f88b-4d95-8c84-78fdea7bbeb2 | SUBSCRIBER_ABSENT |
| 1.51E+15 | 1.51E+15 | 1.51E+15 | impact1 | pd-dialer12 | 6fb449d6-1b25-4339-8507-2d8bf68c595d | NORMAL_CLEARING |
| 1.51E+15 | 1.51E+15 | 1.51E+15 | impact1 | pd-dialer30 | 5c5c39cf-5e2b-4258-be5c-9278443cddb8 | NORMAL_CLEARING |
| 1.51E+15 | | 1.51E+15 | touch2 | pd-dialer24 | 0643576d-b537-4a23-8b21-ecf364b8531f | NORMAL_CLEARING |
| 1.51E+15 | | 1.51E+15 | echo2 | pd-dialer30 | 9bdcf4a9-4f29-4a89-8e86-dc5ae9858003 | SUBSCRIBER_ABSENT |

| attempts | phone_number | caller_id | sip_hangup_disposition | foreign_id | lead_created_at | called_count |
|---|---|---|---|---|---|---|
| 1 | 6096380625 | 6098377382 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6099616987 | recv_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6094693272 | send_bye | 001R | 16:45.7 | |
| 2 | 6096380625 | 6094693268 | recv_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6092011704 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6093736978 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6093736981 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6092011728 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6094295330 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6095725477 | recv_bye | 001R | 16:45.7 | |
| 2 | 6096380625 | 6095245653 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6095725481 | send_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6094295277 | recv_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6095245617 | recv_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6092011729 | recv_bye | 001R | 16:45.7 | |
| 1 | 6096380625 | 6094295257 | send_bye | 001R | 16:45.7 | |

# EXHIBIT G

**Tom Wheeler**

| | |
|---|---|
| **From:** | Adrian Bacon |
| **Sent:** | Monday, March 2, 2020 12:31 PM |
| **To:** | Jeffrey Backman; Abbas Kazerounian, Esq. |
| **Cc:** | Todd Friedman; Matt Loker; Tom Wheeler; Brian Cummings; Khia Joseph; 38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail |
| **Subject:** | RE: McCurley v Royal Seas - Meet and Confer [IWOV-Active.FID11005533] |

Jeff and Brian,

This will summarize the issues raised in call.

I requested whether you will oppose our request to decertify the broader class while not requesting decertification of the subclass.  You declined to tell me whether you will oppose our relief.  My understanding is that you have not yet decided whether you will request full decertification in an opposition or plan to file a separate decertification motion as to the subclass.  Either way, I need to know by tomorrow because we are going to be filing our motion by then.

I understand you also plan to file a daubert motion with respect to Mr. Weeks and Ms. Peters on the same factual grounds as the last motions, which were denied.  I understand your position regarding the procedure being different and the fact that Ms. Peters has put forth a supplemental report.  We oppose these motions.

Finally, we discussed next week's MSC and the class notice.  You made a comment that you felt it was inappropriate that we send notice out prior to the MSC, and that we also acted inappropriately in seeking to certify this class in the first place and thereafter unfairly expecting your "corporate client" to pay a massive class settlement.  You then started talking about individual resolution.  I obviously disagree with those sentiments.  We expect your client go come to the MSC in good faith in this certified class.

Adrian R. Bacon, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Tel.  (866)598-5042 ext 648
Fax  (866)633-0228
www.toddflaw.com

---

**From:** Adrian Bacon <abacon@toddflaw.com>
**Sent:** Monday, March 2, 2020 8:41 AM
**To:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>; Abbas Kazerounian, Esq. <ak@kazlg.com>
**Cc:** Todd Friedman <tfriedman@toddflaw.com>; Matt Loker <ml@kazlg.com>; Tom Wheeler
<twheeler@toddflaw.com>; Brian Cummings <Brian.Cummings@gmlaw.com>; Khia Joseph <Khia.Joseph@gmlaw.com>;
38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail <{F11005533}.Active@gmlaw.imanage.work>
**Subject:** Re: McCurley v Royal Seas - Meet and Confer [IWOV-Active.FID11005533]

I'm available today at noon PST.  Does that work for you?

Get Outlook for iOS

---

**From:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>
**Sent:** Monday, March 2, 2020 6:17:25 AM
**To:** Adrian Bacon <abacon@toddflaw.com>; Abbas Kazerounian, Esq. <ak@kazlg.com>
**Cc:** Todd Friedman <tfriedman@toddflaw.com>; Matt Loker <ml@kazlg.com>; Tom Wheeler

<twheeler@toddflaw.com>; Brian Cummings <Brian.Cummings@gmlaw.com>; Khia Joseph <Khia.Joseph@gmlaw.com>;
38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail <{F11005533}.Active@gmlaw.imanage.work>
**Subject:** RE: McCurley v Royal Seas - Meet and Confer [IWOV-Active.FID11005533]

I was out from Thursday afternoon through the weekend.  What time works today?

Perhaps it makes sense for you all to move to enlarge your deadline to send out Notice until after the mediation...to the extent the timing of that is a concern.  We wouldn't oppose that.

