# Exhibit "2"

1                       UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF CALIFORNIA
2              CASE No.  17-cv-1988 AJB (AGS)
                                 consolidated with
3                           17-cv-986 AJB (AGS)PP
4      JOHN MCCURLEY, individually
       and on behalf of all others
5      similarly situated,
                       Plaintiff,
6      vs.
7      ROYAL SEAS CRUISES, INC.,
8                       Defendant.
       _____
9      DAN DEFOREST, individually
       and on behalf of all others
10     similarly situated
                       Plaintiff,
11      v.
12     ROYAL SEAS CRUISES, INC.,
13                      Defendant
       _____/
14                               One East Broward Blvd.
15                               Fort Lauderdale, Florida
                                 February 18, 2020
16                               10:10 a.m. - 12:25 p.m.
17             DEPOSITION OF MELISSA HANSON
18        Taken before SUZANNE VITALE, R.P.R., F.P.R.
19     and Notary Public for the State of Florida at Large,
20     pursuant to Notice of Taking Deposition filed in the
21     above cause.
22
23
24
25     PAGES 1 - 84

                                              Page 1

```
1    APPEARANCES:

2    On behalf of Plaintiffs:

3    LAW OFFICES OF TODD M. FRIEDMAN, PC

4    21550 Oxnard Street

5    Suite 780

6    Woodland Hills, California 91367

7    BY:  THOMAS WHEELER, ESQ.

8

9    On behalf of Defendants:

10   GREENSPOON MARDER, LLP

11   200 East Broward Boulevard

12   Suite 1800

13   Fort Lauderdale, Florida 33301

14   BY:  RICHARD EPSTEIN, ESQ.

15   ALSO PRESENT:  Geoff Pette

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1
 2                          I N D E X
 3
 4    Examination                                    Page
 5    Direct          By Mr. Wheeler:                   4
 6    Cross           By Mr. Epstein:                  81
 7
 8                     PLAINTIFF EXHIBITS
 9    No.                                             Page
10    Exhibit 1       Notice of Deposition              8
11    Exhibit 2       Script                           16
12    Exhibit 3       Call List                        21
13    Exhibit 4       Screenshot of Customer           24
14                    Contact
15    Exhibit 5       Cecelia Hetchler Affidavit       38
16    Exhibit 6       Second  Disclosure               43
17    Exhibit 7       Wilder Affidavit                 75
18    Exhibit 8       SignNow Sheet                    76
19    Exhibit 9       Thumb Drive                      82
20
21
22
23
24
25
```

```
 1    Thereupon:
 2                      MELISSA HANSON
 3    a witness named in the notice heretofore filed,
 4    being of lawful age and having been first duly
 5    sworn, testified on her oath as follows:
 6                    DIRECT EXAMINATION
 7    BY MR. WHEELER:
 8         Q.    Good morning.
 9         A.    Good morning.
10         Q.    My name is Tom Wheeler.  I'm an attorney
11    in this action that my client Dan DeForest and --
12    sorry -- John McCurley have brought against Royal
13    Sea Cruises, Inc.
14              Can you please state and spell your name
15    for the record?
16         A.    Melissa Hanson.  M-E-L-I-S-S-A
17    H-A-N-S-O-N.
18         Q.    Have you ever been deposed before?
19         A.    Yes.
20         Q.    How many times?
21         A.    This is my third.
22         Q.    And when was the other most recent time?
23         A.    I don't remember exactly.  A few months.
24         Q.    A few months ago, okay.
25              Do you want me to go over the ground rules
```

Page 4

1    of a deposition or do you know them?

2         A.   You can go over them.

3         Q.   So the purpose of this deposition today is

4    to learn facts about the case that support or don't

5    support my clients' position.  In particular today,

6    we're here to explore contact made between Royal Sea

7    Cruises, Inc., and class members.

8              I'm going to ask questions and I'll try to

9    ask them clearly and concisely but I'll probably

10   fail a bunch.  If you ever don't understand a

11   question, please ask me to rephrase it and I'm happy

12   to do so, okay?

13        A.   Okay.

14        Q.   It's not a marathon.  You can take a break

15   whenever you want.  The only request I have is that

16   if a question is pending, please answer it and then

17   we can go over it, okay?

18        A.   Okay.

19        Q.   The oath you just took is the same oath

20   you'd take in a court of law, so although we're in a

21   more informal conference setting, the testimony you

22   give today would have the same effect as if we were

23   in court.

24        A.   Okay.

25        Q.   Do you know what the difference between an

Page 5

1    estimate and a guess is?

2         A.   Yes.

3         Q.   After we're done today, you'll have the

4    chance to review your testimony.  If there's

5    anything that you need to correct, you're more than

6    welcome to do so.  Though, if it's a substantive

7    change like a yes to a no, I may comment on it at

8    the time of trial, okay?

9         A.   Okay.

10        Q.   We're doing just fine.  I imagine it's

11   because it's your fourth time.  We don't want to

12   talk over each other and also we want to make sure

13   we give verbal answers.  Nods of the heads, shrugs

14   of the shoulder don't show up on the transcript,

15   okay?

16        A.   Okay.

17        Q.   Have you taken any drugs, alcohol or other

18   medication that would impact your ability to give

19   your best testimony today?

20        A.   No.

21        Q.   Is there any reason why you can't give

22   your complete and full testimony today?

23        A.   No.

24        Q.   Thank you.

25             MR. EPSTEIN:  Let's be clear about

                                          Page 6

1          something.  She's here in a capacity as a

2          30(b)(6) designee of Royal Seas Cruises.  She's

3          not here in any individual capacity.  This is

4          also pursuant to a notice that details what the

5          subject matter and the topics with a deposition

6          are going to be and we are going to insist that

7          the inquiry remain very much consistent with

8          the topics that are listed there.

9               There's already been a fully developed

10         30(b)(6) deposition taken of Royal Seas in this

11         case.  This is not a second chance for a

12         30(b)(6) inquiry with respect to the merits or

13         other substance of the case.

14              As you said, it deals with one very

15         specific sequence of events and they were

16         outlined in motions that you have filed,

17         motions to strike, et cetera.

18              So let us just understand that this is

19         going to be limited and focused on that.

20         Ms. Hanson is here in a representative capacity

21         speaking on behalf of the company and that

22         we're going to pretty much hold you to your

23         notice.

24              MR. WHEELER:  I'm only here to ask

25         questions about what happened as outlined in

                                              Page 7

```
 1          this notice.  We already took a 30(b)(6).  I
 2          want to say it's been almost two years.
 3              Literally the only reason we're here today
 4          is to basically find out what notice or contact
 5          was had between Royal Seas Cruise members and
 6          class members that we're not otherwise aware of
 7          and, specifically, after class certification.
 8     BY MR. WHEELER:
 9          Q.   Do you understand that you were designated
10     as the 30(b)(6) representative with respect to
11     certain topics for defendant?
12          A.   Yes.
13          Q.   Do you mind if I refer to Royal Sea
14     Cruises, Inc. as Royal Seas?
15          A.   That's fine.
16          Q.   It's just easier.
17              MR. WHEELER:  Let's go ahead and just
18          start with that then.  Introducing Exhibit 1.
19              (Thereupon, the referred-to document was
20     marked by the court reporter for Identification as
21     Plaintiff's Exhibit 1.)
22     BY MR. WHEELER:
23          Q.   So marked as Exhibit 1 is a notice of
24     deposition for today.  If you turn to page 3 -- let
25     me ask this first.
```

Veritext Legal Solutions
866 299-5127

```
1              Have you seen this document before?
2         A.   Yes.
3         Q.   If you look at the topics numbered 1
4    through 12, are you prepared to testify about those
5    topics today on behalf of defendant?
6              MR. EPSTEIN:  Let me kind of, I guess, ask
7         a question first.
8              She has the ability to testify concerning
9         the topics with one sort of caveat.  What does
10        March 6, 2017 have to do with this case?
11             MR. WHEELER:  March 6, 2017 is when this
12        case was filed.
13             MR. EPSTEIN:  No, that's not exactly
14        right.  The complaints were filed in May and in
15        June of 2017.
16             MR. WHEELER:  Let me rephrase it then.
17        March 6, 2017 -- let me actually check.
18             MR. EPSTEIN:  You can see it actually
19        predates the filing of the lawsuit so it's kind
20        of difficult question for her to be able to
21        answer if it has nothing to do with the
22        lawsuit.
23             MR. WHEELER:  Well, it's within the class
24        period.
25             MR. EPSTEIN:  It may be within the class
```

Page 9

1          period but there was no class, there was no
2          lawsuit.  There was no information that there
3          was going to be a class and the relevant time
4          period is really March -- or the relevant date
5          is March 27, 2019.  That's the date of the
6          class certification order.
7              But, you know, again, she'll kind of
8          struggle with that because basically these
9          people were prospective customers, existing
10         customers, you know, actual customers, people
11         they were arranging travel for, so they would
12         have had contact with them in any number of
13         different ways.
14             And in reality, I don't think you're
15         asking us for that.  You're not really asking
16         for what has been done in the context of
17         marketing their products or fulfilling the
18         services and products that they sell so ...
19             MR. WHEELER:  No, I mean, our position in
20         this case generally, which I think is correct,
21         is that you're more than welcome to sell these
22         people products and service their products.
23         You just can't talk about the lawsuit,
24         especially after we certified the class.
25             The only thing I wanted to cover my base

                                              Page 10

```
 1           on -- and I'll slow down -- by proposing that
 2           date was -- there's an open question that I
 3           don't know, which we'll find out in this
 4           deposition, as to whether Royal Seas otherwise
 5           had contact with class members prior to class
 6           certification regarding this lawsuit.
 7                I just don't know and that's what I'm
 8           trying to make sure I assess out fully.
 9                MR. EPSTEIN:  Which is exactly why the
10           March 6, 2017 date kind of befuddles us because
11           it's at least two months before any lawsuit was
12           filed.
13                I can tell you that -- let me find my
14           notated one.  The DeForest lawsuit was filed on
15           May 12, 2017 and McCurley was filed on June 7,
16           2017.  Maybe there was some digits that were
17           transposed, I don't know.
18                MR. WHEELER:  I'm not going to hold you to
19           that March 6, 2017 date.  I just want to know
20           what contact was made with regards to -- when I
21           ask the question, if there is a problem with
22           it, let's discuss it, is that better.
23                MR. EPSTEIN:  Yes.
24     BY MR. WHEELER:
25           Q.   Back on the topic.
```

Page 11

```
 1              Are you prepared to testify regarding
 2     topics 1 through 12 withstanding your counsel's note
 3     regarding the March 6, 2017 date being somewhat
 4     arbitrary?
 5         A.   Yes.
 6         Q.   Thank you.
 7              If you'd look at the next set -- next part
 8     of that page 4 and continuing on for three pages.
 9     There are 18 requests for production.
10              Do you know if all the documents that were
11     produced by your counsel prior to deposition are all
12     responsive documents to those requests?
13              MR. EPSTEIN:  They are responsive
14          non-privileged documents.  There are internal
15          communications, communications with counsel to
16          which a privilege is and will be asserted.
17              They are not being produced.  Other than
18          that, you pretty much have the full range of
19          everything that was documented.
20              MR. WHEELER:  Just because I have to ask
21          her because she's under oath.
22     BY MR. WHEELER:
23         Q.   Is what your counsel just said your
24     understanding of what was produced?
25         A.   Yes.
```

Page 12

1    Q. Thank you.

2     Following class certification, which

3 occurred on March 27, 2019, what contact has Royal

4 Seas had with class members regarding this

5 litigation?  If it's unclear what I mean by

6 regarding this litigation, let me know.

7    A. Unclear.

8    Q. Let me ask a more broad question just to

9 make sure I understand.

10     Does Royal Seas follow up with its clients

11 after they purchase cruise programs?

12    A. Yes.

13    Q. How often do you usually follow them?

14    A. That's a pretty broad question also.

15 There's numerous reasons that we would follow up

16 with a customer.

17    Q. What reasons would those be?

18    A. To verify travel.  They could possibly

19 call into our customer service to have questions

20 about traveling, travel dates.  I mean, numerous

21 questions.

22    Q. Do you also follow up to try and sell them

23 more cruises or what have you?

24    A. Yes.

25    Q. Excluding -- let's just focus on that.

Veritext Legal Solutions
866 299-5127

1           Do you regularly, as in a normal monthly

2    or yearly interval, call your current clients to

3    inquire about further cruises?

4           A.    Yes.

5           Q.    How often?

6           A.    It also depends on a lot of things.  If

7    they've traveled.  I mean, the date where they are

8    in their contract with us.  There's a lot of

9    different reasons.

10          Q.    Do you normally contact them prior to them

11   having travel if they've already purchased services

12   from you for the purposes of soliciting more

13   cruises?

14          A.    Yes.

15          Q.    Can you give me any kind of an estimate?

16   Can it be as quickly or as often as a month?  How

17   often are you contacting people again with regards

18   to cruises?

19          A.    It would be very difficult for me to

20   narrow it down.  I can't really say.

21          Q.    But either way, Royal Seas will continue

22   to communicate with its clients, correct?

23          A.    Correct.

24          Q.    How much time is there usually between the

25   purchase and actual travel date?

```
 1           A.    It depends on the person as well.
 2           Q.    I'm just trying to get an understanding as
 3     to how often you actually are talking.
 4                 MR. EPSTEIN:  Again, I'll give you some
 5           leeway here.  I understand that you're talking
 6           about potential post class certification
 7           communications which are normal and in the
 8           ordinary course and which, as I understand it,
 9           as we understand it, you're not -- you're not
10           arguing should not be occurring, that they're
11           allowed to contact their customers about
12           business things.
13                 MR. WHEELER:  Of course.  That would be
14           absurd.
15     BY MR. WHEELER:
16           Q.    Following class certification, which
17     occurred on March 27, 2019, did Royal Seas contact
18     class members regarding this litigation?
19           A.    Yes.
20           Q.    How did they contact class members, what
21     method did they use?
22           A.    Can you, like, narrow it for me?
23           Q.    Phone, e-mail, letter?
24           A.    Phone.
25           Q.    So Royal Seas places calls to class
```

1    members, correct?

2         A.   To our clients.

3         Q.   When these calls are being -- let me just

4    start with this because I think this is helpful.

5              MR. EPSTEIN:   That's the script?

6              MR. WHEELER:   Yes.   I'm going to introduce

7         this as Exhibit 2.

8              (Thereupon, the referred-to document was

9    marked by the court reporter for Identification as

10   Plaintiff's Exhibit 2.)

11   BY MR. WHEELER:

12        Q.   Marked as Exhibit 2 is a document that was

13   produced this morning in response to our request for

14   production.

15             Have you seen this document before?

16        A.   Yes.

17        Q.   What is it?

18        A.   A script that we would use to contact our

19   customers.

20        Q.   If you look at this script, after the

21   first two paragraphs, it begins mentioning

22   diabeteshealth.info.

23             Do you see that?

24        A.   Yes.

25        Q.   Was this script specifically made to be

Page 16

1    read or used to contact class members regarding that

2    website?

3         A.   It was specifically made to contact people

4    that opted in on diabeteshealth.

5         Q.   How did Royal Seas know if people had

6    opted in on diabeteshealth.info?

7         A.   Through our source that transferred those

8    calls, we received information on the websites that

9    they visited to opt in.  We collected the

10   information from any transfers that we had with

11   that -- with the opt in for that site.

12        Q.   Did you have a preexisting database of

13   that or did you have to reach out to those

14   individuals to get that information?

15        A.   What individuals?

16        Q.   The transfer partners?

17        A.   We have that information.

18        Q.   So you store it?

19        A.   Correct.

20        Q.   When was this script prepared?

21        A.   I don't remember the date.

22        Q.   Was it after March 27, 2019?

23        A.   I don't know.

24        Q.   When were the calls placed to individuals

25   using this script?

Page 17

```
 1        A.    Over several months.  July approximately.
 2        Q.    July of last year?
 3        A.    Correct.
 4        Q.    Who drafted this script?
 5        A.    My attorneys.
 6        Q.    And by your attorneys, you mean your
 7    outside counsel or in-house counsel?
 8        A.    Collectively.
 9        Q.    Do you know who decided that this script
10    needed to be made, as in was it a managerial
11    decision or do you know?
12        A.    No.
13        Q.    Do you know if there are any drafts of
14    this script?
15        A.    No.
16        Q.    Let me rephrase that question because that
17    was a bad question.
18              Were there any drafts of this script?
19        A.    I don't know.
20        Q.    How was this script actually used, with
21    respect to I mean how were these calls placed?
22        A.    One of my customer service agents used it
23    and contacted -- called the people.
24        Q.    I realize I forgot a really important
25    foundational question.
```

Veritext Legal Solutions
866 299-5127

1              What is your position at Royal Seas?

2        A.   Vice president.

3        Q.   Just vice president or vice president of

4   something?

