UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MCCURLEY and DAN DEFOREST, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>   v.<br><br>ROYAL SEA CRUISES, INC.,<br><br>                              Defendant. | Case No. 17-cv-00986-BAS-AGS<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT (ECF No. 165);**<br><br>**AND**<br><br>**(2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 160)** |

Plaintiffs bring a Motion for Summary Judgment ("Plaintiffs' MSJ") (ECF No. 160), which Defendant opposes (ECF No. 176) and Plaintiffs reply (ECF No. 181). Defendant brings an Amended Motion for Summary Judgment ("Defendant's MSJ") (ECF No. 165), which Plaintiffs oppose (ECF No. 175) and Defendant replies (ECF No. 183). The Court held oral argument on both motions on January 27, 2021. Based on the papers filed and the oral arguments of the parties, the Court **GRANTS** Defendant's Motion (ECF No. 165) and **DENIES** Plaintiffs' Motion. (ECF No. 160).

I.   BACKGROUND

Plaintiffs filed a Consolidated Class Action Complaint against Royal Seas Cruises, Inc. ("Royal Seas") alleging violations of the Telephone Consumer Protection Act

("TCPA"), 47 U.S.C. §§227 *et seq.* and California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630 *et seq.* (ECF No. 31.) The Court certified a class with respect to the TCPA only of:

> All persons within the United States who received a telephone call (1) from Prospects, DM, Inc. on behalf of Royal Seas Cruises, Inc. (2) on said Class Member's cellular telephone (3) made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, (4) between November 2016 and December 2017, (5) where such calls were placed for the purpose of marketing, (6) to non-customers of Royal Seas Cruises, Inc. at the time of the calls, and (7) whose cellular telephone number is associated in Prospects DM's records with either diabeteshealth.info or www.yourautohealthlifeinsurance.com.

The Court also certified a Transfer Subclass of "[a]ll members of the Class whose call resulted in a transfer to Royal Seas Cruises, Inc." (ECF No. 87.) At Plaintiffs' request, the Court later decertified the class in part and allowed Plaintiffs to proceed solely on the Transfer Subclass. (ECF No. 191.)

Both Plaintiffs and Defendant now bring Motions for Summary Judgment. (ECF Nos. 160, 165.) Both Motions address three of the same issues: (1) whether proof exists that the calls were made using an automatic telephone dialing system ("ATDS") or prerecorded voice; (2) whether Royal Seas Cruises Inc. ("Royal Seas") can be held vicariously liable for the calls placed by Prospect DM ("Prospect"); and (3) whether Royal Seas has any evidence to support its defense that the calls were made with the express consent of all class members.

Defendant's Motion for Summary Judgment also challenges the TCPA as a violation of the constitutional right to free speech and moves for summary judgment on the CIPA claims. These last two arguments can be dispensed with quickly. Since Plaintiffs do not respond to Defendant's Motion for Summary Judgment on the CIPA claims,[1] the Court concludes Plaintiffs have waived this claim and **GRANTS** Defendant's

---

[1] The Court notes Plaintiffs also did not move to certify a class with respect to the CIPA claims.

Motion for Summary Judgment on this ground. *See Hurd v. Terhune*, 8 Fed. App'x 676, 677 (9th Cir. 2001) (finding plaintiff waived a claim "by failing to delineate it specifically and explicitly in his opposition to defendant's motion for summary judgment") (citing *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)).

On the other hand, the Ninth Circuit has clearly held that the TCPA does not violate the First Amendment. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014) (citing *Moser v. FCC,* 46 F.3d 970, 973-4 (9th Cir. 1995)), *aff'd* 577 U.S. 153 (2016) as revised (Feb. 9, 2016). Therefore, the Court denies Defendant's Motion on this ground.

The remaining three issues, however, require greater analysis. Ultimately, for the reasons stated below, the Court concludes Plaintiffs fail to elicit any facts supporting their theory of vicarious liability. Thus, the Court denies Plaintiff's Motion (ECF No. 160) and grants Defendant's Motion (ECF No. 165).

**II.    STATEMENT OF FACTS**

The Court laid out the facts of this case in its Order Granting in Part Class Certification. (ECF No. 87.) Since the facts generally remain the same, the Court adopts its Statement of Facts from that order.