***Jeffrey A. Backman, Esq.***
*Partner*
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL  33301
Toll Free - (888)491-1120
Direct Fax - (954)213-0140
Direct Dial - (954)734-1853
Email:   jeffrey.backman@gmlaw.com
http://www.gmlaw.com

# GreenspoonMarder

**From:** Adrian Bacon <abacon@toddflaw.com>
**Sent:** Thursday, February 27, 2020 4:05 PM
**To:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>; Abbas Kazerounian, Esq. <ak@kazlg.com>
**Cc:** Todd Friedman <tfriedman@toddflaw.com>; Matt Loker <ml@kazlg.com>; Tom Wheeler <twheeler@toddflaw.com>; Brian Cummings <Brian.Cummings@gmlaw.com>; Khia Joseph <Khia.Joseph@gmlaw.com>;
38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail <{F11005533}.Active@gmlaw.imanage.work>
**Subject:** RE: McCurley v Royal Seas - Meet and Confer [IWOV-Active.FID11005533]

I would prefer to meet and confer tomorrow on our issue.  This should not be controversial.  Please have one of the other three attorneys working on this matter make themselves available to discuss with me tomorrow.  .  I am free any time except 10-11 PST tomorrow.

What issues would you like to meet and confer with us regarding?

Adrian R. Bacon, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Tel.  (866)598-5042 ext 648
Fax  (866)633-0228
www.toddflaw.com [toddflaw.com]

**From:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>
**Sent:** Thursday, February 27, 2020 12:34 PM
**To:** Adrian Bacon <abacon@toddflaw.com>; Abbas Kazerounian, Esq. <ak@kazlg.com>
**Cc:** Todd Friedman <tfriedman@toddflaw.com>; Matt Loker <ml@kazlg.com>; Tom Wheeler <twheeler@toddflaw.com>; Brian Cummings <Brian.Cummings@gmlaw.com>; Khia Joseph <Khia.Joseph@gmlaw.com>;
38541_0019 _Royal Seas Cruises_ Inc_ _ adv_ McCurley_ 21_1 E_Mail <{F11005533}.Active@gmlaw.imanage.work>
**Subject:** RE: McCurley v Royal Seas - Meet and Confer [IWOV-Active.FID11005533]

I'm out of pocket the rest of this week.  Monday and Tuesday afternoon work.  We have issues we'd like to confer on as well.  Let me know what time works best on either of those dates.

**Jeffrey A. Backman, Esq.**
*Partner*
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL  33301
Toll Free - (888)491-1120
Direct Fax - (954)213-0140
Direct Dial - (954)734-1853
Email:   jeffrey.backman@gmlaw.com
http://www.gmlaw.com [nam12.safelinks.protection.outlook.com]

# GreenspoonMarder

**From:** Adrian Bacon <abacon@toddflaw.com>
**Sent:** Wednesday, February 26, 2020 4:12 PM
**To:** Jeffrey Backman <Jeffrey.Backman@gmlaw.com>; Abbas Kazerounian, Esq. <ak@kazlg.com>
**Cc:** Todd Friedman <tfriedman@toddflaw.com>; Matt Loker <ml@kazlg.com>; Tom Wheeler <twheeler@toddflaw.com>
**Subject:** McCurley v Royal Seas - Meet and Confer

Jeff,

I would like to meet and confer with you regarding Plaintiffs' anticipated motion to request partial decertification as to the broader class.

This will follow up on the discussions you and Abbas had after the deposition of Mr. Grant.  Due to Mr. Grant's testimony regarding the inability of Prospects DM to distinguish a call placed on behalf of Royal Seas Cruises from another of its client using available data, we feel that there is no way to give direct notice to the broader class in satisfaction of the Court's Order regarding Class Notice.  If this alone were the only issue, we could find another means of notifying the class.  However, the testimony suggests that there is no way to manageably identify the number of consumers who were called under the Royal Seas contract, or verify whether a consumer who received a call that otherwise qualified within the class definition was in fact called on behalf of Royal Seas.  The exception to this is obviously those consumers who are members of the Transfer Subclass, since they were transferred to Royal Seas and there are records identifying these consumers from multiple sources.  Accordingly, we believe it is appropriate and necessary to request decertification of the broader Class.  We do not take this decision lightly, and we would not be requesting this relief if we felt we had other options.

We plan to file our moving papers next week.  We are also going to send out class notice to the Transfer Subclass.  I suspect that your client would not oppose the relief requested herein, given your position on these issues likely aligns with ours, but please let me know if I have that wrong.  I am available this afternoon and much of tomorrow and Friday to meet and confer, should you wish to do so.  Please let me know some times that work on your end.

Regards,

Adrian R. Bacon, Esq.
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
Tel.  (866)598-5042 ext 648
Fax  (866)633-0228
www.toddflaw.com [toddflaw.com] [nam12.safelinks.protection.outlook.com]

GREENSPOON MARDER LLP LEGAL NOTICE
The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail.

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are attempting to collect a debt from you.