5        A.   Vice president.

6        Q.   What's your job duties?

7        A.   I'm sorry?

8        Q.   What are your job duties?

9        A.   Gosh, mostly operational things,

10   everything from payroll, dealing with employees,

11   signing checks, pretty much everything, all of

12   operations.

13        Q.   With regards to operations, does that

14   include the call center?

15        A.   Yes.

16        Q.   And is the call center both fielding

17   telemarketing inquiries and handling customer

18   service?

19        A.   I don't understand your question.

20              MR. EPSTEIN:  Object to the form of that

21         question.

22              MR. WHEELER:  I'll rephrase.

23   BY MR. WHEELER:

24        Q.   With regards to the call center, let just

25   ask it open ended, what does the call center do?

Veritext Legal Solutions
866 299-5127

```
 1          A.    Customer service.
 2          Q.    Are you also fielding inbound calls with
 3    regards to people potentially buying cruises?
 4          A.    In our corporate center?  We have outside
 5    call centers as well, so you have to tell me
 6    specifically what you mean.
 7          Q.    Let's go with the corporate center.  Are
 8    they fielding these inbound calls?
 9          A.    For the purpose of sales?
10          Q.    Yes.
11          A.    No.
12          Q.    They're just handling customer service?
13          A.    Correct.
14          Q.    Do you oversee both the outside call
15    centers and the corporate call center?
16          A.    Like, I'm not actually in any of the
17    outside call centers.  If they have issues or
18    questions, they will call me for something but they
19    have their own individual owners.
20          Q.    With regards to the representative who
21    placed these calls, were they in the corporate call
22    center?
23          A.    Yes.
24          Q.    Was it just one representative?
25          A.    Yes.
```

Veritext Legal Solutions
866 299-5127

1          Q.    How many calls did they place?

2          A.    I don't know.  I know we pulled quite a

3     few.  I believe 560 or so.

4          Q.    I'll check my math.

5          A.    Okay.

6          Q.    I'm not going to introduce it currently --

7     well, yeah, why not.  Let's introduce this.

8                (Thereupon, the referred-to document was

9     marked by the court reporter for Identification as

10    Plaintiff's Exhibit 3.)

11    BY MR. WHEELER:

12         Q.    Marked as Exhibit 3 is another document

13    that was produced this morning in response to a

14    request for production.

15                Have you seen this document before?

16         A.    Yes.

17         Q.    What is it?

18         A.    List of calls that -- the list of clients

19    for her to call.

20         Q.    So there are around 500 or so entries in

21    this list.  It's about 32 per page.

22         A.    Correct.

23         Q.    This is a list of every person she called

24    for the purpose of using this script that's Exhibit

25    2?

                                           Page 21

1        A.    Attempted to call, yes.

2        Q.    And by attempted, you mean she called them

3   and they may not have picked up?

4        A.    Correct.

5        Q.    How was it determined that this would be

6   the list of people that would be called?

7        A.    We pulled the transfers that had that

8   specific opt in and of those, we took the people

9   that had sales with us.

10        Q.    So this is actually a list of all the

11   people who were transferred from diabeteshealth.info

12   to whom a sale was actually made?

13        A.    Correct.

14        Q.    If a call was not successful with regards

15   to reaching the person, would the call

16   representative call again?

17        A.    I'm not sure of everyone.

18        Q.    What were her general instructions with

19   regards to contacting these people?

20        A.    To contact them and read the script that

21   we provided.

22        Q.    And there was no how many times she did

23   call.  Would she leave a voice mail?

24        A.    No.

25        Q.    So she would have just done whatever -- we

1    don't know for certain?

2         A.   Correct.

3         Q.   It may have been different or it may have

4    been the same between different people?

5         A.   Correct.

6         Q.   The only requirement was that she call

7    these people and if she'd contact them, she'd read

8    this script that's Exhibit 2?

9         A.   Correct.

10        Q.   Was she supposed to record -- I'll use the

11   term disposition -- the disposition of the calls?

12        A.   I don't know what you mean.

13        Q.   Was she supposed to record whether she

14   reached them or not?

15        A.   We have a CRM that she would make notes

16   into.

17             MR. EPSTEIN:  I got something?

18             MR. WHEELER:  You have it on digital for

19        me?

20             MR. EPSTEIN:  These are all of the

21        recordings.

22             MR. PETTE:  Those are all of the

23        recordings of the individuals that she, the

24        agent, spoke to.

25             MR. WHEELER:  Thank you.

1          What I'm a going to look at now is this

2     document and introduce it as Exhibit 4.

3          (Thereupon, the referred-to document was

4     marked by the court reporter for Identification as

5     Plaintiff's Exhibit 4.)

6     BY MR. WHEELER:

7          Q.   Marked as Exhibit 4 is another set of

8     documents that was produced this morning in response

9     to our request for production.

10         Have you seen this before?

11         A.   Yes.

12         Q.   What is it?

13         A.   Screenshots of the customers that our

14    representative made contact with.

15         Q.   So if she made contact with them -- let me

16    start with a more basic question.

17         So is DevDex the system by which you're

18    recording the results of any contact or attempted

19    contact?

20         A.   Yes.

21         Q.   Is this automated?

22         A.   I don't know what that means.

23         Q.   Does a computer automatically generate

24    these entries or does your agent enter in what the

25    result of the call is?

Veritext Legal Solutions
866 299-5127

```
 1          A.    The agent entered her notes.

 2          Q.    Looking at these -- let's just start with

 3     the first page.  The second entry says "COMP 12 MNTH

 4     EXT.

 5                What does that mean?

 6          A.    That she gave them a 12-month extension to

 7     travel.

 8          Q.    This is just background for me.

 9                When people purchase cruises from Royal

10     Seas, are they for a specific date or a voucher?

11          A.    They have 18 months to use their package,

12     to travel on their package once they purchase it.

13          Q.    So they'll call up and figure out a date

14     if there's availability to actually do it; is that

15     right?

16          A.    Correct.

17          Q.    And if the 18 months runs out, they can

18     get an extension, correct?

19          A.    Correct.

20          Q.    Is an extension always given out?

21          A.    No.

22          Q.    Why might an extension be given?

23          A.    Why would an extension be given?

24          Q.    Yes.

25          A.    Say you have someone in the military and
```

Page 25

1    they're being deployed overseas, so then they are

2    not going to be available in the 18-month period, we

3    would give them an extension.  They have a health

4    issue maybe and they need more time.  Many reasons

5    that we give them.

6         Q.   Why wouldn't an extension be given?

7         A.   If they just didn't -- they just ran out

8    of time for no reason, just didn't travel, forgot

9    about it, whatever the case.

10        Q.   So it's sort of discretionary?

11        A.   Correct.

12        Q.   Looking at the first entry here or first

13   page, how can we tell that this script was called

14   and used with this person?  Is there a way to tell

15   from this page?

16        A.   That the script was used, no.

17        Q.   That the person was called for the purpose

18   of reading the script?

19        A.   No.

20        Q.   Why was this person produced, this

21   individual person's notes produced?

22        A.   Because she contacted them based on the

23   list that we gave her.

24        Q.   When calling -- let me start with this.

25             Does Royal Seas call clients if they

Page 26

1    haven't traveled by the time their cruise package is

2    going to expire?

3            A.    Say it one more time.

4            Q.    Sure.  Does Royal Seas always call people

5    when their cruise package is about to expire?

6            A.    Typically, yes.

7            Q.    With regards to this script, was she

8    instructed to give extensions to people who asked

9    for them when she read them this script?

10           A.    No.

11           Q.    Was it communicated that clients of Royal

12   Seas for whom this script was used should be given

13   some sort of preference?

14           A.    Preference?

15           Q.    For this extension?

16           A.    No.

17           Q.    Looking at this first page, I see that

18   there was a call -- it just says on September 23,

19   2019, that entry that said COMP 12 MNTH EXT, right?

20                 Does that entry reflect a call?

21           A.    She would need to speak with them in order

22   to give them an extension so, yes.

23           Q.    Do you know if that entry corresponds to

24   this script being read?

25           A.    Not offhand.

Page 27

1          MR. WHEELER:  I don't actually want to

2     know specifically what was redacted.

3          What kind of information was being

4     redacted from these sheets?

5          MR. EPSTEIN:  Basically prior.  These are

6     existing customers, so if it dealt with

7     anything regarding their existing travel

8     package, booking arrangements.  There's some

9     that it's more extensive.  Some that you will

10    see no other ones means that there was no other

11    activity.  So it's basically anything prior

12    that relates to the actual customer

13    relationship.

14         MR. WHEELER:  To the extent there was any

15    contact following March 2017, 2019, would

16    that --

17         MR. EPSTEIN:  It should be reflected here.

18         MR. WHEELER:  It should not have been

19    redacted?

20         MR. EPSTEIN:  Well, if it related to them

21    booking a cruise, I would say yes, it would

22    have been redacted, but I don't know that there

23    was in truth much or any of that.

24         The purpose of the redaction was to

25    isolate the calls that were placed off of the

                                           Page 28

```
1            list that is Exhibit Number 3 and provide the
2            CRM notes that relate to those calls and to
3            exclude the normal customer relationship kind
4            of contact.
5                 In some of these, it was fairly extensive.
6            It just didn't necessarily show on the way the
7            scroll bar was.
8                 MR. WHEELER:  Got it.
9                 MR. EPSTEIN:  But if you look at the
10           fourth page, I believe it's the fourth page,
11           yeah, the fourth page, you'll see there's
12           nothing else there.  That means that person,
13           after the purchase, there was no further
14           contact.
15                MR. WHEELER:  Okay, great.
16                MR. EPSTEIN:  The third page, you can see
17           there was fairly extensive contact and, in
18           fact, I remember this one in particular, it
19           goes down quite a bit.  These people traveled.
20           I think they upgraded.  They did a lot of stuff
21           so that's all we did.
22                Nothing sinistry.  You have what was
23           related to the calls that were made off the
24           list that's Exhibit 3.
25      BY MR. WHEELER:
```

Page 29

1      Q.   So looking through this -- let me ask it

2   more generally.

3          When did that call service representative

4   start actually making these calls?

5      A.   I don't remember the exact date.  It was

6   July and it was for several months, obviously to get

7   through the list.

8      Q.   Like July to October; is that right?

9      A.   Further than that, actually.

10      Q.   If you turn to -- I really wish this was

11   Bates stamped.  It's the Roy Lloyd page.  I think

12   it's the sixth page.

13          If you see there, his second entry says

14   "Spoke with Miss Lloyd and she agreed to sign

15   affidavit 12 MNTH EXT."

16          Do you see that?

17      A.   Yes.

18      Q.   What does that entry reflect?

19      A.   I don't understand your question.

20      Q.   I have a guess as to what it reflects with

21   regards to what's written there.  I'm just trying to

22   make sure that's right.  So I can tell you what I

23   think it says.

24          Does this say that Miss Lloyd in response

25   to this call for the script agreed to sign an

1    affidavit and also a 12-month extension was given to

2    her for the use of a cruise?

3         A.   Yes.

4         Q.   And again, as we see here, without the

5    actual use of the word affidavit which -- strike

6    that.

7              Let me ask it this way.  Has Royal Seas

8    ever called in the relevant time period, which I'm

9    going to say is from 2017 on, their clients for the

10   purposes of gathering affidavits besides via this

11   script?

12        A.   No.

13        Q.   So if it says "affidavit," we know it was

14   because they were being called using this script

15   asking for them to sign an affidavit, correct?

16        A.   I would assume.

17        Q.   I don't think clients normally just

18   volunteer to give you affidavits, I hope so -- okay.

19              With regards to -- let me strike that.

20   Let me ask a broader question because I don't want

21   to leaf through this right now.

22              How many people responded to this script

23   and said they would sign affidavits?

24        A.   Six.

25        Q.   How many actually did sign affidavits?

Page 31

```
 1          A.    I believe four.

 2          Q.    I'm just trying to avoid to have to look

 3     through this packet right now.

 4                What other kinds of response were received

 5     in response to the script from your clients?

 6          A.    That she spoke with?

 7          Q.    Yes.

 8          A.    That they didn't remember.

 9          Q.    Do you know -- and I may eventually find

10     out.

11                Do you know if anyone responded that they

12     did not recall entering their information on

13     diabeteshealth.info?

14          A.    I don't recall.

15          Q.    Do you know if anyone explicitly stated

16     they did not enter the information on

17     diabeteshealth.info?

18          A.    Not that I'm aware of.

19          Q.    I'm not going to go and listen to them

20     right now.  With regard to these recordings that

21     were produced, is that recordings of every

22     conversation that actually occurred with a client

23     using this script?

24          A.    Yes.

25          Q.    How do you know that that's a full and
```

Page 32

1    complete set of that -- of those calls?

2         A.   Based on what the representative told me,

3    what she put in her notes.

4         Q.   So again, is there a way to know whether a

5    call in this CRM database was for or rather using

6    this script?

7         A.   I don't understand your question.

8         Q.   Let me rephrase it.  With regards to

9    producing these recordings, was that by looking at

10   who on this list -- and by this list, I mean Exhibit

11   3 -- who on this exhibit list responded to or has a

12   customer service entry following, say, July of 2019,

13   is that how it was determined whether there was a

14   response or not?

15        A.   Say it one more time.

16        Q.   Sure.

17             MR. EPSTEIN:  I don't want to preempt her

18        but Geoff -- we talked about this.  I believe

19        it was done the other way around, just to make

20        clear for your questions.

21             There was 500 and however many other

22        people.  I believe there was 25 that she

23        actually spoke to.  She spoke to 25.

24             MR. PETTE:  I think it was 23, I believe.

25             MR. EPSTEIN:  23, whatever.  That's what

Page 33

```
 1          that is, so we reversed it.  We identified the
 2          people that she actually spoke to and then
 3          provided the CRM notes for them, as opposed to
 4          doing it the other way around.
 5               Because the rest of the people, she didn't
 6          speak to anybody.  They were all no answers or
 7          whatever, so of all the people that she called,
 8          and we're not sure exactly how many she did
 9          call, but there's no records of those.  Those
10          are just people that she didn't connect with.
11          So the people she actually spoke to, we were
12          able to identify and we pulled the CRM notes,
13          right?
14               MR. PETTE:  Correct.  And to clarify,
15          there's, I believe, 30 recordings because some
16          had multiple communications, so that's why
17          there will be more calls than CRM screenshots.
18          Maybe that will help you out.
19               MR. EPSTEIN:  Again, I'm trying to work
20          through it.  I wasn't trying to preempt her but
21          it's simpler than it appears.
22               MR. WHEELER:  That's helpful.  I'm going
23          to ask her some point questions.
24               MR. EPSTEIN:  Of course.
25     BY MR. WHEELER:
```

Page 34

```
1          Q.    How many people were actually reached for

2     the purposes of reading this script?

3          A.    23.

4          Q.    And of those 23, six responded they would

5     sign an affidavit?

6          A.    Yes.

7          Q.    Of those 6, only three actually did?

8          A.    Correct.

9          Q.    For these call recordings we have, those

10    reflect the 23 -- the calls to the 23 individuals

11    either that could use this script or followed up on

12    this script, correct?

13         A.    Correct.

14         Q.    So you don't actually know if the call

15    service representative called all the people in

16    Exhibit 3, the 500 or so?

17         A.    That is my understanding.

18         Q.    It's your understanding that -- it's your

19    understanding she did or didn't?

20         A.    That she attempted to contact them.

21         Q.    Does she still work for the company?

22         A.    Yes.

23         Q.    Was she doing anything else when she was

24    placing these calls?

25         A.    She didn't tell me.
```

Page 35

1        Q.   So for this call service representative,

2   was her job solely to call these people for a month

3   or two and try to reach them?

4        A.   No, she has other duties as well.

5        Q.   Just because I have to know, what is her

6   name?

7        A.   Dionne.

8             MR. EPSTEIN:   Her name is right there.

9   BY MR. WHEELER:

10       Q.   Dionne Mattingly?

11       A.   Yes.

12       Q.   What is her position?

13       A.   Customer service agent.

14       Q.   How long has she been with the company?

15       A.   Since the beginning, since March of '16.

16       Q.   By beginning, you mean the beginning of

17   this litigation?

18       A.   The beginning of our company.

19       Q.   When did your company begin?

20       A.   March of 2016.

21       Q.   Is there a specific reason she was chosen

22   to place these calls?

23       A.   She's one of our save team agents so she's

24   used to -- she's been with us a long time.  She's

25   very versed in all of our customer service needs.

Page 36

1          Q.   What is the save team?

2          A.   Particularly difficult clients, she would

3     handle them.

4          Q.   Try and save the relationship?

5          A.   Correct.

6          Q.   So she's a very good customer service

7     representative?

8          A.   Correct.

9          Q.   You should show her that in your

10    testimony.  She'd appreciate that, I'm sure.

11              Once a person had responded that they

12    would be willing to sign an affidavit, what would

13    happen to that information?  I can clarify.

14         A.   Okay.

15         Q.   What's the next thing Royal Seas would do

16    after a customer responded they would sign the

17    affidavit in response to the script?