Generally, Royal Seas sells vacation packages by calling potential leads. (Joint Statement of Undisputed Facts ("JSUF") ¶ 1, ECF No. 184; Declaration of Jennifer Poole ("Poole Decl.") ¶ 4, Ex. 5 to Def.'s MSJ, ECF No. 165-6.) In November 2016, Prospect and Royal Seas entered into an agreement under which Royal Seas purchased leads from Prospect for possible purchasers of the Royal Seas vacation packages. (JSUF ¶¶ 3–4; Declaration of Joshua Grant ("Grant Decl.") ¶ 7, Ex. 6 to Def.'s MSJ, ECF No. 165-7.) The contract between the two parties delineated that Royal Seas would only pay for leads that were "generated in a TCPA-compliant manner." (Grant Decl. ¶ 7.)

According to Joshua Grant, the President of Prospect, a "real human being" from Prospect would call the telephone number to inquire whether the individual being called wants to hear more about the offer from Royal Seas. (Grant Decl. ¶ 12.) If so, then the Prospect employee would "live transfer" the call to a representative at Royal Seas. (*Id.*;

Poole Decl. ¶ 5.) The "live human being" who placed the call from Prospect had "pre-scripted voice prompts" allowing the human being to use the computer to make the initial approach to the potential customer. (Deposition of Jennifer Poole ("Poole Dep.") 25:12-17, Ex. 4 to Def.'s MSJ, ECF No. 165-5; Deposition of Joshua Grant ("Grant Dep.") 167–173, Ex. 3 to Def.'s MSJ, ECF No. 165-4.) If the agent clicked the voice prompt, the prompt played. (Grant Dep. 168–171.) However, there was always a live agent on the calls. (Grant Dep. 225–227.) Some of the agents opted to use their own voices instead of the voice prompts. (Grant Dep. 227.)

Prospect used multiple third-party call centers to actually make the calls. (Grant Dep. 121–125.) When a Prospect agent was logged into the phone system and was ready to accept a call, he or she would hit a button and receive the call generated by the third-party dialer. (Grant Dep. 177.) There is no information in the record about how this third-party dialer placed the call.

Prospect received the leads from third-party web publishers. (Grant Dep. 133.) The web publisher would send the data about the telephone numbers through an application programming interface ("API") into the Prospect data base. (Grant Dep. 134.) These web publishers were required to ensure that the telephone numbers being called had opted in to receiving the telephone call. (Grant Dep. 149–154.) Typically, the web publishers would give Prospect all the opt-in data when Prospect purchased the leads from them. (Grant Dep. 433–434.) Similarly, Prospect sent all opt-in data for each lead transferred to Royal Seas via API at the time the customer was live transferred. (Poole Decl. ¶ 8.)

Prospect also checked by reviewing the website and the opt-in language and by verifying that their company name was in the opt-in language. (Grant Dep. 433–434.) Prospect employs TCPA attorneys and investigates any complaint about a violation of the TCPA. (Grant Dep. 161.) Prospect kept its own Do Not Call list, which was uploaded directly into the Prospect system bypassing the third-party dialer. (Grant Dep. 281–282.) This upload blocked the call from being made to anyone on the Do No Call list. (*Id*.)

Royal Seas received an opt-in for class representative John McCurley from the website www.diabeteshealth.info, which is a domain owned by Landfall Data, LLC ("Landfall"). Kevin Brody is the CEO of Landfall. (Declaration of Kevin Brody ("Brody Decl.") ¶¶ 2, 8, Ex. 7 to Def.'s MSJ, ECF No. 165-8.) According to Brody, every lead provided by Landfall was created by a user visiting the website landing page and completing the appropriate form. (Brody Decl. ¶ 10.) The individual must complete a form by entering his or her name, email address, and telephone number and by checking a box consenting to be called. (Brody Decl. ¶12.) The individual must then hit "NEXT" to process the opt-in. (*Id.*) Brody provides a copy of the opt-in form allegedly created by John McCurley's telephone number on April 30, 2017. (Brody Decl. ¶ 13.)

There is some confusion as to the website that provided the opt-in for class representative Daniel Deforest. Although the information provided by Royal Seas was that Mr. Deforest's opt-in came from the website domain www.myhealthcareauthority.com, Prospect indicates the correct website for Mr. Deforest's opt-in was www.yourautohealthlifeinsurance.com. (Grant Decl. ¶ 30.)

The website myhealthcareauthority.com is owned by Citadel Marketing Group, LLC f/d/a Transparent Data Services ("Citadel"). (Declaration of David Andras ("Andras Decl.") ¶ 3, Ex. 8 to Def.'s MSJ, ECF No. 165-9.) David Andras is the owner of Citadel. (Andras Decl. ¶ 2.) Any lead provided by Citadel was generated by an individual who visited its website and filled out a form including contact information, telephone number and consent to be called. (Andras Decl. ¶ 6.) All the information must be filled out, the consent box must be checked, and the user must click "submit" or the contact information would not be stored. (Andras Decl. ¶ 12.)