18         A.   We send it to them.

19         Q.   Who sends it?

20         A.   Our customer service agent or her manager.

21         Q.   So Dionne or manager?  Yes?

22         A.   Yes.  Sorry.

23         Q.   With regards to the affidavit -- let's

24    introduce one just so we have it.  Exhibit 5.

25              MR. PETTE:  You want to go off and I'll

Page 37

1          explain what these documents are?
2              MR. WHEELER:  I'm fine with that.  Let me
3          introduce this and then we'll go off.
4              (Thereupon, the referred-to document was
5      marked by the court reporter for Identification as
6      Plaintiff's Exhibit 5.)
7      BY MR. WHEELER:
8          Q.   So introduced as Exhibit 5 is an affidavit
9      that appears to be signed by Cecelia Hetchler after
10     that editorializing.
11             What is this?
12         A.   I'm sorry?
13         Q.   What is this document?
14         A.   A document that we sent to Cecelia
15     Hetchler.
16             MR. WHEELER:  Let's go off the record for
17         a second.
18             (Short discussion off the record.)
19     BY MR. WHEELER:
20         Q.   So off the record, we discussed briefly
21     this document produced so I can hopefully ask better
22     questions.
23             Let me start with this.  Did Royal Seas
24     use two different websites to send these affidavits
25     to the individuals who said they would sign them?

                                                  Page 38

```
 1          A.    Yes.

 2          Q.    Why was it two different websites?

 3          A.    Cost.

 4          Q.    What was cost consideration?

 5          A.    They had a limited number that they could

 6     get without getting charged.

 7          Q.    Got it.  Back to this affidavit.  Who

 8     drafted this affidavit?

 9          A.    My attorneys.

10          Q.    With regards to the underlying spaces, why

11     is certain information on here blank?

12          A.    Those are blank for them to fill in for

13     the specific customer.

14          Q.    Who filled those in?

15          A.    I don't know.

16          Q.    So you don't know if it was you -- you

17     don't know if it was Royal Seas or Ms. Hetchler who

18     filled those in?

19          A.    Correct.

20          Q.    But these blanks existed in the original

21     form affidavits which were to be sent to these

22     clients, correct?

23          A.    Correct.

24          Q.    Do you know if any clients who received

25     these affidavits called back to discuss the form?
```

Page 39

1          A.   I don't know.

2          Q.   With regards to this one for Miss

3     Hetchler, let's turn to the second page -- so

4     looking at this page, this document was sent to Miss

5     Hetchler on October 2, 2019, correct?

6          A.   Correct.

7          Q.   And customerservice@royalseas.com, is that

8     just the generic intake box for your customer

9     service?

10         A.   Correct.

11         Q.   Based off this, you can see that on

12    October 18, 2019, Miss Hetchler signed, correct?

13         A.   Correct.

14         Q.   I wanted to quickly look and see if I can

15    find the CRM notes.

16              Cecelia Hetchler, so on the top left of

17    her page, it says Cecelia Hetchler, have you found

18    it?

19         A.   Yes.

20         Q.   So looking at this CRM entry from Exhibit

21    4, we see that there's an initial contact with

22    regards to this on October 2, 2019.

23              Do you see that?

24         A.   Yes.

25         Q.   It says 12-month extension, correct?

Page 40

```
 1        A.   Yes.
 2        Q.   Or it's the notes that reflect a 12-month
 3   extension was given, correct?
 4        A.   Yes.
 5        Q.   If you look up, there's an e-mail address.
 6             Is this -- well, let me ask this more
 7   generally -- does Royal Seas -- did Miss Hetchler
 8   give that e-mail address to be sent this affidavit?
 9        A.   I would assume.  I don't know.  I would
10   assume.
11        Q.   I can listen to the call recording
12   probably, right?
13        A.   Okay.
14        Q.   On the next entry, it says "sent
15   affidavit."
16             Do you see that?
17        A.   Yes.
18        Q.   It says Tara Marciales, do you see that?
19        A.   Yes.
20        Q.   Is that the supervisor of Miss Mattingly?
21        A.   Yes.
22        Q.   So this reflects that Ms. Marciales sent
23   the affidavit, correct?
24        A.   Correct.
25        Q.   And then there's a follow-up on
```

Page 41

```
 1      October 3rd.
 2              Do you see that?
 3      A.    Yes.
 4      Q.    And a follow-up on October 18th.
 5              Do you see that?
 6      A.    Yes.
 7      Q.    It's not reflected in here but based off
 8      the affidavit we have, she did end up completing it
 9      on October 18th, correct?
10      A.    Correct.
11      Q.    Was Ms. Mattingly instructed to follow up
12      with the six people who said they would sign
13      affidavits if they had not signed them yet?
14      A.    I don't personally know.
15      Q.    Do you know -- strike that.
16              This is kind of a weird question.  Why
17      don't you personally know?
18      A.    She has a manager.  Her manager would have
19      instructed her.
20      Q.    So her manager may or may not have told
21      her to do that, we don't know?
22      A.    Correct.
23              MR. WHEELER:  Mark this as Exhibit 6.
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1              (Thereupon, the referred-to document was
 2    marked by the court reporter for Identification as
 3    Plaintiff's Exhibit 6.)
 4    BY MR. WHEELER:
 5         Q.   Marked as Exhibit 6 is a document that was
 6    produced by defendant entitled "Defendant Royal
 7    Sales Cruises, Inc.'s Second Supplemental
 8    Disclosure" and it was sent to our office on
 9    January 17, 2019.
10              Have you seen this before?
11         A.   No.
12         Q.   Turn to the second page where it says
13    "Witnesses."
14              Do you see that?
15         A.   Yes.
16         Q.   So under "Witnesses," it identifies three
17    under A, B and C; Gary Little, David Calderon and
18    Dan Geiger.
19              Do you see that?
20         A.   Yes.
21         Q.   You can look and confirm that attached to
22    this disclosure are those three affidavits that are
23    signed, okay?  Why don't you just check to make
24    sure.
25         A.   Okay.
```

Page 43

1          Q.   In reality, Royal Seas actually contacted
2     and got affidavits from four people, correct?
3          A.   Correct.
4          Q.   Cecelia Hetchler was also contacted and
5     signed an affidavit, correct?
6          A.   Correct.
7          Q.   Once a signed affidavit was received, what
8     happened to it internally?
9          A.   I don't know.
10         Q.   You don't know who it was sent to?
11         A.   No.
12         Q.   But the customer service at Royal Seas
13    account, who controls that account?
14         A.   IT department.
15         Q.   Who has access to it?
16         A.   Tara.
17         Q.   That's the supervisor, right?
18         A.   Right.
19         Q.   Does Miss Mattingly also have access to
20    it?
21         A.   I don't believe so.  I'm not sure.
22         Q.   Do you know if there was any process or
23    procedure put in place with regards to what would
24    happen to these affidavits once they were signed?
25         A.   I'm sure -- no, I don't know what the

                                        Page  44

```
1    procedure was.
2         Q.   But as of October -- actually, that's
3    wrong.
4              As of October 18th, you would have been --
5    by you, I mean Royal Seas would have been in
6    possession of this affidavit, correct?
7         A.   Correct.
8         Q.   I'm going to use this document to make my
9    life easier.  Look at the back again.
10        A.   Which document is that?
11        Q.   The supplemental disclosure, the most
12   recent one.
13             If you look at the back of it, there's A,
14   B and C exhibits.
15             Exhibit A appears to be an affidavit
16   signed by Gary Little.
17             Do you see that?
18        A.   Yes.
19        Q.   If you turn the page, there's the
20   HelloSign tracking page, correct?
21             Do you see that?
22        A.   Yes.
23        Q.   So does this also reflect that on
24   August 13th, Mr. Little was sent this affidavit and
25   he signed on or about August 17, 2019, correct?
```

Page 45

```
 1        A.    Correct.
 2        Q.    So as of August 17, 2019, Royal Seas would
 3   have been in possession of this document, correct?
 4        A.    Correct.
 5        Q.    Just to close the loop, turn back a page
 6   to the actual document.
 7              On this one, the name, the date and the
 8   phone number are underlined, but the word "have" is
 9   bold.
10              Do you know why it's bold?
11        A.    No.
12        Q.    But that is information which was blank in
13   the original affidavit which was to be used,
14   correct?
15        A.    I'm not sure.
16        Q.    If you look here, it says "Dated the 7th
17   day of August," correct?
18        A.    Yes.
19        Q.    If you turn to the next page, it says
20   "Sent August 13, 2019."
21              Do you know why those two dates don't
22   match?
23        A.    No.
24        Q.    Turn to Exhibit B.  This is going to be
25   repetitive.
```

Page 46

```
 1              Just to confirm again, there are various
 2     fields underlined on this first page of this
 3     affidavit.  You don't know who filled out those
 4     entries, correct?
 5          A.   Correct.
 6          Q.   But this appears to be an affidavit signed
 7     by Mr. David Calderon, correct?
 8          A.   Correct.
 9          Q.   Turn the page.
10              And it was sent on October 2, 2019,
11     correct?
12          A.   Correct.
13          Q.   And signed on -- it looks like October 4th
14     after midnight.
15              Do you see that?
16          A.   Yes.
17          Q.   But either way, by October 4th, Eastern
18     Standard Time at least, you would have been in
19     possession of this document, correct?
20          A.   Yes.
21          Q.   Turn to Exhibit C.  On this one, the "have
22     not" is not underlined.
23              Do you know why it's not underlined?
24          A.   No.
25          Q.   But otherwise, to your knowledge, the
```

Page 47

1   underlined fields were fields that were entered,

2   correct?

3           A.   Correct.

4           Q.   I will also represent to you -- I actually

5   think they're highlighted on this one, you can kind

6   of see it a little bit, correct?  It's very, very

7   light.

8           A.   Okay.

9           Q.   Do you know why they were highlighted?

10          A.   No.

11          Q.   Turn the page.

12               So this was sent using SignNow, correct?

13          A.   Correct.

14          Q.   Based off that, it appears that it was

15   sent October 3, 2019, correct?

16          A.   Correct.

17          Q.   And it was signed October 4, 2019,

18   correct?

19          A.   Correct.

20          Q.   So Royal Seas was in possession of this

21   document as of October 4, 2019, correct?

22          A.   Correct.

23          Q.   Just to close the loop on this, besides

24   this script which is Exhibit 2, Royal Seas has not

25   otherwise contacted its clients with regard to this

                                             Page 48

1    litigation specifically, correct?

2         A.   Correct.

3         Q.   And the only time this script was used --

4    this is a little repetitive.  I just want to make

5    sure I'm right -- was from around July until around

6    November of 2019, correct?

7         A.   Correct.

8         Q.   Let's take a break for a minute.

9              (Short recess taken.)

10   BY MR. WHEELER:

11        Q.   Let's look at the script, which is Exhibit

12   2.  I'm going to ask a more broad question first.

13             You see the first two paragraphs and the

14   last paragraph after "ending the call"?

15        A.   Yes.

16        Q.   Are those portions of the script pretty

17   standard in the calls you place to your clients for

18   other purposes too?

19        A.   In some instances, yes.

20        Q.   Because Royal Seas often calls its clients

21   to inquire whether they've traveled or not and how

22   they enjoyed their experience, correct?

23        A.   Correct.

24        Q.   And they also ask if the client would be

25   interested in purchasing another cruise, correct?

Page 49

1          A.    Correct.

2          Q.    Looking at the portion beginning with "In

3     reviewing your information" and continuing on to

4     just about "ending your call," this portion was

5     drafted by your attorneys, correct?

6          A.    Correct.

7          Q.    So you have no independent knowledge from

8     whatever your attorneys did with regards to how this

9     was created or phrased, correct?

10         A.    Correct.

11         Q.    If you look at the -- I'm just going to

12    read it, I guess.  That's probably the easiest way.

13              It says, "In reviewing your information,

14    we show you visited diabeteshealth.info and provided

15    your information so that Royal Seas could contact

16    you at (phone number) regarding a complimentary

17    cruise promotion."

18              Did I read that correct?

19         A.    Yes.

20         Q.    And then you ask is that correct.

21              It then says if person responds yes, the

22    representative is asked to -- so the script says

23    that if the person responds yes, the representative

24    is to ask, "Would you be kind enough to complete a

25    brief survey, basically saying that you went to

                                              Page 50

```
 1    diabeteshealth.info website and requested more
 2    information about Royal Seas complimentary cruise
 3    promotion."
 4              Do you see that?
 5        A.    Yes.
 6        Q.    In this script, it nowhere describes there
 7    is a pending lawsuit against Royal Seas, correct?
 8        A.    Correct.
 9        Q.    In this script, it does not describe that
10    a class has been certified for which the person
11    who's being called is a member, correct?
12        A.    Correct.
13        Q.    In this script, it doesn't even mention
14    what an affidavit is, does it?
15        A.    Correct.
16        Q.    And it doesn't advise the person who's
17    being called that the affidavit will be used by --
18    will potentially be used by Royal Seas in this
19    litigation, correct?
20        A.    Correct.
21        Q.    Do you know why it was decided that this
22    affidavit will be referred to as a brief survey?
23        A.    No.
24        Q.    It's most likely attorney.  I mean, we've
25    basically covered -- I don't want to know what your
```

Page 51

```
 1    attorneys did or they told you.  I just want to know
 2    if you have any independent knowledge and the answer
 3    is probably no, so that's fine.  If there's an
 4    issue, obviously Richard will object.
 5              MR. EPSTEIN:  You've asked and answered
 6         your own question.
 7              MR. WHEELER:  I'm fine with that.  That's
 8         fine.
 9    BY MR. WHEELER:
10         Q.   So the next thing says, "If yes, great,
11    the address we have is blank and we show your e-mail
12    address as blank?  Would you prefer us to e-mail or
13    mail this document to you?"
14              Do you see that?
15         A.   Yes.
16         Q.   Did you actually physically mail any of
17    these to anyone?  And by these, I mean these
18    affidavits.
19         A.   No.
20         Q.   In response to this script, the document
21    that was sent was the affidavits of the form you
22    were looking at previously, correct?
23         A.   Correct.
24         Q.   There's no other document that was sent to
25    these people, correct, in response to this script?
```

Veritext Legal Solutions
866 299-5127

1      A.    Correct.

2      Q.    So there's no other survey, right?

3      A.    Correct.

4      Q.    And there's no letter with the affidavits,

5    correct?

6      A.    Correct.

7      Q.    And there's no e-mails besides an e-mail,

8    perhaps, from these document-signing companies that

9    went with them, correct?

10      A.    Correct.

11      Q.    I don't know the answer to this.

12    Hopefully you do.  I'm going to give you an example.

13            When you use DocuSign, it will send an

14    e-mail to the person stating Hey, Tom wants you to

15    sign this document, click this link to sign it.

16            Do you know what e-mail was actually sent

17    to the people who received contact from either

18    SignNow or HelloSign?

19      A.    No.

20      Q.    Do you know if a specific e-mail form that

21    would be used was ever drafted to be sent?

22      A.    No.

23      Q.    If you look at the next paragraph, which

24    begins with, "If no, try to rephrase the question."

25    I'll probably find out when I actually get to listen

1    to this and by this, I mean the recordings in a

2    minute.

3              Are these just suggestions of various ways

4    Ms. Mattingly could rephrase the question or was she

5    supposed to go through all of these specifically?

6        A.   To use these specifically.

7        Q.   So she was supposed to work through one

8    after another, isn't it possible, and then if you

9    are unsure and then keep going; is that right?

10       A.   Correct.

11       Q.   Is Ms. Mattingly a lawyer?

12       A.   No.

13       Q.   Do you know if Ms. Mattingly was told that

14   she could go off script at all?

15       A.   No.

16       Q.   Ms. Mattingly was supposed to follow the

17   scripts exactly, correct?

18       A.   Correct.

19       Q.   Do you know if you ever heard back from

20   the two people you sent affidavits to who did not

21   sign them with regards to signing the affidavits?

22       A.   I don't know.

23       Q.   Did anyone who was sent an affidavit call

24   in response to ask specifically what the document

25   was?

1          A.    I don't know.

2          Q.    But the recordings will reflect that, fair

3     enough?

4          A.    Okay.

5          Q.    Do you know if defendant's lawyers

6     listened in on any of Miss Mattingly's calls?

7          A.    Say it one more time.

8          Q.    Do you know if Royal Seas' lawyers -- let

9     me strike that.  Let me start with this.

10              Is it possible to monitor an active call

11    using Royal Seas, whatever they use for calling?

12         A.    Yes.

13         Q.    Do you know if Royal Seas' attorneys ever

14    monitored any of the calls placed by Miss Mattingly?

15         A.    No.

16         Q.    I'm going to rephrase it because I asked a

17    poor question.

18              Did Royal Seas' lawyers ever monitor a

19    call placed by Miss Mattingly with regards to the

20    script?