Neither party offers information about the ownership or practices of www.yourautohealthlifeinsurance.com, which is the website at issue in the certified class. Plaintiffs offer two experts (Nathan Bacon and Wesley Weeks) who claim the websites www.diabeteshealth.info and www.myhealthcareauthority.com could not have generated the opt-in information or traffic that they claim to have generated. (Expert Report of

Nathan Bacon ("Bacon Report"), Ex. C to Pls.' Mot. for Class Certification, ECF No. 151-4; Expert Report of Wesley Weeks ("Weeks' Report"), Ex. D to Mot. to Exclude, ECF No. 164-5.)[2]

Prospect did not own or control the websites. (Grant Dep. 938.) Prospect did not give the name of the third-party website publishers to Royal Seas because that ran the risk that Royal Seas would cut Prospect out and go directly to the third-party web publishers for leads. (*Id*. 945.) Neither David Andras and Citadel, nor Kevin Brody and Landfall, had any contact with Royal Seas. (Andras Decl. ¶ 15; Brody Decl. ¶ 4.) However, when Royal Seas first entered into a contract with Prospect, Royal Seas looked at several sample sites provided by Prospect to make sure the opt-in language was sufficient. (Poole Dep. 14:13–15:19.)

Class representative John McCurley received multiple calls on his cell phone—from what turned out to be Prospect—in which a pre-recorded voice asked three questions: (1) whether he was at least 21 years old; (2) whether he could travel within the next 18 months; and (3) whether he had a major credit card. (Declaration of John McCurley ("McCurley Decl.") ¶¶ 4–5, ECF No. 49-6.) When he answered yes, he was then connected to a live person who asked whether he was interested in a cruise. (McCurley Decl. ¶ 6.) Although the opt-in documentation for McCurley's telephone said that someone named Jose Fernandez in Concord, CA had consented to receive calls when visiting the www.diabeteshealth.info website, McCurley has never visited this website, never used the name "Jose Fernandez," nor has he ever lived in Concord, CA. (McCurley Decl. ¶¶ 11–15, 17–25.) McCurley never consented to having his cell phone called by Prospect or Royal Seas. (McCurley Decl. ¶ 6.)

Similarly, class representative Dan Deforest received a call from what turned out to be Prospect on his cell phone with a prerecorded voice message, which eventually

---

[2] Defendant moves to exclude the testimony of Mr. Bacon and Mr. Weeks. (ECF Nos. 151, 164.) Since the Court does not rely on the opinion of either expert to formulate this opinion, the Motions will be **DENIED AS MOOT**.

connected him to a live agent from Prospect who transferred him to a live person at Royal Seas. (Declaration of Dan Deforest ("Deforest Decl.") ¶ 3, ECF No. 49-7.) Although the opt-in documentation for Deforest's telephone said he consented to the call while visiting www.myhealthauthority.com, he had never visited this website. (*Id.* ¶ 8.) He also never consented to having his cell phone called by Prospect or Royal Seas. (*Id.* ¶ 6.) And his browsing history reflects that he did not visit the website www.yourauto healthlifeinsurance.com at the time in question. (Ex. A to Declaration of Thomas E. Wheeler, ECF No. 77-1.)

## III. ANALYSIS

### A. Standard

Summary Judgment is appropriate under Rule 56(c) when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen*

*v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 242, 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See* Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

**B.   TCPA**

The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." *Id.* § 227(a)(1).

The Federal Communications Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. 47 U.S.C. § 227(b)(2). The FCC has promulgated a comprehensive set of rules governing telemarketing and telephone solicitation calls, which require "prior express written consent" for such calls. *See* 47 C.F.R. § 64.1200(a)(1), (2). "Telemarketing" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(12). "Prior express written consent" means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." *Id.* § 64.1200(f)(8). A "signature" may include "an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law." *Id.* § 64.1200(f)(8)(ii).

### 1. Use of ATDS or Prerecorded Voice

In determining whether a call was made using an ATDS, the "focus should be on whether the equipment has the capacity" to be used as an ATDS, even if it does not actually function as an ATDS. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). "[T]he term [ATDS] means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018).

When determining whether the equipment has the capacity to act as an ATDS, courts must ask, "'[H]ow much is required to enable the device to function as an autodialer?' In other words, 'does the equipment require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?'" *Meier v. Allied Interstate, LLC*, No. 18-cv-1562-GPC-BGS, 2020 WL 819014, at *8 (S.D. Cal. Feb.

19, 2020) (quoting *ACA Int'l v. Fed. Communications Comm'n*, 885 F.3d 687, 696 (D.C. Cir. 2018)).