21         A.    No.  A live call?

22         Q.    Yes.

23         A.    No.

24         Q.    Did Royal Seas' lawyers ever listen to a

25    recording of a call placed by Miss Mattingly?

Page 55

```
 1        A.    Yes.

 2        Q.    How do you know that?

 3        A.    We provided it to you.

 4        Q.    Do you know if at the time, they listened

 5   to the calls?

 6        A.    No.

 7        Q.    When you said yes, you meant just because

 8   it was previous to this litigation right now, so

 9   obviously they listened to it before giving it to

10   me?

11        A.    Correct.

12        Q.    Thank you for clarifying it for me.

13              You mentioned the calls began being placed

14   around July of 2019.

15              Do you know when there were -- let me just

16   ask this.

17              When was there originally discussions

18   about making these calls in the first place?

19        A.    I don't remember.

20        Q.    Was it around the same time in July?

21        A.    No, it would have been before that.

22        Q.    Do you have an estimate of how long before

23   that, a few months?

24        A.    I don't remember.

25        Q.    The same year, at least?
```

Page 56

```
1          A.    I don't remember.

2          Q.    But either way, the calls did not begin

3    until 2019, correct?

4          A.    Correct.

5                MR. WHEELER:  Off the record for a second.

6                (Short recess taken.)

7    BY MR. WHEELER:

8          Q.    Back on the record.  You understand you're

9    still under oath, correct?

10          A.    Correct.

11          Q.    Does Ms. Mattingly have the ability to

12    give extensions whenever she wants?

13          A.    Yes.

14          Q.    Is there any limitation on when she can

15    choose to give an extension?

16          A.    No.

17          Q.    If she gives out too many, will she be

18    talked to about it?

19          A.    No.

20          Q.    So it's purely discretionary?

21          A.    Correct.

22          Q.    What was Miss Mattingly told about the

23    purpose of this script that she was supposed to

24    read?

25          A.    Nothing other than to call the customers
```

Page 57

1    and read the script, give the information to send

2    out the document to them.

3         Q.   She wasn't told what or it wasn't to be

4    used for?

5         A.   No.

6         Q.   Was she told it was important?

7         A.   I mean, everything she does in her job is

8    important.

9         Q.   She was just told she was to do this?

10        A.   Correct.

11        Q.   When an extension is given to a customer,

12   how is it reflected in the CRM database?

13        A.   Exactly as you saw in the notes.

14        Q.   The 12-month extension?

15        A.   Correct.

16        Q.   Just looking at the CRM database, there's

17   three other tabs which we can't see, will those tabs

18   reflect when the cruise actually would normally

19   expire?

20        A.   No.  It's on upon the sale date.

21        Q.   So my question just is, how do you know

22   when their cruise expired?

23        A.   From the sale date.

24        Q.   And the sale date is reflected -- where is

25   it reflected?  Even if I can't see it.

```
 1          A.   The number next to his name.  So the
 2     BZ081617, that was sold on August 16, 2017.
 3               MR. EPSTEIN:  We're looking at the first
 4          page.
 5               MR. WHEELER:  Of exhibit?
 6               MR. EPSTEIN:  4.
 7     BY MR. WHEELER:
 8          Q.   Is everyone 18 months to use?
 9          A.   Correct.
10          Q.   Does Royal Seas send any correspondence to
11     its customers after it grants them an extension?
12          A.   As far as?
13          Q.   E-mails, letters confirming extensions?
14          A.   Not usually.
15          Q.   If you did you send the correspondence,
16     any correspondence, would it be reflected in this
17     CRM information?
18          A.   Should be.
19          Q.   Does Royal Seas send letters to its
20     customers?
21          A.   Yes.
22          Q.   I imagine -- let me rephrase this.  One of
23     those letters is probably marketing, correct, one
24     type of letter?
25          A.   I'm sorry?
```

Veritext Legal Solutions
866 299-5127

1      Q.    Let me just ask you actually.

2            What kind of letters does Royal Seas send

3      to its customer?

4      A.    Letters confirming their sales, letters

5      regarding an itinerary.  There's numerous.

6      Q.    And Royal Seas also sends e-mails to its

7      clients?

8      A.    Correct.

9      Q.    Same purposes?

10     A.    Correct.

11     Q.    And those e-mails would not be reflected

12     in this CRM database, correct?

13     A.    It would depend.  I mean, it may.  It may

14     not.

15     Q.    But otherwise, if there is a 12-month

16     extension, CRM note, that would be honored?

17     A.    Correct.

18     Q.    And just so I understand a little more

19     about your business.  So when people purchase, they

20     then will call and schedule a date for the cruise,

21     correct?

22     A.    Correct.

23     Q.    How much ahead -- how much lead time do

24     they have to give you to actually be able to get on

25     a cruise?  Can they go on a cruise in the same month

Page 60

1   or what?

2        A.   We ask for 60 days.

3        Q.   If they call and make a reservation

4   outside of their -- let's say they book it but it

5   falls outside the 18 months, would you still let

6   them go?

7        A.   Yes.

8        Q.   As long as they have it on the calendar?

9        A.   Correct.

10        Q.   I just wanted to know.

11             MR. EPSTEIN:  We're getting a little far

12        afield but no harm done.

13   BY MR. WHEELER:

14        Q.   So I'm going to start with a recording

15   that was produced this morning which is numbered

16   300000000, so eight zeros, 151480-7406270980.

17             If you look at the front page of this

18   document, of the account notes, Mr. Geiger's phone

19   number is 740-627-0980, correct?

20        A.   I don't know.

21        Q.   Doesn't it look like the top left after

22   Dan Geiger?

23        A.   Say it again.

24        Q.   Is it (740)627-0980?

25        A.   Correct.

Page 61

1          Q.    I don't know if you actually answered

2    this, but do you know if the file number I just read

3    you for the call recording reflects that it was a

4    call with that phone number, if that number was in

5    the file name?

6          A.    I don't recall.

7          Q.    That's fine.

8                So that is the phone number at least for

9    Mr. Geiger, correct?

10         A.    Right.

11         Q.    Does Royal Seas record all of its calls?

12         A.    Yes.

13         Q.    I am going to pull this up and see how it

14   sounds.  It doesn't sound good.  I'm just trying to

15   figure out how to -- as I said, you don't have to

16   record this.

17               (Whereupon audio was played for the

18   witness off the record.)

19   BY MR. WHEELER:

20         Q.    So that is a call recording of the call

21   between Mr. Geiger and Miss Mattingly, correct?

22         A.    Yes.

23         Q.    And the woman on that call is

24   Miss Mattingly, correct?

25         A.    Yes.

1          Q.   And looking at the account notes, that

2     call would have occurred on September 23, 2019 at

3     around 3:43 p.m., correct?

4          A.   Yes.

5          Q.   Listening to that call and looking at this

6     script, would you agree that Miss Mattingly did not

7     exactly follow the script in how she was handling

8     the call until we paused it?  She wasn't reading the

9     script verbatim, correct?

10          A.   Almost verbatim but, yeah, a few words in

11    there maybe.

12          Q.   I mean, when you talk to a customer, a lot

13    of things can happen off of the script; is that

14    fair?

15          A.   Fair.

16          Q.   Do you know if -- strike that.

17               Miss Mattingly offered him a 12-month

18    extension since his cruise had expired, correct?

19          A.   Correct.

20          Q.   And looking at Mr. Geiger's account, his

21    cruise would have expired in February of 2018,

22    correct?

23          A.   No.

24          Q.   When would his cruise have expired?

25          A.   February of '19.

Page 63

1          Q.   I see what you're saying, okay, because
2     it's August 16, 2017 is the sale date?
3          A.   Correct.
4          Q.   Because that's the 8/16/17 reflected in
5     the header, right?
6          A.   Yes.
7          Q.   So this call is placed in September, which
8     is seven months after his cruise is expired.
9               Is there any restriction on extending a
10    cruise already after it is expired?
11         A.   No.
12         Q.   So it's completely discretionary based on
13    your customer service reps?
14         A.   Yes.
15         Q.   More generally speaking, will Royal Seas
16    call people whose cruises have expired?
17         A.   Yes.
18         Q.   And when they have these calls, is it for
19    purposes of giving them extensions so they take the
20    cruise?
21         A.   Could be.
22         Q.   What other reasons?
23         A.   Sell them additional things to go with
24    their vacation.
25         Q.   When they sell additional things to go

1    with their vacation for a cruise that is expired,

2    will they also extend the cruise at that point, too?

3         A.   Yes.

4         Q.   So the extension of the cruise deadline is

5    used to encourage them to use the services they're

6    purchased for, correct?

7         A.   Correct.

8         Q.   Was Miss Mattingly told that her job of

9    reading the script was to obtain affidavits?

10        A.   She was just told to read the script and

11   if the people agreed, to let Tara know so she could

12   send them information.

13        Q.   So my question is more broad, which is,

14   this script is special because of the affidavit --

15   not the affidavit -- the diabetes health info

16   portion in the middle, correct, that's unique?

17        A.   Yes.

18        Q.   Did Miss Mattingly understand that that

19   unique portion of the script meant that she was

20   trying to obtain these affidavits?

21             MR. EPSTEIN:  Objection, form, competence

22        of the witness and foundation.  If you can

23        answer.

24             THE WITNESS:  Repeat it, please.

25   BY MR. WHEELER:

Page 65

1      Q.   Sure.  Did Ms. Mattingly know -- strike

2   that.

3           Was Miss Mattingly told that the purpose

4   of this script was to obtain the affidavits?

5      A.   That she was told that she needed to read

6   the script and that if they agreed, we would be

7   sending them something.

8      Q.   Was she ever told specifically that the

9   actual purpose behind this script was the obtaining

10  of the affidavits?  I can try and make it a little

11  clearer.

12          This script is unique because of the

13  portion regarding collecting the affidavits.

14  Therefore, did Miss Mattingly know that obtaining

15  the affidavits -- that she was reading this script

16  for the purpose of obtaining affidavits?

17          MR. EPSTEIN:  Objection, form, competence,

18      lacking foundation.  Go ahead, if you know.

19          THE WITNESS:  Again, the same thing.  She

20      was reading a script so we could send them

21      something.

22  BY MR. WHEELER:

23      Q.   Was she told specifically that she should

24  try and increase the amount of people that responded

25  such that they would actually provide affidavits?

Page 66

1          A.   No.

2          Q.   Do you know if she understood that based

3     off of what was in the script?

4          A.   No.

5          Q.   Only she would know that?  She hasn't

6     voiced it otherwise?

7          A.   Correct.

8          Q.   But you're saying that you directly -- or

9     none of her supervisors told her you are to obtain

10    as many affidavits as possible using the script?

11         A.   No.

12         Q.   I'm going to play the call.  I paused it

13    at one minute 45 seconds into the call.

14              (Whereupon audio was played for the

15    witness off the record.)

16    BY MR. WHEELER:

17         Q.   Just to confirm, after listening to the

18    call, she had at no point tells Mr. Geiger that

19    there's litigation pending against Royal Seas

20    Cruise, correct?

21         A.   Correct.

22         Q.   She doesn't actually tell him that this

23    survey is actually an affidavit, correct?

24         A.   Correct.

25         Q.   But she does tell them that he needs to

Page 67

1    fill out the survey, correct?

2         A.   Correct.

3         Q.   And she does offer him a 12-month

4    extension while also telling him he needs to fill

5    out the survey, correct?

6         A.   Correct.

7         Q.   And Mr. Geiger ended up filling out an

8    affidavit, correct?  I think.

9         A.   I don't remember.

10         Q.   It's Exhibit C to the supplemental.

11         A.   Okay, yes.

12         Q.   Let's look at Exhibit C, the supplemental

13    that you have in front of you.

14              With regards to number 3, it reads, "Prior

15    to purchasing my vacation package from Royal Seas, I

16    went to the web page diabeteshealth.info where I

17    entered my phone number, 908-331-1177 and requested

18    I can be contacted by Royal Seas."

19              Do you see that?

20         A.   Not that phone number.

21         Q.   (908)331-1177 -- I'm looking at the wrong

22    one.  Sorry.  My mistake.

23              (704)627-0980, correct?

24         A.   Correct.

25         Q.   That paragraph, except maybe the phone

Veritext Legal Solutions
866 299-5127

1    number, was drafted by Royal Seas, correct?

2         A.   Our attorneys.

3         Q.   Ms. Geiger did not draft that paragraph,

4    correct?

5         A.   Correct.

6         Q.   Let's listen to another call.  I'm going

7    to play a recording that was produced which the file

8    number is 300000000, eight zeros, 172377-4049353474.

9              This corresponds to Ms. Wilder, so let's

10   pull up the account or the CRM while we're on it.

11   Also it's Mr. Wilder, I think.  It's about four

12   pages in.

13             Do you have it?

14        A.   Yes.

15        Q.   So just to confirm on the top left of this

16   page, it reads, Britten Wilder (404)935-3474,

17   correct?

18        A.   Yes.

19        Q.   And that number corresponds to the phone

20   number, correct?

21        A.   Yes.

22        Q.   And looking at the header of the actual

23   CRM database, it says 8/10/17?

24             Do you see that?

25        A.   Yes.

Page 69

1       Q.   And that reflects the purchase date was

2    August 10, 2017, correct?

3       A.   Correct.

4       Q.   So much later, Mr. Geiger, that means that

5    the expiration date was February of 2019?

6       A.   Correct.

7            MR. WHEELER:   I'm playing the recording.

8            (Whereupon audio played for the witness

9    off the record.)

10   BY MR. WHEELER:

11      Q.   I'm pausing it on 56 seconds.   So that's

12   Miss Mattingly on the phone, correct?

13      A.   Correct.

14      Q.   And that is a recording between

15   Miss Mattingly and Mr. Wilder, correct?

16      A.   Correct.

17      Q.   Based off this, that call is from

18   October 21, 2019, correct?

19      A.   Correct.

20      Q.   Miss Mattingly says that Royal Seas is

21   running a promotion to book dates on complimentary

22   cruises in particular.

23           That was not the purpose of her call, was

24   it?

25      A.   No.

Veritext Legal Solutions
866 299-5127

1          Q.    There's no other promotion regarding these

2     specific complimentary cruises, correct?

3          A.    We do sometimes, yes.

4          Q.    But the purpose of this call was to read

5     that script and the affidavit, correct?

6          A.    I believe so, yes.

7          Q.    I'm going to keep playing at 56 seconds.

8               (Whereupon audio was played for the

9     witness off the record.)

10    BY MR. WHEELER:

11         Q.    I'm going to pause it at 240.  Just to

12    make sure, to the extent Ms. Mattingly e-mailed

13    Mr. Wilder regarding the extensions separately,

14    that's not reflected in the CRM notes, correct?

15         A.    She just makes notes in there.

16         Q.    I know.  My question is, Miss Mattingly

17    mentions that she will e-mail him regarding --

18    sending him an e-mail regarding the extension, okay?

19         A.    Okay.

20         Q.    Where is that -- where would that e-mail

21    be reflected?

22         A.    We don't normally send an e-mail.

23         Q.    But she said she would.  Do you know if

24    she did send an e-mail?

25         A.    I have no idea.

                                             Page 71

1          Q.    And you don't know if that e-mail said
2     anything besides you get a 12-month extension?  Let
3     me strike that.  Let me ask this.
4              Do you have a normal formal e-mail you
5     send when you give someone an extension?
6          A.    No.
7          Q.    So how does an e-mail regarding an
8     extension get drafted?
9          A.    Usually would not.
10         Q.    You just don't normally send -- you don't
11    normally send e-mails regarding 12-month extensions?
12         A.    Correct.
13         Q.    Would Royal Seas store copies of any
14    e-mails it sent out to its clients?
15         A.    I'm not sure.
16         Q.    Do you know if to the extent
17    Miss Mattingly actually sent this e-mail regarding
18    the 12-month extension, you would have a copy of it?
19         A.    I wouldn't know.
20         Q.    Miss Mattingly would know?
21         A.    I don't think so.
22         Q.    She wouldn't know if she sent an e-mail?
23         A.    That's not -- okay.  She would know if she
24    sent the e-mail.
25         Q.    Where are these e-mails normally stored --

                                             Page 72

1      let me rephrase this.

2             I use Outlook.  There is a "sent" folder.

3      Does Royal Seas have a "sent" folder that reflects

4      outgoing e-mails?

5          A.   Individually.

6          Q.   Individually, you mean -- does each

7      customer service representative have their own

8      e-mail account?

9          A.   No.

10         Q.   Is there just the one, Royal Seas'

11     customer one?

12         A.   Right.

13         Q.   That's the one we saw on the DocuSign or

14     the signature thing, okay.

15            Do you know if that e-mail will keep

16     records of sent e-mails from it?

17         A.   As far as I know.

18         Q.   Similar to Mr. Geiger in regards to

19     Mr. Wilder, he received a 12-month extension, right?

20         A.   Yes.

21         Q.   But he was also told he needed to fill out

22     a survey, correct?