This does not mean that the equipment must operate without any human intervention whatsoever. *Id.* "Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning the machine on or initiating its functions." *Marks*, 914 F.3d at 1052–53. "In addition, 'the test for human involvement looks to the time a call or message is sent or dialed, not what might have happened *earlier* to enter the phone number into the system.'" *Meier*, 2020 WL 819014, at *6 (quoting *Washington v. Six Continents Hotels, Inc.*, No. 216-cv-03719-ODW, 2018 WL 4092024, at *5 (C.D. Cal. Aug. 24, 2018)).

Thus, in *Meier*, the district court held that a system requiring the intervention of human "clicker agents" to dial was not an ATDS. 2020 WL 819014, at *6. "Though a single click on a computer screen 'may seem too minimal' an act of human intervention, it is not in aggregate.'" *Id.* (quoting *Collins v. Nat'l Student Loan Program*, 360 F. Supp. 3d 268, 273 (D.N.J. 2018)).

In this case, there is no evidence offered by the Plaintiffs as to how the calls were placed or what the capacity was of the equipment making these calls. The calls were placed by a third-party call center, but what type of equipment was used to place the call, and whether the calls were placed by hand from a master list or from a system that used a random or sequential number generator, is uncertain. However, Plaintiffs argue that they system described by Grant is an ATDS: the system automatically places the call when the agent is ready. Missing, however, is what the third-party dialer was required to do to place the call before it was transferred to the Prospect agent. There is simply no evidence as to whether an ATDS was or was not used.

However, there is clear evidence that an artificial or prerecorded voice was used on some occasions, but not every occasion. (Grant Dep. 41:167–42:168, 51:225.) Additionally, a "live human being" was always present even when a prerecorded voice was used. Although use of a prerecorded voice in this fashion may be sufficient to qualify

as a violation of the TCPA, Plaintiffs now face problems with their certified class, since they now face individual inquiry issues as to which calls made to the class were made using a prerecorded voice and which were made without. However, as discussed below, the Court need not reach this issue because it finds that Plaintiffs fail to establish that Royal Seas is vicariously liable for the acts of Prospect and, indirectly, the claimed malfeasance by the third-party web sites.

### 2. Vicarious Liability of Royal Seas for Calls Placed by Prospect

It is undisputed that none of the calls at issue were placed by Royal Seas. (JSUF ¶ 2.) For Royal Seas to be liable for the calls placed by Prospect, Plaintiff must show that there is an agency relationship between Prospect and Royal Seas and that Prospect had actual authority, apparent authority, or ratified the calls made in alleged violation of the TCPA. *See Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019); *Kristensen v. Credit Payment Services*, 879 F.3d 1010, 1014 (9th Cir. 2018) (adopting FCC rule that "calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call"); *Gomez v. Campbell-Ewald Co.*, 768 F.3d at 879. Plaintiff has the burden of establishing that an agency relationship exists. *Henderson*, 918 F.3d at 1073.

Any claim of actual authority in this case is belied by the express language in the contract between Royal Seas and Prospect requiring that any leads be from individuals who had consented to be called. *See Jones v. Royal Admin. Svcs., Inc.,* 887 F.3d 443, 446 (9th Cir. 2018). ("Any claim that [Defendant] had actual authority to place the calls is precluded by the express language in [Defendant's] contract . . . expressly prohibiting telemarketing methods that would violate state or federal law, including laws governing robocalls.")

"'Apparent authority is the power held by an agent, or other actor, to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestation.'" *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274, 2015 WL

3526253, at *8 (C.D. Cal. May 18, 2015) (quoting Restatement (Third) of Agency § 2.03 (2006)).  Critical to the analysis of "apparent authority" is "'proof of something said or done by the alleged principal, on which the plaintiff reasonably relied.'" *Thomas v. Taco Bell Corp.*, 582 Fed. Appx. 678, 679 (9th Cir. 2014) (quoting *NLRB v. Dist. Council of Iron Workers of Cal, & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997)); Restatement (Third) of Agency § 2.03 (2006) (third party's belief must not only be reasonable but "traceable" to the principal's manifestations).  "[T]he ostensible authority of an agent cannot be based solely on the agent's conduct." *C.A.R. Transp. Brokerage Co. Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  Here, the only arguable manifestation by Royal Seas is Royal Seas' contract with Prospect allowing it to approve the prerecorded scripts used by Prospect.  This demonstrates Royal Seas' knowledge that prerecorded scripts would be used, but it provides no evidence that Royal Seas had any reason to believe the individuals Prospect called with those prerecorded scripts had not agreed to this contact by entering their names in a third-party website.  These are the consenting callers Prospect agreed by contract to transfer to Royal Seas, and these are the consenting callers Royal Seas had every reason to believe were being transferred to them.