23         A.   Yes.

24         Q.   I'm 99 percent sure the rest of this call

25     is useless but it's only 40 seconds so I'm going to

Page 73

1    play it.

2              (Whereupon audio played for the witness

3    off the record.)

4    BY MR. WHEELER:

5         Q.   So that actually brings up another

6    question.  She does mention that she's going to send

7    an e-mail to him.

8              To the extent that e-mail mentioned what

9    is termed as a survey but is an affidavit, would it

10   have been produced today, do you know?

11        A.   I don't understand the question.

12        Q.   My question is, when the documents were

13   being decided that were being produced today in

14   response to a request for production, were e-mails

15   also searched?

16        A.   I don't know.

17             MR. WHEELER:  Counsel, do you know?

18             MR. EPSTEIN:  I think there was a search

19        of e-mails but I think we're also confused

20        here.

21             The CRM says that she was sent the

22        affidavit.  That's what happened.

23             MR. WHEELER:  My question is more --

24             MR. EPSTEIN:  No, I understand.  We didn't

25        find and we don't believe that there is a

Page 74

```
 1          separate e-mail here.  What happened was she
 2          used the whatever -- SignNow and that's how it
 3          was transmitted.
 4               MR. WHEELER:  Okay.  There was no --
 5               MR. EPSTEIN:  No separate e-mail that we
 6          could find or that we're aware of.
 7               MR. WHEELER:  I'm going to take your
 8          representation that there is no separate e-mail
 9          and if there were, you would have produced it?
10               MR. EPSTEIN:  Yes.  I mean, the way from
11          the on standpoint, all of this is e-mail, you
12          know, these SignNow, these sites are e-mail.
13          She wasn't physically involved with them.  That
14          went, I guess, to Tara, as it shows there,
15          Tara, but that's how it comes across to the
16          recipient as an e-mail.
17               MR. WHEELER:  Got it.
18               MR. EPSTEIN:  From our standpoint, that's
19          all she's referring.  There were no separate
20          e-mails to any of these people.
21     BY MR. WHEELER:
22          Q.   Let's look at the blank affidavit for
23     Mr. Wilder, Exhibit 7, I think.
24
25
```

Page 75

```
 1              (Thereupon, the referred-to document was

 2   marked by the court reporter for Identification as

 3   Plaintiff's Exhibit 7.)

 4   BY MR. WHEELER:

 5        Q.   Marked as Exhibit 7 is a document that was

 6   produced this morning which appears to be a form

 7   affidavit from Mr. Britten Wilder.

 8              Have you seen this document before?

 9        A.   No.

10              MR. WHEELER:  Can we also introduce the

11         SignNow sheet.

12              (Thereupon, the referred-to document was

13   marked by the court reporter for Identification as

14   Plaintiff's Exhibit 8.)

15   BY MR. WHEELER:

16        Q.   Marked as Exhibit 8 is a screenshot of a

17   website for SignNow reflecting two affidavits sent,

18   one to Mr. Wilder and one to Mr. Geiger, that was

19   produced this morning in response to our request for

20   production.

21              Have you seen this document before?

22        A.   No.

23        Q.   Reviewing this now, do you know what it

24   is?

25        A.   Yes.
```

                                              Page 76

1      Q.   What is it?

2      A.   It's a record of when we sent e-mails.

3      Q.   And by e-mails, we mean the blank

4    affidavits to the class members, correct?

5      A.   Correct.

6      Q.   This is two of them, right, Mr. Wilder and

7    Mr. Geiger, correct?

8      A.   Correct.

9      Q.   Then there was also four others similar

10   ones signed, correct?

11     A.   Correct.

12     Q.   Looking at Exhibit 7, which is the blank

13   affidavit, given that Mr. -- let's start with the

14   this.

15          Mr. Wilder never signed the affidavit,

16   correct?

17     A.   Correct.

18     Q.   So looking at the blank field which -- not

19   blank fields.  Looking at the underlying fields

20   which is the name, the date and the phone number, do

21   you see those?

22     A.   Yes.

23     Q.   Looking at those fields, given that

24   Mr. Wilder never filled out -- never signed the

25   affidavit, do you now believe that those fields are

Page 77

1    put in by Royal Seas?

2         A.    It appears that way.

3         Q.    You don't know for certain?

4         A.    Correct.

5         Q.    But we know that Mr. Wilder never did sign

6    this affidavit, correct?

7         A.    Correct.

8         Q.    And then it reflects -- the affidavit

9    based off Exhibit 8 was sent, as the CRM notes, was

10   sent October 21, 2019, correct?

11        A.    Correct.

12        Q.    And based off of Exhibit 7, the date the

13   affidavit was to be signed was also October 21,

14   2019, correct?

15        A.    Correct.

16        Q.    And in the call we listened a minute ago

17   with Mr. Wilder, he was never informed that this

18   document being sent to him was an affidavit,

19   correct?

20        A.    Correct.

21        Q.    He was never informed of that there was

22   active pending litigation against Royal Sea Cruises,

23   correct?

24        A.    Correct.

25        Q.    And he was never informed that he is a

1    member of a class, correct?

2         A.   Correct.

3              MR. WHEELER:  Off the record.

4              (Short recess taken.)

5    BY MR. WHEELER:

6         Q.   You understand that you are still under

7    oath, correct?

8         A.   Yes.

9         Q.   So after listening to the calls and

10   reading the script, we can agree that, at least in

11   the calls we listened to, Miss Mattingly, again, did

12   not inform the people she called that there was a

13   class action lawsuit pending against Royal Seas

14   Cruises; is that correct?

15             MR. EPSTEIN:  Objection, asked and

16        answered and recordings are the best evidence

17        and their contents.

18             Answer the best you can.

19             THE WITNESS:  Yes.

20   BY MR. WHEELER:

21        Q.   Do you know why she didn't?

22        A.   No.

23        Q.   To the extent there is a reason why, it

24   would have been made by the attorneys, correct?

25        A.   Say that again.

Page 79

1          Q.   To the extent a decision was made either

2     way with regards to how this script was written,

3     your attorneys are the ones who drafted it, right?

4          A.   Correct.

5          Q.   And this script does not inform people in

6     any way that what they're signing which is a survey

7     is actually an affidavit, correct?

8               MR. EPSTEIN:   Objection, best evidence,

9          asked and answered.

10              THE WITNESS:   Correct.

11    BY MR. WHEELER:

12         Q.   And the reason why, to the extent there is

13    one, would have been determined by your attorneys

14    who drafted this script, correct?

15         A.   Correct.

16         Q.   One more in that vein, slightly different

17    though.

18              And this script does not inform these

19    individuals who are class members that they are

20    represented by counsel following class

21    certification, correct?

22         A.   Correct.

23         Q.   The reason why that information was not

24    provided would have been, once again, determined by

25    your attorneys who drafted this script, correct?

Veritext Legal Solutions
866 299-5127

```
 1        A.    Correct.
 2              MR. WHEELER:  I have nothing else.
 3                     CROSS EXAMINATION
 4    BY MR. EPSTEIN:
 5        Q.    Just a couple of questions.
 6              For those people for whom the CRM reflects
 7    received a 12-month extension of their travel
 8    package, was that 12-month extension granted and
 9    honored regardless of whether they provided an
10    affidavit or declaration?
11        A.    Yes.
12        Q.    And as to Gary Little, I believe it was --
13    Gary Little, he did not receive an extension, did
14    he?
15        A.    No.
16        Q.    And that was because?
17        A.    He traveled.
18        Q.    He had already traveled?
19        A.    Correct.
20        Q.    So he didn't need it?
21        A.    Correct.
22        Q.    Nothing further.
23              MR. WHEELER:  I'm fine.  Thank you.
24              MR. EPSTEIN:  She will read.
25              THE COURT REPORTER:  Do you need a copy?
```

Page 81

1          MR. WHEELER:  Yes, electronic.  Can you

2     get it by Friday?

3          THE COURT REPORTER:  Yes.

4          (Thereupon, the referred-to document was

5     marked by the court reporter for Identification as

6     Plaintiff's Exhibit 9.)

7          THE COURT REPORTER:  Do you need a copy of

8     the transcript?

9          MR. EPSTEIN:  Yes, please, PDF, mini.

10          (Concluded at 12:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 82

```
 1                          AFFIDAVIT
 2
       STATE OF FLORIDA            )
 3     COUNTY OF _____  )
 4
               I, _____, being
 5     first duly sworn, do hereby acknowledge that I did
       read a true and certified copy of my deposition
 6     which was taken in the case of MCCULREY V. ROYAL
       SEAS, taken on the 18th day of February, 2020, and
 7     the corrections I desire to make are as indicated on
       the attached Errata Sheet.
 8                          _____
                                        (Deponent)
 9
10         + + + + + + + + + + + + + + + + + +
11                         CERTIFICATE
12
13     STATE OF FLORIDA            )
       COUNTY OF _____  )
14
15
               Before me personally appeared
16     _____,
       to me well known / known to me to be the person
17     described in and who executed the foregoing
       instrument and acknowledged to and before me that he
18     executed the said instrument in the capacity and for
       the purpose therein expressed.
19
20             Witness my hand and official seal, this
       ____ day of _____, _____.
21
22
23                          _____
                                      (Notary Public)
24
       My Commission Expires:
25


                                            Page 83
```

```
 1                      CERTIFICATE

 2    STATE OF FLORIDA  )

 3    COUNTY OF BROWARD )

 4

 5

 6            I, SUZANNE VITALE, R.P.R., F.P.R. do

 7    hereby certify that I was authorized to and did

 8    stenographically report the foregoing deposition

 9    of MELISSA HANSON; that a review of the

10    transcript was requested; and that the transcript

11    is a true record of my stenographic notes.

12            I FURTHER CERTIFY that I am not a

13    relative, employee, attorney, or counsel of any

14    of the parties, nor am I a relative or employee

15    of any of the parties' attorney or counsel

16    connected with the action, nor am I financially

17    interested in the action.

18            Dated this 20th day of February, 2020.

19

20

21

22            SUZANNE VITALE, R.P.R., F.P.R.

23            My Commission No. DD179981

24            Expires: 5/24/2020

25
```

Veritext Legal Solutions
866 299-5127

**[1 - actual]**

| 1 |
| --- |
| **1** 1:25 3:10 8:18 8:21,23 9:3 12:2 |
| **10** 70:2 |
| **10:10** 1:16 |
| **12** 9:4 11:15 12:2 25:3,6 27:19 30:15 31:1 40:25 41:2 58:14 60:15 63:17 68:3 72:2 72:11,18 73:19 81:7,8 |
| **12:25** 1:16 82:10 |
| **13** 46:20 |
| **13th** 45:24 |
| **151480-740627...** 61:16 |
| **16** 3:11 36:15 59:2 64:2 |
| **17** 1:2,3 43:9 45:25 46:2 |
| **172377-404935...** 69:8 |
| **18** 1:15 12:9 25:11 25:17 26:2 40:12 59:8 61:5 |
| **1800** 2:12 |
| **18th** 42:4,9 45:4 83:6 |
| **19** 63:25 |
| **1988** 1:2 |

| 2 |
| --- |
| **2** 3:11 16:7,10,12 21:25 23:8 40:5 40:22 47:10 48:24 49:12 |
| **200** 2:11 |
| **2016** 36:20 |
| **2017** 9:10,11,15 9:17 11:10,15,16 |

| | |
| --- | --- |
| 11:19 12:3 28:15 31:9 59:2 64:2 70:2 | |
| **2018** 63:21 | |
| **2019** 10:5 13:3 15:17 17:22 27:19 28:15 33:12 40:5 40:12,22 43:9 45:25 46:2,20 47:10 48:15,17,21 49:6 56:14 57:3 63:2 70:5,18 78:10,14 | |
| **2020** 1:15 83:6 84:18 | |
| **20th** 84:18 | |
| **21** 3:12 70:18 78:10,13 | |
| **21550** 2:4 | |
| **23** 27:18 33:24,25 35:3,4,10,10 63:2 | |
| **24** 3:13 | |
| **240** 71:11 | |
| **25** 33:22,23 | |
| **27** 10:5 13:3 15:17 17:22 | |

| 3 |
| --- |
| **3** 3:12 8:24 21:10 21:12 29:1,24 33:11 35:16 48:15 68:14 |
| **30** 7:2,10,12 8:1 8:10 34:15 |
| **300000000** 61:16 69:8 |
| **32** 21:21 |
| **3249** 84:21 |
| **331-1177** 68:21 |
| **33301** 2:13 |
| **38** 3:15 |

| | |
| --- | --- |
| **3:43** 63:3 | |
| **3rd** 42:1 | |

| 4 |
| --- |
| **4** 3:5,13 12:8 24:2 24:5,7 40:21 48:17,21 59:6 |
| **40** 73:25 |
| **404** 69:16 |
| **43** 3:16 |
| **45** 67:13 |
| **4th** 47:13,17 |

| 5 |
| --- |
| **5** 3:15 37:24 38:6 38:8 |
| **5/24/2020** 84:24 |
| **500** 21:20 33:21 35:16 |
| **56** 70:11 71:7 |
| **560** 21:3 |

| 6 |
| --- |
| **6** 3:16 7:2,10,12 8:1,10 9:10,11,17 11:10,19 12:3 35:7 42:23 43:3,5 |
| **60** 61:2 |
| **627-0980** 61:24 68:23 |

| 7 |
| --- |
| **7** 3:17 11:15 75:23 76:3,5 77:12 78:12 |
| **704** 68:23 |
| **740** 61:24 |
| **740-627-0980** 61:19 |
| **75** 3:17 |
| **76** 3:18 |
| **780** 2:5 |

| | |
| --- | --- |
| **7th** 46:16 | |

| 8 |
| --- |
| **8** 3:10,18 76:14,16 78:9 |
| **8/10/17** 69:23 |
| **8/16/17** 64:4 |
| **81** 3:6 |
| **82** 3:19 |
| **84** 1:25 |

| 9 |
| --- |
| **9** 3:19 82:6 |
| **908** 68:21 |
| **908-331-1177** 68:17 |
| **91367** 2:6 |
| **935-3474** 69:16 |
| **986** 1:3 |
| **99** 73:24 |

| a |
| --- |
| **a.m.** 1:16 |
| **ability** 6:18 9:8 57:11 |
| **able** 9:20 34:12 60:24 |
| **absurd** 15:14 |
| **access** 44:15,19 |
| **account** 44:13,13 61:18 63:1,20 69:10 73:8 |
| **acknowledge** 83:5 |
| **acknowledged** 83:17 |
| **action** 4:11 79:13 84:16,17 |
| **active** 55:10 78:22 |
| **activity** 28:11 |
| **actual** 10:10 14:25 28:12 31:5 46:6 66:9 69:22 |

Page 1

[additional - bz081617]

additional   64:23
64:25
address   41:5,8
52:11,12
advise   51:16
affidavit   3:15,17
30:15 31:1,5,13
31:15 35:5 37:12
37:17,23 38:8
39:7,8 41:8,15,23
42:8 44:5,7 45:6
45:15,24 46:13
47:3,6 51:14,17
51:22 54:23 65:14
65:15 67:23 68:8
71:5 74:9,22
75:22 76:7 77:13
77:15,25 78:6,8
78:13,18 80:7
81:10 83:1
affidavits   31:10
31:18,23,25 38:24
39:21,25 42:13
43:22 44:2,24
52:18,21 53:4
54:20,21 65:9,20
66:4,10,13,15,16
66:25 67:10 76:17
77:4
afield   61:12
age   4:4
agent   23:24 24:24
25:1 36:13 37:20
agents   18:22
36:23
ago   4:24 78:16
agree   63:6 79:10
agreed   30:14,25
65:11 66:6
ags   1:2,3

ahead   8:17 60:23
66:18
ajb   1:2,3
alcohol   6:17
allowed   15:11
amount   66:24
answer   5:16 9:21
52:2 53:11 65:23
79:18
answered   52:5
62:1 79:16 80:9
answers   6:13 34:6
anybody   34:6
appearances   2:1
appeared   83:15
appears   34:21
38:9 45:15 47:6
48:14 76:6 78:2
appreciate   37:10
approximately
18:1
arbitrary   12:4
arguing   15:10
arrangements
28:8
arranging   10:11
asked   27:8 50:22
52:5 55:16 79:15
80:9
asking   10:15,15
31:15
asserted   12:16
assess   11:8
assume   31:16 41:9
41:10
attached   43:21
83:7
attempted   22:1,2
24:18 35:20
attorney   4:10
51:24 84:13,15

attorneys   18:5,6
39:9 50:5,8 52:1
55:13 69:2 79:24
80:3,13,25
audio   62:17 67:14
70:8 71:8 74:2
august   45:24,25
46:2,17,20 59:2
64:2 70:2
authorized   84:7
automated   24:21
automatically
24:23
availability   25:14
available   26:2
avoid   32:2
aware   8:6 32:18
75:6

b

b   7:2,10,12 8:1,10
43:17 45:14 46:24
back   11:25 39:7
39:25 45:9,13
46:5 54:19 57:8
background   25:8
bad   18:17
bar   29:7
base   10:25
based   26:22 33:2
40:11 42:7 48:14
64:12 67:2 70:17
78:9,12
basic   24:16
basically   8:4 10:8
28:5,11 50:25
51:25
bates   30:11
befuddles   11:10
began   56:13
beginning   36:15
36:16,16,18 50:2

begins   16:21
53:24
behalf   1:4,9 2:2,9
7:21 9:5
believe   21:3 29:10
32:1 33:18,22,24
34:15 44:21 71:6
74:25 77:25 81:12
best   6:19 79:16,18
80:8
better   11:22 38:21
bit   29:19 48:6
blank   39:11,12
46:12 52:11,12
75:22 77:3,12,18
77:19
blanks   39:20
blvd   1:14
bold   46:9,10
book   61:4 70:21
booking   28:8,21
boulevard   2:11
box   40:8
break   5:14 49:8
brief   50:25 51:22
briefly   38:20
brings   74:5
britten   69:16 76:7
broad   13:8,14
49:12 65:13
broader   31:20
brought   4:12
broward   1:14
2:11 84:3
bunch   5:10
business   15:12
60:19
buying   20:3
bz081617   59:2