Plaintiffs' main argument is that Royal Seas should be held liable under the agency theory of "ratification."  (Pls.' MSJ at 18.)  "'Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.'" *Id.* (quoting Restatement (Third) of Agency § 4.01).  "To constitute ratification . . . a principal need not explicitly communicate consent to an agent." *Id.* at 1074.  The ratification can be achieved simply by rewarding or congratulating the agent's behavior or failing to object or repudiate the action. *Id.*  "The focal point . . . is an observable indication that a principal has exercised an explicit or implicit choice to consent to the purported agent's acts." *Id.*

There are two ways to prove ratification:  (1) actual knowledge and (2) willful ignorance.  Under "actual knowledge," a principal can be liable under ratification if it knowingly accepts the benefit of the act. *Henderson*, 918 F.3d at 1073.  The plaintiff must

point to evidence that the principal had knowledge of the act, exercised choice, and consented to the acts committed by the agent. *Id.* Under a willful ignorance theory, a principal assumes the risk of lack of knowledge when the plaintiff shows that the principal "had knowledge of facts that would have led a reasonable person to investigate further but ratified [the principal's] acts anyway without investigation." *Kristensen*, 879 F.3d at 1015.

There is no evidence that Royal Seas had actual knowledge that the calls Prospect made were placed without actually receiving an opt-in from the person being called. In fact, Prospect and the third-party websites maintain to this day—not only to Royal Seas but also to the Court—that all calls were made only after receiving consent from the person being called. Plaintiffs point to no evidence that Royal Seas had knowledge of any TCPA violation.

Instead, Plaintiffs argue that there is evidence that Royal Seas willfully ignored the violations because it had knowledge of facts that would have led a reasonable entity to investigate further. Specifically, Plaintiffs argue that Royal Seas should have known to investigate because: (1) Royal Seas did nothing to verify that Prospect was following the TCPA as it contracted to do; (2) cruise lines have been subject to approximately 100 TCPA actions in the past; and (3) the fact that so few people actually purchased the cruises after transfer should have alerted Royal Seas to the fact that not everyone consented to be called. What is noticeably missing from Plaintiffs argument is that Royal Seas ever received information from any of the individuals who were transferred that they had not consented to be called. Simply the lack of verification is insufficient. Royal Seas specifically contracted with Prospect for leads that had consented to be called. Royal Seas also looked at a sampling of the websites to make sure the opt-in language was sufficient. In the absence of any evidence that this opt-in language was not being used or that Prospect was not conducting itself as it contracted to do, Plaintiffs simply cannot prove that Royal Seas ratified any violation by willful ignorance.

Additionally, the fact that numerous cruise companies have been sued for TCPA violations explains why Royal Seas was careful to include language requiring adherence

to the TCPA in its contract with Prospect and why it required Prospect to show it how the opt-in language would look so its attorneys could approve. This alone does not demonstrate that Royal Seas was on notice that Prospect was violating the law.

Finally, the fact that a small number of those contacted actually bought cruises is not helpful. There are any number of reasons why someone who agreed to be contacted about a cruise might ultimately decide not to purchase. In the absence of evidence that Royal Seas received any complaints about the calls, it is not reasonable to conclude that Royal Seas had some notice that the reason for the low rate of conversion was because these people had not consented to be called.

Since Plaintiffs provide no evidence to support their theory of vicarious liability, the Court will **GRANT** Royal Seas' Motion for Summary Judgment on this ground

### 3. Consent to be Called

Because the Court finds no vicarious liability for Royal Seas, this last issue is moot. However, the Court notes that the Declarations of McCurley and Deforest explicitly stating that they did not consent to be called, nor had ever visited the websites at issue, raise an issue of fact for the jury to determine, at least with respect to the named Plaintiffs.

## IV. CONCLUSION

Because the calls at issue were placed by a third-party caller at the behest of Prospect, not Royal Seas, and because Royal Seas has no evidence that would support its theory that Royal Seas is vicariously liable for the calls placed by Prospect, the Court **GRANTS** Defendant's Amended Motion for Summary Judgment (ECF No. 165) and **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 160). In light of this decision, the Court finds the remaining motions (ECF Nos. 151, 159, 163 and 164) are all **MOOT**. The clerk is directed to enter a judgment in favor of Defendant and against Plaintiffs and to close the case.

**IT IS SO ORDERED.**

**DATED: January 28, 2021**

Hon. Cynthia Bashant
United States District Judge