[c - continuing]

| c | | | |
|---|---|---|---|
| **c** 43:17 45:14 47:21 68:10,12 | 64:18 79:9,11 | 15:20,25 17:1 51:10 77:4 79:1 79:13 80:19,20 | **completely** 64:12 |
| **calderon** 43:17 47:7 | **capacity** 7:1,3,20 83:18 | **clear** 6:25 33:20 | **completing** 42:8 |
| **calendar** 61:8 | **case** 1:2 5:4 7:11 7:13 9:10,12 10:20 26:9 83:6 | **clearer** 66:11 | **complimentary** 50:16 51:2 70:21 71:2 |
| **california** 1:1 2:6 | **cause** 1:21 | **clearly** 5:9 | **computer** 24:23 |
| **call** 3:12 13:19 14:2 19:14,16,24 19:25 20:5,14,15 20:17,18,21 21:19 22:1,14,15,16,23 23:6 24:25 25:13 26:25 27:4,18,20 30:3,25 33:5 34:9 35:9,14 36:1,2 41:11 49:14 50:4 54:23 55:10,19,21 55:25 57:25 60:20 61:3 62:3,4,20,20 62:23 63:2,5,8 64:7,16 67:12,13 67:18 69:6 70:17 70:23 71:4 73:24 78:16 | **caveat** 9:9 | **click** 53:15 | **concerning** 9:8 |
| | **cecelia** 3:15 38:9 38:14 40:16,17 44:4 | **client** 4:11 32:22 49:24 | **concisely** 5:9 |
| | **center** 19:14,16,24 19:25 20:4,7,15 20:22 | **clients** 5:5 13:10 14:2,22 16:2 21:18 26:25 27:11 31:9,17 32:5 37:2 39:22,24 48:25 49:17,20 60:7 72:14 | **concluded** 82:10 |
| | **centers** 20:5,15,17 | | **conference** 5:21 |
| | **certain** 8:11 23:1 39:11 78:3 | | **confirm** 43:21 47:1 67:17 69:15 |
| | **certificate** 83:11 84:1 | **close** 46:5 48:23 | **confirming** 59:13 60:4 |
| | **certification** 8:7 10:6 11:6 13:2 15:6,16 80:21 | **collected** 17:9 | **confused** 74:19 |
| | **certified** 10:24 51:10 83:5 | **collecting** 66:13 | **connect** 34:10 |
| | **certify** 84:7,12 | **collectively** 18:8 | **connected** 84:16 |
| | **cetera** 7:17 | **comes** 75:15 | **consideration** 39:4 |
| **called** 18:23 21:23 22:2,6 26:13,17 31:8,14 34:7 35:15 39:25 51:11 51:17 79:12 | **chance** 6:4 7:11 | **comment** 6:7 | **consistent** 7:7 |
| | **change** 6:7 | **commission** 83:24 84:23 | **consolidated** 1:2 |
| | **charged** 39:6 | **communicate** 14:22 | **contact** 3:14 5:6 8:4 10:12 11:5,20 13:3 14:10 15:11 15:17,20 16:18 17:1,3 22:20 23:7 24:14,15,18,19 28:15 29:4,14,17 35:20 40:21 50:15 53:17 |
| | **check** 9:17 21:4 43:23 | **communicated** 27:11 | |
| **calling** 26:24 55:11 | **checks** 19:11 | **communications** 12:15,15 15:7 34:16 | |
| | **choose** 57:15 | | |
| **calls** 15:25 16:3 17:8,24 18:21 20:2,8,21 21:1,18 23:11 28:25 29:2 29:23 30:4 33:1 34:17 35:10,24 36:22 49:17,20 55:6,14 56:5,13 56:18 57:2 62:11 | **chosen** 36:21 | **comp** 25:3 27:19 | **contacted** 18:23 26:22 44:1,4 48:25 68:18 |
| | **clarify** 34:14 37:13 | **companies** 53:8 | |
| | **clarifying** 56:12 | **company** 7:21 35:21 36:14,18,19 | **contacting** 14:17 22:19 |
| | **class** 5:7 8:6,7 9:23,25 10:1,3,6 10:24 11:5,5 13:2 13:4 15:6,16,18 | **competence** 65:21 66:17 | **contents** 79:17 |
| | | **complaints** 9:14 | **context** 10:16 |
| | | **complete** 6:22 33:1 50:24 | **continue** 14:21 |
| | | | **continuing** 12:8 50:3 |

Page 3

[contract - deposition]

contract  14:8
controls  44:13
conversation
  32:22
copies  72:13
copy  72:18 81:25
  82:7 83:5
corporate  20:4,7
  20:15,21
correct  6:5 10:20
  14:22,23 16:1
  17:19 18:3 20:13
  21:22 22:4,13
  23:2,5,9 25:16,18
  25:19 26:11 31:15
  34:14 35:8,12,13
  37:5,8 39:19,22
  39:23 40:5,6,10
  40:12,13,25 41:3
  41:23,24 42:9,10
  42:22 44:2,3,5,6
  45:6,7,20,25 46:1
  46:3,4,14,17 47:4
  47:5,7,8,11,12,19
  48:2,3,6,12,13,15
  48:16,18,19,21,22
  49:1,2,6,7,22,23
  49:25 50:1,5,6,9
  50:10,18,20 51:7
  51:8,11,12,15,19
  51:20 52:22,23,25
  53:1,3,5,6,9,10
  54:10,17,18 56:11
  57:3,4,9,10,21
  58:10,15 59:9,23
  60:8,10,12,17,21
  60:22 61:9,19,25
  62:9,21,24 63:3,9
  63:18,19,22 64:3
  65:6,7,16 67:7,20
  67:21,23,24 68:1

68:2,5,6,8,23,24
69:1,4,5,17,20
  70:2,3,6,12,13,15
  70:16,18,19 71:2
  71:5,14 72:12
  73:22 77:4,5,7,8
  77:10,11,16,17
  78:4,6,7,10,11,14
  78:15,19,20,23,24
  79:1,2,7,14,24
  80:4,7,10,14,15
  80:21,22,25 81:1
  81:19,21
corrections  83:7
correspondence
  59:10,15,16
corresponds  27:23
  69:9,19
cost  39:3,4
counsel  12:11,15
  12:23 18:7,7
  74:17 80:20 84:13
  84:15
counsel's  12:2
county  83:3,13
  84:3
couple  81:5
course  15:8,13
  34:24
court  1:1 5:20,23
  8:20 16:9 21:9
  24:4 38:5 43:2
  76:2,13 81:25
  82:3,5,7
cover  10:25
covered  51:25
created  50:9
crm  23:15 29:2
  33:5 34:3,12,17
  40:15,20 58:12,16
  59:17 60:12,16

69:10,23 71:14
  74:21 78:9 81:6
cross  3:6 81:3
cruise  8:5 13:11
  27:1,5 28:21 31:2
  49:25 50:17 51:2
  58:18,22 60:20,25
  60:25 63:18,21,24
  64:8,10,20 65:1,2
  65:4 67:20
cruises  1:7,12 4:13
  5:7 7:2 8:14 13:23
  14:3,13,18 20:3
  25:9 43:7 64:16
  70:22 71:2 78:22
  79:14
current  14:2
currently  21:6
customer  3:13
  13:16,19 18:22
  19:17 20:1,12
  28:12 29:3 33:12
  36:13,25 37:6,16
  37:20 39:13 40:8
  44:12 58:11 60:3
  63:12 64:13 73:7
  73:11
customers  10:9,10
  10:10 15:11 16:19
  24:13 28:6 57:25
  59:11,20
customerservice
  40:7
cv  1:2,3

d

d  3:2
dan  1:9 4:11 43:18
  61:22
database  17:12
  33:5 58:12,16
  60:12 69:23

date  10:4,5 11:2
  11:10,19 12:3
  14:7,25 17:21
  25:10,13 30:5
  46:7 58:20,23,24
  60:20 64:2 70:1,5
  77:20 78:12
dated  46:16 84:18
dates  13:20 46:21
  70:21
david  43:17 47:7
day  46:17 83:6,20
  84:18
days  61:2
dd179981  84:23
deadline  65:4
dealing  19:10
deals  7:14
dealt  28:6
decided  18:9
  51:21 74:13
decision  18:11
  80:1
declaration  81:10
defendant  1:8,13
  8:11 9:5 43:6,6
defendant's  55:5
defendants  2:9
deforest  1:9 4:11
  11:14
department  44:14
depend  60:13
depends  14:6 15:1
deployed  26:1
deponent  83:8
deposed  4:18
deposition  1:17,20
  3:10 5:1,3 7:5,10
  8:24 11:4 12:11
  83:5 84:8

[describe - existed]

**describe**  51:9
**described**  83:17
**describes**  51:6
**designated**  8:9
**designee**  7:2
**desire**  83:7
**details**  7:4
**determined**  22:5
  33:13 80:13,24
**devdex**  24:17
**developed**  7:9
**diabetes**  65:15
**diabeteshealth**
  17:4
**diabeteshealth.i...**
  17:6 22:11 32:13
  32:17 50:14 51:1
  68:16
**diabeteshealth.i...**
  16:22
**difference**  5:25
**different**  10:13
  14:9 23:3,4 38:24
  39:2 80:16
**difficult**  9:20
  14:19 37:2
**digital**  23:18
**digits**  11:16
**dionne**  36:7,10
  37:21
**direct**  3:5 4:6
**directly**  67:8
**disclosure**  3:16
  43:8,22 45:11
**discretionary**
  26:10 57:20 64:12
**discuss**  11:22
  39:25
**discussed**  38:20
**discussion**  38:18

**discussions**  56:17
**disposition**  23:11
  23:11
**district**  1:1,1
**document**  8:19
  9:1 16:8,12,15
  21:8,12,15 24:2,3
  38:4,13,14,21
  40:4 43:1,5 45:8
  45:10 46:3,6
  47:19 48:21 52:13
  52:20,24 53:8,15
  54:24 58:2 61:18
  76:1,5,8,12,21
  78:18 82:4
**documented**  12:19
**documents**  12:10
  12:12,14 24:8
  38:1 74:12
**docusign**  53:13
  73:13
**doing**  6:10 34:4
  35:23
**draft**  69:3
**drafted**  18:4 39:8
  50:5 53:21 69:1
  72:8 80:3,14,25
**drafts**  18:13,18
**drive**  3:19
**drugs**  6:17
**duly**  4:4 83:5
**duties**  19:6,8 36:4

**e**

**e**  3:2 4:16 15:23
  41:5,8 52:11,12
  53:7,7,14,16,20
  59:13 60:6,11
  71:12,17,18,20,22
  71:24 72:1,4,7,11
  72:14,17,22,24,25
  73:4,8,15,16 74:7

74:8,14,19 75:1,5
  75:8,11,12,16,20
  77:2,3
**easier**  8:16 45:9
**easiest**  50:12
**east**  1:14 2:11
**eastern**  47:17
**editorializing**
  38:10
**effect**  5:22
**eight**  61:16 69:8
**either**  14:21 35:11
  47:17 53:17 57:2
  80:1
**electronic**  82:1
**employee**  84:13
  84:14
**employees**  19:10
**encourage**  65:5
**ended**  19:25 68:7
**enjoyed**  49:22
**enter**  24:24 32:16
**entered**  25:1 48:1
  68:17
**entering**  32:12
**entitled**  43:6
**entries**  21:20
  24:24 47:4
**entry**  25:3 26:12
  27:19,20,23 30:13
  30:18 33:12 40:20
  41:14
**epstein**  2:14 3:6
  6:25 9:6,13,18,25
  11:9,23 12:13
  15:4 16:5 19:20
  23:17,20 28:5,17
  28:20 29:9,16
  33:17,25 34:19,24
  36:8 52:5 59:3,6
  61:11 65:21 66:17

74:18,24 75:5,10
  75:18 79:15 80:8
  81:4,24 82:9
**errata**  83:7
**especially**  10:24
**esq**  2:7,14
**estimate**  6:1 14:15
  56:22
**et**  7:17
**events**  7:15
**eventually**  32:9
**evidence**  79:16
  80:8
**exact**  30:5
**exactly**  4:23 9:13
  11:9 34:8 54:17
  58:13 63:7
**examination**  3:4
  4:6 81:3
**example**  53:12
**exclude**  29:3
**excluding**  13:25
**executed**  83:17,18
**exhibit**  3:10,11,12
  3:13,15,16,17,18
  3:19 8:18,21,23
  16:7,10,12 21:10
  21:12,24 23:8
  24:2,5,7 29:1,24
  33:10,11 35:16
  37:24 38:6,8
  40:20 42:23 43:3
  43:5 45:15 46:24
  47:21 48:24 49:11
  59:5 68:10,12
  75:23 76:3,5,14
  76:16 77:12 78:9
  78:12 82:6
**exhibits**  3:8 45:14
**existed**  39:20

Veritext Legal Solutions
866 299-5127

[existing - going]

**existing** 10:9 28:6 28:7
**experience** 49:22
**expiration** 70:5
**expire** 27:2,5 58:19
**expired** 58:22 63:18,21,24 64:8 64:10,16 65:1
**expires** 83:24 84:24
**explain** 38:1
**explicitly** 32:15
**explore** 5:6
**expressed** 83:18
**ext** 25:4 27:19 30:15
**extend** 65:2
**extending** 64:9
**extension** 25:6,18 25:20,22,23 26:3 26:6 27:15,22 31:1 40:25 41:3 57:15 58:11,14 59:11 60:16 63:18 65:4 68:4 71:18 72:2,5,8,18 73:19 81:7,8,13
**extensions** 27:8 57:12 59:13 64:19 71:13 72:11
**extensive** 28:9 29:5,17
**extent** 28:14 71:12 72:16 74:8 79:23 80:1,12

**f**

**f.p.r.** 1:18 84:6,22
**fact** 29:18
**facts** 5:4

**fail** 5:10
**fair** 55:2 63:14,15
**fairly** 29:5,17
**falls** 61:5
**far** 59:12 61:11 73:17
**february** 1:15 63:21,25 70:5 83:6 84:18
**field** 77:18
**fielding** 19:16 20:2,8
**fields** 47:2 48:1,1 77:19,19,23,25
**figure** 25:13 62:15
**file** 62:2,5 69:7
**filed** 1:20 4:3 7:16 9:12,14 11:12,14 11:15
**filing** 9:19
**fill** 39:12 68:1,4 73:21
**filled** 39:14,18 47:3 77:24
**filling** 68:7
**financially** 84:16
**find** 8:4 11:3,13 32:9 40:15 53:25 74:25 75:6
**fine** 6:10 8:15 38:2 52:3,7,8 62:7 81:23
**first** 4:4 8:25 9:7 16:21 25:3 26:12 26:12 27:17 47:2 49:12,13 56:18 59:3 83:5
**florida** 1:15,19 2:13 83:2,13 84:2
**focus** 13:25

**focused** 7:19
**folder** 73:2,3
**follow** 13:10,13,15 13:22 41:25 42:4 42:11 54:16 63:7
**followed** 35:11
**following** 13:2 15:16 28:15 33:12 80:20
**follows** 4:5
**foregoing** 83:17 84:8
**forgot** 18:24 26:8
**form** 19:20 39:21 39:25 52:21 53:20 65:21 66:17 76:6
**formal** 72:4
**fort** 1:15 2:13
**found** 40:17
**foundation** 65:22 66:18
**foundational** 18:25
**four** 32:1 44:2 69:11 77:9
**fourth** 6:11 29:10 29:10,11
**friday** 82:2
**friedman** 2:3
**front** 61:17 68:13
**fulfilling** 10:17
**full** 6:22 12:18 32:25
**fully** 7:9 11:8
**further** 14:3 29:13 30:9 81:22 84:12

**g**

**gary** 43:17 45:16 81:12,13
**gathering** 31:10

**geiger** 43:18 61:22 62:9,21 67:18 68:7 69:3 70:4 73:18 76:18 77:7
**geiger's** 61:18 63:20
**general** 22:18
**generally** 10:20 30:2 41:7 64:15
**generate** 24:23
**generic** 40:8
**geoff** 2:15 33:18
**getting** 39:6 61:11
**give** 5:22 6:13,18 6:21 14:15 15:4 26:3,5 27:8,22 31:18 41:8 53:12 57:12,15 58:1 60:24 72:5
**given** 25:20,22,23 26:6 27:12 31:1 41:3 58:11 77:13 77:23
**gives** 57:17
**giving** 56:9 64:19
**go** 4:25 5:2,17 8:17 20:7 32:19 37:25 38:3,16 54:5,14 60:25 61:6 64:23,25 66:18
**goes** 29:19
**going** 5:8 7:6,6,19 7:22 10:3 11:18 16:6 21:6 24:1 26:2 27:2 31:9 32:19 34:22 45:8 46:24 49:12 50:11 53:12 54:9 55:16 61:14 62:13 67:12 69:6 71:7,11

[going - know]

73:25 74:6 75:7
**good** 4:8,9 37:6
62:14
**gosh** 19:9
**granted** 81:8
**grants** 59:11
**great** 29:15 52:10
**greenspoon** 2:10
**ground** 4:25
**guess** 6:1 9:6
30:20 50:12 75:14

**h**

**h** 4:17
**hand** 83:20
**handle** 37:3
**handling** 19:17
20:12 63:7
**hanson** 1:17 4:2
4:16 7:20 84:9
**happen** 37:13
44:24 63:13
**happened** 7:25
44:8 74:22 75:1
**happy** 5:11
**harm** 61:12
**header** 64:5 69:22
**heads** 6:13
**health** 26:3 65:15
**heard** 54:19
**hellosign** 45:20
53:18
**help** 34:18
**helpful** 16:4 34:22
**heretofore** 4:3
**hetchler** 3:15 38:9
38:15 39:17 40:3
40:5,12,16,17
41:7 44:4
**hey** 53:14
**highlighted** 48:5,9

**hills** 2:6
**hold** 7:22 11:18
**honored** 60:16
81:9
**hope** 31:18
**hopefully** 38:21
53:12
**house** 18:7

**i**

**idea** 71:25
**identification** 8:20
16:9 21:9 24:4
38:5 43:2 76:2,13
82:5
**identified** 34:1
**identifies** 43:16
**identify** 34:12
**imagine** 6:10
59:22
**impact** 6:18
**important** 18:24
58:6,8
**inbound** 20:2,8
**inc.'s** 43:7
**include** 19:14
**increase** 66:24
**independent** 50:7
52:2
**indicated** 83:7
**individual** 7:3
20:19 26:21
**individually** 1:4,9
73:5,6
**individuals** 17:14
17:15,24 23:23
35:10 38:25 80:19
**info** 65:15
**inform** 79:12 80:5
80:18
**informal** 5:21

**information** 10:2
17:8,10,14,17
28:3 32:12,16
37:13 39:11 46:12
50:3,13,15 51:2
58:1 59:17 65:12
80:23
**informed** 78:17,21
78:25
**initial** 40:21
**inquire** 14:3 49:21
**inquiries** 19:17
**inquiry** 7:7,12
**insist** 7:6
**instances** 49:19
**instructed** 27:8
42:11,19
**instructions** 22:18
**instrument** 83:17
83:18
**intake** 40:8
**interested** 49:25
84:17
**internal** 12:14
**internally** 44:8
**interval** 14:2
**introduce** 16:6
21:6,7 24:2 37:24
38:3 76:10
**introduced** 38:8
**introducing** 8:18
**involved** 75:13
**isolate** 28:25
**issue** 26:4 52:4
**issues** 20:17
**itinerary** 60:5

**j**

**january** 43:9
**job** 19:6,8 36:2
58:7 65:8

**john** 1:4 4:12
**july** 18:1,2 30:6,8
33:12 49:5 56:14
56:20
**june** 9:15 11:15

**k**

**keep** 54:9 71:7
73:15
**kind** 9:6,19 10:7
11:10 14:15 28:3
29:3 42:16 48:5
50:24 60:2
**kinds** 32:4
**know** 5:1,25 10:7
10:10 11:3,7,17
11:19 12:10 13:6
17:5,23 18:9,11
18:13,19 21:2,2
23:1,12 24:22
27:23 28:2,22
31:13 32:9,11,15
32:25 33:4 35:14
36:5 39:15,16,17
39:24 40:1 41:9
42:14,15,17,21
44:9,10,22,25
46:10,21 47:3,23
48:9 51:21,25
52:1 53:11,16,20
54:13,19,22 55:1
55:5,8,13 56:2,4
56:15 58:21 61:10
61:20 62:1,2
63:16 65:11 66:1
66:14,18 67:2,5
71:16,23 72:1,16
72:19,20,22,23
73:15,17 74:10,16
74:17 75:12 76:23
78:3,5 79:21

[knowledge - mini]

knowledge  47:25
50:7 52:2
known  83:16,16

**l**

l  4:16
lacking  66:18
large  1:19
lauderdale  1:15
2:13
law  2:3 5:20
lawful  4:4
lawsuit  9:19,22
10:2,23 11:6,11
11:14 51:7 79:13
lawyer  54:11
lawyers  55:5,8,18
55:24
lead  60:23
leaf  31:21
learn  5:4
leave  22:23
leeway  15:5
left  40:16 61:21
69:15
letter  15:23 53:4
59:24
letters  59:13,19,23
60:2,4,4
life  45:9
light  48:7
limitation  57:14
limited  7:19 39:5
link  53:15
list  3:12 21:18,18
21:21,23 22:6,10
26:23 29:1,24
30:7 33:10,10,11
listed  7:8
listen  32:19 41:11
53:25 55:24 69:6

listened  55:6 56:4
56:9 78:16 79:11
listening  63:5
67:17 79:9
literally  8:3
litigation  13:5,6
15:18 36:17 49:1
51:19 56:8 67:19
78:22
little  43:17 45:16
45:24 48:6 49:4
60:18 61:11 66:10
81:12,13
live  55:21
lloyd  30:11,14,24
llp  2:10
long  36:14,24
56:22 61:8
look  9:3 12:7
16:20 24:1 29:9
32:2 40:14 41:5
43:21 45:9,13
46:16 49:11 50:11
53:23 61:17,21
68:12 75:22
looking  25:2 26:12
27:17 30:1 33:9
40:4,20 50:2
52:22 58:16 59:3
63:1,5,20 68:21
69:22 77:12,18,19
77:23
looks  47:13
loop  46:5 48:23
lot  14:6,8 29:20
63:12

**m**

m  2:3 4:16
mail  15:23 22:23
41:5,8 52:11,12
52:13,16 53:7,14

53:16,20 71:17,18
71:20,22,24 72:1
72:4,7,17,22,24
73:8,15 74:7,8
75:1,5,8,11,12,16
mailed  71:12
mails  53:7 59:13
60:6,11 72:11,14
72:25 73:4,16
74:14,19 75:20
77:2,3
making  30:4
56:18
manager  37:20,21
42:18,18,20
managerial  18:10
marathon  5:14
march  9:10,11,17
10:4,5 11:10,19
12:3 13:3 15:17
17:22 28:15 36:15
36:20
marciales  41:18
41:22
marder  2:10
mark  42:23
marked  8:20,23
16:9,12 21:9,12
24:4,7 38:5 43:2,5
76:2,5,13,16 82:5
marketing  10:17
59:23
match  46:22
math  21:4
matter  7:5
mattingly  36:10
41:20 42:11 44:19
54:4,11,13,16
55:14,19,25 57:11
57:22 62:21,24
63:6,17 65:8,18

66:1,3,14 70:12
70:15,20 71:12,16
72:17,20 79:11
mattingly's  55:6
mcculrey  83:6
mccurley  1:4 4:12
11:15
mean  10:19 13:5
13:20 14:7 18:6
18:21 20:6 22:2
23:12 25:5 33:10
36:16 45:5 51:24
52:17 54:1 58:7
60:13 63:12 73:6
75:10 77:3
means  24:22
28:10 29:12 70:4
meant  56:7 65:19
medication  6:18
melissa  1:17 4:2
4:16 84:9
member  51:11
79:1
members  5:7 8:5,6
11:5 13:4 15:18
15:20 16:1 17:1
77:4 80:19
mention  51:13
74:6
mentioned  56:13
74:8
mentioning  16:21
mentions  71:17
merits  7:12
method  15:21
middle  65:16
midnight  47:14
military  25:25
mind  8:13
mini  82:9

Page 8

[minute - pausing]

minute   49:8 54:2
   67:13 78:16
mistake   68:22
mnth   25:3 27:19
   30:15
monitor   55:10,18
monitored   55:14
month   14:16 25:6
   26:2 31:1 36:2
   40:25 41:2 58:14
   60:15,25 63:17
   68:3 72:2,11,18
   73:19 81:7,8
monthly   14:1
months   4:23,24
   11:11 18:1 25:11
   25:17 30:6 56:23
   59:8 61:5 64:8
morning   4:8,9
   16:13 21:13 24:8
   61:15 76:6,19
motions   7:16,17
multiple   34:16

n

n   3:2 4:17,17
name   4:10,14 36:6
   36:8 46:7 59:1
   62:5 77:20
named   4:3
narrow   14:20
   15:22
necessarily   29:6
need   6:5 26:4
   27:21 81:20,25
   82:7
needed   18:10 66:5
   73:21
needs   36:25 67:25
   68:4
never   77:15,24,24
   78:5,17,21,25

nods   6:13
non   12:14
normal   14:1 15:7
   29:3 72:4
normally   14:10
   31:17 58:18 71:22
   72:10,11,25
notary   1:19 83:23
notated   11:14
note   12:2 60:16
notes   23:15 25:1
   26:21 29:2 33:1
   34:3,12 40:15
   41:2 58:13 61:18
   63:1 71:14,15
   78:9 84:11
notice   1:20 3:10
   4:3 7:4,23 8:1,4
   8:23
november   49:6
number   10:12
   29:1 39:5 46:8
   50:16 59:1 61:19
   62:2,4,4,8 68:14
   68:17,20 69:1,8
   69:19,20 77:20
numbered   9:3
   61:15
numerous   13:15
   13:20 60:5

o

o   4:17
oath   4:5 5:19,19
   12:21 57:9 79:7
object   19:20 52:4
objection   65:21
   66:17 79:15 80:8
obtain   65:9,20
   66:4 67:9
obtaining   66:9,14
   66:16

obviously   30:6
   52:4 56:9
occurred   13:3
   15:17 32:22 63:2
occurring   15:10
october   30:8 40:5
   40:12,22 42:1,4,9
   45:2,4 47:10,13
   47:17 48:15,17,21
   70:18 78:10,13
offer   68:3
offered   63:17
offhand   27:25
office   43:8
offices   2:3
official   83:20
okay   4:24 5:12,13
   5:17,18,24 6:8,9
   6:15,16 21:5
   29:15 31:18 37:14
   41:13 43:23,25
   48:8 55:4 64:1
   68:11 71:18,19
   72:23 73:14 75:4
once   25:12 37:11
   44:7,24 80:24
ones   28:10 77:10
   80:3
open   11:2 19:25
operational   19:9
operations   19:12
   19:13
opposed   34:3
opt   17:9,11 22:8
opted   17:4,6
order   10:6 27:21
ordinary   15:8
original   39:20
   46:13
originally   56:17

outgoing   73:4
outlined   7:16,25
outlook   73:2
outside   18:7 20:4
   20:14,17 61:4,5
overseas   26:1
oversee   20:14
owners   20:19
oxnard   2:4

p

p.m.   1:16 63:3
   82:10
package   25:11,12
   27:1,5 28:8 68:15
   81:8
packet   32:3
page   3:4,9 8:24
   12:8 21:21 25:3
   26:13,15 27:17
   29:10,10,11,16
   30:11,12 40:3,4
   40:17 43:12 45:19
   45:20 46:5,19
   47:2,9 48:11 59:4
   61:17 68:16 69:16
pages   1:25 12:8
   69:12
paragraph   49:14
   53:23 68:25 69:3
paragraphs   16:21
   49:13
part   12:7
particular   5:5
   29:18 70:22
particularly   37:2
parties   84:14,15
partners   17:16
pause   71:11
paused   63:8 67:12
pausing   70:11

Page 9

[payroll - question]

**payroll** 19:10
**pc** 2:3
**pdf** 82:9
**pending** 5:16 51:7
   67:19 78:22 79:13
**people** 10:9,10,22
   14:17 17:3,5
   18:23 20:3 22:6,8
   22:11,19 23:4,7
   25:9 27:4,8 29:19
   31:22 33:22 34:2
   34:5,7,10,11 35:1
   35:15 36:2 42:12
   44:2 52:25 53:17
   54:20 60:19 64:16
   65:11 66:24 75:20
   79:12 80:5 81:6
**percent** 73:24
**period** 9:24 10:1,4
   26:2 31:8
**person** 15:1 21:23
   22:15 26:14,17,20
   29:12 37:11 50:21
   50:23 51:10,16
   53:14 83:16
**person's** 26:21
**personally** 42:14
   42:17 83:15
**pette** 2:15 23:22
   33:24 34:14 37:25
**phone** 15:23,24
   46:8 50:16 61:18
   62:4,8 68:17,20
   68:25 69:19 70:12
   77:20
**phrased** 50:9
**physically** 52:16
   75:13
**picked** 22:3
**place** 21:1 36:22
   44:23 49:17 56:18

**placed** 17:24
   18:21 20:21 28:25
   55:14,19,25 56:13
   64:7
**places** 15:25
**placing** 35:24
**plaintiff** 1:5,10 3:8
**plaintiff's** 8:21
   16:10 21:10 24:5
   38:6 43:3 76:3,14
   82:6
**plaintiffs** 2:2
**play** 67:12 69:7
   74:1
**played** 62:17
   67:14 70:8 71:8
   74:2
**playing** 70:7 71:7
**please** 4:14 5:11
   5:16 65:24 82:9
**point** 34:23 65:2
   67:18
**poor** 55:17
**portion** 50:2,4
   65:16,19 66:13
**portions** 49:16
**position** 5:5 10:19
   19:1 36:12
**possession** 45:6
   46:3 47:19 48:20
**possible** 54:8
   55:10 67:10
**possibly** 13:18
**post** 15:6
**potential** 15:6
**potentially** 20:3
   51:18
**pp** 1:3
**predates** 9:19
**preempt** 33:17
   34:20

**preexisting** 17:12
**prefer** 52:12
**preference** 27:13
   27:14
**prepared** 9:4 12:1
   17:20
**present** 2:15
**president** 19:2,3,3
   19:5
**pretty** 7:22 12:18
   13:14 19:11 49:16
**previous** 56:8
**previously** 52:22
**prior** 11:5 12:11
   14:10 28:5,11
   68:14
**privilege** 12:16
**privileged** 12:14
**probably** 5:9
   41:12 50:12 52:3
   53:25 59:23
**problem** 11:21
**procedure** 44:23
   45:1
**process** 44:22
**produced** 12:11
   12:17,24 16:13
   21:13 24:8 26:20
   26:21 32:21 38:21
   43:6 61:15 69:7
   74:10,13 75:9
   76:6,19
**producing** 33:9
**production** 12:9
   16:14 21:14 24:9
   74:14 76:20
**products** 10:17,18
   10:22,22
**programs** 13:11
**promotion** 50:17
   51:3 70:21 71:1

**proposing** 11:1
**prospective** 10:9
**provide** 29:1
   66:25
**provided** 22:21
   34:3 50:14 56:3
   80:24 81:9
**public** 1:19 83:23
**pull** 62:13 69:10
**pulled** 21:2 22:7
   34:12
**purchase** 13:11
   14:25 25:9,12
   29:13 60:19 70:1
**purchased** 14:11
   65:6
**purchasing** 49:25
   68:15
**purely** 57:20
**purpose** 5:3 20:9
   21:24 26:17 28:24
   57:23 66:3,9,16
   70:23 71:4 83:18
**purposes** 14:12
   31:10 35:2 49:18
   60:9 64:19
**pursuant** 1:20 7:4
**put** 33:3 44:23
   78:1

---

**q**

**question** 5:11,16
   9:7,20 11:2,21
   13:8,14 18:16,17
   18:25 19:19,21
   24:16 30:19 31:20
   33:7 42:16 49:12
   52:6 53:24 54:4
   55:17 58:21 65:13
   71:16 74:6,11,12
   74:23

Veritext Legal Solutions
866 299-5127

[questions - reviewing]

**questions**  5:8 7:25
  13:19,21 20:18
  33:20 34:23 38:22
  81:5
**quickly**  14:16
  40:14
**quite**  21:2 29:19

**r**

**r.p.r.**  1:18 84:6,22
**ran**  26:7
**range**  12:18
**reach**  17:13 36:3
**reached**  23:14
  35:1
**reaching**  22:15
**read**  17:1 22:20
  23:7 27:9,24
  50:12,18 57:24
  58:1 62:2 65:10
  66:5 71:4 81:24
  83:5
**reading**  26:18
  35:2 63:8 65:9
  66:15,20 79:10
**reads**  68:14 69:16
**reality**  10:14 44:1
**realize**  18:24
**really**  10:4,15
  14:20 18:24 30:10
**reason**  6:21 8:3
  26:8 36:21 79:23
  80:12,23
**reasons**  13:15,17
  14:9 26:4 64:22
**recall**  32:12,14
  62:6
**receive**  81:13
**received**  17:8 32:4
  39:24 44:7 53:17
  73:19 81:7

**recess**  49:9 57:6
  79:4
**recipient**  75:16
**record**  4:15 23:10
  23:13 38:16,18,20
  57:5,8 62:11,16
  62:18 67:15 70:9
  71:9 74:3 77:2
  79:3 84:11
**recording**  24:18
  41:11 55:25 61:14
  62:3,20 69:7 70:7
  70:14
**recordings**  23:21
  23:23 32:20,21
  33:9 34:15 35:9
  54:1 55:2 79:16
**records**  34:9
  73:16
**redacted**  28:2,4,19
  28:22
**redaction**  28:24
**refer**  8:13
**referred**  8:19 16:8
  21:8 24:3 38:4
  43:1 51:22 76:1
  76:12 82:4
**referring**  75:19
**reflect**  27:20
  30:18 35:10 41:2
  45:23 55:2 58:18
**reflected**  28:17
  42:7 58:12,24,25
  59:16 60:11 64:4
  71:14,21
**reflecting**  76:17
**reflects**  30:20
  41:22 62:3 70:1
  73:3 78:8 81:6
**regard**  32:20
  48:25

**regarding**  11:6
  12:1,3 13:4,6
  15:18 17:1 28:7
  50:16 60:5 66:13
  71:1,13,17,18
  72:7,11,17
**regardless**  81:9
**regards**  11:20
  14:17 19:13,24
  20:3,20 22:14,19
  27:7 30:21 31:19
  33:8 37:23 39:10
  40:2,22 44:23
  50:8 54:21 55:19
  68:14 73:18 80:2
**regularly**  14:1
**relate**  29:2
**related**  28:20
  29:23
**relates**  28:12
**relationship**  28:13
  29:3 37:4
**relative**  84:13,14
**relevant**  10:3,4
  31:8
**remain**  7:7
**remember**  4:23
  17:21 29:18 30:5
  32:8 56:19,24
  57:1 68:9
**repeat**  65:24
**repetitive**  46:25
  49:4
**rephrase**  5:11
  9:16 18:16 19:22
  33:8 53:24 54:4
  55:16 59:22 73:1
**report**  84:8
**reporter**  8:20 16:9
  21:9 24:4 38:5
  43:2 76:2,13

  81:25 82:3,5,7
**represent**  48:4
**representation**
  75:8
**representative**
  7:20 8:10 20:20
  20:24 22:16 24:14
  30:3 33:2 35:15
  36:1 37:7 50:22
  50:23 73:7
**represented**  80:20
**reps**  64:13
**request**  5:15 16:13
  21:14 24:9 74:14
  76:19
**requested**  51:1
  68:17 84:10
**requests**  12:9,12
**requirement**  23:6
**reservation**  61:3
**respect**  7:12 8:10
  18:21
**responded**  31:22
  32:11 33:11 35:4
  37:11,16 66:24
**responds**  50:21,23
**response**  16:13
  21:13 24:8 30:24
  32:4,5 33:14
  37:17 52:20,25
  54:24 74:14 76:19
**responsive**  12:12
  12:13
**rest**  34:5 73:24
**restriction**  64:9
**result**  24:25
**results**  24:18
**reversed**  34:1
**review**  6:4 84:9
**reviewing**  50:3,13
  76:23

[richard - short]

**richard** 2:14 52:4
**right** 9:14 25:15
 27:19 30:8,22
 31:21 32:3,20
 34:13 36:8 41:12
 44:17,18 49:5
 53:2 54:9 56:8
 62:10 64:5 73:12
 73:19 77:6 80:3
**roy** 30:11
**royal** 1:7,12 4:12
 5:6 7:2,10 8:5,13
 8:14 11:4 13:3,10
 14:21 15:17,25
 17:5 19:1 25:9
 26:25 27:4,11
 31:7 37:15 38:23
 39:17 41:7 43:6
 44:1,12 45:5 46:2
 48:20,24 49:20
 50:15 51:2,7,18
 55:8,11,13,18,24
 59:10,19 60:2,6
 62:11 64:15 67:19
 68:15,18 69:1
 70:20 72:13 73:3
 73:10 78:1,22
 79:13 83:6
**royalseas.com**
 40:7
**rules** 4:25
**running** 70:21
**runs** 25:17

**s**

**s** 4:16,16,17
**sale** 22:12 58:20
 58:23,24 64:2
**sales** 20:9 22:9
 43:7 60:4
**save** 36:23 37:1,4

**saw** 58:13 73:13
**saying** 50:25 64:1
 67:8
**says** 25:3 27:18
 30:13,23 31:13
 40:17,25 41:14,18
 43:12 46:16,19
 50:13,21,22 52:10
 69:23 70:20 74:21
**schedule** 60:20
**screenshot** 3:13
 76:16
**screenshots** 24:13
 34:17
**script** 3:11 16:5,18
 16:20,25 17:20,25
 18:4,9,14,18,20
 21:24 22:20 23:8
 26:13,16,18 27:7
 27:9,12,24 30:25
 31:11,14,22 32:5
 32:23 33:6 35:2
 35:11,12 37:17
 48:24 49:3,11,16
 50:22 51:6,9,13
 52:20,25 54:14
 55:20 57:23 58:1
 63:6,7,9,13 65:9
 65:10,14,19 66:4
 66:6,9,12,15,20
 67:3,10 71:5
 79:10 80:2,5,14
 80:18,25
**scripts** 54:17
**scroll** 29:7
**sea** 4:13 5:6 8:13
 78:22
**seal** 83:20
**search** 74:18
**searched** 74:15

**seas** 1:7,12 7:2,10
 8:5,14 11:4 13:4
 13:10 14:21 15:17
 15:25 17:5 19:1
 25:10 26:25 27:4
 27:12 31:7 37:15
 38:23 39:17 41:7
 44:1,12 45:5 46:2
 48:20,24 49:20
 50:15 51:2,7,18
 55:8,11,13,18,24
 59:10,19 60:2,6
 62:11 64:15 67:19
 68:15,18 69:1
 70:20 72:13 73:3
 73:10 78:1 79:13
 83:6
**second** 3:16 7:11
 25:3 30:13 38:17
 40:3 43:7,12 57:5
**seconds** 67:13
 70:11 71:7 73:25
**see** 9:18 16:23
 27:17 28:10 29:11
 29:16 30:13,16
 31:4 40:11,14,21
 40:23 41:16,18
 42:2,5 43:14,19
 45:17,21 47:15
 48:6 49:13 51:4
 52:14 58:17,25
 62:13 64:1 68:19
 69:24 77:21
**seen** 9:1 16:15
 21:15 24:10 43:10
 76:8,21
**sell** 10:18,21 13:22
 64:23,25
**send** 37:18 38:24
 53:13 58:1 59:10
 59:15,19 60:2

 65:12 66:20 71:22
 71:24 72:5,10,11
 74:6
**sending** 66:7
 71:18
**sends** 37:19 60:6
**sent** 38:14 39:21
 40:4 41:8,14,22
 43:8 44:10 45:24
 46:20 47:10 48:12
 48:15 52:21,24
 53:16,21 54:20,23
 72:14,17,22,24
 73:2,3,16 74:21
 76:17 77:2 78:9
 78:10,18
**separate** 75:1,5,8
 75:19
**separately** 71:13
**september** 27:18
 63:2 64:7
**sequence** 7:15
**service** 10:22
 13:19 18:22 19:18
 20:1,12 30:3
 33:12 35:15 36:1
 36:13,25 37:6,20
 40:9 44:12 64:13
 73:7
**services** 10:18
 14:11 65:5
**set** 12:7 24:7 33:1
**setting** 5:21
**seven** 64:8
**she'd** 23:7,7 37:10
**she'll** 10:7
**sheet** 3:18 76:11
 83:7
**sheets** 28:4
**short** 38:18 49:9
 57:6 79:4

Veritext Legal Solutions
866 299-5127

[shoulder - three]

shoulder   6:14
show   6:14 29:6
    37:9 50:14 52:11
shows   75:14
shrugs   6:13
sign   30:14,25
    31:15,23,25 35:5
    37:12,16 38:25
    42:12 53:15,15
    54:21 78:5
signature   73:14
    84:21
signed   38:9 40:12
    42:13 43:23 44:5
    44:7,24 45:16,25
    47:6,13 48:17
    77:10,15,24 78:13
signing   19:11 53:8
    54:21 80:6
signnow   3:18
    48:12 53:18 75:2
    75:12 76:11,17
similar   73:18 77:9
similarly   1:5,10
simpler   34:21
sinistry   29:22
site   17:11
sites   75:12
situated   1:5,10
six   31:24 35:4
    42:12
sixth   30:12
slightly   80:16
slow   11:1
sold   59:2
solely   36:2
soliciting   14:12
somewhat   12:3
sorry   4:12 19:7
    37:22 38:12 59:25
    68:22

sort   9:9 26:10
    27:13
sound   62:14
sounds   62:14
source   17:7
southern   1:1
spaces   39:10
speak   27:21 34:6
speaking   7:21
    64:15
special   65:14
specific   7:15 22:8
    25:10 36:21 39:13
    53:20 71:2
specifically   8:7
    16:25 17:3 20:6
    28:2 49:1 54:5,6
    54:24 66:8,23
spell   4:14
spoke   23:24 30:14
    32:6 33:23,23
    34:2,11
stamped   30:11
standard   47:18
    49:17
standpoint   75:11
    75:18
start   8:18 16:4
    24:16 25:2 26:24
    30:4 38:23 55:9
    61:14 77:13
state   1:19 4:14
    83:2,13 84:2
stated   32:15
states   1:1
stating   53:14
stenographic
    84:11
stenographically
    84:8

store   17:18 72:13
stored   72:25
street   2:4
strike   7:17 31:5,19
    42:15 55:9 63:16
    66:1 72:3
struggle   10:8
stuff   29:20
subject   7:5
substance   7:13
substantive   6:6
successful   22:14
suggestions   54:3
suite   2:5,12
supervisor   41:20
    44:17
supervisors   67:9
supplemental   43:7
    45:11 68:10,12
support   5:4,5
supposed   23:10,13
    54:5,7,16 57:23
sure   6:12 11:8
    13:9 22:17 27:4
    30:22 33:16 34:8
    37:10 43:24 44:21
    44:25 46:15 49:5
    66:1 71:12 72:15
    73:24
survey   50:25
    51:22 53:2 67:23
    68:1,5 73:22 74:9
    80:6
suzanne   1:18 84:6
    84:22
sworn   4:5 83:5
system   24:17

|   t   |
|---|

tabs   58:17,17
take   5:14,20 49:8
    64:19 75:7

taken   1:18 6:17
    7:10 49:9 57:6
    79:4 83:6,6
talk   6:12 10:23
    63:12
talked   33:18 57:18
talking   15:3,5
tara   41:18 44:16
    65:11 75:14,15
team   36:23 37:1
telemarketing
    19:17
tell   11:13 20:5
    26:13,14 30:22
    35:25 67:22,25
telling   68:4
tells   67:18
term   23:11
termed   74:9
testified   4:5
testify   9:4,8 12:1
testimony   5:21 6:4
    6:19,22 37:10
thank   6:24 12:6
    13:1 23:25 56:12
    81:23
thing   10:25 37:15
    52:10 66:19 73:14
things   14:6 15:12
    19:9 63:13 64:23
    64:25
think   10:14,20
    16:4 29:20 30:11
    30:23 31:17 33:24
    48:5 68:8 69:11
    72:21 74:18,19
    75:23
third   4:21 29:16
thomas   2:7
three   12:8 35:7
    43:16,22 58:17

Page 13

[thumb - willing]

thumb  3:19
time  4:22 6:8,11
  10:3 14:24 26:4,8
  27:1,3 31:8 33:15
  36:24 47:18 49:3
  55:7 56:4,20
  60:23
times  4:20 22:22
today  5:3,5,22 6:3
  6:19,22 8:3,24 9:5
  74:10,13
todd  2:3
told  33:2 42:20
  52:1 54:13 57:22
  58:3,6,9 65:8,10
  66:3,5,8,23 67:9
  73:21
tom  4:10 53:14
top  40:16 61:21
  69:15
topic  11:25
topics  7:5,8 8:11
  9:3,5,9 12:2
tracking  45:20
transcript  6:14
  82:8 84:10,10
transfer  17:16
transferred  17:7
  22:11
transfers  17:10
  22:7
transmitted  75:3
transposed  11:17
travel  10:11 13:18
  13:20 14:11,25
  25:7,12 26:8 28:7
  81:7
traveled  14:7 27:1
  29:19 49:21 81:17
  81:18

traveling  13:20
trial  6:8
true  83:5 84:11
truth  28:23
try  5:8 13:22 36:3
  37:4 53:24 66:10
  66:24
trying  11:8 15:2
  30:21 32:2 34:19
  34:20 62:14 65:20
turn  8:24 30:10
  40:3 43:12 45:19
  46:5,19,24 47:9
  47:21 48:11
two  8:2 11:11
  16:21 36:3 38:24
  39:2 46:21 49:13
  54:20 76:17 77:6
type  59:24
typically  27:6

u

unclear  13:5,7
underlined  46:8
  47:2,22,23 48:1
underlying  39:10
  77:19
understand  5:10
  7:18 8:9 13:9 15:5
  15:8,9 19:19
  30:19 33:7 57:8
  60:18 65:18 74:11
  74:24 79:6
understanding
  12:24 15:2 35:17
  35:18,19
understood  67:2
unique  65:16,19
  66:12
united  1:1
unsure  54:9

upgraded  29:20
use  15:21 16:18
  23:10 25:11 31:2
  31:5 35:11 38:24
  45:8 53:13 54:6
  55:11 59:8 65:5
  73:2
useless  73:25
usually  13:13
  14:24 59:14 72:9

v

v  1:11 83:6
vacation  64:24
  65:1 68:15
various  47:1 54:3
vein  80:16
verbal  6:13
verbatim  63:9,10
verify  13:18
versed  36:25
vice  19:2,3,3,5
visited  17:9 50:14
vitale  1:18 84:6,22
voice  22:23
voiced  67:6
volunteer  31:18
voucher  25:10
vs  1:6

w

want  4:25 5:15
  6:11,12 8:2 11:19
  28:1 31:20 33:17
  37:25 49:4 51:25
  52:1
wanted  10:25
  40:14 61:10
wants  53:14 57:12
way  14:21 26:14
  29:6 31:7 33:4,19
  34:4 47:17 50:12

57:2 75:10 78:2
  80:2,6
ways  10:13 54:3
we've  51:24
web  68:16
website  17:2 51:1
  76:17
websites  17:8
  38:24 39:2
weird  42:16
welcome  6:6 10:21
went  50:25 53:9
  68:16 75:14
wheeler  2:7 3:5
  4:7,10 7:24 8:8,17
  8:22 9:11,16,23
  10:19 11:18,24
  12:20,22 15:13,15
  16:6,11 19:22,23
  21:11 23:18,25
  24:6 28:1,14,18
  29:8,15,25 34:22
  34:25 36:9 38:2,7
  38:16,19 42:23
  43:4 49:10 52:7,9
  57:5,7 59:5,7
  61:13 62:19 65:25
  66:22 67:16 70:7
  70:10 71:10 74:4
  74:17,23 75:4,7
  75:17,21 76:4,10
  76:15 79:3,5,20
  80:11 81:2,23
  82:1
wilder  3:17 69:9
  69:11,16 70:15
  71:13 73:19 75:23
  76:7,18 77:6,15
  77:24 78:5,17
willing  37:12

[wish - zeros]

**wish**   30:10
**withstanding**   12:2
**witness**   4:3 62:18
  65:22,24 66:19
  67:15 70:8 71:9
  74:2 79:19 80:10
  83:20
**witnesses**   43:13,16
**woman**   62:23
**woodland**   2:6
**word**   31:5 46:8
**words**   63:10
**work**   34:19 35:21
  54:7
**written**   30:21 80:2
**wrong**   45:3 68:21

| **x** |
| --- |

**x**   3:2

| **y** |
| --- |

**yeah**   21:7 29:11
  63:10
**year**   18:2 56:25
**yearly**   14:2
**years**   8:2

| **z** |
| --- |

**zeros**   61:16 69:8

Page 15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.